1:24-CV-01319-TWT-CMS

# EXHIBIT A –

# JHOSTIN QUINONES

# DEPOSITION

JHOSTIN NUNEZ-QUINONES                                November 06, 2024
QUINONES V. FLOCK GROUP, INC.                                    1—4

**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

JHOSTIN QUINONES,                      No. 1:24-CV-01319

   Plaintiff,

v.

FLOCK GROUP, INC.,

   Defendant.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPED DEPOSITION OF

JHOSTIN NUNEZ-QUINONES

November 6, 2024

10:01 a.m.

1075 Peachtree Street, NE

Suite 1700

Atlanta, Georgia

Marcella Daughtry, RPR, RMR

Georgia License No. 6595-1471-3597-5424

California CSR No. 14315

**Page 2**

APPEARANCES OF COUNSEL

For the Plaintiff:

   THE WORKERS FIRM
   MR. PATRICK REID
   2 20th Street North, Suite 900
   Birmingham, Alabama 35203
   patrick@theworkersfirm.com

For the Defendant:

   DUANE MORRIS LLP
   MR. ADAM C. KEATING
   MR. ZACHARY J. MCCORMACK
   1075 Peachtree Street NE, Suite 1700
   Atlanta, Georgia 30309
   404-253-6988
   akeating@duanemorris.com
   zmccormack@duanemorris.com

Also Present:

   Laura McCormick
   Rick Richey, videographer

**Page 3**

INDEX OF EXAMINATION

WITNESS: JHOSTIN NUNEZ-QUINONES

| EXAMINATION | PAGE |
|---|---|
| BY MR. KEATING | 8 |
| BY MR. REID | 167 |
| | |
| FURTHER EXAMINATION | |
| BY MR. KEATING | 170 |

* * *

**Page 4**

INDEX TO EXHIBITS

| EXHIBITS | | PAGE |
|---|---|---|
| Exhibit 1 | Notice of Deposition | 11 |
| Exhibit 2 | Complaint for damages | 33 |
| Exhibit 3 | Offer of Employment dated 6/4/21 | 50 |
| Exhibit 4 | Employee Handbook FLOCK000066 to 105 (Confidential) | 59 |
| Exhibit 5 | Harassment-Free Workplace Policy FLOCK000209 to 211 (Confidential) | 61 |
| Exhibit 6 | Anti-Harassment Training Policy FLOCK000107 to 108 (Confidential) | 61 |
| Exhibit 7 | Certificate of Training Completion FLOCK000106 (Confidential) | 62 |
| Exhibit 8 | Confidential Information Assignment Agreement FLOCK000215 to 227 (Confidential) | 62 |
| Exhibit 9 | Corrective Action Form dated 10/13/22 FLOCK000015 to 16 (Confidential) | 65 |
| Exhibit 10 | E-mail chain from Omar Lodge to Jhostin Nunez 10/13/22 FLOCK000042 (Confidential) | 74 |
| Exhibit 11 | Messages Flock 000025 (Confidential) | 76 |



JHOSTIN NUNEZ-QUINONES
QUINONES V. FLOCK GROUP, INC.

November 06, 2024
5–8

Page 5

INDEX TO EXHIBITS, CONT'D

| EXHIBITS | | PAGE |
|---|---|---|
| Exhibit 12 | Messages<br>Flock 000022<br>(Confidential) | 80 |
| Exhibit 13 | E-mail chain from Omar Lodge<br>to Jhostin Nunez 3/7/23<br>Flock 000034<br>(Confidential) | 84 |
| Exhibit 14 | Messages<br>Flock 000020 to 21<br>(Confidential) | 85 |
| Exhibit 15 | E-mail chain from Omar Lodge<br>to Jhostin Nunez 3/20/23<br>Flock 000031<br>(Confidential) | 92 |
| Exhibit 16 | Device Support Engineer 1<br>Job description<br>Flock 000062 to 63<br>(Confidential) | 99 |
| Exhibit 17 | E-mail from Omar Lodge to<br>Jhostin Nunez 8/9/23<br>Flock 000045<br>(Confidential) | 108 |
| Exhibit 18 | E-mail chain from Omar Lodge<br>to Jhostin Nunez 9/19/23<br>Flock 000038 to 40<br>(Confidential) | 112 |
| Exhibit 19 | E-mail from Omar Lodge to<br>Jhostin Nunez 11/2/23<br>Flock 000029<br>(Confidential) | 130 |
| Exhibit 20 | E-mail chain from Jhostin Nunez<br>to People team 11/2/23<br>Flock 000026<br>(Confidential) | 134 |

Page 6

INDEX TO EXHIBITS, CONT'D

| EXHIBITS | | PAGE |
|---|---|---|
| Exhibit 21 | E-mail chain from Jhostin Nunez<br>to Laura McCormick 11/2/23<br>Flock 000027<br>(Confidential) | 140 |
| Exhibit 22 | Flock Safety Termination Form<br>Flock 000019<br>(Confidential) | 147 |
| Exhibit 23 | Charge of Discrimination | 149 |
| Exhibit 24 | Note for Employee file<br>dated 8/22/24<br>FLOCK000312<br>(Confidential) | 151 |
| Exhibit 25 | Plaintiff's First Supplemental<br>Responses to Defendant's First<br>Interrogatories | 165 |

* * *

Page 7

1    THE VIDEOGRAPHER:  Good morning, ladies and
2  gentlemen.  This is the beginning of media number one in
3  the video-recorded deposition of Jhostin Quinones.
4    Today's date is November 6th, 2024.  It's 10:01 a.m.,
5  Eastern Daylight Time, and the case is Jhostin Quinones,
6  plaintiff, versus Flock Group, Inc., defendant, Civil
7  Action File Number 1:24-cv-01319, in the United States
8  District Court for the Northern District of Georgia,
9  Atlanta Division.
10    My name is Rick Richey.  I am the videographer.
11  The court reporter is Marcie Daughtry, and we represent
12  Esquire Deposition Solutions.
13    Would the attorneys please introduces
14  themselves.
15    MR. KEATING:  My name is Adam Christopher
16  Keating.  I'm an attorney with Duane Morris representing
17  Flock Group, Inc., the defendant in the matter.
18    MR. McCORMACK:  My name is Zachary John
19  McCormack.  I am an attorney with Duane Morris, and I am
20  also representing the defendant, Flock Group, in the
21  matter.
22    MR. REID:  Patrick Reid at The Workers Firm for
23  plaintiff.
24    THE VIDEOGRAPHER:  Would the court reporter
25  please swear the witness.

Page 8

1    JHOSTIN NUNEZ-QUINONES,
2  called as a witness herein, having been first duly sworn
3  by the shorthand reporter to speak the truth and nothing
4  but the truth, was examined and testified as follows:
5
6    EXAMINATION
7  BY MR. KEATING:
8    Q  Good morning, Mr. Quinones.  My name is Adam
9  Keating.  I know we introduced our -- myself off the
10  record.  You mentioned that your first name, you go by
11  Jhostin.  Is it okay if I call you that today?
12    A  Yes.
13    Q  Okay.  Can you please state your full name for
14  the record.
15    A  Jhostin Nuñez-Quinones.
16    Q  And you understand you are here for your
17  deposition in the case that you filed against Flock
18  Group, Inc.?
19    A  Correct.
20    Q  And we'll just go over some quick ground rules.
21  Have you ever had your deposition taken before?
22    A  No.
23    Q  Okay.  So this is a -- a question and answer
24  type setup, where we have a court reporter.  We have a
25  videographer.  I think the videographer --



Page 9

1    Do you have Mr. Quinones in frame and all that
2  good stuff?
3        Okay.  The purpose of the deposition, so
4  it's -- it's -- again, you filed a lawsuit against Flock
5  Group, Inc.  We are here to take your deposition.  We
6  have a court reporter typing out your answers, as well as
7  a videographer.  It's a question and answer.  From time
8  to time, your counsel may object to the form of the
9  question.  You still have to answer the question unless
10  they instruct you not to answer.
11       Since it is a question and answer and we have
12  somebody taking it down, I will ask that we try not to
13  talk over each other, and that I will need verbal
14  responses, because she can't take down head nods, yes or
15  no, either way.  So I will just ask that any answer that
16  I -- you know, any question that I ask you answer
17  verbally.
18       Is that fair?
19    A  Understood.  Yes.
20    Q  If you have any questions, like any clarifying
21  questions, you don't understand the question that I am
22  asking, you know, please feel free to tell me you don't
23  understand, and I will see if I can rephrase it or
24  reframe it to a way that you can better understand it.
25       As I mentioned, we're going to try to avoid

Page 10

1  interruptions to the best we can and avoid talking over
2  each other, and I will need audible responses.
3        As regarding breaks, I usually take a break
4  about every hour, but if you need to take a break at any
5  time -- you know, this isn't the CIA -- you are free to
6  take a break.  I would just ask that if there is a
7  question pending, that you answer the question and then
8  we take a break.
9        Is that fair?
10    A  Understood.
11    Q  And you understood that you, you know, swore an
12  oath to tell the truth today; is that correct?
13    A  Understood.  Yes.
14    Q  And you understand that that carries the same
15  weight and effect as if you were in a court of law.
16       Do you understand that?
17    A  Understood.  Yes.
18    Q  And that there's possible criminal or civil
19  penalties that can result if you do not tell the truth
20  during this deposition?
21    A  Understood.  Yes.
22    Q  I'm going to hand you what I'm going to mark as
23  Exhibit 1.
24       Here's a copy for you.  A copy for -- can we go
25  off the record for just a second?

Page 11

1        (Off-the-record discussion.)
2        (Deposition Exhibit 1 was marked for
3  identification.)
4    Q  BY MR. KEATING:  All right.  Mr. Jhostin, I --
5  I handed you what we marked as Exhibit 1.  This is just
6  your notice of deposition.
7        Have you seen this document before?
8    A  Yes.
9    Q  And it just states the date and time.  So today
10  is November 6th.  It's about 10:00 a.m., and we're taking
11  this deposition via stenographer and videographer.
12       Do you understand that?
13    A  Yes.
14    Q  Are you -- have you taken any medications this
15  morning?
16    A  No.
17    Q  Is there any reason that you are not able to --
18  be able to testify today?
19    A  No.
20    Q  Got enough sleep last night?
21    A  Yes.
22    Q  Okay.  Have you consumed any other substances
23  this morning other than a prescription medicine or drugs
24  that may impair your ability to testify?
25    A  No.

Page 12

1    Q  Okay.  So there's no reason you can't listen
2  and understand the question and then respond to that
3  question?
4    A  Yes, I can -- I can listen and answer your
5  questions.
6    Q  Okay.  Perfect.
7        What have you done to prepare for this
8  deposition?
9    A  In regards to?
10    Q  Did you meet with your attorney prior to the
11  deposition?
12       MR. REID:  Hold on.  Just you can talk about,
13  yes, we met, but just don't say anything that we talked
14  about.  Okay?
15       THE WITNESS:  Yes.
16       We met.
17    Q  BY MR. KEATING:  When did you meet?
18    A  It was on a phone call.
19    Q  When -- when did that phone call take place?
20    A  Yesterday.
21    Q  Okay.  So yesterday, November 5th; is that
22  correct?
23    A  Correct.
24    Q  How long was that phone call?
25    A  It was two phone calls.  The first one, I



JHOSTIN NUNEZ-QUINONES                                November 06, 2024
QUINONES V. FLOCK GROUP, INC.                                    13–16

Page 13

1  believe to my best of my recollection, was around 30, 20
2  minutes.  The second one was around 15 minutes.
3      Q  Okay.  So you had two phone calls, one lasting
4  about 20 to 30 minutes, and then another phone call the
5  same day?
6      A  Yes.
7      Q  Lasting about 15 minutes; is that correct?
8      A  Correct.
9      Q  Was that a virtual phone call or just over the
10  telephone?
11      A  Over the telephone.
12      Q  Okay.  Did you review any documents on that
13  phone call?
14      A  In regards to what?
15      Q  In regards to your case.
16      A  The documents, the one that were provided, yes,
17  I reviewed some.
18      Q  Did you take any notes on that phone call?
19      A  No.
20      Q  Did you bring any notes with you today?
21      A  No.
22      Q  Other than the two phone calls that took place
23  yesterday, November 5th, did you do anything else to
24  prepare for this deposition, reviewing documents or
25  anything else on your own?

Page 14

1      A  Only the documents that was provided, yes.
2      Q  You mean the documents that the defendant
3  provided in discovery in this matter?
4      A  Correct.
5      Q  Do you remember what documents you reviewed?
6      THE WITNESS:  Answer that question?
7      MR. REID:  Yeah, that's fine.
8      THE WITNESS:  Gotcha.
9      So we reviewed the -- some e-mails that was
10  sent, human resources, and also some Slack messages.
11      Q  BY MR. KEATING:  Any other documents you can
12  recall reviewing?
13      A  To my -- also my employment information.
14  So it's my pay.
15      Q  Anything else?
16      A  That's to my best of recollection.
17      Q  Where did you take these phone calls from?
18      A  It was from my job on my phone, my personal
19  phone.
20      Q  Was anyone else present on the phone other than
21  yourself and your attorney?
22      A  It was Douglas McMillan and Patrick Reid and
23  myself.  That's it.
24      Q  And Douglas, is he also an attorney with
25  Patrick's law firm?

Page 15

1      A  Yes.  Correct.
2      MR. REID:  Yeah.
3      Q  BY MR. KEATING:  Anybody other than yourself
4  and your attorneys on the phone call?
5      A  No.
6      Q  Have you spoken with any current or former
7  Flock employees about this deposition?
8      A  No.
9      Q  Since your termination from Flock, have you
10  spoken with any current or former Flock employees?
11      A  No.
12      Q  Have you remained friends with anyone from
13  Flock?
14      A  No.
15      Q  Since filing your lawsuit, have you made any
16  notes or, you know, documents regarding your case other
17  than in consultation with your attorneys?
18      A  No.
19      Q  During your employment, did you make any notes
20  or keep any journals, you know, about your allegations in
21  this matter?
22      A  The only documents that I have was the e-mail
23  that I sent, and that's it.
24      Q  Okay.  So no other personal notebooks,
25  journals, anything like that?

Page 16

1      A  Correct.
2      Q  Okay.  No diaries, correct?
3      A  Correct.
4      Q  Have you turned over to your attorney all
5  documents that you have related to your employment at
6  Flock?
7      A  Correct.
8      Q  Is that a yes?
9      A  Yes.
10      Q  When did you first obtain an attorney relating
11  to your employment with Flock?
12      A  That would be around one week before my
13  termination.
14      Q  And who was the law firm that you retained one
15  week before your termination?
16      A  It was Barrett & Farahany.
17      Q  What made you seek out Barrett & Farahany?
18      A  So I just Googled.  That's the first thing that
19  showed up, and I contacted them.
20      Q  So is that beginning -- we can get more precise
21  with the dates, but around the beginning of November of
22  2023?
23      A  Correct.
24      Q  Did you retain an attorney before or after you
25  e-mailed Ms. McCormick on November 2nd, 2023?



JHOSTIN NUNEZ-QUINONES                          November 06, 2024
QUINONES V. FLOCK GROUP, INC.                        17–20

Page 17

1    A  It was around --
2        MR. REID:  Objection.  Vague as what retain
3  means.
4    Q  BY MR. KEATING:  Did you contact an attorney
5  before e-mailing Ms. McCormick on November 2nd, 2023?
6    A  No, it was after.
7    Q  And since engaging Barrett & Farahany, you have
8  since moved your case over to The Workers Law Firm; is
9  that correct?
10    A  Yes.  Correct.
11    Q  Are you aware that Barrett & Farahany has a
12  lien for attorneys' fees on this case?
13    A  Correct.  Yes, I do.
14    Q  Have you seen that document of the lien for
15  attorneys' fees?
16    A  Yes, I acknowledged it.
17    Q  And do you understand what that means?
18    A  Yes.  They have potential fees associated with
19  this case because they first started it.
20    Q  I think I asked this already, but I'm going to
21  ask again, have you ever given a deposition before?
22    A  This is my first deposition.
23    Q  Have you ever been a witness in any -- any
24  case?
25    A  Any case in the state of Georgia?

Page 18

1    Q  Yes.
2    A  I was subpoenaed once.  It was in Miami in
3  2017, but that never went nowhere.
4    Q  And so that was in Miami, Florida?
5    A  Yes.
6    Q  And so you were subpoenaed in a -- was it a
7  litigation matter, a lawsuit?
8    A  I believe it was, to my best recollection.
9  There was a crime at Florida International University.
10  They thought I saw something, and it just didn't go
11  anywhere, to the best of recollection.
12    Q  So you didn't have to appear for that subpoena?
13    A  Oh, no.
14    Q  And that was a criminal case, to your
15  recollection?
16    A  Yeah, I believe so, to my best of recollection.
17    Q  Have you ever been a witness or given testimony
18  in any other matter?
19    A  No.
20    Q  In this matter you filed an EEOC charge,
21  correct?
22    A  That's correct.
23    Q  Other than that EEOC charge, have you filed any
24  other EEOC charges prior?
25    A  No.

Page 19

1    Q  Any other charges with any other administrative
2  agency such as the Department of Labor, the National
3  Labor Relations Board, the SEC, things of that nature?
4    A  No.  This is my first one.
5    Q  And you've never testified at trial, correct?
6    A  Correct.
7    Q  You never testified at any administrative
8  hearing?
9    A  Correct.
10    Q  Have you ever filed any lawsuits other than
11  this case?
12    A  This is my first lawsuit.
13    Q  Okay.  Have you ever assisted anyone in filing
14  a charge of discrimination prior?
15    A  No.
16    Q  And then the same question regarding other
17  agencies or other administrative agencies; have you ever
18  assisted anyone in filing an administrative agency
19  charge?
20    A  No.  Never.
21    Q  Have you ever gone by any other names?
22    A  No.
23    Q  What is your date of birth?
24    A  October 5th, 1994.
25    Q  And what's your current address?

Page 20

1    A  1310 Beaver Creek Road, Alpharetta, Georgia
2  30022.
3    Q  Do you have any plans on moving in the next
4  year?
5    A  No.
6    Q  Do you rent or home -- or do you rent or own
7  that residence?
8    A  Rent.
9    Q  Is it an apartment?
10    A  An apartment, correct.
11    Q  How long have you lived at that apartment?
12    A  I've been there, to my best of recollection,
13  since 2022.
14    Q  Did you live there during your employment with
15  Flock?
16    A  Correct.  Yes.
17    Q  Did you live at another apartment when you
18  first began your employment with Flock?
19    A  It was an Extended Stay.  It wasn't an
20  apartment.
21    Q  What's your cell phone number?
22    A  470-800-6597.
23    Q  I'm just going to repeat that back so I know
24  it.  470-800-6597; is that correct?
25    A  Yes.  Correct.



JHOSTIN NUNEZ-QUINONES                          November 06, 2024
QUINONES V. FLOCK GROUP, INC.                           21–24

Page 21

1    Q   How long have you had that telephone number?
2    A   I've had that telephone number since to, my
3    best recollection, 2021.
4    Q   Any plans on changing that telephone number
5    within the next year?
6    A   No.
7    Q   Does anyone live with you at the apartment on
8    Beaver Creek Road?
9    A   No.
10   Q   Prior to the Extended Stay, where did you live?
11   A   I was at University of North Florida.  I was in
12   the dorms.
13   Q   Are you married?
14   A   No.
15   Q   Any children?
16   A   No.
17   Q   Are your parents still living?
18   A   My mom is still living.  I don't know anything
19   about my father.
20   Q   What's your mother's name?
21   A   Angelita Quinones.
22   Q   Can you spell that first name for me.
23   A   A-n-g-e-l-i-t-a.
24   Q   And the last name is the same as yours,
25   Quinones?

Page 22

1    A   Uh-huh.
2    Q   Where does your mother currently reside?
3    A   I do not know.
4    Q   Any siblings?
5    A   Yes.
6    Q   How many?
7    A   I have one half brother and one half sister.
8    Q   Do you know where either one of them reside?
9    A   No.
10   Q   What's your Social Security number?
11   A   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.
12   Q   Ever have any other Social Security number?
13   A   No.
14   Q   Ever use any other Social Security number?
15   A   No.
16   Q   And just so you know, I'm asking all these
17   background information in case this does go to trial and
18   we need to subpoena you or find you and we can't get
19   ahold of you through counsel.  That's why I'm asking all
20   these kind of personal detailed questions.
21   A   Understood.
22   Q   What's your current e-mail address?
23   A   J-h-o-s-t-i-n-n 1239@gmail.com.
24   Q   So that -- it's j-h-o-s-t-i-n-n?
25   A   Correct.

Page 23

1    Q   Any other e-mail addresses?
2    A   I have a a-t-t-i-c-u-s 22@protonmail.ch.
3    Q   Any reason why you have two e-mail addresses?
4    A   As a backup.
5    Q   Does anyone else have access to those e-mail
6    accounts?
7    A   No.
8    Q   Were those your e-mail addresses when you were
9    employed with Flock?
10   A   Yes.
11   Q   Any other e-mail addresses?
12   A   No.
13   Q   What type of cell phone do you currently have?
14   A   I have a Samsung Galaxy.
15   Q   Is this the same phone that you had during your
16   employment with Flock?
17   A   Correct.  Yes.
18   Q   Who is your cell phone carrier?
19   A   T-Mobile.
20   Q   The same carrier that you've had -- that you
21   had during your employment with Flock?
22   A   Correct.
23   Q   Did you ever text with anybody at Flock during
24   your employment?
25   A   Only on my watch.

Page 24

1    Q   Do you still have those text messages?
2    A   No.
3    Q   Were they deleted?
4    A   Yes, deleted.
5    Q   When -- when were they deleted?
6    A   I did not remember, but I can tell you probably
7    2022, '23.
8    Q   Were they deleted before filing this lawsuit?
9    A   Before, correct.
10   Q   And I'm sorry, you said the current Samsung
11   Galaxy you have, is that an A54?
12   A   Yes.  Correct.
13   Q   Did you have at one point a Samsung Galaxy A12?
14   A   To my best of recollection, I believe so.  I
15   probably lost it.  I don't know.
16   Q   Do you know if you still have that phone?
17   A   I don't have it in my possession.
18   Q   Do you remember what happened to it?
19   A   It got lost.
20   Q   And was that the cell phone you had during your
21   employment with Flock?
22   A   Oh, no, that was before.
23   Q   Do you have any social media accounts?
24   A   No.
25   Q   No Facebook account?

JHOSTIN NUNEZ-QUINONES
QUINONES V. FLOCK GROUP, INC.

November 06, 2024

25–28

Page 25

1  A  No.
2  Q  Instagram?
3  A  No.
4  Q  Twitter?
5  A  No.
6  Q  TikTok?
7  A  No.
8  Q  Snapchat?
9  A  No.
10  Q  LinkedIn?
11  A  No.
12  Q  Have you ever filed for bankruptcy?
13  A  No.
14  Q  Have you ever received public assistance such
15  as welfare, food stamps, Medicaid?
16  A  No.
17  Q  Have you ever made a claim for disability
18  benefits?
19  A  No.
20  Q  Ever file a workers' compensation claim?
21  A  No.
22  Q  Where did you go to high school?
23  A  Belleview High School.
24  Q  Where is that?
25  A  That's in Belleview, Florida.

Page 26

1  Q  Did you graduate?
2  A  Yes.
3  Q  Is that B-e-l-l-a?
4  A  B-e-l-l-e-v-i-e-w.  Belleview.
5  Q  Belleview.
6     When did -- what year did you graduate?
7  A  2020.
8  Q  Did you grow up in Belleview, Florida?
9  A  No.
10  Q  Where did you grow up?
11  A  I need more specifics because I moved around a
12  lot.
13  Q  Where were you born?
14  A  I was born in San Juan, Puerto Rico.
15  Q  How long did you live in San Juan?
16  A  I moved away when I was five.
17  Q  Where did you move to when you were five?
18  A  Orlando, Florida.
19  Q  And how long did you live in Orlando?
20  A  It was probably -- to my best recollection, I
21  lived there for eight years.
22  Q  After Orlando, where did you move?
23  A  I moved back to Puerto Rico.
24  Q  The second time in Puerto Rico, how long did
25  you live there?

Page 27

1  A  I believe it was one year, to my best
2  recollection.
3  Q  And then after that?
4  A  Louisiana for less than a year.
5  Q  After Louisiana, where did you live?
6  A  Hartford, Connecticut.
7  Q  How long did you live there?
8  A  Less than a year.
9  Q  After Hartford, Connecticut, where did you go?
10  A  To my best recollection, I don't know exact
11  time frame, but it was Ocala, Florida.
12  Q  And do you remember how long you lived in
13  Ocala?
14  A  Ocala, I lived there from -- my best
15  recollection, from 2010 to 2014.
16  Q  And is Belleview -- Belleview High School in or
17  near Ocala?
18  A  Yes.  Correct.
19  Q  Did you go to -- have you -- after high school,
20  did you go to college?
21  A  College of Central Florida.
22  Q  And what year did you enroll there?
23  A  To my best recollection, it was 2013.
24  Q  Did you graduate from the College of Central
25  Florida?

Page 28

1  A  Yes, an associate's.
2  Q  Was it a two-year school?
3  A  Correct.
4  Q  What did you study at College of Central
5  Florida?
6  A  It was medical science, I believe.
7  Q  So that would have been from 2013 to roughly
8  2015; is that correct?
9  A  Uh-huh.  Correct.
10  Q  After the College of Central Florida, did you
11  receive any additional education?
12  A  I went to Florida Gulf Coast University.
13  Q  Where is that located?
14  A  In Fort Myers.
15  Q  Did you graduate from Florida Gulf Coast
16  University?
17  A  No.
18  Q  Why did you leave that school?
19  A  It was not a good fit.
20     (Court reporter clarification.)
21  Q  BY MR. KEATING:  How long did you attend that
22  school?
23  A  To my best recollection, less than a year.
24  Q  Did you go to any other schools after Florida
25  Gulf Coast?

JHOSTIN NUNEZ-QUINONES
QUINONES V. FLOCK GROUP, INC.

November 06, 2024
29–32

Page 29

1    A    The University of North Florida.
2    Q    Did you graduate from the University of North
3    Florida?
4    A    No.
5    Q    How long were you at the University of North
6    Florida?
7    A    To my best recollection, it was one year.
8    Q    Why did you leave that school?
9    A    COVID.
10    Q    You mean that you got COVID or that --
11    A    It was shut down.
12    Q    It was shut down during COVID?
13    A    Correct.
14    Q    The latter?
15    A    Yes. It was shut down during COVID so we
16    couldn't be on campus.
17    Q    After COVID, did you return to the University
18    of North Florida?
19    A    No.
20    Q    Did you -- have you -- go to any other schools
21    after the University of North Florida?
22    A    Western Governors University online.
23    Q    I'm going to repeat that, Western Governors
24    University?
25    A    Uh-huh.

Page 30

1    Q    That's an online school?
2    A    Correct.
3    Q    Did you graduate from the Western Governors
4    University?
5    A    No.
6    Q    How long did you attend that school?
7    A    Less than a year, my best recollection.
8    Q    Why did you disenroll from that school?
9    A    I'm trying to get back in there, but the reason
10    I disenrolled is because after the case, this case, I
11    couldn't, you know, afford to go to school.
12    Q    I understand.
13        So other than your associate's degree, do you
14    have any other degrees or certificates?
15    A    No.
16    Q    Are you currently attending school and/or
17    classes?
18    A    No.
19    Q    Any other educational history that I may have
20    missed there?
21    A    To my best -- to my recollection, no.
22    Q    Have you ever filed for unemployment insurance
23    benefits?
24    A    No.
25    Q    So after your employment ended with Flock in

Page 31

1    November of '23, you did not apply for unemployment
2    compensation benefits, correct?
3    A    Correct, I did not apply for anything.
4    Q    Before working at Flock, where did you work?
5    A    It would be at KNAPP, K-N-A-P-P.
6    Q    K-N -- I'm sorry, K-N-A-P-P?
7    A    Correct.
8    Q    Is that the full name of the company?
9    A    Yes.
10    Q    Where was that located?
11    A    Kennesaw, Georgia.
12    Q    And what -- what does KNAPP do?
13    A    Logistics company.
14    Q    What did you do for KNAPP?
15    A    I was a software support engineer.
16    Q    When -- when did you start working there?
17    A    To my best recollection, it was around
18    March 2021.
19    Q    How long were you employed at KNAPP?
20    A    Three months.
21    Q    What were your job responsibilities there?
22    A    To my best of recollection, was support
23    customers with software and deployments, educate the
24    customers about how to use a software, and troubleshoot
25    problems.

Page 32

1    Q    Did you ever change positions?
2    A    No.
3    Q    Were you terminated from that job?
4    A    No, I resigned.
5    Q    Why did you resign?
6    A    It was not a good fit.
7    Q    Any problems with your supervisors while you
8    were there?
9    A    Can you be more specific?
10    Q    Did you file any complaints against your
11    supervisors of that company?
12    A    No.
13    Q    So from March to June of 2021 roughly you
14    worked at KNAPP. After you resigned from that position,
15    where was your next place of employment?
16    A    Flock Safety.
17    Q    Did you consider Flock to be a -- a promotion
18    in job?
19    A    In regards to what?
20    Q    Was it a -- job advancement or was it more of
21    a lateral move?
22    A    The way I was presented, it was a lateral move.
23    Q    At KNAPP, did you get along with your direct
24    supervisors?
25    A    Can you be more specific?

Page 33

1  Q  Did you like them?
2  A  Professionally or personally?
3  Q  Professionally.
4  A  Professionally, they seemed to know what they
5  were doing, so in that regard.
6  Q  How would you rate your performance in that
7  position; average, above average?
8  A  It was during COVID.  A lot of things were
9  changing, so I can't really rate that.
10      MR. REID:  Jhostin, just one thing that I
11  always talk about, is when you are done with one
12  document, just flip it over like this so you will still
13  have them kind of in a stack in order if we need to go
14  back to anything.  Okay?
15      THE WITNESS:  Understood.
16      (Deposition Exhibit No. 2 was marked for
17  identification.)
18  Q  BY MR. KEATING:  I have handed you what we have
19  marked as Exhibit 2, I believe.  It's a copy of your
20  complaint.  Do you -- in this matter.  Do you recognize
21  that document?  You can take a minute to look through it,
22  and just let me know when you are ready to proceed.
23  A  Yes, I've seen this.
24  Q  And this is the lawsuit that you filed against
25  Flock Group Inc., correct?

Page 34

1  A  Correct.
2  Q  It was filed on your behalf, I should say; is
3  that correct?
4  A  Correct.
5  Q  Did you review this document prior to it being
6  filed?
7  A  Correct.
8  Q  In your assessment, it's true and accurate?
9  A  Yes.  Correct.
10  Q  Who have you communicated with regarding the
11  events or claims at issue in this -- in this matter other
12  than your attorneys?
13  A  Just my attorneys.
14  Q  You haven't spoken to any current employees at
15  Flock about this lawsuit?
16  A  I have not spoken to anybody.
17  Q  So that includes former employees of Flock?
18  A  Correct.
19  Q  Have you spoken to any family members about
20  this lawsuit?
21  A  No.
22  Q  Have you spoken with your current employer or
23  former employer about this lawsuit?
24  A  No.
25  Q  So no one else other than your attorneys,

Page 35

1  correct?
2  A  Correct.
3  Q  If you turn to page 4, paragraph 13, who was on
4  the daily meetings with -- that you allege in paragraph
5  13, specifically with the larger team?
6  A  Gotcha.  It will be -- to my best recollection,
7  it will be Omar Lodge, Sheri -- not Sheri, I apologize.
8  Sammer Kazwah, Akeia Dixon, Michelle Sharp -- I do not
9  recollect like her full last name -- and Avia Smith and
10  Mia Gonzalez.
11  Q  Anybody else you can think of that would have
12  been on those group meetings?
13  A  Brian Bernard would occasionally show up.
14  Q  Who is Brian Bernard?
15  A  He was the -- I don't know the job title right
16  now, but at the time it was director of operations.
17  Q  But he was not on every meeting -- every group
18  meeting, correct?
19  A  No.  Occasionally he would show up.
20  Q  If you had to give an estimate of how many
21  times Brian was on the group meetings, would it be less
22  than five?
23  A  It depends on the time frame.  Can you be more
24  specific about a time frame?
25  Q  Throughout your employment.  How many times --

Page 36

1  let me -- poor question.
2      Throughout your employment or during the
3  duration of your employment with Flock, the number of
4  times that you remember Brian Bernard being on a group
5  meeting, is it more or less than five?
6  A  More than five.
7  Q  More or less than ten times?
8  A  To my best of recollection, not more than ten
9  times.
10  Q  Okay.  Not looking for super definite, but more
11  or less than 20 times?
12  A  My best of my recollection, around more than
13  20, but I can't give you a specific number above that.  I
14  don't know.  I don't recall.
15  Q  How often would you have group meetings?
16  A  Depends.  Can you be specific on the time
17  frame?
18  Q  Average throughout your employment.
19  A  So averagely we would have like once a day, but
20  we would change our schedules often.
21  Q  So it was -- it was a frequent occurrence to
22  have online group meetings?
23  A  Correct.
24  Q  Daily or almost daily; would that be correct?
25  A  Correct.

JHOSTIN NUNEZ-QUINONES
QUINONES V. FLOCK GROUP, INC.

November 06, 2024

37–40

Page 37

1  Q  Would you also have daily individual meetings
2  with Omar?
3  A  Can you be more specific on the time frame?
4  The reason I'm asking is because things were changing so
5  fast, so I want to give you the best information.
6  Q  On average throughout your employment, did you
7  have daily meetings, individual meetings with Mr. Lodge,
8  or almost daily meetings with Mr. Lodge individually?
9  A  It would be weekly.
10  Q  Weekly meetings?
11  A  Uh-huh.  But that would be the average.  It
12  would change from time to time.
13  Q  Can you please describe the strange request
14  that you allege Mr. Lodge made about your on camera
15  presence that you specify in paragraph 14.
16  A  Sure.  So --
17      MR. REID:  Go to that and read it before you
18  answer the question just so you know what he's talking
19  about.
20      THE WITNESS:  Gotcha.  What page again?
21      BY MR. REID:  It's on page 4, paragraph 14.  I
22  will give you a chance to read that paragraph, and then I
23  will reask my question.
24  A  Okay.  Sure.  So I got a question about this
25  one.  Do you want me to talk about the first meeting or

Page 38

1  the second meeting on that day?
2  Q  Well, this is -- let me -- let me ask a
3  question.
4  A  Yes.
5  Q  If that's okay.
6  A  Uh-huh.
7  Q  So in paragraph 14 you allege, "As Plaintiff's
8  employment with Defendant continued, Lodge started to
9  make stranger requests about Plaintiff's on camera
10  presence during these meetings."
11  A  Oh, okay.  Understood.  I understand the
12  question now.
13  Q  So when -- when did the first request that you
14  deem strange occur regarding your on camera presence?
15  A  Gotcha.  So my question is for this day, it
16  will be for November 2nd, or just my whole employment?
17  Q  This one doesn't have a date, so I'm asking,
18  when did you -- when did you first feel that these
19  requests were strange?  What day, if you can remember?
20  A  Not day, but I can tell you around March 2022,
21  that would be around where he started making weird
22  requests.
23  Q  And you used the word weird.  What -- what kind
24  of requests would Mr. Lodge make?
25  A  It would -- first he would try to get me on the

Page 39

1  camera to get up close, stand in a certain way, and he
2  will also try to get into my personal life.
3  Q  I'm sorry, you traveled off there at the
4  bottom.
5  A  In my personal life.
6  Q  So in March of 2022, you believe that's when
7  Mr. Lodge's request, in your words, were -- were strange,
8  correct?
9  A  Correct.
10  Q  And I'm going to pick apart the -- take it
11  piece by piece.  So one of his requests that you deem
12  strange was that he asked you to get on camera; is that
13  correct?
14  A  Not get on camera but my body placement.
15  Q  What -- what request did he have regarding your
16  body placement?
17  A  To get up close and, you know, really show my
18  face.  That's what I deemed kind of weird.
19  Q  Did this occur during group meetings?
20  A  It would be group meetings and the one-on-ones.
21  Q  How many times, beginning in March of '22,
22  did -- did Mr. Lodge make this request of you to put
23  your -- your face close to the camera?
24  A  Just so I understand the question, you are
25  asking for March '22 to the end of my employment?

Page 40

1  Q  Yeah.
2  A  All right.  So it would be -- I want to say --
3  I don't know exact times, but I know it would be like
4  every other meeting.  Does that make sense?  That would
5  be the frequency of the request.
6  Q  Did you ever report this request to anybody?
7  A  The first time I reported it was to human
8  resources.
9  Q  And that was in November of 2023, correct?
10  A  Correct.
11  Q  Why didn't you report it in March of 2022 when
12  the request began?
13  A  Because I was intimidated of losing my job.
14  Q  Did -- did Mr. Lodge say anything to you that
15  would intimidate you that you were going to lose your
16  job?
17  A  Yes.
18  Q  What did he say?
19  A  He says:  Don't worry; I'm going to tell human
20  resources that you are not following instructions and you
21  will be terminated.
22  Q  He said that in response to what?
23  A  On me asking specifically why are you asking me
24  to get closer to the camera and having these bizarre
25  requests?

Page 41

1    Q  When did he make that statement?

2    A  That statement was on the last meeting that we
3  had, which was November 2nd, the one-on-one meeting.

4    Q  Okay.  But let's take it back to March of 2022.
5  Did Mr. Lodge say anything to you at that time that made
6  you feel that you would lose your job?

7    A  He would look -- in other words, he wouldn't
8  say it directly but passively.

9    Q  How would he say it passively?

10    A  You know, a lot of people would like this job.
11  You are easily replaceable, in that regard.

12    Q  When did he -- do you recall specifically when
13  he made that statement?

14    A  He would -- not specifically, but he would
15  occasionally make statements like that.

16    Q  So you don't recall any specific instance where
17  Mr. Lodge said that you were easily replaceable --

18    A  No.

19    Q  -- on a phone call?

20    MR. REID:  Objection.  Misstates the witness's
21  testimony.

22    Go ahead, Jhostin.

23    THE WITNESS:  Gotcha.

24    So the first time was March 22nd.  Now, he
25  would occasionally do that.  I don't specifically know,

Page 42

1  because it was so many times, that I got used to his
2  behavior.

3    Q  BY MR. KEATING:  If this occurred frequently
4  from March 22nd to November of 2023, why did you not
5  report it during that more than a year time frame to
6  anybody?

7    MR. REID:  Asked and answered.

8    Go ahead.

9    THE WITNESS:  So as I stated, I was scared of
10  losing my job and my livelihood, and I was just scared
11  of, you know, if I don't follow along, follow directions,
12  I will get fired.

13    Q  BY MR. KEATING:  Did Mr. Lodge say anything to
14  make you feel that you would lose your job specifically?

15    A  Correct.  Yes, he did.  He would say --

16    Q  What?

17    A  He would say I am easily replaceable.

18    Q  When did he make that statement?

19    A  The first time he did it was on March 22nd.

20    Q  Of what year?

21    A  It would be 2022.

22    Q  Was this on a group meeting?

23    A  A one-on-one.

24    Q  And at that time, did you make a complaint to
25  human resources about the statement that Mr. Lodge

Page 43

1  reportedly made?

2    A  No.

3    Q  The only complaint you made to human resources
4  regarding Mr. Lodge's request was on November 2nd, 2023,
5  correct?

6    A  Yes.

7    Q  An employer can establish work rules and
8  procedures, correct?

9    A  Correct.

10    Q  And some of those work rules and procedures
11  could be that employees need to be on camera during
12  meetings, correct?

13    A  Correct.

14    Q  Do you think that's a fair rule for an employer
15  to have?

16    A  Yes, and I have no problem with that.  The
17  problem --

18    Q  You answered the question.  Thank you.

19    MR. REID:  No, hold on.  You can -- you can
20  keep going if you want.

21    THE WITNESS:  Yeah, the problem that I have
22  is --

23    MR. KEATING:  Okay.  I'd appreciate it if we --
24  if you object to the form, that's fine, but speaking
25  objections I'm not going to --

Page 44

1    MR. REID:  I'm not going to let you cut off his
2  answer.  We are not going to do that.

3    MR. KEATING:  Okay.  Then stop the speaking
4  objections, please.

5    Q  BY MR. KEATING:  Go ahead, continue.

6    A  So what I'm saying is, it's not camera.  It was
7  the way that he was asking me to get up close, you know,
8  put my body in a certain way, and that's why I didn't
9  feel comfortable.

10    Q  In how -- in what way did he ask you to place
11  your body?

12    A  So he would sometimes say lower the camera.
13  Sometimes he would say get closer, I really want to see
14  your face.

15    Q  Is it possible that he was just trying to get a
16  clearer vision of you in camera?

17    MR. REID:  Objection.  It calls for
18  speculation.

19    Go ahead.

20    MR. KEATING:  Again with the speaking
21  objection.

22    MR. REID:  It's not a speaking objection.

23    MR. KEATING:  That is.  You can object to the
24  form.

25    MR. REID:  If you want to call the judge, it's

JHOSTIN NUNEZ-QUINONES                                    November 06, 2024
QUINONES V. FLOCK GROUP, INC.                                      45–48

Page 45

1  not a speaking objection. It's not. I can object to the
2  form or I can say that, just a short, concise statement
3  of what the objection is.
4       THE WITNESS: Can you repeat the question
5  again?
6       Q  BY MR. KEATING: Yes. You mentioned that he
7  asked you to place your body to get closer to the camera,
8  and my follow-up question was, is it possible that he
9  could just be asking to get a clearer vision of you in
10 camera so that he could see you on camera?
11      MR. REID: The same objection.
12      Go ahead.
13      Q  BY MR. KEATING: Correct?
14      A  So I took that in consideration, but when he
15 started micromanaging in a point like a little bit here,
16 a little bit there, he was getting really specific with
17 my movements, that's when I didn't feel comfortable the
18 way he was asking me, you know, to place myself on
19 camera.
20      Q  And you not feeling comfortable, that was your
21 own perception, correct, of how you perceived his
22 statements to you, correct?
23      A  Well, yeah, that's how I perceived it.
24      Q  You mentioned that he made some -- some
25 inquiries into your personal life. What were those

Page 46

1  inquiries?
2       A  So he would ask if I'm married, if I'm seeing
3  anybody in that regard; also my family, and I didn't feel
4  comfortable with him getting in my personal life.
5       Q  When did he ask you if you were married?
6       A  It would be -- to my best of my recollection,
7  it would be around April/May of 2022. Well, he would
8  occasionally ask me that.
9       Q  Okay. How did that come up in conversation?
10      A  So he would first ask me how my day is going,
11 how is my weekend, how is my family, and he will ask me
12 like, so how are you -- like who are you seeing outside
13 of work? And he would, you know, casually drop a line,
14 okay, so it seems like you have a good social life, and
15 he would try to get into my social life.
16      Q  Is it possible that he was just being friendly?
17      A  I --
18      MR. REID: Objection. It calls for
19 speculation.
20      Go ahead.
21      Q  BY MR. KEATING: You don't mention any of those
22 comments in your complaint, correct?
23      A  I only complained about what happened that day,
24 but his, you know, behavior continued to get worse and
25 worse.

Page 47

1       Q  But I'm -- specifically regarding your lawsuit
2  that you filed. There is nothing in this complaint,
3  Exhibit 2, that mentions any comments about Mr. Lodge
4  asking if you are married?
5       A  Correct.
6       Q  Or anything happening in March of 2022,
7  correct?
8       A  Correct.
9       Q  Did you ever get any disciplinary or corrective
10 actions during your employment with Flock?
11      A  Can you be more specific? Like what documents?
12      Q  Were you ever written up at Flock?
13      A  Can you -- a write-up in a sense, because I've
14 been e-mailed, and then I only had one actual write-up
15 that was given.
16      Q  During your employment at Flock, did you ever
17 receive a verbal warning?
18      A  Yes.
19      Q  During your employment with Flock, did you ever
20 receive coaching regarding your performance or job
21 performance?
22      A  Inconsistently, so...
23      Q  When did you begin working at Flock?
24      A  It was around June 2021.
25      Q  Do you remember the exact date?

Page 48

1       A  No, I do not remember the exact date.
2       Q  What was your title?
3       A  It was quality -- from my best recollection, it
4  was a quality deployment engineer.
5       Q  How did you apply to Flock?
6       A  Their website.
7       Q  Did you apply directly through their website or
8  was it through like a third party like LinkedIn or
9  another job -- job board?
10      A  From my best recollection, it was a website.
11      Q  Directly to their website?
12      A  Correct.
13      Q  What made you seek out Flock?
14      A  I was just looking for start-ups. I Googled.
15 That's the first -- you know, one of the best companies I
16 saw at the time. It was in an article, and I applied
17 there.
18      Q  Do you remember what you Googled in looking for
19 start-ups?
20      A  Start-ups, the best start-ups Atlanta.
21      Q  You applied via their website, to your
22 recollection, correct?
23      A  Correct.
24      Q  Who did you interview with?
25      A  I interviewed with Omar Lodge. What's his

JHOSTIN NUNEZ-QUINONES
QUINONES V. FLOCK GROUP, INC.

November 06, 2024
49–52

Page 49

1   name?  I believe it was -- it was like three other
2   people, but I don't remember exactly their names.
3       Q   How many interviews did you have?
4       A   It was -- so it was on four.
5       Q   Were they group interviews or one-on-one
6   interviews?
7       A   It was round, so one person each.
8       Q   Was it one day of interviews or consecutive
9   days or multiple days of interviews?
10      A   One day.
11      Q   Do you remember filling out an employment
12  application?
13      A   For Flock?
14      Q   Yeah.
15      A   Yes.
16      Q   Okay.  So after -- when you first interviewed
17  with Omar, did you get along with him?
18      A   Can you be more specific?  Like is he cordial?
19      Q   Did you -- did you seem to like him during your
20  interview?
21      A   I wasn't really focused on him.  Like I was
22  just focused on getting a job and seeing how the company
23  is going.
24      Q   Did -- based on your interview, I assume you
25  liked Flock enough to keep going with the process,

Page 50

1   correct?
2       A   The company, yes.
3           MR. KEATING:  Do you want to take a quick
4   break, if that works?
5           MR. REID:  Yeah, that works.
6           THE VIDEOGRAPHER:  10:49 a.m., we're off the
7   record.  This is the end of media number one.
8           (The deposition was at recess from 10:49 a.m.
9   to 10:59 a.m.)
10          THE VIDEOGRAPHER:  10:59, we're back on the
11  record.  This is the beginning of media number two.
12      Q   BY MR. KEATING:  All right.  Jhostin, we're
13  back on the record.
14          Do you understand that?
15      A   Yes.
16      Q   Okay.  During the break, did you speak with
17  your attorney at all about your testimony in this case?
18      A   No.
19      Q   I'm handing you what we're gonna mark as
20  Exhibit No. 3.  I will let you take a look through that
21  document.
22          (Deposition Exhibit No. 3 was marked for
23  identification.)
24      Q   BY MR. KEATING:  Do you recognize that
25  document?

Page 51

1       A   Oh, yes.  It's an offer letter.
2       Q   And is that your digital signature on the last
3   page of the Acknowledgment and Acceptance of Employment
4   Offer?
5       A   Correct.
6       Q   And this offer letter states that you will
7   start your employment with Flock on 6/21 of 2021.
8           Is that, you know, an accurate date to the best
9   of your recollection?
10      A   Oh, yes, that's an accurate date.
11      Q   And it lists your title as QA Deployment
12  Engineer.  Is that what your recollection of your -- your
13  title was when you joined the company?
14      A   Oh, yes.  When I first started, yes.
15      Q   And your salary when you started employment was
16  $55,000 per year.  Does that sound about right?
17      A   That's correct.
18      Q   So following the interview process, you
19  received a offer of employment, which you accepted,
20  correct?
21      A   Yes.
22      Q   And you started on or around 6/21 of 2021,
23  correct?
24      A   Correct.
25      Q   And was Mr. Lodge your supervisor from the

Page 52

1   beginning of your employment?
2       A   Correct.  Yes.
3       Q   Did you have any other supervisors during your
4   employment at Flock?
5       A   No.
6       Q   Do you recall what Mr. Lodge's title was when
7   you were first hired at Flock?
8       A   I do not recall.  I only recall the title he
9   had when I left.
10      Q   Okay.  And I know that -- I'm familiar with the
11  job title of Device Support Engineer.  Are you familiar
12  with that title?
13      A   Yes.
14      Q   What's the difference between a -- in your --
15  you know, to the best of your knowledge, the difference
16  between a QA Deployment Engineer and a Device Support
17  Engineer?
18      A   In regards to the industry or just a company?
19      Q   In regards to the company.  Did you ever -- let
20  me rephrase that.
21          Was your title ever changed from QA Deployment
22  Engineer --
23      A   Oh, yes.
24      Q   -- to your knowledge?
25          What was it changed to?

JHOSTIN NUNEZ-QUINONES                                    November 06, 2024
QUINONES V. FLOCK GROUP, INC.                                      53–56

Page 53

1    A   Device Support Engineer II.
2    Q   Was there any difference in your job duties and
3  responsibilities when that title changed?
4    A   Regarding to -- so the thing is, when I had a
5  job title, everything changed so fast that it wasn't --
6  you know, the job title didn't change anything.  I still
7  had different responsibilities, if that answers your
8  question.
9    Q   So the -- the job title, if the job title
10  changed, that didn't necessarily mean your job duties and
11  responsibilities changed, correct?
12    A   So my job duties changed every day because it
13  was a fast growing company.
14    Q   It was a start-up.  It evolved as time went on,
15  correct?
16    A   Yes, correct.
17    Q   Did you -- during your -- the tenure of your
18  employment with Flock, did you ever receive any
19  promotions?
20    A   No.
21    Q   Did your salary ever increase?
22    A   To my best of recollection, it was -- I don't
23  remember exact date, but it got bumped up to $71,000 a
24  year or 70, around that range.
25    Q   Do you remember the year in which that

Page 54

1  occurred?
2    A   I believe it was 2022 or '21.  I'm not sure.
3    Q   Was there any -- was that associated with a
4  promotion, or why did you -- why was your salary
5  increased?
6    A   I'm not sure why it was increased.  They just
7  increased it.
8    Q   When you first joined Flock, how was your
9  relationship with Omar Lodge professionally?
10    A   Professionally, I understood that we were a
11  start-up, and I had no problems, and everything was going
12  okay when I first started.
13    Q   And throughout your employment, you were a
14  remote worker, correct?
15    A   Correct.  Yes.
16    Q   Did you ever go into the Atlanta office of
17  Flock?
18    A   When I first started, I was only going Tuesday
19  and Thursday, to my best of my recollection.
20    Q   So there were occasions when you would go
21  on-site to Flock's office, correct?
22    A   Correct.  Yes.
23    Q   On, you said, Tuesdays and Thursdays?
24    A   Correct.
25    Q   Did that continue throughout your employment?

Page 55

1    A   No.
2    Q   When did you stop going into the Flock office?
3    A   I don't remember, but I believe it's around
4  2021, so I want to believe like three months into my
5  employment, to my best of my recollection.
6    Q   So the first three months of your employment
7  you went to the office two days a week; is that correct?
8    A   Correct.
9    Q   And then following those three months, were you
10  completely remote?
11    A   Yes.  Correct.  Completely remote.
12    Q   Did you work from home?
13    A   Yes.
14    Q   Did Flock supply you with like a video camera,
15  computer setup, or how did that work?
16    A   From my best of recollection, I had a -- a
17  monitor.  I had a keyboard, a mouse, and my laptop, and I
18  only brought my laptop -- when I stopped going to the
19  office, I only brought my laptop to my house.
20    Q   And those items that you just mentioned -- the
21  keyboard, the monitor, the laptop -- was there a webcam
22  as well?
23    A   The only thing that had a webcam, from my best
24  recollection, was the laptop.
25    Q   Okay.  Those other items -- the keyboard, the

Page 56

1  monitor, the laptop -- were they all Flock equipment?
2    A   Oh, yes.
3    Q   Okay.  Did you ever use any of your own
4  equipment while working at Flock?
5    A   Can you be more specific?
6    Q   Your own computer equipment while working at
7  Flock?
8    A   No.
9    Q   So the only computer equipment you used while
10  working at Flock was owned by the company?
11    A   Yes.  Correct.
12    Q   When you first joined Flock, you know, did you
13  get along with your coworkers?
14    A   Professionally or personally?
15    Q   Professionally.
16    A   Yes.
17    Q   Personally?
18    A   Yes.
19    Q   Okay.  Did your coworkers seem to get along
20  with Mr. Lodge professionally?
21        MR. REID:  Objection.  Speculation.
22        Go ahead.
23        THE WITNESS:  From what I've seen in the
24  meetings, professionally they seemed to get along.
25    Q   BY MR. KEATING:  How was your performance

JHOSTIN NUNEZ-QUINONES
QUINONES V. FLOCK GROUP, INC.

November 06, 2024
57–60

Page 57

1 during your first year at Flock?
2     A    To my -- to the company's standards or my
3 standards?
4     Q    Your standards, how would you rate yourself,
5 your performance during your first year of Flock?
6     A    I believe I did a good job, and I believe I
7 tried my best.
8     Q    Did you receive any performance reviews?
9     A    I don't remember.
10     Q    Okay.  Did you get along with Brian Bernard
11 professionally?
12     A    I barely spoke to him, so from the few
13 instances I had, it seemed like we got along.
14     Q    Who is Avia Smith?
15     A    Avia Smith.
16     Q    Avia Smith, thank you.
17     A    Yeah, she was a coworker.
18     Q    What was her title?
19     A    A QA Deployment Engineer, too.
20     Q    Was she -- did she have the same title as you
21 or the same role as you?
22     A    Correct.  Yes.
23     Q    Okay.  Did you get along with Avia Smith
24 professionally?
25     A    Yes.

Page 58

1     Q    Did you ever interact with her personally or
2 socially?
3     A    Can you be more specific, like outside of work?
4     Q    Correct, outside of work.
5     A    No, only at work.
6     Q    Who was Laura McCormick?
7     A    I don't know the exact title, but I believe she
8 was the HR director or business partner.  I don't
9 remember the exact title.
10     Q    Is this the same person as Laura McKinnon that
11 you reference in your interrogatory responses?
12     A    I believe so, yes.
13     Q    Okay.  Other than your interaction with
14 Ms. McCormick on November 2nd of '23, did you ever, prior
15 to that, have any contact with her?
16     A    No.
17     Q    You understood your employment with Flock was
18 at will, correct?
19     A    Yes.  Correct.
20     Q    Do you know what the term "at will" means?
21     A    They can fire me for any legal reason.
22     Q    And you can also terminate the employment for
23 any reason as well?  You can leave and they can also
24 terminate you, correct?
25     A    Correct.  For any legal reason, correct.

Page 59

1     Q    Did you sign any other agreements when you
2 first came on board with Flock?
3     A    To my best recollection, are you -- specify the
4 question.  Other companies?  Other individuals?
5     Q    Did you -- did you execute any agreements with
6 Flock when you first came on board?
7     A    From my recollection, no.
8     Q    Okay.  After you accepted the offer, you went
9 through an onboarding process, correct?
10     A    Correct.  Yes.
11     Q    Okay.  Do you recall receiving an employee
12 handbook when you first came on board at Flock?
13     A    Physically or digitally?
14     Q    Either physically or digitally.
15     A    I believe they gave me one, from my best of
16 recollection.
17     Q    I'm handing you what we are going to mark as
18 Exhibit 4.
19         (Deposition Exhibit No. 4 was marked for
20 identification.)
21     Q    BY MR. KEATING:  I'll let you thumb through
22 this.  I will direct you to a specific page here in a
23 second, but if you could, just turn to the back page and
24 let me know if that is your digital signature above the
25 date of January 23rd, 2023.

Page 60

1     A    Yes.  Correct.
2     Q    And that's a little after you -- you first came
3 on board with Flock, correct?
4     A    Yes.  Correct.
5     Q    Do you remember if you received a prior version
6 than this --
7     A    I don't remember.
8     Q    -- during your employment?
9         Okay.  If you turn to page 10 of that handbook.
10 Actually, let me -- let me strike that question.
11         On the back of the handbook, the last page
12 where your signature is, if you take a minute and just
13 read that paragraph above where you signed to yourself,
14 and then I will ask you a question about it.
15     A    Okay.
16     Q    And specifically that last sentence, there's
17 a -- it's an acknowledgment that you -- it's your
18 responsibility to read and understand the handbook and
19 comply with the policies contained therein, correct?
20     A    Correct.
21     Q    It was kind of paraphrased to it, but you --
22 you acknowledge receiving it.  It's your responsibility
23 to read and understand it and ask any questions about it.
24 Is that fair?
25     A    Yes, fair.

JHOSTIN NUNEZ-QUINONES
QUINONES V. FLOCK GROUP, INC.

November 06, 2024
61–64

Page 61

1    Q  And if you turn to page 10, there is a Flock --
2  it does contain -- it does have a policy regarding no
3  retaliation, correct, on page 10?
4    A  Give me one moment.  I'm getting to the page.
5    That's correct.  I see it.  It's right here.
6    Q  I'm handing you now what we are going to mark
7  as Exhibit 5.
8    (Deposition Exhibit No. 5 was marked for
9  identification.)
10    Q  BY MR. KEATING:  And if you could turn to the
11  back page of that document and just confirm for me
12  whether that's your digital signature above the date of
13  January 17th, 2023; is that correct?
14    A  Yes.  Correct.
15    Q  And above that signature, there's also an
16  acknowledgment that you've received, read, and understand
17  the harassment-free workplace policy of Flock Safety,
18  correct?
19    A  Yes.  Correct.
20    Q  And I'm handing you what we've marked as
21  Exhibit 6.
22    (Deposition Exhibit No. 6 was marked for
23  identification.)
24    Q  BY MR. KEATING:  And this is a document
25  entitled Anti-Harassment Training Policy, and if you

Page 62

1  could turn to the second page and confirm that that is
2  your digital signature above the date January 17th of
3  2023; is that correct?
4    A  Yes.  Correct.
5    Q  And then same question, that above that
6  signature, there is an acknowledgment you've received,
7  read, and understand the Anti-Harassment Policy of Flock
8  Safety, correct?
9    A  Yes.  Correct.
10    Q  And this is what we're gonna mark as Exhibit 7.
11    (Deposition Exhibit No. 7 was marked for
12  identification.)
13    Q  BY MR. KEATING:  Certificate of HR
14  Anti-Harassment Training Completion.  Is that your
15  digital signature on that document?
16    A  That's correct.
17    Q  Do you remember taking this training?
18    A  I did take this training, I remember, yes.
19    Q  You do remember taking this training; is that
20  correct?
21    A  Correct.
22    Q  Okay.
23    (Deposition Exhibit No. 8 was marked for
24  identification.)
25    Q  BY MR. KEATING:  I'm handing you what's marked

Page 63

1  as Exhibit 7.
2    MR. McCORMACK:  8.
3    MR. KEATING:  8, thank you.
4    Q  BY MR. KEATING:  It is the confidential
5  information invention assignment agreement.  If you could
6  turn to the second to last page of this document and
7  confirm that this is your digital signature next to the
8  date of June 4th of 2021; is that correct?
9    A  Yes.  Correct.
10    Q  Do you remember reading and signing this
11  agreement?
12    A  Yes, I do.
13    Q  Okay.  So we talked a second ago about your
14  recollection that you do remember getting a verbal
15  warning during your employment with Flock, correct?
16    A  That's correct.
17    Q  Do you remember what it was for?
18    A  To my best of my recollection, I only closed 12
19  cases.
20    Q  Do you recall that it also detailed occurrences
21  dating back as far as March 9th of 2022?
22    A  Oh, yes.
23    Q  And so it would seem to be a series of -- of
24  performance issues that were being addressed and one
25  verbal warning, correct?

Page 64

1    A  Yes.
2    Q  Do you recall what the performance-related
3  issue was that occurred in March of 2022 that was
4  addressed in that -- that warning?
5    A  March, I do not remember --
6    Q  Okay.
7    A  -- exactly.
8    Q  There is another -- there's actually two
9  instances in March.  Do you recall either one of those
10  instances in March that were addressed in that verbal
11  warning?
12    A  From my best recollection, something about me
13  not closing enough cases.
14    Q  Okay.  There is also an incident that occurred
15  on May 5th of 2022 in that -- detailed in that verbal
16  warning.
17    Do you recall what that was related to?
18    A  I don't recall exactly.
19    Q  Could it also have been related to your work
20  output?
21    A  Yeah.  To my specific work output, yes.
22    Q  Okay.  And now in March of 2022, that's when
23  you allege that Mr. Lodge began making these strange
24  requests, correct?
25    A  Yes.  Correct.

JHOSTIN NUNEZ-QUINONES
QUINONES V. FLOCK GROUP, INC.

November 06, 2024
65–68

Page 65

1    Q   And right around the same time that you were
2  having performance issues, correct?
3    A   That he -- he was saying I had performance
4  issues, correct.
5    Q   And the verbal warning also brings up an
6  incident that occurred on September 27th of 2022.
7       Do you recall what that related to?
8    A   No.
9    Q   Could it -- do you remember if there was any
10 issue with your lack of responsiveness in September of
11 2022?
12   A   No, I do not.
13   Q   Okay.
14      (Deposition Exhibit No. 9 was marked for
15 identification.)
16   Q   BY MR. KEATING:  Is this one of the documents
17 that you -- I'm sorry, I'm handing you what we are going
18 to mark as Exhibit 9.  Do you recall -- do you recognize
19 this document?
20   A   Oh, okay.  Now I remember it, yes.  Okay.
21   Q   Is this one of the documents that you reviewed
22 in preparation for your deposition?
23   A   Preparation, yes, that's one I reviewed.
24   Q   Okay.  So just -- just so I'm clear, this is a
25 document that you reviewed prior to your deposition?

Page 66

1    A   Correct.  Yes.
2    Q   With your attorney, correct?
3    A   Correct.
4    Q   Okay.  And so in the Details of Occurrence, it
5  lists five separate incidences; is that correct?
6    A   Yes.  Correct.
7    Q   Okay.  And on the bottom of this corrective
8  action form, it identifies that, you know, the
9  unacceptable behaviors addressed above must cease
10 immediately; is that correct?
11   A   Correct.
12   Q   Okay.  And if you turn to the second page of
13 that document, is that your digital signature that you
14 acknowledge receiving in reviewing this corrective action
15 form?
16   A   Correct.  Yes.
17   Q   Did you have a meeting with Mr. Lodge to go
18 over this verbal warning?
19   A   The only meeting I had was with him, and I
20 don't remember an exact HR representative.  I was in a
21 meeting, and they just said you have been written up, and
22 this is why.
23   Q   Okay.  Did you have any disagreement with this
24 verbal warning?
25   A   Yes, I do.

Page 67

1    Q   At that time, did you say any disagreement that
2  you had with this verbal warning during that meeting?
3    A   During the meeting, no, but after the meeting,
4  yes, with Omar Lodge.
5    Q   And what did you say to Mr. Omar Lodge after
6  the meeting?
7    A   So for the first incident, I told him the 12
8  cases, the only reason I solved 12 cases, because I was
9  put in a task that I could not close cases because we're
10 monitoring some cameras, so I couldn't close cases.
11   Q   And when did that meeting occur?
12   A   No, that was after -- the next one-on-one
13 after.
14   Q   The next one-on-one after --
15   A   After this.
16   Q   -- October 13th of 2022?
17   A   That's correct.
18   Q   Okay.  What else did you say to Mr. Lodge at
19 that time?
20   A   Sure.  On the 27th, this one, the second one, a
21 lack of responsiveness to direct.  He never had a --
22 well, he would have inconsistent rules with
23 responsiveness.  Sometimes he would not care if you do
24 not respond more than 24 hours, or sometimes he would
25 want an e-mail immediately.  So it was really

Page 68

1  inconsistent.  And I told him that specifically that I
2  need more consistent -- you know, a consistent guideline
3  to the responsiveness of my e-mails.
4    Q   Okay.  Did you ever put any of these concerns
5  regarding your write-up in -- in writing?
6    A   No, because I was told by Omar Lodge that we're
7  a team, and we're not supposed to -- you know, we're
8  supposed to trust each other.
9    Q   When were you told by Omar Lodge that
10 statement?
11   A   That was on a meeting right after this
12 write-up, the same one-on-one meeting where I expressed
13 my concerns.
14   Q   And what specifically did Mr. Lodge say?
15   A   In regards to what specifically?
16   Q   In regards to what you just said, that he made
17 a comment to you --
18   A   Oh.
19   Q   -- regarding something.
20   A   He said I will take note.
21   Q   Take note of what?
22   A   Of what I said.  I will take that into
23 consideration.
24   Q   But again, you did not put any of these
25 rebuttals to this verbal warning in writing, correct?

JHOSTIN NUNEZ-QUINONES                           November 06, 2024
QUINONES V. FLOCK GROUP, INC.                              69–72

Page 69

1    A   That's correct.

2    Q   And in the verbal warning of October of '22,

3   there is a plan for improvement, correct, down below?

4    A   Down below, oh, yes.

5    Q   There's one, two, three, four -- five bullet

6   points.

7        Did Mr. Lodge go over those bullet points with

8   you during this meeting?

9    A   He just read through them, but he didn't

10  specify a time frame or when I'm supposed to keep, you

11  know, going through these, if that makes sense.

12   Q   Okay.  It doesn't, so I'll ask some clarifying

13  questions.

14   A   Okay.

15   Q   But you -- you do remember or recall him

16  reading through those five bullet points and, for

17  example, the first one, "All e-mails are to be responded

18  to within 24 hours, and slack messages are to be

19  responded to within two hours," he read through those

20  statements with you?

21   A   Oh, yes.  Correct.

22   Q   Okay.  So for the first one, "All e-mails are to be

23  responded to within 24 hours," did you follow this metric

24  after the meeting?

25   A   I was never sent feedback, so I never knew.  I

Page 70

1   tried my best, but I never got feedback of if I'm

2   complying with this.

3    Q   Okay.  "Work output needs to be improved and

4   stay consistent, delivering equally with the rest of the

5   group.  Close a minimum of 65 cases daily (tier 1 + 2) in

6   Salesforce, until the queue is cleared each day.

7   Processed with at least 90 (sic) percentage accuracy

8   within SLA."

9        Did you comply with this metric following your

10  verbal warning?

11       MR. REID:  It says 98 instead of 90.

12   Q   BY MR. KEATING:  98 percent accuracy.

13   A   We couldn't do that because certain cases,

14  sometimes the ticketing system will break, and we will

15  not have enough to do 65, so I physically could not do

16  this.

17   Q   And is that your interpretation that you

18  couldn't physically do it?

19   A   No.  Like in general, the whole team.  So

20  example, we would have a ticketing system, and let's say

21  we have five people on the team, correct?  We wouldn't

22  have enough tickets for everybody to get 65, so we

23  couldn't actually hit that number.

24   Q   How about the third bullet point, "When the

25  queue of cases in Salesforce have all been solved, comb

Page 71

1   through the daily report to find cameras with alarms.

2   Create a case in Camera Management that flows to

3   Salesforce, and specify what you did to solve the alarm."

4        Did you file this metric after the meeting?

5    A   Oh, yes, I did do that.

6    Q   How about the last one, "40 hours of general

7   availability during normal working hours, communicating

8   ahead of time when you will not be available"?

9        Did you follow this metric after the meeting?

10   A   Yes, correct.  And just to specify this, we did

11  have some team members that did not follow this also,

12  this rule.

13   Q   I'm just asking about --

14   A   No, no, no.  Yeah, but I'm just saying.

15   Q   I don't want to get into other people.  I'm

16  just asking about you.  Did you file this --

17       MR. REID:  He can answer the question how he

18  wants to answer the question.

19       THE WITNESS:  Yeah.

20       MR. KEATING:  And I can ask my question how I

21  want to ask it.  Please stop.

22       MR. REID:  No, I will not stop.

23   Q   BY MR. KEATING:  Did you --

24       MR. REID:  No.

25       MR. KEATING:  Stop.

Page 72

1        MR. REID:  No, we're not going to continue.  He

2   can answer the question how he feels --

3        MR. KEATING:  Are you instructing your client

4   not to answer?

5        MR. REID:  No, I'm instructing you to stop --

6   stop --

7        MR. KEATING:  No, what you are doing is doing

8   speaking objections which I --

9        MR. REID:  Yes, because --

10       MR. KEATING:  -- vehemently oppose to.  So

11  please stop.

12       MR. REID:  You are trying -- no.

13       MR. KEATING:  No.

14       MR. REID:  We're gonna talk about this.

15       MR. KEATING:  You want to talk about this

16  outside?

17       MR. REID:  Outside where?

18       MR. KEATING:  Outside off the record, because

19  right now I'm asking your client a question.

20       MR. REID:  No.  I would like this to be on the

21  record.  I would like you to allow my client to finish

22  his answers to your questions.  It doesn't matter whether

23  you think he's done or not.  He's not done.  He has the

24  right to finish his answer to the question, and I'm not

25  gonna allow you to bully him or tell him, no, that's

JHOSTIN NUNEZ-QUINONES                              November 06, 2024
QUINONES V. FLOCK GROUP, INC.                              73—76

Page 73

1  fine.
2      MR. KEATING:  Are you done?
3      MR. REID:  Yeah, I am.
4      Q   BY MR. KEATING:  Specifically -- I will restate
5  the question, Mr. Quinones.
6      A   Okay.  Go ahead.
7      Q   The metric -- the last metric, "40 hours of
8  general availability during normal working hours,
9  communicating ahead of time when you will not be
10  available," did you specifically comply with this metric
11  following this meeting?
12      A   Yes.  Correct.
13      Q   Okay.  Were you ever reprimanded for not having
14  40 hours of general availability after this meeting?
15      A   For my -- best of recollection, no.
16      Q   Okay.  And in the box below the Plan for
17  Improvement, the last sentence states, "Failure to
18  sustain improvement may result in further action, up to
19  and including termination of employment."
20      Is that -- did I read that correctly?
21      A   Yes.
22      Q   Okay.  And you received and signed this
23  document on October 13th of 2022, correct?
24      A   Yes.  Correct.
25      Q   And following this meeting, did Mr. Lodge

Page 74

1  e-mail you a copy of this document?
2      A   Yes.  Correct.
3      MR. KEATING:  Let's pause and go off the record
4  for a minute while we clean this up.
5      THE VIDEOGRAPHER:  11:26 a.m., we're off the
6  record.  This is the end of media number two.
7      (The deposition was at recess from 11:26 a.m.
8  to 11:30 a.m.)
9      THE VIDEOGRAPHER:  11:30, we're back on the
10  record.  This is the beginning of media number three.
11      Q   BY MR. KEATING:  Are you ready to proceed,
12  Jhostin?
13      A   Yes.  Correct.
14      Q   Okay.  Before we had a quick break, we were
15  talking about an e-mail that Mr. Lodge had sent you in
16  October of '22 regarding your verbal warning.  Do you
17  recall that e-mail?  And I think we have marked as
18  Exhibit 10 is -- is what I believe is that e-mail.
19      (Deposition Exhibit 10 was marked for
20  identification.)
21      Q   BY MR. KEATING:  Do you recognize this
22  document?
23      A   Yes.  Correct.
24      Q   Is that the e-mail that we were speaking of?
25      A   Yes.  Correct.

Page 75

1      Q   Okay.  And Mr. Lodge states in that e-mail that
2  he's -- they are here to support you being successful and
3  meeting your expectations at work, correct?
4      A   That's correct.  That's what they said, but...
5      Q   That's what he stated, correct?
6      A   Yeah, that's what he said.
7      Q   Do you know who Alex Graber is?
8      A   I am familiar with the name.  I'm not familiar
9  with the actual position he holds.
10      Q   Did you ever meet Mr. Graber in person?
11      A   No.
12      Q   How about virtually like on video camera --
13      A   No.
14      Q   -- or on a screen?
15      No.  Did you just -- did you communicate to him
16  with just via -- was it Slack messages that you guys
17  used?  Or what did you guys use to communicate
18  internally?
19      A   To my best recollection, only on Salesforce
20  comments, and maybe perhaps -- I don't remember
21  exactly -- Slack messages.
22      Q   Okay.  Just as a -- as a backup, how did -- how
23  did you communicate with other employees on your team or
24  within Flock?
25      A   So on my team, it was Slack.  Rarely used

Page 76

1  e-mail and the virtual meeting, so Google and all that.
2  Other team members it would be on Salesforce comments.
3  That's the only way we would kind of talk.  Other than
4  that, you know, we weren't really talking, if that
5  answers your question.
6      Q   That does.  Thank you.
7      (Deposition Exhibit No. 11 was marked for
8  identification.)
9      Q   BY MR. KEATING:  I will give you a chance to
10  read through this short string.
11      A   Uh-huh.
12      Q   Do you recall this message at all, specifically
13  the one in the middle?
14      A   On the one in the middle, yes.
15      Q   Where it says "Original post"?
16      A   Yes.
17      Q   What was your relationship with Alex Graber?
18  Did you -- was he a supervisor?  What was -- you know,
19  did you have a -- I guess to your recollection -- bad
20  question.  To your recollection, who was Alex Graber at
21  Flock?
22      A   I didn't know exactly his job title.  I think
23  it was like, to my best recollection, customer service
24  manager or something like that, but he wasn't involved
25  directly in our team.  He wasn't a direct supervisor to

JHOSTIN NUNEZ-QUINONES                              November 06, 2024
QUINONES V. FLOCK GROUP, INC.                                    77–80

Page 77

1  me.
2     Q   Did you get along with Mr. Graber?
3     A   We barely spoke, so I can't answer that
4  question.  You know, I didn't even have enough time to
5  meet him like that, professionally or personally.
6     Q   Who is Melissa Lee?
7     A   I do not know who that is.
8     Q   Who is Kyle Whyte?
9     A   I do not know who that is.
10    Q   Okay.  This references no images since
11 January -- 1/25, which I purport is January 25th, and
12 this message was dated Friday, February 3rd.
13    A   Uh-huh.
14    Q   What would -- do you recall what he would be
15 referencing of "No images since 1/25"?
16    A   Sure.  So when it comes to certain cameras,
17 there would be certain issues where we can't capture
18 evidence because either it's a software issue or a
19 hardware issue.  There would be certain situations where
20 we were told not to do anything because the software team
21 will be working on it or hardware team will be working on
22 it.  We will also be told that we cannot roll trucks due
23 to financial issues -- or not financial, let me rephrase,
24 budget constraints.
25        So an example, if there's a camera in

Page 78

1  Tennessee, right, so Tennessee Police Department, we were
2  told not to roll trucks out there because we needed a
3  budget for another department so, you know, so we can fix
4  their cameras.  So we will be getting conflicting, you know,
5  directions.
6        So referring to this answer to your question,
7  what happened was, to my best of my recollection, there
8  were certain cameras that were having software issues,
9  and we were told not to do anything or roll anything
10 until software team handles it.
11    Q   Okay.
12    A   If that answers your question.
13    Q   I think so.  So just to -- to reask it, what
14 does he -- what does he mean by "No images"?  That's the
15 no images from the camera?
16    A   Yeah.
17    Q   Was it common to go nine days without any
18 images?
19    A   So to best answer that question, there is --
20 were so many problems with those cameras that there was
21 really no common issue.  All I know is for this time
22 frame, that was a common issue, where there was cameras
23 that were going off-line and not capturing evidence.
24    Q   Did Alex follow up at all regarding this
25 message, to your recollection?

Page 79

1     A   To my recollection, no.
2     Q   Okay.  And so that -- the update to -- that the
3  first part of that, "QA deployment Engineers any update,"
4  was that directed to you or was that directed -- who was
5  that directed to?
6     A   So that was directed to the whole team.
7     Q   Okay.  Do you recall if Omar messaged you on
8  February 10th and February 15th of 2023 regarding
9  performance issues?
10    A   I believe so, yes.
11    Q   What is your recollection of what that
12 performance issue consisted of?
13    A   I do not remember exactly.
14    Q   Do you remember if it related to a Jira ticket?
15    A   Oh, now I remember.  Yeah, so -- yeah, if I
16 have the document, I can probably answer the question
17 better.
18    Q   Okay.  Before we go there, I just want to get
19 some background.  What is a Jira ticket?
20    A   So it would be -- Jira would be like a -- from
21 my best of recollection, it was like a ticketing system
22 that an engineering team would use to monitor certain
23 situations.  So example, like we stated earlier in a
24 previous question, if a camera goes off-line in a certain
25 district, that ticketing system will go ahead and make a

Page 80

1  ticket, and we would look into that; but just to add more
2  context, sometimes that ticketing system will not work
3  properly, so it will misconstrue tickets.  It will
4  misconstrue situations.
5     Q   Okay.  And what is a QA deployment mention?
6     A   So you mentioned -- so if we can go ahead to
7  the one right here, QA Deployment Engineers --
8     Q   Yes.
9     A   -- the document we saw before, that would be a
10 mention.
11    Q   Okay.  And a mention is just a -- is it a
12 callout?
13    A   Yeah, so like an at.
14    Q   Okay.
15        (Deposition Exhibit No. 12 was marked for
16 identification.)
17    Q   BY MR. KEATING:  This is marked as Exhibit
18 11 -- 12.  Thank you.
19        Do you recall -- I will let you take a look.
20 Read through this chain and let me know when you are
21 ready.
22    A   All right.  Okay.
23    Q   Okay.  Do you recognize this chain of, I guess,
24 mentions?
25    A   Yes.  Correct.

JHOSTIN NUNEZ-QUINONES
QUINONES V. FLOCK GROUP, INC.

November 06, 2024
81–84

Page 81

1  Q  Okay.  Why does Omar state that if you have not
2  resolved a QA deployment mention, you need to give him a
3  response?
4     A  Yeah, so what happened was, we were -- so we
5  had mentions, and if you see in the previous document, it
6  will be like a group of mentions, so it will be relating
7  to one certain issue.
8     I have talked to him previously that we needed
9  to have certain mentions for certain situations, so I was
10  confused on what situation he was talking about.  So I
11  told him specifically, what are we talking about?  And
12  not here, it's not on a document, and he didn't clarify
13  anything.  He just left me on red.
14     Q  Did you give him a response?
15     A  On -- I tried to give him a response on Slack,
16  and he never responded back, just ghosted me.
17     Q  Did you ever follow up with him after that
18  about this?
19     A  Yes.  And he said we are still looking into it,
20  and he would never answer the question and would never
21  follow through.
22     Q  Did you raise this concern with anybody else?
23     A  I tried to talk to him, but since the workload
24  was so much, I had to go and not -- you know, focus on my
25  work, and I couldn't -- I didn't have enough time to

Page 82

1  raise it --
2     Q  Okay.
3     A  -- to anybody else, yeah.
4     Q  Okay.  So just to confirm it, other than raise
5  it -- trying to raise it with Omar, you didn't raise it
6  with anybody else, correct?
7     A  Oh, that's correct, yes.
8     Q  Okay.  Do you recall if Omar e-mailed you in
9  March of 2023 regarding performance deficiencies?
10     A  Yes.
11     Q  Okay.  What is your recollection of that
12  conversation or e-mail or document?
13     A  I don't recollect exactly, but if I see the
14  e-mail, I can give you a better answer.
15     Q  Did you have a one-on-one with him at that
16  time, around that time frame where he mentioned that
17  there was some performance concerns or issues with
18  your -- with your performance?
19     A  Yes.
20     Q  Okay.  And what do you recall from that
21  conversation?
22     A  I don't recall exactly what he was saying, but
23  what I recall is my concerns that I brought up with the
24  team, that there were inconsistent metrics, and those
25  metrics, you know, as we like -- we stated earlier in the

Page 83

1  deposition, we -- we physically can't note those metrics
2  because we don't have enough cases or we don't have
3  enough information.  And I raised those concerns in those
4  meetings, but I don't exactly recall what he was talking
5  about.
6     Q  Okay.  Do you recall if he had an issue with
7  you deviating from management or manager's objectives
8  regarding daily kind of one-on-ones?
9     A  I read -- yes, so I remembered that, and I also
10  told him, like we stated earlier, there is certain
11  situations where there is contradicting information, and
12  for me to give performance, like better performance, I
13  need better feedback and better coaching, and I didn't --
14  he never responded.
15     Q  Okay.
16     A  If that answers your question.
17     Q  Do you recall during this performance issue or
18  performance coaching that he addressed the amount of
19  canceled truck rolls -- unwarranted truck rolls?
20     A  Yes, he did say that.
21     Q  Okay.  And what's the issue with unwarranted
22  truck rolls?
23     A  So it really depends on the situation.  So I'll
24  give you an example.  Sometimes the camera angle is bad,
25  but -- and it goes back to the ticketing system.

Page 84

1  Sometimes if the angle is bad, it can either be just the
2  angle or it can also be a software issue.
3     So for unwarranted truck roll, that means that
4  the truck was not supposed to be rolled out, but I
5  brought him to my concern -- and I'm trying to just
6  answer the question best to my ability.  I told him
7  specifically that we need better clarification of what --
8  when do we truck -- roll a truck and when we don't roll a
9  truck.
10     Q  Do you recall that your truck -- your
11  unwarranted truck roll was higher than 5 percent?
12     A  Yes.
13     Q  Okay.  I want to mark -- Exhibit 13?  13.
14     (Deposition Exhibit No. 13 was marked for
15  identification.)
16     THE WITNESS:  Thank you.
17     Q  BY MR. KEATING:  I will give you a chance to
18  read that.
19     Do you recall this e-mail?
20     A  Yes, I do.
21     Q  And this the performance coaching that we were
22  just discussing?
23     A  Yes.
24     Q  And that's your e-mail address up top, correct?
25     A  Yes.  Correct.

JHOSTIN NUNEZ-QUINONES                    November 06, 2024
QUINONES V. FLOCK GROUP, INC.                    85–88

Page 85

1    Q   And you see that Laura McCormick is bcc'd on
2    that e-mail?
3    A   When I had this e-mail -- I have the document,
4    yes, but at the time I did not see that bcc.
5    Q   Okay.  Do you recall the Slack messages that
6    Mr. Lodge refers to in this e-mail?
7    A   Yes.
8    Q   Okay.  I'm gonna kind of bounce back and forth
9    here, but I've got...
10       (Deposition Exhibit No. 14 was marked for
11   identification.)
12   Q   BY MR. KEATING:  I will show you what we've
13   marked as Exhibit 13 (sic).  I will let you take a look
14   at those Slack messages and ask you some questions.
15       14.  I'm gonna do this all day.
16       Were these the Slack messages Mr. Lodge was
17   referring to?
18   A   Yes.  Correct.
19   Q   Do you think you had a professional tone in
20   these messages?
21   A   I believe so.  Yes, I did.
22   Q   Do you think saying "nah it's cool y'all can
23   have them" is an acceptable way to speak to a supervisor?
24   A   Supervisors talk to me like that, too.  We had
25   a casual tone within the team.

Page 86

1    Q   Okay.  So in your view, saying "nah it's cool
2    y'all can have them" is an okay way to speak to your
3    supervisor?
4    A   Yeah.
5    Q   How about, "I don't know what do y'all need" in
6    response to asking what you can do for the day?
7    A   Yes.  We normally talk like that by the team.
8    Everybody talks like that, so it was a casual tone within
9    the team.
10   Q   Okay.  What is Mr. Lodge referring to when he
11   states you had two daily -- you two had "daily sync to go
12   over the objectives for the day"?  Did you guys -- I
13   mean, let me rephrase that.
14   A   Uh-huh.
15   Q   What is Mr. Lodge referring to when he states
16   you two had "daily sync to go over the objectives for the
17   day"?
18       MR. REID:  Is this on 14 or 13?
19       MR. KEATING:  It's on 13, I believe.  It's in
20   that e-mail.
21       MR. REID:  Yeah, yeah, yeah.
22       THE WITNESS:  Oh, you are in the e-mail?
23   Q   BY MR. KEATING:  Yes, sir.
24   A   Oh, sorry.  Give me one moment.
25       So daily sync, he's referring to the -- the

Page 87

1    group meetings, the 9:15 meetings that sometimes he would
2    do it daily.  Sometimes he would do it, you know, twice a
3    week.  So that's what he's referring to, to that meeting.
4    Q   And in this e-mail, he's referring to that
5    there was an issue with you going against the plan and
6    that being intolerable versus your tone in the message;
7    is that correct?
8    A   Yes.  Correct.
9    Q   Okay.  And I think we -- we talked about this
10   earlier, but in the e-mail, it says, "just under 20% of
11   your closed cases requiring a truck roll were canceled as
12   the issue was resolvable remotely."
13       Can you explain what that means?
14   A   Yeah.  So this issue, from my best of my
15   recollection, it was a software issue.  We -- and there
16   was this problem with the team, of other teams.  We were
17   not properly communicated that these certain situations
18   were resolved remotely.  Because we will have our tasks
19   split up, so referring to like the beginning meeting,
20   every team member will have a different task.
21       We were not specifically told that this was
22   resolved remotely, like me specifically wasn't told that
23   this was resolved remotely, so that's why I rolled the
24   trucks.  I wasn't communicated that.
25   Q   Okay.  And the target was to get it under --

Page 88

1    under 5 percent of the total cases for unwarranted truck
2    rolls, correct?
3    A   That's correct.
4    Q   Okay.  Why did Mr. Lodge want to get it down to
5    under 5 percent?
6    A   I am not sure.  He was talking to the software
7    team.  So...
8    Q   But he --
9    A   And the deployment team, so I don't know what
10   plan they had.
11   Q   Okay.  Well, he -- but he does mention here in
12   this e-mail to you that he wants to get your target under
13   5 percent, correct?
14   A   Yeah, yeah.  To me, yes.
15   Q   And yours was at nearly 20 percent, correct?
16   A   Yes.  Correct.
17   Q   So there's a discrepancy between 5 and 20
18   percent, correct?
19   A   Yes.
20   Q   What are DVC codes?
21   A   So a DVC code, to my best of recollection, is
22   for problems with a camera, so like a software issue or a
23   hardware issue.
24   Q   What does it mean to assign DVC codes to cases
25   moved to tier 3?

JHOSTIN NUNEZ-QUINONES
QUINONES V. FLOCK GROUP, INC.

November 06, 2024
89–92

Page 89

1    A    So -- so tier 3 -- so example, if we have a
2    certain problem that keeps repeating itself, we will move
3    it to tier 3, and we will assign a DVC code.
4        Q    But if you automatically -- if you don't assign
5    the DVC codes move to tier 3, is that a shortcut?
6        A    No.  So sometimes -- and like we stated
7    earlier, the ticketing system will be bad; it will go
8    off, so sometimes we will manually do a DVC code, or it
9    will be, you know, the Jira ticketing system will do it
10   automatically.  So it was between a manual and automatic,
11   if that answers your question.
12       Q    And in the beginning of this e-mail, Mr. Lodge
13   is referencing that there is -- there is issues with your
14   performance, correct?
15       A    Yes.
16       Q    From his perspective?
17       A    Uh-huh.
18       Q    Okay.  At the end of the e-mail, he mentions,
19   you know, "Let me know how I can help you on this
20   journey."
21           Do you see that?
22       A    Uh-huh.  Yes.
23       Q    Did you ever ask for help following this
24   e-mail?
25       A    Yes, I did.

Page 90

1        Q    Okay.  When?
2        A    It was the next, whatchamacallit, daily
3    meeting, daily sync.
4        Q    Okay.  And what do you -- what do you recall
5    asking for help on?
6        A    More clarification on the actual rules and the
7    actual metrics we were using, because -- and the
8    communication, because I can't perform my best if there's
9    no good communication or standards, you know, clear
10   standards put forth to that.
11       Q    And did Mr. Lodge have a response to that?
12       A    No.
13       Q    He didn't respond at all?
14       A    No.  He said duly noted.  I will come back to
15   you, and he never followed through.
16       Q    Okay.  A couple weeks after this performance
17   coaching e-mail, do you recall Mr. Lodge e-mailing you
18   again regarding DVC code assignments?
19       A    Yes.
20       Q    And what is your recollection of that?
21       A    I don't recall, but if I see the document, I
22   can give you a better answer.
23       Q    You recall he e-mailed you, correct?
24       A    Oh, yes.
25       Q    Do you have any idea what he e-mailed you about

Page 91

1    with DVC codes?
2        A    Just some DVC codes, but I don't remember
3    exactly.
4        Q    Do you remember anything about DVC codes in
5    that e-mail?
6        A    In that e-mail, no, because we had a lot of DVC
7    codes, so...
8        Q    Do you recall it being about an e-mail that you
9    got before you left for the holidays?
10       A    What date?  Around March?
11       Q    This is March of --
12       A    Oh, yes.
13       Q    -- '23.
14       A    Yes.
15       Q    What holiday was this for?  Or you just went
16   on -- was it vacation?
17       A    Vacation, correct.
18       Q    Okay.  Do you recall that he e-mailed you
19   before vacation asking you to -- fix these DVC codes?
20       A    Yes.
21       Q    Okay.  And had -- did you do that?
22       A    I tried to my best of ability, yes.
23       Q    Did you -- did you complete the task that he
24   asked of you?
25       A    Before I did, yes.

Page 92

1        Q    Okay.  You did.
2        A    That's what he said to me, that I completed it.
3        Q    Okay.
4            (Deposition Exhibit No. 15 was marked for
5    identification.)
6        Q    BY MR. KEATING:  I'm handing you what we've
7    marked as Exhibit 15.
8            Do you recall this e-mail?
9        A    Yes.
10       Q    Okay.  And specifically this -- it's the second
11   sentence that I'm looking at.  "I sent you an e-mail
12   before you left for holidays expecting you to step and
13   fix this, you did not."
14       A    Uh-huh.
15       Q    So that differs from your prior response of you
16   saying that you fixed it, correct?
17       A    Yeah, so I fixed it, but to -- just to
18   emphasize, sometimes the ticketing system for Jira, it
19   will automatically just restore DVC codes.  And I tried
20   to explain to that, that that might be a possibility, but
21   he just didn't want to listen.
22       Q    Okay.  But this is another e-mail of him
23   addressing some performance concerns with you, correct?
24       A    Yes.
25       Q    Going back to the comments, you -- you

Page 93

1  indicated, started in March of '22 from Mr. Lodge
2  regarding asking whether you were married or not.  Did
3  you ever tell him that you were not comfortable answering
4  that question?
5      A   I'll tell him, I will -- so I would try to like
6  switch the conversation, but at first I would not tell
7  him to stop.  I would just try to change the conversation
8  to professional.
9      Q   Did you ever tell him to stop asking that
10  question?
11      A   Towards the end of my employment at Flock,
12  yeah.
13      Q   And how many times did he ask you the question
14  if you were married or not?  It seems to be a question
15  you only ask once.
16      A   So he would keep asking me, I'd say once a
17  month, and it would just keep going.
18      Q   When you say "once a month," what specifically
19  did he ask you once a month?
20      A   Like he would ask me like, oh, how is your
21  personal life?  How is your relationships?
22      Q   So not necessarily about if you are married,
23  but just about maybe your personal or social life,
24  correct?
25      A   On both.

Page 94

1      Q   And at that -- when do you -- do you recall any
2  specific times that you told him that you are not
3  comfortable answering that question?
4      A   Yes.
5      Q   When?
6      A   So it was prior March 2022, I kind of like
7  softly didn't answer the question.  Then I remember three
8  months later, that's when I started like, okay, can you
9  please stop.  I don't feel comfortable about my personal
10  life being at work.
11      Q   Okay.  And what was his response to that?
12      A   He says, Well, you need to relate more to the
13  team, and you have to be more open towards the team, but
14  I did not feel comfortable, you know, how he was phrasing
15  that.
16      Q   And did these conversations occur during group
17  or -- group calls?
18      A   One-on-ones.
19      Q   One-on-ones.  And do you recall -- after you
20  told him not to -- you didn't feel comfortable talking
21  about your personal life, did he continue to ask
22  questions?
23      A   He would try to punish me, and then he will
24  try -- he will back off, and then he will try to ask
25  questions again.

Page 95

1      Q   How would he try to punish you?
2      A   So one thing is he will give me conflicting --
3  conflicting orders.  So I will tell him, hey, listen, I
4  can't do this because I was told by the software team
5  that I can't do that.  And he will purposefully give me
6  wrong information just to --
7      Q   Can you provide more detail regarding how that
8  is -- how you feel that that was punishment?
9      A   Yeah, so he will purposely make me look bad in
10  front of other team members to make it seem like I'm not
11  performing well so he will have a reason to fire me.
12      Q   Do you have any specific instances where he
13  made you look bad in front of other team members?
14      A   Yeah, so if you look -- and also -- but on the
15  one-on-ones, he would write down what everybody else is
16  doing, make me look bad, and then on the following
17  meetings, like the group meetings, he will say, Well,
18  Jhostin is down here.  He's not doing too well.  He needs
19  to step it up.
20      Q   Do you have any specific dates for when these
21  occurred?
22      A   No, but I do know they occasionally happened
23  like once a month.
24      Q   Is there a reason why you did not include any
25  of this information in your lawsuit?

Page 96

1      A   Yeah.  The reason was I didn't have that
2  document in hand because they took -- took off my
3  computer.  You know, they shut down my computer after I
4  got terminated.
5      Q   But you don't recall any specific date that
6  these, you know, which you feel were punishments against
7  you, occurred, correct?
8      A   Oh, no.  I don't recall the dates exactly, but
9  the frequency I do.
10      Q   Did you ever report to anybody that
11  Mr. Lodge -- you felt Mr. Lodge was punishing you because
12  you weren't answering questions about your personal life?
13      A   No, because I felt like I was going to get
14  terminated and my livelihood would be taken away.
15      Q   Okay.  Why did you feel that you would be
16  terminated?
17      MR. REID:  Objection.  Asked and answered.
18  But go ahead.
19      THE WITNESS:  Gotcha.
20  I feel like I would be terminated because I'm
21  more junior, so me being junior and him being more senior
22  on the team, they are going to value his opinion more
23  over mine.
24      Q   BY MR. KEATING:  That's you -- but did anybody
25  make any mention to you that that would occur, or that

JHOSTIN NUNEZ-QUINONES                                          November 06, 2024
QUINONES V. FLOCK GROUP, INC.                                          97—100

Page 97

1  was your own personal perception?
2      A  The way the team was talking -- not team but
3  Omar was talking, I perceived that he was just gonna
4  because nobody asked my side of the story.
5      Q  But again, I'm not getting any specific details
6  regarding how you felt that you were being punished.
7      A  Uh-huh.
8      Q  Do you have any specific details of how you
9  felt you were being punished by Mr. Lodge?
10     A  Yes.  So again, he would make it seem like I
11 wasn't doing a good job.
12     Q  How?
13     A  By the metrics.  The metrics did not actually
14 tell the whole story.
15     Q  Okay.
16     A  Did that make sense?
17     Q  Are you alleging that Mr. Lodge was
18 manipulating the metrics to make you look bad?
19     A  No.  He would take the metrics, like certain
20 metrics -- like an example, like we said earlier, let's
21 say there's not enough cases to do 65 cases, right?  He
22 will purposefully put me in that situation so it looks
23 like I'm not doing my job.
24     Q  And you never reported this to anybody,
25 correct?

Page 98

1      A  I talked to him personally but nobody else,
2  yeah.
3      Q  Okay.  And we went through a -- you went
4  through anti-harassment training with the company,
5  correct?
6      A  Yes.
7      Q  You were aware that you could raise concerns to
8  human resources, correct?
9      A  Yes.
10     Q  Okay.  And actually, you did eventually raise a
11 concern to human resources on November 2nd of 2023,
12 correct?
13     A  Yes.
14     Q  But prior to that, you did not raise any
15 concerns about Mr. Lodge before November 2nd, 2023,
16 correct?
17     A  Yes.  Correct.
18        MR. KEATING:  Okay.  I am starving, so I am
19 going to break for lunch.
20        MR. REID:  Sure.
21        MR. KEATING:  Okay.
22        THE VIDEOGRAPHER:  11:56, we're off the record.
23 This is the end of media number three.
24        (The deposition was at recess from 11:56 a.m.
25 to 12:48 p.m.)

Page 99

1        THE VIDEOGRAPHER:  12:48, we're back on the
2  record.  This is the beginning of media number four.
3      Q  BY MR. KEATING:  All right.  Jhostin, we are
4  back on the record.  Are you ready to proceed?
5      A  Yes.
6      Q  All right.  We had a little lunch break.
7  During the lunch break, did you talk with your counsel at
8  all about this case?
9      A  No.
10     Q  Did you talk at all about your testimony in
11 this case?
12     A  No.
13     Q  Okay.  I will hand you what we are going to
14 mark as Exhibit No. 16.
15        (Deposition Exhibit No. 16 was marked for
16 identification.)
17     Q  BY MR. KEATING:  This is a -- take a look
18 through the document, but I believe this is a job
19 description from Flock for a Device Support Engineer I.
20 And you previously had mentioned that, you know, either
21 when you were hired or shortly after you were hired, your
22 title changed to Device Support Engineer I; is that
23 correct?
24     A  II.
25     Q  II?

Page 100

1      A  Yeah.
2      Q  Well, taking a look through these job -- I know
3  you mentioned that some of the job duties changed, and
4  they were evolving because it's a start-up?
5      A  Uh-huh.
6      Q  In looking at this, you know, job description,
7  where some challenges you'll tackle, is this a -- an
8  accurate representation of kind of what you did during
9  your time at Flock?
10     A  Give me one moment.  I'm kind of reading
11 through some of these.
12     Q  Of course.
13        MR. REID:  Objection, vague.
14        But you can answer it if you can.
15        THE WITNESS:  No, because these are kind of
16 vague.
17     Q  BY MR. KEATING:  So what did you do at Flock
18 that is different --
19     A  So --
20     Q  -- from the Device Support Engineer I role
21 here?
22     A  So as far as kind of like the metrics were
23 changing all the time, so --
24     Q  The metrics for what?
25     A  So it would be -- an example, certain device

JHOSTIN NUNEZ-QUINONES
QUINONES V. FLOCK GROUP, INC.

November 06, 2024
101–104

Page 101

1  situations, so situation, would be like 24 hours.  We will
2  also have situations where we will have like a camera
3  down.  That will be like 12 hours.  So those metrics
4  were -- you know, they're not even on this job
5  application -- not job -- job description.  So those
6  differ, if that makes sense.
7      Q   Okay.  So do you disagree that these are some
8  of the challenges you would tackle in your role as Device
9  Support Engineer?
10     A   It is not specific enough.
11     Q   Okay.
12     A   To answer your question.
13     Q   All right.  Regarding the metrics, you
14  mentioned at one point that during the group meetings,
15  your metrics and other team members were placed on the
16  screen, correct?
17     A   Yes, they will have a dashboard.
18     Q   Dashboard.  And did you disagree with those
19  metrics that were put on the dashboard?
20     A   In what sense?  Like the actual number or?
21     Q   The actual number.
22     A   Yes, I did disagree with some of them due to
23  sometimes there were situations where we couldn't
24  close -- you know, we couldn't close a certain number of
25  cases because other teams were looking at it.

Page 102

1      Q   Okay.
2      A   If that makes sense just answering your
3  question.
4      Q   So the -- you don't think that the metrics that
5  were placed on the dashboard were accurate?
6      A   Yes.  Correct.
7      Q   Why don't you think they were accurate?
8      A   There would be situations -- and I can give you
9  one example.  There would be certain cameras that will
10  have a -- a hardware issue.  The hardware team will take
11  like -- or hardware team or the production team will take
12  those cameras, and they will say there is certain cases
13  that -- there is certain cameras that we have to look at.
14  You can put them on hold, but you cannot close them.  And
15  those -- those cases were not properly classified on the
16  dashboard, if that makes sense.
17     Q   Do you have a specific date or example where
18  you disagreed with the metrics being put on the dashboard
19  that you can --
20     MR. REID:  Objection.
21     Q   BY MR. KEATING:  -- recall?
22     A   One, I don't know the exact date, but I can
23  tell you the situation.  There was a situation with some
24  cameras in Arizona where they were overheating and the
25  soldier (sic) wasn't working.  They were not classifying

Page 103

1  those cameras correctly, and they were saying that pretty
2  much we couldn't close some of those cameras because they
3  were still working with production.  So those numbers
4  were not reflected properly of actually what's going on.
5      Q   Did you ever report the issue of you not
6  thinking the numbers were reported properly to anybody?
7      A   I brought it up to Omar Lodge in the meetings.
8  I don't remember the exact date, but I did brought it up
9  to him.
10     Q   Do you remember when that may have occurred?
11     A   I'm not sure.  Probably 2022.
12     Q   Okay.  Do you remember if it was the fall,
13  spring, summer?
14     A   It was summer.
15     Q   Summer of '22?
16     A   To my best of recollection.
17     Q   Okay.  Going back to your comment that you felt
18  Mr. Lodge would punish you if you brought concerns about
19  his comments of you putting your, you know, picture in
20  frame on a camera, if you escalated those concerns, you
21  do not recall any specific dates when he made those
22  comments, do you?
23     A   Not the dates but the frequencies.
24     Q   Okay.
25     A   Like once --

Page 104

1      Q   Well, how frequent --
2      A   -- a month.
3      Q   How frequent would these alleged threats of
4  punishment occur?
5      A   It would be like once a month, probably twice a
6  month.
7      Q   Okay.  And what specifically did he say to you
8  where you thought he would be punishing you?
9      A   He would say that --
10     MR. REID:  Asked and answered.
11     Go ahead.
12     THE WITNESS:  Gotcha.
13     Long story short, he would say like you are
14  easily replaceable.  Anybody would like to have this job.
15  You know, you -- you know, you don't do what I tell you,
16  you won't be long with this company.  So he will say
17  that.
18     Q   BY MR. KEATING:  In saying you were easily
19  replaceable, why did he, in your mind, say that to you?
20     A   Just an intimidation tactic, trying to
21  intimidate me.
22     Q   And did -- were you ever punished by Mr. Lodge?
23     MR. REID:  Objection.  Asked and answered.
24     Go ahead.
25     THE WITNESS:  Gotcha.

JHOSTIN NUNEZ-QUINONES                    November 06, 2024
QUINONES V. FLOCK GROUP, INC.                      105–108

Page 105

1    So the way I feel is, he tried to punish me by
2  looking at me -- making me try to look bad and also, you
3  know, by writing me up and not telling the whole story of
4  what's happening.
5    Q  BY MR. KEATING:  I want to get away with how
6  you feel.  I want to know specific examples of ways --
7  specific adverse employment actions that Mr. Lodge took
8  against you.
9    A  Gotcha.
10    Q  Do you have any specific examples of adverse
11  employment action that Mr. Lodge took against you?
12    A  Yeah.
13    MR. REID:  Objection, vague, and to the extent
14  it calls for a legal conclusion.
15    Go ahead.
16    THE WITNESS:  Gotcha.
17    So as I said earlier, like he will give me
18  certain tasks, and he will misrepresent the actual data
19  that was actually going on.
20    Q  BY MR. KEATING:  When did this occur?
21    A  So I said it earlier.  It happens like once a
22  month or it will happen infrequently, so I can't just
23  say, hey, it happened on this day, this day, this day.
24    Q  And you never reported this to anybody,
25  correct?

Page 106

1    A  Yes, correct, because I felt --
2    Q  And even in your November 2nd of 2023 e-mail to
3  Ms. McCormick, where you bring a complaint against
4  Mr. Lodge regarding your camera presence, nowhere in that
5  e-mail did you mention that Mr. Lodge threatened to
6  punish you, correct?
7    A  No.
8    Q  And nowhere in that e-mail did you mention that
9  Mr. Lodge threatened to retaliate against you, correct?
10    A  No.
11    Q  Turning to --
12    MR. KEATING:  And Madam Court Reporter, do you
13  remember what exhibit this number is (indicating)?
14    MR. REID:  It's the one with the screenshots
15  but they are kind of like smaller?
16    MR. KEATING:  Yes.
17    MR. REID:  Yeah, 13.
18    Q  BY MR. KEATING:  Turning to Exhibit 13, this
19  e-mail from Mr. Lodge to yourself on March 7th of 2023,
20  from his standpoint, your Slack exchange with him was not
21  acceptable, correct?
22    A  From his standpoint.
23    MR. REID:  Objection, calls for speculation.
24    Go ahead.
25    Q  BY MR. KEATING:  From your manager's

Page 107

1  standpoint, he writes, "Our Slack exchange last Thursday,
2  March 2nd is not acceptable."
3    Is that correct?
4    A  Yes, that's from his perspective.
5    Q  And he actually wrote that in the e-mail,
6  correct?
7    A  Yes.
8    Q  So he -- he specified to you that the Slack
9  exchange last Thursday, March 2nd, is not acceptable,
10  correct?
11    A  Correct.
12    Q  And that was because he -- in the e-mail, you
13  explicitly went against the plan of the daily sync
14  objectives, correct?
15    A  Correct.
16    Q  Okay.  So you just understand that this is an
17  e-mail from your boss telling you that your performance
18  is not acceptable in his opinion, correct?
19    A  Correct.
20    Q  Do you recall receiving an e-mail from
21  Mr. Lodge in August of 2023 specifically addressing more
22  concerns regarding your behavior and work output?
23    A  If I see the document, I can give you a better
24  answer, but I believe he gave me an e-mail.
25    Q  Okay.  Do you remember him discussing with you

Page 108

1  concerns regarding your behavior and work output in
2  August of 2023?
3    A  Correct.
4    Q  Okay.  What do you recall without -- we'll take
5  a look at the document, but I want to know what you
6  recall first.
7    A  So what I recall, it was something about my
8  attitude and something about case numbers, but that's the
9  best of my recollection.
10    Q  Okay.  This will be Exhibit 17.
11    (Deposition Exhibit No. 17 was marked for
12  identification.)
13    Q  BY MR. KEATING:  Take a minute to read through
14  that e-mail and then I will ask some questions about it
15  here.
16    A  Okay.
17    Q  Actually, I'm gonna turn back to a different
18  exhibit real quick.
19    Madam Court Reporter, the e-mail from
20  April 21st, 2023, what exhibit number is that?  It's -- I
21  will show you my version of it.  Actually, I'm sorry,
22  that's -- I don't think I introduced that one.  We're
23  going to scratch that.
24    Going -- turning back to this e-mail.
25    A  Uh-huh.

JHOSTIN NUNEZ-QUINONES
QUINONES V. FLOCK GROUP, INC.

November 06, 2024
109—112

Page 109

1    Q   The one on Wednesday, August 9th of 2023.
2    A   Okay.
3    Q   In the second paragraph, Mr. Lodge is stating
4  he's observed instances of your behavior that don't align
5  with the expected conduct within our team, correct?
6    A   Yes.  Correct.
7    Q   He's -- and then he goes on to refer back to a
8  conversation that you had with him during your one-on-one
9  meeting where he raised concerns about not being able to
10 see you.
11   A   Correct.
12   Q   Do you see that?
13   A   Uh-huh.  Correct.
14   Q   Do you remember that meeting on July 27th, the
15 one-on-one where he talks about not being able to see
16 you?
17   A   Correct.
18   Q   Okay.  And he further goes on to state that you
19 nonchalantly replied that it was IT related.  How was
20 it --
21   A   Yes.
22   Q   -- IT related, from your recollection?
23   A   So I don't have the document, but I did talk to
24 the IT department.  There was a software update with the
25 computer, and apparently the webcam was not working at

Page 110

1  that time.
2    Q   Okay.
3    A   So I told him that it was an IT issue, and I
4  would have to talk to IT.
5    Q   And then further down in the passage, he goes
6  on to talk about some issues with your responsiveness,
7  correct?
8    A   Correct.
9    Q   And in the last sentence -- no, second to last
10 sentence, he mentioned, "Such behavior is
11 counterproductive to your personal growth and advancement
12 and must be rectified."
13       Do you see that?
14   A   Yes.
15   Q   Is that a correct recitation of what Mr. Lodge
16 put in the e-mail?
17   A   Yes.  Correct.
18   Q   The next sentence your manager states,
19 "Furthermore, recent tasks assigned to you have
20 compounded my apprehension about the diminishing quality
21 and quantity of your work output," correct?
22   A   Yes.  Correct.
23   Q   And in the next paragraph, "I urge you to take
24 a moment to contemplate these concerns and the potential
25 impact of your actions on the overall team dynamic and

Page 111

1  work quality."
2        Is that a correct recitation of that, what he
3  put in that e-mail?
4    A   Yes.  Correct.
5    Q   So this e-mail addressed not closing cases from
6  Omar's point of view, correct?
7    A   Yes.  Correct.
8    Q   This e-mail addressed diminishing quality and
9  quantity of work from your supervisor's perspective,
10 correct?
11   A   Correct.
12   Q   Do you remember -- do you remember if you ever
13 responded to this e-mail?
14   A   I do not remember if I responded to this
15 e-mail.
16   Q   Okay.  And at the time you received this
17 e-mail, do you know that Laura McCormick was bcc'd on the
18 e-mail?
19   A   No, I did not.
20   Q   Were you aware that Mr. Lodge thought you were
21 a bad performer in April of 2023?
22   A   No, he did not provide feedback.
23   Q   Do you -- do you know that Mr. Lodge had issues
24 and concerns about your performance and being a continued
25 employee in April of 2023?

Page 112

1    A   No, I did not.
2    Q   But you were aware that he had sent you several
3  performance coaching and e-mails and other
4  performance-related instances, correct?
5    A   Correct.
6    Q   I'm handing you what we're going to mark as
7  Exhibit 18.
8        (Deposition Exhibit No. 18 was marked for
9  identification.)
10   Q   BY MR. KEATING:  Do you recognize this e-mail?
11   A   Yes.  Correct.
12   Q   Is this an e-mail you reviewed with your
13 counsel prior to the deposition?
14   A   Yes.  Correct.
15   Q   And that's your e-mail address up top?
16   A   Uh-huh.
17   Q   And it's dated September 19th of 2023, correct?
18   A   Correct.
19   Q   In this e-mail, Mr. Lodge is again discussing
20 some lack of inactivity regarding your -- your case
21 output, correct?
22   A   Correct.
23   Q   Okay.  And that here in the second paragraph,
24 he mentioned that your first case was closed at 9:36 and
25 your last case was closed at 2:41 p.m., almost three

JHOSTIN NUNEZ-QUINONES                                   November 06, 2024
QUINONES V. FLOCK GROUP, INC.                            113—116

Page 113

1  hours later, correct?
2      A  Correct.
3      Q  All right.  So he -- this e-mail, he's
4  questioning the -- the number of hours and how productive
5  you are being at work, correct?
6      A  Correct.
7      Q  And again, that's another performance-related
8  coaching e-mail, correct?
9      MR. REID:  Objection to the extent it calls for
10 speculation.
11     Go ahead.
12     THE WITNESS:  Yeah.  So for my performance,
13 correct.  But I want to reiterate, I was never -- there
14 was never a set type of -- the hours, yeah, 40 hours, but
15 a certain type of schedule was never told on our team.
16 We would never have a set schedule.
17     Q  BY MR. KEATING:  Just to be clear, you -- you
18 did say that is it correct that this is a performance
19 coaching e-mail from your supervisor to you, correct?
20     A  Yes.
21     MR. REID:  The same objection.
22     THE WITNESS:  Correct.
23     Q  BY MR. KEATING:  Just so I can get it clear
24 without an objection, this is a performance coaching
25 e-mail from your supervisor to you, correct?

Page 114

1      A  That's correct.
2      MR. REID:  Same objection on that one.
3      Q  BY MR. KEATING:  On the -- obviously, this is
4  an e-mail chain, so there's three pages to this document.
5  On the third page, there's an e-mail from you -- I'm
6  sorry, it's a -- on Friday, September -- it's the last
7  one, Friday, September 22nd, 2023 at 9:33 a.m.
8      Do you see that -- that thread?
9      A  Yes.
10     Q  And it mentions you worked some cases at night
11 being able to adjust settings.
12     What -- was it normal to work on things at
13 night, or what did that mean?
14     A  So there were certain camera issues where the
15 nighttime quality was bad, and we will have to -- he
16 will -- and it was inconsistent with this, but we will
17 have to go and change the settings at night to get a
18 better picture.
19     Q  And so with that first e-mail that Omar sent to
20 you was on Tuesday, September 19th, correct, on that
21 first page?
22     A  Yes.  Correct.
23     Q  And you didn't respond until Friday,
24 September 22nd, 2023, correct?
25     A  Yes.  Correct.

Page 115

1      Q  Okay.  And that's nearly three days later,
2  correct?
3      A  Correct.
4      Q  And the verbal warning you received in October
5  of 2022 mentioned that you should be responding to
6  e-mails within 24 hours, correct?
7      A  Yes, correct.  But to emphasize, there were
8  certain situations where I did not respond to 24 hours.
9  We just talked on Slack, and he did not enforce that
10 rule.
11     Q  Okay.  But for this instance, he e-mailed you
12 on September 19th, and you didn't respond until Friday,
13 September 22nd, correct?
14     A  Correct.
15     Q  Turning to the incident on November 2nd of
16 2023, who was on the call during that group meeting on
17 November 22nd, 2023?
18     A  It was Akeia.  No, it wasn't Akeia.  I
19 apologize.  It was Avia Smith, Mia Gonzalez, Michelle
20 Sharp, Omar Lodge, and Sammer Kazwah.
21     Q  What's typically discussed during those
22 meetings?
23     A  It would just be professional.  As I say, like
24 it's professional, sometimes personal.  Things were
25 changing so fast that I can't really, you know, give you

Page 116

1  a specific thing.
2      Q  Okay.  You remember sometimes personal.  What
3  were some of the personal things discussed on group
4  calls?
5      A  Pretty much --
6      MR. REID:  Already asked and answered.
7      But go ahead.
8      THE WITNESS:  Gotcha.
9      So personal would be like your personal life.
10 How is your family?  How is your day going?
11     Q  BY MR. KEATING:  And this was on the group
12 call, correct?
13     A  Yes.  Correct.
14     Q  So Mr. Lodge would ask other people, not just
15 you, about their personal life, correct?
16     A  Yeah, but to degree, like not too personal,
17 if that makes sense.  He was more personal with me than
18 with the other team members.
19     Q  In what ways was it more personal towards you?
20 Do you know what he spoke about with other team members?
21     A  Well, in the group meetings we're talking
22 about?
23     Q  Correct.
24     A  Yeah, I was in the meeting, so I listened to
25 them, and they would talk about, you know, how is your

JHOSTIN NUNEZ-QUINONES
QUINONES V. FLOCK GROUP, INC.

November 06, 2024
117–120

Page 117

1 office set up?  How is your family and stuff like that.
2    Q   Okay.  So you just mentioned that he asked
3 other people how their family was?
4    A   Uh-huh.
5    Q   But somehow when he asked you how your family
6 was, that is more personal?
7    A   No, no, because if -- remember later, like
8 before we were talking earlier, he will talk about my
9 relationship, like if I'm married, if I'm seeing anybody.
10    Q   Do you know if he talked about that with
11 anybody else?
12    A   I'm not -- no.  In the --
13    Q   You don't know --
14    A   -- group meetings, no.
15    Q   -- correct?
16    A   I don't know, but in the group meetings he
17 didn't do that.
18    Q   Okay.  But you did just testify that during
19 group meetings, Mr. Lodge would ask the group
20 personal-related questions?
21    A   Yeah, to a -- but as I stated, to a degree.  So
22 not too personal, you know, more like overlay, but he
23 would not ask someone about like their love life or
24 their -- you know.
25    Q   And did -- what specifically did Mr. Lodge ask

Page 118

1 you about your love life?
2       MR. REID:  Objection to the extent already
3 asked and answered.
4       Go ahead.
5       THE WITNESS:  Yeah, so he would say if I was
6 married, if I am seeing anybody.
7    Q   BY MR. KEATING:  When did he ask you these
8 questions?  I'm not getting an answer to this question
9 and this is what is getting a little frustrating.
10       When did he ask you these specifically personal
11 questions that you are saying he asked you?
12    A   So like I stated, it's frequent.  So it's
13 like --
14    Q   When?
15    A   -- once a month.  I can't because I don't --
16    Q   He asked you multiple times if you were
17 married?  That just doesn't jibe.  So I'm trying to get
18 to the bottom of this question, and I've had -- like,
19 it's been like four hours trying to get to the same round
20 and round.  I know that's speaking.  It's not -- let
21 me -- let me ask a question here.
22       On the group meetings, did Mr. Lodge ask you
23 more than once whether you were married or not?
24    A   No.  In the group meetings, no.  As I stated
25 earlier, it was done --

Page 119

1    Q   On the group --
2    A   -- like once.
3    Q   -- meetings, no, that's -- that's your
4 answer --
5    A   Yeah.
6    Q   -- correct?
7    A   Uh-huh.  On the group meetings, no.
8    Q   On these group meetings, was it -- what -- the
9 issues discussed included personal?
10    A   Uh-huh.
11    Q   Maybe small talk, as well as work-related talk,
12 correct?
13    A   Correct.
14    Q   Okay.  On the group meeting of November 2nd,
15 2023, did everyone on that call have their camera turned
16 on?
17    A   Yes.
18    Q   Did you?
19    A   Yes.
20    Q   Okay.  Was your camera facing you?
21    A   Yes.
22    Q   Were you in the center of the camera?
23    A   I was a little bit off center but my face was
24 visible.
25    Q   Okay.  Is it fair to say you were in the left

Page 120

1 corner of the screen?
2    A   In frame, yes.
3    Q   Okay.  Were there anybody else, any other
4 employees in the left corner or out of frame?
5    A   Out of frame, no.
6    Q   Okay.  Do you know if Omar could see you?
7    A   Yes, he could see me.
8    Q   How do you know he could see you?
9    A   He says -- he said I can see you, but I need
10 you to get closer.
11    Q   Okay.  And is it possible that he asked if he
12 could -- you could get it closer just so he could get a
13 better view of you on camera?
14       MR. REID:  Objection.  It calls for
15 speculation.
16       Go ahead.
17    Q   BY MR. KEATING:  Is it possible?
18    A   Possible.  I'm unsure because I don't really
19 think --
20    Q   It's possible that he could just be asking to
21 get a better view of you on camera, correct?
22    A   Yes.
23       MR. REID:  The same objection.
24    Q   BY MR. KEATING:  And that's a yes, correct?
25    A   Yes.

JHOSTIN NUNEZ-QUINONES                                    November 06, 2024
QUINONES V. FLOCK GROUP, INC.                                    121–124

Page 121

1    Q   What did Omar say to you regarding
2    repositioning your camera frame?
3    A   He said, "I really want to see your face. Can
4    you get closer?"
5    Q   Okay. And this was also on a group call with a
6    number of other employees, correct?
7    A   Correct.
8    Q   Is there any specific reason why you did not
9    want to center your body on the camera frame?
10   A   First, I just didn't feel comfortable in the
11   tone he was saying it. Second of all, due to like the
12   previous comments he was making, I just felt like he was
13   just trying to look at my body in a weird way. I didn't
14   feel comfortable.
15   Q   Were you clothed during this meeting?
16   A   Yes.
17   Q   Okay. In looking at your body, did he ask to
18   see your body, or did he ask to see -- to you to center
19   the camera frame so he could see your face?
20   A   Well, on the second meeting? And we're gonna
21   get to the other --
22   Q   I'm talking about the group meeting right now.
23   A   At the time, no, but --
24   Q   Did he specifically say during --
25       MR. REID: Hold on.

Page 122

1    Q   BY MR. KEATING: -- the group meeting --
2        MR. REID: He's not done.
3        THE WITNESS: Well, in the second meeting --
4    Q   BY MR. KEATING: No, I'm not asking about the
5    second --
6    A   -- he --
7    Q   -- meeting right now. I'm not asking --
8        (Simultaneous cross-talk.)
9    Q   BY MR. KEATING: -- about the second meeting
10   right now.
11       MR. REID: I don't care.
12   Q   BY MR. KEATING: So answer my question.
13       MR. REID: I don't care.
14       MR. KEATING: Okay, great.
15       MR. REID: He's going to answer it how he's
16   going to answer it. You can't interrupt his answer.
17       MR. KEATING: Stop.
18   Q   BY MR. KEATING: I'm going to ask you about the
19   group meeting --
20       MR. REID: No.
21   Q   BY MR. KEATING: -- specifically.
22   A   I feel like --
23       MR. REID: Hold on one second, Jhostin.
24   Remember what you were going to say.
25       We are not going to do this. If he wants --

Page 123

1        MR. KEATING: Yeah, we are not going to do
2    this.
3        MR. REID: If you want to call the magistrate,
4    call the magistrate. He's going to answer the questions
5    you are asking how he wants to answer.
6        (Simultaneous cross-talk.)
7        MR. KEATING: The problem, he's not answering
8    my question. The problem is, he's not answering my
9    questions. That's the problem. That's the problem --
10       MR. REID: No, actually --
11       MR. KEATING: -- for the last four hours.
12       MR. REID: -- in the last question, he answered
13   your question and then was explaining his answer. So I
14   don't know if you want to get mad at that, but we can
15   call the magistrate if you want. Besides that --
16       MR. KEATING: I'm going to --
17       MR. REID: -- he's going to answer.
18       MR. KEATING: -- rephrase my question.
19   Q   BY MR. KEATING: During the --
20       MR. REID: No, you are not.
21       (Simultaneous cross-talk.)
22       MR. REID: He's going to finish answering the
23   question that --
24       THE WITNESS: I just want to -- can I --
25       (Simultaneous cross-talk.)

Page 124

1        MR. REID: Stop. Stop talking.
2        THE WITNESS: Okay.
3        MR. REID: Madam Court Reporter, please play
4    back the last question that Mr. Keating asked, and he's
5    going to finish his answer to that question.
6        And then you can move on to your next question.
7    We are not going to do this.
8        MR. KEATING: Don't tell me how I'm going to
9    conduct my deposition.
10       MR. REID: I will tell you --
11       MR. KEATING: This is my deposition.
12       (Simultaneous cross-talk.)
13       MR. REID: I don't care if this is what you are
14   going to do. He's going to --
15       MR. KEATING: Madam Court Reporter --
16       MR. REID: -- answer his question.
17       MR. KEATING: -- please read back the last
18   question.
19       (Off-the-record discussion.)
20   Q   BY MR. KEATING: I'm going to rephrase the
21   question and ask it again.
22       MR. REID: Sure.
23   Q   BY MR. KEATING: Okay. During the group
24   meeting on November 2nd of 2023 --
25       MR. REID: That's not what you asked him.

JHOSTIN NUNEZ-QUINONES                                          November 06, 2024
QUINONES V. FLOCK GROUP, INC.                                           125–128

Page 125

1    MR. KEATING:  Well, this is going to be a new
2    question then, Patrick.
3    Q    BY MR. KEATING:  During the group meeting on
4    November 22nd (sic) of 2023, did everyone have their
5    cameras on?
6    A    That's correct.
7    Q    Did Mr. Lodge, during that group meeting, ask
8    you to center your body in the camera frame?
9    A    Yes.  Correct.
10   Q    Did he specifically ask you to center your
11   body, or did he ask you to center your face in the frame?
12   A    He said, "Please put your face and body in the
13   camera."
14   Q    Okay.  Why did you not want to center your body
15   and face on camera?
16   A    I did not feel comfortable the way he said it.
17   And again, I feel like I've answered your question.  The
18   second meeting, he said, "You put your face and body
19   where I tell you" in a really aggressive tone, and I did
20   not feel the way he's talking about my body in the
21   previous questions, you know, the context, he was
22   being -- he was being really -- I will say he was making
23   me feel uncomfortable.
24   Q    Well, it's hard to anticipate how you would
25   feel on a second meeting when that meeting hadn't

Page 126

1    occurred during the first meeting.
2    A    No, no.
3    Q    So during the first meeting --
4    A    Uh-huh.
5    Q    -- why did you feel uncomfortable?  Because
6    again, you can't predict the future of what's going to
7    happen on the second meeting.
8    A    Yeah.
9    Q    During the first group meeting on November 2nd
10   of 2023, why do you allege that you felt uncomfortable
11   putting your body and face on camera?
12   A    Because previous questions it was asking about
13   my personal life, about my -- my personal life, if I'm
14   married, my romantic interests.  With that context and
15   the way he said it, I didn't feel comfortable, so I felt
16   like he was escalating, you know, his advances.
17   Q    You felt that he was escalating, correct?  This
18   is your perception, not any external things, this is how
19   you perceived it, correct?
20   A    Correct.
21   Q    In your e-mail to Ms. McCormick on November 2nd
22   of 2023 -- I'm sorry, in your e-mail to Ms. McCormick on
23   November 6th of 2023, when you talked about Mr. Lodge
24   making you feel uncomfortable by putting your face on
25   camera, you never mentioned anything about it being

Page 127

1    sexual in nature, correct?
2    A    Yes.  It was bizarre behavior.  That's what I
3    stated.
4    Q    But you never mentioned in that e-mail anything
5    about sexual in nature, correct?
6    A    Correct.
7    Q    Okay.  When Mr. Lodge asked you to move your
8    body and face in camera, what was your response?
9    A    I asked him, how does my face and body being
10   two inches from the center of the camera or where you
11   tell me to affect the meeting of the team or the
12   productivity of the team?
13   Q    And was that -- you said that during the group
14   meeting?
15   A    That's correct.
16   Q    Okay.  And on the group meeting, what was
17   Mr. Lodge's response?
18   A    So he said, "You put your face and body where I
19   tell you."
20   Q    And that was as a directive from your manager,
21   correct?
22   A    Correct.
23   Q    Why did you log off the meeting?
24   A    I did not feel comfortable with his answer, and
25   I felt like there needs to be a -- you know, I need an

Page 128

1    explanation, and I felt like it was going to keep
2    escalating, so I logged off the call.
3    Q    You felt that it was going to keep escalating,
4    but you didn't know it was going to keep escalating --
5    A    Well, it was --
6    Q    -- correct?
7    A    It was escalating before this meeting.  So I
8    felt it was going to escalate even further.
9    Q    And again, this was on a group meeting with
10   about five or six other employees, correct?
11   A    Correct.
12   Q    And the five or six other employees were all in
13   frame and had their camera on, correct?
14   A    Correct.
15   Q    Did you say good-bye, or did you just abruptly
16   log off the meeting?
17   A    No, I said, if you want to talk one-on-one
18   further about this issue, you can go ahead, and I logged
19   off the call.  I told him I don't feel comfortable.
20   Q    Did you normally hang up on your supervisor
21   during group calls?
22   A    No, that's the first time.
23   Q    You had a one-on-one meeting after that with
24   Mr. Lodge that same day, correct?
25   A    Correct.

JHOSTIN NUNEZ-QUINONES                                    November 06, 2024
QUINONES V. FLOCK GROUP, INC.                                    129–132

Page 129

1    Q   Did you hang up on Mr. Lodge during this
2    meeting?
3    A   Yes.
4    Q   Why?
5    A   I told -- he friend (sic) talked to HR saying
6    that I was not being responsive and that he was gonna
7    talk to Laura McCormick. At that point I felt like HR
8    needs to get involved because this wasn't going to go
9    anywhere, and he started getting aggressive with me.
10    Q   How did he get aggressive with you?
11    A   He raised his voice.
12    Q   And you perceived somebody raising their voice
13    with you as being aggressive?
14    A   Yes. If they raise their voice and raise their
15    hands on the camera, that's an aggressive.
16    Q   And again, that's your perception that he was
17    being aggressive?
18    A   Correct.
19    Q   Okay. And following the group meeting, you
20    received a reprimand from Mr. Lodge, correct?
21    A   Correct.
22    Q   Regarding your behavior during that call?
23    A   Correct.
24    Q   I'm handing you what's going to be marked as
25    Exhibit 19.

Page 130

1    (Deposition Exhibit No. 19 was marked for
2    identification.)
3    Q   BY MR. KEATING: Specifically the title of the
4    e-mail that's marked as Exhibit 19 is "Reprimand for
5    Morning Sync Behavior," correct?
6    A   Correct.
7    Q   Okay. In the e-mail, the second sentence he
8    says, "I am writing to address a concerning incident that
9    occurred during our morning sync today. Your behavior
10    during the meeting was not in line with our team's
11    expectations and standards of professionals."
12    Is that correct?
13    A   Correct.
14    Q   And the behavior that he is discussing is the
15    behavior that we were just talking about where you
16    refused to put your face on camera and logged off
17    abruptly, correct?
18    A   Correct.
19    Q   When asked why you were not on camera, you
20    responded by saying "it was not a big deal." It not
21    being a big deal is your perception and interpretation of
22    what a big deal is, correct?
23    A   Yes, but he used half of what I said. That's
24    not the whole sentence.
25    Q   Then what was the full sentence?

Page 131

1    A   The full sentence was like, I believe, due to
2    the productivity, it's not a big deal. Can you please
3    explain to me how the productivity of the team is
4    affected by me not being my camera fully on the face --
5    or my camera fully -- my face not fully on camera?
6    Q   And that comment about it not being a big deal
7    is your interpretation of it not being a big deal,
8    correct?
9    A   Correct.
10    Q   It could have been a big deal to Mr. Lodge,
11    correct?
12    A   It depends on the --
13    MR. REID: Speculation.
14    THE WITNESS: It depends.
15    Q   BY MR. KEATING: It could have been a big deal
16    to Mr. Lodge. You don't know, right?
17    A   I don't know. It could have been.
18    Q   It could have been a big deal to the company to
19    have your face on camera, correct?
20    MR. REID: The same objection.
21    Q   BY MR. KEATING: You don't know.
22    A   Yeah, and that's why I was asking.
23    Q   And we talked about before that employers have
24    the right to set rules and workplace conduct for their
25    employees, correct?

Page 132

1    A   Yeah. Understood.
2    Q   And one of those rules could be that it's a big
3    deal to have your face on camera, correct?
4    A   Correct.
5    Q   Okay. In the third paragraph, Mr. Lodge
6    emphasizes the participation in video meetings is an
7    essential part of remote work culture.
8    Do you agree that participation in video
9    meetings, if you are going to be a remote worker, is a
10    reasonable job requirement?
11    A   For this job or in general?
12    Q   In general.
13    A   In general, I can't answer that question
14    because every industry is different. Every company is
15    different.
16    Q   For this job, it was common to have your
17    cameras on during these meetings, correct?
18    A   Not common. Sometimes it was not required and
19    sometimes it was required.
20    Q   Okay. More often than not, would you have your
21    camera on during group team meetings?
22    A   More often than not, sure, yeah.
23    Q   In the one, two, three -- in the fifth
24    paragraph of Mr. Lodge's e-mail, he references that --
25    basically that you are dismissing these concerns, and

Page 133

1  disrupting the meeting was not an appropriate way to
2  handle such matters; is that correct?
3      A   That's what he says, correct.
4      Q   And then the next paragraph he says to take
5  this reprimand seriously.
6          Did I read that correctly?
7      A   That's correct.
8      Q   And then moving forward, you were expected to
9  actively participate in team meetings, maintain a
10  professional demeanor, and address concerns through
11  appropriate channels, such as discussing them with him
12  during one-on-one meetings, correct?
13     A   That's correct.
14     Q   And then finally he closes it, if you have any
15  questions or need further clarification, please contact
16  him.
17         Did you ever contact him regarding any
18  clarification regarding this matter?
19     A   This one?
20     Q   Yeah.
21     A   So this was -- after this, no.  I talked to
22  human resources, and I told human resources I don't
23  feel -- I'm not going to talk to him until I get a
24  policy.
25     Q   Right.  So right after you got reprimanded for

Page 134

1  your behavior on the group morning meeting, you sent an
2  e-mail to human resources because you got written up,
3  correct?
4      A   Correct.
5          (Deposition Exhibit No. 20 was marked for
6  identification.)
7      Q   BY MR. KEATING:  And is this the e-mail you
8  sent to human resources, or the People team following
9  your write-up from that morning?
10     A   Yes.  Correct.
11     Q   Okay.  And then shortly thereafter you were
12  written up -- let's see here.  I think this is in
13  Mountain Time, but it says 7:46 a.m., you received your
14  reprimand for the morning behavior, correct?
15     A   Is that the document we saw before?
16     Q   Yes, the e-mail.
17     A   Yes, correct.
18     Q   Okay.  And then less than an hour later
19  Ms. McCormick sent you or said that she will send you a
20  calendar invite to learn more about the situation,
21  correct?
22     A   Yes.  Correct.
23     Q   And did she -- did she follow through with that
24  and send you a calendar invite to talk about the issues?
25     A   Yes.  Correct.

Page 135

1      Q   During that meeting, did you mention anything
2  about Mr. Lodge's request to you being sexual in nature?
3      A   Yes.
4      Q   What specifically did you say?
5      A   So I said I didn't feel comfortable the way he
6  was talking about my face and body.  I also said that
7  there are women who work in this company also, and if a
8  man would go to a woman and say that, you know, and be
9  that aggressive, that would be a big situation, but if a
10  man says anything or something like that, it will be --
11  there would be -- like would there be the same
12  consequences or the same actions?
13     Q   And that -- there was women on that group call,
14  correct?
15     A   Yes.
16     Q   And to your knowledge, did anybody else on that
17  phone call see any cause for concern with Mr. Lodge's
18  request --
19         MR. REID:  Objection.  It calls for --
20     Q   BY MR. KEATING:  -- to your knowledge?
21         MR. REID:  -- speculation.
22         THE WITNESS:  On the call in the meeting, no.
23     Q   BY MR. KEATING:  So to your knowledge, you have
24  no idea if anybody else on that call had any problem with
25  Mr. Lodge's request of you, correct?

Page 136

1      A   Yeah, I did not know.
2      Q   Okay.  And you mentioned during the
3  conversation you had with Ms. McCormick, that you
4  referenced if you were a woman, how would that be
5  perceived?  Did you mention anything about it being
6  sexual in nature?
7          MR. REID:  Objection.
8      Q   BY MR. KEATING:  With those words specifically?
9      A   Gotcha.
10         THE WITNESS:  You want me to answer?
11         MR. REID:  Objection to the extent it's already
12  been asked and answered.
13         But go ahead, yeah.
14         THE WITNESS:  Gotcha.
15         So I will say yes, because if a woman is there,
16  I will tell them, hey, if you angle the camera a certain
17  way or talk -- comment about their body being sexual,
18  that would be perceived as, you know, sexual harassment.
19     Q   BY MR. KEATING:  I want to know from your
20  memory and recollection, did you use the words "sexual in
21  nature" during that conversation --
22     A   Yes.
23     Q   -- with Ms. McCormick?
24     A   Yes.
25     Q   What was Ms. McCormick's response?

Page 137

1    A   She would look into this.  She will talk to the
2  other -- you know, to the upper-level management, and
3  will go from there.
4    Q   Okay.  So after receiving the written reprimand
5  from your behavior that morning from the group meeting,
6  you had a follow-up one-on-one with Mr. Lodge that day,
7  correct?
8    A   No.  I only had a one-on-one on the 2nd,
9  correct, just to clarify?
10    Q   On November 2nd, yes, sir.
11    A   The only one I had was right after like at
12  11:00.  That's the only one-on-one I had.
13    Q   Was that before or after you received the --
14  the reprimand e-mail?
15    A   Oh, that was after the reprimand e-mail.
16    Q   So you had your one-on-one after the reprimand
17  e-mail?
18    A   Correct.
19    Q   Okay.  Just so I can get the timeline right,
20  you -- you had the group meeting?
21    A   Correct.
22    Q   Where we -- there was some behavior that was
23  exhibited.  You logged off?
24    A   Uh-huh.
25    Q   You received a -- the written reprimand e-mail?

Page 138

1    A   Correct.
2    Q   And then you had a one-on-one with Mr. Lodge?
3    A   Correct.
4    Q   Okay.  During the one-on-one meeting with
5  Mr. Lodge, what was -- did Mr. Lodge address your
6  behavior from the morning meeting?
7    A   Yes.
8    Q   What did he say?
9    A   He said:  You will just put your face and body
10  where I tell you.
11    Q   Okay.  And what was your response?
12    A   And I -- I reiterated, what -- How does that
13  affect the productivity of the team?  And also:  I do not
14  feel comfortable because how you are here telling me what
15  to do with my body and I have consistent rules, why do
16  you want me to do this?
17    Q   Okay.  And Mr. Lodge then stated that he felt
18  disrespected because you were not following his
19  instructions, correct?
20    A   Correct.
21    Q   After which you promptly logged off the
22  one-on-one meeting, correct?
23    A   Yes.  But before that he started getting
24  aggressive with me.
25    Q   And -- and aggressive by your perception, that

Page 139

1  he had raised his voice with you, correct?
2    A   And his hands, correct.
3    Q   And what -- when he raised his voice, what did
4  he say in a heightened tone of voice?
5    A   He said:  You better da, da, da, da, and then
6  after that I couldn't hear because --
7    Q   You said -- you just -- you did -- you did the
8  verbal ellipsis.
9    A   Okay.
10    Q   You better not what?
11    A   You better -- you better not do -- like you
12  better do what you -- what I tell you to do, and then
13  after that missed sentence, I logged off because I just
14  didn't feel comfortable.
15    Q   What made you think that Mr. Lodge's request to
16  you was sexual in nature?
17        MR. REID:  Objection to the extent it's already
18  been asked and answered.
19        Go ahead.
20        THE WITNESS:  Yeah, so it was his tone and, you
21  know, the pretext of asking for my personal
22  relationships, and the tone he was saying it in did not
23  make me feel comfortable.
24    Q   BY MR. KEATING:  And again, this request was
25  done on a group phone call -- a group call -- video call

Page 140

1  with five to six other employees, correct?
2    A   Uh-huh.  Correct.
3    Q   And to your knowledge, nobody else on that call
4  complained about Mr. Lodge's behavior from that phone
5  call, correct?
6    A   Correct.
7        (Deposition Exhibit No. 21 was marked for
8  identification.)
9    Q   BY MR. KEATING:  I'm handing you what we're
10  going to mark as Exhibit 21.  Thank you.
11        So we've got the -- kind of the following
12  chain.  On November 2nd, it was you responding to Laura,
13  "Thank you for the invite.  Will see you soon."  That was
14  when she reached out to -- to find out more about what
15  happened that -- that day, correct?
16    A   Correct.
17    Q   And then that was on Thursday morning.  By
18  Monday morning you -- you pinged her again asking her, do
19  you have a follow-up meeting?
20        Did anything happen between Thursday and Monday
21  that you thought you needed a follow-up meeting to talk
22  about?
23    A   Yes, I did not receive a response at all, not a
24  follow-up, for a whole day.
25    Q   It had only been a day?

JHOSTIN NUNEZ-QUINONES                                        November 06, 2024
QUINONES V. FLOCK GROUP, INC.                                      141–144

Page 141

1   A   Yeah.
2   Q   That's not that long, correct?
3   A   More than a day, yeah.  So it was like the
4   whole weekend pretty much.
5   Q   Well, the -- do you know if Ms. McCormick works
6   on the weekend?
7   A   I'm not sure.
8   Q   Okay.  If Ms. McCormick -- it was one business
9   day, correct?
10  A   Okay.
11  Q   Okay.  So within -- after one business day of
12  not hearing back from Ms. McCormick, you followed up on
13  Monday, November 6th, correct?
14  A   Correct.
15      MR. REID:  Objection.  The document speaks for
16  itself.
17  Q   BY MR. KEATING:  And again, this -- your
18  initial reach-out e-mail on November 2nd came after you
19  received the e-mail reprimand from Mr. Lodge,
20  correct?
21  A   The one on November 2nd, yes, correct.
22  Q   Okay.  You mentioned in the -- in the
23  one-on-one meeting, that second paragraph, "Obsession
24  with my face being seen up close."
25      Why -- what makes you think that it was an

Page 142

1   obsession of Mr. Lodge's to see your face up close?
2   A   Just the tone of his delivery and the way he
3   just -- the way he just kept, you know, being that
4   interested in my face.
5   Q   Could it -- is it possible that he was -- he
6   wanted to see your face because your face was not on
7   camera?
8   A   No, it was --
9       MR. REID:  Objection.  It calls for
10  speculation.
11      THE WITNESS:  So it was on the screen.  He
12  could see my face.  He just wanted to see it closer.
13  Q   BY MR. KEATING:  How close did he want -- never
14  mind.  Strike that question.
15      You reference a bizarre behavior by Mr. Lodge.
16  What makes you think that the behavior was bizarre?  Why
17  did you use that term "bizarre"?
18  A   Because just the obsession and just the -- you
19  know, I've never seen somebody like that obsessed with
20  people's faces or their body, and I understand if you
21  want to see them closer, but his bizarre obsession with
22  me getting up close is just weird.
23  Q   You keep saying body.  Did Mr. Lodge ever
24  request to see a specific part of your body other than
25  your face?

Page 143

1   A   No.
2   Q   Okay.  He never said, I need to see your arms
3   or legs or anything of that nature, correct?
4   A   Correct.
5   Q   The only thing Mr. Lodge referenced wanting to
6   be able to see is your face and body in frame, correct?
7   A   Yes.  Correct.
8   Q   In your view, did Mr. Lodge make any other
9   comments other than asking to see your face and body in
10  frame that were sexual in nature?
11  A   In that meeting?
12  Q   Throughout your employment.
13  A   No.
14  Q   That was a no?
15  A   No.
16  Q   Okay.  So the only thing that you perceived to
17  be sexual in nature was Mr. Lodge asking to see your face
18  and body on camera in a group call or on a
19  videoconference with him, correct?
20  A   Yes, and the questions that was --
21  Q   The questions about your personal chitchat,
22  correct?
23  A   Correct.
24  Q   You didn't attend the November 3rd, 2023
25  meeting with Mr. Lodge, did you?

Page 144

1   A   Correct, I did not attend.
2   Q   And why did you not -- you did not attend it
3   because you said you didn't feel safe, correct?
4   A   I didn't feel comfortable, correct.
5   Q   You didn't feel comfortable or didn't feel
6   safe?
7   A   I did not feel safe and comfortable.
8   Q   Okay.  Did Mr. Lodge do anything to make you
9   feel unsafe?
10  A   Well, he didn't do anything, but my fear was it
11  was gonna keep escalating.
12  Q   Escalating how?
13  A   Again, he -- he might go to HR and ask for my
14  personal information.  He might ask for my personal
15  phone -- well, he has my personal number, but like
16  e-mail, so I felt like he was just going to keep
17  escalating into my personal life.
18  Q   Did Mr. Lodge ever threaten physical harm to
19  you?
20  A   No, but I was fearful that it might escalate to
21  that.
22  Q   But just to be clear, Mr. Lodge never
23  threatened physical harm to you, correct?
24  A   No.
25  Q   Okay.  Did Mr. Lodge ever threaten you

JHOSTIN NUNEZ-QUINONES                           November 06, 2024
QUINONES V. FLOCK GROUP, INC.                           145–148

Page 145

1  physically?
2      A   No.
3      Q   So any perception of you feeling unsafe was
4  your own perceived intent from Mr. Lodge, correct?
5      A   Correct.  I just felt like he was gonna keep
6  escalating the issue.
7      Q   You felt, correct?
8      A   Uh-huh.  Correct.
9      Q   And why did you feel that he was gonna keep
10 escalating the issue?
11     A   Because he --
12         MR. REID:  Objection to the extent already
13 asked and answered.
14         Go ahead.
15         THE WITNESS:  Yeah, so he would -- as I stated
16 earlier, he would keep getting more and more with -- you
17 know, with responses getting more aggressive.  The last
18 call, I stated when he raised his hands and his voice, I
19 felt like he was going to keep getting more aggressive, I
20 didn't feel safe.
21     Q   BY MR. KEATING:  Is it possible Mr. Lodge was
22 just exasperated with your conduct and personal -- and
23 performance on your job?
24         MR. REID:  Objection to the extent it calls for
25 speculation.

Page 146

1          Go ahead.
2          THE WITNESS:  It might be.  I'm not sure.
3      Q   BY MR. KEATING:  Did Mr. Lodge ever demote you?
4      A   No.
5      Q   Other than giving you a verbal warning and
6  performance coaching, did Mr. Lodge ever decrease your
7  pay?
8      A   No.
9      Q   Other than the verbal warning and performance
10 coaching, did Mr. Lodge ever give you any other written
11 warnings?
12     A   From my recollection --
13     Q   Or write-ups I should say?
14     A   From my recollection, no.
15     Q   Okay.  Other than the -- the -- the
16 disciplinary actions that we discussed today, correct?
17     A   Correct.
18     Q   Your employment was terminated from Flock on
19 November 8th, 2023, correct?
20     A   Correct.
21     Q   Do you recall the separation meeting?
22     A   Yes.
23     Q   Who was present during that separation meeting?
24     A   Laura McCormick and Omar Lodge.
25     Q   During that separation meeting you asked

Page 147

1  Mr. Lodge to log off the call, correct?
2      A   Yes.  Correct.
3      Q   Why did you ask Mr. Lodge to log off the call?
4      A   Because Laura McCormick wanted me to verify my
5  e-mail in front of him and my personal information.
6      Q   Mr. Lodge obliged that request and logged off
7  the call, correct?
8      A   Correct.
9      Q   During that meeting, Ms. McCormick informed you
10 that your position was being eliminated, correct?
11     A   Correct.
12     Q   What did Laura tell you during the termination
13 meeting?
14     A   So she had told me that they were offering a
15 severance package, the COBRA.  I'm not -- I don't recall
16 exactly.  Was it like COBRA health insurance?  And that,
17 you know, I -- you know, all my access will be
18 terminating, you know, like my e-mails, my Slack will be
19 terminated that day.
20     Q   Okay.
21         (Deposition Exhibit No. 22 was marked for
22 identification.)
23     Q   BY MR. KEATING:  Have you ever seen this
24 document before?
25     A   Yes.

Page 148

1      Q   Okay.  Were you given this termination form?
2      A   Yes.  Correct.
3      Q   Were you given this during your termination
4  meeting?
5      A   Yes.  Correct.
6      Q   And it says exact reason for the discharge,
7  "Position elimination - Device Support Engineer II,"
8  correct?
9      A   Yes, correct.
10     Q   Are you aware of any -- are you aware -- strike
11 that.
12         Are you aware of the business reasons for Flock
13 eliminating the Device Support Engineer II position?
14     A   No, I'm not aware.
15     Q   Following your termination -- well, actually,
16 strike that question.
17         You mentioned before that you contacted an
18 attorney after sending an e-mail to Ms. McCormick,
19 correct?
20     A   Correct.
21     Q   Was that after the November 6th e-mail or
22 before the November 6th e-mail?
23     A   Before.
24     Q   So you contacted an attorney before the
25 November 6th e-mail?

JHOSTIN NUNEZ-QUINONES
QUINONES V. FLOCK GROUP, INC.

November 06, 2024
149–152

Page 149

1    A   Correct.
2    Q   Did your attorney help you write the e-mail on
3  November 6th to Ms. McCormick?
4    A   No.
5    Q   Did your attorney provide you -- I'm not asking
6  what they said or if -- you know, if they -- did they
7  give you any guidance in writing that e-mail to
8  Ms. McCormick?
9    A   No.
10   Q   Following your termination, you filed a charge
11 of discrimination with the EEOC, correct?
12   A   Yeah, Sevra Roberts (phonetic) did on my
13 behalf.
14      (Deposition Exhibit 23 was marked for
15 identification.)
16   Q   BY MR. KEATING:  Do you recall reviewing this
17 charge of discrimination before it was filed?
18   A   Yes.  Correct.
19   Q   And on the -- there is boxes here, right?  You
20 check what your discrimination was based on.  The box is
21 checked for sex, discrimination based on sex, correct?
22   A   Correct.
23   Q   Your lawsuit, however, does not contain any
24 sexual discrimination allegation; is that correct?
25   A   Correct.

Page 150

1    Q   It's only one count of retaliation; is that
2  correct?
3    A   Correct.
4    Q   Okay.  Why did you not allege a claim of sexual
5  discrimination in your lawsuit?
6    A   So for that, when I got that, all I did was as
7  a sexual -- when the lawsuit, I did not allege that
8  because I felt it was just retaliation.  But sexual
9  harassment also, to answer your question.
10   Q   So you do not believe that Mr. Lodge was
11 sexually harassing you?
12   A   No, he was sexually harassing.
13      MR. REID:  Objection to the extent it calls --
14      THE WITNESS:  Yes, correct.
15      MR. REID:  -- for a legal conclusion.
16      Go ahead.
17   Q   BY MR. KEATING:  So why did you not allege
18 sexual harassment in your lawsuit?
19      MR. REID:  Jhostin, don't talk about anything
20 that you talk about with any lawyers.
21      THE WITNESS:  Okay.  Gotcha.
22   Q   BY MR. KEATING:  Let me ask a better question.
23 In your lawsuit, there is no claim for sexual harassment,
24 correct?
25   A   Correct.

Page 151

1    Q   Where do you work now?
2    A   BOLD Integrated Payments.
3      (Court reporter clarification.)
4    Q   BY MR. KEATING:  When did you obtain that job?
5    A   May.
6    Q   Of 2024?
7    A   Uh-huh.  That's correct.
8    Q   How is that job going?
9    A   In regards to what?
10   Q   How is it going?  Are you enjoying it?
11   A   Yes.
12   Q   Have you had any performance issues at that
13 job?
14   A   No.
15   Q   Have you gotten written up at that job at all?
16   A   Huh?
17   Q   Have you received any -- any warnings --
18   A   No.
19   Q   -- or write-ups from that job?
20   A   No.
21   Q   You don't recall receiving a verbal warning in
22 that -- in that position?
23   A   I don't recall, no.
24      (Deposition Exhibit No. 24 was marked for
25 identification.)

Page 152

1    Q   BY MR. KEATING:  I'm handing you what we are
2  going to mark as Exhibit 24.
3      Is Evan Tyler your current supervisor or
4  manager?
5    A   Oh, yes.  Correct.
6    Q   Okay.  Have you seen this document before?
7    A   No.
8    Q   Okay.  This is a level 2 escalation, a verbal
9  warning between -- regarding you, correct, Jhostin
10 Quinones?
11   A   Yes.  Correct.
12   Q   And in this document it says it's a level 2
13 verbal warning that needs documenting, and the date of
14 this incident was August 20th, 2024, correct?
15   A   Correct.
16   Q   Okay.  In the description of the incident, it
17 mentions, "Jhostin (raising his voice) said, bro, I don't
18 need you explaining anything to me, just take the case.
19 Matt responded with, you are coming at me with all this
20 hostility, I don't want to help you."
21      Do you recall this recollection -- or do you
22 recall this incident?
23   A   Yes, but that is not the exact statement I
24 said.
25   Q   Okay.  But this is a -- a verbal warning

JHOSTIN NUNEZ-QUINONES
QUINONES V. FLOCK GROUP, INC.

November 06, 2024
153—156

Page 153

1  regarding your behavior at your current job, correct?
2      A   Yes.
3      Q   After your -- during your termination meeting
4  on November 8th of 2023, did you have any response after
5  Ms. McCormick went through the reasons for your
6  discharge?
7      A   No.
8      Q   You don't recall saying anything to her after
9  that?
10     A   After the call?
11     Q   After -- no, during the call.
12     A   I asked her if I can talk to anybody, and she
13  said, no, you can't talk to anybody after this.  You
14  know, say farewell.
15     Q   And then what happened?
16     A   I logged off the call.
17     Q   Okay.  Was it a phone call or a video call?
18     A   A Video.
19     Q   Were you on camera?
20     A   Yes.
21     Q   Were you in frame?
22     A   Yes.
23     Q   In your lawsuit, you claim that Flock had a job
24  posting on builtin.com, correct?
25     A   Correct.

Page 154

1      Q   Do you know if that job was ever filled?
2      A   No, I do not.
3      Q   Okay.  And this job posting was for a Device
4  Support Engineer I, correct?
5      A   Correct.
6      Q   Your title when you were terminated was Device
7  Support Engineer II, correct?
8      A   Correct.
9      Q   I think I already asked this, and if I did, I'm
10  sure your counsel will let me know.  When did you begin
11  working at BOLD Integrated Solutions?
12     A   It was May.
13     Q   Okay.  May 6th of 2024 sound about right?
14     A   Uh-huh.
15     Q   What position -- for what position were you
16  hired?
17     A   Client services.  Client services
18  representative.
19     Q   What's your starting salary -- what was your
20  salary when you were hired?
21     A   $47,000 a year.
22     Q   Have you received any increases in your salary
23  to date?
24     A   No.
25     Q   Do you recall when you applied for that

Page 155

1  position?
2      A   No, I do not recall exactly when I applied.
3      Q   Other than your salary, have you received
4  any -- any other compensation from that company, like a
5  bonus --
6      A   No.
7      Q   -- or anything like that?
8          Who is your current supervisor?
9      A   Evan Tyler.
10     Q   Have you requested any time off for any medical
11  reasons at that job?
12     A   Yes.
13     Q   For what?
14     A   I had a motorcycle accident.
15     Q   Okay.  When did that motorcycle accident occur?
16     A   September 6th of this year.
17     Q   I'm sorry to hear that.  I hope you are okay.
18     A   Uh-huh.
19     Q   Did you sustain any injuries from that
20  motorcycle accident?
21     A   A fractured thumb.
22     Q   Fractured thumb?
23     A   Yeah.  I had surgery on this thumb right here
24  (indicating).
25     Q   When did you have surgery?

Page 156

1      A   That was around September 19th of this year.
2      Q   Is your thumb currently healed or are you still
3  seeing a doctor for that ailment?
4      A   Physical therapy.
5      Q   Physical therapy.  How often do you go to
6  physical therapy?
7      A   Two times a week.
8      Q   How long do you -- do you have an end date for
9  your physical therapy?
10     A   No, as of today.
11     Q   Have you received a performance review or
12  evaluation at all at BOLD Integrated Solutions yet?
13     A   No.
14     Q   Do you work for any other companies prior to
15  BOLD Integrated Solution after your employment with Flock
16  ended?
17     A   DICK'S Sporting Goods.
18     Q   What was -- when did you -- what dates did you
19  work at that job?
20     A   To my best recollection, it was around middle
21  of November -- I don't know the exact dates -- all the
22  way to February.
23     Q   And that would be November of 2023?
24     A   Correct.
25     Q   Until when, I'm sorry?

JHOSTIN NUNEZ-QUINONES
QUINONES V. FLOCK GROUP, INC.

November 06, 2024
157–160

Page 157

1   A   Around February.
2   Q   February of '24?
3   A   Uh-huh.
4   Q   What was your position?
5   A   I was a shoe service specialist.
6   Q   Okay.
7   A   To my best recollection.
8   Q   Were you paid hourly or salary?
9   A   Hourly.
10  Q   And what was your hourly wage?
11  A   $15 an hour.
12  Q   When did you apply for that position, do you
13  remember?
14  A   I believe it was like a week after I got
15  terminated.
16  Q   Okay.  Did you -- other than your hourly wage,
17  did you receive any other compensation?
18  A   No.
19  Q   So no bonuses or anything at that job?
20  A   No.
21  Q   Who was your supervisor at DICK'S?
22  A   I do not recall because it had a lot of people
23  coming in and out.
24  Q   Understood.
25      Did you request -- ever request any time off

Page 158

1   for a medical reason at DICK'S?
2   A   No.
3   Q   Did you ever take a leave of absence at DICK'S?
4   A   No.
5   Q   Did you ever receive a performance evaluation
6   at DICK'S?
7   A   No.
8   Q   And do you recall answering interrogatories in
9   this case?
10  A   No.
11  Q   Okay.  Let's see.
12  A   Oh, sorry.  Move to strike.
13      What do you mean "interrogatories"?  Can you --
14  Q   Yeah, I'll -- I'll -- that's a bad question, so
15  I will strike that.
16      You were treated by Dr. Miller at Alpharetta
17  Internal Medicine, correct?
18  A   Yes.  Correct.
19  Q   In -- in around October 30th of 2023, you saw
20  him for some twitching of your eye.
21      Do you remember that?
22  A   Yes.  Correct.
23  Q   And he prescribed you, was it Klonopin?
24  A   I believe so, yes.
25  Q   Do you take -- do you still take Klonopin?

Page 159

1   A   No, I do not take that anymore.
2   Q   Have you ever taken that drug?
3   A   I only took it, you know, when it was
4   prescribed, but once I finished it, I stopped using it.
5   Q   And did you take that because of your -- was it
6   because of your eye twitch?
7   A   Oh, yes, correct.
8       MR. KEATING:  Okay.  I'm gonna break.  I think
9   I'm just going to double-check my notes, but we should be
10  wrapping up here --
11      MR. REID:  Okay.
12      MR. KEATING:  -- from my perspective, at least
13  soon.
14      MR. REID:  Yeah, I will go ahead and get ready
15  anything I've got.
16      MR. KEATING:  And we will take a ten-minute
17  break and we will come back.
18      THE VIDEOGRAPHER:  1:50 p.m., and we are off
19  the record.  This is the end of media number four.
20      (The deposition was at recess from 1:50 p.m. to
21  2:06 p.m.)
22      THE VIDEOGRAPHER:  2:06, we're back on the
23  record.  This is the beginning of media number five.
24  Q   BY MR. KEATING:  Thanks for that quick little
25  break, Jhostin.

Page 160

1   A   Uh-huh.
2   Q   Following your termination, have you seen
3   any -- any healthcare providers for any emotional or
4   mental distress?
5   A   No.
6   Q   Why did you leave DICK'S?
7   A   So the pay wasn't good.  It was only 15 bucks
8   an hour.
9   Q   Okay.  And you left DICK'S in, was it February,
10  I believe, of 2024?
11  A   To my best recollection, yes, February.
12  Q   And you started your current job in May of
13  2024?
14  A   That's correct.
15  Q   Between February and May of 2024, did you apply
16  for jobs during that period of time?
17  A   Oh, yeah, I tried.  Yes.
18  Q   Okay.  And there is -- I don't want to go
19  through the -- the long -- the long list, but in the
20  supplemental interrogatories, I believe your counsel
21  provided a list of jobs that you applied for.  From your
22  recollection, is that a true and accurate recounting of
23  the jobs you applied for?
24  A   Yes.  Correct.
25  Q   Okay.  How did you apply for those jobs?  Was

JHOSTIN NUNEZ-QUINONES
QUINONES V. FLOCK GROUP, INC.

November 06, 2024
161–164

Page 161

1  it online for the most part?
2      A   Yes.
3      Q   Was there any rhyme or reason in the jobs that
4  you picked to apply for?
5      A   I try to apply for customer service jobs.
6  That's the best I could, you know, find.
7          MR. KEATING:  Zach, do you have the
8  supplemental interrogatory responses?
9          MR. McCORMACK:  Yes.
10     Q   BY MR. KEATING:  While he's looking for that, I
11  will keep asking some other questions.
12         What's your definition of harassment?
13         MR. REID:  Objection to the extent -- actually,
14  no, go ahead.
15         THE WITNESS:  Okay.  Specific like in a -- in a
16  workplace environment?
17     Q   BY MR. KEATING:  I just want to know from
18  your -- from your understanding, what's your definition
19  of -- how do you define harassment?
20     A   Unwanted behavior pretty much.  If you say to
21  somebody like, hey, I don't want to do something or in a
22  sense like, you know, going through like their personal
23  stuff, physical harm and you tell them please stop, and
24  they keep badgering you and keep, you know, asking you to
25  do stuff you don't want to do, you know, and not related

Page 162

1  to job duties but, you know, your personal well-being,
2  you know, and boundaries, if that makes -- answers your
3  question.
4      Q   And in your view, is there a difference between
5  something making you uncomfortable and something being
6  unlawful harassment?
7          MR. REID:  Objection to the extent it calls for
8  a legal conclusion.
9          Go ahead.
10         THE WITNESS:  Gotcha.
11         It depends on -- it depends on the situation.
12     Q   BY MR. KEATING:  In prior virtual meetings with
13  Mr. Lodge, was your face ever in the corner of the screen
14  or the frame?
15     A   Oh, yes.
16         MR. REID:  Vague as to time.
17         Go ahead.
18     Q   BY MR. KEATING:  Is that a yes?
19     A   Oh, yes.
20     Q   In the November 2nd, 2024 meeting, where, from
21  your recollection, was your face in the camera frame?
22     A   It was -- so it was just a center, a centering
23  on my face.  It was like between halfway and like -- I'm
24  on the left corner but not all the way like out of the
25  screen, if that makes sense.  My face was still in the

Page 163

1  frame on my body.
2      Q   Do you know if Mr. Lodge could see your whole
3  face?
4      A   Yes, he could see my whole face.
5      Q   Do you know if he could see your whole face --
6  or let me rephrase that.
7          Is it possible that Mr. Lodge couldn't see your
8  whole face during that meeting?
9          MR. REID:  Objection to the extent it's already
10  asked and answered.
11         Go ahead.
12         THE WITNESS:  So he said, yes, he can see my
13  face, but I want to see it closer.
14     Q   BY MR. KEATING:  Okay.
15     A   That's what he said.
16     Q   Did you speak to Ms. Smith on November 2nd,
17  2023 about the meeting?
18     A   Avia Smith?
19     Q   Avia Smith, yes.
20     A   Yes.  Correct.
21     Q   What did you -- is that a -- sorry, is that a
22  man or a woman?
23     A   A woman, Avia, yes.
24     Q   During that conversation with Ms. Smith, what
25  did you say?

Page 164

1      A   I said, what was the reason for his behavior?
2  I didn't feel comfortable, and I'm not attending any more
3  meetings until I get this resolved with human resources.
4      Q   And that was on a Slack's team -- Slack team's
5  meeting?
6      A   Yeah, so it was not on a Slack message; it was
7  on a voice call Slack, if that answers your question.
8      Q   So it was a -- a verbal conversation --
9      A   Uh-huh.  Yes.
10     Q   -- you had with Ms. Smith?
11         Was that after the group meeting?
12     A   Yes.  Correct.
13     Q   Was that before your one-on-one with Mr. Lodge
14  or after?
15     A   Before the one-on-one.
16     Q   Okay.  In paragraph 18 of your complaint, you
17  mentioned that Mr. Lodge would oddly smile at you while
18  making requests to have your face in camera.  What -- why
19  in your -- why did you use the word "oddly smile"?
20  What's an odd smile for Mr. Lodge?
21     A   I felt like it was more like oddly -- like I'm
22  looking for a good word.  Like he enjoys -- not in a
23  friendly manner but in a sexual manner, he enjoys doing
24  that, if that makes sense, like looking at and analyzing
25  my face.

JHOSTIN NUNEZ-QUINONES
QUINONES V. FLOCK GROUP, INC.

November 06, 2024
165–168

Page 165

1  Q  Why did you feel that way?  Did Mr. --
2  Mr. Lodge say anything to you that would make you think
3  that?
4      A  Well, the way -- the tone he would say it.
5      Q  Again, it was your perception of Mr. Lodge that
6  you termed that an odd smile, correct?
7      A  Oh, yes.
8      Q  There were a number of jobs that you applied
9  for that you -- let me -- let me rephrase that.
10         The jobs with which you applied for, how many
11  did you receive offers of employment?
12     A  Zero.  The only one -- actually one.  The only
13  one I had an offer was BOLD Integrated Payments where I
14  work at right now.
15     Q  Was there any strategy or rhyme or reason for
16  all the jobs you applied for during that period?
17        MR. REID:  Objection, vague.
18        Go ahead.
19        THE WITNESS:  Actually, can you be more
20  specific like?
21     Q  BY MR. KEATING:  Yeah, I can, actually.
22        (Deposition Exhibit No. 25 was marked for
23  identification.)
24     Q  BY MR. KEATING:  Do you recognize this
25  document?  And we're going to mark this as Exhibit 25.

Page 166

1  On page 2, there is a table that sets forth -- I don't
2  know how many jobs, a lot --
3      A  Uh-huh.
4      Q  -- that you applied for.
5      A  Correct.
6      Q  Is this a -- kind of an accurate, to your
7  knowledge, representation of the jobs for which you
8  applied?
9      A  Yes.
10     Q  Okay.  Given that there is probably a hundred
11  jobs here, was there a -- a strategy with which you
12  applied for these jobs?
13     A  Gotcha.
14        MR. REID:  The same objection, vague.
15        But go ahead.
16        THE WITNESS:  Yeah, so I was just working for
17  like business analysts, so my strategy was pretty much
18  just get a customer service job or a tech job, you know,
19  and I could transfer my skills.
20     Q  BY MR. KEATING:  And again, for all but the job
21  for BOLD Integrated Payments, you did not get an offer
22  from any of these other places of employment, correct?
23     A  Correct.
24     Q  And were these all applied for online or did --
25  was any like done in person, filling out old-school

Page 167

1  applications?
2      A  All online.
3      Q  Online.  Was it through their website or
4  through a third-party job website?
5      A  Websites.  Their website.
6      Q  So you went to their -- the company
7  specifically, and like the careers page, so to speak?
8      A  So I would go to Google.  I would see the job,
9  and then I would go to the actual like company's Website,
10  see if their job is there and apply.
11        MR. KEATING:  Okay.  I think that's all the
12  questions I got.
13        THE WITNESS:  Okay.
14        MR. REID:  Give me one second.  We don't have
15  to go off the record.  I just need to write down one
16  thing.
17
18              EXAMINATION
19  BY MR. REID:
20     Q  Okay.  So I'm just going to -- with the doctor
21  that you went to, Dr. Miller, do you -- do you remember
22  visiting him for stress and anxiety and that your left
23  eye was twitching?
24     A  Yes, on October 30th, correct.
25     Q  Okay.  And then I want you to go back to your

Page 168

1  EEOC charge.  Do you know what that looks like?
2      A  Just give me one moment.
3      Q  It's this one (indicating).  I don't know what
4  exhibit that is.
5      A  Okay.  Let me go back to the -- give me one
6  moment.  Yes, correct.
7      Q  I want you to read paragraph 2 to yourself, and
8  just let me know when you are done.
9      A  All right.  Gotcha.
10     Q  Can you expand on a little bit about how Omar
11  Lodge, his requests relating to you being on camera,
12  where you were on camera, specifically things like that,
13  changed over time as we go from March and then into the
14  summer of 2023 and onwards?
15     A  Sure.  So at first, you know, with the camera,
16  he -- he would be cool like, if you don't -- you don't
17  have to have your camera on.  It can be on or off.  And
18  then he would say, no, like, I want to see your faces.
19  Then he would come in and said, oh, well, now I really
20  just want to see your face, and he would just start
21  getting, you know, really intense, and then he'll back
22  off.  And then further down the timeline, you know, get
23  more intense and then he will back off; more intense and
24  he will back off.
25     Q  Okay.  And so in November, you were worried

JHOSTIN NUNEZ-QUINONES                        November 06, 2024
QUINONES V. FLOCK GROUP, INC.                      169–172

Page 169

1  that that was yet another escalation of this continuing
2  escalating behavior?
3      A  Correct.
4      Q  What is -- do you know what PDS Engineering is?
5      A  No.  To my recollection, I don't remember.
6      Q  And then I want to take you to Exhibit 18,
7  which is this one that says hours worked at the top.
8      A  One moment.
9      Q  It's an e-mail.
10     A  Okay.  I'm ready.
11     Q  Okay.  Before we talk about that, so one of the
12  questions I asked you earlier was that -- specifically
13  the escalation with the camera-related activities.  In
14  November 2023, when you were complaining to HR when you
15  had those -- that one-on-one meeting with Omar Lodge,
16  were -- was that one of the reasons that you felt it
17  might be sexual harassment?
18     A  That's correct.
19     Q  Okay.  All right.  So now we're gonna go to
20  this.  So you were asked earlier kind of about this
21  e-mail exchange, and, you know, Omar Lodge at one point
22  said, "Hi Jhostin.  Hi Jhostin.  Your reply is very much
23  appreciated" on the third page, right?
24     A  Yes, I see it.
25     Q  And so there he's talking about a written reply

Page 170

1  to the e-mail?
2      A  Uh-huh.
3      Q  Do you know whether you had any meetings with
4  him outside of these e-mails or had Slack messages with
5  him or verbal conversations about the original e-mail on
6  the first page?
7      A  Yeah, so we had verbal conversations, and he
8  never communicated directly during those verbal
9  conversations that I have to respond to this specific
10  e-mail.
11     Q  But y'all talked about the content?
12     A  Yeah, correct.
13     Q  And then out of the blue, he then asks you,
14  hey, please respond also to my e-mail?
15     A  Correct.
16     Q  Which he had not asked you to do before?
17     MR. KEATING:  Object to the form.
18     THE WITNESS:  Correct.
19     MR. REID:  That might be it.  Give me one
20  second.
21     Okay, that's all I have.
22
23          FURTHER EXAMINATION
24  BY MR. KEATING:
25     Q  I just have one follow-up question.

Page 171

1      A  Sure.
2      Q  Other -- following your -- your separation of
3  employment from Flock until the present, do you have any
4  other sources of income other than DICK'S and BOLD
5  Integrated Solutions?
6      A  No.
7      MR. REID:  Okay.
8      MR. KEATING:  All right.
9      MR. REID:  All righty.
10     MR. KEATING:  Thank you, Mr. Quinones.  Thank
11  you, Jhostin, for your time.
12     Are we off the record?
13     THE VIDEOGRAPHER:  2:19 p.m., we're off the
14  record.  This is the end of media number five.  This
15  concludes the deposition.
16     THE REPORTER:  Does anybody need a copy of the
17  transcript?
18     MR. KEATING:  We will do standard for maybe
19  like two weeks.  We'll do electronic and standard.
20     MR. REID:  I don't need it at this time.
21     (The deposition concluded at 2:19 p.m.)
22
23
24
25

Page 172

1          CERTIFICATE OF REPORTER
2  STATE OF GEORGIA    )
3  COUNTY OF DEKALB    )
4
5      I, Marcella Daughtry, a Certified
   Reporter in the State of Georgia and State of California,
6  do hereby certify that the foregoing deposition was taken
   before me in the County of DeKalb, State of Georgia; that
7  an oath or affirmation was duly administered to the
   witness, JHOSTIN NUNEZ-QUINONES; that the questions
8  propounded to the witness and the answers of the witness
   thereto were taken down by me in shorthand and thereafter
9  reduced to typewriting; that the transcript is a full,
   true and accurate record of the proceeding, all done to
10  the best of my skill and ability;
11     The witness herein, JHOSTIN NUNEZ-QUINONES, has
   requested signature.
12
       I FURTHER CERTIFY that I am in no way related
13  to any of the parties nor am I in any way interested in
   the outcome hereof.
14
15     IN WITNESS WHEREOF, I have set my hand in my
   office in the County of DeKalb, State of Georgia, this
16  15th day of November, 2024.
17
18
19
       _____
20     Marcella Daughtry, RPR, RMR
       GA License No. 6595-1471-3597-5424
21     California CSR No. 14315
22
23
24
25

JHOSTIN NUNEZ-QUINONES
QUINONES V. FLOCK GROUP, INC.

November 06, 2024
173—175

Page 173

1  Jhostin Quinones v. Flock Group
   J11760907

2

3         DECLARATION UNDER PENALTY OF PERJURY

4

5              I declare under penalty of perjury that I

6  have read the entire transcript of my deposition taken in

7  the above-captioned matter or the same has been read to

8  me, and the same is true and accurate, save and except

9  for changes and/or corrections, if any, as indicated by

10  me on the DEPOSITION ERRATA SHEET hereof, with the

11  understanding that I offer these changes as if still

12  under oath.

13

14  Signed on the_____day

15  of _____20__.

16

17

18

19  _____

    JHOSTIN NUNEZ-QUINONES

20

21

22

23

24

25

Page 174

1            DEPOSITION ERRATA SHEET

          J11760907

2

3  Page No.___Line No.___Change to:_____

4  _____

5  Page No.___Line No.___Change to:_____

6  _____

7  Page No.___Line No.___Change to:_____

8  _____

9  Page No.___Line No.___Change to:_____

10  _____

11  Page No.___Line No.___Change to:_____

12  _____

13  Page No.___Line No.___Change to:_____

14  _____

15  Page No.___Line No.___Change to:_____

16  _____

17  Page No.___Line No.___Change to:_____

18  _____

19  Page No.___Line No.___Change to:_____

20  _____

21  Page No.___Line No.___Change to:_____

22  _____

23  Page No.___Line No.___Change to:_____

24  JHOSTIN NUNEZ-QUINONES

25  Signature:_____

Page 175

1            DEPOSITION ERRATA SHEET

2          J11760907

3  Page No.___Line No.___Change to:_____

4  _____

5  Page No.___Line No.___Change to:_____

6  _____

7  Page No.___Line No.___Change to:_____

8  _____

9  Page No.___Line No.___Change to:_____

10  _____

11  Page No.___Line No.___Change to:_____

12  _____

13  Page No.___Line No.___Change to:_____

14  _____

15  Page No.___Line No.___Change to:_____

16  _____

17  Page No.___Line No.___Change to:_____

18  _____

19  Page No.___Line No.___Change to:_____

20  _____

21  Page No.___Line No.___Change to:_____

22  _____

23  Page No.___Line No.___Change to:_____

24  JHOSTIN NUNEZ-QUINONES

25  Signature:_____

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JHOSTIN QUINONES,                    )
                                     )
              Plaintiff,             )
                                     )
                                     )   Civil Action No.: 1:24-CV-01319
       v.                            )
                                     )
FLOCK GROUP, INC.,                   )
                                     )
              Defendant.             )
                                     )
                                     )

## DEFENDANT'S NOTICE OF DEPOSITION OF JHOSTIN QUINONES

**WITNESS:**       **JHOSTIN QUINONES**

**DATE:**          **November 6, 2024 at 10:00 a.m.**

**LOCATION:**      **Duane Morris, LLP**
                   **1075 Peachtree Street, NE**
                   **Suite 1700**
                   **Atlanta, GA 30309**

PLEASE TAKE NOTICE THAT, Pursuant to Rules 26 and 30 of the Federal

Rules of Procedure, Defendant Flock Group, Inc., by and through its undersigned

counsel of record will take the deposition of Jhostin Quinones. Said deposition shall

take place in-person at Duane Morris, LLP, 1075 Peachtree Street, NE, Suite 1700,

Atlanta, GA 30309, on November 6, 2024. The deposition will commence at 10:00



a.m. before a certified court reporter and/or videographer, and will continue from day to day thereafter until completed.

Dated:  October 21, 2024

Respectfully submitted,

**DUANE MORRIS LLP**

*/s/ Zachary J. McCormack*
Adam C. Keating
GA Bar No. 202672
Zachary J. McCormack
GA Bar No. 357954
1075 Peachtree Street NE
Suite 1700
Atlanta, GA 30309-3929
Telephone: 404-253-6988
Facsimile: 404-393-0744
E-Mail:
Akeating@duanemorris.com
Zmccormack@duanemorris.com

*Counsel for Defendant Flock Group, Inc.*

2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JHOSTIN QUINONES,                        )
                                         )
             Plaintiff,                   )
                                         )   Civil Action No.: 1:24-CV-01319
      v.                                  )
                                         )
FLOCK GROUP, INC.,                        )
                                         )
             Defendant.                   )
                                         )
                                         )

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court

using the CM-ECF System which will automatically send e-mail notification to all

counsel of record.

This 21st day of October, 2024.

By: */s/ Zachary J. McCormack*
    Zachary J. McCormack
    Georgia Bar No. 357954

    *Counsel Defendant Flock Group, Inc.*

3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JHOSTIN QUINONES

    Plaintiff,

v.

FLOCK GROUP INC,

    Defendant.

Civil Action No.

JURY TRIAL DEMANDED

## COMPLAINT FOR DAMAGES

COMES NOW, Plaintiff Jhostin Quinones ("Plaintiff"), by and through his

undersigned counsel, and files this, her Complaint for Damages against Defendant

Flock Group Inc ("Defendant") and shows the Court as follows:

## NATURE OF COMPLAINT

1.

Plaintiff brings this action for damages, and reasonable attorney fees against

Defendant for violations of his rights under Title VII of the Civil Rights Act of 1964,

as amended ("Title VII").



## JURISDICTION AND VENUE

2.

Plaintiff invokes the jurisdiction of this court pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

3.

The unlawful employment practices alleged in this Complaint were committed within this district. In accordance with 28 U.S.C. § 1391, venue is appropriate in this Court.

## ADMINISTRATIVE PROCEDURES

4.

Plaintiff has fulfilled all conditions necessary to proceed with this cause of action under the Title VII. Plaintiff timely filed his Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). The EEOC issued Plaintiff's Notice of Right to sue on March 8, 2024.

5.

Plaintiff timely files this action within ninety (90) days of receipt of the Notice of Right to Sue from the EEOC.

## PARTIES

6.

Plaintiff is a male citizen of the United States of America and is subject to the jurisdiction of this Court.

7.

At all times relevant, Defendant was qualified and licensed to do business in Georgia, and at all times material hereto has conducted business within this District.

8.

At all times relevant, Defendant has had fifteen or more employees. For each working day in each of twenty or more calendar weeks during 2022 and 2023, Defendant had fifteen or more employees.

9.

Defendant was an employer subject to Title VII at all times relevant to the claims asserted herein.

10.

Defendant may be served with process by delivering a copy of the summons and complaint to its Registered Agent, Registered Agents Inc, at 300 Colonial Center Pkwy. STE 100N, Roswell, GA, 30076.

3

## **FACTS**

### 11.

Plaintiff began working for Defendant in or about June 2021 as a Device Support Engineer II.

### 12.

Plaintiff's Manager was Omar Lodge.

### 13.

Lodge would have online daily meetings with both Plaintiff individually and with Plaintiff and the larger team.

### 14.

As Plaintiff's employment with Defendant continued, Lodge started to make stranger requests about Plaintiff's on camera presence during these meetings.

### 15.

At first, Lodge simply asked Plaintiff to turn on his cameras during meetings, which Plaintiff complied with.

### 16.

Lodge then began telling Plaintiff he needed to put his camera closer to his face that Plaintiff was comfortable with.

4

17.

Lodge further progressed into telling Plaintiff that he had to center his face in the camera.

18.

Although at first, Lodge would oddly smile at Plaintiff while making these requests, over time, Lodge became more and more aggressive when making the requests, likely because Plaintiff would question Lodge on why he needed to follow his instructions.

19.

Plaintiff formed the belief that Lodge's requests were sexual in nature, which is why he began to question them.

20.

When Lodge started to become aggressive after Plaintiff questioned his requests, Plaintiff believed Lodge had felt Plaintiff rejected his sexual or romantic advances and had become angry with him.

21.

On or about November 2, 2023, Lodge aggressively told Plaintiff during a group meeting to move his face closer to the camera and to center himself in the frame.

22.

When Plaintiff asked Lodge why he needed to do so, Lodge told Plaintiff that he "just really wanted to see" Plaintiff's face in a very odd tone. Lodge had earlier said that exact same phrase to Plaintiff in the same odd tone three to four times.

23.

When Plaintiff responded that his face was already in the camera frame, Lodge told Plaintiff that he had to put both his face and body where Lodge wanted them and told Plaintiff to sit up straight in a very odd tone.

24.

Plaintiff again believed that Lodge's requests were sexual in nature, and so Plaintiff told Lodge that he was uncomfortable following his instructions, that they could talk about it in their one-on-one meeting, and that he was going to log off of the group meeting. Plaintiff then logged off of the group meeting.

25.

Later that same day, in his one-on-one meeting with Lodge, Plaintiff asked Lodge why he was making such a big deal out of the positioning of his camera during the earlier meeting.

26.

Lodge responded that it was because Plaintiff's head was "two inches from where" he wanted it. This again made Plaintiff uncomfortable, and so he logged off of the meeting.

27.

That same day, after the one-on-one meeting, Plaintiff complained to Human Resources employee Laura and reported that Lodge was harassing him about his camera positioning during group meetings, that he believed the harassment was sexual in nature, and asked to see Defendant's policies related to being on camera.

28.

Plaintiff also specifically asked Laura to think about how it would appear if Lodge had made the comments he had made to Plaintiff to a woman to illustrate why he believed the requests were sexual in nature.

29.

Plaintiff was also reprimanded that same day by Lodge for being "off-screen," which was not true, as Plaintiff was on screen during the meetings.

30.

On or about November 6, 2023, Plaintiff followed up with Laura about his complaints of Lodge's behavior after not hearing back.

7

31.

On or about November 8, 2023, Defendant terminated Plaintiff, telling him his position had been eliminated.

32.

However, approximately two weeks after Plaintiff's termination, Defendant posted a job posting for a Device Support Engineer on a job listings website, builtin.com.

33.

On December 15, 2023, Defendant removed that job posting.

34.

Although Defendant purports to provide a legitimate non-discriminatory reason for the adverse action, this reason is pretext.

35.

Plaintiff was treated less favorably in the terms or conditions of his employment than others outside of his protected class, i.e. individuals who had not reported sexual harassment.

36.

As a result of Defendant's unlawful actions, Plaintiff has suffered damages, including lost wages and emotional distress.

8

## **COUNT I: Retaliation in Violation of Title VII**

37.

Plaintiff re-alleges paragraphs 11-36 as if set forth fully herein.

38.

Defendants actions (to wit, termination) because of Plaintiff's protected activity constitute unlawful intentional retaliation in violation of Title VII.

39.

Plaintiff engaged in protected activity under Title VII when he complained about sexual harassment.

40.

Defendant willfully and wantonly disregarded Plaintiff's rights, and Defendant's retaliation against Plaintiff was undertaken in bad faith.

41.

Accordingly, Defendant is liable for the damages Plaintiff has sustained as a result of Defendant's unlawful retaliation, including lost wages and emotional disress caused by the retaliation.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Court:

(A)   Grant Plaintiff a trial by jury as to all triable issues of fact;

9

(B)    Grant Plaintiff damages for lost wages and benefits and prejudgment interest thereon;

(C)    Grant Plaintiff general damages for mental and emotional suffering caused by Defendant's unlawful conduct;

(D)    Grant declaratory judgment declaring that Plaintiffs' rights have been violated;

(E)    Grant Punitive damages based on Defendant's willful, malicious, intentional, and deliberate acts, including ratification, condonation and approval of said acts;

(F)    Grant Plaintiff reasonable attorneys' fees and expenses of litigation;

(G)    Grant injunctive relief of reinstatement, or front pay in lieu thereof, and prohibiting Defendant from further unlawful conduct of the type described herein; and

(H)    Award Plaintiff such further and additional relief as may be just and appropriate.

This 26th day of March, 2024.

**BARRETT & FARAHANY**

/s/ V. Severin Roberts
V. Severin Roberts
Georgia Bar No. 940504

10

Attorney for Plaintiff

P.O. Box 530092
Atlanta, GA 30353
(404) 214-0120
(404) 214-0125 facsimile
severin@justiceatwork.com

11

JS44 (Rev. 10/2020 NDGA)

# CIVIL COVER SHEET

The JS44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form is required for the use of the Clerk of Court for the purpose of initiating the civil docket record. (SEE INSTRUCTIONS ATTACHED)

## I. (a) PLAINTIFF(S)

Jhostin Quinones

## DEFENDANT(S)

Flock Group Inc

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF**_____
(EXCEPT IN U.S. PLAINTIFF CASES)

**COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT**_____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS** (FIRM NAME, ADDRESS, TELEPHONE NUMBER, AND E-MAIL ADDRESS)

V. Severin Roberts
P.O. Box 530092
Atlanta, GA 30353-0092
(404) 214-0120
severin@justiceatwork.com

**ATTORNEYS** (IF KNOWN)

## II. BASIS OF JURISDICTION
(PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. GOVERNMENT PLAINTIFF

☐ 2 U.S. GOVERNMENT DEFENDANT

☑ 3 FEDERAL QUESTION (U.S. GOVERNMENT NOT A PARTY)

☐ 4 DIVERSITY (INDICATE CITIZENSHIP OF PARTIES IN ITEM III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES
(PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(FOR DIVERSITY CASES ONLY)

| | PLF | DEF | | PLF | DEF | |
|---|---|---|---|---|---|---|
| | ☐1 | ☐1 | CITIZEN OF THIS STATE | ☐4 | ☐4 | INCORPORATED OR PRINCIPAL PLACE OF BUSINESS IN THIS STATE |
| | ☐2 | ☐2 | CITIZEN OF ANOTHER STATE | ☐5 | ☐5 | INCORPORATED AND PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE |
| | ☐3 | ☐3 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | ☐6 | ☐6 | FOREIGN NATION |

## IV. ORIGIN (PLACE AN "X "IN ONE BOX ONLY)

☑ 1 ORIGINAL PROCEEDING

☐ 2 REMOVED FROM STATE COURT

☐ 3 REMANDED FROM APPELLATE COURT

☐ 4 REINSTATED OR REOPENED

☐ 5 TRANSFERRED FROM ANOTHER DISTRICT (Specify District)

☐ 6 MULTIDISTRICT LITIGATION - TRANSFER

☐ 7 APPEAL TO DISTRICT JUDGE FROM MAGISTRATE JUDGE JUDGMENT

☐ 8 MULTIDISTRICT LITIGATION - DIRECT FILE

## V. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE - DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Title VII of the Civil Rights Act of 1964, as amended ("Title VII")

(IF COMPLEX, CHECK REASON BELOW)

☐ 1. Unusually large number of parties.

☐ 2. Unusually large number of claims or defenses.

☐ 3. Factual issues are exceptionally complex

☐ 4. Greater than normal volume of evidence.

☐ 5. Extended discovery period is needed.

☐ 6. Problems locating or preserving evidence

☐ 7. Pending parallel investigations or actions by government.

☐ 8. Multiple use of experts.

☐ 9. Need for discovery outside United States boundaries.

☐ 10. Existence of highly technical issues and proof.

## CONTINUED ON REVERSE

# VI. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

**CONTRACT - "0" MONTHS DISCOVERY TRACK**
- [ ] 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT
- [ ] 152 RECOVERY OF DEFAULTED STUDENT LOANS (Excl. Veterans)
- [ ] 153 RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS

**CONTRACT - "4" MONTHS DISCOVERY TRACK**
- [ ] 110 INSURANCE
- [ ] 120 MARINE
- [ ] 130 MILLER ACT
- [ ] 140 NEGOTIABLE INSTRUMENT
- [ ] 151 MEDICARE ACT
- [ ] 160 STOCKHOLDERS' SUITS
- [ ] 190 OTHER CONTRACT
- [ ] 195 CONTRACT PRODUCT LIABILITY
- [ ] 196 FRANCHISE

**REAL PROPERTY - "4" MONTHS DISCOVERY TRACK**
- [ ] 210 LAND CONDEMNATION
- [ ] 220 FORECLOSURE
- [ ] 230 RENT LEASE & EJECTMENT
- [ ] 240 TORTS TO LAND
- [ ] 245 TORT PRODUCT LIABILITY
- [ ] 290 ALL OTHER REAL PROPERTY

**TORTS - PERSONAL INJURY - "4" MONTHS DISCOVERY TRACK**
- [ ] 310 AIRPLANE
- [ ] 315 AIRPLANE PRODUCT LIABILITY
- [ ] 320 ASSAULT, LIBEL & SLANDER
- [ ] 330 FEDERAL EMPLOYERS' LIABILITY
- [ ] 340 MARINE
- [ ] 345 MARINE PRODUCT LIABILITY
- [ ] 350 MOTOR VEHICLE
- [ ] 355 MOTOR VEHICLE PRODUCT LIABILITY
- [ ] 360 OTHER PERSONAL INJURY
- [ ] 362 PERSONAL INJURY - MEDICAL MALPRACTICE
- [ ] 365 PERSONAL INJURY - PRODUCT LIABILITY
- [ ] 367 PERSONAL INJURY - HEALTH CARE/ PHARMACEUTICAL PRODUCT LIABILITY
- [ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY

**TORTS - PERSONAL PROPERTY - "4" MONTHS DISCOVERY TRACK**
- [ ] 370 OTHER FRAUD
- [ ] 371 TRUTH IN LENDING
- [ ] 380 OTHER PERSONAL PROPERTY DAMAGE
- [ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY

**BANKRUPTCY - "0" MONTHS DISCOVERY TRACK**
- [ ] 422 APPEAL 28 USC 158
- [ ] 423 WITHDRAWAL 28 USC 157

**CIVIL RIGHTS - "4" MONTHS DISCOVERY TRACK**
- [ ] 440 OTHER CIVIL RIGHTS
- [ ] 441 VOTING
- [x] 442 EMPLOYMENT
- [ ] 443 HOUSING/ ACCOMMODATIONS
- [ ] 445 AMERICANS with DISABILITIES - Employment
- [ ] 446 AMERICANS with DISABILITIES - Other
- [ ] 448 EDUCATION

**IMMIGRATION - "0" MONTHS DISCOVERY TRACK**
- [ ] 462 NATURALIZATION APPLICATION
- [ ] 465 OTHER IMMIGRATION ACTIONS

**PRISONER PETITIONS - "0" MONTHS DISCOVERY TRACK**
- [ ] 463 HABEAS CORPUS- Alien Detainee
- [ ] 510 MOTIONS TO VACATE SENTENCE
- [ ] 530 HABEAS CORPUS
- [ ] 535 HABEAS CORPUS DEATH PENALTY
- [ ] 540 MANDAMUS & OTHER
- [ ] 550 CIVIL RIGHTS - Filed Pro se
- [ ] 555 PRISON CONDITION(S) - Filed Pro se
- [ ] 560 CIVIL DETAINEE: CONDITIONS OF CONFINEMENT

**PRISONER PETITIONS - "4" MONTHS DISCOVERY TRACK**
- [ ] 550 CIVIL RIGHTS - Filed by Counsel
- [ ] 555 PRISON CONDITION(S) - Filed by Counsel

**FORFEITURE/PENALTY - "4" MONTHS DISCOVERY TRACK**
- [ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881
- [ ] 690 OTHER

**LABOR - "4" MONTHS DISCOVERY TRACK**
- [ ] 710 FAIR LABOR STANDARDS ACT
- [ ] 720 LABOR/MGMT. RELATIONS
- [ ] 740 RAILWAY LABOR ACT
- [ ] 751 FAMILY and MEDICAL LEAVE ACT
- [ ] 790 OTHER LABOR LITIGATION
- [ ] 791 EMPL. RET. INC. SECURITY ACT

**PROPERTY RIGHTS - "4" MONTHS DISCOVERY TRACK**
- [ ] 820 COPYRIGHTS
- [ ] 840 TRADEMARK
- [ ] 880 DEFEND TRADE SECRETS ACT OF 2016 (DTSA)

**PROPERTY RIGHTS - "8" MONTHS DISCOVERY TRACK**
- [ ] 830 PATENT
- [ ] 835 PATENT-ABBREVIATED NEW DRUG APPLICATIONS (ANDA) - a/k/a Hatch-Waxman cases

**SOCIAL SECURITY - "0" MONTHS DISCOVERY TRACK**
- [ ] 861 HIA (1395ff)
- [ ] 862 BLACK LUNG (923)
- [ ] 863 DIWC (405(g))
- [ ] 863 DIWW (405(g))
- [ ] 864 SSID TITLE XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS - "4" MONTHS DISCOVERY TRACK**
- [ ] 870 TAXES (U.S. Plaintiff or Defendant)
- [ ] 871 IRS - THIRD PARTY 26 USC 7609

**OTHER STATUTES - "4" MONTHS DISCOVERY TRACK**
- [ ] 375 FALSE CLAIMS ACT
- [ ] 376 Qui Tam 31 USC 3729(a)
- [ ] 400 STATE REAPPORTIONMENT
- [ ] 430 BANKS AND BANKING
- [ ] 450 COMMERCE/ICC RATES/ETC.
- [ ] 460 DEPORTATION
- [ ] 470 RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS
- [ ] 480 CONSUMER CREDIT
- [ ] 485 TELEPHONE CONSUMER PROTECTION ACT
- [ ] 490 CABLE/SATELLITE TV
- [ ] 890 OTHER STATUTORY ACTIONS
- [ ] 891 AGRICULTURAL ACTS
- [ ] 893 ENVIRONMENTAL MATTERS
- [ ] 895 FREEDOM OF INFORMATION ACT 899
- [ ] 899 ADMINISTRATIVE PROCEDURES ACT / REVIEW OR APPEAL OF AGENCY DECISION
- [ ] 950 CONSTITUTIONALITY OF STATE STATUTES

**OTHER STATUTES - "8" MONTHS DISCOVERY TRACK**
- [ ] 410 ANTITRUST
- [ ] 850 SECURITIES / COMMODITIES / EXCHANGE

**OTHER STATUTES - "0" MONTHS DISCOVERY TRACK**
- [ ] 896 ARBITRATION (Confirm / Vacate / Order / Modify)

## \* PLEASE NOTE DISCOVERY TRACK FOR EACH CASE TYPE. SEE LOCAL RULE 26.3

---

# VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF CLASS ACTION UNDER F.R.Civ.P. 23    DEMAND $ _____

JURY DEMAND [x] YES [ ] NO (CHECK YES **ONLY** IF DEMANDED IN COMPLAINT)

# VIII. RELATED/REFILED CASE(S) IF ANY

JUDGE _____    DOCKET NO. _____

CIVIL CASES ARE DEEMED RELATED IF THE PENDING CASE INVOLVES: (CHECK APPROPRIATE BOX)
- [ ] 1. PROPERTY INCLUDED IN AN EARLIER NUMBERED PENDING SUIT.
- [ ] 2. SAME ISSUE OF FACT OR ARISES OUT OF THE SAME EVENT OR TRANSACTION INCLUDED IN AN EARLIER NUMBERED PENDING SUIT.
- [ ] 3. VALIDITY OR INFRINGEMENT OF THE SAME PATENT, COPYRIGHT OR TRADEMARK INCLUDED IN AN EARLIER NUMBERED PENDING SUIT.
- [ ] 4. APPEALS ARISING OUT OF THE SAME BANKRUPTCY CASE AND ANY CASE RELATED THERETO WHICH HAVE BEEN DECIDED BY THE SAME BANKRUPTCY JUDGE.
- [ ] 5. REPETITIVE CASES FILED BY PRO SE LITIGANTS.
- [ ] 6. COMPANION OR RELATED CASE TO CASE(S) BEING SIMULTANEOUSLY FILED (INCLUDE ABBREVIATED STYLE OF OTHER CASE(S)):

- [ ] 7. EITHER SAME OR ALL OF THE PARTIES AND ISSUES IN THIS CASE WERE PREVIOUSLY INVOLVED IN CASE NO. _____ , WHICH WAS DISMISSED. This case [ ] IS [ ] IS NOT (check one box) SUBSTANTIALLY THE SAME CASE.

---

/s/ V. Severin Roberts                               03/26/2024

SIGNATURE OF ATTORNEY OF RECORD                      DATE



06/04/2021

Jhostin Nunez

Re: Offer of Employment



Dear Jhostin:

On behalf of Flock Group Inc (the "**Company**"), I am pleased to offer you employment with Flock Group Inc in the position of QA Deployment Engineer, starting on 06/21/2021. In that position, you will report to Omar Lodge.

During your employment, you will be paid a base salary at the annual rate of $55,000 per year. Your compensation will be paid in regular installments in accordance with the Company's regular payroll process, and subject to applicable tax and other withholdings. As an exempt employee, you will not be eligible for any overtime pay. This position is a full-time position and your regular salary will be pro-rated based on a 40 hour work week.

1. <u>At-Will Employment:</u> Your employment with the Company is "at-will." In other words, either you or the Company can terminate your employment at any time for any reason, with or without cause and with or without notice, without liability except as expressly set forth in this letter. No representative of the Company has authority to enter into any agreement contrary to the foregoing "employment at will" relationship.

2. <u>Additional Agreements:</u> As a condition of your employment, you agree to execute any additional agreements required by the Company at the start of your employment. This includes any agreements that relate to your confidentiality or intellectual property assignment obligations to the Company. You further agree that at all times during your employment (and afterwards as applicable), you will be bound by, and will fully comply with, these additional agreements.

3. <u>Stock Options.</u> Subject to the approval of the Company's Board of Directors, you will have the opportunity to acquire an equity interest in the Company in the form of Stock Options (the "Equity Award"). The Equity Award will cover 4,222 shares of the Company's common stock and will be subject to the terms and conditions applicable to such awards granted under the Company's Stock Plan (the "Plan"), as described in that Plan and the applicable Plan agreement, which you will be required to sign. All of the Equity Award shares (the "Vesting Shares") will be subject to vesting. Subject to your continued service with the Company and the terms of the applicable Plan agreement, the Vesting Shares will vest as follows: 1/4th of the Vesting Shares shall vest on the 12-month anniversary of the commencement of your employment, and an additional 1/48th of the Vesting Shares shall vest each month thereafter. The applicable share price or exercise price used in connection with the Equity Award will be equal to the fair market value per share of the Company's common stock on the date the Equity Award is granted, as determined by the Company's Board of Directors. There is no guarantee that the

Internal Revenue Service will agree with this value. You should consult with your own tax advisor concerning the tax consequences of accepting the Equity Award.

4. Contingencies: This offer is contingent upon the successful completion of any background or reference checks desired by the Company. For purposes of federal immigration law, you will be required to provide to the Company documentary evidence of your identity and eligibility for employment in the United States. Such documentation must be provided to us within three business days following the start of your employment, or our employment relationship with you may be terminated.

5. Adjustments and Changes in Employment Status. The Company reserves the right to make personnel decisions regarding your employment, including but not limited to decisions regarding any transfers or other changes in duties or assignments, changes in your salary and other compensation, changes in benefits and changes in Company policies or procedures.

6. Entire Agreement: This employment agreement, along with the Confidentiality Agreement, sets forth the terms and conditions of your employment with the Company, and supersedes any prior representations or agreements concerning your employment with the Company, whether written or oral. You acknowledge and agree that you are not relying on any statements or representations concerning the Company or your employment with the Company except those made in this agreement. This employment agreement may not be modified or amended except by a written agreement signed by you and an authorized officer of the Company.

7. No Conflicting Obligations. By execution of this letter, you represent and warrant that your performance of this letter does not and will not breach any agreement you have entered into, or will enter into, with any other party. You must disclose to the Company any and all agreements relating to your prior employment that may affect your eligibility to be employed by the Company or limit the manner in which you may be employed. It is the Company's understanding that any such agreements will not prevent you from performing the duties of your position and you represent that such is the case. Moreover, you agree that, during the term of your employment with the Company, you will not engage in any other employment, occupation, consulting, or other business activity directly related to the business in which the Company is now involved or becomes involved during the term of your employment, nor will you engage in any other activities that conflict with your obligations to the Company. Similarly, you agree not to bring any third-party confidential information to the Company, including that of any former employer, and that you will not in any way utilize any such information in performing your duties for the Company. By signing and accepting this offer, you represent and warrant that: (i) you are not subject to any pre-existing contractual or other legal obligation with any person, company or business enterprise which may be an impediment to, or a conflict of interest with, your employment with the Company, or your providing services to the Company as its employee; (ii) you do not have and shall not bring onto the Company's premises, or use in the course of your employment with the Company, any confidential or proprietary information of another person, company or business enterprise to whom you previously provided services; and (iii) you will not, at any time during your employment with the Company, breach any obligation or agreement that you have entered into with any third party, including your former employers. You agree not to enter into any written or oral agreement that conflicts with this letter.

This offer letter expires on 06/08/2021.

Jhostin, we are excited by the prospect of you joining the Company!

Sincerely,

CONFIDENTIAL

Flock Group Inc

*Garrett Langley*

Garrett Langley

## Acknowledgment and Acceptance of Employment Offer

I accept employment with Flock Group Inc and acknowledge and fully agree to the terms and conditions set forth in this offer letter:

*Jhostin Nunez*

Jhostin Nunez

FLOCK000155

# flock safety

**Employee Handbook**
*Last Updated: January 2023*



EXHIBIT
4
Quinones

# flock safety

**Policies Regarding Non-Discrimination and Equal Employment**                              **6**

   Equal Employment Opportunity                                                  6

   Non-Discrimination                                                            7

   Workplace Harassment and Discrimination                                       7

      FORMS OF UNLAWFUL HARASSMENT                                             7

         Social Media                                                         8

         Sexual Harassment                                                    8

            Sexual harassment exists when:                                   8

            Procedures for Addressing Claims of Unlawful Harassment or Discrimination9

            No Retaliation                                                  10

            Consensual Relationships                                        10

**POLICY ON NEPOTISM/EMPLOYMENT OF FAMILY MEMBERS**                                        **11**

   Definition of Family Members                                                   11

   Nepotism Policy                                                                11

   When Relationships Change:                                                     11

**COMPENSATION AND PERFORMANCE**                                                           **12**

   Employee Classifications                                                       12

      Regular Full-Time Employees                                              12

      Regular Part-Time Employees                                              12

      Temporary Employees                                                      12

      Exempt Employees                                                         12

      Non-Exempt Employees                                                     13

   Payday; Deductions                                                             13

   Direct Deposit                                                                 14

   Performance Evaluations                                                        14

   Internal Candidate Application Process                                         14

   **Promotions**                                                                 **16**

   Migrations                                                                     16

   Employee Referral Program Policy                                               17

      What constitutes a great referral?                                       17

      How to Submit a Referral                                                 17

      Tracking your referral                                                   18

      Referral Reward                                                          18

   Resignations                                                                   18

**EXPENSE REIMBURSEMENT**                                                                  **18**

**NON-BUSINESS ACTIVITIES**                                                                **18**

   Outside Employment                                                             19

FLOCK000067

# flock safety

**CHANGES IN PERSONAL STATUS**     **19**

**PAID TIME OFF**     **20**
    HOLIDAYS     20
    VACATION, SICK AND PERSONAL DAYS     20
    Part-Time, Non-Exempt (Salaried or Hourly), and Temporary Employees – Paid Time Off     21

**LEAVES OF ABSENCE**     **21**
    FAMILY AND MEDICAL LEAVE     21
        Reasons for Leave     22
        Notice of Leave     22
        Medical Certification     22
        Reporting While On Leave     23
        Use of Accrued Paid Leave for Family/Medical Leave     23
        Medical and Other Benefits During Leave     23
        Intermittent and Reduced Schedule Leave     23
        Returning From Leave     24
            Definitions     24
    PARENTAL LEAVE POLICY     25
    LACTATION/BREASTFEEDING POLICY     26
    NON-MEDICAL LEAVES     26
    MILITARY LEAVE     26
    JURY DUTY     27
    BEREAVEMENT     27

**BENEFIT PLANS**     **27**

**WORKERS' COMPENSATION**     **28**

**CONFIDENTIALITY AND NON-DISCLOSURE**     **30**

**BUSINESS ETHICS**     **30**

**CONFLICTS OF INTEREST**     **30**

**COMPUTER AND ELECTRONIC TECHNOLOGY**     **31**

**SOCIAL MEDIA POLICY**     **33**
    Rules of Engagement     33

**SURVEILLANCE AND SEARCH POLICY**     **34**

**BACKGROUND CHECK POLICY**     **34**

**SUBSTANCE ABUSE**     **35**

**DRUG AND ALCOHOL POLICY**     **36**

CONFIDENTIAL
FLOCK000068

# flock safety

| | |
|---|---|
| Work Rules | 36 |
| Required Testing | 36 |
| Pre-employment | 36 |
| Reasonable suspicion | 37 |
| Post-accident | 37 |
| Consequences | 38 |
| Confidentiality | 38 |
| **ANTI-VIOLENCE POLICY** | **38** |

FLOCK000069

# flock safety

Welcome to Flock!

As an employee of Flock, you are joining a team of individuals who are committed to quality and professionalism in the service of our customers. This Handbook provides you with important information you should know about the Company. This Handbook serves as a guide to both new and seasoned employees alike. It contains our corporate mission, corporate philosophy, benefits, and personnel policies and practices.

This Handbook is designed to be a working guide for Company personnel in their day-to-day functions and performance of their jobs. It is the responsibility of each and every employee to abide by, implement and administer the policies set forth in this Handbook in a consistent, fair and impartial manner. This Handbook is intended to help all employees at Flock in the fulfillment of their responsibilities.

**This Handbook is not intended to create, nor shall it be construed as creating, an express or implied contract, a cause of action, or a guarantee of employment for any term. If you have any questions, please feel free to ask your supervisor.**

At all times during your employment, your employment relationship with the Company remains at-will, and you have the right to terminate your employment and the Company has the right to terminate your employment, with or without notice, for any reason or no reason.

CONFIDENTIAL
FLOCK000070

# flock safety

## Policies Regarding Non-Discrimination and Equal Employment

Equal Employment Opportunity

Flock is committed to equal-employment principles, and we recognize the value of committed employees who feel they are being treated in an equitable and professional manner. We strive to find ways to attract, develop and retain the talent needed to meet business objectives and to recruit and employ highly qualified individuals representing the diverse communities in which we live and work.

Flock is an equal opportunity employer and does not discriminate against employees or applicants for employment on the basis of race, color, religion, creed, sex, sexual orientation, gender, pregnancy, marital status, age, national origin, ancestry, physical or mental disability, medical condition, military or veteran status, or any other status or condition protected by applicable federal, state or local law.  Employment policies and employment-related decisions are based on merit, qualifications, performance and business needs. The decisions and criteria governing the employment relationship (including but not limited to recruitment, hiring, probation, training, placement and employee development, transfers, compensation, benefits, educational assistance, leaves of absence,  promotion, discipline, layoff, and termination) with all employees are made in a non-discriminatory manner—without regard to race, religion, color, creed, national origin, sex, sexual orientation, gender, age, pregnancy, marital status, physical or mental disability, medical condition, military or veteran status, or any other status protected by applicable federal, state or local law, except where a bona fide occupational qualification applies.

In keeping with this policy, we do not engage in prohibited discrimination based on any protected characteristic, including an individual's disability. Consistent with the requirements of the Americans with Disabilities Act (ADA), as amended by the ADA Amendments Act and equivalent state or local laws, the Company will make reasonable accommodations to comply with federal and state disability discrimination laws. The company wishes to have timely, good faith discussions with a disabled applicant or employee to determine what accommodations may be appropriate and each is invited to identify for the company reasonable accommodations that can be made to assist in performing the essential functions of the position.

Flock is committed to fostering an environment in which all individuals are valued equally. To that end, we all need to respect and encourage meaningful differences. People from different backgrounds and perspectives provide vitality, creativity, new ideas and growth. Acceptance and appreciation of other cultures, ways of thought and dispositions will contribute to a successful and rewarding working environment at Flock.

CONFIDENTIAL                                        FLOCK000071

# flock safety

Non-Discrimination

Flock has always maintained strong policies designed to keep the Company free from any form of discrimination. The Company will comply with all laws related to discrimination in employment because of race, religion, color, creed, national origin, sex, sexual orientation, gender, age, pregnancy, marital status, physical or mental disability, medical condition, military or Veteran status, or any other status protected by applicable federal, state or local law.

This policy applies to all terms, conditions and privileges of employment including, but not limited to, recruiting, hiring, probation, training, placement and employee development, transfers, compensation, benefits, educational assistance, leaves of absence, promotion, discipline, layoff, or termination.

Workplace Harassment and Discrimination

The Company is firmly committed to maintaining a working environment free from unlawful harassment and/or discrimination, including but not limited to sexual harassment. The Company expressly prohibits all forms of unlawful harassment or discrimination.

*FORMS OF UNLAWFUL HARASSMENT*

Harassment is generally defined as unwelcome verbal or non-verbal conduct, based upon a person's protected characteristic, that denigrates or shows hostility or aversion toward the person because of the characteristic, and which affects the person's employment opportunities or benefits, has the purpose or effect of unreasonably interfering with the person's work performance, or has the purpose or effect of creating an intimidating, hostile, or offensive working environment. Such conduct includes, but is not limited to, the following:

- Using epithets or slurs, offensive jokes, remarks, or pranks;
- Mocking, ridiculing or mimicking another's culture, accent, appearance or customs;
- Engaging in hostile or offensive acts or threatening to do so or otherwise intimidating others; or
- Posting or circulating offensive material in any form, including by electronic mail or on Company property.

FLOCK000072

# flock safety

## Social Media

Harassment can also happen within social media. Some guidelines to keep in mind - do not offend your audience: Don't use ethnic slurs, personal insults, obscenity, etc. Show proper consideration for others' privacy and for topics that may be considered objectionable or inflammatory (i.e., politics and religion). Be mindful of your own personal biases and respect your audience. Never publicly criticize a current, former or potential Flock Safety employee, customer or business partner online. This includes comments on their employees, location or other identifiers (and don't assume that a cosmetic name change will veil an attack). Always assume that our customers and partners might stumble upon your blog or Twitter feed, so never say anything.

The above list is not intended to be exhaustive, but merely illustrative of the types of conduct that the Company will deem to constitute unlawful harassment and serve as grounds for disciplinary action, up to and including immediate discharge.

## Sexual Harassment

Sexual harassment is a form of sex discrimination.  It is the Company's firm commitment to maintain a working environment free from sexual harassment.  The Company prohibits any form of sexual harassment or any other harassment on any basis.

It shall be a violation of Company policy for any employee to harass another employee, applicant, vendor, visitor or client through conduct or communications of a sexual nature as defined by this policy.  If you become a victim or aware of any such harassment occurring within the Company at any level, you should immediately approach any Human Resources team member to discuss the nature of such harassment.  The Company will act to investigate all complaints of sexual harassment, either formal or informal, verbal or written.

Sexual harassment exists when:

1.  Submission to such conduct is either an explicit or implicit term or condition of employment (including, but not limited to, hiring, compensation, promotion, retention, assignment or opportunities); or

2.  Submission to or rejection of such conduct is used as a basis for employment decisions; or

3.  Such conduct has the purpose or effect of interfering with an individual's work performance or of creating an intimidating, hostile or offensive work environment.

Any sexual harassment as defined above, when perpetrated on an employee, applicant, vendor, visitor or client by any Company employee, will be treated as sexual harassment under this policy.

8

# flock safety

Sexual harassment may include, but is not limited to:

- Verbal harassment or abuse;
- Subtle pressure for sexual activity, including flirtation, propositions or advances;
- Unwanted sexual advances or requests for sexual favors;
- Demanding sexual favors, accompanied by implied or overt threats;
- Sexually motivated physical conduct, including but not limited to inappropriate patting, pinching or other close physical contact;
- Intentional brushing against another's body in the workplace;
- The display of derogatory posters, cartoons, drawings or other obscene materials;
- Any unwelcome sexually motivated comments, including comments about a person's dress or body; or
- Other verbal or physical conduct or communication of a sexual nature in the workplace.

This list is not intended to be exhaustive; rather, it is merely illustrative of the types of behavior which will be deemed sexually harassing, inappropriate and grounds for disciplinary action, up to and including immediate termination of employment.

*Procedures for Addressing Claims of Unlawful Harassment or Discrimination*

It is the Company's express policy to encourage victims of unlawful harassment or discrimination to come forward with such claims.

Any employee who feels they have been harassed or been a victim of unlawful discrimination, or who has witnessed or become aware of harassment or discrimination, should immediately bring the subject to the attention of an appropriate supervisor. If the employee's direct supervisor is the offending person, or the employee does not feel comfortable discussing the matter with their direct supervisor, the employee should approach any Human Resources team member.

Inquiries and/or complaints will be investigated immediately by the appropriate impartial officer of the Company. Any such investigation will be conducted in as confidential a manner as is compatible with a thorough investigation of the complaint. Generally, all parties concerned will be interviewed.

Complaints should be submitted as soon as possible after an incident has occurred, preferably in writing. The People team may assist the complainant in completing a written statement or, in the event an employee refuses to provide information in writing, the People team will dictate the verbal complaint. The Company will take appropriate action based on the outcome of the investigation.

CONFIDENTIAL
FLOCK000074

# flock safety

Any employee determined to have harassed or discriminated against another employee, applicant, vendor, visitor or client will be subject to disciplinary procedures, up to and including immediate termination.

If the investigation results in a finding that an individual falsely accused another of harassment, discrimination or retaliation in a knowing or malicious manner, or otherwise knowingly or maliciously provided false information during the course of the investigation, that individual will also be subject to the appropriate disciplinary action, up to and including termination of employment.

## *No Retaliation*

Retaliation against any individual who makes a good faith complaint or provides any information regarding harassment or discrimination, including those who participate in any investigation of such complaints, will not be tolerated. Any individual who engages in retaliation is in violation of this policy and will be disciplined accordingly, up to and including termination of employment. Complaints and information of retaliation are subject to the same reporting, investigation and remedial procedures as harassment or discrimination claims.

If any employee has a suggestion, problem or complaint regarding equal employment issues, the employee should contact the VP, Human Resources If the VP, Human Resources is an inappropriate person for an employee to address, or is otherwise unavailable, employees with such issues should contact the Company's General Counsel.

Any employee who is a witness to any incident of harassment or discrimination, has knowledge of harassment or discrimination, or otherwise has reason to believe that harassment or discrimination in or related to the Flock workplace is taking or has taken place (whether involving a co-worker, supervisor, or non-employee), must report such conduct to their supervisor or an officer of the Company immediately.

## *Consensual Relationships*

Consensual romantic and/or sexual relationships between an employee with supervisory authority and any subordinate, including one not directly under the supervisor, will compromise the Company's ability to enforce its policy against sexual harassment. Consequently, if such relationships arise, they will be considered carefully by the Company and appropriate action will be taken. Such action may include a change in the responsibilities of the individuals involved in such relationships or transfer of location within the Company to diminish or eliminate the

supervisory relationship and workplace contact that may exist. Any supervisory employee involved in such a relationship is required to report the relationship to their supervisor, and to the Human Resources team. If a supervisory employee does not report such a relationship, disciplinary action may be taken, up to and including termination.

10
FLOCK000075

# flock safety

## POLICY ON NEPOTISM/EMPLOYMENT OF FAMILY MEMBERS

Flock policy currently permits the employment of family members with very specific guidelines and only with the approval of the VP, Human Resources. However, the employment of family members can cause conflicts of interest, emotional disruption, favoritism and limit the diversity of our workforce. Flock believes in hiring and promoting people based on their knowledge, skills, abilities, and potential. For these reasons, we wish to reduce the potential conflicts of interest that can occur when family members work together.

Definition of Family Members

For the purpose of this policy, a family member is defined as a spouse, partner, parent, step-parent, sibling, child, step-child, step-sibling, aunt or uncle, niece or nephew, grandparent, grandchild, or cousin. In-laws (or partner's family) are also considered family. Other non-family relationships can be considered on a case-by-case basis.

Nepotism Policy

No family members shall:

·        Work as peers in the same department or share a manager.

·        Have any reporting relationship between them.

·        Oversee processes that will affect a family member. For instance, HR employees may not be a business partner, employee relations manager, or compensation supervisor over any department that the family member is in.

·        Participate in any disciplinary or reward decision that directly affects an individual family member.

This policy shall be enforced when hiring, promoting, or transferring employees.

When dealing with outside firms, either as vendors, clients, or service providers, these same guidelines shall apply.

When Relationships Change:

Flock understands that family relationships can change throughout employment. People may date and marry over the course of employment.

If a new relationship violates the nepotism policy (for example, a new romantic relationship, a family marriage that creates a new family relationship), report the change or potential change to your Human Resources team representative as soon as possible.

CONFIDENTIAL                                                            FLOCK000076

# flock safety

Human Resources will work with you, your family member, and your manager(s) to find a solution that doesn't violate the nepotism policy.

If you have any concerns about relationships within the business, please notify the Human Resources team as soon as possible.

## COMPENSATION AND PERFORMANCE

Employee Classifications

The Company employs various types of employees as listed below. Each employee's status is represented by a combination of these definitions. If you have any questions concerning what your status is, please contact a Human Resources team member.

*Regular Full-Time Employees*

Those employees who are regularly scheduled to work at least 30 hours per week.

*Regular Part-Time Employees*

Those employees who regularly work less than 30 hours per week. Regular part-time employees may not be entitled to or eligible for all of the Company's benefits. If you are a part-time employee and you have questions about your benefits, you should ask your supervisor or Human Resources for clarification.

*Temporary Employees*

Those individuals employed for a specific period of time, assignment or project. Temporary employees may work either full-time or part-time and will be eligible for all benefits required by law.

*Exempt Employees*

Those employees who are classified as exempt from overtime pay provisions of the federal Fair Labor Standards Act and applicable state law (i.e., not eligible for and does not receive overtime pay). Exempt employees are paid a salary that compensates for all hours worked, including when required to work beyond their normal work hours to accomplish the work of the company.

12

FLOCK000077

# flock safety

*Non-Exempt Employees*

Those employees whose duties do not fit the definition of exempt employment and who are eligible for overtime pay under the provisions of federal and state law.

## WAGES

Full-time, salaried, exempt employees will be paid **semi-monthly** in accordance with the Company's regular payroll process in place.

Full-time and part-time hourly, and full-time, salaried, non-exempt employees will be paid weekly, on Fridays in accordance with the Company's regular payroll process in place.

Non-exempt employees are paid at their regular rate of pay for up to forty (40) hours, and at the rate of one and one-half (1½) times their regular rate of pay for hours worked in excess of forty (40) hours during the established workweek or as otherwise required by applicable state law. For purposes of calculating overtime payments, only hours actually worked are counted. Consequently, hours paid but not worked (e.g., holidays, vacation, sick days, jury duty, bereavement leaves) are not counted as hours worked.

All employees are responsible for reviewing their pay stub each pay period and immediately reporting any problems or errors to the People Team if the paycheck appears to be inaccurate or it has been misplaced.

Salary and hourly rate adjustments may be made in connection with an employee's annual performance review, a promotion or at any time when, at the Company's discretion, it is deemed appropriate to recognize meritorious performance. The amount of adjustment is generally intended to reflect the level of demonstrated superior performance.

Bonuses are granted at the discretion of the officers of the Company and are based on merit and performance. Bonuses are not guaranteed.

### Payday; Deductions

Paychecks include salary or wages earned, less any mandatory or elected deductions. Mandatory deductions include federal or state withholding tax, Social Security (FICA) tax, state unemployment compensation, and deductions required by wage garnishment, child support, and other income withholding orders or notices. Elected deductions are deductions authorized by the employee and may include, for example, contributions to benefit plans and 401(k).

13
FLOCK000078

# flock safety

Employees may contact the People Team to obtain necessary authorization forms for requesting additional deductions from their paycheck. The company prohibits deductions from a non-exempt employee's pay except as required or permitted by applicable law.

Unless prohibited by applicable federal, state, or local law, other permissible deductions from an exempt employee's salary include deductions for:

- Full-day or partial-day unpaid absences taken outside the scope of the Flexible Time Off policy, as applicable.
- Unpaid full-day disciplinary suspensions imposed in good faith for workplace conduct rule infractions.
- Penalties imposed in good faith for infractions of safety rules of major significance.
- A proportionate amount of the employee's full salary for time not worked in the employee's first or last week of employment.

## Direct Deposit

All employees are able to include and edit their banking information in Rippling, in order to have your paycheck deposited directly into your bank account. Direct deposit may be made to an employee's checking account, savings account, or both. You may opt to deposit your money into up to three separate accounts. The Company recommends direct deposit to all employees.

## Performance Evaluations

Flock will endeavor to review the performance of its employees on at least an annual basis. Performance evaluations will generally cover the employee's ability to perform their assigned responsibilities, job skills, knowledge of the job, organization, timeliness of completion of assignments, the quality and quantity of work performed, attitudes, dependability, attendance, initiative, problem-solving skills and communication skills. Goals, objectives and expectations for the coming year will also be discussed.

## Internal Candidate Application Process

At Flock, we believe that we have assembled an incredible group of talented people. Our culture is a strong one and those who thrive in it are the people we want to keep and provide ample opportunity for them to grow in their careers. When a new role opens up, we want to ensure that we consider not only the best candidates out in the market, but also the best internal candidates. To ensure that internal candidates are considered as seriously as their

14
FLOCK000079

# flock safety

external peers, we have developed a clear strategy for what an internal candidate should expect when applying for a role.

*Requirement to be considered for an internal role:*
You must have been in your role, and not on a PIP/receiving disciplinary action, for 6 consecutive months to be considered for any internal position. Some roles may require a year of good standing in your current role. Recruiting will confirm this with the People team/Hiring Manager prior to starting the interview process.

Internal candidates are only eligible to apply for one role at a time. If you have already applied, and want to change directions, please talk with your Recruiter.

Your interview panel will be slightly smaller than an external candidate and will be solely focused on the role and team you are seeking to join.

After you have determined your eligibility, please use this as a guide for applying to a role on our internal job board. You are also able to apply on our external jobs website but please make sure to reach out to a Recruiter to let us know you have applied if you use the external website.

If your experience represents a strong fit for the position you are applying for, the interview process will commence. The steps are as follows:

1. Your Recruiter will set up an initial conversation with you to explore the role and answer your questions. Prior to your call with your recruiter be sure to tell your current manager that you are in the interview process. Your recruiter will also notify your hiring manager that you are interviewing.

2. The interview process will flow exactly the same as it would for an external candidate. Typically our jobs follow this structure:
   - Interview with the Recruiter (already complete at this point)
   - Interview with the Hiring Manager
   - Panel Interview

3. If you successfully complete the interviews, and are made an offer, congratulations! Thank you so much for growing with Flock.

4. Your Recruiter will talk with you to discuss feedback from the final interview and deliver a verbal offer to you. Please ask any remaining questions about the role before verbally accepting.

Once we have received your verbal acceptance, you will need to meet with your current manager to discuss a transition plan and come to an agreement on a start date for your new

15
CONFIDENTIAL

# flock safety

role. You should have this conversation and provide a start date to your Recruiter within 2 business days of receiving a verbal offer.

Once a start date is decided, you will receive a written offer letter via email that will contain all of the details for your new role. In order to officially accept your new role, **you must respond via email** to your Recruiter accepting/declining the offer.

Once you speak with the Hiring Manager, you must disclose your application with your current manager. If you have questions about this, please partner with your Recruiter.

**A note on internal applications:** We are so thankful that you would like to apply for a new role at Flock. Your manager and our Human Resources team are committed to enabling your growth at Flock and are here to help you at every step of the way. All of our internal candidates will be evaluated and interviewed alongside, and just as rigorously as external candidates. Please update your resume with your current Flock experience and take the process just as seriously as your initial interviews with Flock.

### Promotions

Promotion is movement from one position to a higher-level position. It is the general policy of the Company to hire and/or promote based upon individual merit and ability. Flock employees will be given full consideration for available positions of greater responsibility, based upon the employee's ability to meet the requirements of the position, including but not limited to training, attendance, experience, demonstrated job performance and other qualifications and factors which managers, supervisors and officers deem relevant.

Although the Company favors promotion from within the Company and will generally consider qualified employees for promotion to vacant positions at least concurrently with outside applicants, the Company at all times reserves the absolute right to recruit, interview and hire from outside of the Company when it is determined that it is necessary to obtain the best qualified candidate or is otherwise in the best interests of the Company.

To be considered for promotion, an employee must have consistently demonstrated satisfactory performance and must have completed any initial evaluation period. Employees will not be eligible for promotion if they have received a Disciplinary Action/Performance Improvement Notice (as defined in the Disciplinary Procedure policy in this Handbook) within the last 6 months.Additionally, in order for a promotion to be considered, there must be a business need.

### Migrations

A migration is the lateral movement from one position to another position at the same level. Employees at the Company are assigned to positions for which they qualify.

# flock safety

To be considered for a transfer, an employee must be qualified for the new position, have consistently demonstrated satisfactory performance and have completed any probationary period.  Employees will not be eligible for a transfer if they have received a Disciplinary Action/Performance Improvement Notice  within the last 6 months.


Employee Referral Program Policy

Flock uses an employee referral program to encourage employees to refer candidates for jobs at the Company. This program benefits us by increasing our candidate pool and lets employees share their positive experience with people in their network that may be a strong fit for a role at Flock.

While we always appreciate employee referrals, referring candidates should be taken seriously. At this stage of our growth, we are looking for candidates with very specific skills. Referral may highlight a candidate's resume but does not guarantee them an interview.

### What constitutes a great referral?

 A referral should be someone with whom you have a professional relationship. This means someone you have worked with on a team, a former manager, or someone you worked with cross-functionally. You should have enough knowledge of this person's professional history that you can provide insight into how they are a match to one of our open positions and why you believe they would be a great fit at Flock.

An easy way to figure out if your referral is someone you should submit is to ask four questions:
- Have I worked with this person before in a professional setting?
- Do I know what skills this person has and how it aligns with the open position I am submitting them for?
- Have I asked the Hiring Manager or Recruiter about the position in question?
- Do I believe the person is a great professional fit for the role in question?

If you can answer yes to each question this is a referral you should submit.


### How to Submit a Referral

Every employee at Flock has a Greenhouse account. If you are having difficulty accessing your account, please reach out to a member of the recruiting team and they will be able to assist you.

To submit a referral login to your account.
1. In the upper right-hand corner, you will see a plus sign in a circle.
2. Hover over this and select "add referral".
3. Add your referral's resume or enter their information.
4. Fill out the required sections

17

# flock safety

1. Work Relationship
2. Work History
3. Candidate Skills

Candidates must be submitted via Greenhouse in order to be considered for any role. A Greenhouse referral submission will alert the appropriate Recruiter.

*Tracking your referral*

The recruiting team will review your referral's credentials within 2 business days and schedule a recruiter phone screen *if* the candidate meets all requirements. While we cannot communicate status or details of a referred candidate's application, we will let you know if your candidate is a) released from the process or b) hired.

*Referral Reward*

Referring a candidate with relevant skills for a role at Flock is an effort we would like to reward with a special gift reserved for referring employees whose referral accepts a full-time offer at the Company. Employees are only eligible for one referral gift per calendar year, and the gift will be mailed to you within 90 days of your candidates' start date.

## Resignations

Flock requests that employees who find it necessary to resign provide their supervisor and the People team member with **at least** two weeks' written notice.

## EXPENSE REIMBURSEMENT

All employees will be reimbursed for mileage and reasonable pre-approved expenses incurred in connection with work other than normal home-to-office travel. If traveling by privately-owned automobile, mileage will be reimbursed at the standard IRS reimbursement rate in place at the time. If traveling by other than privately owned automobile, the amount of the actual costs of transportation will be reimbursed.

Trips outside of your home city require prior approval from your supervisor to be subject to reimbursement. For more details on expense reimbursements, see "Flock Business & Travel Expense Reimbursement Policy."

Receipts are required for all reimbursements. Expenses for spouses and non-employees accompanying employees are not reimbursable.

## NON-BUSINESS ACTIVITIES

Non-solicitation

FLOCK000083

# flock safety

It is important that work time be utilized for the business of the Company. Trespassing, solicitation or distribution of literature by any non-employee on Company premises is prohibited. Solicitation by an employee of another employee is prohibited while either person is on work time. Employees are not permitted to distribute literature such as brochures, booklets, pamphlets or flyers at any time in any work area.

Nothing in this Handbook, including this section, is intended to preclude or dissuade employees from engaging in legally protected activities or otherwise interfere with any rights of employees under applicable federal or state law, including Section 7 of the National Labor Relations Act (NLRA).

Outside Employment

It is anticipated that employees of the Company will devote their full time, energy and attention to their duties on behalf of the Company. Due to the nature of the Company's business, it may sometimes be necessary for employees to work outside of normal business hours. Simultaneous outside employment is therefore actively discouraged. Simultaneous employment with any direct or indirect competitor will be grounds for immediate termination.

Any full-time employee who desires to take on other employment in addition to their responsibilities to the Company is required to provide the Company with the details of such anticipated employment in writing, including information regarding the nature of the work and the anticipated hours.

## CHANGES IN PERSONAL STATUS

All personnel records must contain current and complete information. Employees are required to notify the Company promptly in writing of any change in:

1. Name;
2. Address;
3. Telephone number;
4. Dependents;
5. Deductions on W-4 forms;
6. Change in status for health care programs;
7. Person to be identified in case of emergency;

CONFIDENTIAL

FLOCK000084

# flock safety

**PAID TIME OFF**

HOLIDAYS

The following shall be the official paid holidays recognized by the Company:

New Year's Day
Martin Luther King Jr. Day
Memorial Day
Juneteenth
Independence Day
Labor Day
Thanksgiving Day
Friday after Thanksgiving
Christmas Eve
Christmas Day
New Year's Eve
Employee's Birthday

If a holiday falls on a Saturday or Sunday, the holiday shall be observed on Friday or Monday, at the discretion of the Company, and the Company shall provide notice to all employees as to the day being observed.

VACATION, SICK AND PERSONAL DAYS

**Full-Time Salaried Exempt Employees - Flexible Time Off ("FTO")**

Regular time away from work is important. All regular, full-time, salaried exempt employees in good standing are eligible to take paid time off as needed. Eligible employees are expected to manage their own time off, provided it does not inhibit regular business operations and that specific job responsibilities are met. This policy does not apply to part-time, nonexempt (salaried or hourly), or temporary employees.

To maintain the continuity of business, employees are expected to have FTO days approved, where possible, ahead of time by their supervisor. All requests for time off should be coordinated with your team and approved in advance by your manager. Requests for time off may be approved or denied depending on specific business unit needs. The company is flexible in approving time off when doing so would not interfere with company operations. For situations that arise outside of typical vacation and time off needs, please refer to the additional leave policies and work specifically with your manager and the VP, Human Resources.

FTO is for vacation, sick, and personal time off. FTO does not cover any other time off covered in this Employee Handbook, including but not limited to holidays and FMLA leave. In addition,

20

# fⁱock safety

FTO cannot be used to provide more paid time off under any extended leave policies (e.g., FMLA).

If you are absent three (3) days or more due to an illness, you need to provide a doctor's release to Human Resources when you are able to return to work. This is to protect both you and the Company. You should not return to work before you are able to do so

Employees will be eligible to start using FTO immediately. FTO is paid at the eligible employee's regular pay rate and is not subject to overtime. FTO requests that exceed [ten (10) consecutive business days should be approved by both the employee's supervisor and Human Resources.

Under the FTO plan, employees do not "accrue" FTO days as in traditional plans and will not be compensated for "unused" FTO time upon termination.

In the event an employee abuses the FTO policy by taking time off that negatively impacts their job or the frequency of unscheduled absences becomes excessive, corrective action may be taken which may include termination of employment.

The FTO policy, as well as all other company policies, is continually evaluated and may be amended, modified, or terminated at any time.


Part-Time, Non-Exempt (Salaried or Hourly), and Temporary Employees – Paid Time Off

Hourly employees receive the following paid time-off:

15 Vacation Days. Vacation time is accrued every week. When an employee leaves the Company, they are entitled to receive payment for any accrued but unused vacation days (including carry-over days accrued in previous years).

5 Sick Days. Sick Days are credited in full on January 1st of each calendar year. Where applicable, the Company will comply with all state and local laws regarding paid sick leave.

3 Personal Days. Personal Days are credited in full on January 1st of each calendar year.

In the event of your termination from Flock, whether voluntary or involuntary, with or without cause, Flock will not be obligated to pay you for any unused sick days, personal days or holidays, except as required by statute.


## LEAVES OF ABSENCE

FAMILY AND MEDICAL LEAVE

Employees are eligible to take up to 12 weeks of unpaid family/medical leave within any 12-month period and be restored to the same or an equivalent position upon the employee's

21

# flock safety

return from leave provided that the employee: (1) has worked for the Company for at least 12 months, and for at least 1,250 hours in the 12 months preceding the commencement of the requested leave; and (2) is employed at a work site that has 50 or more employees within a 75-mile radius.

The 12-month period in which an employee may take 12 weeks of leave will be calculated as a rolling 12 months preceding the request for leave. For example, if an employee has taken eight weeks of leave during the 12 months preceding the request for leave, an employee is entitled to four more weeks of leave.

*Reasons for Leave*

An employee may take family/medical leave for any of the following reasons: (1) the birth of a son or daughter and in order to care for such son or daughter; (2) the placement of a son or daughter with the employee for adoption or foster care; (3) to care for a spouse, son, daughter or parent with a "serious health condition;" or (4) because of the employee's own "serious health condition." Leave because of reasons "1" or "2" must be completed within the 12-month period beginning on the date of birth or placement. In addition, spouses employed by the Company who request leave because of reasons "1" or "2" or "3" may only take a combined total of 12 weeks of leave during any 12-month period.

*Notice of Leave*

If an employee's need for family/medical leave is foreseeable, the employee must give the Company 30 days prior written notice. If this is not possible, the employee must at least give notice as soon as practicable. Failure to provide such notice may be grounds for delay of leave. Where the need for leave is not foreseeable, the employee is expected to notify the Company within one (1) to two (2) business days of learning of the employee's need for leave, except in extraordinary circumstances.

*Medical Certification*

If an employee is requesting leave because of their own or a family member's serious health condition, the employee must provide appropriate medical certification. Failure to provide required medical certification in a timely manner might result in denial of leave until it is provided. The Company, at its expense, may require an examination by a second health care provider designated by the Company, if it doubts the medical certification the employee initially provides. If the second health care provider's opinion conflicts with the original medical certification, the Company, at its expense, may require a third, mutually agreeable, health care

22

# flock safety

provider to conduct an examination and provide a final and binding opinion. The Company may require subsequent medical recertification on a reasonable basis.

*Reporting While On Leave*

If an employee takes leave because of the employee's own serious health condition or to care for a family member, the employee must contact the Company each month regarding the status of the condition and the employee's intention to return to work.

*Use of Accrued Paid Leave for Family/Medical Leave*

Family/medical leave is unpaid. When taking leave because of the employee's own serious health condition, the employee may be eligible for paid Short Term Disability benefits, as outlined in the benefit summary plan – a copy of which may be obtained from the Human Resources team. An employee is only eligible if they are enrolled in this voluntary benefit. After the employee's accrued leave (and possible Short Term Disability) benefits has been exhausted, the remainder of the employee's family/medical leave will be unpaid. The substitution of paid leave for unpaid leave time does not extend the 12-week leave period.

*Medical and Other Benefits During Leave*

During an approved family/medical leave, the Company will maintain the employee's health benefits. If Flexible Time Off is used concurrently with unpaid family/medical leave, the Company will deduct the employee's portion of the health plan premium as a regular payroll deduction. If the employee's leave is unpaid, the employee must remit the employee's portion of the premium on a monthly basis to the Company on a periodic basis as communicated by the Company to the employee. The employee's health care coverage will cease if the employee's premium payment is more than 30 days late. If the employee elects not to return to work at the end of the leave period, the employee will be required to reimburse the Company for the cost of the premiums paid by the Company for providing coverage during the employee's leave, unless the employee cannot return to work because of a serious health condition or other circumstances beyond the employee's control.

*Intermittent and Reduced Schedule Leave*

Leave because of the employee's own or a family member's serious health condition may be taken intermittently (in separate blocks of time) or on a reduced leave schedule (reducing the

FLOCK000088

# flock safety

usual number of hours the employee works per workweek or workday) only if medically necessary. If leave is unpaid, the Company will reduce the employee's salary based on the amount of time actually worked. In addition, while the employee is on an intermittent or reduced schedule leave, the Company may temporarily transfer the employee to an alternative position which better accommodates the employee's recurring leave and which has equivalent pay and benefits. Leave taken because of the birth or adoption of a child or the placement of a child with the employee for foster care may not be taken intermittently or on a reduced schedule leave.

*Returning From Leave*

If the employee takes leave because of the employee's own serious health condition, the employee is required to provide medical certification that the employee is fit to resume work.

**Definitions**

For the purpose of this policy, the following definitions apply:

"Spouse" means a husband or wife.

"Parent" includes biological parents, adoptive parents and individuals who act as the employee's parents, but does not include parents-in-law.

"Son" or "daughter" includes biological, adopted, foster children, stepchildren, legal wards and other persons for whom the employee acts in the capacity of a parent and who are under 18 years of age, or are age 18 or older but incapable of caring for themselves because of a physical or mental disability.

"Serious health condition" means any illness, injury, impairment or physical or mental condition that involves: (1) inpatient care, including any period of incapacity subsequent to or in connection with such inpatient care; or (2) continuing treatment by a health care provider.

"Continuing treatment" means one or more of the following:

> (1)    A period of incapacity of **more than three consecutive calendar days** that involves treatment two (2) or more times by a health care provider or, alternatively, requires treatment by a health care provider on only one occasion, but results in a regimen of continuing treatment under the supervision of the

# flock safety

health care provider. A "regimen of continuing treatment" includes only treatments which cannot be initiated without a visit to a health care provider, such as taking prescription drugs. It does not include the taking of over-the-counter medication, nor does it include therapy such as bed rest, drinking fluids and exercise.

(2)    Any period of incapacity due to pregnancy or prenatal care.

(3)    Any period of incapacity or treatment for a "chronic serious health condition." A "chronic serious health condition" is one which requires periodic visits to a doctor, continues over an extended period and causes episodic rather than continuing periods of incapacity. Examples of such conditions include asthma, diabetes and epilepsy. The employee is entitled to leave for such conditions even if the employee (or a family member) does not receive treatment from a health care provider during the absence and even if the absence does not last for more than three (3) days.

(4)    A period of incapacity which is permanent or long term due to a condition for which treatment may not be effective. Examples include Alzheimer's, a severe stroke or the terminal stages of a disease.

(5)    Any period of absence to receive multiple treatments for a condition that would likely result in a period of incapacity of more than three consecutive calendar days if it were not treated. Examples of such conditions include chemotherapy or radiation treatment for cancer, physical therapy for arthritis or dialysis for kidney disease.

*Please note that, ordinarily, ailments such as the common cold, the flu, earaches, upset stomach, minor ulcers, headaches other than migraine, routine dental or orthodontia problems and periodontal disease **are not** serious health conditions.*

"Health Care Provider" includes: licensed MD's and OD's, podiatrists, dentists, clinical psychologists, optometrists, chiropractors authorized to practice in the state where licensed, nurse practitioners and nurse-midwives authorized under State law, clinical social workers and Christian Science practitioners.

PARENTAL LEAVE POLICY

At Flock, all parents are eligible to receive a minimum 12 weeks of paid leave, following the birth of a child or the placement of a child with an employee in connection with adoption. This benefit is paid at 100% of your standard compensation during the 12-week period. For hourly employees, this benefit is paid 100% at a rate of 40 hours per week. This 12 week must be taken all at once and cannot be split, unless where required by law. Paid Parental Leave will run

25
CONFIDENTIAL

# flock safety

concurrently with any unpaid leave of absence for which the employee is eligible for the same occurrence (e.g., FMLA) unless otherwise required by applicable law. If pregnant, mothers may be eligible for additional time under our short-term disability plan, up to 16 weeks.

If state or local law provides greater paid parental leave benefits than those provided by this Parental Leave Policy, the employee may receive the benefits provided under the applicable state or local law but cannot take both (either consecutively or concurrently, though if the applicable state or local law only provides for partial wage replacement paid parental leave benefits, the employee may supplemental such wage replacement to bring the total paid parental leave benefits up to 100% of such employees' regular wages for the applicable period).

To be eligible, you'll need:

- To be a current employee at Flock (there are no waiting periods on this benefit!)
- To be a regular full-time employee (part-time employees, temporary employees and interns are not eligible for this benefit)
- To have notified your manager and the People Team at least 4 weeks before the projected birth or placement of your new child.

## LACTATION/BREASTFEEDING POLICY

As part of our family-friendly policies and benefits, Flock Safety supports breastfeeding employees by accommodating an employee who needs to express breast milk during the workday.

Accommodation for Lactating Employees

For up to one year after the child's birth, any employee who is breastfeeding will be provided reasonable break times to express breast milk.

## NON-MEDICAL LEAVES

If an employee is granted a non-medical leave of absence, the employee's insurance benefits will terminate at the end of the month following that employee's last day of work. Some benefits, such as health insurance coverage, may be continued at an employee's expense. See the Human Resources team for further details.

## MILITARY LEAVE

Any Company employee who serves in the military is eligible for employment and benefit protection as specified in the Uniformed Services Employment and Re-Employment Act ("USERRA").

FLOCK000091

# flock safety

Upon notification of active military duty or assignment, the employee must bring a copy of the notification to their immediate supervisor immediately upon receipt thereof and in no event later than two (2) weeks prior to the anticipated leave. Appropriate leave of absence forms must be completed to document the extended leave intentions. Benefit terms will be issued by the personnel administrator.

## JURY DUTY

When called for jury duty, an employee will be allowed the necessary time off with pay for up to two (2) weeks. On any day when the employee's presence is not required at court, or on any day when the employee's presence is required at court for less than four (4) hours, the employee is expected to report to work. A copy of the jury duty notice is to be provided to a Human Resources team member promptly upon the employee receiving notice of their requirement to serve jury duty. Upon completion of jury duty, employees are to furnish a copy of their jury attendance record to a Human Resources team member.

## BEREAVEMENT

Full-time, regular employees are eligible to receive paid time off for absences related to the death of immediate family members and fellow employees or retirees of Flock.

An employee who wishes to take time off due to the death of an immediate family member should notify their supervisor as soon as possible. If an employee leaves work early on the day they are notified of the death, that day will not count as bereavement leave. In addition to bereavement leave, an employee may, with their supervisor's approval, use vacation or Flexible PTO for additional approved time off as necessary. Employees under discipline for attendance issues may be required to provide documentation with regard to their request to take bereavement leave.

Bereavement pay is calculated based on the base pay rate at the time of absence, and it will not include any special forms of compensation, such as incentives, commissions, bonuses, overtime or shift differentials.

Employees are allowed up to five (5) consecutive days off from regularly scheduled duty with regular pay in the event of the death of the employee's family member.

## **BENEFIT PLANS**

Employees should refer to the summary plan descriptions for each applicable health care benefit plan for detailed information regarding eligibility, coverage, benefits determinations and

27

FLOCK000092

# flock safety

similar issues. The Company reserves the right to modify, change or eliminate any of its benefits at any time.  Where applicable, the terms of the specific plan documents control eligibility, benefits determinations and other conditions.  You are provided copies of summary plan descriptions and other relevant information at the time of employment.  Any questions regarding your coverage should be directed to a Human Resources team member.  Copies of plan documents also can be obtained from a Human Resources team member.

The Company at all times reserves the right to determine carriers, benefit levels, co-payments and deductibles.  The plan may be modified or discontinued at any time in accordance with state and federal law.

Should you terminate your employment with the Company for any reason, your health benefits will terminate at the end of the month in which you terminate your employment.  Depending upon the circumstances surrounding your termination, you may be eligible to receive continuation coverage at your cost (COBRA).

## WORKERS' COMPENSATION

The Company provides workers' compensation insurance coverage for its employees as required by law.  To protect your coverage, if you are injured or become ill as a result of the performance of your job, report the illness or injury to your supervisor immediately, regardless of the nature or severity.  You and your supervisor must follow up with a written accident report. Most delays in the workers' compensation process result from failure to report an injury as soon as it occurs.

**Employees are required to notify their supervisors of any accidents, regardless of whether injury or monetary loss results.**

## DISCIPLINARY PROCEDURE

It sometimes becomes necessary to impose disciplinary action upon an employee.  Whenever deemed appropriate, the Company may endeavor to use a progressive procedure whereby the employee is told what is expected and given a reasonable opportunity to correct their actions. This procedure involves the issuance of "Disciplinary Action/Performance Improvement Notices" and increasingly severe penalties, up to and including termination from employment.  The Company reserves the right at all times to handle disciplinary matters as it deems appropriate under the circumstances, including skipping any step in the progressive disciplinary procedure or, alternatively, repeating a step.

Listed below are some of the types of actions which will constitute grounds for disciplinary action:

FLOCK000093

# flock safety

1.    Excessive tardiness or absenteeism;
2.    Failure to notify appropriate personnel when absent;
3     Unsatisfactory work performance
4.    Interference with other employees' performance of duties;
5.    Violations of Company policy or other misconduct;
6.    Smoking in work area; or
7.    Other violation of professional decorum

The above list is not intended to be exhaustive; rather, this list is intended only to illustrate some of the types of misconduct for which employees may be subject to disciplinary action.

Ordinarily, the receipt of three Disciplinary Action/Performance Improvement Notices by an employee within a two-year period will be grounds for termination. For serious offenses, more severe disciplinary action, including immediate termination, may be used. Additionally, nothing in this disciplinary procedure policy modifies the Company's policy of at-will employment.

## IMMEDIATE SUSPENSION AND/OR DISCHARGE

As mentioned above, serious circumstances may justify immediate suspension or termination. In such a case, the employee will only be paid for services which were performed up to the time of suspension or discharge.

Listed below are some of the types of actions which the Company may consider to be so serious as to justify immediate suspension and/or discharge:

1.    Theft or attempted theft of Company property or personal property;
2.    Unauthorized use or willful destruction of Company property;
3.    Public scandal;
4.    Any absence of three or more consecutive days without notice;
5.    Any discussion or disclosure of confidential information relating to the Company or any of its clients or business, whether or not such discussion is willful, or any unauthorized accessing of confidential information;
6.    Falsification of personnel, payroll or other employment records or information;
7.    Falsification of information on a resume;
8.    Sexual harassment or any other type of unlawful harassment or discrimination;
9.    Gambling, fighting or use of foul or abusive language in the workplace, threatening others in the workplace or participating in an incident of workplace violence;
10.    Possession, distribution or use of controlled or addictive substances, including drugs (other than prescription medicine taken under the supervision of a health care provider or other medically-related drugs to the extent that they are taken in accordance with their directions) and alcohol, on Company property during business hours or appearance at work under the influence of such substances;

29

# flock safety

11.    Possession or use of a firearm or other weapon on Company premises, property or vehicles (except where such policy conflicts with applicable state law regarding an employee's ability to keep a firearm locked in their personal vehicle in a Company parking lot);

12.    Use of Company technology for unlawful purposes or to harass others; or

13.    Horseplay in the workplace or any other act that might endanger the safety of others.

The above list is not intended to be exhaustive; rather, this list is intended only to be illustrative of some of the types of misconduct for which employees may be subject to immediate termination.

## CONFIDENTIALITY AND NON-DISCLOSURE

Company employees will have access to confidential or proprietary information regarding the Company, its customers/clients, vendors and suppliers. Examples of such confidential information include, but are not limited to, information of a business nature such as marketing information, future plans, strategies and financial data, employee and customer data and lists, computer programs, data files, reports, business tools and business methods.

It is integral to our success that our customers and others with whom we do business have complete confidence in the Company's ability to maintain the confidentiality of any information provided to us. All such information, whether of a personal or business nature, must be kept strictly confidential. All employees are expected to maintain the highest standards of confidentiality regarding information which they have obtained during the course of their employment. Unauthorized disclosure or use of confidential information may result in discipline, up to and including immediate termination.

## BUSINESS ETHICS

It is the express policy of Flock to conduct all business in an ethical and lawful manner. The Company's assets and facilities may not be used for any unlawful or improper purpose.

## CONFLICTS OF INTEREST

Employees of the Company have a duty to avoid any relationships, activities, conduct or interests which conflict with the legitimate business interests of the Company or its customers. The benefits which the Company derives from its customer relationships must not be diminished by the conflicting interests of its personnel. Employees are expected to bring any potentially conflicting situations to the attention of their supervisor immediately. All questions of conflict of interest should be referred to Legal and Human Resources for final resolution.

Some areas where a conflict of interest could arise:

CONFIDENTIAL                                                                                 FLOCK000095

# flock safety

*Employee interest in transactions*
Any direct or indirect interest (financial or otherwise) by an employee, or relative sharing living quarters with the employee, in an organization or company with which the Company is transacting or seeking to transact business or which is seeking to transact business with the Company.

*Interest in other organizations*
Any direct or indirect interest by an employee, or relative sharing living quarters with the employee, in any organization or enterprise which is known by the employee to compete with the Company or any of its current customers.

*Outside activities*
Participation by the employee in the operation or management of any enterprise other than the Company.

*Gifts or favors which might influence business judgment*
The acceptance by any employee, or relative sharing living quarters with the employee, of any gifts or other benefits which are, or which appear to have been, given for the purpose of influencing the business judgment of that employee. The acceptance, in moderation, of conventional business courtesies such as an occasional business lunch may be permitted[RJ9].

*Insider trading*
An employee's direct or indirect use of or sharing of confidential, privileged or otherwise proprietary business information of the Company or any of the Company's customers for financial gain. This includes investment by the employee or the transmission of this information to others so that they can use this information for their financial gain.

Employees are expected to remain alert to situations presenting the potential for conflicts of interest. While it is difficult to specify every situation which might involve a conflict of interest, common sense and a willingness to place the interests of the Company ahead of any personal gain that might be achieved by compromising the Company's reputation or competitive position will generally allow employees to make proper judgments.

## COMPUTER AND ELECTRONIC TECHNOLOGY

Given that the Company requires access to specific services and technology as part of its operations, we provide employees with access to the necessary services and equipment to be successful. Such products and services (**"Company Systems"**) include, but are not limited to,

# flock safety

computer hardware, software, data and networks, e-mail, telephones, voicemail, fax machines, the Internet depending on the role of the individual.

Company Systems are intended to be used for the sole purpose of conducting Company business. Employees have no reasonable expectation of privacy when utilizing Company Systems. No Company Systems (excluding individually assigned equipment such as a laptop) are to be removed from the Company's premises at any time without the express permission of a supervisor. Company Systems may not be used for transmitting, retrieving or storing any communications of a discriminatory, harassing, defamatory, pornographic or threatening nature, or that are derogatory to any individual or group. Additionally, Company Systems may not be used for transmitting, retrieving or storing any obscene or X-rated communications or for any other purpose that is illegal, against any of the Company's policies or contrary to the Company's best interests. Expressly prohibited are false and/or malicious communications and communications of a sexually or racially offensive manner. In that regard, the Company's policies against harassment, including sexual harassment, apply to electronic communications as well as any other form of communication. Finally, Company Systems should not be used in a manner that is likely to cause congestion or significantly hamper the ability of others to access and use such systems, such as for the purpose of the distribution of "chain letters."

Information and files created, stored and/or transmitted with Company Systems are not private or confidential and constitute the property of the Company. Such information, however, may constitute private and confidential information as to outside third parties. Company management may access at any time such information and files and reserves the right to monitor and review employee usage of Company Systems, to ensure that they are being used in compliance with the law and with the Company's policies. When requested, employees shall disclose to the Company's management all passwords or security measures used on Company Systems.

E-mail should not be considered a private method of communication and messages may be monitored without prior notice, in order to prevent personal use of these systems as well as in order to monitor the quality of our services. Therefore, employees should not have an expectation of privacy with regard to e-mail messages or computer files that they use at work and should refrain from utilizing the e-mail system or computer files for any messages that they consider to be private or confidential.

It is both illegal and unethical to engage in practices that violate copyright laws or licensing agreements. The Company requires that all employees respect the rights conferred by such laws and agreements and refrain from making unauthorized copies of protected materials, including but not limited to computer software. Employees are required to honor the terms of all licensing agreements for software used on Company Systems.

Employees who violate this policy, including misuse of any Company Systems, or knowingly allow others to do so, are subject to disciplinary action up to and including termination and

CONFIDENTIAL                                                                    FLOCK000097

# flock safety

possible legal action. Use of Company Systems constitutes an employee's acceptance of this policy and agreement to abide by its terms. As with all of its policies, the Company reserves the right to change or revoke this policy at any time.

## SOCIAL MEDIA POLICY

Social media is a huge part of our job, and our day-to-day personal lives. To keep the best interest of Flock Safety, and you, in mind, we've developed a few policies regarding the use of digital and social media. In general, we view personal digital and social media platforms positively, and we respect employees using them as a medium of self-expression. However, we have an obligation to our customers, our colleagues and our company to honor confidentiality and protect privacy. In addition, we need to hold ourselves to transparency, authenticity, honesty and confidentiality as communications professionals. Accordingly, Flock Safety has developed the following guidelines to limit potential risks and provide a set of best practices.

These guidelines pertain to every Flock employee or contractor creating or contributing to blogs (including micro-blogs such as Twitter), wikis, social networks, virtual worlds, or any other kind of digital and social media. We expect all who participate in digital and social media in either a professional or personal setting to follow these guidelines.

These guidelines will continually evolve as new technologies and social networking tools emerge. As we notify you of changes and updates to the guidelines, please treat them as part of this policy. Should you have any questions, please reach out to the People Team.

### Rules of Engagement

Do not disclose private information: You cannot disclose confidential or other proprietary information associated with Flock Safety or its clients and partners. As expected, you need to abide by the same rules in the online world as you do in the offline world. Not only do we have legal and contractual obligations, but we also pride ourselves on a high standard of professional ethics. This goes for everything from a mention of a new product or service to a headshot of an employee. It also means that you should not disclose that we are working with a particular customer unless the customer has indicated that we can speak out publicly about our work with them.

Do not disclose new business pitches: Don't reveal anything about new business efforts (RFPs, meetings, pitches, etc.) in any online venue. Mentioning competitors or certain industries, even on a social networking site, can be an indication of a company we are pitching. Pitches can be under NDA; even more than potentially losing a business opportunity, we want to uphold our reputation as having the highest respect for confidential business communication.

CONFIDENTIAL                                                                    FLOCK000098

# flock safety

Do not quote or post work without permission and respect copyrighted material: When quoting customers, partners or suppliers, always get their written approval on quotes before publishing anything. And if you want to post work online, you must have the approval of both your customer and your department head. Please remember the line between "fair use" and infringement can be easily crossed, as it can be unclear — but understand you are free to report the facts and ideas embodied in another person's article or web page. Copyright only protects the expression, the combination of words and structure that expresses the factual information, not the facts themselves. However, be aware that images, photos, music and artwork make up a good portion of copyright material and cannot be used unless specified otherwise.

Do not believe anything is private: Even if you think an email, a forum, a community or a discussion, etc., is "private," you still must follow these guidelines and maintain a professional code of conduct.

We expect our employees to positively represent the brand, our values and principles, and cultural norms in any and all digital and social media.

## SURVEILLANCE AND SEARCH POLICY

As it deems necessary to maintain the security of its premises, facilities, property, employees and visitors to its premises, the Company reserves the right to utilize surveillance, including video surveillance, in the workplace.  The Company also reserves the right to search or inspect the contents of offices, lockers, storage areas or units, file cabinets, desks, boxes and work stations at any time.  In addition, all personal property brought onto the Company's premises, including but not limited to packages, backpacks, luggage, briefcases, bags or vehicles is subject to inspection.

## BACKGROUND CHECK POLICY

The Company conducts background checks on all employees after they have accepted an offer of employment with the Company.  Unless otherwise directed or required by state law, the Company considers a 7-year criminal search and the following events may disqualify an employee from employment:

- Any Felony Conviction punishable by 1 or more years in prison
- Pending criminal charges
- Repeated convictions of the same offense
- Any conviction of larceny or theft over $500
- A conviction for DUI in the past 3 years

34
CONFIDENTIAL

FLOCK000099

# flock safety

· A conviction of vehicular manslaughter/homicide or hit and run

All Employees + Field Techs (because they are driving for Flock) are required to undergo a 5 Panel standard DOT drug test. Any positive test is disqualifying.
The Company also obtains 3 years of Motor Vehicle Records. A combination of 3 or more moving violations and/or at-fault accidents would be disqualifying.

*This policy was created with the law enforcement customer background check requirements in mind, but the Company will comply with applicable federal, state, and local laws.

## SUBSTANCE ABUSE

It is the intent of the Company to maintain a workplace that is free of drugs and to discourage drug and alcohol abuse by its employees. The Company has a vital interest in maintaining safe and efficient working conditions for its employees. Substance abuse is incompatible with health, safety, efficiency and success at the Company.

It is Company policy that employees may not be on duty or on Company property while possessing drugs, or with illegal drugs in their system, or while under the influence of drugs. Violation of this policy will result in disciplinary action up to and including termination. Any employee who possesses, sells or distributes drugs, or is convicted of an offense that involves the sale, distribution, possession, or manufacture of illegal drugs, will be terminated from employment immediately. Employees who are convicted of other offenses involving illegal drugs will be considered to be in violation of this policy and will be subject to disciplinary action, up to and including termination.

For the purposes of this policy, the term "drug" or "drugs" includes all illegal substances, controlled substances and substances which can alter an individual's senses or affect their ability to function on the job (other than prescription drugs taken in accordance with a prescription lawfully issued to an individual employee or over-the-counter drugs taken in accordance with their directions).

The Company reserves the right to test employees suspected of violating this policy. Any testing program for drug use would be coordinated through Human Resources and testing would be conducted at and by a licensed medical facility designated by the Company pursuant to the laws regulating employee drug testing then in effect. Employees required to submit to testing must provide urine and/or blood samples in accordance with the utilized licensed medical facility's procedures and legal guidelines then in effect. Any employee who violates the substance abuse policy or refuses to comply with any required testing procedure will be subject to disciplinary action, up to and including termination of employment.

FLOCK000100

# f\'ock safety

## DRUG AND ALCOHOL POLICY

Flock's mission is to eliminate non-violent crime in our communities and we take that mission very seriously. The health and wellbeing of Flock employees is also very important, so this policy was created to support the health and safety of our employees, the health and the safety of the public and our mission. Driving while under the influence or distracted is a danger to you and to everyone on the road. Therefore, we are asking you to take this policy seriously and to never drive while under the influence or distracted. Driving under the influence significantly increases the risk of severe bodily injury or death, not just to you, but also to any of the drivers and passengers in the vehicles around you as well. The purpose of this policy is to ensure a safe and productive environment for our employees and to ensure public safety while we're on the road accomplishing our mission.

Work Rules

Whenever employees are working, are operating any Flock vehicle, or are conducting Company-related work offsite, they are prohibited from:

·    Using, possessing, buying, selling, manufacturing or dispensing an illegal drug (to include possession of drug paraphernalia).
·    Being under the influence of alcohol or an illegal drug as defined in this policy.
·    Possessing or consuming alcohol.

The presence of any detectable amount of any illegal drug, illegal controlled substance or alcohol or cannabis, in an employee's body system, while performing company business is prohibited.

Flock will also not allow employees to perform their duties while taking prescribed drugs that are adversely affecting their ability to safely and effectively operate a motor vehicle. Employees taking a prescribed medication must carry it in a container labeled by a licensed pharmacist or be prepared to produce the container if asked.
Any illegal drugs or drug paraphernalia will be turned over to an appropriate law enforcement agency and may result in criminal prosecution.

Required Testing

*Pre-employment*

Applicants being considered for hire in driving roles (ex. Field Installation Technicians) must pass a drug test before beginning work. A clean result is required as a condition of the offer of

FLOCK000101

# flock safety

employment. Refusal to submit to testing will result in disqualification of further employment consideration.

*Reasonable suspicion*

Employees are subject to testing based on (but not limited to) observations by at least two (2) members of management of apparent workplace use, possession or impairment. Human Resources, or the manager should be consulted before sending an employee for testing. Management must document specific observations and behaviors that create a reasonable suspicion that an employee is under the influence of illegal drugs or alcohol.

Examples include:

- Odors (smell of alcohol, body odor or urine);
- Movements (unsteady, fidgety, dizzy);
- Eyes (dilated, constricted or watery eyes, or involuntary eye movements);
- Face (flushed, sweating, confused or blank look);
- Speech (slurred, slow, distracted mid-thought, inability to verbalize thoughts);
- Emotions (argumentative, agitated, irritable, drowsy);
- Actions (yawning, twitching); and/or
- Inactions (sleeping, unconscious, no reaction to questions).

When reasonable suspicion testing is warranted, both management and Human Resources will meet with the employee to explain the observations and the requirement to undergo a drug and/or alcohol test within two (2) hours. Refusal by an employee will be treated as a positive drug test result and will result in immediate termination of employment.

Under no circumstances will the employee be allowed to drive to the testing facility. A member of management will arrange transportation both to and from the testing facility.

*Post-accident*

Employees are subject to testing when they cause or contribute to accidents that seriously damage a Flock vehicle, machinery, equipment or property or that result in an injury to themselves or another employee requiring offsite medical attention. A circumstance that constitutes probable belief will be presumed to arise in any instance involving a work-related accident or injury in which an employee who was operating a motorized vehicle (including a Flock forklift, pickup truck, or bucket truck) is found to be responsible for causing the accident. In any of these instances, the investigation and subsequent testing must take place within two

FLOCK000102

# flock safety

(2) hours following the accident, if not sooner. Refusal by an employee will be treated as a positive drug test result and may result in immediate termination of employment.

Under no circumstances will the employee be allowed to drive themself to the testing facility. A member of management will arrange transportation both to and from the testing facility.

### Consequences

Applicants who refuse to cooperate in a drug test or who test positive will not be hired and will not be allowed to reapply/retest in the future. Employees who refuse to cooperate in required tests or who use, possess, buy, sell, manufacture or dispense an illegal drug in violation of this policy will be terminated. If the employee refuses to be tested, yet the Company believes they are impaired, under no circumstances will the employee be allowed to drive home. Employees who test positive, or otherwise violate this policy, will be subject to discipline, up to and including termination.

### Confidentiality

Information and records relating to positive test results, drug and alcohol dependencies, and legitimate medical explanations provided will be kept confidential to the extent required by law. Such records and information may be disclosed among managers and supervisors on a need-to-know basis and may also be disclosed when relevant to a grievance, charge, claim or other legal proceeding initiated by or on behalf of an employee or applicant.

## ANTI-VIOLENCE POLICY

The Company provides a safe workplace for all employees. The safety and security of employees is of paramount importance. Threats, threatening behavior or other acts of physical or verbal violence will not be tolerated. Consistent with this policy, acts or threats of physical violence, including intimidation, harassment and/or coercion, which involve or affect the Company or which occur on Company or our clients' property will not be tolerated. Violations of this policy should be reported to your supervisor or a Human Resources team member and will lead to disciplinary action up to and including termination.

The Company does not allow firearms, knives or other weapons in the workplace.

Acts or threats of violence include conduct which is sufficiently severe, offensive or intimidating to alter the employment conditions at the Company or to create a hostile, abusive or intimidating work environment for one or more employees, subcontractors or vendors. Examples of workplace violence include, but are not limited to, the following:

FLOCK000103

# flock safety

- Causing or threatening physical injury to another person;
- Physically assaulting another individual;
- Making threatening remarks;
- Making harassing or threatening phone calls;
- Harassing surveillance or stalking (following or watching someone);
- Aggressive or hostile behavior that creates reasonable fear of injury to another person or subjects another individual to emotional distress;
- Intentionally damaging Company property or property of another employee;
- The use or possession of a firearm or any other type of weapon or destructive device; and/or
- Committing acts motivated by, or related to, harassment or domestic violence.

The Company prohibition against threats and acts of violence applies to all persons, whether it is practiced by or against employees, applicants for employment, vendors, collaborators, clients or other visitors on Company property or on Company business.  Violations of this policy by any individual on Company property or on Company business will result in disciplinary action, up to and including termination and/or legal action as appropriate.

Every employee is strongly encouraged to report any potentially dangerous situation of which he/she is aware to a supervisor or a Human Resources team member. Reports can be made anonymously and all reported incidents will be investigated.

CONFIDENTIAL

FLOCK000104

The employee handbook describes important information about Flock Safety, and I understand that I should consult the HR Team regarding any questions not answered in the handbook. I have entered into my employment relationship with Flock Safety voluntarily and acknowledge that there is no specified length of employment. Accordingly, either I or Flock Safety can terminate the relationship at will, with or without cause, at any time, so long as there is not violation of applicable federal or state law. I understand that, except for employment at-will status, any and all policies and practices may be changed at any time by Flock Safety and the company reserves the right to change my hours, wages and working conditions at any time. All such changes will be communicated through official notices, and I understand that revised information may supersede, modify, or eliminate existing policies. I understand and agree that nothing in the employee handbook creates, or is intended to create, a promise or representation of continued employment and that employment at Flock Safety is employment at-will, which may be terminated at the will of either Flock Safety or myself. Furthermore, I acknowledge that this handbook is neither a contract of employment nor a legal document. I understand and agree that employment and compensation may be terminated with or without cause and with or without notice at any time by Flock Safety or myself. I have received the handbook, and I understand that it is my responsibility to read and comply with the policies contained in this handbook and any revisions made to it.

Jhostin Nunez

*Jhostin Nunez*

01/23/2023

CONFIDENTIAL

FLOCK000105

# flock safety

## Harassment-Free Workplace Policy

*Last Updated: January 2023*

**Purpose:** Provide a work environment free from harassment by ensuring that appropriate officials are notified of, and have the opportunity to promptly correct, harassing conduct; Communicate clearly that the Flock Safety will not tolerate sexual or non-sexual harassing behavior; and address harassing conduct and hold employees accountable at the earliest possible stage, before the conduct becomes "severe or pervasive," i.e., harassment within the meaning of anti-discrimination law.

Flock Safety does not tolerate harassment of employees by owners, supervisors or co-workers. This includes harassment based upon race, gender, national origin, religion, color, marital status, disability or impairment, age, sexual orientation and/ or gender identity or expression. Sexual harassment is against the law in the workplace and prohibited by Flock Safety . Sexual harassment generally takes two forms:

> • **QUID PRO QUO:** occurs when submission to or rejection of unwelcome sexual conduct by an individual is used as a basis for employment decisions affecting the individual.

> • **HOSTILE ENVIRONMENT SEXUAL HARASSMENT:** is unwelcome behavior based on sex that unreasonably interferes with an individual's job performance or creates an intimidating, hostile or offensive working environment even if it leads to no tangible or economic job consequences. The conduct must be such that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive it to be abusive. The conduct must be severe or pervasive enough to create an objective, hostile or abusive work environment.

Sexual harassment is prohibited by law. It is illegal and against our policy for any worker, male or female, to harass another worker, male or female. Requesting sexual favors in exchange for employment benefits is prohibited by law. Additionally, sexual harassment may result from verbal, visual or physical conduct. Unwelcome touching, leering, pinching, patting, brushing up against, grabbing, sexual comments, sexual jokes, sexual gestures, sexual drawings and sexual photographs, for example, are all prohibited.

Employees should report all incidents of sexual or other unlawful harassment to their supervisor or HR. If the supervisor or someone from the HR, is unavailable, or the employee is uncomfortable contacting that person for any reason (including the supervisor or someone in HR being the source of the alleged harassment), the employee should contact his/her designated human resources director or any company officer. Employees can raise concerns and make a report without fear of reprisal.



1

# flock safety

Confidentiality will be maintained, as much as reasonably possible, with respect to any harassment complaint. However, employees who have knowledge of the incident or similar problems will be interviewed and the complaint, investigative steps and findings will be thoroughly documented.

Employees who lodge a complaint will be notified of the findings of the investigator.

Anyone engaging in sexual or other unlawful harassment can be subjected to disciplinary action up to and including immediate termination of employment.

*If any employee has any questions, comments or concerns about this sexual harassment policy, please contact VP, Human Resources, Daniele Feuillebois.*

CONFIDENTIAL

FLOCK000210

I acknowledge that I have received, read, and understand the Harassment-Free Workplace policy of Flock Safety. I understand that failure to comply with the policy could result in disciplinary action up to and including termination of employment.

Jhostin Nunez

*Jhostin Nunez*

01/17/2023

CONFIDENTIAL

# flock safety

## Anti-Harassment Training Policy

*Last Updated: January 2023*

In accordance with Flock's commitment to maintaining a safe work environment, and in accordance with any and all federal, state, and local regulations or laws, employees are required to take anti-harassment training as a condition of their employment.

Employees must complete anti-harassment training for the duration of 120 minutes if they directly manage employees or 60 minutes if they do not directly manage employees. This training will need to be completed once every two years that any employee is employed with Flock.

New employees are required to complete this training in their first 90 calendar days of employment. The only instance in which an employee may be granted an exception to this requirement is if:

1) The employee is on a leave of absence at the time the training needs to be completed or renewed thereby preventing them from meeting the deadline. Upon their return from leave, they will have 30 calendar days to complete the required training.
2) There are technical issues with the training platform that prevent the employee from completing the training. These issues must be reported prior to the 90 calendar day mark. Once the issue is resolved, the employee will have 30 calendar days to complete the required training.

If an employee is promoted to a role in which they will now be directly managing people, the employee will have 90 calendar days from the date of promotion to complete the 120 minute anti-harassment training for managers.

Failure to comply with any of the requirements listed above will result in disciplinary action, up to and including termination.



FLOCK000107

I acknowledge that I have received, read, and understand the Anti-Harassment policy of Flock Safety. I understand that failure to comply with the policy could result in disciplinary action up to and including termination of employment.


Jhostin Nunez

*Jhostin Nunez*

01/17/2023

CONFIDENTIAL

FLOCK000108

# CERTIFICATE
## OF HR ANTI-HARASSMENT TRAINING COMPLETION

### THIS CERTIFICATE IS PRESENTED TO

*Jhostin Nunez*

FOR COMPLETING THE FEDERALLY MANDATED HR ANTI-HARASSMENT TRAINING COURSE WITH FLOCK SAFETY

May 25, 2022
DATE ISSUED

May 25, 2024
DATE EXPIRES



**EXHIBIT 7**
(Quinones)

FLOCK000106

CONFIDENTIAL



As a condition of my becoming employed (or my employment being continued) by Flock Safety, a Delaware corporation, or any of its current or future subsidiaries, affiliates, successors or assigns (collectively, the "Company"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by the Company, I agree to the following:

1.**Relationship**. This Confidential Information and Invention Assignment Agreement (this "Agreement") will apply to my employment relationship with the Company. If that relationship ends and the Company, within a year thereafter, either reemploys me or engages me as a consultant, I agree that this Agreement will also apply to such later employment or consulting relationship, unless the Company and I otherwise agree in writing. Any such employment or consulting relationship between the parties hereto, whether commenced prior to, upon or after the date of this Agreement, is referred to herein as the "Relationship."

2.**Duties**. I will perform for the Company such duties as may be designated by the Company from time to time or that are otherwise within the scope of the Relationship and not contrary to instructions from the Company. During the Relationship, I will devote my entire best business efforts to the interests of the Company and will not engage in other employment or in any activities detrimental to the best interests of the Company without the prior written consent of the Company.

3.**Confidential Information**.

a. **Protection of Information**. I understand that during the Relationship, the Company intends to provide me with information, including Confidential Information (as defined below), without which I would not be able to perform my duties to the Company. I agree, at all times during the term of the Relationship and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company to the extent necessary to perform my obligations to the Company under the Relationship, and not to disclose to any person, firm, corporation or other entity, without written authorization from the Company in each instance, any Confidential Information that I obtain, access or create during the term of the Relationship, whether or not during working hours, until such Confidential Information becomes publicly and widely known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved. I further agree not to make copies of such Confidential Information except as authorized by the Company.

b. **Confidential Information**. I understand that "Confidential Information" means information and physical material not generally known or available outside the Company and information and physical material entrusted to the Company in confidence by third parties. Confidential Information includes, without limitation: (i) Company Inventions (as defined

below); and (ii) technical data, trade secrets, know-how, research, product or service ideas or plans, software codes and designs, algorithms, developments, inventions, patent applications, laboratory notebooks, processes, formulas, techniques, biological materials, mask works, engineering designs and drawings, hardware configuration information, agreements with third parties, lists of, or information relating to, employees and consultants of the Company (including, but not limited to, the names, contact information, jobs, compensation, and expertise of such employees and consultants), lists of, or information relating to, suppliers and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the Relationship), price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts, historical financial data, budgets or other business information disclosed to me by the Company either directly or indirectly, whether in writing, electronically, orally, or by observation.

c. **Third Party Information**. My agreements in this Section 3 are intended to be for the benefit of the Company and any third party that has entrusted information or physical material to the Company in confidence.

d. **Other Rights**. This Agreement is intended to supplement, and not to supersede, any rights the Company may have in law or equity with respect to the protection of trade secrets or confidential or proprietary information.

4.**Ownership of Inventions**.

a. **Inventions Retained and Licensed**. I have attached hereto, as Exhibit A, a complete list describing with particularity all Inventions (as defined below) that, as of the Effective Date, belong solely to me or belong to me jointly with others, and that relate in any way to any of the Company's actual or proposed businesses, products, services, or research and development, and which are not assigned to the Company hereunder;

or, if no such list is attached, I represent that there are no such Inventions at the time of signing this Agreement.

b. **Use or Incorporation of Inventions**. If in the course of the Relationship, I use or incorporate into a product, process or machine any Invention not covered by Section 4(d) of this Agreement in which I have an interest, I will promptly so inform the Company. Whether or not I give such notice, I hereby irrevocably grant to the Company a nonexclusive, fully paid- up, royalty-free, assumable, perpetual, worldwide license, with right to transfer and to sublicense, to practice and exploit such Invention and to make, have made, copy, modify, make derivative works of, use, sell, import, and otherwise

distribute such Invention under all applicable intellectual property laws without restriction of any kind.

c. **Inventions**. I understand that "Inventions" means discoveries, developments, concepts, designs, ideas, know how, improvements, inventions, trade secrets and/or original works of authorship, whether or not patentable, copyrightable or otherwise legally protectable. I understand this includes, but is not limited to, any new product, machine, article of manufacture, biological material, method, procedure, process, technique, use, equipment, device, apparatus, system, compound, formulation, composition of matter, design or configuration of any kind, or any improvement thereon. I understand that "Company Inventions" means any and all Inventions that I may solely or jointly author, discover, develop, conceive, or reduce to practice during the period of the Relationship, except as otherwise provided in Section 4(g) below.

d. **Assignment of Company Inventions**. I agree that I will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, all my right, title and interest throughout the world in and to any and all Company Inventions and all patent, copyright, trademark, trade secret and other intellectual property rights therein. I hereby waive and irrevocably quitclaim to the Company or its designee any and all claims, of any nature whatsoever, that I now have or may hereafter have for infringement of any and all Company Inventions. I further acknowledge that all Company Inventions that are made by me (solely or jointly with others) within the scope of and during the period of the Relationship are "works made for hire" (to the greatest extent permitted by applicable law) and are compensated by my salary. Any assignment of Company Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "Moral Rights"). To the extent that Moral Rights cannot be assigned under applicable law, I hereby waive and agree not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

e. **Maintenance of Records**. I agree to keep and maintain adequate and current written records of all Company Inventions made or conceived by me (solely or jointly with others) during the term of the Relationship. The records may be in the form of notes, sketches, drawings, flow charts, electronic data or recordings, laboratory notebooks, or any other format. The records will be available to and remain the sole property of the Company at all times. I agree not to remove such records from the Company's place of business except as expressly permitted by Company policy which may, from time to time, be revised at the sole election of the Company for the purpose of furthering the Company's business. I agree to deliver all such records (including any copies thereof) to the Company at the time of termination of the Relationship as provided for in Sections 5 and 6.

f. **Patent and Copyright Rights**. I agree to assist the Company, or its designee, at its expense, in every proper way to secure the Company's, or its designee's, rights in the Company Inventions and any copyrights, patents, trademarks, mask work rights, Moral Rights, or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company or its designee of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, recordations, and all other instruments which the Company or its designee shall deem necessary in order to apply for, obtain, maintain and transfer such rights, or if not transferable, waive and agree not to enforce any and all such rights, and in order to assign and convey to the Company or its designee, and any successors, assigns and nominees the sole and exclusive right, title and interest in and to such Company Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto. I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue during and at all times after the end of the Relationship and until the expiration of the last such intellectual property right to expire in any country of the world. I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney-in-fact, to act for and in my behalf and stead to execute and file any such instruments and papers and to do all

CONFIDENTIAL                                                                                      FLOCK000217

other lawfully permitted acts to further the application for, prosecution, issuance, maintenance or transfer of letters patent, copyright, mask work and other registrations related to such Company Inventions. This power of attorney is coupled with an interest and shall not be affected by my subsequent incapacity.

g. **Exception to Assignments**. Subject to the requirements of applicable state law, if any, I understand that the Company Inventions will not include, and the provisions of this Agreement requiring assignment of inventions to the Company do not apply to, any invention which qualifies fully for exclusion under the provisions of applicable state law, if any, attached hereto as Exhibit B. In order to assist in the determination of which inventions qualify for such exclusion, I will advise the Company promptly in writing, during and after the term of the Relationship, of all Inventions solely or jointly conceived or developed or reduced to practice by me during the period of the Relationship.

5.**Company Property; Returning Company Documents**. I acknowledge and agree that I have no expectation of privacy with respect to the Company's telecommunications, networking or information processing systems (including, without limitation, files, e- mail messages, and voice messages) and that my activity and any files or messages on or using any of those systems may be monitored or reviewed at any time without notice. I further agree that any property situated on the Company's premises and owned by the Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by Company personnel at any time with or without notice. I agree that, at the time of termination of the Relationship, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings,

blueprints, sketches, laboratory notebooks, materials, flow charts, equipment, other documents or property, or reproductions of any of the aforementioned items developed by me pursuant to the Relationship or otherwise belonging to the Company, its successors or assigns.

6.**Termination Certification**. In the event of the termination of the Relationship, I agree to sign and deliver the "Termination Certification" attached hereto as Exhibit C; however, my failure to sign and deliver the Termination Certification shall in no way diminish my continuing obligations under this Agreement.

7.**Notice to Third Parties**. I agree that during the periods of time during which I am restricted in taking certain actions by the terms of this Agreement (the "Restriction Period"), I shall inform any entity or person with whom I may seek to enter into a business relationship (whether as an owner, employee, independent contractor, or otherwise) of my contractual obligations under this Agreement. I also understand and agree that the Company may, with or without prior notice to me and during or after the term of the Relationship, notify third parties of my agreements and obligations under this Agreement. I further agree that, upon written request by the Company, I will respond to the Company in writing regarding the status of my employment or proposed employment with any party during the Restriction Period.

8. **Solicitation of Employees, Consultants and Other Parties**. As described above, I acknowledge and agree that the Company's Confidential Information includes information relating to the Company's employees, consultants, customers and

CONFIDENTIAL
FLOCK000218

others, and that I will not use or disclose such Confidential Information except as authorized by the Company. I further agree as follows:

a. **Employees, Consultants**. I agree that during the term of the Relationship, and for a period of twelve (12) months immediately following the termination of the Relationship for any reason, whether with or without cause, I shall not, directly or indirectly, solicit, induce, recruit or encourage any of the Company's employees or consultants to terminate their relationship with the Company, or attempt to solicit, induce, recruit, encourage or take away employees or consultants of the Company, either for myself or for any other person or entity.

b. **Other Parties**. I agree that during the term of the Relationship, I will not negatively influence any of the Company's clients, licensors, licensees or customers from purchasing Company products or services or solicit or influence or attempt to influence any client, licensor, licensee, customer or other person either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company. In addition, I acknowledge that the Company has valuable Trade Secrets (as defined by applicable law from time to time) to which I will have access during the term of the Relationship. I understand that the Company intends to vigorously pursue its rights under applicable Trade Secrets law if, during a period of twelve (12) months immediately following the termination of the

Relationship for any reason, whether with or without cause, I solicit or influence or attempt to influence any client, licensor, licensee, customer or other person either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company. Thereafter, the Company intends to vigorously pursue its rights under applicable Trade Secrets law as the circumstances warrant.

9. **At-Will Relationship**. I understand and acknowledge that, except as may be otherwise explicitly provided in a separate written agreement between the Company and me, my Relationship with the Company is and shall continue to be at-will, as defined under applicable law, meaning that either I or the Company may terminate the Relationship at any time for any reason or no reason, without further obligation or liability, other than those provisions of this Agreement that explicitly survive the termination of the Relationship.

10. **Representations and Covenants**.

a. **Facilitation of Agreement**. I agree to execute promptly, both during and after the end of the Relationship, any proper oath, and to verify any proper document, required to carry out the terms of this Agreement, upon the Company's written request to do so.

b. **No Conflicts**. I represent that my performance of all the terms of this Agreement does not and will not breach any

agreement I have entered into, or will enter into, with any third party, including without limitation any agreement to keep in confidence proprietary information or materials acquired by me in confidence or in trust prior to or during the Relationship. I will not disclose to the Company or use any inventions, confidential

or non-public proprietary information or material belonging to any previous client, employer or any other party. I will not induce the Company to use any inventions, confidential or non-public proprietary information, or material belonging to any previous client, employer or any other party. I acknowledge and agree that I have listed on Exhibit A all agreements (e.g., non-competition agreements, non-solicitation of customers agreements, non-solicitation of employees agreements, confidentiality agreements, inventions agreements, etc.), if any, with a current or former client, employer, or any other person or entity, that may restrict my ability to accept employment with the Company or my ability to recruit or engage customers or service providers on behalf of the Company, or otherwise relate to or restrict my ability to perform my duties for the Company or any obligation I may have to the Company. I agree not to enter into any written or oral agreement that conflicts with the provisions of this Agreement.

c. **Voluntary Execution**. I certify and acknowledge that I have carefully read all of the provisions of this Agreement, that I understand and have voluntarily accepted such provisions, and that I will fully and faithfully comply with such provisions.

11. **Electronic Delivery**. Nothing herein is intended to imply a right to participate in any of the Company's equity incentive plans, however, if I do participate in such plan(s), the

Company may, in its sole discretion, decide to deliver any documents related to my participation in the Company's equity incentive plan(s) by electronic means or to request my consent to participate in such plan(s) by electronic means. I hereby consent to receive such documents by electronic delivery and agree, if applicable, to participate in such plan(s) through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

12. **Miscellaneous**.

a. **Governing Law**. The validity, interpretation, construction and performance of this Agreement, and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the state of California, without giving effect to the principles of conflict of laws.

b. **Entire Agreement**. This Agreement sets forth the entire agreement and understanding between the Company and me relating to its subject matter and merges all prior discussions between us. No amendment to this Agreement will be effective unless in writing signed by both parties to this Agreement. The Company shall not be deemed hereby to have waived any rights or remedies it may have in law or equity, nor to have given any authorizations or waived any of its rights under this Agreement, unless, and only to the extent, it does so by a specific writing signed by a duly authorized officer of the

CONFIDENTIAL                                                                    FLOCK000220

Company, it being understood that, even if I am an officer of the Company, I will not have authority to give any such authorizations or waivers for the Company under this Agreement without specific approval by the Board of Directors. Any subsequent change or changes in my duties, obligations, rights or compensation will not affect the validity or scope of this Agreement.

c. **Successors and Assigns**. This Agreement will be binding upon my heirs, executors, administrators and other legal representatives, and my successors and assigns, and will be for the benefit of the Company, its successors, and its assigns.

d. **Notices**. Any notice, demand or request required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address as set forth on the signature page, as subsequently modified by written notice, or if no address is specified on the signature page, at the most recent address set forth in the Company's books and records.

e. **Severability**. If one or more of the provisions in this Agreement are deemed void or unenforceable to any extent in any context, such provisions shall nevertheless be enforced to the fullest extent allowed by law in that and other contexts, and the validity and force of the remainder of this Agreement shall not be affected. The Company and I have attempted to limit my right to use, maintain and disclose the Company's Confidential Information, and to limit my right to solicit employees and customers only

to the extent necessary to protect the Company from unfair competition. Should a court of competent jurisdiction determine that the scope of the covenants contained in Section 8 exceeds the maximum restrictiveness such court deems reasonable and enforceable, the parties intend that the court should reform, modify and enforce the provision to such narrower scope as it determines to be reasonable and enforceable under the circumstances existing at that time.

f. **Remedies**. I acknowledge and agree that violation of this Agreement by me may cause the Company irreparable harm, and therefore I agree that the Company will be entitled to seek extraordinary relief in court, including, but not limited to, temporary restraining orders, preliminary injunctions and permanent injunctions without the necessity of posting a bond or other security (or, where such a bond or security is required, I agree that a $1,000 bond will be adequate), in addition to and without prejudice to any other rights or remedies that the Company may have for a breach of this Agreement.

g. **Advice of Counsel**. I ACKNOWLEDGE THAT, IN EXECUTING THIS AGREEMENT, I HAVE HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT LEGAL COUNSEL, AND I HAVE READ AND UNDERSTOOD ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT. THIS AGREEMENT SHALL NOT BE CONSTRUED AGAINST ANY PARTY BY REASON OF THE DRAFTING OR PREPARATION HEREOF.

h. **Counterparts**. This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and all of which together shall constitute one and the same agreement.

EXHIBIT A
LIST OF PRIOR INVENTIONS
AND ORIGINAL WORKS OF AUTHORSHIP
EXCLUDED UNDER SECTION 4(A) AND CONFLICTING AGREEMENTS DISCLOSED UNDER
SECTION 10(B)

The following is a list of (i) all inventions that belong solely to me or belong to me jointly with others, and that relate in any way to any of the Company's actual or proposed businesses, products, services, or research and development, and which are not assigned to the Company pursuant to this Agreement and (ii) all agreements, if any, with a current or former client, employer, or any other person or entity, that may restrict my ability to accept employment with the Company or my ability to recruit or engage customers or service providers on behalf of the Company, or otherwise relate to or restrict my ability to perform my duties for the Company or any obligation I may have to the Company:

Example Invention

Except as indicated above on this exhibit, I have no inventions, improvements or original works to disclose pursuant to Section 4(a) of this Agreement and no agreements to disclose pursuant to Section 10(b) of this Agreement.

EXHIBIT B

**For Employees in California, Section 2870 of the California Labor Code is as follows:**

a. Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

1.Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of

FLOCK000222

the employer; or

2.Result from any work performed by the employee for the employer.

b. To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

**For Employees in Illinois, Chapter 765, Section 1060/2 of the Illinois Compiled Statutes is as follows:**

1.A provision in an employment agreement which provides that an employee shall assign or offer to assign any of the employee's rights in an invention to the employer does not apply to an invention for which no equipment, supplies, facilities, or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless (a) the invention relates (i) to the business of the employer, or (ii) to the employer's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the employee for the employer. Any provision which purports to apply to such an invention is to that extent against the public policy of this State and is to that extent void and unenforceable. The employee shall bear the burden of proof in establishing that his invention qualifies under this subsection.

2.An employer shall not require a provision made void and unenforceable by subsection (1) of this Section as a condition of employment or continuing employment. This Act shall not preempt existing common law applicable to any shop rights of employers with respect to employees who have not signed an employment agreement.

3.If an employment agreement entered into after January 1, 1984, contains a provision requiring the employee to assign any of the employee's rights in any invention to the employer, the employer must also, at the time the agreement is made, provide a written notification to the employee that the agreement does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless (a) the invention relates (i) to the business of the employer, or (ii) to the employer's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the employee for the employer.

**For Employees in Kansas: Sections 44-130 of the Kansas Labor and Industries Code is as follows:**

a. Any provision in an employment agreement which provides that an employee shall assign or offer to assign any of the employee's rights in an invention to the employer shall not apply to an invention for which no equipment, supplies, facilities or trade secret

                                                                                          FLOCK000223

information of the employer was used and which was developed entirely on the employee's own time, unless:

1.The invention relates to the business of the employer or to the employer's actual or demonstrably anticipated research or development; or

2.the invention results from any work performed by the employee for the employer.

b. Any provision in an employment agreement which purports to apply to an invention which it is prohibited from applying to under subsection (a), is to that extent against the public policy of this state and is to that extent void and unenforceable. No employer shall require a provision made void and unenforceable by this section as a condition of employment or continuing employment.

**For Employees in Minnesota, Section 181.78 of the Minnesota Labor, Industry Code is as follows:**

a. If an employment agreement contains a provision requiring the employee to assign any of the employee's rights in any invention to the employer, the employer shall provide, at the time the agreement is made, a written notification to the employee that the agreement does not apply to an invention for which no equipment, supplies, facility or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless:

1.The invention relates directly to the business of the employer or to the employer's actual or demonstrably anticipated research or development; or

2.The invention results from any work performed by the employee for the employer.

b. Even though the employee meets the burden of proving the conditions specified in this section, the employee shall disclose, at the time of employment or thereafter, all inventions being developed by the employee, for the purpose of determining employer and employee rights in an invention.

**For Employees in Washington, Section 49.44.140 of the Washington Labor Regulations is as follows:**

1.A provision in an employment agreement which provides that an employee shall assign or offer to assign any of the

CONFIDENTIAL                                          FLOCK000224

employee's rights in an invention to the employer does not apply to an invention for which no equipment, supplies, facilities, or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless (a) the invention relates (i) directly to the business of the employer, or (ii) to the employer's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the employee for the employer. Any provision which purports to apply to such an invention is to that extent

against the public policy of this state and is to that extent void and unenforceable.

2.An employer shall not require a provision made void and unenforceable by subsection (1) of this section as a condition of employment or continuing employment.

3.If an employment agreement entered into after September 1, 1979, contains a provision requiring the employee to assign any of the employee's rights in any invention to the employer, the employer must also, at the time the agreement is made, provide a written notification to the employee that the agreement does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless (a) the invention relates (i) directly to the business of the employer, or (ii) to the employer's actual or demonstrably anticipated research or development, or (b) the invention results from any work preformed performed by the employee for the employer.

EXHIBIT C

**TERMINATION CERTIFICATION**

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, flow charts, materials, equipment, other documents or property, or copies or reproductions of any aforementioned items belonging to Test, a Delaware corporation, its subsidiaries, affiliates, successors or assigns (collectively, the "Company").

I further certify that I have complied with all the terms of the Company's Confidential Information and Invention Assignment Agreement signed by me, including the reporting of any Inventions (as defined therein), conceived or made by me (solely or jointly with others) covered by that agreement, and I acknowledge my continuing obligations under that agreement.

I further agree that, in compliance with the Confidential Information and Invention Assignment Agreement, I will preserve

as confidential all trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know- how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants or licensees.

I further agree that for twelve (12) months from the date of this Certification, I shall not either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees or consultants to terminate their relationship with the Company, or attempt to solicit, induce, recruit, encourage or take away employees or consultants of the Company, either for myself or for any other person or entity.

Further, I agree that I shall not use any Confidential Information of the Company to negatively influence any of the Company's clients or customers from purchasing Company products or services or to solicit or influence or attempt to influence any client, customer or other person either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company.

Further, I acknowledge that the Company has valuable Trade Secrets (as defined by applicable law from time to time) to which I have had access. I understand that the Company intends to vigorously pursue its rights under applicable Trade Secrets law if, during a period of twelve (12) months from the date of this Certification, I solicit or influence or attempt to influence any client, licensor, licensee, customer or other person either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company. Thereafter, the Company intends to vigorously pursue its rights under applicable Trade Secrets law as the circumstances warrant.

Effective:06/04/2021

By : *Jhostin Nunez*

Name :  Jhostin Nunez

Accepted and Agreed to :  Flock Group Inc

By : *Garrett Langley*

Name :  Garrett Langley

Title :  Chief Executive Officer

CONFIDENTIAL

FLOCK000226

# APPENDIX A

CONFIDENTIAL

FLOCK000227

## Corrective Action Form

| Employee Name: Jhostin Nunez | Title:<br>QA Deployment Engineer | Dept: Product<br>Management | Date: 10/13/22 |
|---|---|---|---|
| Manager Name: Omar Lodge | Corrective Action Type:  Verbal Warning | | |

Thank you for meeting with us today (10/13/22, at 11:00am ET). We are here to support you in being successful in meeting expectations at work.  If there are roadblocks that we can remove or questions that we can answer for you, please let us know.  As a summary of our conversation we covered the following occurrences and our expectations for improvement:

### Details of Occurrence(s):

- On 10/10/22, you solved only 12 cases in the Salesforce queue, and opened 7 cases in Camera Management.  There is a large portion of the day, where no measurable work output was produced.
- On 9/27/22 I sent you an email about your lack of responsiveness to direct messages in Slack, and that this lack of responsiveness did not meet work performance expectations.  The email requested that you acknowledge receipt of the email, and you never responded.
- On 5/5/22 in a 1:1 meeting, we discussed consistently improving your work output. Our goal is 65 solved cases per day (approximately one every eight (8) minutes, and you were not meeting this goal.
- On 3/17/22 in a 1:1 meeting, we discussed improving work output and consistency, in addition to your responsiveness during work hours, and that your work output did not meet expectations.
- On 3/9/22 an email was sent to you after you went against workflow procedures mandated to the entire group.  In Salesforce, you changed cases that we were actively investigating to "closed" instead of "hold." Which meant that malfunctioning customer cameras may have been physically replaced (with additional costs incurred), instead of fixed the cameras remotely.

### Plan for Improvement:

- All emails are to be responded to within 24 hours, and slack messages are to be responded to within two (2) hours.  Confirming receipt and acknowledging messages will help me to know that you are working on the task, and keeps our team running smoothly.
- Work output needs to be improved and stay consistent, delivering equally with the rest of the group. Close a minimum of 65 cases daily (tier 1 + 2) in Salesforce, until the queue is cleared each day. Processed with at least 98% accuracy and within SLA.
- When the queue of cases in Salesforce have all been solved, comb through the daily report to find cameras with alarms.  Create a case in Camera Management that flows to Salesforce, and specify what you did to solve the alarm.
- Support our stakeholders with specific issues at critical sites, pilot customers, and growth regions by responding to all QA Deployment Engineer Salesforce "mentions" within 2 hours, on the day that you are assigned to respond (assigned to one team member daily).
- 40 hours of general availability during normal working hours, communicating ahead of time when you will not be available.

The unacceptable behaviors addressed above must cease immediately. Failure to sustain improvement may result in further action, up to and including termination of employment.

This document does not alter the employment-at-will relationship with Flock Safety. Additionally,



EXHIBIT
9
Quinones

the contents of this document are to remain confidential. A scanned copy of this corrective action will be kept in your Rippling profile.

By signing this document, you are acknowledging that you have received and reviewed this Corrective Action Form; it does not indicate an admission of guilt or agreement with the contents.

Employee Signature: *Jhostin Nunez*    Date: *10/13/22*

Manager Signature: __Omar Lodge_____    Date: __10/13/22_____

CONFIDENTIAL

# f ock safety

Laura McCormick <laura.mccormick@flocksafety.com>

---

## Follow-up on Feedback Meeting from 10/13/22
2 messages

---

**Omar Lodge** <omar.lodge@flocksafety.com>                    Thu, Oct 13, 2022 at 9:22 AM
To: Jhostin Nunez <jhostin.nunez@flocksafety.com>
Cc: Laura McCormick <laura.mccormick@flocksafety.com>

Good morning Jhostin,

As a follow up to our feedback meeting on 10/13/22, see the attached document. Please acknowledge receipt of this document. We are here to support you in being successful in meeting expectations at work. If there are roadblocks that we can remove or questions that we can answer for you, please let us know.

Regards,
--
Omar Lodge
Production Device Support
+1 (404) 403-9934

# f ock safety

---

📄 **Verbal Warning - 10-13-22 - Jhostin Nunez.pdf**
　　53K

---

**Omar Lodge** <omar.lodge@flocksafety.com>                    Thu, Oct 13, 2022 at 9:56 AM
To: Laura McCormick <laura.mccormick@flocksafety.com>

FYI

---------- Forwarded message ---------
From: **Jhostin Nunez** <jhostin.nunez@flocksafety.com>
Date: Thu, Oct 13, 2022 at 11:53 AM
Subject: Re: Follow-up on Feedback Meeting from 10/13/22
To: Omar Lodge <omar.lodge@flocksafety.com>
[Quoted text hidden]
[Quoted text hidden]

---

📄 **Verbal Warning - 10-13-22 - Jhostin Nunez-signed.pdf**
　　131K



CONFIDENTIAL

00285566

 Alex Graber

@QA Deployment Engineers **Any update?**

View/Comment   or **reply to this email**

**Original post**

 00285566 — Alex Graber **to Flock Safety Only**
Friday, February 3, 2023 2:55 PM

**@Jhostin Nunez** no images since 1/25. Please prioritize at request of **@Melissa Lee** & **@Kyle Whyte**

 Alex Graber

@QA Deployment Engineers **Any update?**

Monday, February 6, 2023 4:58 PM

Case - 00313952 - #022 S Maple @ Rhodes Ave WB
New mount, not a slipped angle - opened FOV



FLOCK 000025

00297955



**Jhostin Nunez**

will do thank you

View/Comment   or reply to this email

**Original post**

00297955 — Omar Lodge **to Flock Safety Only**
Wednesday, February 15, 2023 10:25 AM

@**Jhostin** Nunez please check back on this before logging off today and if the charge current never goes positive, (the camera charge/voltage just decreases) the AC kit will need to be replaced.

**Jhostin Nunez**

will do thank you

Wednesday, February 15, 2023 10:58 AM

00296912



**Jhostin Nunez**

Hello,

I believe I pushed a jira ticket on this one did it not go through?

View/Comment   or reply to this email

**Original post**

00296912 — Omar Lodge **to Flock Safety Only**
Friday, February 10, 2023 4:53 PM

@**Jhostin** Nunez why were you just hanging to this one and not tagging it according to JIRA issue?

**Jhostin Nunez**

Hello,

I believe I pushed a jira ticket on this one did it not go through?

Saturday, February 11, 2023 3:44 AM



00295706

# f¹ock safety

Laura McCormick <laura.mccormick@flocksafety.com>

---

## Jhostin/Omar 1:1 3/7
3 messages

---

**Omar Lodge** <omar.lodge@flocksafety.com>                                    Tue, Mar 7, 2023 at 1:59 PM
To: Jhostin Nunez <jhostin.nunez@flocksafety.com>
Bcc: laura.mccormick@flocksafety.com

Hi Jhostin,

As a follow up to our 1:1 this morning, I cannot stress it enough, the importance of the team's performance and in particular your performance at this time. What we did in the past cannot and will not get us to where we need to be. That said, our slack exchange last Thursday, March 2nd is not acceptable, and this is not from the standpoint of tone, which is hard to perceive over text. However, from the standpoint that we have a daily sync to go over the objectives for the day and then you explicitly go against that plan is much more intolerable than perceived tone in a message.
I cannot say it enough, just how critical of a junction we are at as a team and as of such I will actively be auditing team members' cases. Here is your audit: Jhostin's TR Closed Case Audit from Friday 3/3 to Monday 3/6, just under 20% of your closed cases requiring a truck roll were canceled as the issue was resolvable remotely. The default should not be to roll a truck to correct an issue as this financially has a huge impact on the company's bottomline. Our target here is to get your unwarranted truck rolls well under 5% of the total cases closed requiring a truck roll.
Lastly, not assigning DVC codes to cases moved to Tier 3 is a shortcut that just creates extra work for someone else on the team. This morning all 84 of the 91 cases without a DVC code assignment in Tier 3 were yours, the others were hotlist cases that do not get a DVC code. Let's commit to stepping up and doing the right thing the first time everytime.

PDS Engineering is on the verge of leveling up, let me know where and how I can help you on this journey.

Sincerely,
--
Omar Lodge
Production Device Support
+1 (404) 403-9934

# f¹ock safety

---

**3 attachments**



**Screenshot 2023-03-07 at 14.39.47.png**
266K





**Screenshot 2023-03-07 at 14.40.28.png**
182K

CONFIDENTIAL



**Thursday, March 2nd** ⌄

**Omar Lodge** 10:20 AM
hey 👋 what is the focus for you today before bright plates?

**Jhostin Nunez** 10:22 AM
i moved heartbeats to tier 2

**Omar Lodge** 10:22 AM
yesterday?

so you are checking to see if they are back today?

**Jhostin Nunez** 10:23 AM
nah i'm moving tier 1 to tier 2

then i'm gonna check the ones from yesterday

**Omar Lodge** 10:23 AM
I thought Avia was working HB cases

**Jhostin Nunez** 10:23 AM
well i guess ya'll cabe have them

*can

**Omar Lodge** 10:24 AM
Brian specially asked her to tell him what she was seeing

did I miss something

**Jhostin Nunez** 10:25 AM
nah it'ts cool ya'll can have them

you are right

**Omar Lodge** 10:25 AM
so what will be your focus this morning?

**Jhostin Nunez** 10:26 AM
i don't know what do ya'll need

**Omar Lodge** 10:26 AM
can you clean this up

Screenshot 2023-03-02 at 10.26.13.png ⌄

CONFIDENTIAL



EXHIBIT
14
Quinones

FLOCK 000020



CONFIDENTIAL

FLOCK 000021

f ẏ ock safety                                      Laura McCormick <laura.mccormick@flocksafety.com>

---

## Re: Monday March 20th - T3 DVC code Assignment
4 messages

**Omar Lodge** <omar.lodge@flocksafety.com>                     Mon, Mar 20, 2023 at 7:43 AM
To: Jhostin Nunez <jhostin.nunez@flocksafety.com>
Cc: Brian Barnard <brian.barnard@flocksafety.com>
Bcc: laura.mccormick@flocksafety.com

Jhostin,

This slack conversation was with regards to irStatus specifically, an issue that does not have a DVC code.
You went through T1 DPIs nighttime Blurry plates + bright nighttime plates which would fall into the category of a DVC
code that already exists. I sent you an email before you left for holidays expecting you to step and fix this, you did not.
Today I am explicitly asking for you to assign the proper DVC codes for the cases you moved to T3 as the rest of the team
has been doing.

Thank You,

On Mon, Mar 20, 2023 at 9:11 AM Jhostin Nunez <jhostin.nunez@flocksafety.com> wrote:
good morning,

Attached is a picture of a message sent on on march 10th saying that there will be a discussion about cleaning up dvc
codes that were untagged.I assumed that theses cases were off my hands.It is March 20th, and theses cases were not
even touched.If i was told to take on this task before going on vacation, I would have done that.

I am not sure if these cases were changed during my vacation.So I cannot give a promise that 89 cases will be finished
today.

Regards,
Jhostin Nunez

On Mon, Mar 20, 2023 at 8:48 AM Omar Lodge <omar.lodge@flocksafety.com> wrote:
Good Morning Jhostin,

I hope you had a relaxing time off last week and ready to hit the ground running this week!
Today your assignment:
  • Assign correct DVC codes to all 89 of your unmarked cases moved to T3
      ○ Please do not make the assumption they all fall into one DVC code based on original DPI alarm
      ○ Close cases where device is no longer affected by the alarm
      ○ Reassign DVC code where applicable and process accordingly for that DVC code
  • Share a report on the breakdown of DVCs processed

Please reply to this email letting me know if you have any questions or concerns and to confirm you can and will be
able to process all 89 of your T3 cases by EOD today.

Thank You as always.
Regards

--
Omar Lodge
Production Device Support
+1 (404) 403-9934

f ẏ ock safety



--
Omar Lodge
Production Device Support
CONFIDENTIAL                                                                              FLOCK 000031

# Device Support Engineer 1

## About the opportunity

Flock is actively searching for a Device Support Engineer 1 (DSEI) to deliver comprehensive support for our production-deployed devices. This position plays an instrumental role in assisting both hardware and software development teams, along with the operations team, throughout the product lifecycle while providing ongoing technical support to the Customer Success, Product, and Sales divisions.

In this role, your primary responsibility is to proficiently identify and categorize incoming cases related to specified device performance indicators (DPI). As a frontline agent, you will ensure the validity of incoming cases and determine the appropriate course of action.

## Some challenges you'll tackle

- Be the First Line Engineering support (Tiered Device Support)
- Process assigned DPI cases quickly and accurately
- Escate, apply known fixes, monitor and generate work orders when appropriate
- Audit individual or full networks of cameras
- Support collecting field data for return recovery
- Support of critical sites, pilot customers and growth regions
- Participate in risk assessments of installation requirements
- Generate and track bugs
- Escalate observed issues to responsible team
- Support the Customer Support Team with customer issues.
- Support the Deployment Team with deployed testing assets.



**About You**

- Experience working with cloud-based web applications.
- Good written and verbal communication skills.
- 1+ years of test or support experience.
- Bachelor's degree desired; Associates degree or equivalent experience considered.
- Experience with help and support desk activities, including answering cases and managing process flows.
- Familiarity with Salesforce is a bonus.
- Experience working with high case volume is an additional advantage.
- Ability to handle multiple issues and cases simultaneously while providing detailed and timely follow-up reports between all applicable internal departments.

FLOCK 000063

# flock safety

Laura McCormick <laura.mccormick@flocksafety.com>

---

## Addressing Concerns Regarding Behavior and Work Output - Jhostin Nunez
1 message

**Omar Lodge** <omar.lodge@flocksafety.com>                                      Wed, Aug 9, 2023 at 7:09 AM
To: Jhostin Nunez <jhostin.nunez@flocksafety.com>
Bcc: laura.mccormick@flocksafety.com

Hello Jhostin,

I trust this message finds you well. It is with sincere intention that I write to discuss some matters that have come to my attention concerning your recent behavior and work performance. As we all strive to uphold the highest standards of professionalism and excellence here at Flock, I believe that transparent communication is vital in addressing any challenges that may arise.

To begin, I've observed instances of behavior that do not align with the expected conduct within our team. It is of utmost importance that we treat our colleagues with unwavering respect and consideration at all times. I want to refer back to our conversation during our July 27th 1:1 meeting, where I raised my concerns about not being able to see you. Your nonchalant reply stating that this was IT related prompted my discussion then, and this concern resurfaced during an interaction yesterday on August 8th within our prod_device_support Slack channel. After I requested you at 10:18 am to close duplicate cases with existing work orders, it was only at 11:35 am that you acknowledged the request only after I pinged you about the request. Your engagement at 3:01 pm was similarly casual, necessitating a clarification on your question. Such behavior is counterproductive to your professional growth and advancement and must be rectified. Remember, cultivating a positive and collaborative work environment is essential for our team's success.

Furthermore, recent tasks assigned to you have compounded my apprehension about the diminishing quality and quantity of your work output. Our collective success hinges on each team member's unwavering dedication and contribution. While I understand that hurdles may surface, it is imperative that you communicate any challenges you encounter. A notable contrast can be drawn from my recent experience this morning, where I efficiently closed and accurately updated the location status of 62 cases to reflect "Optimizing - Maintenance Scheduled" in under 30 minutes. In comparison, your work output on August 8th totaled 109 cases over 8 hours, with 101 being the same type of case I worked on earlier this morning. Notably, the location status was left unchanged, denoting "In Service," a discrepancy that opens the door to new cases due to incorrect status indications.

I urge you to take a moment to contemplate these concerns and the potential impact of your actions on the overall team dynamic and work quality. While I remain committed to supporting you and offering guidance, the onus falls on you to take decisive steps toward rectification and performance enhancement.

Let's delve deeper into these issues during our scheduled 1:1 meeting this Thursday. I believe that, with the right mindset, we can collaboratively overcome these challenges and propel our team's excellence.

Thank you for your attentiveness to this matter. I anticipate our upcoming meeting and am optimistic about the positive strides we can achieve together.

Best regards,

--

CONFIDENTIAL

EXHIBIT
17
Quinones

FLOCK 000045

# f*ock safety

Laura McCormick <laura.mccormick@flocksafety.com>

## Hours Worked?

3 messages

**Omar Lodge** <omar.lodge@flocksafety.com>                     Tue, Sep 19, 2023 at 3:35 PM
To: Jhostin Nunez <jhostin.nunez@flocksafety.com>
Bcc: laura.mccormick@flocksafety.com

Hi Jhostin,

I see that you are online however I am not seeing any activity from you even though we have plenty to do.
Your first modified case was at 9:14AM and the last case touched was 2:41PM and it is now 5:30PM.



Likewise for cases closed your first closed case was at 9:36AM and your last closed case was at 2:41PM almost some 3



hours ago.
The Dashboard shows we have plenty of work here including the two categories you are incharge of Long Time Since
Last Heartbeat which has cases from 10:22AM this morning to as recent as 4PM still in Tier 1.

CONFIDENTIAL

Uptime has a case from yesterday and this morning still not touched.



Everyone should be helping to drive down the nighttimeImageQuality cases when they are freed up from their normal queue.

Please tell me what I am missing here.

Regards,

--

**Omar Lodge**
**Forward Deployment Engineer**  

flocksafety.com

# flock safety



**Omar Lodge** <omar.lodge@flocksafety.com>
To: Jhostin Nunez <jhostin.nunez@flocksafety.com>
Bcc: laura.mccormick@flocksafety.com

Fri, Sep 22, 2023 at 7:21 AM

Hi Jhostin,

CONFIDENTIAL

FLOCK 000039

Based on our conversation in our 1:1 yesterday we spoke about ignoring communications and you said you would respond to this email.
As a courtesy follow up, please respond as you told me you would.

Regards
[Quoted text hidden]
--
Omar Lodge
Production Device Support
+1 (404) 403-9934
# f͡lock safety

---

**Omar Lodge** <omar.lodge@flocksafety.com>                                    Fri, Sep 22, 2023 at 7:58 AM
To: Jhostin Nunez <jhostin.nunez@flocksafety.com>
Bcc: laura.mccormick@flocksafety.com

Hi Jhostin,

Your reply is very much appreciated.

Thank you,

On Fri, Sep 22, 2023 at 9:33 AM Jhostin Nunez <jhostin.nunez@flocksafety.com> wrote:
> Hello,
>
> I worked some cases at night to being able to adjust settings.Closing night time quality cases during the night helps see adjustments faster.
>
> Regards,
> Jhostin Nunez
> [Quoted text hidden]
> --

**Jhostin Nunez**
**Device Support Engineer II**   

🖱 flocksafety.com

# f͡lock safety



# fⱡock safety

Laura McCormick <laura.mccormick@flocksafety.com>

## Reprimand for Morning Sync Behavior
4 messages

**Omar Lodge** <omar.lodge@flocksafety.com>
To: Jhostin Nunez <jhostin.nunez@flocksafety.com>
Bcc: laura.mccormick@flocksafety.com

Thu, Nov 2, 2023 at 7:46 AM

Dear Jhostin,

I hope this message finds you well. I am writing to address a concerning incident that occurred during our morning sync today. Your behavior during the meeting was not in line with our team's expectations and standards of professionalism.

When asked why you were not on camera, you responded by saying that it was "not a big deal" and questioned why the meeting was being stopped for this issue. Subsequently, you abruptly stated that you could not continue the meeting and suggested discussing the matter in our 1:1 meeting, after which you disconnected from the call.

I must emphasize that participation in video meetings is an essential part of our remote work culture. It is important to have your camera on during team meetings to foster a sense of engagement, accountability, and transparency. By not being on camera and dismissing the issue, you demonstrated a lack of respect for your colleagues and the importance of effective communication within the team.

Furthermore, abruptly ending the meeting without any prior notice or a reasonable explanation is disruptive to the team's workflow and shows a disregard for the group's time and efforts.

I want to remind you that our team values open and constructive communication. If you have concerns or issues related to our meetings or work processes, it is essential that you address them in a respectful and collaborative manner. Dismissing these concerns and disrupting the meeting is not the appropriate way to handle such matters.

I strongly encourage you to take this reprimand seriously and reflect upon your actions. Moving forward, I expect you to actively participate in our team meetings, maintain a professional demeanor, and address concerns through appropriate channels, such as discussing them with me during our 1:1 meetings.

I believe that we can work together to resolve any issues and maintain a positive and productive team environment. I hope to see an improvement in your behavior and participation in our future meetings.

If you have any questions or need further clarification regarding this matter, please feel free to reach out to me. Let us use this as an opportunity for growth and better collaboration within the team.

Sincerely,

--

**Omar Lodge**
**Forward Deployment Engineer**



 flocksafety.com

# fⱡock safety



CONFIDENTIAL

# flock safety

Laura McCormick <laura.mccormick@flocksafety.com>

---

## UNCOMFORTABLE BEHAIVOR

7 messages

---

**Jhostin Nunez** <jhostin.nunez@flocksafety.com>                    Thu, Nov 2, 2023 at 8:44 AM
To: People team <people@flocksafety.com>

Hello,

I was wondering IF I can talk to somebody about webcam policies as I have a situation that is making me feel uncomfortable.

--

### Jhostin Nunez
**Device Support Engineer II**   

▷ flocksafety.com

---

# flock safety



NEW VIDEO SERIES
## The Future of Policing
[ WATCH NOW ]



EXHIBIT
20
Quinones

--

You received this message because you are subscribed to the Google Groups "People team" group.
To unsubscribe from this group and stop receiving emails from it, send an email to people+unsubscribe@flocksafety.com.
To view this discussion on the web visit https://groups.google.com/a/flocksafety.com/d/msgid/people/
CAHnpTAMjyDtvuXtcRQ9GGwG4jjeOciKq0P08cm1jrNiQuwzWkQ%40mail.gmail.com.

---

**Laura McCormick** <laura.mccormick@flocksafety.com>                Thu, Nov 2, 2023 at 8:45 AM
To: Jhostin Nunez <jhostin.nunez@flocksafety.com>
Cc: People team <people@flocksafety.com>

Hi Jhostin,
I will send you a calendar invite, to learn more about the situation.
Thank you.

CONFIDENTIAL

**Laura McCormick (she/her)**
*Senior Human Resources Business Partner*
laura.mccormick@flocksafety.com

[Quoted text hidden]

---

Jhostin Nunez <jhostin.nunez@flocksafety.com>
To: Laura McCormick <laura.mccormick@flocksafety.com>

Thu, Nov 2, 2023 at 8:53 AM

Hello Laura,

Thank you for the invite.Will see you soon.
[Quoted text hidden]

---

Jhostin Nunez <jhostin.nunez@flocksafety.com>
To: Laura McCormick <laura.mccormick@flocksafety.com>

Mon, Nov 6, 2023 at 8:00 AM

Hello Laura,

Hope you are having a good day.I was wondering if I can request a follow up meeting about the incidents that occurred on November 2nd, 2023 with my direct supervisor Omar Lodge in both my 9:15 AM meeting and at my 11:00 AM meeting, and the webcam policies Flock Safety has for its employees.

A quick recap of the incidents is as follows:
-At the 9:15 meeting, I had my camera on and my face was positioned on the left corner frame of the screen.My face was visible and was told by my direct supervisor Omar Lodge to move the camera closer.I informed my direct supervisor Omar Lodge that my face can be seen and there is no need to be closer to the camera.He asked me to please get closer to the camera and angle it to see my face ""clearer" and that he "really wanted to see my face".My face was on the screen clearly and I felt really uncomfortable in the way Omar lodge was to determined to get my face closer to the camera.I then asked "Why is this a big deal? and how does this affect the productivity of the team?" He then asked me again to adjust my camera to get a "clearer" view of my face.I promptly logged off as I felt really uncomfortable in this behavior and was promptly given a false reprimand and also gave the HR team a blind carbon copy of this false reprimand..

-On my 1:1, I positioned my body and face the same way I did in my earlier meeting and asked Omar Lodge again "How does the position of my face and body on screen affect the productivity of my job and the team? I believe someone having their head not move 2 inches will not be a serious problem".Omar Lodge then proceeded to say that "I felt disrespected because your head was 2 inches from where I wanted it ".I again promptly logged off as this harassment and obsession with my face being seen "up close" to the camera is becoming really uncomfortable and stressful.

I did not attend the 9:15 AM meeting on November 3rd, 2023 as I do not feel safe due to the harassment and bizarre behavior displayed by my direct supervisor Omar Lodge.My colleague Avia Smith gave me the information that was shown in that meeting.

Hope to hear back and have this situation settled and resolved as this can be happening in other teams.

Regards,
Jhostin Nunez

[Quoted text hidden]

---

Laura McCormick <laura.mccormick@flocksafety.com>
To: Daniele Feuillebois <daniele.feuillebois@flocksafety.com>

Mon, Nov 6, 2023 at 8:41 AM

Forwarding this message from Jhostin.  I will bring it up in our HRBP call later today.
Thank you.

**Laura McCormick (she/her)**
*Senior Human Resources Business Partner*
laura.mccormick@flocksafety.com
[Quoted text hidden]

CONFIDENTIAL



EXHIBIT
21
Quinones

FLOCK 000027

# flock safety

**Flock Safety Termination Form**

| | |
|---|---|
| Flock Safety | Alpharetta, GA |
| Company Name | City/State in which employee worked |
| Employee's Name: Jhostin Nunez | Social Security Number: xxx-xx-4015 |
| Original Hire Date: 06/21/2021 | Last Day Worked: 11/8/2023 |

DISCHARGED - ☐ VIOLATION OF COMPANY POLICY ☐ POOR PERFORMANCE

☐ UNEXCUSED ABSENTEEISM ☐ UNEXCUSED TARDINESS ☐ MISCONDUCT

☐ FAILURE TO FOLLOW SUPERVISORY INSTRUCTIONS ☑ OTHER

**MUST STATE EXACT DETAILS OF THE REASON FOR DISCHARGE**

Position elimination - Device Support Engineer II.

**IF DISCHARGED FOR VIOLATION OF CO. POLICY, STATE EXACT POLICY VIOLATED**

WERE WARNINGS GIVEN? _____ WHEN? _____ WRITTEN? _____ VERBAL? _____

IF WRITTEN, PLEASE FORWARD COPIES

VOLUNTARY QUIT: IF KNOWN, PLEASE STATE THE REASON(S) FOR THE VOLUNTARY QUIT.

**EXHIBIT**
22
Quinones

LAID OFF (LACK OF WORK)

IS LACK OF WORK: PERMANENT? _____ INDEFINITE? _____

TEMPORARY? _____ EXPECTED DATE OF RECALL? _____

ADDITIONAL REMARKS: (PA Clients include hourly wage)(MD Clients include last qtr gross wages)

| | |
|---|---|
| Date of this report: 11/8/23 | Tel. No. |
| Signed by: Laura McCormick | Title: Sr. HR Business Partner |

Copyright © 2021 by Unemployment Solutiosn Inc. – All Rights Reserved

CONFIDENTIAL


Unemploymeem Solutions Inc
USI

2595 - 1021

FLOCK 000019

## USI EMPLOYMENT TERMINATION REPORT

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | | ☐ FEPA<br>☒ EEOC | 410-2024-05405 |
| | | | and EEOC |

| | State or local Agency, if any | | |
|---|---|---|---|

| Name (indicate Mr., Ms., Mrs.)<br>**Mr. Jhostin Nunez Quinones** | RECEIVED AT ATDO<br>EEOC ON 2/26/2024 | Home Phone (Incl. Area Code)<br>**(470) 800-6597** | Date of Birth<br>**10/5/1994** |
|---|---|---|---|
| Street Address<br>**1310 Beaver Creek Road** | City, State and ZIP Code<br>**Alpharetta, Georgia 30022** | | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name<br>**Flock Group Inc** | | No. Employees, Members<br>**~500** | Phone No. (Include Area Code)<br>**(866) 901-1781** |
|---|---|---|---|
| Street Address<br>**1170 Howell Mill Road, Suite 100** | City, State and ZIP Code<br>**Atlanta, GA 30318** | | |
| Name | | No. Employees, Members | Phone No. (Include Area Code) |
| Street Address | State and ZIP Code | | |

**EXHIBIT 23 Quinones**

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| ☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN<br>☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION<br>☐ OTHER (Specify) | Earliest: **January 2021**   Latest: **November 2023**<br><br>☒ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I.     I was hired by Respondent, in or about June 2021, as a Device Support Engineer II.

II.    My Manager at Respondent was Omar Lodge. On and off, Lodge would have daily meetings with both myself and larger team meetings. As my employment with Respondent continued, Lodge's requests surrounding my appearing on camera during these meetings became more strange. At first, he started asking me to turn on my camera, which I had no problem with. However, as time progressed, Lodge then started to tell me that I had to put my face closer to my camera than I was comfortable with, and then progressed into telling me that I had to be centered in the camera as well. As these uncomfortable requests continued and progressed, I became concerned that Mr. Lodge may have some form of sexual fetish and that his requests may be sexual in nature.

III.   On or about November 2, 2023, Lodge made some comments to me that I perceived as sexual. Lodge aggressively told me to move my face closer to my camera and that I had to be in the center of the camera, and when I asked him why, he told me that he "really wanted to see my face." When I further said my face could already be seen, Lodge told me I had to "put my face and body where" he wanted me to. He also told me to sit up straight in the frame in a very odd tone. I told him I was uncomfortable following those instructions, that we could talk about it in our one-on-one, and that I was going to log off of the meeting. I then logged off.

IV.   Later that day, in my one-on-one with Lodge, I again asked Lodge why he had made such a big deal out of my positioning on my camera in our earlier meeting, and Lodge told me that he felt "disrespected" because my head was "two inches from where he wanted it."

V.    That same day, I complained to Human Resources employee Laura and reported that Lodge was harassing me, and that I thought it seemed sexual in nature and that I wanted to see Respondent's policies about being on camera. I also specifically asked to Laura to think about how it would look if a man told a woman what Lodge had told me, to show her why I thought the requests appeared sexual in nature. I further reported that I found Lodge's behavior very uncomfortable, and that I felt I was being harassed. Laura told me she would have to check on Respondent's policies and get back to me.

VI.   That day, I was also reprimanded by Lodge for being "off-screen," which was not true.

VII. On November 6, 2023, I followed up with Laura and complained once again about Lodge's behavior because I had not heard back.

VIII. On or about November 8, 2023, Respondent terminated me, saying that my position had been eliminated. However, approximately two weeks after my termination, I saw that Respondent was hiring for a Device Engineer position in my department.

IX. I believe I have been sexually harassed and retaliated against in violation of Title VII of the Civil Rights Act of 1964.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 02/26/24      Mr. Jhostin Nunez Quinones | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |
| Date      Charging Party Signature | |

Thursday, August 22, 2024

## Note for Employee File
### HR related - Level 1 or Level 2 Incident Documentation

This form is designed for use by managers to document Level 1 or Level 2 incidents with employees and will be filed in an employee's file. It will also be filed in the manager's file who is submitting the incident.

The company recognizes that there are times when an employee's behavior and/or performance may warrant being observed and noted, but not yet verbally, or in writing, approaching it with the employee. This is considered a Level 1 escalation.

A Level 2 escalation is a Verbal Warning between a manager and an employee related to an incident.

**Manager Submitting this Form:**          Evan Tyler

**Name of Employee:**          Jhostin Nunez Quinones

**Is this a...**          Level 2 Verbal Warning that needs documenting

**Date of Incident**          Tuesday, August 20, 2024

**If a Level 2 Verbal Warning, what was**          Wednesday, August 21, 2024
**the date of the verbal warning?**

### Describe the incident warranting this action:
After speaking with a merchant in regard to a PIN Debit acceptance issue, Jhostin went to Matt Weasel to get assistance. However, Jhostin did not like the fact that Matt was attempting to use the issue as a learning opportunity for Jhostin.

Jhostin (raising his voice) said, "bro, I don't need you explaining anything to me, just take the case...." Matt responded with, "You are coming at me with all this hostility, I don't want to help you."

### Names of others that witnessed the incident:
Stephanie Buckley, Shamroze Moosa

### Any additional information that would be helpful to provide:
Jhostin was coached that should he need assistance again, to not ask or tell that person take the case. That instead he should request they join the call and work alongside him to learn in real-time and solve the issue. I understand the want to bring the issue to a close swiftly, but our colleagues are here to assist not be yelled at or bullied into doing anything.



CONFIDENTIAL          FLOCK000312

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JHOSTIN QUINONES,

    Plaintiff,

v.

FLOCK GROUP, INC.,

    Defendant.

Civil Action No.

1:24-CV-01319-TWT-CMS

JURY TRIAL DEMANDED

## PLAINTIFF'S FIRST SUPPLEMENTAL RESPONSES TO DEFENDANT'S FIRST INTERROGATORIES

### INTERROGATORIES

3.

Describe all attempts you made to obtain employment from January 1, 2019 through the present and for each such attempt identify the date you first attempted to obtain employment with the potential employer; all persons with whom you spoke or to whom you wrote in your attempt to obtain employment, including all employment agencies, consultants, counselors, or "headhunters" and all persons with whom you had an interview; all documents relating to your attempts to obtain employment, including but not limited to any applications, cover letters, correspondence or resumes; the response received from the potential employer,



EXHIBIT
25
Quinones

including whether you received a job offer; if you received a job offer, state the date of the offer, the amount of salary or compensation offered, and identify all documents relating to the offer; and your response to the offer, and identify all documents relating to your response to the offer.

| Employer | Position | Application Date | Job Offered | Job Accepted |
|---|---|---|---|---|
| Bold Integrated Payments | | 03/2023 | 04/2024 | $47,000 |
| Emory Healthcare | Business Analyst I | 11/15/2023 | No | |
| Banked | Customer Support | 11/15/2023 | No | |
| WorldVia | Technical Support Specialist | 11/15/2023 | No | |
| USCREEN | Teir 1 Technical Support Specialist | 11/15/2023 | No | |
| Whole Foods Market | | 11/16/2023 | No | |
| Locus Robotics | Customer Support Specialist | 11/22/2023 | No | |
| Sift | Customer Service | 11/22/2023 | No | |
| CIOX Health | Health Information Specialist I | 11/22/2023 | No | |
| Level | | 11/23/2023 | No | |
| mySidewalk | | 11/23/2023 | No | |
| Yembo | | 11/23/2023 | No | |
| Heard | Frontline Support Specialist | 11/23/2023 | No | |
| Ringba | | 11/24/2023 | No | |
| Docebo | Technical Support Analyst | 11/24/2023 | No | |
| Prime Therapeutics | Quality Specialist I | 11/24/2023 | No | |
| TTEC | Help Desk Technician | 11/25/2023 | No | |
| WeSki | Customer Service Representative | 11/27/2023 | No | |
| Budderfly | | 11/27/2023 | No | |
| Forta | Support Analyst | 11/27/2023 | No | |
| Modern Treasury | | 11/28/2023 | No | |
| Nuvei | Technical Support Specialist | 11/28/2023 | No | |
| Photobooth Supply Co. | Technical Support Engineer | 11/28/2023 | No | |
| Webflow | | 11/29/2023 | No | |
| DXC Technology | Helpdesk-Technical Support | 11/29/2023 | No | |
| Bio-Rad | | 11/29/2023 | No | |
| Platform Science | Technical Support Specialist | 11/30/2023 | No | |
| Ellevest | | 11/30/2023 | No | |
| MaestroQA | Customer Experience Specialist | 11/30/2023 | No | |
| Postscript | Customer Experience Advocate | 12/15/2023 | No | |
| Files.com | Customer Support Engineer | 12/16/2023 | No | |
| Under Armour | Systems Operations Analyst | 12/19/2023 | No | |
| CCC | Operations Analyst | 12/19/2023 | No | |
| CDW | Operations Analyst II | 12/19/2023 | No | |
| Equifax | Customer Support | 12/21/2023 | No | |
| Zelis | | 12/22/2023 | No | |
| PowerSchool Group, LLC | Associate Technical Support Engineer | 12/25/2023 | No | |
| Insight Software | Operations Analyst | 12/27/2023 | No | |
| Runway | | 12/27/2023 | No | |

| | | | | |
|---|---|---|---|---|
| WOW | Affordable Connectivity Program Enrollment and Support Specialist | 12/29/2023 | No | |
| Zillow | Product Support Expert | 12/29/2023 | No | |
| Fleetio | | 12/29/2023 | | |
| LINQ | Technical Support Specialist II | 12/29/2023 | | |
| UPS | Customer Success Representative | 01/01/2024 | | |
| BriefCam | Tier 3 Support and Implementation | 01/01/2024 | | |
| UserTesting | IT Support Specialist | 01/01/2024 | | |
| Waystar | Solution Adoption Enrollment Specialist -- Strategic Accounts | 01/01/2024 | | |
| Intuit | | 01/02/2024 | | |
| CharterUP | Operations Analyst | 01/02/2024 | | |
| BeatStars Inc. | | 01/03/2024 | | |
| AIRBUS | Customer Order Specialist | 01/04/2024 | | |
| Children's Healthcare of Atlanta | Application Analyst | 01/05/2024 | | |
| Prophecy | | 01/05/2024 | | |
| Hotel Engine | | 01/05/2024 | | |
| Nextech | Healthcare Software Support Representative | 01/05/2024 | | |
| Upgrade | Merchant Support Specialist | 01/08/2024 | | |
| Veriforce LLC | Client Support Associate | 01/08/2024 | | |
| SofterWare | Technical Support Representative | 01/08/2024 | | |
| ZeroEyes | Client Services Technician | 01/09/2024 | | |
| Fieldguide | Customer Support Representative | 01/24/2024 | | |
| Togetherwork | Customer Success Specialist | 01/24/2024 | | |
| Prophecy | Product Support Specialist | 01/24/2024 | | |
| Sopra Banking Software | Business Support Team Analyst | 01/24/2024 | | |
| RaceTrac | Technical Support Analyst I | 02/12/2024 | | |
| Patreon | Customer Service Support Specialist | 02/12/2024 | | |
| Pie Insurance | Customer Service Operations Analyst | 02/16/2024 | | |
| SCA Health | Supply Chain Operations Analyst | 02/16/2024 | | |
| WEG Electric Corp | Service Egineering Specialist | 02/17/2024 | | |
| LexisNexis Risk Solutions | | 02/18/2024 | | |
| Citizen | Customer Service | 02/18/2024 | | |
| Olo | Customer Support Specialist | 02/18/2024 | | |
| Airspace | Quality Assurance Analyst | 02/20/2024 | | |
| Press Ganey | Operations Support Specialist | 02/20/2024 | | |
| Abridge | Customer Support Specialist | 02/20/2024 | | |
| SureCost | Customer Support Specialist | 02/20/2024 | | |
| PostHog | | 02/20/2024 | | |
| Alcon | Validation Engineer | 02/20/2024 | | |
| GTreasury | Client Support Analyst | 02/21/2024 | | |
| SpringHealth | Quality Specialist - Medication Management | 02/21/2024 | | |
| Symetra | Associate Customer Operations Representative | 02/21/2024 | | |
| Pure Insurance | Product Specialist | 02/21/2024 | | |
| PayNearMe | Technical Support Engineer | 02/22/2024 | | |
| GoFundMe | Technical Support Engineer | 02/22/2024 | | |

| Infuse North America | | 02/23/2024 | | |
| ClearCompany | Client Support Specialist | 02/23/2024 | | |
| AIQ | Customer Support Specialist | 02/25/2024 | | |
| Stavvy | Customer Support Specialist II | 02/25/2024 | | |
| Red Wing Shoe Company | | 02/26/2024 | | |
| Medallion | | 02/27/2024 | No | |
| Health Plans, Inc. | Customer Service Representative | 02/27/2024 | No | |
| EverCommerce Payment Solutions | Customer Service and Support Associate | 02/28/2024 | No | |
| Dalstrong | Customer Service Representative | 02/28/2024 | No | |
| Edmentum | | 02/28/2024 | No | |
| JAMF | Technical Support Associate | 02/29/2024 | No | |
| Newfold Workday | Domain Support Rep | 02/29/2024 | No | |
| Betterment | Customer Support Associate | 03/02/2024 | No | |
| Higher Logic | Customer Support Specialist | 03/02/2024 | No | |
| Smartsheet | | 03/02/2024 | No | |
| COSTCO | Membership Clerk | 03/24/2024 | No | |
| Quadient | Technical Support Specialist | 04/01/2024 | No | |
| Axon | Technical Support Representative | 04/01/2024 | No | |
| ISN Software Corporation | Business Analyst | 04/01/2024 | No | |
| Wollborg Michelson Recruiting | | 04/01/2024 | No | |
| Sun Auto Tire and Service | | 04/01/2024 | No | |
| Sprout | Technical Support | 04/01/2024 | No | |
| US Forest Service - Resource Assistant Program | Fisheries and Wildlife/Natural Resources Specialist | 04/02/2024 | No | |
| AppFolio | Customer Care Specialist | 04/02/2024 | No | |

**RESPONSE:**     Plaintiff incorporates his original objections and response to

Defendant's Interrogatory No. 3. By way of further response, Plaintiff, to the best of

his knowledge, supplements his response as follows:


6.


Identify all persons, including but not limited to physicians, psychologists,

psychiatrists, hospitals, institutions, therapists, groups or agencies, other than expert

witnesses, whom you have consulted at any time from January 1, 2019 through the

present, for medical, psychological, psychiatric or related treatment, diagnosis or

counseling for emotional distress or any related conditions or symptoms and for each

state the date(s) each person or entity was consulted; the purpose(s) of consulting

with each person or entity; and identify all documents relating to each consultation

(including any medications prescribed or taken by Plaintiff).

**RESPONSE:**       Plaintiff states that to the best of his recollection he has received

treatment from the following providers in response to this request:

Facility:     Alpharetta Internal Medicine.

Address: 1380 Upper Henbree Rd., Roswell, Georgia, 30076.

Treating Physician: Dr. Miller

Dates of Service:    10/30/23

Reason for Visit:   Stress and Anxiety; Left Eye Twitching

Medications Prescribed:  Klonopin

This 17th day of September, 2024.

Docusign Envelope ID: F2D99AFF-B01D-4DAC-B08E-8CE8A63D6127

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JHOSTIN QUINONES,

    Plaintiff,

v.

FLOCK GROUP, INC.,

    Defendant.

Civil Action No.

1:24-CV-01319-TWT-CMS

JURY TRIAL DEMANDED

## CERTIFICATE OF SERVICE

I hereby certify that I have this day I served *Plaintiff's First Supplemental Responses To Defendant's First Interrogatories* to all counsel of record via electronic mail

This 17th day of September, 2024.

*s/ V. Severin Roberts*
V. Severin Roberts
Georgia Bar No. 940504
Douglas McMillan
Georgia Bar No. 621646
*Attorneys for Plaintiff*

Docusign Envelope ID: F2D99AFF-B01D-4DAC-B08E-8CE8A63D6127

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JHOSTIN QUINONES,

    Plaintiff,

v.

FLOCK GROUP, INC.,

    Defendant.

Civil Action No.

1:24-CV-01319-TWT-CMS

JURY TRIAL DEMANDED

## VERIFICATION

I, Katrina Nelson, hereby declare, under penalty of perjury that the information contained in *Plaintiff's First Supplemental Responses To Defendant's First Interrogatories* is true and correct to the best of my knowledge. I am over the age of eighteen (18) years of age and competent to make this statement under oath.

This 17th day of September, 2024.

Signed by:
Jhostin Nunez Quinones
327F58C112E44C5...

Jhostin Quinones