# EXHIBIT B –

# OMAR LODGE

# DEPOSITION

1          IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF GEORGIA
2             ATLANTA DIVISION

3  JHOSTIN QUINONES,       )     Civil Action No.
                    )     1:24-CV-01319
4    Plaintiff,       )
                    )
5  v.                  )
                    )
6  FLOCK GROUP, INC.,     )
                    )
7    Defendant.       )
  _____)

8

9

10

11

12

13

14

15

16        The Videoconference Deposition of

17                Omar Lodge

18          (Taken by The Plaintiff)

19           Conducted Remotely

20           November 20, 2024

21

     Reported by: Jacqueline Frazier
22           Certified Court Reporter
           Georgia
23           License No. 5465-2647-6265-0624

24

25

**Page 2**

```
1   STATE OF GEORGIA
2   COUNTY OF GWINNETT
3   VIDEOCONFERENCE DEPOSITION OF OMAR LODGE
4
5           Pursuant to Article 8.B of the RULES AND
6   REGULATIONS OF THE BOARD OF COURT REPORTING OF THE
7   JUDICIAL COUNCIL OF GEORGIA, I make the following
8   disclosure:
9
10          I am a Georgia Certified Court Reporter.  I
11  am here as a representative of Huseby Global
12  Litigation.
13
14          Huseby Global Litigation was contacted by
15  the offices of THE WORKERS' FIRM, to provide court
16  reporting services for this deposition.  Huseby Global
17  Litigation will not be taking this deposition by
18  O.C.G.A. 15-14-37 (a) and (b).
19
20
21
22
23
24
25
```

**Page 3**

```
1            A P P E A R A N C E S
2
3   ON BEHALF OF THE PLAINTIFF:
4       PATRICK REID - videoconference
        ATTORNEY AT LAW
5       THE WORKERS' FIRM
        7000 CENTRAL PARKWAY
6       SUITE 1100
        ATLANTA, GEORGIA  30328
7       patrick@theworkersfirm.com
8
9   ON BEHALF OF THE DEFENDANT:
10      ADAM KEATING - videoconference
        ZACHARY MCCORMACK - videoconference
11      ATTORNEYS AT LAW
        DUANE MORRIS, LLP
12      1075 PEACHTREE STREET, NE
        SUITE 1700
13      ATLANTA, GEORGIA  30309
        akeating@duanemorris.com
14      zmccormack@duanemorris.com
15
16
17
18
19
20               - - -
21      The Videoconference Deposition of Omar Lodge,
22  taken by the Plaintiff, Conducted Remotely, on the 20th
23  day of November 2024, at 10:00 a.m., before Jacqueline
24  Frazier, Certified Court Reporter.
25
```

**Page 4**

```
1            INDEX TO EXAMINATIONS
2
3   Examination by Mr. Reid...........................5
4   Examination by Mr. Keating.......................94
5   Reexamination by Mr. Reid.......................101
6
7   Certificate of Reporter.........................106
8
9            INDEX TO EXHIBITS
10  Exhibit          Description              Page
11  P-1              FLOCK 64                 48
12  P-2              FLOCK 65                 50
13  P-3              FLOCK 17                 53
14  P-4              FLOCK 19                 55
15  P-5              FLOCK 29-30              68
16  P-6              FLOCK 26-28              79
17  P-7              FLOCK 47                 87
18  P-8              FLOCK 45-46              91
19  D-26             FLOCK 34-36              98
20  D-27             FLOCK 37                 100
21
22
23
24
25
```

**Page 5**

```
1            P R O C E E D I N G S
2                  - - -
3       (Whereupon, the videoconference deposition of Omar
4   Lodge commenced at 10:00 a.m. on November 20, 2024.)
5           (Whereupon, the Zoom recording feature
6   was turned on.)
7           MR. REID:  Madam Court Reporter, will
8   you please swear in the witness.
9           (It was stipulated by all counsel
10  present that the court reporter is authorized
11  to swear the witness remotely.)
12          (Whereupon, a brief recess was taken.)
13              OMAR LODGE,
14  having been duly sworn, was deposed and examined as
15  follows:
16              EXAMINATION
17  BY MR. REID:
18      Q   Good morning, Mr. Lodge.
19          How are you doing today?
20      A   I'm doing well.  Thanks.
21          How are you?
22      Q   Good.  All right then.
23          Is there any reason -- so these are -- I'm
24  going to go through some preliminaries that I always go
25  with, with people that, you know, attorneys typically
```

Page 6

1  do at the beginning.
2          Is there any reason that you'd be inhibited
3  from testifying truthfully and accurately today?
4      A   No.
5      Q   Okay.  And I also want to make sure just, you
6  know, we just saw -- kind of saw the madam court
7  reporter speaking with us.  So she's here, she's taking
8  down everything that you and I are saying, and it's
9  going to be hard for her, you know, if we start talking
10 over each other to capture, you know, what each of us
11 is saying.
12         So I'm going to do my best to not interrupt
13 you.  I would ask that you do the same for me just so
14 that we could get a clean record here, okay?
15     A   Okay.
16     Q   All right.  So what did you do to prepare for
17 your deposition today?  And I don't want you to -- by
18 the way, when I ask you this, I don't want you to talk
19 to me of anything you talked about with your attorneys.
20 Don't talk to me about that.
21         But what did you do to prepare for your
22 deposition today?
23     A   I looked over some e-mails that were sent.
24 That was pretty much in it.
25     Q   Okay.  Do you remember what e-mails, what the

Page 7

1  content of those e-mails were?
2      A   It was just the e-mail exchange between
3  Justin and I, as well as the e-mails that led up to, I
4  guess, when he was actually terminated.
5      Q   So you -- were those e-mails from around the
6  time of Justin's termination that you're talking about?
7      A   Even before.  There was --
8      Q   Okay.
9      A   -- just e-mails in general.
10     Q   Got it.  Okay.
11         Did that include the -- well, let me ask you
12 this:  Did you remember there being a script for when
13 you terminated Justin?
14     A   Correct.  Yes.
15     Q   Did you review that as well?
16     A   I did look over that e-mail, yes.
17     Q   Okay.  Got it.  All right.
18         Did you make any notes during your
19 preparations for this deposition?
20     A   No.
21     Q   Okay.  Got it.
22         Where do you currently live?
23     A   I live here in Atlanta.
24     Q   What is your address?
25     A   1940 Woodland Hills Avenue, Atlanta,

Page 8

1  Georgia 30318.
2      Q   Okay.  Do you have any plans to move from
3  that residence within the next few years?
4      A   No, I don't.
5      Q   Okay.  Does anyone live at that house with
6  you?
7      A   Yes.
8      Q   Who is that?
9      A   I have roommates.
10     Q   Okay.  And who are the -- what are your
11 relationship to them besides being roommates?
12     A   They're just roommates.
13     Q   Okay.
14     A   I --
15     Q   How many do you have?
16     A   So it's a duplex, so there's four other
17 persons living at that house.
18     Q   Okay.  And one of them lives in, I guess,
19 your side of the duplex, and then the other two are, I
20 guess, on the other side?
21     A   Correct.
22     Q   Okay.
23     A   Correct.
24     Q   What is the name of the person that lives
25 with you in your half?

Page 9

1          MR. KEATING:  Objection to form as
2      relevance.
3          You can answer.
4      A   Yll, Y-L-L, Zeke, Z-E-K-E.
5  BY MR. REID:
6      Q   Okay.  You said -- did you say Z-E-K-E or A?
7      A   E.  Z-E-K-E.
8      Q   Okay.  Got it.
9          And have you lived anywhere -- are there any
10 other residences in the last four years?
11     A   Yes.
12     Q   Okay.  What was it?  What were the addresses
13 of those residences?
14     A   6375 Hampshire Drive, and that's in Tucker
15 Georgia --
16     Q   Okay.
17     A   -- 30086 -- or 85.
18     Q   And where are you currently employed?
19     A   Southern States, LLC.
20     Q   Okay.  Southern -- you said Southern States,
21 LLC?
22     A   Correct.
23     Q   Okay.  And when did you become employed by
24 Southern States, LLC?
25     A   The 1st of January, 2024.

Page 10

1    Q    Okay.  And what is your position there?
2    A    I'm an area sales manager.
3    Q    Okay.  So what were the circumstances of you
4  ending your employment with Flock?
5    A    I've worked with Southern States prior to
6  coming to Flock, and they started a new division at
7  Southern States, D&D, distribution automation.  And
8  it's -- it was almost like a startup within a
9  100-year-old company.  And they had reached out to me
10  prior, asking me if I wanted to come back.  And I did
11  not take the opportunity.  But then they were saying
12  that, We have a new one, and this is your time.  So
13  that's -- that was why I made the decision to leave
14  when I did --
15    Q    Okay.
16    A    -- because it was the second they showed me
17  (inaudible) did to me.
18    Q    Was there anything related to your employment
19  with Flock that was going on that made you change your
20  mind in terms of going over there?
21    A    No, sir.
22    Q    Okay.  What does Flock do, if you can
23  describe it?
24    A    Flock exists to eliminate crime by collecting
25  object -- I mean evidence, that we can actually use to

Page 11

1  take people to court essentially or to have this.
2    Q    And I -- it's my understanding that, at least
3  to some degree, your team, when you were at Flock, had
4  to do something with cameras, correct?
5    A    Correct.
6    Q    So can you tell me how you're -- the team
7  that -- well, first of all, what was the name of the
8  team that you managed?
9    A    We were device support production.
10    Q    Okay.
11    A    Device support.
12    Q    And then Jhostin Quinones was on that team --
13  or Jhostin Quinones was on that team, correct?
14    A    Correct.
15    Q    Okay.  And who else -- do you remember who
16  else was on that team at the time that Mr. Quinones was
17  terminated?
18    A    (Inaudible) was on that team.
19    Q    Okay.  Who else?
20    A    Akia -- I can't remember her last name right
21  now.  Akia was also on the team.  Samuel Oswald, Mia
22  Gonzalez --
23    Q    Okay.
24    A    -- and Michelle Sharp.
25    Q    Okay.  And was someone promoted when you left

Page 12

1  or you -- where -- when that happened?
2    A    No.  I'm not aware of any of that happening.
3    Q    Okay.  In between Mr. Quinones's termination
4  do you -- well, let me ask you this:  Between
5  Mr. Quinones's termination and the next six months, are
6  you aware of any other individuals being hired onto
7  that team?
8    A    No.  No one else was hired.
9    Q    Okay.  And if you could just give me a
10  rundown of what the device support team does.
11    MR. KEATING:  Objection as to time.
12  BY MR. REID:
13    Q    What did the device support team do as of
14  November 2023?
15    A    We continue business as usual.  We -- our job
16  was to ensure that every device that was supplied in
17  the field was actually collecting evidence.  That was
18  our sole purpose.
19    Q    Were there any other teams that had duties
20  related to making sure the devices in the field were
21  collecting evidence?
22    A    No.
23    Q    Okay.  And did the device support team
24  actually go physically to locations if, you know,
25  something was physically wrong with the camera or

Page 13

1  defective?
2    A    No, we did not.
3    Q    Okay.  So who would be -- there would be
4  another team that would handle that at Flock?
5    A    Correct.
6    Q    What would that team be?
7    A    That was our field office team.  So...
8    Q    And then were there any -- so it's my
9  understanding that you're the team -- you were in
10  charge of -- the device support team was more in charge
11  of the software around the cameras, you know, checking
12  the cameras remotely to see if the problems could be
13  fixed remotely, right?
14    A    That is correct.
15    Q    And then the field support team was, if
16  there's something physically wrong with the camera that
17  needed to be retrieved or something like that, they
18  would go -- maybe go and get it?
19    A    That is correct.
20    Q    Okay.  And then there was maybe another team
21  where, you know, once the field team has retrieved the
22  camera and brought it back, maybe fix it, is there a
23  team that does not?
24    A    Yes, that is correct.
25    Q    What team would that be?

Page 14

1    A    I don't recall the name of that team.  But it
2    was an engineering team that would actually repair
3    those cameras.
4         Q    Got it.
5              And then so is Flock a nationwide company?
6         A    Yes.  We have cameras all over the United
7    States.
8         Q    Okay.  So does your -- did your team, as of
9    November 2023, have responsibility for cameras all over
10   the United States?
11        A    Correct.  Yes.
12        Q    Okay.  And does your team sometimes have to
13   troubleshoot problems that cameras have specifically
14   related to them capturing video or perhaps even audio
15   at night?
16        A    Correct.  Yes.
17        Q    Okay.  Because a camera could be working fine
18   during the daytime, but then something with the
19   software or whatever it is could be malfunctioning at
20   night, right?
21        A    Yes.  Correct.
22        Q    Okay.  And what were the working hours of
23   that team from July 2023 to November '23 -- 2023?  And
24   feel free to tell me if they changed at any point
25   during that time.

Page 15

1         A    We had normal business hours, but it was very
2    flexible because it was remote work.  So it was just
3    based on someone saying they needed to work at night,
4    or it just depends on the type of (inaudible) that were
5    focused on these nighttime images, that they might opt
6    to work at nighttime.
7         Q    Got it.
8              So when you say "flexible," is it flexible in
9    any other way, or is it just simply if someone is
10   working on nighttime cameras, maybe they don't work the
11   9:00 to 5:00?
12             MR. KEATING:  Object to form.
13             You can answer.
14        A    No.  It was completely predetermined.  No one
15   was asked to work at night.
16   BY MR. REID:
17        Q    Okay.
18        A    It would just be someone's -- I mean, it was
19   easier to look at cameras at night because when you
20   made that change, you could see them immediately.
21   So --
22        Q    Sure.
23        A    -- we all still work normal hours, but if,
24   for whatever reason, you wanted to not put a bunch of
25   cases, you'd do it at night.

Page 16

1         Q    Okay.
2         A    So it was never -- yeah.
3         Q    Was it acceptable, let's say, if you had
4    something going on during the day -- well, let's ignore
5    that nighttime camera situation for now and assume that
6    we're talking about a camera that has some issue in the
7    daytime.
8              Would an employee be able to, you know, if
9    they have a doctor's appointment during the day, go and
10   work outside of normal work hours?
11        A    Yes.  When you -- if you told the team prior,
12   that was acceptable.
13        Q    Okay.  And what were the actual hours of
14   work?
15        A    Generally, we would start 9:00 through 5:00.
16        Q    Okay.
17        A    And we have all mornings since that 9:15.
18        Q    Okay.  Were those every day?
19        A    Yes.
20        Q    Okay.  And that was the entire group every
21   day?
22        A    Yes.
23        Q    Okay.  So moving on from that line of
24   questioning, so in fall of 2022, do you remember how
25   many cases that your team was handling per day?  Like,

Page 17

1    how many were they receiving per day?
2         A    The fall -- it's pretty tricky because
3    anytime we have a change of season, the time change, we
4    don't have as much sunlight, so we get cameras going
5    off, I guess, before sooner than normal.  So at some
6    point, we were probably seeing close to 500 cases a
7    day.
8         Q    Okay.  And that would've been true as the
9    fall of 2022?
10        A    Correct.
11        Q    Okay.  What about fall of 2023?
12        A    It was pretty much the same throughout.
13        Q    Okay.  So are you saying that 500 a day is
14   the average amount of cases that your team would
15   receive, or...
16        A    I'm not -- I can't recall exactly, but I do
17   know it was a very high volume of cases.
18        Q    Was it always a very high volume of cases?
19        A    No.  It was particularly so whenever the
20   season changed --
21        Q    Okay.
22        A    -- when we have the time change.
23        Q    And what months during the year would that
24   be?
25        A    So generally from November through March.

Page 18

1  Q   Okay.  From the entire period of November to
2  March?  Or are you saying that November and March are
3  times where they specifically (inaudible).
4         MR. KEATING:  Object to the form, vague.
5     A   Whenever the sun goes down early, it would
6  just be -- and it is cold, especially in the north, we
7  have a lot of cameras that were going off white.  So
8  it's -- it was all based on season.
9  BY MR. REID:
10    Q   Gotcha.
11        So let's talk about the other period of the
12  year, so March to November.
13        How many cases on average would you have
14  estimated that your team received per day to solve
15  during that time?
16    A   To be fair, I cannot recall those numbers.
17    Q   Okay.  But you just said 500 being the
18  average amount for the other time period, right?  You
19  don't have any guess as to what the amount might be for
20  the March to November period?
21    A   It was less.
22    Q   Okay.  Well, how much less, like a hundred
23  cases less, 150, 200?
24    A   I don't recall how many cases, obviously.
25    Q   Okay.  Would it be significantly less or

Page 19

1  around the same?
2         MR. KEATING:  Object to the form, asked
3     and answered.
4         MR. REID:  It has not been answered.
5     A   It would be less.  It would be significantly
6  less.
7  BY MR. REID:
8     Q   Okay.  All right.  Do you recall how many
9  cases individuals on the team were expected to solve
10 per day?
11        MR. KEATING:  Object to form.  Vague as
12    to time.
13 BY MR. REID:
14    Q   As of November 2023?  Let's go with that.
15    A   Nothing changed.  We were still doing --
16 everyone was expected to process at least 85 cases per
17 day.
18    Q   At least 85?
19    A   Yes.
20    Q   Okay.  You said nothing changed.
21        So is that true for the entirety of the time
22 you worked at Flock, there was 85 cases a day?
23    A   No.  I mean, we worked in a quite dynamic
24 environment, so when it comes down to expectations,
25 they were always written up and presented to the group,

Page 20

1  and then we decide based on the case volume what we
2  could handle.
3     Q   Okay.  And would you do that -- I think you
4  called them the daily syncs.
5         Would you do that in those meetings?
6     A   We would review -- yes, we would review what
7  was in the expectation of daily syncs.
8     Q   For that day or were there ever times where
9  you -- well, let's do this first, for that day, right?
10    A   No.  It was never changed on the fly upon a
11 daily basis.
12    Q   So how often would you all go and look at,
13 okay, this is what we've got going on, this is what we
14 need to focus on in the daily syncs?
15    A   Every morning -- every day, we'd essentially
16 figure out where could we make the most impact because
17 when it comes out to the winter cameras, cameras in
18 November to March, a lot of times we couldn't do
19 anything with those cameras.  So we were pretty much
20 just banking them, or put them in a queue by
21 themselves.
22    Q   Okay.
23    A   So the focus was always the core cameras that
24 we could still, I mean, have an impact on.
25    Q   But -- so what I'm trying to get to is,

Page 21

1  specifically with a requirement of 85 cameras a day,
2  right, would -- how often would you reevaluate, okay,
3  should it be 85 cameras a day, or should it be
4  something else?
5     A   Eighty-five was pretty much the general
6  standard.  It -- because the deal was just based on
7  your workload, you could -- some people work a lot
8  faster than some, so that was the average that everyone
9  agreed upon.
10        So if you worked -- the expectation was, if
11 you were done with your queue, if your queue didn't
12 have 85 cameras -- because what we had, we had
13 different alarm reasons for each case, and if your
14 queue was done, if you're done working your queue, then
15 the expectation would be just to move on, and you'd
16 start working on -- and that's what we had our syncs.
17 We're our talking about what would be the next big
18 impact that we could make in keeping these cameras
19 collecting evidence.
20    Q   Got it.
21        Okay.  And you mentioned earlier that there
22 are some cameras during the winter months you just
23 can't do anything with at all, and you put them
24 somewhere.
25        What did you mean by that?

Page 22

1    A   So we -- I mean, we determined that it is
2  suffering from just a lack of sunlight.  So we would --
3  we actually had a queue where we just -- had -- we just
4  put those cases inside that queue so they would not
5  keep alarming, so they would not get new -- actually a
6  new case created for that same camera.
7    **Q   And what was the plan for those cameras, that**
8  **another team would take care of it or that they would**
9  **just -- you'd just wait to fix those or that -- like,**
10  **what would happen with them?**
11    A   So it was an effort between, I guess, boss
12  working with ops, working with engineering to see how
13  good they come back, I guess, winter cameras.  So --
14    **Q   So for some queues, maybe -- so you guys put**
15  **a camera into a queue, you realize you can't fix it,**
16  **and it goes to another queue?**
17    MR. KEATING:  Object to the form,
18    misstates prior testimony.
19    You can answer to the extent you can.
20    A   It did not go to another team.  We had a
21  tier 3 person.  That person would try to determine and
22  categorize most cameras and actually give a report to
23  the engineering team on what we believe were the
24  categories of why these cameras were going offline.
25  BY MR. REID:

Page 23

1    **Q   And then what would the engineering team then**
2  **do?**
3    A   As -- they had a myriad of things that they
4  were trying to keep these cameras online.  So we had so
5  many cases that I am not privy to everything that they
6  were doing on the engineering part.  We have all the
7  (inaudible).  There's so much in this country --
8    MR. KEATING:  Let him finish the
9    question, Patrick.
10    MR. REID:  Yeah, I thought he was done.
11    So -- but in general, they would take
12    that report and try and fix those cameras,
13    correct?
14    THE WITNESS:  I don't think they could
15    do an individual fix because of how many
16    cameras it was.  But they were trying to
17    analyze them, figure out, I mean, do we need
18    bigger batteries, do we need heaters.
19    So it was being analyzed and all this
20    stuff, but no one was individually fixing
21    those cameras.  We looked at individual
22    devices.  When we elevated it, we're giving
23    them a report so that they could try to fix a
24    batch of cameras instead of just one.
25  BY MR. REID:

Page 24

1    **Q   Got it.  Okay.  That clears that up.  Thank**
2  **you.**
3    **Were there times that the team didn't receive**
4  **enough cases for everyone to do 85 cases a day?**
5    A   It's been -- in the summer months, yes,
6  sometimes we would.
7    **Q   Okay.  Did that only happen in the summer**
8  **months?**
9    A   Generally, yes.
10    **Q   Okay.  So it could have happened at other**
11  **times as well?**
12    A   It could have.  So systems are quite dynamic
13  in a sense that you can -- based on engineering,
14  turning on and off alarms, you could get more from
15  these cases.
16    **Q   Got it.**
17    **Okay.  And do you remember what Jhostin**
18  **Quinones' position was on the team, what his actual --**
19  **his title was?**
20    A   He was a --
21    MR. KEATING:  Objection as to time.
22  BY MR. REID:
23    **Q   At the time of his termination.**
24    A   Device support engineer 2.
25    **Q   Okay.  What is a device support engineer 2?**

Page 25

1    A   Okay.  So they were allowed to do more --
2  they could actually (inaudible) role, meaning they
3  would have the field ops team, they would create a work
4  order to have field ops team remove that camera and
5  replace them essentially.  So -- and they were also
6  allowed to actually make adjustments to the cameras as
7  well.
8    **Q   Okay.  And what is the difference between a**
9  **device support engineer 2 and device support**
10  **engineer 1?**
11    A   So generally, would not -- we did not want
12  engineer 1s to actually be truck rolls.  We wanted
13  people with work experience to actually -- because that
14  was one of the big things that we had.  We had way too
15  many truck rolls.
16    So we try to limit that by having the tier 2
17  people actually the truck rolls.  So tier 1, they were
18  more -- visually see what was going on.  They could
19  apply certain fixes, but in most cases, they would pass
20  that on to tier 2 if they needed it.
21    **Q   Okay.  You keep using this term, "truck**
22  **roll."**
23    **Could you explain what that is?**
24    A   So a truck roll is when our work order is
25  created to purchase a camera that cannot fix remotely.

Page 26

1    Q    Got it.
2         Okay.  And so a support engineer 2 generally
3    has more responsibility than a support engineer 1,
4    correct?
5    A    In the grand scheme of things, it should have
6    been, but it was not.
7    Q    What do you mean by that?
8    A    We had engineer 1s that were doing pretty
9    much the same level of work as engineer 2.
10   Q    Okay.  And I think you talked about this a
11   little bit earlier, but there's also a device support
12   engineer 3, right?
13   A    Correct.
14   Q    And what are any differences between that
15   role and the other roles besides them providing these
16   reports that you talked about for the engineering team?
17   A    So, yeah, engineer 3, it was if 2 that was --
18   if 2 did not know what to do with his camera, and they
19   still believed that it could have been fixed remotely,
20   that they would have passed it to engineer 3.  But also
21   engineer 3, they were the ones that were liaisoned with
22   engineer 2 to kind of, like, get an idea of what was
23   happening to groups of cameras and pass that
24   information on to engineers.
25   Q    Okay.  Do you know someone named Alex Garber?

Page 27

1    A    Yes.
2    Q    What team was he on?
3    A    He was on the customer success team.
4    Q    Okay.  What does that team do?
5    A    So customer success, they actually interact
6    directly with the customers.
7    Q    Okay.
8    A    So -- yeah.
9    Q    So -- no.  Go ahead.  You are done.
10   A    No.  The customer who owns the camera, they
11   are the ones who speak with the customer.  We never
12   spoke with customers.
13   Q    Okay.  So if, like, a customer complains or
14   has an issue, they bring it to the -- that team?
15   A    Correct.
16   Q    Okay.  Do you know what a Jira ticket is?
17   A    Yes.
18   Q    What is that?
19   A    That was how we actually liaison with
20   engineers.  So any engineer -- anything that we wanted
21   to pass up to an engineer, we would create a Jira
22   ticket for it.
23   Q    And then it would be sent to them, and they
24   would see it, correct?
25   A    Correct.

Page 28

1    Q    Okay.  Was there any ever -- was there ever
2    any issues with the Jira system actually functioning?
3    A    I don't recall.
4         MR. KEATING:  Object to form.
5         You can answer.
6         THE WITNESS:  I don't recall there ever
7    being one.
8    BY MR. REID:
9    Q    Okay.  So there was never a time where
10   someone said, hey, you know, I believe I supported
11   this -- you know, submitted this Jira ticket.  Is
12   someone not seeing it?  And then, you know, some other
13   team had to get brought on to try and figure out what
14   was going on with the Jira system?
15   A    I don't remember.
16   Q    Okay.
17   A    I don't remember it having an issue.
18   Q    Got it.
19        What does putting a hold on a camera do?
20   What does that mean?
21   A    Putting a hold on the camera?
22   Q    Yeah.  I've seen that term used throughout
23   some documents.
24   A    It would be putting a hold on the case, but
25   not on the camera.

Page 29

1    Q    Okay.  Got it.
2         So what does putting a hold on a case mean?
3    A    When you put a case on hold, you prevent it
4    from actually alarming again, creating a new case.
5    Q    Okay.  And there could be legitimate reasons
6    to do that, right?
7    A    Right.
8    Q    And so one of the reasons maybe could be,
9    I've sent it to that engineering team.  They're working
10   on it, right?
11   A    Yes.
12   Q    What could some other reasons be?  Can you
13   think of any other reasons why someone might put a hold
14   on a camera, legitimately?
15        MR. KEATING:  Object to form.
16   A    You said case, not camera?
17   BY MR. REID:
18   Q    Sure.  Case hold.
19        Is there any other reason why someone would
20   put a case hold that's legitimate that you can think
21   of?
22   A    You could -- we put cameras on hold if we
23   believe that we could fix that camera remotely.  We
24   could put that case on hold.
25   Q    Okay.  So then you're saying we're working on

Page 30

1    it, we're going to put it in hold while we work on it,
2    and then, you know, once you apply the solution, then
3    you might turn it off, or take it off hold?
4         A    Correct.
5         Q    Okay.  Got it.
6              So is it typical that once you start looking
7    at a camera and trying to fix it, you put it on a hold?
8    Or, sorry, once you start looking at a case, and you're
9    going to apply a solution and you apply a solution,
10   that you put a case on a hold at some point during that
11   process?
12             MR. KEATING:  Object to the form.
13        A    Yes, that is correct.  You -- it is general,
14   especially cameras that were on the case type,
15   disappearing cameras, or uptight.
16   BY MR. REID:
17        Q    Okay.
18             MR. KEATING:  Can you let him finish
19        his answer, Patrick?  You keep interrupting.
20             MR. REID:  He's talking.
21             MR. KEATING:  He's not finished.  He
22        keeps talking and you keep interrupting and
23        talking with him.
24             Omar, please feel free to finish your
25        answer before he interrupts.

Page 31

1    BY MR. REID:
2         Q    Yeah.  Mr. Lodge, when I say, like, okay, or
3    say, mm-hmm, I'm just -- I mean, that's just what I'm
4    doing when I talk and I listen to someone.  I'm not --
5         A    Okay.
6         Q    -- trying to interrupt you, and I want you to
7    finish all of your answers.
8         A    Yes.  So you could -- generally, if the
9    camera was collecting evidence, if it was still
10   collecting evidence, but it was not doing so
11   efficiently, we would keep -- we couldn't put that
12   camera on hold.  That (inaudible), essentially.
13        Q    Okay.  Who is Brian Barnard?
14        A    I reported to Brian Barnard.
15        Q    And what teams is he over besides -- well,
16   he's over your team, he was over your team at the time
17   of -- in November 2023, correct?
18        A    Correct.  Yes.
19        Q    What other teams was he over, if any?
20        A    Brian was also over the tech line team
21   earlier, I guess, the late part of '23.  Well, not --
22   the early part of '23, the late part of '22.
23        Q    Okay.  Did you say tech line team?
24        A    Correct.
25        Q    Okay.  And what does that team do, if you

Page 32

1    know?
2         A    So tech line, they interacted with the field
3    technicians that were actually executing the work
4    orders.
5         Q    And those would be the people that go out to
6    actually retrieve cameras?
7         A    Correct.
8         Q    Okay.  Okay.  Okay.  I want to talk to you
9    for a second about Mr. Quinones's termination.
10             Do you remember the circumstances surrounding
11   Mr. Quinones' termination?
12        A    Yes.
13        Q    Okay.  And do you recall that around that
14   time, he had objected to you about how you were telling
15   him to present himself on camera, both in a group
16   meeting and in a one-on-one with you?
17        A    Look, I guess I don't understand your
18   question.
19        Q    Sure.
20             Well, do you remember during -- around the
21   time of his termination, there was a group meeting with
22   you where he had questioned you to some degree about
23   why he needed to be in a specific position in his
24   camera frame?
25        A    I'm really sorry.  So I'm going to tell you

Page 33

1    everything that happened, how this happened because I
2    really did not -- it was not that big of a deal for
3    Jhostin to -- for us to be here today.  I am very
4    shocked that what happened in that meeting has us here
5    today because that was not the reason behind Jhostin's
6    termination.
7              When we started the meeting, Jhostin was not
8    in frame.  Yes, you could see his shoulder.  And it was
9    said -- I mean, I mentioned, Jhostin, you're not in
10   frame.  I mean, but beyond that meeting, when we still
11   started, everyone was given their own needs.  Everyone
12   was contributing as normal.  When it was Jhostin's turn
13   to speak, I was like, it would be nice, Jhostin, if you
14   would be in frame.
15             And Jhostin was like, how does this affect
16   our productivity?  And beyond that, he was just like, I
17   can't do this right now.  We can talk about it in our
18   one-on-one.  And he dropped off the call.  That was the
19   extent.  So for us to be here, I am still shocked that
20   it was never a big event.  We went on with our daily --
21   with our day like normal.
22        Q    Okay.  Do you remember before his
23   termination, hearing that he had had contact with HR
24   about that situation?
25             MR. KEATING:  Object to the form.

Page 34

1    A    I -- yes, I heard that he had reached out to
2  HR.
3  BY MR. REID:
4    Q    Okay.  From who?
5    A    I don't recall.
6    Q    Was it possibly Laura McCormick?
7    A    More than likely, yes.
8    Q    Okay.  And we'll go through some documents
9  that might refresh your memory in a little bit.
10        But what do you remember about hearing about
11  Jhostin going to HR about the situation that had
12  occurred?
13    A    Jhostin went to HR and he was complaining
14  about being on video.  And that was the very first time
15  I ever heard Jhostin mention that he did not want to be
16  on video.  Because we created an expectation document
17  for the entire group, and everyone was fine with that
18  document.  At no point Jhostin said, I don't want to be
19  on camera.
20    Q    Okay.  Do you recall -- we'll look through
21  that later.
22        What was your involvement in Mr. Quinones's
23  termination?
24    A    I was in the meeting and I read the script
25  that was given to me, and that was pretty much it.

Page 35

1    Q    Okay.  When I say "termination," I kind
2  of -- I guess I mean it more generally.  So I also mean
3  like in terms of the discussion about if Jhostin was
4  going to be terminated, like, when that decision was
5  made.
6        Were you a part of that process?
7    A    So just -- the talks of Jhostin's termination
8  did not start in November.  We were talking about this
9  in February, in March.  Because the interaction with
10  Jhostin, Jhostin was a very difficult employee to
11  manage.  Jhostin did not want to work.  And we -- I
12  mean, now, tried to coach Jhostin to actually do the
13  work.  But Jhostin didn't want to -- he didn't want to
14  do the work.
15    Q    Okay.  Well, do you remember sending him an
16  e-mail about 30 minutes to an hour after the group
17  meeting where he logged off, where you told him that
18  you believed that he could work through these problems
19  with him?
20    A    Yes.
21    Q    Okay.  And why did you say that -- well,
22  we'll go through that e-mail in a little bit more
23  detail later.
24        But in terms of actually the discussions in
25  November around whether Mr. Quinones should be

Page 36

1  terminated, did you have involvement in that?
2    A    Yes.  Because Jhostin was definitely our
3  lowest performer.  I wanted Jhostin terminated even
4  before November.  So the mere fact Jhostin was being
5  disrespecting -- disrespectful to the entire group, not
6  just -- I mean, he was not affecting me.  I had group
7  members that did not want to work in certain cases
8  after Jhostin touched them because -- so he was
9  affecting the group, not me.
10    Q    Sure.
11        I'm just trying to get -- were you involved
12  in those conversations around whether Jhostin should be
13  terminated in November of 2023?
14    A    I was asked if he should -- I mean, everyone
15  knew my perspective that Jhostin should, yes, he
16  needed -- he should have been terminated a while ago,
17  yes.
18    Q    Okay.  Why was he not terminated a while ago?
19    A    Because we tried to coach Jhostin before.  We
20  tried everything we could do, and he would improve and
21  then he would fall back off.  But Jhostin's attitude
22  was the thing that we could not fix.
23    Q    Okay.  And the impetus for the conversations
24  in November was what happened in the meeting, the group
25  meeting in -- with Jhostin and then in the one-on-one

Page 37

1  with you later, right?
2    A    So in the one-on-one, we really did not
3  communicate well.  He was just like -- Jhostin pretty
4  much just said -- I don't know if he was just having a
5  bad day or what, but we did not even exchange
6  two sentences before he fell off that call.  I don't
7  even remember the extent of what we spoke about in that
8  call because he was just not having any face-to-face
9  with me that day.
10    Q    But those two interactions were the impetus
11  for starting the discussions that resulted in Jhostin's
12  termination, right?
13        MR. KEATING:  Object to the form,
14    already answered.
15        You can respond to the statement if you
16    understand the question.
17    A    So Jhostin stopped showing up to our meetings
18  afterwards.  I mean, I did not see Jhostin any at all
19  again.  I mean, I would send Jhostin a message.  I
20  would not get a response.  So at that point -- I mean,
21  he reports to me.
22        So you ask me, what do I do with this
23  employee?  I would say, I've already laid out the
24  paperwork to say this guy is not doing the work.  So
25  from my point of view, Jhostin needed to be terminated,

Page 38

1  seeing that he was no longer reporting to me.
2  BY MR. REID:
3     Q    Sure.
4          But what I'm asking, though, is that the
5  impetus for that kicking off in November was the
6  interactions that you had with Jhostin in the
7  one-on-one in the group meeting, right?
8          MR. KEATING:  Object to form.
9     A    No.  No.  That was a straw on the camel's
10 back, but the straw was already stacked.
11 BY MR. REID:
12    Q    Sure.  I understand that -- go ahead.  Sorry.
13         MR. KEATING:  Let him finish his answer,
14    please.
15         MR. REID:  Adam, there's a lag on Zoom.
16    I can't do anything about that.
17         MR. KEATING:  It's not my fault you're
18    not here in person.  You're living in
19    Atlanta, come on down.  But give him a chance
20    to answer the question.  If you need to pause
21    from it, that's fine, and he can answer the
22    question.
23         MR. REID:  Go ahead, Mr. Lodge.  Go
24    ahead, if you're not done.
25    A    I would never say that the disrespect that we

Page 39

1  saw in that meeting was the reason for Jhostin's
2  termination.  If that's what you want me to do, if
3  that's where you're trying to go, that was never the
4  reason for Jhostin's termination.  Jhostin was
5  terminated because he was the lowest performer in that
6  group.  Jhostin did the bare minimum.
7          I mean, we had tier 1 people doing more work
8  than he was.  I mean, we had people in the group,
9  everyone knew Jhostin was just skipping by.  So I --
10 BY MR. REID:
11    Q    I think there might be a misunderstanding
12 about what I'm asking you here.  I think that you kind
13 of answered it in your answer to the question, but you
14 said the straw that broke the camel's back was what
15 happened in those two meetings, right?
16         MR. KEATING:  Object to the form.
17    A    The straw that broke the camel's back is
18 Jhostin.  He was no -- nonresponsive after that
19 meeting.  As you said, you asked me.  I sent him an
20 e-mail saying -- well, we've always worked through
21 things.  That's what normal-thinking people do.  We
22 process and we work through.  Jhostin, he shut that
23 door completely after that meeting.
24 BY MR. REID:
25    Q    And when you say "that meeting," you mean the

Page 40

1  one-on-one with you, right?
2          MR. KEATING:  Object to the form.
3     A    That day.  Because as I said, I can't say we
4  had a one-on-one.
5  BY MR. REID:
6     Q    Okay.  And did you ever ask HR, like, Why is
7  Jhostin not communicating with me?  Do you know why?
8     A    No.  I never -- I mean, I never asked HR why
9  Jhostin wasn't communicating with me.
10    Q    And did HR ever interview you about what had
11 happened the day of the one-on-one and the team meeting
12 where Jhostin logged off?
13    A    Yeah.  I mean, we spoke about it.
14    Q    Okay.  In what context?  In a meeting with
15 others?  Just between you and one other person?
16    A    I can't recall exactly.  But I know we spoke
17 about it.
18    Q    And what do you remember being spoken about?
19    A    Just the way -- the natural progression of
20 how things happened.
21    Q    Sure.
22         Did anyone ever provide you with Jhostin's
23 perspective of what had happened?
24    A    I -- no.  No, I was never really informed
25 that Jhostin was -- I mean, not comfortable with me on

Page 41

1  camera.
2     Q    Well, you seem to know that now.
3          So how did you find that out?
4     A    When this lawsuit was filed.
5     Q    Okay.  So who was the person that actually
6  made the decision to terminate Mr. Quinones?
7          MR. KEATING:  Object to the form.
8          If you know, you can answer.
9     A    I mean, I know I reported to Brian Barnard.
10 So I know we had -- I had conversations with Brian.  I
11 had conversations with HR.  And the decision was made.
12 BY MR. REID:
13    Q    But you're not the one that made the
14 decision, right?
15    A    No.  I might have been a part of it, but I
16 didn't make that decision.
17    Q    Okay.  But you recommended to whoever made
18 the decision -- well, do you know who made -- you don't
19 know who made the decision?
20         MR. KEATING:  Object to the form.
21    A    I have been recommended since earlier that
22 year that Jhostin be terminated.
23 BY MR. REID:
24    Q    Sure.
25         And you, again, in November, recommended that

Page 42

1  he be terminated, right?
2      A    Correct.
3      Q    Okay.  And do you know when the decision --
4  when exactly the decision to terminate Mr. Quinones was
5  made?
6          MR. KEATING:  Object to the form.
7      A    I don't.
8  BY MR. REID:
9      Q    Okay.  Do you know who made the script in the
10 meeting that -- so you referenced a script earlier.
11 You -- and you're talking about a script that you used
12 during the meeting where Jhostin was terminated, right?
13     A    Yes.
14     Q    Do you know who wrote that?
15     A    I got a script from HR.
16     Q    Anyone in particular?
17     A    Laura McCormick.
18     Q    All right.  I'm going to share with
19 you a document.  Give me one second.
20          MR. KEATING:  Before you do that,
21     Patrick, I'm going to -- since there's no
22     question pending, I'm going to take a quick
23     bathroom break.  I had a lot of coffee this
24     morning.
25          MR. REID:  Sure.  Yeah.  No problem.

Page 43

1          (Whereupon, a brief recess was taken.)
2  BY MR. REID:
3      Q    All right.  Mr. Lodge, so we just had a
4  break.
5          Did you talk to anyone about your testimony
6  during that break?
7      A    No.
8      Q    Okay.  And I want to go back to the Southern
9  States, LLC.
10         So you said that they were reaching out to
11 you and basically begging you to come and join them,
12 right?
13     A    Yes.
14         MR. KEATING:  Object to form.
15 BY MR. REID:
16     Q    I don't know what exactly you said, but they
17 were asking you to come and work for them?
18     A    Yes.
19     Q    Okay.  So who was doing that from Southern
20 States?
21     A    So I've worked in that department previous to
22 coming to Flock.  Alex Bradford, she's the national
23 sales manager there.
24     Q    Okay.  And so she was asking you to come --
25 when did she start asking you --

Page 44

1      A    She wasn't asking.
2      Q    When did she start asking you?
3      A    Alex Bradfish.
4      Q    Bradfish.
5          Okay.  And so when did she -- you said that
6  there was a period kind of in 2022 or early 2023, I
7  guess, where they had asked you -- and I don't know
8  what you did with that, but then there was another
9  period later on where they then came back to you,
10 right?
11     A    Correct.  Yes.
12     Q    When would they have come back to you in late
13 2023?
14     A    I was -- I never stopped communicating with
15 them when it comes on to them because they were my
16 previous employee, but Alex said that they had another
17 opening within the sales department because they were
18 growing, and if I wanted to come back, me, being the
19 second salesperson they hired, because they had filled
20 the first position a year before, me, being the second
21 salesperson, would be greatly beneficial to come in in
22 this new adventure with them, so --
23     Q    And do you remember around when she would
24 have told you that?
25     A    You keep saying she; it's a he.

Page 45

1      Q    Oh.  Alex Bradford [sic].
2      A    Alex is not -- it's a he.
3      Q    Correct.  Okay.  Sorry about that.
4          Do you remember when he would have contacted
5  you to tell you that there was a position open?
6      A    So the position -- they knew the position was
7  always going to be open, and we started seriously
8  saying in September that the end of the year -- at
9  first I was asking, Could we go until March of 2024?
10         And he said, no, we are looking for someone
11 sooner than March of 2024.
12     Q    Got it.
13         Were those communications via e-mail, phone?
14     A    No.  Alex used to live five minutes from me,
15 so we would actually meet.
16     Q    So there won't be any e-mails that
17 say -- from Alex to you saying, Hey, we've got this
18 kind of like opening and all this stuff, right?
19     A    No.
20     Q    Okay.  Gotcha.
21         Okay.  So you also were talking before the
22 break kind of about how people on the team were having
23 issues with Mr. Quinones.
24         Can you tell me about when that started?
25 When did people on that team decided to -- start to

Page 46

1   have issues with Mr. Quinones?
2       A    Sorry.  So the team was small.  I would say
3   when it comes out to the end of '22, when we were
4   actually, I guess, a part of tech line, we were
5   supposed to be, I guess, the next level.  If tech line
6   was having an issue with a device to create value for
7   our team, we volunteered to offer help to tech line.
8   So -- and then what we did, we therefore decided that
9   we would have different people assigned to -- I mean,
10  to help tech line at certain times.
11       And that was primarily when we started
12  getting feedback because whenever they needed --
13  whenever Jhostin was assigned to be the person to help
14  tech line, he would be very slow at being responsive.
15  So -- and then I knew if Jhostin was supposed to be the
16  person that was helping tech line at it, just being
17  available, I had to make sure I was available because I
18  know they would not be able to get him together --
19       Q    Sorry.  Go ahead.
20       A    So, yeah -- so we're talking all the way back
21  to, I guess, last -- I mean, the '22, when we took on
22  tech line, which was the fall, the winter season of
23  2022.
24       Q    Okay.  And was the tech line, was it on a
25  rotational basis?

Page 47

1       A    When it comes to device support and tech
2   line, yes, it was on a rotational basis.
3       Q    Okay.  And so what -- but I think the
4   question I had asked you earlier is people on your
5   team, when did you start finding out that people on
6   your team had issues with Jhostin?
7       A    So -- and this goes back to -- I mean, back
8   in '23, February, March.  So the way things work is we
9   had QA deployment, QA deployment mentions.  So whenever
10  a customer success team would get a call from a
11  customer stating that something was wrong with their
12  device, they would mention -- our team, they would do a
13  general mention.
14       And on specific days, we had a specific
15  engineer that was supposed to take care of all those QA
16  deployment mentions on top of handling their queue.
17  And then the person who worked after Jhostin would say,
18  I don't know what he does, but all I know is that I
19  have a bunch of QA deployment mentions every day after
20  Jhostin was on rotation to take care of those mentions.
21       Q    Okay.
22       A    That was the first -- that was when it was
23  evident that Jhostin was not even -- not taking care of
24  the people he was supposed to be taking care of.
25       Q    And that would have started, I believe, in

Page 48

1   early 2023?
2       A    Correct.
3       Q    Okay.  Okay.  All right.  So I'm going to
4   show you the document now.  Okay.  I'm going to mark
5   this as Exhibit 1.
6       And this is a script, I guess, we've talked
7   about.  It's Flock --
8       A    What's the Bates number?
9       (Whereupon, Plaintiff's Exhibit No. 1
10      was marked for identification.)
11  BY MR. REID:
12       Q    Flock 64.  And whenever I show something, if
13  it has a Bates on it, I'll go ahead and read it.
14       A    Okay.
15       Q    Just for record purposes.
16       Okay.  Can you see this document?
17       A    Yes, I can.  I can.
18       Q    Okay.  Do you -- what is this?
19       A    So this was -- that verbiage was what I said
20  to Jhostin when we met him to -- at his separation
21  meeting.
22       Q    Okay.  And so you told him during his
23  separation meeting that, We've made some tough business
24  decisions to eliminate one of the device support
25  engineer 2 positions on our team, right?

Page 49

1       A    Yes, that's what the document states.
2       Q    Okay.  And you read that, correct?
3       A    Yes.
4       Q    And then you also told him that as a
5   result -- it's not verbatim, I'm not reading it
6   verbatim now.  But as a result of that decision to
7   eliminate one of the device support engineer 2
8   positions, that Justin's position was being eliminated,
9   correct?
10       MR. KEATING:  Object to form.  The
11       document speaks for itself.  Asked and
12       answered.
13       A    Yeah.  His position was being
14  eliminated, correct.
15  BY MR. REID:
16       Q    Okay.  Okay.  That's fine.
17       Okay.  And I'm now going to show you another
18  document.  So let me stop sharing my screen for a
19  moment here.  Well, I think I can probably just do
20  this.
21       Well, let me stay here for a second.
22       Did you and Laura McCormick have a meeting
23  before you went into Jhostin's termination meeting
24  about this script?
25       A    Yes.  We spoke about what was going to be

Page 50

1  said, and that's why a script was made because we
2  weren't just -- I wasn't just going to go into that
3  meeting not knowing exactly what to say.  So it was
4  written down so I could focus on exactly the words that
5  needed to be said.
6     Q    Okay.  Did you write the words, or did
7  someone else write the words?
8     A    That was -- we -- that was from Laura.  That
9  e-mail, that is from Laura.
10     Q    Okay.  Got it.
11     All right.  So I'm going to take you to
12  another exhibit, which I will mark as Exhibit 2.
13     And this is Bates-stamped Flock 65.
14     And you see here, again, like the last
15  document we looked at, this termination reason,
16  position eliminated, correct?
17     MR. KEATING:  Object to the form.
18     If you've seen this document, you can
19    answer to the extent that you have any
20    information or knowledge about this document.
21     (Whereupon, Plaintiff's Exhibit No. 2
22    was marked for identification.)
23  BY MR. REID:
24     Q    Well, I'll represent to you, Mr. Lodge, that
25  this is -- it seems to be part of some e-personnel file

Page 51

1  for Mr. Quinones, and this is one of the, I guess,
2  pages on that personnel file.
3     Do you recognize this at all?
4     A    No, I do not.
5     Q    Okay.  But on here, it says, Termination
6  reason, position eliminated, correct?
7     MR. KEATING:  Object to the form,
8    document speaks for itself.  He's already
9    testified he has never seen this document
10    before.
11     MR. REID:  Well, that's okay.  I'm just
12    asking what's on the document.
13     MR. KEATING:  He's never seen this
14    document before.  He's a potted plant [sic].
15     MR. REID:  It's a deposition, not a
16    trial, so your objection is reserved.
17     All right.  Mr. Lodge, but on here, it
18    says, Termination reason, position
19    eliminated, correct?
20     MR. KEATING:  Object to the form,
21    document speaks for itself.
22     You can read the document, if you'd
23    like.
24     THE WITNESS:  It says "eliminated."
25    Correct.

Page 52

1  BY MR. REID:
2     Q    Okay.  And it says, Last day of work,
3  November 8th, 2023, right?
4     MR. KEATING:  Object to the form,
5    document speaks for itself.
6     If you wanted to read the document, you
7    can.
8     MR. REID:  Well, there's a question
9    that's coming after this, Adam, that might be
10    relevant, that he might have knowledge of,
11    which is why I'm having him read this, but
12    thank you.
13     All right.  So, Mr. Lodge, it says,
14  Last day of work, November 8th, 2023, right?
15     MR. KEATING:  Same objection.
16     THE WITNESS:  Correct.
17  BY MR. REID:
18     Q    And that -- do you remember that as being
19  Mr. Quinones' last day of work?
20     A    As far as I can recall, yes, that is correct.
21     Q    Okay.  And so this information could be
22  related.  It looks like it appears to be Mr. Quinones,
23  correct?
24     MR. KEATING:  Object to the form.
25     A    What was that?  Pardon me.

Page 53

1  BY MR. REID:
2     Q    This information, it appears, then, could be
3  talking about Mr. Quinones's termination.  It could be
4  description details of Mr. Quinones's termination.
5     A    I don't know because I've never seen this
6  document before.
7     Q    Okay.  Fair enough.  Yeah.  I mean, that's
8  fine.
9     All right.  So I'm going to show you another
10  document.  I'm going to mark this as Exhibit 3.
11     Do you recognize what this document is,
12  Mr. Lodge?
13     A    I do not.
14     (Whereupon, Plaintiff's Exhibit No. 3
15    was marked for identification.)
16  BY MR. REID:
17     Q    Have you ever seen one of these before?
18     A    I have not.
19     Q    Okay.  So what this is -- and by the way,
20  this is -- I don't think this says Bates.  Oh, no,
21  there it is.  It's Flock 17, Bates.  So this is what's
22  called a "separation notice," Mr. Lodge.  And so the
23  employer fills this out when they terminate an
24  employee.  And so I would assume that, since you've
25  never seen this document before, you didn't fill it

Page 54

1  out, right?

2      A    That is correct.

3      Q    Okay.  And you see that the employee's name

4  on this separation notice is Jhostin Quinones, right?

5  Or Jhostin Nunez?

6      A    Correct.

7      Q    And do you understand Jhostin Nunez to be

8  Jhostin Quinones?

9      A    Yes.  Yes, he does have that name, as well.

10     Q    Okay.  And you'll see it says, Period of last

11  employment from 6/21/2021 to 11/08/2023.

12         Do you recall that those were the dates of

13  Mr. Quinones' employment with Flock, Inc.?

14     A    I don't recall.  I don't know the specific

15  date he was hired, but it is in the timeline of when he

16  was hired.

17     Q    Sure.

18         And then we compare 11/08/2023 with the

19  exhibit I just showed you.  It also says 11/08/2023,

20  right?

21     A    Yes.  Yes.

22     Q    Okay.  And so the reason it's given for the

23  separation from Mr. Quinones here is -- at 4B, you

24  see -- and I can highlight it for you, it says -- well,

25  it's a bit of an ordinary document, but you can see it

Page 55

1  says, Four, reason for separation, and then it says, A,

2  lack of work, and there's a box that's not checked, and

3  then it says, B, if other than lack of work, state

4  fully and clearly the circumstances of the separation.

5  And it says, Position elimination, correct?

6         MR. KEATING:  Object to the form, the

7      document speaks for itself.

8      A    That's what the document states.

9  BY MR. REID:

10     Q    Okay.  Okay.  Now, I'm going to show you

11  another document, which I will mark as Exhibit 4.  Give

12  me one second.

13         Have you ever seen one of these documents

14  before?

15     A    I have not.

16         (Whereupon, Plaintiff's Exhibit No. 4

17      was marked for identification.)

18  BY MR. REID:

19     Q    Okay.  Do you know -- I'm going to scroll to

20  the bottom right here and zoom in for you.  One second.

21  So, this.  Oh, by the way, this is Bates Flock 19.

22         Do you know what Unemployment Solutions Inc.

23  is?

24     A    I do not.

25     Q    Okay.  And so you didn't fill out this

Page 56

1  document, correct?

2      A    That is correct.

3      Q    And it, again, says that the reason for

4  Jhostin Quinones's termination is position elimination,

5  device support engineer 2, right?

6         MR. KEATING:  Object to the form, the

7      document speaks for itself.

8  BY MR. REID:

9      Q    Have you ever seen this document?

10     A    Probably better asked by another company.

11     Q    Sure.  Yeah.  Yeah.

12     A    The document says position elimination.

13  Correct.

14     Q    Okay.  And so in all four of the documents

15  that we just looked at, the script and then the other

16  three documents, they all say that the reason for

17  Justin being terminated is that the position was

18  eliminated, right?

19     A    The documents do say position elimination.

20     Q    And so that's why Mr. Quinones was

21  terminated, right?  His position was eliminated.

22     A    His position was eliminated.

23     Q    Okay.  And were there any conversations that

24  were separate from Mr. Quinones's termination that you

25  can recall about the need to eliminate the device

Page 57

1  support engineer 2?

2      A    We were always having conversations about the

3  size of the team.  And when it comes down to the dollar

4  figure that the team carried based on the work that

5  they were expected to do, we were always in

6  conversation whether or not we could justify supporting

7  a team of that size.  And that was from earlier in the

8  year.

9      Q    Well, so were you saying earlier in 2023,

10  there were conversations about whether your team needed

11  to downsize?

12     A    There were -- yes.  There were always

13  conversations about whether or not we needed it.  And

14  that's why my job was to make sure I could show that

15  our team was valuable.  That's why we took on

16  supporting tech line.  We took on supporting customer

17  service because people just looked at us as camera

18  babysitters.

19         So it was -- we were always in the crosshairs

20  of why is it we're paying these guys this much money to

21  just babysit cameras.  Essentially, you could have

22  gotten someone with lower skills to do some of the work

23  that we were doing.  So, yes, we were always in

24  conversation of whether or not we needed all the people

25  we had on that team.

Page 58

1    Q    Okay.  What were -- what was the content of
2  those conversations, if any, in October and early
3  November 2023?
4    A    The content of the conversation was always
5  that we could actually get this work done at a cheaper
6  paygrade.
7    Q    Okay.  And what would that cheaper paygrade
8  be?  Is it like a particular -- by which I mean -- I
9  guess that's a confusing question.
10    When I say -- when I ask that, I mean, like,
11  would it be device support engineer 1?  Would it be
12  another position that maybe hadn't been, you know,
13  invented yet?
14    A    It was actually a lower position than
15  engineer 1 because we didn't even need them to have an
16  engineering degree.  So it was actually called, like,
17  "analysts."  I could never say that right.
18    Q    Analysts?
19    A    Analysts.
20    Q    Okay.  And so what -- do you remember --
21  before these things with Jhostin happened where he hung
22  up in the group meeting and then in your one-on-one,
23  what were the conversations at that time about whether
24  the team needed to be downsized?
25    A    I mean, it was -- yeah, the team was all --

Page 59

1  as I said, Brian was always asking me to tell him how
2  can we become more efficient.  So it was always a
3  conversation.  We had one-on-ones every week.  It was
4  always a conversation to be fair.
5    Q    Okay.  And what would you have told him in
6  October 2024 when you all talked about that?
7    MR. KEATING:  Object to the form as to
8    time.
9  BY MR. REID:
10    Q    2023.  2023.  Sorry, I apologize.
11    What would you have told him in October 2023
12  about that?
13    A    I can remember in one of my last e-mails in
14  September when we stated that Jhostin would be -- he
15  would be logged off at ten, and he'd be logged off by
16  two.  And I was like, this is why his opening is so
17  low.  Can we get rid of this position now?
18    Q    Okay.  So do you know if during that time
19  period if Mr. Quinones was working outside the 9:00 to
20  5:00?
21    A    Not to my knowledge because we had no
22  discussion on working outside of normal work hours.
23    Q    And so did you ever ask him, hey, are you
24  working outside of normal work hours?
25    A    Yeah.  We had a sync every day so if you

Page 60

1  weren't -- if you were late working, you wouldn't --
2  you tell everybody in the room, I stayed up until
3  11:00 o'clock looking at nighttime cameras.
4    I mean, you must understand the culture that
5  we had.  That's why I'm really surprised by this whole
6  process.  It was a culture of communication where we
7  spoke to each other daily.  So for Jhostin -- so if
8  Jhostin had to work at night, he would have mentioned
9  it to the group, but that was never a discussion.
10    Q    Okay.  So let me ask you, so when you're
11  trying to foster an environment for your team, what
12  kind of environment are you trying to foster to create
13  a communicative environment?
14    A    I did not disturb -- I mean, I -- yes, I was
15  the person who first started this group.  I was the
16  person who was looking at cameras, so I have been in
17  the trenches.  I know exactly what they go through.
18    So for me, I was a facilitator for them to
19  actually -- so I took away every roadblock that they
20  could encounter so they could do the work, essentially.
21    Q    Did you want to foster a friendly environment
22  where everyone was friends or anything like that?
23    A    I will say that we did not work in a toxic
24  environment, so, yes.
25    Q    Sure.  And did you --

Page 61

1    A    We were friendly to each other.
2    Q    Okay.  Did you ever have conversations with
3  Jhostin during the summer of 2023 where you maybe asked
4  him, like, what his weekend plans were, anything like
5  that where he told you that he didn't really like to,
6  you know, involve his personal life and his
7  professional life together?
8    A    We -- when it comes down to it, yes, we spoke
9  about what did we do last -- over the weekend, what are
10  we doing for the holidays, yes.  We spoke about --
11    Q    What I'm asking is, did Jhostin ever say that
12  he wasn't really comfortable or didn't want to share
13  those things with people that he worked with?
14    A    Yeah.  Jhostin had -- he did mention to some
15  extent that he did not like sharing, and he would
16  stop -- no pressure Jhostin to say anything more.
17    Q    Okay.
18    A    People shared as much as they wanted to
19  share.  Sometimes we got more than we wanted to hear.
20  But that was always done in the group morning syncs.
21  In our one-on-ones, we never got personal.
22    Q    Sure.
23    Well, did you -- would you ever ask Jhostin,
24  like, hey, you know, what are your plans this weekend,
25  right?  You would ask him that?

Page 62

1      MR. KEATING:  Object to the form.
2  BY MR. REID:
3      Q    Did you ever ask Jhostin if he was married?
4      A    No.
5      MR. KEATING:  I think there's three
6  questions pending (inaudible) answered.
7      THE WITNESS:  Everyone -- I mean, we
8  would always ask people what were you up to
9  this weekend.  I mean, it's just being
10 friendly with no intent.
11 BY MR. REID:
12     Q    Okay.  Did you ever ask Jhostin if he was
13 married?
14     A    No, because I knew Jhostin was not married.
15     Q    Okay.  Did you ever ask Justin if he was
16 seeing anyone?
17     A    No.
18     Q    Okay.  All right.  And you didn't tell
19 Jhostin during the termination meeting that he was
20 being terminated as a result of his performance, right?
21     MR. KEATING:  Object to the form.
22     A    The words that I said to Jhostin were on that
23 document you showed me earlier.  Those were the exact
24 words I said to Jhostin, and then I got off.  I said,
25 yeah, I was off the call after that.

Page 63

1  BY MR. REID:
2      Q    And nothing else in addition to the words
3  that are on that piece of paper?
4      A    Nothing else.
5      Q    Okay.  And did Jhostin make any comments
6  about not wanting to be on the call with you during
7  that call?
8      A    After my words were said, he said he would
9  like for me to drop off and I dropped off.
10     Q    Did he explain why?
11     A    No.
12     Q    Okay.  So the decision that was in -- give me
13 one second.
14     So the decision was made after this
15 one-on-one and the group meeting where Mr. Quinones
16 hung up to eliminate the device support engineer 2
17 position, right?
18     A    The decision was made -- I -- Jhostin had
19 stopped short -- I mean, I had no more interactions
20 with Jhostin.  Jhostin was just now a floating star.
21     Q    Who is he reporting to?
22     A    So it was -- there was no -- so Jhostin was
23 reporting to no one at that point.  So the decision was
24 made when Jhostin stopped communicating with anyone.
25     Q    Okay.  So I'll ask you about that in a

Page 64

1  second.
2      But the question that I asked you was, the
3  decision to eliminate a device support engineer 2
4  position was made after the point in which Jhostin had
5  logged off of the calls, the group call, the one-on-one
6  call with you, right?
7      MR. KEATING:  Object to the form.
8      (Inaudible) he wasn't solely the decision
9      maker.
10     You can answer to the extent you can.
11     A    The timing was right.  The time was perfect.
12 BY MR. REID:
13     Q    Again, I want you to focus on the question
14 that I'm asking, okay?  And I'm not trying to be rude.
15 I mean, sometimes it's like when we're asking questions
16 back and forth over an hour it's like, you know, this
17 tends to happen.
18     So the question is:  The decision to
19 eliminate the device support engineer 2 position was
20 made after the day where Jhostin Quinones logged off of
21 the team call and logged off of the one-on-one call
22 with you, right?
23     A    Yes.  This decision was made after that call.
24     Q    Okay.  Gotcha.
25     And do you -- well, no.  We'll get to that

Page 65

1  later.  And then you didn't do this, so let me ask you
2  about that.  Let me take you back to Exhibit, I
3  believe, 4 just really quick, which is, again,
4  Bates-stamped 19.
5      Do you have any reason -- do you know at all
6  why these boxes where it says "discharged" in red are
7  not checked besides the other box?
8      MR. KEATING:  Object to the form.
9      A    I have no knowledge of this document.  I've
10 never seen this document before, so I don't know.
11 BY MR. REID:
12     Q    Okay.  Fair enough.
13     All right.  Okay.  So let's go over the group
14 meeting on November 2nd, 2023 again.  So tell me of
15 your recollection of the words that you and Jhostin
16 exchanged from the point that you said, hey, Jhostin,
17 it would be great, you know, you could be in your
18 camera frame or whatever you said to the point that
19 Jhostin logged off.  Just tell me what your memory of
20 what happened in those intervening moments is.
21     A    So, yeah, as I said, when the meeting
22 started, Jhostin was not in frame.  He was asked to
23 come in frame, but it was not even ideal.  So because
24 we've had people join these meetings, and guess what,
25 they're like I'm not feeling great today, I'm not in my

Page 66

1 camera, or I'm not looking great today, so I'm not in
2 my camera. I worked late last night, I'm not in my
3 camera. Jhostin did not say any of that.
4        So when the meeting started, he was not in
5 frame, and I was like, Jhostin, no one can see you.
6 But the meeting began anyways. So everyone went around
7 the room. We spoke about what we're going to do for
8 the day, what we did the day before, and when it came
9 on -- when it came to Jhostin's turn, I asked him
10 again, Jhostin, are you going to come into frame so we
11 can see you?
12        And Jhostin then said, what does it have to
13 do with production of this meeting? This has nothing
14 to do with production, so I'm not going to deal with
15 this today. (Inaudible). We can talk about it in our
16 one-on-one, and he got off the call. And that was it.
17    Q    So all you said to Jhostin was, it would be
18 nice to see you in frame, and then he logged off before
19 you could say anything else?
20    A    Correct.
21    Q    Okay. Now, you also said, you know,
22 sometimes people, you know they have different reasons
23 why they don't want to be on camera, and that's fine,
24 right?
25    A    That was completely fine. Yes.

Page 67

1    Q    It would be fine, for example, if an
2 employee -- if you said, hey, you know, why aren't you
3 on camera, and the employee said, It's a computer
4 issue, right, I can't get on right now, that would be
5 fine, right?
6    A    That was fine.
7    Q    Okay. Now -- and Mr. Quinones didn't say he
8 was uncomfortable during that meeting, did he?
9    A    No, he did not.
10    Q    Okay. And so what exactly was your issue, in
11 your own words, with how Jhostin acted during that
12 meeting?
13    A    It was just the way, the attitude, that he --
14 or that energy that he brought. It was almost
15 something was annoying him. I mean -- and he pretty
16 much -- when Jhostin fell off that call, everyone was
17 in shock because no one understood -- I mean, that
18 escalated beyond. That was not a part of what we were
19 talking. I mean, anything in that (inaudible). What
20 was -- what Jhostin as facing that day had nothing to
21 do with that meeting, so...
22    Q    Gotcha.
23        And so the expectation in general, though,
24 was that cameras -- that employees would have their
25 cameras on, right?

Page 68

1    A    That was the expectation. Correct.
2    Q    And do you remember that after that group
3 meeting that you sent Mr. Quinones a verbal warning?
4    A    I sent him an e-mail, yes.
5    Q    Okay. Well, sure.
6        Do you remember bcc'ing Laura McCormick on
7 that e-mail?
8    A    Yes, I did copy HR on that e-mail.
9    Q    Okay. So I'm going to share -- is this the
10 e-mail that you're referencing? And I'm going to mark
11 this as Exhibit 5, and it's Flock 29 to Flock 30,
12 sorry.
13        Is this the e-mail that you're referencing?
14    A    That is -- yeah. It looks to be.
15        (Whereupon, Plaintiff's Exhibit No. 5
16    was marked for identification.)
17 BY MR. REID:
18    Q    Okay. Was it a policy at Flock at the time
19 that employees had to be positioned a certain way in
20 their camera for the meetings?
21    A    I like that we keep going to this camera
22 incident because I'm telling you, it was never a camera
23 issue. This thing about him being on camera got blown
24 out of proportion. I mean, everyone -- we came up with
25 this document when it comes on to our performance and

Page 69

1 what we expected our expectations of the group.
2 Everyone in the group agreed to it. Everyone in the
3 group agreed to the number of cases that we were going
4 to work. Everyone in the group agreed to being on
5 camera in the morning. Everyone in the group agreed to
6 9:15.
7        So I did not just come up with this. It was
8 a group decision, and that was the environment I
9 fostered. That's what you need to understand, Patrick.
10 So that's why I'm really surprised that Jhostin is
11 saying no, that he was uncomfortable with being on
12 camera. This is not a camera issue.
13    Q    Okay. So I'm going to ask a question again.
14        So when you're talking about those rules that
15 everyone agreed upon, was there a rule that everyone
16 agreed upon about having to be centered in the camera
17 during group meetings?
18    A    Just imagine if we're having a meeting and
19 I'm not -- and my camera is on, but I'm not in the
20 frame. It's like, I'm not even here. Why do I need to
21 turn my camera on? If you had an issue with your
22 camera on, tell me, Patrick. That's what normal people
23 do. You say, I do not want to be on camera. And then,
24 we can say, fuck, is there a camera policy that we're
25 not following, that I am pushing on these people? But

Page 70

1    I was never -- it was never brought up.  So for a
2    lawsuit, maybe it's not, but a camera?
3         Q    Okay.  So the question again, I just want --
4    I need to get an answer to this question.
5              Was there a group, I guess, agreement that
6    people would be centered in their frames during group
7    meetings on video?
8         A    No.  We never spoke about being centered in
9    the frame.
10        Q    Okay.  So you're saying, at the time, your
11   focus was not on the fact that Mr. Quinones didn't want
12   to be on video, but it was -- well, actually, let me
13   share this document.
14             So in this document, I think he said -- and
15   you wrote this e-mail, right?
16        A    Yes, it is from Omar Lodge.  I wrote that
17   e-mail to Jhostin, correct.
18        Q    Okay.  And here you write -- where is it?
19   You say, When you're asked why you're not on camera,
20   you responded by saying that it was not a big deal and
21   questioned why the meeting was being stopped for this
22   issue.  Subsequently, you rebuttaly stated that you
23   could not continue the meeting and suggested discussing
24   the matter in our one-on-one meeting, after which you
25   disconnected from the call.

Page 71

1              Do you remember that happening?
2         A    I do, yes.  That's what happened.  Correct.
3         Q    Okay.  And then you say, I must emphasize the
4    participation in video meetings is an essential part of
5    our remote culture.  It's important to have your camera
6    on during team meetings to foster a sense of
7    engagement, accountability, and transparency.  By not
8    being on camera, dismissing this issue, you're
9    demonstrating a lack of respect of your colleagues and
10   the importance of effective communication within the
11   team.
12             I read that -- did I read that correctly?
13        A    Yes.  Yes.  That's what is stated right
14   there.
15        Q    So in the e-mail, you're saying that it's
16   both a camera issue because he needs to have the camera
17   on, and -- sorry, let me finish my question -- and that
18   it was also a problem that he dismissed the issue,
19   right?
20        A    I said it's important.  I didn't say it was
21   required.  And this was the first time it was an issue.
22   So for it to escalate this much, yeah, this is the
23   first time we're hearing about this.  So that's why I'm
24   saying it is important so that we can see -- so that we
25   can feel like a group working together.  And it was --

Page 72

1    and just dismissing it, saying, I don't want to be on
2    camera, that's not being professional.
3              I mean, this was Jhostin's first job.  If
4    Jhostin thinks that this is how we can go into a
5    corporate environment and behave, then he has a lot to
6    learn.  I mean, I hired Jhostin when he was still in
7    college.  And it was my obligation to make sure
8    Jhostin -- I mean, there's proper channels to
9    everything.  And that was definitely not the way this
10   was supposed to have been handled.  And that's what I
11   was trying to say in that e-mail there.
12        Q    Sure.
13             And you also say, I believe that we can --
14   and I'll highlight it.  I believe that we can work
15   together to resolve any issues and maintain a positive
16   and productive team environment.  I hope to see an
17   improvement in your behavior and participation in our
18   future meetings.
19             And so at the -- I read that correctly,
20   correct?
21        A    Yes, you did.
22        Q    Okay.  And so at that time that you sent this
23   e-mail, you were planning on working with Jhostin on
24   this issue, right?
25             MR. KEATING:  Object to form.

Page 73

1         A    Yeah.  I always worked with Jhostin.
2    BY MR. REID:
3         Q    Okay.  And at the time you sent this e-mail,
4    you were not planning on terminating Jhostin for what
5    had happened?
6              MR. KEATING:  Object to the form.
7         A    That is correct.
8    BY MR. REID:
9         Q    Okay.  Did you talk at all -- that day, that
10   same day, did you -- yeah.  Well, yeah.  That day, did
11   you talk with Brian Barnard at all about what was going
12   on with Jhostin?
13        A    Yeah, I reported to Brian.  So, yes, I raised
14   it up as an issue.
15        Q    Okay.  Did you talk to him before your
16   one-on-one with Jhostin or after the one-on-one with
17   Jhostin?
18        A    I do not recall.
19        Q    Okay.  Gotcha.
20             Do you recall consulting with Brian about
21   sending this e-mail that we're looking at right now?
22        A    No, I did not consult with Brian before
23   sending that e-mail.
24        Q    Okay.  Did you consult with HR before sending
25   the e-mail or did you send it?

Page 74

1      A    I just sent that e-mail.
2      Q    Got it.
3           Okay.  How do you remember Brian Barnard
4  entering the conversation as it relates to this -- the
5  events that are being talked about in this e-mail?
6      A    So when Jhostin pretty much was
7  noncommunicative to me, that was when Brian was like,
8  Is this like an avenue for us to, you know, eliminate
9  his position essentially?
10     Q    Okay.  Gotcha.
11          Would you have had the conversation about
12 Jhostin continuing to be unresponsive outside of
13 e-mail?
14     A    Well, it was -- I mean, I guess the whole
15 conversation was even before he was unresponsive.  I
16 mean, it was just the whole way the whole situation
17 went down.  I mean, it was the circumstances behind it
18 all.
19     Q    Gotcha.
20     A    Him dropping off two calls that day, him not
21 responding to anyone after, that's when we're like,
22 Well, I guess now it's better than ever to just
23 eliminate his position.
24     Q    Gotcha.  Okay.
25          From the time that this e-mail was sent up

Page 75

1  until Mr. Quinones's termination, are you aware of any
2  other inappropriate work behavior that Jhostin engaged
3  in in front of human resources personnel or other
4  coworkers?
5      A    After Jhostin dropped off of a -- our
6  one-on-one meeting, I never had an interaction with
7  Justin again until when we had our separation meeting.
8      Q    Okay.  And then obviously you then remember
9  having the one-on-one meeting with him after this
10 e-mail, right?
11     A    Correct.
12     Q    Okay.  Now, did Jhostin ever say during the
13 one-on-meeting that you were being -- well, take me
14 through what you remember happening from the -- Jhostin
15 joining the meeting until Jhostin leaving the meeting.
16          MR. KEATING:  Object to the form, asked
17     and answered.
18          You can go ahead and reanswer.
19     A    As I said, that meeting was very short.
20 Jhostin was not having that great meeting, and
21 Jhostin -- as I said, I can't even remember the
22 comments that Jhostin dropped off of that call so fast.
23 BY MR. REID:
24     Q    You -- but do you remember him saying
25 anything to you in particular?

Page 76

1      A    I do not remember him saying anything in
2  particular.
3      Q    Okay.  But he said something, right?
4          MR. KEATING:  Object to the form.
5  BY MR. REID:
6      Q    It's not like he got on the call and said
7  nothing and then hung up, right?
8      A    Yeah, I'm sure he's -- yeah.  Obviously, he
9  said something.  He joined the call.
10     Q    Sure.
11          Do you remember him telling you that he felt
12 uncomfortable, he felt uncomfortable with your requests
13 related to his camera?
14     A    I'm telling you the truth here.  I'm --
15 just -- I don't recall Jhostin saying he was ever
16 uncomfortable with me.  The first time I saw this was
17 when I read it in the lawsuit that was filed.
18     Q    Okay.  Did he ask you during -- do you recall
19 him asking you during that meeting again why it was
20 such an issue, what is -- what the body -- position of
21 his body was on his camera during the earlier group
22 meeting?
23          MR. KEATING:  Object to the form, asked
24     and answered.
25     A    We did not.  I don't recall getting into any

Page 77

1  conversations about being in frame with Jhostin at that
2  meeting.
3  BY MR. REID:
4      Q    Okay.  Do you remember raising your voice at
5  Jhostin during that meeting?
6      A    No, no.
7      Q    Okay.  And after -- so after your one-on-one
8  meeting with Mr. Quinones, up until his termination, he
9  did not act inappropriately in front of you or any
10 other employee of Flock again that you're aware of,
11 right?
12          MR. KEATING:  Object to the form, asked
13     and answered.  He said he's never interacted
14     with him after that meeting.
15     A    Yes, I -- yeah, Jhostin never joined our
16 meetings after that incident.  No, we never had a
17 one-on-one after a one-on-one.
18 BY MR. REID:
19     Q    Okay.  During either of the meetings, either
20 the one-on-one or the group meeting, did you tell
21 Mr. Quinones that he was to put his body where you
22 wanted him -- where you wanted him to put it?
23     A    I did not force anyone to put their bodies
24 where they wanted to put it.  I will tell you it is
25 respectable, but I can't force you or tell you what is

Page 78

1  expected.  I mean, yeah, I will say the professional
2  thing to do -- you know, I would say this is your first
3  job, so you probably should learn a thing or two.  I
4  would suggest.  That's all I do.  But I can't tell you
5  where your body needs to be.
6      Q    Okay.  But did you ever say those words to
7  Mr. Quinones that he was to put his body where you
8  wanted him to put it?
9      A    I don't recall ever telling Jhostin
10 specifically, I need you in the center frame of that
11 camera.
12     Q    Okay.  But during either of the meetings, do
13 you ever recall telling Mr. Quinones that he needed to
14 get closer to his camera?
15     A    No.
16     Q    Okay.  I'm going to show you another e-mail.
17 I'm going to show -- we'll mark -- because I think --
18 are we on Exhibit 6?  I believe we are.  Sorry, pull
19 that up.
20          All right.  I want you to just read through
21 these and tell me if you've ever heard any of the
22 information that's contained in them before.  And just
23 let me know when you're ready to scroll down.
24          MR. REID:  Oh, by the way, for Adam and
25      the record, it's 26 Flock to 28 Flock.

Page 79

1          MR. KEATING:  Okay.  You think you can
2      read through it?  Can you scroll down?
3          MR. REID:  Yep.
4          MR. KEATING:  Okay.  Whenever you're
5      ready, you can ask him to scroll down.
6          THE WITNESS:  You can keep scrolling.
7          MR. REID:  Oh, I'm sorry.
8          And that stops that.
9          THE WITNESS:  Okay.
10         (Whereupon, Plaintiff's Exhibit No. 6
11     was marked for identification.)
12 BY MR. REID:
13     Q    Okay.  So have you ever heard any of the
14 information that's contained in these e-mails before?
15         MR. KEATING:  Object of the form as to
16     the attorney-client privilege.
17 BY MR. REID:
18     Q    Besides attorneys, has anyone besides
19 attorneys relayed any of the information contained in
20 these e-mails to you before?
21     A    When I saw the e-mails, this is when I --
22     Q    In reference to when you were preparing for
23 the attorneys.
24     A    Correct.  Correct.
25     Q    Okay.  He's asking about prior to that time,

Page 80

1  during your appointment.
2      A    No, I didn't know that he -- I was asking him
3  to put his face closer to the camera.  I did not.
4      Q    Gotcha.
5          Okay.  So I would assume -- would you
6  disagree -- let's see.  Well, let's do this part first.
7          So from where it says "at," with the hyphen
8  before it and the word "past," would you disagree with
9  this story of events?
10     A    I would definitely disagree with that story
11 because, in our point of view, we never saw it.  We
12 could hardly see Avia's face because she always had the
13 sun behind her.  But no one -- we never, but at least
14 she was in the frame.  We knew she was there.
15     Q    Sure.
16     A    Paying attention.
17     Q    But you would agree that he said -- that
18 Mr. Quinones said something along the lines of, why is
19 this a big deal, and how does this affect the
20 productivity of the team, right?
21     A    I -- yes, I do remember him saying that.
22     Q    And then you would agree -- you would
23 disagree, I'm assuming, with, He then asked me to
24 adjust my camera to get a clearer view of my face.
25     A    As I said, after Jhostin, I -- all I remember

Page 81

1  after Jhostin said, Why is this a big deal, and how
2  does this affect the productivity of the team, Jhostin
3  pretty much -- that was it.  He logged out.  Because,
4  honestly, I was ready to move on.  Because this was --
5  I'm telling you, this was not worth pursuing.  We were
6  ready to move on.  Justin hung up before anything else
7  could have been said.
8      Q    Gotcha.
9          Okay.  So -- and then going down to where it
10 talks about the one-on-one, would you disagree that
11 during the one-on-one he asked you again, How does the
12 position of my face and body on the screen affect the
13 productivity of my job and the team?  This portion
14 here.
15         MR. KEATING:  Object to the form.
16         What was the question?
17 BY MR. REID:
18     Q    Would you agree or disagree that Mr. Quinones
19 said this during the one-on-one meeting, the
20 highlighted portion that I just read?
21     A    As I mentioned before, I do not remember us
22 getting into any discussions about body positions in
23 our one-on-one.  Because Jhostin -- yes, I just
24 remember Jhostin getting off that call.  And that's --
25 I was -- yeah, that's all I remember.

Page 82

1    Q    So would you disagree that he said this, or
2 are you saying you don't remember?
3    A    I can't disagree because I don't remember.
4    Q    Okay.  And what about the part where it says,
5 I believe -- that said Jhostin saying, he said, I
6 believe someone having their head not moved two inches
7 will not be a serious problem, is it possible that he
8 said that?
9         MR. KEATING:  Object to the form, asked
10        and answered.  He says he doesn't remember.
11        MR. REID:  Well, he just said it's
12        possible he could have said the earlier
13        thing.  So I'm asking if it's possible he
14        could have just -- he could say he could have
15        just -- could have also said this.
16             Is it possible that Jhostin could have
17        said, I believe someone having their head not
18        moved two inches will not be a serious
19        problem, during your one-on-one?
20        THE WITNESS:  Patrick, I -- as I said,
21        I did not have any discussions with Justin
22        about cameras and being uncomfortable with
23        being on camera.
24 BY MR. REID:
25    Q    Okay.  So that's a no, that he did not say

Page 83

1 that, right?
2    A    That's not a very definitive -- no.
3         MR. KEATING:  Objection, asked and
4         answered.
5 BY MR. REID:
6    Q    Well, did -- okay.
7             Is it -- do you remember him saying this or
8 not?
9    A    No, I don't remember him saying that.
10        MR. KEATING:  Before we go any more
11        questions, Patrick, I need to use the
12        restroom.  So there's no questions.
13        MR. REID:  Got it.
14        (Whereupon, a brief recess was taken.)
15 BY MR. REID:
16    Q    Hi, Mr. Lodge.  We ended off talking about --
17 we're still talking about the one-on-one meeting that
18 you had with Mr. Quinones on November 2nd, 2023.
19             Now, did you -- do you remember getting -- I
20 want to -- I think I already asked you that.
21 (Inaudible).
22             Do you remember anyone's voice getting raised
23 during the one-on-one meeting?
24    A    No, I do not recall.
25    Q    And then do you remember having a meeting

Page 84

1 with Brian Barnard, Laura McCormick, and Danielle
2 Feuillebois?  I don't know how to pronounce her name.
3 I'm going to butcher it, I'm sorry.  Danielle
4 Feuillebois on or about November 3rd, 2023, about the
5 situation that we've been discussing that occurred on
6 November 2nd?
7    A    To be fair, I don't recall having a meeting
8 with all those people.
9    Q    Okay.  Do you recall having a meeting with
10 anyone?
11    A    As I said, I had meetings with Laura
12 McCormick, I had meetings with Brian Barnard, my direct
13 manager.
14    Q    How many meetings do you remember being in
15 with Laura McCormick before Mr. Quinones's termination,
16 from November 2nd to his termination?
17    A    Possibly one.  That's all I can -- I know we
18 went over what we were going to say, so at least it was
19 one meeting.
20    Q    Okay.  One second.  One second, please.
21        Okay.  I'm going to share back one of the
22 earlier exhibits, which starts at Flock 29.
23        So you remember one meeting, you obviously
24 also -- Ms. McCormick was in the termination meeting
25 with you, right?

Page 85

1    A    That is correct.
2    Q    Okay.  So that's two so far.
3        And then you can see here, Laura McCormick on
4 November 2nd -- well, Brian Barnard says something, and
5 then Laura McCormick follows up on November 2nd, the
6 same day that these meetings happened, and she says --
7 she asks you a question about the expectations on
8 cameras, and she says, I will set up time with both --
9 she's actually replying to Brian.  And she says, I will
10 set up time with both you and Omar, which is you, to
11 learn more about Jhostin's current work performance,
12 right?
13        MR. KEATING:  Object to the form,
14        document speaks for itself.  You can answer.
15 BY MR. REID:
16    Q    Do you see that that says that?
17        Okay.  And then -- and Brian then responds
18 and says, I know we had time on the calendar this
19 afternoon.
20        Does that refresh your recollection of
21 whether you, Brian, and Laura had a meeting that day?
22    A    I don't remember us having a meeting --
23    Q    Okay.
24    A    -- that day.
25    Q    Fair enough.

Page 86

1          Okay.  So again, Mr. Lodge, I think, you
2    know, I've asked some questions that I think obviously
3    have annoyed you.  But I think you understand that I
4    have a job I have to do, so I kind of have to ask some
5    embarrassing questions.  So -- but the next few
6    questions are going to probably be the worst of them.
7          What is your sexuality?
8          MR. KEATING:  Object to the form.  It's
9    harassing, irrelevant.
10         MR. REID:  It's clearly relevant, Adam.
11   Sorry.  It is.
12         MR. KEATING:  But you don't have -- you
13   say your client doesn't have a sexual
14   harassment claim.  I don't know.
15         MR. REID:  Well, it's a retaliation for
16   providing -- yeah, I mean, he's -- okay.  I'm
17   not going to argue with you about this, Adam.
18   I think you know it's relevant.
19         And so, Mr. Lodge, I'm going to have to
20   ask the question again.
21         What is your sexuality?
22         MR. KEATING:  Object to the form.
23         You can answer to the extent you feel
24   comfortable.
25         THE WITNESS:  I'm straight.

Page 87

1    BY MR. REID:
2          Q    Okay.  And were you sexually attracted to
3    Mr. Quinones?
4          A    No.
5          Q    Okay.  Did you enjoy -- did you derive any
6    sort of enjoyment or pleasure from telling Mr. Quinones
7    how he needed to position his body on camera or by
8    making him turn his camera on?
9          A    No.
10         Q    Okay.  We can move on from this now.
11         Okay.  So I'm going to show you another
12   document, which I believe is Exhibit 7.  Let me get the
13   Bates for that.
14         Okay.  Can you see that, Mr. Lodge?
15         A    I can.
16         (Whereupon, Plaintiff's Exhibit No. 7
17   was marked for identification.)
18   BY MR. REID:
19         Q    Okay.  Do you recognize this?
20         A    Yeah, it's funky.
21         Q    Okay.  By the way, I didn't read the Bates.
22   The Bates is 47, Flock 47.
23         And so you write in this e-mail on a
24   temporary -- well, you inform the team that
25   Mr. Quinones is terminated, right?

Page 88

1          A    Yes.
2          Q    And then you tell them, On a temporary
3    basis -- and then you list three people on the team and
4    yourself -- will be stepping in to cover Jhostin
5    Nunez's responsibilities, right?
6          A    Yes, that's what the e-mail states.
7          Q    Okay.  So why was it on a temporary basis?
8    Why did you write that?
9          A    I don't know why I used the word "temporary,"
10   but -- because I'm sure there would have been concerns
11   with our -- this is -- I don't know.  I mean, that --
12   it was just a word I used.
13         Q    Okay.  Well, could it be because the plan is
14   to maybe have someone else move over and take over
15   those duties sometime in the future?
16         MR. KEATING:  Object to the form.
17         A    Well, clearly, those duties would have to be
18   absorbed by someone.  So if the interim, everyone was
19   going to be taken on to cover what Jhostin was doing.
20   BY MR. REID:
21         Q    Gotcha.
22         Okay.  Was there any other -- did you
23   terminate any other person -- or not you, excuse me.
24         Was any other person terminated from your
25   team and Mr. Quinones's team in the two years preceding

Page 89

1    his termination?
2          A    No.  No one else was terminated.
3          Q    Okay.  And are you aware of any employees
4    besides Mr. Quinones that complained about you to HR?
5          MR. KEATING:  Object to the form.
6          A    No.
7    BY MR. REID:
8          Q    Okay.  And so we talked a little bit earlier
9    about how you like to foster kind of a communicative
10   work environment where you guys talk about your
11   weekends and stuff like that.  Obviously, your work
12   duties and stuff like that.
13         Do people ever use colloquial words when you
14   all are conversing on the team at the time in November
15   of 2023?
16         A    No.
17         Q    Words like "y'all" or saying, like, "nah,"
18   things like that?
19         A    Yes, people, yeah, were expressed -- were
20   allowed to express themselves freely.  That was
21   appropriate, yes.
22         Q    And that's what you wanted them to feel free
23   to do, right?
24         A    That is correct.
25         Q    Okay.  Okay.  Okay.  When you -- so when

1  you're writing -- so we've looked at one of these
2  earlier.  So when you're writing an e-mail to an
3  employee with a reprimand inside of the e-mail, do you
4  typically put the important -- the most important
5  things in the e-mail first?
6      MR. KEATING:  Object to the form.
7      A    An e-mail portrays what I wanted to say.  I
8  don't know about putting it first.  I'm not an English
9  major.  I'm an engineer.  So, yes, I want to get a
10  point across, and that's what's stated in the e-mail.
11  BY MR. REID:
12     Q    Okay.  So I'm going to point you to this
13  e-mail.  Let's see.  Pull it up.  And we're almost
14  done.  I only really have a couple of more questions.
15  So I'm going to point you to this e-mail, which I'll
16  mark Exhibit 8, and it is Flock 45 to Flock 46.
17          And if you would go ahead and read this
18  e-mail if you'd like to.
19     MR. KEATING:  Take your time to read it.
20     MR. REID:  Sorry, what was that?
21     MR. KEATING:  I said -- I told him to
22  take his time to read it.
23     MR. REID:  Oh.  Oh, sorry, I thought he
24  had said something.
25     MR. KEATING:  We're back on.

1          Your screen is not showing anymore,
2  Patrick.
3      MR. REID:  Something happened to his
4  Zoom.  I'll share it back.
5      MR. KEATING:  Is Madam Court Reporter
6  still on?  She's the important one.
7      THE COURT REPORTER:  Yes.
8      MR. REID:  Okay.  Good.
9          (Whereupon, Plaintiff's Exhibit No. 8
10  was marked for identification.)
11  BY MR. REID:
12     Q    I can zoom if you want, Mr. Lodge.  I don't
13  know at what point you're at.
14     A    No, we're good.
15     MR. KEATING:  Your eyes are better than
16  mine, Omar.
17  BY MR. REID:
18     Q    Yeah.  As you can see, I wear glasses.
19     A    Okay.
20     Q    Okay.  And so in this e-mail at the top at
21  the beginning, you start off by talking about an issue
22  with the camera with Jhostin, and then you delve into
23  other work-related things like his quality and
24  performance, how many cases he is taking on and solving
25  a day, things like that, right?

1      A    Correct.  That's what the e-mails states,
2  yes.
3      Q    Okay.  And do you have any independent
4  recollection besides reviewing this e-mail of the
5  occurrence that you mentioned -- the occurrences that
6  you're mentioning in this e-mail?
7      A    I remember the camera deal because his camera
8  wasn't working and he had to get a new PC from IT
9  because --
10     Q    So what -- no.  Go ahead.
11     A    Yeah, I guess that was a part of -- when I
12  was asking about his responsiveness in the Slack
13  channel, why is he not responsive, he said, I mean,
14  it's not my deal, it's IT's problem.  I was like, then
15  get IT to give you a new computer.
16     Q    Okay.  So there was, like, not only an issue
17  with his camera, but his computer had to be replaced
18  entirely?
19     A    Correct.
20     Q    Got it.
21         Okay.  So why in this reprimand then, if it
22  was an IT issue, do you bring up him saying that it was
23  an IT issue during the meeting when he wasn't on
24  camera?
25     A    So Jhostin knew what the problem was, and

1  Jhostin took no steps to solve it.  So that's why it
2  was brought up.
3      Q    Okay.  So you're saying before this July 27th
4  one-on-one meeting, you had already known that Jhostin
5  was having issues with his camera or with his computer
6  in general?
7      MR. KEATING:  Object to the form.
8      A    Well, yeah.  Well, I did not know Jhostin had
9  a computer problem.  I -- the only question that was
10  asked was, Why are you -- why is it -- why are you not
11  on camera?  And that's just --
12  BY MR. REID:
13     Q    And you say -- go ahead.
14     A    And that's when Jhostin specified that it was
15  an IT issue.
16     Q    Okay.  And you described that incident at --
17  but before it, you put, It is of utmost importance that
18  we treat our colleagues with unwavering respect and
19  consideration at all times.
20         So how was Jhostin not doing that in your
21  one-on-one meeting where he said that his camera was
22  not on because of an IT issue?
23     A    Here's the deal.  I don't recall the whole
24  situation behind me stating those words, but clearly,
25  those words are because we had more daily sync, and by

Page 94

1  asking why his camera wasn't on and the way he
2  responded, that's more than likely the reason why that
3  e-mail was written the way it was written.
4      Q    Okay.  But you don't remember how he
5  responded?
6      A    No, I do not recall.
7          MR. REID:  Okay.  All right.  I think
8      that's all I have for you, Mr. Lodge.  I
9      don't (inaudible)--
10         MR. KEATING:  Give me a couple of
11     minutes.  Yeah, give me a couple of minutes.
12     I'm going to check my notes.  We can go off
13     for two or three minutes.  I'm going to go
14     to his room and just talk with a snack and
15     check my notes.
16         MR. REID:  Sounds good.
17         (Whereupon, a brief recess was taken.)
18              EXAMINATION
19 BY MR. KEATING:
20     Q    Just a couple of questions, Mr. Lodge.
21         Earlier in your testimony today, you've
22 mentioned that earlier in 2023 you were recommending
23 Jhostin to be terminated.
24         Can you elaborate about that a little bit?
25     A    As I've mentioned earlier, (inaudible), there

Page 95

1  was always --
2          MR. REID:  Oh, my God.  Yeah.  We've got
3      somebody from Philly here.
4          MR. WALTER:  Yes, I was requested to
5      join this meeting to assist with sharing of
6      documentation.
7          MR. KEATING:  Okay.  I think you're --
8      I we're good for right now, Walter.  I'll
9      ping you if we need to.
10         MR. WALTER:  Please do.  I'm sorry to
11     interrupt.  Just let me know when I can help.
12 BY MR. KEATING:
13     Q    Sorry about that.  Let me know if you want me
14 to repeat that question.
15     A    Please repeat that question.
16     Q    Okay.  Earlier in your testimony today, you
17 referenced recommending earlier in 2023 that Jhostin be
18 terminated.
19         Can you elaborate on some of those
20 conversations and discussions you had regarding those
21 recommendations?
22         MR. REID:  Objection to the extent it's
23     already been asked and answered.
24     A    Yeah, it was -- the group was new.  I mean,
25 we were always trying to pivot and see how we could

Page 96

1  bring value to the business.  So we're always
2  evaluating the number of cases of just the workload and
3  the type of skills that were necessary to actually do
4  the job of device support.  So it's not that, you know,
5  we -- he was -- we determined that we didn't really
6  need the headcount at that caliber to actually do that
7  type of work.  So it was always an ongoing
8  conversation.
9  BY MR. KEATING:
10     Q    Did you ever recommend that Jhostin be
11 terminated prior to November of 2024?
12     A    Jhostin was always in the crosshairs to be
13 terminated.
14     Q    Do you recall ever sending any e-mails about
15 those recommendations?
16     A    Yes.  I mean, e-mails -- Jhostin was always
17 very difficult.  I mean, I can't figure out why
18 because, as I said, the environment that we brought was
19 the culture I brought.  I mean, it's an exceptional
20 business world.  So the mere fact that -- I mean, I --
21 we -- I remember even back in '22 when we had to give
22 him a formal warning.
23         It's like -- it was like déjà vu where he
24 would get better and then he would fall right back off.
25 But pretty much from -- as -- I can remember as early

Page 97

1  as February, that was when the conversations really did
2  took.  When Brian Barnard took over our team, we really
3  started to hone in on how could we make this group more
4  efficient with a different, I guess, talent pool.  So
5  it was definitely '23, the early parts, talking
6  February, March, April, that it was really strong.
7      Q    So do you recall in March of 2023 sending an
8  e-mail to Laura McCormick recommending how to move
9  forward with Jhostin's termination?
10     A    That is -- yes, I do remember the call.
11     Q    And I'm going to have it shown on the screen.
12 I'll give you a physical copy as well.
13         MR. KEATING:  This is, Patrick, Flock 34
14     to 36.  I think this will be for this
15     Defendant's -- we'll mark as Defendant's
16     Exhibit 26.  You left off on 25.
17         MR. REID:  Sure.  I think this is
18     exhibit --
19         MR. KEATING:  It might already be an
20     exhibit. I can't recall.
21         MR. REID:  What's the --
22         MR. KEATING:  Flock 34 to 36.
23         MR. REID:  Yeah.  This is a separate
24     one. This is a new one.  This would be, I
25     believe, 9.

Page 98

1    MR. KEATING:  (Inaudible) Plaintiff's,
2  for your deposition, 9?  I don't know how
3  you want to do the numbering.
4    MR. REID:  You can do whatever you want.
5  You can call it Defendant's 1 or you can
6  call it 9.
7    MR. KEATING:  Let's say Defendant's 26.
8  For just briefing purposes.
9    (Whereupon, Defendant's Exhibit No. 26
10  was marked for identification.)
11  BY MR. KEATING:
12    Q    So, we'll walk you through this entire e-mail
13  thread, Mr. Lodge.
14    Do you recall the first e-mail on this page,
15  Flock 34?
16    A    I do, yes.
17    Q    This was a-n email from you to Jhostin
18  about -- this was about his performance, correct?
19    A    Correct.
20    Q    Okay.  I want to draw your attention to
21  Flock 35, just a follow-up to the chain.  This is an
22  e-mail -- well, you tell me, what is this e-mail on
23  Flock 35 on March 9th of 2023 at 9:59 a.m. timestamp?
24    A    So, yes.  Essentially, I was trying to build
25  my story to say that Jhostin's position was not needed

Page 99

1  because based on his work output, we could do what --
2  we could do without him.  So this e-mail is just
3  saying, Can we move forward with that termination?
4    Q    Do you recall in -- about a month later,
5  April of 2023, again, talking about -- you know,
6  talking to Laura about moving forward with Jhostin's
7  termination?
8    A    As I said, I remember I met with Laura quite
9  a bit, trying to see how I could get -- Jhostin, the
10  lowest -- my lowest performer, my problem child,
11  terminated.  Gone.
12    Q    And can we pull up Flock 37?  Flock 37.
13    What was this, Defendant's Exhibit 27?
14    What is your recollection of this email,
15  Omar, that you sent to Laura?
16    A    I don't remember.  So as I said, Jhostin made
17  me have to work, because I had to find creative ways to
18  get into the system to figure out, why is it the output
19  of different people were so different?  Because
20  Jhostin's output was much lower than everyone else's
21  output.  And Jhostin would manipulate the system to
22  make it appear that he was working, and it was him
23  mass-moving cases, him not actually filling out the
24  case the way it was supposed to be.
25    And as stated here, the team realizes it's

Page 100

1  not close to their efforts, and it goes back to what I
2  mentioned.  People didn't want to work behind Jhostin.
3  Our people had to -- there was an e-mail where I said,
4  No one's going to clean up your mess.  You need to fix
5  what we've already discussed.  And when the team
6  started to see Jhostin's lackluster effort -- and this
7  was in April -- I was like, We need this distraction
8  gone sooner than later.
9    (Whereupon, Defendant's Exhibit No. 27
10  was marked for identification.)
11  BY MR. KEATING:
12    Q    So that is -- in April, were you talking
13  about having him replaced?
14    A    I just wanted Jhostin gone.  Because it
15  wasn't a matter of replacing him.  It was just -- we
16  didn't need that weight on the team.
17    Q    And regarding the elimination of device
18  support engineer 2, from your perspective, why was
19  Jhostin selected for elimination or termination?
20    A    Just so it's obvious, it was his work output.
21  It wasn't out of the park.  I mean, as I said, what we
22  do was not rocket science.  I honestly could have
23  gotten someone at a low paygrade to do the work Jhostin
24  was doing.  And Justin was assigned or he volunteered
25  to take on the case categories of disappearing cameras

Page 101

1  and uptime.  Those were the easiest cases to handle.  I
2  mean, like, literally, you were -- it was the easiest.
3    I had Michelle who just started, which, by
4  the way, everyone volunteered to train Michelle, to do
5  some one-on-one sessions with Michelle.  Jhostin, he
6  never wanted to help train an -- our new person.  So
7  when it came on to him, the mere fact that Jhostin had
8  the easiest cases to work, and he still were not able
9  to finish those cases, hence go help other people, it
10  was a clearcut choice of who needed to go.
11    MR. KEATING:  No further questions.
12    MR. REID:  Okay.  I've got a little bit
13  of follow-up.  Just a couple of questions.
14    REEXAMINATION
15  BY MR. REID:
16    Q    So when you were being asked by Mr. Keating
17  about the -- eliminating the job position, you said
18  that there was some point where we decided that we
19  could reduce headcount.
20    When was that?
21    A    It goes back, as you see, in March.  I was
22  asked yet to eliminate that position, to terminate
23  Jhostin.
24    Q    But the decision wasn't made until after
25  November 2nd, 2023, right?  When I say "the decision,"

**Page 102**

1  the decision to reduce headcount was not made after
2  November 2nd, 2020 -- was not made before November 2nd,
3  2023?
4      MR. KEATING:  Object to the form, asked
5  and answered.
6      A   It was -- yeah, it was not before this, okay,
7  22nd -- 2nd.
8  BY MR. REID:
9      Q   And so you described Jhostin, and I think
10 your words was, Jhostin was always difficult.  Now,
11 Jhostin worked for Flock, I believe, from late 2021 to
12 late 2023.
13         Was he always difficult?
14     A   I guess because when Jhostin started, it was
15 just Jhostin, Avia, and myself.  So we were manageable,
16 but as the group started to grow, yeah, Jhostin
17 became -- yeah, Jhostin became a little bit more of a
18 challenge.
19     Q   Okay.  When did the team start to grow?
20     A   I would say more -- it was probably like in
21 the fall of '22.
22     Q   Okay.  And that would have kind of been right
23 before or around the time that you -- I can't remember
24 the exact terminology, so forgive me, but the other
25 team, you guys started fielding, doing the rotational

**Page 103**

1  basis of calls --
2      A   But going back, no doubt I think, but no --
3  Jhostin was always hard.  Because we're talking -- I
4  had to give him a verbal warning back in '22.  Because
5  I'm telling you, Jhostin, at first, in '21, when
6  Jhostin started, he was in college.  So we gave Jhostin
7  slack, you know?
8          But when you're done with college -- he was
9  done at the end of '21.  I mean, in '22, he was
10 always -- that's -- yeah, that was when we -- I mean, I
11 was like, This cannot continue.  I mean, before you had
12 an excuse, saying you were studying or whatever.  But
13 now this is a full-time paying job.  You need to be
14 fully committed to it.
15     MR. REID:  Okay.  That's all I have.
16     MR. KEATING:  Thank you for your time,
17 Omar.  Appreciate it.
18     MR. REID:  Thank you.
19     (Whereupon, the Zoom recording feature
20 was turned off.)
21             - - -
22     (The videoconference deposition
23 concluded at 12:17 p.m.)
24
25

**Page 104**

1          E R R A T A   S H E E T
2      I have read the within and foregoing pages
3  and no changes are required.
4      This, the _____ day of _____,
5  2024.
6
7      I have read the within and foregoing pages
8  and the following changes are required:
9  Page _____ Line _____:
10 _____
11 Reason:
12 _____
13 Page _____ Line _____:
14 _____
15 Reason:
16 _____
17 Page _____ Line _____:
18 _____
19 Reason:
20 _____
21     This, the _____ day of _____, 2024.
22 Sworn to and subscribed before me,
23 this _____ day of _____, 2024.
24 _____
25 Notary Public, Georgia

**Page 105**

1                  DISCLOSURE
2  STATE OF GEORGIA)
3  COUNTY OF GWINNETT)
4      Pursuant to Article 10.B of the RULES AND
5  REGULATIONS OF THE BOARD OF COURT REPORTING OF THE
6  JUDICIAL COUNCIL OF GEORGIA, I make the following
7  disclosure:
8      I am a Court Reporter and an independent
9  contractor.
10     I was contacted to provide court reporting
11 services for this deposition.  I will not be taking
12 this deposition under any contract that is prohibited
13 by the O.C.G.A. 15-14-37(a) and (b).  I have no
14 contract/agreement to provide court reporting services
15 with any party to the case, any counsel in the case.
16     I am not disqualified for interest, personal or
17 financial, under O.C.G.A. 9-11-28(c).
18     I will charge my usual and customary rates to all
19 parties in the case.
20     This the 20th day of November 2024.
21 *Jacqueline Frazier*
22 Jacqueline Frazier
23 Court Reporter
24 Certificate Number 5465-2647-6265-0624
25

```
 1                    CERTIFICATE

 2    STATE OF GEORGIA)

 3    COUNTY OF GWINNETT)

 4

 5         I, Jacqueline Frazier, Court Reporter,

 6    certify that the foregoing transcript is a true,

 7    correct, and complete record of the testimony given by

 8    the deponent, OMAR LODGE, who was first duly sworn by

 9    me; that I am not a relative, employee, attorney or

10    counsel of any of the parties; am not a relative or

11    attorney or counsel for any parties; nor financially

12    interested in the action; that the said deponent and

13    counsel in the presence of each other and before me did

14    not waive the reading and signing of the deposition;

15    and the original deposition under seal shall be filed

16    with the Court by the attorney taking the deposition.

17         WITNESS my hand and seal at Suwanee,

18    Gwinnett County, Georgia, this the 20th day of November

19    2024.

20

21    _____

22    Jacqueline Frazier

23    CR No. 5465-2647-6265-0624

24    CCR Seal

25
```

---

**Exhibits**

LodgeO-1   4:11
   48:5,9

LodgeO-2   4:12
   50:12,21

LodgeO-3   4:13
   53:10,14

LodgeO-4   4:14
   55:11,16

LodgeO-5   4:15
   68:11,15

LodgeO-6   4:16
   78:18 79:10

LodgeO-7   4:17
   87:12,16

LodgeO-8   4:18
   90:16 91:9

LodgeO-D-26
   4:19 97:16
   98:9

LodgeO-D-27
   4:20 99:13
   100:9

---

**(**

(inaudible)--
   94:9

---

**1**

1   25:10,17
   26:3 39:7

---

48:5,9
58:11,15
98:5

**100-year-old**
   10:9

**10:00**   5:4

**11/08/2023**
   54:11,18,19

**11:00**   60:3

**150**   18:23

**17**   53:21

**19**   55:21 65:4

**1940**   7:25

**1s**   25:12 26:8

**1st**   9:25

---

**2**

2   24:24,25
   25:9,16,20
   26:2,9,17,
   18,22 48:25
   49:7 50:12,
   21 56:5 57:1
   63:16 64:3,
   19 100:18

**20**   5:4

**200**   18:23

**2022**   16:24
   17:9 44:6
   46:23

**2023**   12:14
   14:9,23

---

17:11 19:14
31:17 36:13
44:6,13 48:1
52:3,14 57:9
58:3 59:10,
11 61:3
65:14 83:18
84:4 89:15
94:22 95:17
97:7 98:23
99:5

**2024**   5:4 9:25
   45:9,11 59:6
   96:11

**22**   31:22
   46:3,21
   96:21

**23**   14:23
   31:21,22
   47:8 97:5

**25**   97:16

**26**   78:25
   97:16 98:7,9

**27**   99:13
   100:9

**27th**   93:3

**28**   78:25

**29**   68:11
   84:22

**2nd**   65:14
   83:18 84:6,
   16 85:4,5

---

**3**

3   22:21
   26:12,17,20,
   21 53:10,14

**30**   35:16
   68:11

**30086**   9:17

**30318**   8:1

**34**   97:13,22
   98:15

**35**   98:21,23

**36**   97:14,22

**37**   99:12

**3rd**   84:4

---

**4**

4   55:11,16
   65:3

**45**   90:16

**46**   90:16

**47**   87:22

**4B**   54:23

---

**5**

5   68:11,15

**500**   17:6,13
   18:17

**5:00**   15:11
   16:15 59:20

---

**6**

6   78:18  79:10

6/21/2021
  54:11

6375   9:14

64   48:12

65   50:13

**7**

7   87:12,16

**8**

8   90:16  91:9

85   9:17
  19:16,18,22
  21:1,3,12
  24:4

8th   52:3,14

**9**

9   97:25  98:2,
  6

9:00   15:11
  16:15  59:19

9:15   16:17
  69:6

9:59   98:23

9th   98:23

**A**

a-n   98:17

a.m.   5:4
  98:23

absorbed   88:18

acceptable
  16:3,12

accountability
  71:7

accurately   6:3

act   77:9

acted   67:11

actual   16:13
  24:18

Adam   38:15
  52:9  78:24
  86:10,17

addition   63:2

address   7:24

addresses   9:12

adjust   80:24

adjustments
  25:6

adventure
  44:22

affect   33:15
  80:19  81:2,
  12

affecting
  36:6,9

afternoon
  85:19

agree   80:17,
  22  81:18

agreed   21:9
  69:2,3,4,5,
  15,16

agreement   70:5

ahead   27:9
  38:12,23,24
  46:19  48:13
  75:18  90:17
  92:10  93:13

Akia   11:20,21

alarm   21:13

alarming   22:5
  29:4

alarms   24:14

Alex   26:25
  43:22  44:3,
  16  45:1,2,
  14,17

allowed   25:1,6
  89:20

amount   17:14
  18:18,19

analysts
  58:17,18,19

analyze   23:17

analyzed   23:19

annoyed   86:3

annoying   67:15

answers   31:7

anymore   91:1

anyone's   83:22

anytime   17:3

apologize
  59:10

appears   52:22
  53:2

apply   25:19
  30:2,9

appointment
  16:9  80:1

April   97:6
  99:5  100:7,
  12

area   10:2

argue   86:17

asks   85:7

assigned   46:9,
  13  100:24

assist   95:5

assume   16:5
  53:24  80:5

assuming   80:23

Atlanta   7:23,
  25  38:19

attention
  80:16  98:20

attitude   36:21
  67:13

attorney-client

79:16
**attorneys** 5:25
6:19 79:18,
19,23

**attracted** 87:2

**audio** 14:14

**authorized**
5:10

**automation**
10:7

**avenue** 7:25
74:8

**average** 17:14
18:13,18
21:8

**Avia's** 80:12

**aware** 12:2,6
75:1 77:10
89:3

_____
**B**

**babysit** 57:21

**babysitters**
57:18

**back** 10:10
13:22 22:13
36:21 38:10
39:14,17
43:8 44:9,
12,18 46:20
47:7 64:16
65:2 84:21
90:25 91:4

96:21,24
100:1

**bad** 37:5

**banking** 20:20

**bare** 39:6

**Barnard** 31:13,
14 41:9
73:11 74:3
84:1,12 85:4
97:2

**based** 15:3
18:8 20:1
21:6 24:13
57:4 99:1

**basically**
43:11

**basis** 20:11
46:25 47:2
88:3,7

**batch** 23:24

**Bates** 48:8,13
53:20,21
55:21 87:13,
21,22

**Bates-stamped**
50:13 65:4

**bathroom** 42:23

**batteries**
23:18

**bcc'ing** 68:6

**began** 66:6

**begging** 43:11

**beginning** 6:1
91:21

**behave** 72:5

**behavior** 72:17
75:2

**believed** 26:19
35:18

**beneficial**
44:21

**big** 21:17
25:14 33:2,
20 70:20
80:19 81:1

**bigger** 23:18

**bit** 26:11
34:9 35:22
54:25 89:8
94:24 99:9

**blown** 68:23

**bodies** 77:23

**body** 76:20,21
77:21 78:5,7
81:12,22
87:7

**boss** 22:11

**bottom** 55:20

**box** 55:2 65:7

**boxes** 65:6

**Bradfish** 44:3,
4

**Bradford** 43:22
45:1

**break** 42:23
43:4,6 45:22

**Brian** 31:13,
14,20 41:9,
10 59:1
73:11,13,20,
22 74:3,7
84:1,12
85:4,9,17,21
97:2

**briefing** 98:8

**bring** 27:14
92:22 96:1

**broke** 39:14,
17

**brought** 13:22
28:13 67:14
70:1 93:2
96:18,19

**build** 98:24

**bunch** 15:24
47:19

**business** 12:15
15:1 48:23
96:1,20

**butcher** 84:3

_____
**C**

**calendar** 85:18

**caliber** 96:6

**call** 33:18
37:6,8 47:10
62:25 63:6,7

64:5,6,21,23
66:16 67:16
70:25 75:22
76:6,9 81:24
97:10 98:5,6

called 20:4
53:22 58:16

calls 64:5
74:20

camel's 38:9
39:14,17

camera 12:25
13:16,22
14:17 16:5,6
22:6,15
25:4,25
26:18 27:10
28:19,21,25
29:14,16,23
30:7 31:9,12
32:15,24
34:19 41:1
57:17 65:18
66:1,2,3,23
67:3 68:20,
21,22,23
69:5,12,16,
19,21,22,23,
24 70:2,19
71:5,8,16
72:2 76:13,
21 78:11,14
80:3,24
82:23 87:7,8
91:22 92:7,
17,24 93:5,
11,21 94:1

cameras 11:4
13:11,12
14:3,6,9,13
15:10,19
17:4 18:7
20:17,19,23
21:1,3,12,
18,22 22:7,
13,22,24
23:4,12,16,
21,24 25:6
26:23 29:22
30:14,15
32:6 57:21
60:3,16
67:24,25
82:22 85:8
100:25

capture 6:10

capturing
14:14

care 22:8
47:15,20,23,
24

carried 57:4

case 20:1
21:13 22:6
28:24 29:2,
3,4,16,18,
20,24 30:8,
10,14 99:24
100:25

cases 15:25
16:25 17:6,
14,17,18
18:13,23,24

19:9,16,22
22:4 23:5
24:4,15
25:19 36:7
69:3 91:24
96:2 99:23

categories
22:24 100:25

categorize
22:22

center 78:10

centered 69:16
70:6,8

chain 98:21

chance 38:19

change 10:19
15:20 17:3,
22

changed 14:24
17:20 19:15,
20 20:10

channel 92:13

channels 72:8

charge 13:10

cheaper 58:5,7

check 94:12,
15

checked 55:2
65:7

checking 13:11

child 99:10

circumstances

10:3 32:10
55:4 74:17

claim 86:14

clean 6:14
100:4

clearer 80:24

clears 24:1

client 86:13

close 17:6
100:1

closer 78:14
80:3

coach 35:12
36:19

coffee 42:23

cold 18:6

colleagues
71:9 93:18

collecting
10:24 12:17,
21 21:19
31:9,10

college 72:7

colloquial
89:13

comfortable
40:25 61:12
86:24

commenced 5:4

comments 63:5
75:22

communicate
37:3

communicating
40:7,9 44:14
63:24

communication
60:6 71:10

communications
45:13

communicative
60:13 89:9

company 10:9
14:5 56:10

compare 54:18

complained
89:4

complaining
34:13

complains
27:13

completely
15:14 39:23
66:25

computer 67:3
92:15,17
93:5,9

concerns 88:10

confusing 58:9

consideration
93:19

consult 73:22,
24

consulting
73:20

contact 33:23

contacted 45:4

contained
78:22 79:14,
19

content 7:1
58:1,4

context 40:14

continue 12:15
70:23

continuing
74:12

contributing
33:12

conversation
57:6,24 58:4
59:3,4 74:4,
11,15 96:8

conversations
36:12,23
41:10,11
56:23 57:2,
10,13 58:2,
23 61:2 77:1
95:20 97:1

conversing
89:14

copy 68:8
97:12

core 20:23

corporate 72:5

correct 7:14
8:21,23 9:22
11:4,5,13,14
13:5,14,19,
24 14:11,16,
21 17:10
23:13 26:4,
13 27:15,24,
25 30:4,13
31:17,18,24
32:7 42:2
44:11 45:3
48:2 49:2,9,
14 50:16
51:6,19,25
52:16,20,23
54:2,6 55:5
56:1,2,13
66:20 68:1
70:17 71:2
72:20 73:7
75:11 79:24
85:1 89:24
92:1,19
98:18,19

correctly
71:12 72:19

counsel 5:9

country 23:7

couple 90:14
94:10,11,20

court 5:7,10
6:6 11:1
91:5,7

cover 88:4,19

coworkers 75:4

create 25:3
27:21 46:6
60:12

created 22:6
25:25 34:16

creating 29:4

creative 99:17

crime 10:24

crosshairs
57:19 96:12

culture 60:4,6
71:5 96:19

current 85:11

customer 27:3,
5,10,11,13
47:10,11
57:16

customers
27:6,12

---

D

D&d 10:7

daily 20:4,7,
11,14 33:20
60:7 93:25

Danielle 84:1,
3

date 54:15

dates 54:12

day 16:4,9,
18,21,25

17:1,7,13
18:14 19:10,
17,22 20:8,
9,15 21:1,3
24:4 33:21
37:5,9 40:3,
11 47:19
52:2,14,19
59:25 64:20
66:8 67:20
73:9,10
74:20 85:6,
21,24 91:25

days  47:14

daytime  14:18
16:7

deal  21:6
33:2 66:14
70:20 80:19
81:1 92:7,14
93:23

decide  20:1

decided  45:25
46:8

decision  10:13
35:4 41:6,
11,14,16,18,
19 42:3,4
49:6 63:12,
14,18,23
64:3,8,18,23
69:8

decisions
48:24

defective  13:1

Defendant's
97:15 98:5,
7,9 99:13
100:9

definitive
83:2

degree  11:3
32:22 58:16

delve  91:22

demonstrating
71:9

department
43:21 44:17

depends  15:4

deployment
47:9,16,19

deposed  5:14

deposition  5:3
6:17,22 7:19
51:15 98:2

derive  87:5

describe  10:23

description
53:4

detail  35:23

details  53:4

determine
22:21

determined
22:1 96:5

device  11:9,11
12:10,13,16,

23 13:10
24:24,25
25:9 26:11
46:6 47:1,12
48:24 49:7
56:5,25
58:11 63:16
64:3,19 96:4
100:17

devices  12:20
23:22

difference
25:8

differences
26:14

difficult
35:10 96:17

direct  84:12

directly  27:6

disagree  80:6,
8,10,23
81:10,18
82:1,3

disappearing
30:15 100:25

discharged
65:6

disconnected
70:25

discussed
100:5

discussing
70:23 84:5

discussion
35:3 59:22
60:9

discussions
35:24 37:11
81:22 82:21
95:20

dismissed
71:18

dismissing
71:8 72:1

disrespect
38:25

disrespectful
36:5

disrespecting
36:5

distraction
100:7

distribution
10:7

disturb  60:14

division  10:6

doctor's  16:9

document
34:16,18
42:19 48:4,
16 49:1,11,
18 50:15,18,
20 51:8,9,
12,14,21,22
52:5,6 53:6,
10,11,25
54:25 55:7,

8,11 56:1,7,
9,12 62:23
65:9,10
68:25 70:13,
14 85:14
87:12

documentation
95:6

documents
28:23 34:8
55:13 56:14,
16,19

dollar 57:3

door 39:23

downsize 57:11

downsized
58:24

draw 98:20

Drive 9:14

drop 63:9

dropped 33:18
63:9 75:5,22

dropping 74:20

duly 5:14

duplex 8:16,19

duties 12:19
88:15,17
89:12

dynamic 19:23
24:12

déjà 96:23

E

e-mail 7:2,16
35:16,22
39:20 45:13
50:9 68:4,7,
8,10,13
70:15,17
71:15 72:11,
23 73:3,21,
23,25 74:1,
5,13,25
75:10 78:16
87:23 88:6
90:2,3,5,7,
10,13,15,18
91:20 92:4,6
94:3 97:8
98:12,14,22
99:2 100:3

e-mails 6:23,
25 7:1,3,5,9
45:16 59:13
79:14,20,21
92:1 96:14,
16

e-personnel
50:25

earlier 21:21
26:11 31:21
41:21 42:10
47:4 57:7,9
62:23 76:21
82:12 84:22
89:8 90:2
94:21,22,25

95:16,17

early 18:5
31:22 44:6
48:1 58:2
96:25 97:5

easier 15:19

effective
71:10

efficient 59:2
97:4

efficiently
31:11

effort 22:11
100:6

efforts 100:1

Eighty-five
21:5

elaborate
94:24 95:19

elevated 23:22

eliminate
10:24 48:24
49:7 56:25
63:16 64:3,
19 74:8,23

eliminated
49:8,14
50:16 51:6,
19,24 56:18,
21,22

elimination
55:5 56:4,
12,19

100:17,19

else's 99:20

email 98:17
99:14

embarrassing
86:5

emphasize 71:3

employed 9:18,
23

employee 16:8
35:10 37:23
44:16 53:24
67:2,3 77:10
90:3

employee's
54:3

employees
67:24 68:19
89:3

employer 53:23

employment
10:4,18
54:11,13

encounter
60:20

end 45:8 46:3

ended 83:16

ending 10:4

energy 67:14

engaged 75:2

engagement
71:7

engineer
  24:24,25
  25:9,10,12
  26:2,3,8,9,
  12,17,20,21,
  22 27:20,21
  47:15 48:25
  49:7 56:5
  57:1 58:11,
  15 63:16
  64:3,19 90:9
  100:18

engineering
  14:2 22:12,
  23 23:1,6
  24:13 26:16
  29:9 58:16

engineers
  26:24 27:20

English  90:8

enjoy  87:5

enjoyment  87:6

ensure  12:16

entering  74:4

entire  16:20
  18:1 34:17
  36:5 98:12

entirety  19:21

environment
  19:24 60:11,
  12,13,21,24
  69:8 72:5,16
  89:10 96:18

escalate  71:22

escalated
  67:18

essential  71:4

essentially
  11:1 20:15
  25:5 31:12
  57:21 60:20
  74:9 98:24

estimated
  18:14

evaluating
  96:2

event  33:20

events  74:5
  80:9

evidence  10:25
  12:17,21
  21:19 31:9,
  10

evident  47:23

exact  62:23

EXAMINATION
  5:16 94:18

examined  5:14

exceptional
  96:19

exchange  7:2
  37:5

exchanged
  65:16

excuse  88:23

executing  32:3

exhibit  48:5,9
  50:12,21
  53:10,14
  54:19 55:11,
  16 65:2
  68:11,15
  78:18 79:10
  87:12,16
  90:16 91:9
  97:16,18,20
  98:9 99:13
  100:9

exhibits  84:22

exists  10:24

expectation
  20:7 21:10,
  15 34:16
  67:23 68:1

expectations
  19:24 69:1
  85:7

expected  19:9,
  16 57:5 69:1
  78:1

experience
  25:13

explain  25:23
  63:10

express  89:20

expressed
  89:19

extent  22:19
  33:19 37:7
  50:19 61:15

64:10 86:23
  95:22

eyes  91:15

---

F

face  80:3,12,
  24 81:12

face-to-face
  37:8

facilitator
  60:18

facing  67:20

fact  36:4
  70:11 96:20

fair  18:16
  53:7 59:4
  65:12 84:7
  85:25

fall  16:24
  17:2,9,11
  36:21 46:22
  96:24

fast  75:22

faster  21:8

fault  38:17

feature  5:5

February  35:9
  47:8 97:1,6

feedback  46:12

feel  14:24
  30:24 71:25
  86:23 89:22

feeling   65:25

fell   37:6
   67:16

felt   76:11,12

Feuillebois
   84:2,4

field   12:17,
   20 13:7,15,
   21 25:3,4
   32:2

figure   20:16
   23:17 28:13
   57:4 96:17
   99:18

file   50:25
   51:2

filed   41:4
   76:17

fill   53:25
   55:25

filled   44:19

filling   99:23

fills   53:23

find   41:3
   99:17

finding   47:5

fine   14:17
   34:17 38:21
   49:16 53:8
   66:23,25
   67:1,5,6

finish   23:8
   30:18,24

31:7 38:13
71:17

finished   30:21

fix   13:22
   22:9,15
   23:12,15,23
   25:25 29:23
   30:7 36:22
   100:4

fixed   13:13
   26:19

fixes   25:19

fixing   23:20

flexible   15:2,
   8

floating   63:20

Flock   10:4,6,
   19,22,24
   11:3 13:4
   14:5 19:22
   43:22 48:7,
   12 50:13
   53:21 54:13
   55:21 68:11,
   18 77:10
   78:25 84:22
   87:22 90:16
   97:13,22
   98:15,21,23
   99:12

fly   20:10

focus   20:14,
   23 50:4
   64:13 70:11

focused   15:5

follow-up
   98:21

force   77:23,
   25

form   9:1
   15:12 18:4
   19:2,11
   22:17 28:4
   29:15 30:12
   33:25 37:13
   38:8 39:16
   40:2 41:7,20
   42:6 43:14
   49:10 50:17
   51:7,20
   52:4,24 55:6
   56:6 59:7
   62:1,21 64:7
   65:8 72:25
   73:6 75:16
   76:4,23
   77:12 79:15
   81:15 82:9
   85:13 86:8,
   22 88:16
   89:5 90:6
   93:7

formal   96:22

forward   97:9
   99:3,6

foster   60:11,
   12,21 71:6
   89:9

fostered   69:9

frame   32:24
   33:8,10,14
   65:18,22,23
   66:5,10,18
   69:20 70:9
   77:1 78:10
   80:14

frames   70:6

free   14:24
   30:24 89:22

freely   89:20

friendly   60:21
   61:1 62:10

friends   60:22

front   75:3
   77:9

fuck   69:24

fully   55:4

functioning
   28:2

funky   87:20

future   72:18
   88:15

G

Garber   26:25

general   7:9
   21:5 23:11
   30:13 47:13
   67:23 93:6

generally
   16:15 17:25

24:9 25:11
26:2 31:8
35:2

Georgia  8:1
9:15

give  12:9
22:22 38:19
42:19 55:11
63:12 92:15
94:10,11
96:21 97:12

giving  23:22

glasses  91:18

God  95:2

Gonzalez  11:22

good  5:18,22
22:13 91:8,
14 94:16
95:8

Gotcha  18:10
45:20 64:24
67:22 73:19
74:10,19,24
80:4 81:8
88:21

grand  26:5

great  65:17,
25 66:1
75:20

greatly  44:21

group  16:20
19:25 32:15,
21 34:17
35:16 36:5,

6,9,24 38:7
39:6,8 58:22
60:9,15
61:20 63:15
64:5 65:13
68:2 69:1,2,
3,4,5,8,17
70:5,6 71:25
76:21 77:20
95:24 97:3

groups  26:23

growing  44:18

guess  7:4
8:18,20 17:5
18:19 22:11,
13 31:21
32:17 35:2
44:7 46:4,5,
21 48:6 51:1
58:9 65:24
70:5 74:14,
22 92:11
97:4

guy  37:24

guys  22:14
57:20 89:10

H

half  8:25

Hampshire  9:14

handle  13:4
20:2

handled  72:10

handling  16:25

47:16

happen  22:10
24:7 64:17

happened  12:1
24:10 33:1,4
36:24 39:15
40:11,20,23
58:21 65:20
71:2 73:5
85:6 91:3

happening  12:2
26:23 71:1
75:14

harassing  86:9

harassment
86:14

hard  6:9

head  82:6,17

headcount  96:6

hear  61:19

heard  34:1,15
78:21 79:13

hearing  33:23
34:10 71:23

heaters  23:18

helping  46:16

hey  28:10
45:17 59:23
61:24 65:16
67:2

high  17:17,18

highlight

54:24 72:14

highlighted
81:20

Hills  7:25

hired  12:6,8
44:19 54:15,
16 72:6

hold  28:19,
21,24 29:2,
3,13,18,20,
22,24 30:1,
3,7,10 31:12

holidays  61:10

hone  97:3

honestly  81:4
100:22

hope  72:16

hour  35:16
64:16

hours  14:22
15:1,23
16:10,13
59:22,24

house  8:5,17

HR  33:23
34:2,11,13
40:6,8,10
41:11 42:11
68:8 73:24
89:4

human  75:3

hundred  18:22

hung   58:21
  63:16 76:7
  81:6

hyphen   80:7

_____

         I

idea   26:22

ideal   65:23

identification
  48:10 50:22
  53:15 55:17
  68:16 79:11
  87:17 91:10
  98:10 100:10

ignore   16:4

images   15:5

imagine   69:18

immediately
  15:20

impact   20:16,
  24 21:18

impetus   36:23
  37:10 38:5

importance
  71:10 93:17

important
  71:5,20,24
  90:4 91:6

improve   36:20

improvement
  72:17

inappropriate

75:2

inappropriately
  77:9

inaudible
  10:17 11:18
  15:4 18:3
  23:7 25:2
  31:12 62:6
  64:8 66:15
  67:19 83:21
  94:25 98:1

inches   82:6,18

incident   68:22
  77:16 93:16

include   7:11

independent
  92:3

individual
  23:15,21

individually
  23:20

individuals
  12:6 19:9

inform   87:24

information
  26:24 50:20
  52:21 53:2
  78:22 79:14,
  19

informed   40:24

inhibited   6:2

inside   22:4
  90:3

intent   62:10

interact   27:5

interacted
  32:2 77:13

interaction
  35:9 75:6

interactions
  37:10 38:6
  63:19

interim   88:18

interrupt   6:12
  31:6 95:11

interrupting
  30:19,22

interrupts
  30:25

intervening
  65:20

interview
  40:10

invented   58:13

involve   61:6

involved   36:11

involvement
  34:22 36:1

irrelevant
  86:9

issue   16:6
  27:14 28:17
  46:6 67:4,10
  68:23 69:12,
  21 70:22

71:8,16,18,
  21 72:24
  73:14 76:20
  91:21 92:16,
  22,23 93:15,
  22

issues   28:2
  45:23 46:1
  47:6 72:15
  93:5

_____

         J

January   9:25

Jhostin   11:12,
  13 24:17
  33:3,7,9,13,
  15 34:11,13,
  15,18 35:3,
  10,11,12,13
  36:2,3,4,8,
  12,15,19,25
  37:3,17,18,
  19,25 38:6
  39:4,6,9,18,
  22 40:7,9,
  12,25 41:22
  42:12 46:13,
  15 47:6,17,
  20,23 48:20
  54:4,5,7,8
  56:4 58:21
  59:14 60:7,8
  61:3,11,14,
  16,23 62:3,
  12,14,19,22,
  24 63:5,18,

20,22,24
64:4,20
65:15,16,19,
22 66:3,5,
10,12,17
67:11,16,20
69:10 70:17
72:4,6,8,23
73:1,4,12,
16,17 74:6,
12 75:2,5,
12,14,15,20,
21,22 76:15
77:1,5,15
78:9 80:25
81:1,2,23,24
82:5,16
88:4,19
91:22 92:25
93:1,4,8,14,
20 94:23
95:17 96:10,
12,16 98:17
99:9,16,21
100:2,14,19,
23

**Jhostin's**
33:5,12 35:7
36:21 37:11
39:1,4 40:22
49:23 66:9
72:3 85:11
97:9 98:25
99:6,20
100:6

**Jira** 27:16,21
28:2,11,14

**job** 12:15
57:14 72:3
78:3 81:13
86:4 96:4

**join** 43:11
65:24 95:5

**joined** 76:9
77:15

**joining** 75:15

**July** 14:23
93:3

**justify** 57:6

**Justin** 7:3,13
56:17 62:15
75:7 81:6
82:21 100:24

**Justin's** 7:6
49:8

---

**K**

**KEATING** 9:1
12:11 15:12
18:4 19:2,11
22:17 23:8
24:21 28:4
29:15 30:12,
18,21 33:25
37:13 38:8,
13,17 39:16
40:2 41:7,20
42:6,20
43:14 49:10
50:17 51:7,
13,20 52:4,
15,24 55:6

56:6 59:7
62:1,5,21
64:7 65:8
72:25 73:6
75:16 76:4,
23 77:12
79:1,4,15
81:15 82:9
83:3,10
85:13 86:8,
12,22 88:16
89:5 90:6,
19,21,25
91:5,15 93:7
94:10,19
95:7,12 96:9
97:13,19,22
98:1,7,11
100:11

**keeping** 21:18

**kicking** 38:5

**kind** 6:6
26:22 35:1
39:12 44:6
45:18,22
60:12 86:4
89:9

**knew** 36:15
39:9 45:6
46:15 62:14
80:14 92:25

**knowing** 50:3

**knowledge**
50:20 52:10
59:21 65:9

---

**L**

**lack** 22:2
55:2,3 71:9

**lackluster**
100:6

**lag** 38:15

**laid** 37:23

**late** 31:21,22
44:12 60:1
66:2

**Laura** 34:6
42:17 49:22
50:8,9 68:6
84:1,11,15
85:3,5,21
97:8 99:6,8,
15

**lawsuit** 41:4
70:2 76:17

**learn** 72:6
78:3 85:11

**leave** 10:13

**leaving** 75:15

**led** 7:3

**left** 11:25
97:16

**legitimate**
29:5,20

**legitimately**
29:14

**level** 26:9

46:5

**liaison**   27:19

**liaisoned**
 26:21

**life**   61:6,7

**limit**   25:16

**lines**   80:18

**list**   88:3

**listen**   31:4

**live**   7:22,23
 8:5 45:14

**lived**   9:9

**lives**   8:18,24

**living**   8:17
 38:18

**LLC**   9:19,21,
 24 43:9

**locations**
 12:24

**Lodge**   5:4,13,
 18 31:2
 38:23 43:3
 50:24 51:17
 52:13 53:12,
 22 70:16
 83:16 86:1,
 19 87:14
 91:12 94:8,
 20 98:13

**logged**   35:17
 40:12 59:15
 64:5,20,21
 65:19 66:18

81:3

**longer**   38:1

**looked**   6:23
 23:21 50:15
 56:15 57:17
 90:1

**lot**   18:7
 20:18 21:7
 42:23 72:5

**low**   59:17
 100:23

**lower**   57:22
 58:14 99:20

**lowest**   36:3
 39:5 99:10

---

### M

**madam**   5:7 6:6
 91:5

**made**   10:13,19
 15:20 35:5
 41:6,11,13,
 17,18,19
 42:5,9 48:23
 50:1 63:14,
 18,24 64:4,
 20,23 99:16

**maintain**   72:15

**major**   90:9

**make**   6:5 7:18
 20:16 21:18
 25:6 41:16
 46:17 57:14
 63:5 72:7

97:3 99:22

**maker**   64:9

**making**   12:20
 87:8

**malfunctioning**
 14:19

**manage**   35:11

**managed**   11:8

**manager**   10:2
 43:23 84:13

**manipulate**
 99:21

**March**   17:25
 18:2,12,20
 20:18 35:9
 45:9,11 47:8
 97:6,7 98:23

**mark**   48:4
 50:12 53:10
 55:11 68:10
 78:17 90:16
 97:15

**marked**   48:10
 50:22 53:15
 55:17 68:16
 79:11 87:17
 91:10 98:10
 100:10

**married**   62:3,
 13,14

**mass-moving**
 99:23

**matter**   70:24

100:15

**Mccormick**   34:6
 42:17 49:22
 68:6 84:1,
 12,15,24
 85:3,5 97:8

**meaning**   25:2

**meet**   45:15

**meeting**   32:16,
 21 33:4,7,10
 34:24 35:17
 36:24,25
 38:7 39:1,
 19,23,25
 40:11,14
 42:10,12
 48:21,23
 49:22,23
 50:3 58:22
 62:19 63:15
 65:14,21
 66:4,6,13
 67:8,12,21
 68:3 69:18
 70:21,23,24
 75:6,7,9,15,
 19,20 76:19,
 22 77:2,5,8,
 14,20 81:19
 83:17,23,25
 84:7,9,19,
 23,24 85:21,
 22 92:23
 93:4,21 95:5

**meetings**   20:5
 37:17 39:15

65:24 68:20 69:17 70:7 71:4,6 72:18 77:16,19 78:12 84:11, 12,14 85:6

members 36:7

memory 34:9 65:19

mention 34:15 47:12,13 61:14

mentioned 21:21 33:9 60:8 81:21 92:5 94:22, 25 100:2

mentioning 92:6

mentions 47:9, 16,19,20

mere 36:4 96:20

mess 100:4

message 37:19

met 48:20 99:8

Mia 11:21

Michelle 11:24

mind 10:20

mine 91:16

minimum 39:6

minutes 35:16 45:14 94:11, 13

misstates 22:18

misunderstanding 39:11

mm-hmm 31:3

moment 49:19

moments 65:20

money 57:20

month 99:4

months 12:5 17:23 21:22 24:5,8

morning 5:18 20:15 42:24 61:20 69:5

mornings 16:17

move 8:2 21:15 81:4,6 87:10 88:14 97:8 99:3

moved 82:6,18

moving 16:23 99:6

myriad 23:3

**N**

nah 89:17

named 26:25

national 43:22

nationwide 14:5

natural 40:19

needed 13:17 15:3 25:20 32:23 36:16 37:25 46:12 50:5 57:10, 13,24 58:24 78:13 87:7 98:25

nice 33:13 66:18

night 14:15, 20 15:3,15, 19,25 60:8 66:2

nighttime 15:5,6,10 16:5 60:3

noncommunicative 74:7

nonresponsive 39:18

normal 15:1,23 16:10 17:5 33:12,21 59:22,24 69:22

normal-thinking 39:21

north 18:6

notes 7:18 94:12,15

notice 53:22 54:4

November 5:4 12:14 14:9, 23 17:25 18:1,2,12,20 19:14 20:18 31:17 35:8, 25 36:4,13, 24 38:5 41:25 52:3, 14 58:3 65:14 83:18 84:4,6,16 85:4,5 89:14 96:11

number 48:8 69:3 96:2

numbering 98:3

numbers 18:16

Nunez 54:5,7

Nunez's 88:5

**O**

object 10:25 15:12 18:4 19:2,11 22:17 28:4 29:15 30:12 33:25 37:13 38:8 39:16 40:2 41:7,20 42:6 43:14

49:10 50:17
51:7,20
52:4,24 55:6
56:6 59:7
62:1,21 64:7
65:8 72:25
73:6 75:16
76:4,23
77:12 79:15
81:15 82:9
85:13 86:8,
22 88:16
89:5 90:6
93:7

objected 32:14

objection 9:1
12:11 24:21
51:16 52:15
83:3 95:22

obligation
72:7

obvious 100:20

occurred 34:12
84:5

occurrence
92:5

occurrences
92:5

October 58:2
59:6,11

offer 46:7

office 13:7

offline 22:24

Omar 5:3,13
30:24 70:16
85:10 91:16
99:15

one's 100:4

one-on-meeting
75:13

one-on-one
32:16 33:18
36:25 37:2
38:7 40:1,4,
11 58:22
63:15 64:5,
21 66:16
70:24 73:16
75:6,9 77:7,
17,20 81:10,
11,19,23
82:19 83:17,
23 93:4,21

one-on-ones
59:3 61:21

ongoing 96:7

online 23:4

open 45:5,7

opening 44:17
45:18 59:16

opportunity
10:11

ops 22:12
25:3,4

opt 15:5

order 25:4,24

orders 32:4

ordinary 54:25

Oswald 11:21

output 99:1,
18,20,21
100:20

owns 27:10

---

**P**

pages 51:2

paper 63:3

paperwork
37:24

Pardon 52:25

park 100:21

part 23:6
31:21,22
35:6 41:15
46:4 50:25
67:18 71:4
80:6 82:4
92:11

participation
71:4 72:17

parts 97:5

pass 25:19
26:23 27:21

passed 26:20

past 80:8

Patrick 23:9
30:19 42:21
69:9,22

orders 32:4

82:20 83:11
91:2 97:13

pause 38:20

paygrade 58:6,
7 100:23

paying 57:20
80:16

PC 92:8

pending 42:22
62:6

people 5:25
11:1 21:7
25:13,17
32:5 39:7,8,
21 45:22,25
46:9 47:4,5,
24 57:17,24
61:13,18
62:8 65:24
66:22 69:22,
25 70:6 84:8
88:3 89:13,
19 99:19
100:2,3

perfect 64:11

performance
62:20 68:25
85:11 91:24
98:18

performer 36:3
39:5 99:10

period 18:1,
11,18,20
44:6,9 54:10

59:19

person  8:24
  22:21 38:18
  40:15 41:5
  46:13,16
  47:17 60:15,
  16 88:23,24

personal  61:6,
  21

personnel  51:2
  75:3

persons  8:17

perspective
  36:15 40:23
  100:18

Philly  95:3

phone  45:13

physical  97:12

physically
  12:24,25
  13:16

piece  63:3

ping  95:9

pivot  95:25

Plaintiff's
  48:9 50:21
  53:14 55:16
  68:15 79:10
  87:16 91:9
  98:1

plan  22:7
  88:13

planning  72:23
  73:4

plans  8:2
  61:4,24

plant  51:14

pleasure  87:6

point  14:24
  17:6 30:10
  34:18 37:20,
  25 63:23
  64:4 65:16,
  18 80:11
  90:10,12,15
  91:13

policy  68:18
  69:24

pool  97:4

portion  81:13,
  20

portrays  90:7

position  10:1
  24:18 32:23
  44:20 45:5,6
  49:8,13
  50:16 51:6,
  18 55:5
  56:4,12,17,
  19,21,22
  58:12,14
  59:17 63:17
  64:4,19
  74:9,23
  76:20 81:12
  87:7 98:25

positioned
  68:19

positions
  48:25 49:8
  81:22

positive  72:15

possibly  34:6
  84:17

potted  51:14

preceding
  88:25

predetermined
  15:14

preliminaries
  5:24

preparations
  7:19

prepare  6:16,
  21

preparing
  79:22

present  5:10
  32:15

presented
  19:25

pressure  61:16

pretty  6:24
  17:2,12
  20:19 21:5
  26:8 34:25
  37:3 67:15
  74:6 81:3
  96:25

prevent  29:3

previous  43:21
  44:16

primarily
  46:11

prior  10:5,10
  16:11 22:18
  79:25 96:11

privilege
  79:16

privy  23:5

problem  42:25
  71:18 82:7,
  19 92:14,25
  93:9 99:10

problems  13:12
  14:13 35:18

process  19:16
  30:11 35:6
  39:22 60:6

production
  11:9 66:13,
  14

productive
  72:16

productivity
  33:16 80:20
  81:2,13

professional
  61:7 72:2
  78:1

progression
  40:19

promoted   11:25

pronounce   84:2

proper   72:8

proportion
  68:24

provide   40:22

providing
  26:15 86:16

pull   78:18
  90:13 99:12

purchase   25:25

purpose   12:18

purposes   48:15
  98:8

pursuing   81:5

pushing   69:25

put   15:24
  20:20 21:23
  22:4,14
  29:3,13,20,
  22,24 30:1,
  7,10 31:11
  77:21,22,23,
  24 78:7,8
  80:3 90:4
  93:17

putting   28:19,
  21,24 29:2
  90:8

---

Q

---

QA   47:9,15,19

quality   91:23

question   23:9
  32:18 37:16
  38:20,22
  39:13 42:22
  47:4 52:8
  58:9 64:2,
  13,18 69:13
  70:3,4 71:17
  81:16 85:7
  86:20 93:9
  95:14,15

questioned
  32:22 70:21

questioning
  16:24

questions   62:6
  64:15 83:11,
  12 86:2,5,6
  90:14 94:20

queue   20:20
  21:11,14
  22:3,4,15,16
  47:16

queues   22:14

quick   42:22
  65:3

Quinones
  11:12,13,16
  35:25 41:6
  42:4 45:23
  46:1 51:1
  52:22 54:4,
  8,23 56:20
  59:19 63:15

64:20 67:7
  68:3 70:11
  77:8,21
  78:7,13
  80:18 81:18
  83:18 87:3,
  6,25 89:4

Quinones'
  24:18 32:11
  52:19 54:13

Quinones's
  12:3,5 32:9
  34:22 53:3,4
  56:4,24 75:1
  84:15 88:25

---

R

---

raised   73:13
  83:22

raising   77:4

reached   10:9
  34:1

reaching   43:10

read   34:24
  48:13 49:2
  51:22 52:6,
  11 71:12
  72:19 76:17
  78:20 79:2
  81:20 87:21
  90:17,19,22

reading   49:5

ready   78:23
  79:5 81:4,6

realize   22:15

realizes   99:25

reanswer   75:18

reason   5:23
  6:2 15:24
  29:19 33:5
  39:1,4 50:15
  51:6,18
  54:22 55:1
  56:3,16 65:5
  94:2

reasons   21:13
  29:5,8,12,13
  66:22

rebuttally
  70:22

recall   14:1
  17:16 18:16,
  24 19:8
  28:3,6 32:13
  34:5,20
  40:16 52:20
  54:12,14
  56:25 73:18,
  20 76:15,18,
  25 78:9,13
  83:24 84:7,9
  93:23 94:6
  96:14 97:7,
  20 98:14
  99:4

receive   17:15
  24:3

received   18:14

receiving   17:1

recess  5:12
  43:1 83:14
  94:17

recognize  51:3
  53:11 87:19

recollection
  65:15 85:20
  92:4 99:14

recommend
  96:10

recommendations
  95:21 96:15

recommended
  41:17,21,25

recommending
  94:22 95:17
  97:8

record  6:14
  48:15 78:25

recording  5:5

red  65:6

reevaluate
  21:2

reference
  79:22

referenced
  42:10 95:17

referencing
  68:10,13

refresh  34:9
  85:20

REID  5:7,17
  9:5 12:12

15:16 18:9
  19:4,7,13
  22:25 23:10,
  25 24:22
  28:8 29:17
  30:16,20
  31:1 34:3
  38:2,11,15,
  23 39:10,24
  40:5 41:12,
  23 42:8,25
  43:2,15
  48:11 49:15
  50:23 51:11,
  15 52:1,8,17
  53:1,16
  55:9,18 56:8
  59:9 62:2,11
  63:1 64:12
  65:11 68:17
  73:2,8 75:23
  76:5 77:3,18
  78:24 79:3,
  7,12,17
  81:17 82:11,
  24 83:5,13,
  15 85:15
  86:10,15
  87:1,18
  88:20 89:7
  90:11,20,23
  91:3,8,11,17
  93:12 94:7,
  16 95:2,22
  97:17,21,23
  98:4

related  10:18
  12:20 14:14

52:22 76:13

relates  74:4

relationship
  8:11

relayed  79:19

relevance  9:2

relevant  52:10
  86:10,18

remember  6:25
  7:12 11:15,
  20 16:24
  24:17 28:15,
  17 32:10,20
  33:22 34:10
  35:15 37:7
  40:18 44:23
  45:4 52:18
  58:20 59:13
  68:2,6 71:1
  74:3 75:8,
  14,21,24
  76:1,11 77:4
  80:21,25
  81:21,24,25
  82:2,3,10
  83:7,9,19,
  22,25 84:14,
  23 85:22
  92:7 94:4
  96:21,25
  97:10 99:8,
  16

remote  15:2
  71:5

remotely  5:11

13:12,13
  25:25 26:19
  29:23

remove  25:4

repair  14:2

repeat  95:14,
  15

replace  25:5

replaced  92:17
  100:13

replacing
  100:15

replying  85:9

report  22:22
  23:12,23

reported  31:14
  41:9 73:13

reporter  5:7,
  10 6:7 91:5,
  7

reporting  38:1
  63:21,23

reports  26:16
  37:21

represent
  50:24

reprimand  90:3
  92:21

requested  95:4

requests  76:12

required  71:21

requirement
  21:1

reserved   51:16

residence   8:3

residences
  9:10,13

resolve   72:15

resources   75:3

respect   71:9
  93:18

respectable
  77:25

respond   37:15

responded
  70:20 94:2,5

responding
  74:21

responds   85:17

response   37:20

responsibilities
  88:5

responsibility
  14:9 26:3

responsive
  46:14 92:13

responsiveness
  92:12

restroom   83:12

result   49:5,6
  62:20

resulted   37:11

retaliation
  86:15

retrieve   32:6

retrieved
  13:17,21

review   7:15
  20:6

reviewing   92:4

rid   59:17

roadblock
  60:19

rocket   100:22

role   25:2
  26:15

roles   26:15

roll   25:22,24

rolls   25:12,
  15,17

room   60:2
  66:7 94:14

roommates   8:9,
  11,12

rotation   47:20

rotational
  46:25 47:2

rude   64:14

rule   69:15

rules   69:14

rundown   12:10

---

S

sales   10:2
  43:23 44:17

salesperson
  44:19,21

Samuel   11:21

scheme   26:5

science   100:22

screen   49:18
  81:12 91:1
  97:11

script   7:12
  34:24 42:9,
  10,11,15
  48:6 49:24
  50:1 56:15

scroll   55:19
  78:23 79:2,5

scrolling   79:6

season   17:3,20
  18:8 46:22

selected
  100:19

send   37:19
  73:25

sending   35:15
  73:21,23,24
  96:14 97:7

sense   24:13
  71:6

sentences   37:6

separate   56:24
  97:23

separation
  48:20,23
  53:22 54:4,
  23 55:1,4
  75:7

September   45:8
  59:14

service   57:17

set   85:8,10

sexual   86:13

sexuality
  86:7,21

sexually   87:2

share   42:18
  61:12,19
  68:9 70:13
  84:21 91:4

shared   61:18

sharing   49:18
  61:15 95:5

Sharp   11:24

shock   67:17

shocked   33:4,
  19

short   63:19
  75:19

shoulder   33:8

show   48:4,12
  49:17 53:9
  55:10 57:14

78:16,17
87:11

**showed**  10:16
54:19 62:23

**showing**  37:17
91:1

**shown**  97:11

**shut**  39:22

**sic**  45:1
51:14

**side**  8:19,20

**significantly**
18:25 19:5

**simply**  15:9

**sir**  10:21

**situation**  16:5
33:24 34:11
74:16 84:5
93:24

**size**  57:3,7

**skills**  57:22
96:3

**skipping**  39:9

**Slack**  92:12

**slow**  46:14

**small**  46:2

**snack**  94:14

**software**  13:11
14:19

**sole**  12:18

**solely**  64:8

**solution**  30:2,
9

**Solutions**
55:22

**solve**  18:14
19:9 93:1

**solving**  91:24

**someone's**
15:18

**sooner**  17:5
45:11 100:8

**sort**  87:6

**Sounds**  94:16

**Southern**  9:19,
20,24 10:5,7
43:8,19

**speak**  27:11
33:13

**speaking**  6:7

**speaks**  49:11
51:8,21 52:5
55:7 56:7
85:14

**specific**  32:23
47:14 54:14

**specifically**
14:13 18:3
21:1 78:10

**spoke**  27:12
37:7 40:13,
16 49:25
60:7 61:8,10
66:7 70:8

**spoken**  40:18

**stacked**  38:10

**standard**  21:6

**star**  63:20

**start**  6:9
16:15 21:16
30:6,8 35:8
43:25 44:2
45:25 47:5
91:21

**started**  10:6
33:7,11
45:7,24
46:11 47:25
60:15 65:22
66:4 97:3
100:6

**starting**  37:11

**starts**  84:22

**startup**  10:8

**state**  55:3

**stated**  59:14
70:22 71:13
90:10 99:25

**statement**
37:15

**states**  9:19,
20,24 10:5,7
14:7,10
43:9,20 49:1
55:8 88:6
92:1

**stating**  47:11

93:24

**stay**  49:21

**stayed**  60:2

**stepping**  88:4

**steps**  93:1

**stipulated**  5:9

**stop**  49:18
61:16

**stopped**  37:17
44:14 63:19,
24 70:21

**stops**  79:8

**story**  80:9,10
98:25

**straight**  86:25

**straw**  38:9,10
39:14,17

**strong**  97:6

**stuff**  23:20
45:18 89:11,
12

**submitted**
28:11

**Subsequently**
70:22

**success**  27:3,5
47:10

**suffering**  22:2

**suggest**  78:4

**suggested**
70:23

summer   24:5,7
   61:3

sun   18:5
   80:13

sunlight   17:4
   22:2

supplied   12:16

support   11:9,
   11 12:10,13,
   23 13:10,15
   24:24,25
   25:9 26:2,3,
   11 47:1
   48:24 49:7
   56:5 57:1
   58:11 63:16
   64:3,19 96:4
   100:18

supported
   28:10

supporting
   57:6,16

supposed   46:5,
   15 47:15,24
   72:10 99:24

surprised   60:5
   69:10

surrounding
   32:10

swear   5:8,11

sworn   5:14

sync   59:25
   93:25

syncs   20:4,7,
   14 21:16
   61:20

system   28:2,14
   99:18,21

systems   24:12

────────────

          T

taking   6:7
   47:23,24
   91:24

talent   97:4

talk   6:18,20
   18:11 31:4
   32:8 33:17
   43:5 66:15
   73:9,11,15
   89:10 94:14

talked   6:19
   26:10,16
   48:6 59:6
   74:5 89:8

talking   6:9
   7:6 16:6
   21:17 30:20,
   22,23 35:8
   42:11 45:21
   46:20 53:3
   67:19 69:14
   83:16,17
   91:21 97:5
   99:5,6
   100:12

talks   35:7
   81:10

team   11:3,6,
   8,12,13,16,
   18,21 12:7,
   10,13,23
   13:4,6,7,9,
   10,15,20,21,
   23,25 14:1,
   2,8,12,23
   16:11,25
   17:14 18:14
   19:9 22:8,
   20,23 23:1
   24:3,18
   25:3,4 26:16
   27:2,3,4,14
   28:13 29:9
   31:16,20,23,
   25 40:11
   45:22,25
   46:2,7 47:5,
   6,10,12
   48:25 57:3,
   4,7,10,15,25
   58:24,25
   60:11 64:21
   71:6,11
   72:16 80:20
   81:2,13
   87:24 88:3,
   25 89:14
   97:2 99:25
   100:5,16

teams   12:19
   31:15,19

tech   31:20,23
   32:2 46:4,5,
   7,10,14,16,

22,24 47:1
   57:16

technicians
   32:3

telling   32:14
   68:22 76:11,
   14 78:9,13
   81:5 87:6

temporary
   87:24 88:2,
   7,9

ten   59:15

term   25:21
   28:22

terminate   41:6
   42:4 53:23
   88:23

terminated
   7:4,13 11:17
   35:4 36:1,3,
   13,16,18
   37:25 39:5
   41:22 42:1,
   12 56:17,21
   62:20 87:25
   88:24 89:2
   94:23 95:18
   96:11,13
   99:11

terminating
   73:4

termination
   7:6 12:3,5
   24:23 32:9
   11,21 33:6,

23 34:23
35:1,7 37:12
39:2,4 49:23
50:15 51:5,
18 53:3,4
56:4,24
62:19 75:1
77:8 84:15,
16,24 89:1
97:9 99:3,7
100:19

terms 10:20
35:3,24

testified 51:9

testifying 6:3

testimony
22:18 43:5
94:21 95:16

thing 36:22
68:23 78:2,3
82:13

things 23:3
25:14 26:5
39:21 40:20
47:8 58:21
61:13 89:18
90:5 91:23,
25

thinks 72:4

thought 23:10
90:23

thread 98:13

ticket 27:16,
22 28:11

tier 22:21
25:16,17,20
39:7

time 7:6
10:12 11:16
12:11 14:25
17:3,22
18:15,18
19:12,21
24:21,23
28:9 31:16
32:14,21
34:14 58:23
59:8,18
64:11 68:18
70:10 71:21,
23 72:22
73:3 74:25
76:16 79:25
85:8,10,18
89:14 90:19,
22

timeline 54:15

times 18:3
20:8,18
24:3,11
46:10 93:19

timestamp
98:23

timing 64:11

title 24:19

today 5:19
6:3,17,22
33:3,5 65:25
66:1,15
94:21 95:16

told 16:11
35:17 44:24
48:22 49:4
59:5,11 61:5
90:21

top 47:16
91:20

touched 36:8

tough 48:23

toxic 60:23

transparency
71:7

treat 93:18

trenches 60:17

trial 51:16

tricky 17:2

troubleshoot
14:13

truck 25:12,
15,17,21,24

true 17:8
19:21

truth 76:14

truthfully 6:3

Tucker 9:14

turn 30:3
33:12 66:9
69:21 87:8

turned 5:6

turning 24:14

type 15:4

30:14 96:3,7

typical 30:6

typically 5:25
90:4

U

uncomfortable
67:8 69:11
76:12,16
82:22

understand
32:17 37:16
38:12 54:7
60:4 69:9
86:3

understanding
11:2 13:9

understood
67:17

Unemployment
55:22

United 14:6,10

unresponsive
74:12,15

unwavering
93:18

uptight 30:15

usual 12:15

utmost 93:17

V

vague 18:4

19:11

**valuable**   57:15

**verbal**   68:3

**verbatim**   49:5,
6

**verbiage**   48:19

**video**   14:14
34:14,16
70:7,12 71:4

**videoconference**
5:3

**view**   37:25
80:11,24

**visually**   25:18

**voice**   77:4
83:22

**volume**   17:17,
18 20:1

**volunteered**
46:7 100:24

**vu**   96:23

---

**W**

---

**wait**   22:9

**walk**   98:12

**Walter**   95:4,8,
10

**wanted**   10:10
15:24 25:12
27:20 36:3
44:18 52:6
61:18,19

77:22,24
78:8 89:22
90:7 100:14

**wanting**   63:6

**warning**   68:3
96:22

**ways**   99:17

**wear**   91:18

**week**   59:3

**weekend**   61:4,
9,24 62:9

**weekends**   89:11

**weight**   100:16

**white**   18:7

**winter**   20:17
21:22 22:13
46:22

**Woodland**   7:25

**word**   80:8
88:9,12

**words**   50:4,6,
7 62:22,24
63:2,8 65:15
67:11 78:6
89:13,17
93:24,25

**work**   15:2,3,
6,10,15,23
16:10,14
21:7 25:3,
13,24 26:9
30:1 32:3
35:11,13,14,

18 36:7
37:24 39:7,
22 43:17
47:8 52:2,
14,19 55:2,3
57:4,22 58:5
59:22,24
60:8,20,23
69:4 72:14
75:2 85:11
89:10,11
96:7 99:1,17
100:2,20,23

**work-related**
91:23

**worked**   10:5
19:22,23
21:10 39:20
43:21 47:17
61:13 66:2
73:1

**working**   14:17,
22 15:10
21:14,16
22:12 29:9,
25 59:19,22,
24 60:1
71:25 72:23
92:8 99:22

**workload**   21:7
96:2

**world**   96:20

**worst**   86:6

**worth**   81:5

**would've**   17:8

**write**   50:6,7
70:18 87:23
88:8

**writing**   90:1,2

**written**   19:25
50:4 94:3

**wrong**   12:25
13:16 47:11

**wrote**   42:14
70:15,16

---

**Y**

---

**y'all**   89:17

**Y-L-L**   9:4

**year**   17:23
18:12 41:22
44:20 45:8
57:8

**years**   8:3
9:10 88:25

**Yll**   9:4

---

**Z**

---

**Z-E-K-E**   9:4,6,
7

**Zeke**   9:4

**zoom**   5:5
38:15 55:20
91:4,12

**Omar**: Thank you for meeting with us today. We've made some tough business decisions to eliminate one of the Device Support Engineer II positions on our team. That means that your position is being eliminated, and that today will be your last day working at Flock. You will be offered a severance of 8 weeks of pay and Laura is here to tell you more about the severance and benefits that will be offered.

**Laura**:
I will send an email today to your personal email address with all of these details stated in writing. Please verify that your personal email address is: jhostinn1239@gmail.com

You will be paid your last regular paycheck for November 1st through November 8th via direct deposit, on or before November 10th.

Regarding the severance, I will send a separation agreement today via DocuSign to your personal email address. The separation agreement will contain an offer of 8 weeks of pay (totaling $12,104.00 minus applicable taxes). You will have 7 days to decide to sign the agreement. If you sign the agreement, we must hold it for 7 days after, during which you can revoke the agreement. Payment will be made as soon possible after the 7 day period lapses. Your medical insurance will continue through the month of November, and Flock will also pay for 1 additional month of medical insurance through COBRA, so that you will have medical coverage through December.

IT will send you a box to return your laptop. Please verify your physical address: 1310 Beaver Creek Road Alpharetta, GA 30022

Do you have any questions?

Thank you and we wish you well.

Meeting Link:

https://flocksafety.zoom.us/j/81374788995



EXHIBIT
LodgeO-1
Huseby.com

EXHIBIT

LodgeO-2

Huseby.com

# Termination Information

**Last day of work**

11/08/2023

**Rehire in future**

No

**Termination Type**

Involuntary

**Termination reason**

Position eliminated

CONFIDENTIAL

EXHIBIT
LodgeO-3
Huseby.com

State of Georgia
Department of Labor

## SEPARATION NOTICE

1. Employee's Name: Jhostin Nunez
2. SSN: XXX-XX-4015

   a. State any other name(s) under which employee worked. ______

3. Period of Last Employment: From 06/21/2021 To 11/8/2023
4. REASON FOR SEPARATION:
   a. LACK OF WORK ☐
   b. If for other than lack of work, state fully and clearly the circumstances of the separation:
      Position elimination

5. Employee received payment for: (Severance Pay, Separation Pay, Wages-In-Lieu of Notice, bonus, profit sharing, etc.) (DO NOT include vacation pay or earned wages)
   Separation Pay (type of payment) in the amount of $ 12,104.00.00 for period from November 9, 2023 to January 4, 2024

   Date above payment(s) was/will be issued to employee on or before 11/22/23

   IF EMPLOYEE RETIRED, furnish amount of retirement pay and what percentage of contributions were paid by the employer.
   ______ per month ______ of contributions paid by employer

6. Did this employee earn at least $7,300.00 in your employ? YES ☑ NO ☐ If NO, how much? $______
   Average Weekly Wage ______

Employer's Name: Flock Safety, Inc

Address: 1170 Howell Mill Rd NW UNIT 210, (Street or RFD)

City: Atlanta State: GA ZIP Code: 30318

Employer's Telephone No. 866-901-1781 (Area Code) (Number)

**Ga. D. O. L. Account Number** 359208-06
This is the number assigned to the employer by Georgia Department of Labor.

I CERTIFY that the above worker has been separated from work and the information furnished hereon is true and correct. This report has been handed to or mailed to the worker.

Laura McCormick
Signature of Official, Employee of the Employer or authorized agent for the employer

Sr. HR Business Partner
Title of Person Signing

7/5/2023
Date Completed and Released to Employee

### NOTICE TO EMPLOYER

At the time of separation, you are required by the Employment Security Law, OCGA Section 34-8-190(c), to provide the employee with this document, properly executed, giving the reasons for separation. If you subsequently receive a request for the same information on a DOL-1199FF, you may attach a copy of this form (DOL-800) as a part of your response.

### NOTICE TO EMPLOYEE

**OCGA SECTION 34-8-190(c) OF THE EMPLOYMENT SECURITY LAW REQUIRES THAT YOU TAKE THIS NOTICE TO THE GEORGIA DEPARTMENT OF LABOR FIELD SERVICE OFFICE IF YOU FILE A CLAIM FOR UNEMPLOYMENT INSURANCE BENEFITS.**

# flock safety

**Flock Safety Termination Form**



| Flock Safety | Alpharetta, GA |
|---|---|
| Company Name | City/State in which employee worked |

Employee's Name: __Jhostin Nunez__     Social Security Number: __xxx-xx-4015__

Original Hire Date: __06/21/2021__     Last Day Worked: __11/8/2023__

---

**DISCHARGED** -   ☐ VIOLATION OF COMPANY POLICY ☐ POOR PERFORMANCE

☐ UNEXCUSED ABSENTEEISM ☐ UNEXCUSED TARDINESS ☐ MISCONDUCT

☐ FAILURE TO FOLLOW SUPERVISORY INSTRUCTIONS ☑ OTHER

**MUST STATE EXACT DETAILS OF THE REASON FOR DISCHARGE**

Position elimination - Device Support Engineer II.

_____

_____

_____

---

**IF DISCHARGED FOR VIOLATION OF CO. POLICY, STATE EXACT POLICY VIOLATED**

_____

_____

_____

WERE WARNINGS GIVEN? _____ WHEN? _____ WRITTEN? _____ VERBAL? _____

IF WRITTEN, PLEASE FORWARD COPIES

---

**VOLUNTARY QUIT:** IF KNOWN, PLEASE STATE THE REASON(S) FOR THE VOLUNTARY QUIT.

_____

_____

---

**LAID OFF (LACK OF WORK)**

IS LACK OF WORK: PERMANENT? _____ INDEFINITE? _____

TEMPORARY? _____   EXPECTED DATE OF RECALL? _____

---

**ADDITIONAL REMARKS:** (PA Clients include hourly wage)(MD Clients include last qtr gross wages)

_____

---

Date of this report: __11/8/23__     Tel. No._____

Signed by: __Laura McCormick__     Title: __Sr. HR Business Partner__

Copyright © 2021 by Unemployment Solutiosn Inc. – All Rights Reserved

2595 - 1021

FLOCK 000019



CONFIDENTIAL

**USI EMPLOYMENT TERMINATION REPORT**



# flock safety

Laura McCormick <laura.mccormick@flocksafety.com>

---

## Reprimand for Morning Sync Behavior

4 messages

---

**Omar Lodge** <omar.lodge@flocksafety.com>                    Thu, Nov 2, 2023 at 7:46 AM
To: Jhostin Nunez <jhostin.nunez@flocksafety.com>
Bcc: laura.mccormick@flocksafety.com

Dear Jhostin,

I hope this message finds you well. I am writing to address a concerning incident that occurred during our morning sync today. Your behavior during the meeting was not in line with our team's expectations and standards of professionalism.

When asked why you were not on camera, you responded by saying that it was "not a big deal" and questioned why the meeting was being stopped for this issue. Subsequently, you abruptly stated that you could not continue the meeting and suggested discussing the matter in our 1:1 meeting, after which you disconnected from the call.

I must emphasize that participation in video meetings is an essential part of our remote work culture. It is important to have your camera on during team meetings to foster a sense of engagement, accountability, and transparency. By not being on camera and dismissing the issue, you demonstrated a lack of respect for your colleagues and the importance of effective communication within the team.

Furthermore, abruptly ending the meeting without any prior notice or a reasonable explanation is disruptive to the team's workflow and shows a disregard for the group's time and efforts.

I want to remind you that our team values open and constructive communication. If you have concerns or issues related to our meetings or work processes, it is essential that you address them in a respectful and collaborative manner. Dismissing these concerns and disrupting the meeting is not the appropriate way to handle such matters.

I strongly encourage you to take this reprimand seriously and reflect upon your actions. Moving forward, I expect you to actively participate in our team meetings, maintain a professional demeanor, and address concerns through appropriate channels, such as discussing them with me during our 1:1 meetings.

I believe that we can work together to resolve any issues and maintain a positive and productive team environment. I hope to see an improvement in your behavior and participation in our future meetings.

If you have any questions or need further clarification regarding this matter, please feel free to reach out to me. Let us use this as an opportunity for growth and better collaboration within the team.

Sincerely,

--

### Omar Lodge

**Forward Deployment Engineer**        

---

flocksafety.com

---

# flock safety

---



**Brian Barnard** <brian.barnard@flocksafety.com>                              Thu, Nov 2, 2023 at 7:48 AM
To: Laura McCormick <laura.mccormick@flocksafety.com>

Feels like this should be a fireable offense and we should use it to end this problem that has been going on for a while.
Thoughts?

[Quoted text hidden]

**Laura McCormick** <laura.mccormick@flocksafety.com>                          Thu, Nov 2, 2023 at 8:41 AM
To: Brian Barnard <brian.barnard@flocksafety.com>, Daniele Feuillebois <daniele.feuillebois@flocksafety.com>

Is the expectation that folks on the team join team meetings with their cameras on?
Some teams at Flock do not have that expectation.  I will set-up time with both you and Omar to learn more about
Jhostin's current work performance.
Thank you.

**Laura McCormick (she/her)**
*Senior Human Resources Business Partner*
laura.mccormick@flocksafety.com

[Quoted text hidden]

**Brian Barnard** <brian.barnard@flocksafety.com>                              Fri, Nov 3, 2023 at 5:47 AM
To: Laura McCormick <laura.mccormick@flocksafety.com>
Cc: Daniele Feuillebois <daniele.feuillebois@flocksafety.com>

I know we have time on the calendar this afternoon, but I hate leaving emails unanswered :)

I think the summary / what we will want to talk about today is: yes the expectation is that cameras are on, but the problem
/ offense is not that he didn't have his camera on, but that disrespectfully communicated to Omar and the team and hung
up. Then again in his 1:1 with Omar, he was disrespectful and hung up on him. So I think the discussion we will want to
focus on is not whether or not having his camera on is fireable offense, but the disrespect and hanging up on his
manager.

Talk to you at 3:45!

[Quoted text hidden]



# flock safety

**EXHIBIT**
1:24-CV-01319-TWT-CMS
LodgeO-6
**Huseby.com**

Laura McCormick <laura.mccormick@flocksafety.com>

---

## UNCOMFORTABLE BEHAIVOR

7 messages

---

**Jhostin Nunez** <jhostin.nunez@flocksafety.com>                    Thu, Nov 2, 2023 at 8:44 AM
To: People team <people@flocksafety.com>

Hello,

I was wondering IF I can talk to somebody about webcam policies as I have a situation that is making me feel uncomfortable.

--

### Jhostin Nunez

**Device Support Engineer II**       

flocksafety.com

## flock safety



--
You received this message because you are subscribed to the Google Groups "People team" group.
To unsubscribe from this group and stop receiving emails from it, send an email to people+unsubscribe@flocksafety.com.
To view this discussion on the web visit https://groups.google.com/a/flocksafety.com/d/msgid/people/
CAHnpTAMjyDtvuXtcRQ9GGwG4jjeOciKq0P08cm1jrNiQuwzWkQ%40mail.gmail.com.

---

**Laura McCormick** <laura.mccormick@flocksafety.com>                    Thu, Nov 2, 2023 at 8:45 AM
To: Jhostin Nunez <jhostin.nunez@flocksafety.com>
Cc: People team <people@flocksafety.com>

Hi Jhostin,
I will send you a calendar invite, to learn more about the situation.
Thank you.

**Laura McCormick (she/her)**
*Senior Human Resources Business Partner*
laura.mccormick@flocksafety.com

[Quoted text hidden]

---

**Jhostin Nunez** <jhostin.nunez@flocksafety.com>                    Thu, Nov 2, 2023 at 8:53 AM
To: Laura McCormick <laura.mccormick@flocksafety.com>

Hello Laura,

Thank you for the invite.Will see you soon.

[Quoted text hidden]

---

**Jhostin Nunez** <jhostin.nunez@flocksafety.com>                    Mon, Nov 6, 2023 at 8:00 AM
To: Laura McCormick <laura.mccormick@flocksafety.com>

Hello Laura,

Hope you are having a good day.I was wondering if I can request a follow up meeting about the incidents that occurred on November 2nd, 2023 with my direct supervisor Omar Lodge in both my 9:15 AM meeting and at my 11:00 AM meeting, and the webcam policies Flock Safety has for its employees.

A quick recap of the incidents is as follows:
-At the 9:15 meeting, I had my camera on and my face was positioned on the left corner frame of the screen.My face was visible and was told by my direct supervisor Omar Lodge to move the camera closer.I informed my direct supervisor Omar Lodge that my face can be seen and there is no need to be closer to the camera.He asked me to please get closer to the camera and angle it to see my face ""clearer" and that he "really wanted to see my face".My face was on the screen clearly and I felt really uncomfortable in the way Omar lodge was to determined to get my face closer to the camera.I then asked "Why is this a big deal? and how does this affect the productivity of the team?" He then asked me again to adjust my camera to get a "clearer" view of my face.I promptly logged off as I felt really uncomfortable in this behavior and was promptly given a false reprimand and also gave the HR team a blind carbon copy of this false reprimand..

-On my 1:1, I positioned my body and face the same way I did in my earlier meeting and asked Omar Lodge again "How does the position of my face and body on screen affect the productivity of my job and the team? I believe someone having their head not move 2 inches will not be a serious problem".Omar Lodge then proceeded to say that "I felt disrespected because your head was 2 inches from where I wanted it ".I again promptly logged off as this harassment and obsession with my face being "up close" to the camera is becoming really uncomfortable and stressful.

I did not attend the 9:15 AM meeting on November 3rd, 2023 as I do not feel safe due to the harassment and bizarre behavior displayed by my direct supervisor Omar Lodge.My colleague Avia Smith gave me the information that was shown in that meeting.

Hope to hear back and have this situation settled and resolved as this can be happening in other teams.

Regards,
Jhostin Nunez

[Quoted text hidden]

---

**Laura McCormick** <laura.mccormick@flocksafety.com>               Mon, Nov 6, 2023 at 8:41 AM
To: Daniele Feuillebois <daniele.feuillebois@flocksafety.com>

Forwarding this message from Jhostin.  I will bring it up in our HRBP call later today.
Thank you.

**Laura** McCormick (she/her)
*Senior Human Resources Business Partner*
laura.mccormick@flocksafety.com
[Quoted text hidden]

---

**Laura McCormick** <laura.mccormick@flocksafety.com>
To: Jhostin Nunez <jhostin.nunez@flocksafety.com>

Tue, Nov 7, 2023 at 11:32 AM

Hi Jhostin,
Sorry for the delay.  I sent a meeting invite for tomorrow.
Thank you.

**Laura McCormick (she/her)**
*Senior Human Resources Business Partner*
laura.mccormick@flocksafety.com

[Quoted text hidden]

---

**Jhostin Nunez** <jhostin.nunez@flocksafety.com>
To: Laura McCormick <laura.mccormick@flocksafety.com>

Tue, Nov 7, 2023 at 11:48 AM

Hello,

No worries.Thank you and see you then!

Regards,
Jhostin Nunez
[Quoted text hidden]



**EXHIBIT**

LodgeO-7

| | |
|---|---|
| **From:** | Omar Lodge <omar.lodge@flocksafety.com> |
| **Sent:** | Wed 11/8/2023 10:45:59 AM (UTC-05:00) |
| **To:** | Akeia Dixon <akeia.dixon@flocksafety.com>, Michelle Sharp-Kinaschuk <michelle.sharp@flocksafety.com>, Avia Smith <avia.smith@flocksafety.com>, Mia Gonzalez <mia.gonzalez@flocksafety.com>, Sammer Kazwah <sammer.kazwah@flocksafety.com> |
| **Cc:** | Brian Barnard <brian.barnard@flocksafety.com> |
| **Subject:** | Separation Notification |

Hey Team,

I'm writing to inform you that effective today, Jhostin Nunez is no longer with Flock Safety.

On a temporary basis, Avia Smith, Akeia Dixon, Sammer Kazwah and I will be stepping in to cover Jhostin Nunez's responsibilities.

If you have questions or would like to talk, please don't hesitate to reach out to Brian Barnard or directly to me.

Kind regards,

--

**Omar Lodge**
**Forward Deployment Engineer**

flocksafety.com



# flock safety

Laura McCormick <laura.mccormick@flocksafety.com>

---

## Addressing Concerns Regarding Behavior and Work Output - Jhostin Nunez
1 message

---

**Omar Lodge** <omar.lodge@flocksafety.com>                                        Wed, Aug 9, 2023 at 7:09 AM
To: Jhostin Nunez <jhostin.nunez@flocksafety.com>
Bcc: laura.mccormick@flocksafety.com

Hello Jhostin,

I trust this message finds you well. It is with sincere intention that I write to discuss some matters that have come to my attention concerning your recent behavior and work performance. As we all strive to uphold the highest standards of professionalism and excellence here at Flock, I believe that transparent communication is vital in addressing any challenges that may arise.

To begin, I've observed instances of behavior that do not align with the expected conduct within our team. It is of utmost importance that we treat our colleagues with unwavering respect and consideration at all times. I want to refer back to our conversation during our July 27th 1:1 meeting, where I raised my concerns about not being able to see you. Your nonchalant reply stating that this was IT related prompted my discussion then, and this concern resurfaced during an interaction yesterday on August 8th within our prod_device_support Slack channel. After I requested you at 10:18 am to close duplicate cases with existing work orders, it was only at 11:35 am that you acknowledged the request only after I pinged you about the request. Your engagement at 3:01 pm was similarly casual, necessitating a clarification on your question. Such behavior is counterproductive to your professional growth and advancement and must be rectified. Remember, cultivating a positive and collaborative work environment is essential for our team's success.

Furthermore, recent tasks assigned to you have compounded my apprehension about the diminishing quality and quantity of your work output. Our collective success hinges on each team member's unwavering dedication and contribution. While I understand that hurdles may surface, it is imperative that you communicate any challenges you encounter. A notable contrast can be drawn from my recent experience this morning, where I efficiently closed and accurately updated the location status of 62 cases to reflect "Optimizing - Maintenance Scheduled" in under 30 minutes. In comparison, your work output on August 8th totaled 109 cases over 8 hours, with 101 being the same type of case I worked on earlier this morning. Notably, the location status was left unchanged, denoting "In Service," a discrepancy that opens the door to new cases due to incorrect status indications.

I urge you to take a moment to contemplate these concerns and the potential impact of your actions on the overall team dynamic and work quality. While I remain committed to supporting you and offering guidance, the onus falls on you to take decisive steps toward rectification and performance enhancement.

Let's delve deeper into these issues during our scheduled 1:1 meeting this Thursday. I believe that, with the right mindset, we can collaboratively overcome these challenges and propel our team's excellence.

Thank you for your attentiveness to this matter. I anticipate our upcoming meeting and am optimistic about the positive strides we can achieve together.

Best regards,

--

CONFIDENTIAL

**Omar Lodge**
**Forward Deployment Engineer**



 flocksafety.com

# flock safety



# flock safety

Laura McCormick <laura.mccormick@flocksafety.com>

---

## Jhostin/Omar 1:1 3/7
3 messages

---

**Omar Lodge** <omar.lodge@flocksafety.com>                    Tue, Mar 7, 2023 at 1:59 PM
To: Jhostin Nunez <jhostin.nunez@flocksafety.com>
Bcc: laura.mccormick@flocksafety.com

Hi Jhostin,

As a follow up to our 1:1 this morning, I cannot stress it enough, the importance of the team's performance and in particular your performance at this time. What we did in the past cannot and will not get us to where we need to be. That said, our slack exchange last Thursday, March 2nd is not acceptable, and this is not from the standpoint of tone, which is hard to perceive over text. However, from the standpoint that we have a daily sync to go over the objectives for the day and then you explicitly go against that plan is much more intolerable than perceived tone in a message. I cannot say it enough, just how critical of a junction we are at as a team and as of such I will actively be auditing team members' cases. Here is your audit: Jhostin's TR Closed Case Audit from Friday 3/3 to Monday 3/6, just under 20% of your closed cases requiring a truck roll were canceled as the issue was resolvable remotely. The default should not be to roll a truck to correct an issue as this financially has a huge impact on the company's bottomline. Our target here is to get your unwarranted truck rolls well under 5% of the total cases closed requiring a truck roll.
Lastly, not assigning DVC codes to cases moved to Tier 3 is a shortcut that just creates extra work for someone else on the team. This morning all 84 of the 91 cases without a DVC code assignment in Tier 3 were yours, the others were hotlist cases that do not get a DVC code. Let's commit to stepping up and doing the right thing the first time everytime.

PDS Engineering is on the verge of leveling up, let me know where and how I can help you on this journey.

Sincerely,

--
Omar Lodge
Production Device Support
+1 (404) 403-9934



---

**3 attachments**


**Screenshot 2023-03-07 at 14.39.47.png**
266K


**Screenshot 2023-03-07 at 14.40.28.png**
182K


EXHIBIT

LodgeO-D26

Huseby.com



**Screenshot 2023-03-07 at 10.49.01.png**
926K

---

**Omar Lodge** <omar.lodge@flocksafety.com>                                    Thu, Mar 9, 2023 at 9:59 AM
To: Laura McCormick <laura.mccormick@flocksafety.com>
Cc: Brian Barnard <brian.barnard@flocksafety.com>

Hi Laura,

I wanted to follow up on the email I sent Jhostin after our 1:1 on Tuesday to see how much more of a story is needed to move forward with termination. Ultimately I would like to have this wrapped up before the end of the month, before the start of Q2.
He will be on vacation next week 3/13 - /3/17. I plan on sending him a summary email of this week's performance, however I can solidify my case please let me know.
He did not have a reply to the email for starters. Secondly, he still has not gone back and tagged the cases moved to T3 with the proper DVC code that was clearly an ask in the morning sync. And he still has this attitude of "it is what it is" that he expressed when I asked the team to step up and work down our backlog this morning.
[Quoted text hidden]
Regards,
[Quoted text hidden]

---

**3 attachments**



**Screenshot 2023-03-07 at 14.39.47.png**
266K



**Screenshot 2023-03-07 at 14.40.28.png**
182K



**Screenshot 2023-03-07 at 10.49.01.png**
926K

**Laura McCormick** <laura.mccormick@flocksafety.com>                    Thu, Mar 9, 2023 at 4:12 PM
To: Omar Lodge <omar.lodge@flocksafety.com>
Cc: Brian Barnard <brian.barnard@flocksafety.com>

Hi Omar,
I flagged this for us to talk through in our weekly meeting tomorrow.
Thank you.

**Laura McCormick (she/her)**
*Senior Human Resources Business Partner*

*Logo*
*Description automatically generated*

720.201.9386 | laura.mccormick@flocksafety.com

[Quoted text hidden]

CONFIDENTIAL                    FLOCK 000036

**f✲ock safety**

**Laura McCormick <laura.mccormick@flocksafety.com>**

---

### Jhostin Nunez Output 4/20
1 message

---

**Omar Lodge** <omar.lodge@flocksafety.com>                                     Fri, Apr 21, 2023 at 2:57 AM
To: Laura McCormick <laura.mccormick@flocksafety.com>

Hi Laura,

Jhostin's work output had me go look for how long and the time of day he was working. This exported SF report Jhostin
Closed Cases Times is very revealing as it shows that he starts processing cases to close around 10am and on a good
day is done by 4pm. I did look at this week, any cases he moved to T2 and T3 and this number was not significant or
outside of this report's time range to be considered. In addition to the fact that he would get credit for any cases that were
moved to T2 for monitoring when closed. These reduced hours clearly are contributing to the lack of output and I want to
see how I can build a case around this to move forward with having him replaced with someone with integrity and that
actually wants to do the work.

The rest of the team realizes his lackluster efforts and I am still optimistic in getting over this distraction sooner than later.

I would like to discuss what around this case needs to be developed to move forward with terminating Jhostin.

Thanks as always,

--
Omar Lodge
Production Device Support
+1 (404) 403-9934

**f✲ock safety**

---



EXHIBIT

LodgeO-D27

Huseby.com

---