# EXHIBIT C –

# BRIAN BARNARD DEPOSITION

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JHOSTIN QUINONES, ) Civil Action No.
) 1:24-CV-01319
Plaintiff, )
)
v. )
)
FLOCK GROUP, INC., )
)
Defendant. )
_______________________________)

The Videoconference Deposition of

Brian Barnard

(Taken by The Plaintiff)

Conducted Remotely

November 20, 2024

Reported by: Jacqueline Frazier
Certified Court Reporter
Georgia
License No. 5465-2647-6265-0624

STATE OF GEORGIA
COUNTY OF GWINNETT
VIDEOCONFERENCE DEPOSITION OF BRIAN BARNARD

Pursuant to Article 8.B of the RULES AND REGULATIONS OF THE BOARD OF COURT REPORTING OF THE JUDICIAL COUNCIL OF GEORGIA, I make the following disclosure:

I am a Georgia-Certified Court Reporter. I am here as a representative of Huseby Global Litigation.

Huseby Global Litigation was contacted by the offices of THE WORKERS' FIRM, to provide court reporting services for this deposition. Huseby Global Litigation will not be taking this deposition by O.C.G.A. 15-14-37 (a) and (b).



A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:
PATRICK REID - videoconference
ATTORNEY AT LAW
THE WORKERS' FIRM
7000 CENTRAL PARKWAY
SUITE 1100
ATLANTA, GEORGIA 30328
patrick@theworkersfirm.com

ON BEHALF OF THE DEFENDANT:
ADAM KEATING - videoconference
ZACHARY MCCORMACK - videoconference
ATTORNEYS AT LAW
DUANE MORRIS, LLP
1075 PEACHTREE STREET, NE
SUITE 1700
ATLANTA, GEORGIA 30309
akeating@duanemorris.com
zmccormack@duanemorris.com

\- - -

The Videoconference Deposition of Brian Barnard, taken by the Plaintiff, Conducted Remotely, on the 20th day of November 2024, at 2:37 p.m., before Jacqueline Frazier, Certified Court Reporter.



INDEX TO EXAMINATIONS

Examination by Mr. Reid.............................5

Certificate of Reporter............................45

INDEX TO EXHIBITS

| Exhibit | Description | Page |
|---|---|---|
| | None Marked. | |



P R O C E E D I N G S

\- - -

(Whereupon, the videoconference deposition of Brian Barnard commenced at 2:37 p.m. on November 20, 2024.)

(Whereupon, the Zoom recording feature was turned on.)

MR. REID: Okay. All right. If the court reporter could please swear in the witness.

(It was stipulated by all counsel present that the court reporter is authorized to swear the witness remotely.)

(Whereupon, a brief recess was taken.)

BRIAN BARNARD,

having been duly sworn, was deposed and examined as follows:

EXAMINATION

BY MR. REID:

Q Okay. Good afternoon, Mr. Barnard. I'm sorry you had to wait in the lobby.

So there are some preliminary things that we do as lawyers in the beginning, just housekeeping things.

So is there any reason that you'd be inhibited from testifying truthfully and accurately

today?
A No.
Q Okay. And obviously, you -- the court reporter just swore you in. So she's taking down, like, what you and I are saying, and it's hard for her to do that if we talk over each other. Sometimes it's hard over Zoom. Sometimes it's hard in person, as well, to be honest.
So can you agree, just try and let me finish my question, and I'll let you try to finish your answer?
A Yes.
Q Okay. What did you do to prepare for your deposition today?
A I reviewed three e-mails that were sent to me.
Q Okay. Regarding Jhostin Quinones's termination, correct?
A Yes.
Q Okay. And have you talked to anyone else about the testimony that they've given?
A No.
Q Okay. Where do you currently live?
A Dunwoody, Georgia.
Q What is your address?



A 1342 Mile Post Drive, Dunwoody, Georgia 30318 [sic].
Q Did you say Mile Post Drive?
A Mile Post. Two words.
Q Is it mile or mild with a D?
A Mile, M-I-L-E, space, P-O-S-T.
Q Okay. Mile Post. Got it.
And do you have any plans to move from that address in the next two years?
A No.
Q Okay. Where are you currently employed?
A Flock Safety.
Q Okay. And what is your position there?
A Senior director of operations.
Q What was your position title in November of 2023?
A Product director.
Q Okay. So you since changed.
What -- when was that change? When did that change occur?
A I moved into operations.
Q It's about a year ago?
A (Witness nods head affirmatively.)
Q Okay. And when you moved into operations -- so did you know -- do you know Omar Lodge?



A Yes.
Q And do you remember you used to be his supervisor, and he used to manage a team called -- do you remember what his team was called?
A (Inaudible) productions, device support.
Q Okay. So I'm going to call that the device support team.
So he managed the device support team, right?
A Yes.
Q And then you were his manager, right?
A Yes.
Q And you say you then, by lieu of that relationship, had some relationship to managing the device support team, right?
A Yes.
Q And I've also been told that you kind of look at the operational level and what -- you know, what different teams are doing, is it effective, and do we need these people here, do we need them somewhere else, decisions like that, right?
A For the device support team at that time.
Q Okay. And do you know who Jhostin Quinones is?
A Yes.
Q Okay. And Jhostin Quinones was on the device



support team, right?
A Yes.
Q Okay. Do you know the history -- so I've been told that in June or July of this year, two positions on that team were eliminated.
Do you recall that?
MR. KEATING: Objection to the fact that you know (inaudible) that team at the time.
BY MR. REID:
Q And you may not know, and so -- yeah.
A If you're talking about recent changes, I'm not familiar with the details of the changes that have happened since I'm no longer on the team.
Q Got it.
Do you remember what month you were no longer on the team?
A Not precisely.
Q Okay. Would you have been on the team as of December 31st of 2023?
A I don't remember precisely.
Q Okay. Were you still in charge of the team when -- or are you aware that Mr. Lodge has left the employment of Flock?
A Yes.

Q Were you still the manager of that team at the time that he left?
A Yes.
Q Okay. All right. During the time that you managed the team, from the time that Mr. Quinones was terminated to the time that you no longer managed the team, do you remember any jobs being posted attempting to hire any individuals onto that team?
A No.
Q Okay. If I told you that from November to March is the busiest time of that team's year in terms of the amount of requests that they're getting from cameras and alerts that they're getting from cameras, would you have any knowledge of whether that is true or not?
A I would believe that's accurate.
Q Okay. And to your knowledge, besides Mr. Quinones, have any other positions on that team been eliminated from July of 2023 to the present?
A I cannot speak to what was done with the team in the last 12 months.
Q Okay. Just going back for a second, in November of 2023, did you also know at that time that November to March would have been the busiest time of the year for that team?



A Yes.
Q Okay. And do you know what the difference between a support engineer 1 and support engineer 2 is for that team?
A Yes.
Q Could you explain that difference to me?
A The technical ability when analyzing camera-support cases to correctly diagnose the issue and apply the correct corrective action. The difference between the two levels will be how often they're able to do that correctly, their success rate, the difficulty of the cases they could work.
Q Okay. Have there ever been any situations in which a person was demoted downwards, so let's say three to two or two to three?
A Not that I'm aware of.
Q Okay. Have there been times where someone goes from one to two or from two to three?
A I'm not aware of any time during my ownership of the team that someone was promoted up through these ranks.
Q Okay. And so I've been told that -- well, let me ask you this first: Do you know what a Jira ticket is?
A A Jira ticket, yes. J-I-R-A, Jira.



Q And that -- that's a -- yes.
And that's a system that Flock uses in their support tickets that are submitted to that system, right?
A Yes.
Q Okay. Do you recall any times in which the Jira system had malfunctions or was not working?
MR. KEATING: Objection as to time.
A I don't know in particular. Because they're a cloud software system, I'm guessing that sometimes there was disruptions, but nothing that comes to mind.
BY MR. REID:
Q Okay. So there's no particular instances where, you know, maybe you had to get involved or you had heard of that, you know, Oh my God, this month, it's really bad, or anything like that, right?
A No.
Q Okay. Okay. So are you aware of conversations about eliminating a position possibly from the device support team?
A Yes.
Q Do you know approximately when those conversations or ideas started occurring?
A Not precisely. It was a long time being discussed, probably --



Q Would you say --
A -- six-plus months.
Q Got it.
So it may be accurate to say -- if someone else testified, you know, March of 2023 is when we started talking about that, would you have any reason to disagree with them on that?
A No.
Q Okay. And what was the reason that -- and were you the progenitor? And by which I mean, were you the person that was kind of, I guess, considering the idea originally of downsizing that team?
A I was part of the conversations on the strategy.
Q Okay. Do you know how they started originally?
A Just casual business discussions, analyzing the team.
Q Okay. So you would look at the team and you would look at, you know, for examples, like, quality of their work, how much work they had to do, how much work their -- how much money their work was earning for the company, and things like that, right?
A Yes.
Q And that -- the reason you were looking at

that is because you want to justify and see if the positions that are on that team are just -- a justified expense for Flock, right?
A Yeah, yes.
Q Okay. And who did you have conversations with from whatever time that those started until those conversations ended?
A Omar and Laura.
Q Okay. Okay. And after Mr. Quinones's position was eliminated in November of 2023, did you continue to have conversations about possibly eliminating more people?
A I do not remember actually discussing eliminating more roles, but we were continuing on the strategy of reducing the cost of the team.
Q Gotcha.
And do you remember perhaps in earlier of 2023 that you were considering, you know -- it's been told to me that maybe three options, so I'll ask it that way -- you know, keeping the team where it was, eliminating positions from the team, or even eliminating the entire team altogether?
A I am not aware of any discussions of eliminating the entire team.
Q Okay. And would you think that that's


something that Omar Lodge would have brought up?
MR. KEATING: Object to the form.
MR. REID: You can still answer.
A I do not have any recollection of Omar suggesting the entire team must shut down.
BY MR. REID:
Q And during those conversations, was Omar kind of more on the side of saying, Oh, yeah, we can eliminate positions, or was he pretty consistently trying to justify and say, No, my team does a good job, we should not eliminate any positions?
A It was an active conversation back and forth.
Q And which one did he fall under if you had to categorize it one or the other?
A I don't think I can absolutely categorize (inaudible) opinion towards the conversation.
Q Okay. So why don't you summarize in your own words what his approach to the conversation was during those six months?
A It was an active back-and-forth, discussing the strategy for the team going forwards.
Q Okay. And do you remember in October of 2023 what the conversations were at that time surrounding the device support team?
A I don't have any recollection of a particular


date and time in which the conversation changed away from the generic strategy of reducing costs.
Q Okay. So the generic strategy was just about reducing costs in general?
MR. KEATING: Object to the form. Misstates prior testimony.
You can answer.
A The strategy was to reduce costs by reducing the skill set required to do the job.
BY MR. REID:
Q Okay. And so it's been said to me that, apparently, at the time, in November of 2023, y'all were hiring engineers to be on that team, right?
MR. KEATING: Object to the form. Misstates prior testimony.
BY MR. REID:
Q Is that (inaudible) --
A I was never aware of any plans to hire, quote-unquote, engineers onto the team.
Q Okay. What was the educational makeup of the people that were on the team as of November 2023?
A I am not aware of their educational background.
Q Okay. Was there a general sense that, Hey, you know, maybe we don't need people that are this


skilled to be in this position?
A The business proposition was that the skill set requirements could be reduced, and therefore, we could use lower cost resources to accomplish the work.
Q Okay. And what was the plan for what -- was there any plans or talks about what might happen to employees if that was a decision that would be made?
A Other than reducing the roles, that was the only thing we discussed.
Q Okay. Do you recall what day the decision was made to eliminate the device engineer position?
A No.
Q Okay. So let me show you a document. Let me show -- what I'm going to show you on this little piece of paper. Give me one second.
Okay. Okay. Okay. I'm going to scroll to the -- can you see this?
(Whereupon, a brief discussion took place off the record.)
BY MR. REID:
Q All right. Can you see the e-mail now?
A Yes.
Q Okay. Do you recall how -- did you receive this e-mail at some point?
A Yes.

Q Do you recall how you received this e-mail?
A I -- you know, I was bbc'd on this e-mail.
Q Well, the e-mail has -- I don't think that that's the case.
You can see that the e-mail says Laura McCormick was bcc'd, right? And it doesn't have your name, does it?
MR. KEATING: Objection. Leading. Because Laura McCormick forwarded it, it doesn't show up bcc's. (Inaudible) bcc?
MR. REID: Well, we can go through that. But it's from -- it looks like it's from Omar Lodge, it's to Jhostin Quinones, and it bcc's Laura McCormick, right? Do you see that?
THE WITNESS: I was bcc'd on that e-mail.
BY MR. REID:
Q Okay. So you -- okay.
And so Omar Lodge would have sent you this?
A Correct.
Q And you would've read it, right?
A Correct.
Q And at the end of the e-mails -- if you would have read at the end of the e-mail where it says, I



believe that we can work together to resolve any issues and maintain a positive and productive team environment. I hope to see an improvement in your behavior and participation in our future meetings, right?
MR. KEATING: Object to the form. The document speaks for itself.
BY MR. REID:
Q Do you recall reading that when the e-mail was sent to you?
A I do not recall on that particular day reading a particular line in this e-mail, but I'm aware of the e-mail.
Q But would you typically read an entire e-mail that you get sent?
A Yes.
Q Okay. And so I'll scroll down.
Now, I'll just let you read the rest of it. They're all pretty short. Just let me know when you're ready to scroll down.
A Can you scroll down?
Q Okay.
A I'm done reading.
Q Okay. So would it appear to you that from this -- would it appear -- well, let me ask you if do



you remember actually.
Do you remember that you had a meeting with Brian Barnard, Laura McCormick, and Danielle on Friday, November 3rd?
MR. KEATING: He's Brian Barnard.
MR. REID: Oh, well, sorry.
Laura McCormick and Danielle Feuillebois on November 3rd?
THE WITNESS: Yes.
BY MR. REID:
Q Okay. Did you have any, like, meetings outside of written communications with anyone before this meeting?
A Just time?
Q About this situation that occurred on November 2nd.
A Not that I'm aware of.
Q Okay. So I'll scroll up here.
And so at the point that you said -- do you see the e-mail that's Thursday, November 2nd, 2023, at 7:48 a.m.?
A Yes.
Q So at that point, besides that e-mail above that we read, did you have any other information on the situation?



A I do not remember if I had other information, if Omar had contacted me.
Q Okay. Do you remember talking with Omar separate from meetings with other people about the situation in the month of November?
A Not specifically.
Q Okay. I'm going to ask you the same question for this e-mail on Friday, November 3rd, 2023, at 5:47, which is: Besides e-mail communications, do you recall having any conversations or meetings with anyone about this situation?
A No.
Q Okay. And so did you meet with Brian Barnard -- not you. You're Brian Barnard.
Again, do you recall meeting with Laura McCormick and Danielle on Friday, November 3rd?
A I remember the meeting. I remember that Laura was there. I cannot attest to whether or not Danielle was in that meeting.
Q Do you remember if anyone else was at that meeting?
A I believe Omar was at the meeting.
Q Okay. What do you remember occurring during that meeting?
A We discussed the e-mail from the morning, the

disrespect and rude behavior of Jhostin. We discussed his long history of performance problems, the documented performance issues that we have had. And I believe in that meeting, we made the decision that we would combine our established strategy that have been coming for a while to reduce head count and cost on that team, combined with his poor performance and with this event of poor behavior, and decided to enforce that strategy.

Q Okay. And so when you're -- when you say this event with a poor behavior, are you talking about the same vein of the things you're talking about in the e-mail that you sent on Friday, 3rd of -- Friday, November 3rd, 2023, at 5:47 a.m.?

MR. KEATING: Object to the form.

A We're referring to the ongoing documented performance issues.

BY MR. REID:

Q And so when was the decision made that you were going to eliminate a position?

A The strategy we had been discussing was to eliminate the position. At this moment in time is when we decided to eliminate the position, I believe on that meeting.

Q Got it.



Okay. And when you say that it had been being discussed, before this meeting, had anyone ever said, Yes, that's what we're going to do, we're going to eliminate a position at some point in the future?

A I'm not aware of a time that it was explicitly documented that was going to be an executed strategy.

Q Okay. And so I guess I'm going to take your words here from this e-mail.

So let's see.

The disrespectful communications to Omar and the hanging up in the team meeting and then the disrespect and the hanging up in the one-on-one with Omar was the impetus for making the decision to eliminate the position, right?

MR. KEATING: Object to the form.

His ongoing performance challenges --

MR. REID: Sure, but those have been going -- no, go ahead.

MR. KEATING: The ongoing performance challenges are the reason his position was the one that was selected for elimination.

MR. REID: Sure.

BY MR. REID:

Q Well, in your opinion, was this the first



time that Mr. Quinones had performance issues?

A No. I think there's a long documented history of his performance problems.

Q How long would you say it stretches back?

A I don't know the exact timeline. I believe there are e-mails in this case that show history of us discussing it. I probably would argue it's at least six months before this incident.

Q Okay. So it's been going on for a long time, right?

A Depends on your definition of a long time.

Q Well, for -- with your definition of a long time, did you think that Mr. Quinones's performance issues had been going on for a long time?

A At least they've been going on long enough to make a decision to eliminate his role.

Q And I think you even say, We should use this -- use it to end this problem that's been going on for a while, right?

A Yes.

Q Okay. And when you say -- now I'll take you to the e-mail above. This is obviously what you're replying to.

But you're saying in this e-mail, Feels like this should be a fireball offense, right?



And I'm going to scroll up. And I want you to identify in this e-mail what you believe was a fireball offense.

A Abruptly leaving the meeting without any prior notice or reasonable explanation.

Q And that would include both the meeting -- the team meeting and the one-on-one, right?

A Yes.

Q Okay. All right. And so that was the impetus for then having this meeting on November 3rd with the other people, right?

A Yes.

Q And then during that meeting, you then decided to terminate Mr. Quinones, right?

A We decided to eliminate the position.

Q Sure.

And that -- so that's true.

And then you also decided in that -- did you also decide in that meeting that you were going to terminate Mr. Quinones?

A We decided that his (inaudible) position (inaudible).

Q Got it.

Okay. And the reasons that you talked about during that meeting for why were -- you got a long

history or, you know, however you want to put it, he's had a history of performance problems, right?
A That was one of the elements discussed.
Q And then you also discussed, Hey, on November 2nd, he also hung up on Mr. Lodge in two separate meetings, right?
A Yes.
Q And that was one of the reasons that the position -- that he was selected for termination, right?
A It was taken into consideration in eliminating the position.
Q So -- but when you say it was taken into consideration, that was one of the reasons why, right?
MR. KEATING: Object to the form. Asked and answered.
A Yes.
BY MR. REID:
Q Okay. And that was also one of the considerations for eliminating the position, right?
A The decision to eliminate the position was based on the business' priority to reduce the costs and complexity of the work done.
Q Okay. Are you saying that the decision with the -- to eliminate the position had nothing to do with



what happened between Mr. Quinones and Mr. Lodge on November 2nd?
A I'm saying the combination of our ongoing strategy discussions to reduce the complexity of the work and the skill set and the cost of the team combined with his bad performance over multiple times culminating in this -- resulted in the decision to eliminate the position that he was occupying.
Q Got it.
And if Mr. Quinones had not hung up on Mr. Lodge in those two meetings, would the position have been eliminated on November 3rd?
A I do not think we would have done it on November 3rd.
Q Okay. Got it.
Now, who are the people who actually -- because there's people that discuss things and then there's people who actually make decisions, right? Can you see how those two things are different?
A I guess.
Q Okay. Well, maybe it will make more sense when I apply it.
So who were the individuals that actually decided, We are going to eliminate the position?
MR. KEATING: Object to the form.



You may answer if you know.
A It would be Laura, Omar, and myself on that phone call. If Danielle was there as part of the phone call, she would have been part of it, as well.
BY MR. REID:
Q Okay. And -- in parallel, the same question, who were the decision-makers in terminating -- choosing Mr. Quinones to be eliminated?
A That would have been a group decision on the phone call, as well.
Q So it would have been everyone that was on that phone call?
A Everyone on the phone call would have got their voice heard because we made a group decision.
Q Okay. Do you remember anything -- like, what do you remember about Omar Lodge saying about whether he thought Mr. Quinones -- that would -- is there -- well, let me back up.
What do you remember Mr. Lodge saying on that call about whether the position should be eliminated?
A I don't remember on that phone call Omar making specific commentary as to our strategy for position elimination.
Q Okay. Did he make specific commentary that he thought that Mr. Quinones should be the one that was



terminated?
A I believe everyone on the phone call was aligned that Jhostin or Mr. Quinones's position was the correct one (inaudible).
Q Okay. Got it.
And if Laura McCormick says that she had a meeting with you on November 2nd, 2023, would you have any reason to disagree with that?
A No. I don't remember the meeting, but I (inaudible).
Q Okay. Do you recall at any point Laura McCormick telling you that Jhostin Quinones had come to her to complain about what had happened on November 2nd?
A I believe at some point, I was told that he had talked to her. I could not tell you at what point during the flow of time that happened.
Q Okay. What do you remember her telling you that Mr. Quinones had told her?
MR. KEATING: Object to the form. Assuming it was her who told him.
A That he had --
BY MR. REID:
Q Let me -- hold on. Let me back up the -- because of that objection.

Was Ms. McCormick the one that told you about what Mr. Quinones was saying?

A I believe Laura told me that Mr. Quinones had contacted her.

Q Okay. And what did she say he had said?

A I don't remember any specifics. I do not believe she described what was in his communication with her other than he had contacted her about this incident.

Q Okay. All right. Let me show you another e-mail. Give me one second.

Okay. Can you see these e-mails?

A Yes.

Q Okay. And I want you to read them and tell me if you've ever seen any of them before, okay?

A You can scroll down.

You can scroll down.

Okay.

Q I think that's -- oh, it's still going.

A Keep scrolling.

Q And that's it.

A Okay.

Q Have you seen any of these e-mails before?

MR. KEATING: Object -- outside of presence of counsel or talking to lawyers.



A No.

BY MR. REID:

Q Well, I'm still going to ask it.

Have you seen the e-mails before at all? I don't want you to talk about anything that had happened with lawyers. I just want to tell -- you tell me if you've ever seen these documents before today.

A I've never seen these e-mails before.

Q Okay. Got it.

Okay. So when Laura McCormick talked to you about what Jhostin would -- Jhostin was saying, did she tell you that he had felt uncomfortable of what had happened on November 2nd?

MR. KEATING: Objection, asked and answered.

A I don't remember the details of what she discussed in the conversation.

BY MR. REID:

Q Okay. Is it possible that she told you that?

MR. KEATING: Objection, asked and answered.

A I don't remember the details.

BY MR. REID:

Q Okay. Is it possible that she told you that Mr. Quinones had compared -- well, let me back up.



Strike that. Let me figure out the best way to ask this.

Is it possible that she told you in talking to her that Mr. Quinones had asked her what would it look like -- or something along the lines of what would it look like if Mr. Lodge our had done this to a female employee?

MR. KEATING: Objection, asked and answered.

A It is possible. I'm not familiar with that quote.

BY MR. REID:

Q Okay. And so you don't remember that, right?

A Correct.

Q But is it possible that she said that to you and you just don't remember?

MR. KEATING: Objection, asked and answered. It's possible.

MR. REID: Oh, sure. It's my question.

A I believe it is likely that Laura mentioned that Jhostin had communicated to her about the incident. I do not have any memory of what was in the e-mail or communications, the basis for any of the details.

BY MR. REID:



Q Sure.

And, Mr. Barnard, I don't mean to be rude to you, but Laura has had this kind of obsession with asking questions in a very odd way, so I need you to answer the question, the specific question, which is: Is it possible that Laura McCormick told you that Mr. Quinones had asked her what would it -- something along the lines of, What would it look like if Omar Lodge had done the same thing he did to me to a female employee?

MR. KEATING: Objection, asked and answered.

He said he doesn't recall the context of any conversations.

You can answer, if you remember.

A Anything is possible. I do not remember that occurring.

BY MR. REID:

Q Okay. And that's a fine answer, and I -- I'm not going to get mad at that or anything. I'm just not trying to trick you, but I just need to get your answer.

And same thing, is it possible that Lauren McCormick reported to you that Jhostin Quinones had said that he had felt sexually harassed by Omar?

MR. KEATING: Objection, asked and answered.
He stated he doesn't recall any of the detail of the conversation.
A Yeah. I don't remember mentioning that.
BY MR. REID:
Q Okay. But is it possible that she didn't?
MR. KEATING: Objection.
A Anything is possible.
BY MR. REID:
Q Okay. Is it possible that she mentioned to you -- well, let me scroll down.
Is it possible that she relayed to you that Jhostin, Mr. Quinones, had said if -- that Omar had told Jhostin, I felt disrespected because your head was two inches from where I wanted it?
MR. KEATING: Objection, asked and answered.
It's possible as it is likely that it's not. These questions are terrible.
MR. REID: That's your opinion, Adam. That's fine.
MR. KEATING: You can answer.
He said, Do you recall or remember?
A I do not remember, but it's possible.



BY MR. REID:
Q Okay. Is it possible that Ms. McCormick told you that Mr. Quinones had said that Omar had told him, You are to put your face and body where I want it?
MR. KEATING: Objection, asked and answered.
A I do not remember the conversation.
BY MR. REID:
Q Okay. Is it possible?
MR. KEATING: Just like it's not possible. Objection.
MR. REID: Well, yeah. That's the whole point, Adam. This whole line of questioning (inaudible).
MR. KEATING: That's a terrible question.
MR. REID: That's your opinion. That's fine, but I'm still going to ask.
Mr. Barnard, is it possible that that was what --
MR. KEATING: Objection. Objection.
A Yes. Anything is possible.
BY MR. REID:
Q Okay. Do you recall Ms. McCormick telling you that Mr. Quinones had said he didn't feel safe due



to what happened on November 2nd?
A Not -- no.
Q Well, do you recall the word "harassment" ever being used?
A No.
Q Okay. Okay. I think we're done with that one.
Okay. Have you ever had occasion to terminate someone at Flock yourself?
A There have been employees that were working for me that were terminated at Flock. I don't know what you mean by me terminating personal, but yes.
Q Did you ever, like, handle any of the paperwork?
A No.
Q Okay. Got you.
After the meeting that you had on November 3rd, 2023, where the decision was made to eliminate the position and that Mr. Quinones would be eliminated, did you have any further conversations related to Jhostin Quinones?
A Not that I'm aware of.
Q Okay. And you thought that Mr. Quinones should be terminated because of performance issues, right?



A I thought that his role should be the one eliminated and the reduction due to his performance issues.
Q Are you aware that nowhere in any documentation about Mr. Quinones's termination is his performance mentioned?
MR. KEATING: Object to the form.
He already said he's not familiar with the paperwork.
A I've not seen any paperwork related to the termination.
BY MR. REID:
Q Okay. Got you.
Okay. And the -- so if we go back to an e-mail that I showed you earlier, Mr. -- I'll just look at this one quick for just a second.
So in this e-mail on November 2nd, Omar Lodge writes, I believe that we can -- he's writing to Mr. Quinones, I believe that we can work together to resolve any issues and maintain a positive and productive team environment. I hope to see your improvement in your behavior and participation in our future meetings.
Did you ever have a conversation with Ms. -- with Mr. Lodge where he told you that he -- I changed

my mind. I don't think that I can work with Jhostin anymore?

A The -- there is no conversation where he said he changed his mind because we had not discussed believing it was possible as he writes in that e-mail. In the meeting, we discussed -- we all agreed that he was the right person, right position to eliminate.

Q Got it.

And do you recall if anyone on that call where the termination meeting occurred said anything about this -- the reports that Mr. Quinones was making to HR?

A I did not on the phone call that I'm aware of.

Q Okay. Got it.

Okay. I think we're done with that.

And did you ever talk to Jhostin Quinones about his version of events?

A Yeah.

Q Are you aware of any investigation being done into Mr. Quinones's report to HR?

A I was not involved with any investigations.

Q Okay. So you would be unaware if one occurred or not, right?

MR. KEATING: Asked and answered.



A I would be unaware.

BY MR. REID:

Q Okay. And besides Danielle, Ms. McCormick, and Mr. Lodge, was anyone else involved in the decision-making process in terminating Mr. Quinones?

A Not that I'm aware of.

Q Okay. Got it.

And was there any -- were there any other individuals that gave out input to you -- maybe not during official meetings, maybe in passing conversation on what they thought should be done?

A No.

Q Okay. Now -- so one thing I want to bring up back -- so we're going to go back to the document I was showing you. I forgot about this.

So in this e-mail, it doesn't appear that anything about the one-on-one has happened yet. So it -- and I'm just going to (inaudible) here to explain more the question.

So it appears that this e-mail to Mr. Quinones was sent before the one-on-one meeting with Mr. Lodge. Then you can see here that it says, You suggested discussing the matter in our one-on-one meeting.

Did you ever receive any information -- well,



it sounds like you did.

You received information about what happened in the one-on-one meeting, right?

MR. KEATING: Object to the form. The document speaks for itself.

This is not his e-mail. You're putting words in his mouth. Please rephrase the question.

BY MR. REID:

Q Well, the question is simply: You received information about what happened in the one-on-one between Mr. Quinones and Mr. Lodge, right?

A It was discussed in a prior meeting.

Q And when you say meeting, you're talking about the November 3rd, 2023, meeting, right?

A Yes.

Q And who was giving that information as to what had happened in the meeting?

A Omar.

Q Okay. And what do you remember him saying about what had happened in the meeting?

A That Jhostin had hung up on him during the one-on-one meeting.

Q Okay. Anything further than that about what was said?



A No.

Q Okay. Got it.

Have you ever received or heard of any complaints about Mr. Lodge from any employee besides Mr. Quinones?

A No.

Q Okay. Do you have any knowledge about why Mr. Lodge left Flock?

A Yes.

Q Okay. Tell me about that.

A When he resigned, he decided he did not want to manage that position. He was going to go looking for other employment.

Q Okay. So he told you that he was still looking and trying to find another job?

MR. KEATING: Object to the form.

A He told me was no longer interested in that position in Flock.

BY MR. REID:

Q Did he explain why?

A Not in detail that I can remember.

Q Okay. So you can't remember him saying anything about the position in particular made him want to resign?

A No.

Q Okay. Are you aware that he then found employment afterwards?
A No. I've not followed up.
Q Got it.
And you guys aren't friends. Like, you don't talk outside of work?
A No.
Q Okay. All right. And I have to ask this question because of the kind of case it is: Do you know Mr. Lodge's sexuality?
A No.
MR. REID: Okay. All right. I believe that's all have for you, Mr. Barnard. Your attorney may have some additional questions for you.
MR. KEATING: I got no questions for you, Barnard.
(Whereupon, the Zoom recording feature was turned off.)
---
(The videoconference deposition concluded at 3:21 p.m.)



E R R A T A S H E E T

I have read the within and foregoing pages and no changes are required.

This, the ________ day of ____________________, 2024.

I have read the within and foregoing pages and the following changes are required:

Page ______ Line ________:
______________________________
Reason:
______________________________________________
Page ______ Line ________:
______________________________
Reason:
______________________________________________
Page ______ Line ________:
______________________________
Reason:
______________________________________________

This, the ______ day of ________________, 2024.

Sworn to and subscribed before me, this ______ day of __________, 2024.
__________________________________



Notary Public, Georgia

DISCLOSURE

STATE OF GEORGIA)
COUNTY OF GWINNETT)

Pursuant to Article 10.B of the RULES AND REGULATIONS OF THE BOARD OF COURT REPORTING OF THE JUDICIAL COUNCIL OF GEORGIA, I make the following disclosure:

I am a Court Reporter and an independent contractor.

I was contacted to provide court reporting services for this deposition. I will not be taking this deposition under any contract that is prohibited by the O.C.G.A. 15-14-37(a) and (b). I have no contract/agreement to provide court reporting services with any party to the case, any counsel in the case.

I am not disqualified for interest, personal or financial, under O.C.G.A. 9-11-28(c).

I will charge my usual and customary rates to all parties in the case.

This the 20th day of November 2024.

Jacqueline Frazier
Court Reporter
Certificate Number 5465-2647-6265-0624



CERTIFICATE

STATE OF GEORGIA)
COUNTY OF GWINNETT)

I, Jacqueline Frazier, Court Reporter, certify that the foregoing transcript is a true, correct, and complete record of the testimony given by the deponent, BRIAN BARNARD, who was first duly sworn by me; that I am not a relative, employee, attorney or counsel of any of the parties; am not a relative or attorney or counsel for any parties; nor financially interested in the action; that the said deponent and counsel in the presence of each other and before me did not waive the reading and signing of the deposition; and the original deposition under seal shall be filed with the Court by the attorney taking the deposition.

WITNESS my hand and seal at Suwanee, Gwinnett County, Georgia, this the 20th day of November 2024.

___________________________
Jacqueline Frazier
CR No. 5465-2647-6265-0624
CCR Seal

**1**

**1** 11:3
**12** 10:21
**1342** 7:1

**2**

**2** 11:3
**20** 5:4
**2023** 7:16 9:20 10:19, 23 13:5 14:10,18 15:22 16:12, 21 20:20 21:8 22:14 29:7 36:18 40:15
**2024** 5:4
**2:37** 5:4
**2nd** 20:16,20 26:5 27:2 29:7,14 31:13 36:1 37:17

**3**

**30318** 7:1
**31st** 9:20
**3:21** 42:22
**3rd** 20:4,8 21:8,16 22:13,14 25:10 27:12, 14 36:18 40:15

**5**

**5:47** 21:9 22:14

**7**

**7:48** 20:21

**A**

**a.m.** 20:21 22:14
**ability** 11:7
**Abruptly** 25:4
**absolutely** 15:15
**accomplish** 17:4
**accurate** 10:16 13:4
**accurately** 5:25
**action** 11:9
**active** 15:12, 20
**Adam** 34:21 35:13
**additional** 42:14
**address** 6:25 7:9
**affirmatively** 7:23
**afternoon** 5:19
**agree** 6:9
**agreed** 38:6
**ahead** 23:19
**alerts** 10:13
**aligned** 29:3
**altogether** 14:22
**amount** 10:12
**analyzing** 11:7 13:17
**anymore** 38:2
**apparently** 16:12
**appears** 39:20
**apply** 11:9 27:22
**approach** 15:18
**approximately** 12:22
**argue** 24:7
**Assuming** 29:21
**attempting** 10:7
**attest** 21:18
**attorney** 42:14
**authorized** 5:12
**aware** 9:23 11:16,19 12:18 14:23 16:18,22 19:12 20:17 23:5 36:22 37:4 38:13, 20 39:6 42:1

**B**

**back** 10:22 15:12 24:4 28:18 29:24 31:25 37:14 39:14
**back-and-forth** 15:20
**background** 16:23
**bad** 12:16 27:6
**Barnard** 5:4, 14,19 20:3,5 21:14 33:2 35:19 42:13, 17
**based** 26:22
**basis** 32:23
**bbc'd** 18:2
**bcc** 18:10
**bcc'd** 18:6,16

**bcc's** 18:10, 14

**beginning** 5:22

**behavior** 19:4 22:1,8,11 37:22

**believing** 38:5

**body** 35:4

**Brian** 5:3,14 20:3,5 21:13,14

**bring** 39:13

**brought** 15:1

**busiest** 10:11, 24

**business** 13:17 17:2

**business'** 26:22

C

**call** 8:6 28:3,4,10, 12,13,20,21 29:2 38:9,13

**called** 8:3,4

**camera-support** 11:8

**cameras** 10:13

**case** 18:4 24:6 42:9

**cases** 11:8,12

**casual** 13:17

**categorize** 15:14,15

**challenges** 23:17,21

**change** 7:19,20

**changed** 7:18 16:1 37:25 38:4

**charge** 9:22

**choosing** 28:7

**cloud** 12:10

**combination** 27:3

**combine** 22:5

**combined** 22:7 27:6

**commenced** 5:4

**commentary** 28:22,24

**communicated** 32:21

**communication** 30:7

**communications** 20:12 21:9 23:11 32:23

**company** 13:23

**compared** 31:25

**complain** 29:13

**complaints** 41:4

**complexity** 26:23 27:4

**concluded** 42:22

**consideration** 26:11,14

**considerations** 26:20

**consistently** 15:9

**contacted** 21:2 30:4,8

**context** 33:13

**continue** 14:11

**continuing** 14:14

**conversation** 15:12,16,18 16:1 31:17 34:4 35:7 37:24 38:3 39:10

**conversations** 12:19,23 13:13 14:5, 7,11 15:7,23 21:10 33:14 36:20

**correct** 6:18 11:9 18:21, 23 29:4 32:14

**corrective** 11:9

**correctly** 11:8,11

**cost** 14:15 17:4 22:6 27:5

**costs** 16:2,4, 8 26:22

**counsel** 5:10 30:25

**count** 22:6

**court** 5:8,11 6:3

**culminating** 27:7

D

**Danielle** 20:3, 7 21:16,19 28:3 39:3

**date** 16:1

**day** 17:10 19:11

**December** 9:20

**decide** 25:19

**decided** 22:8, 23 25:14,15, 18,21 27:24 41:11

**decision** 17:7, 10 22:4,19

23:14 24:16 26:21,24 27:7 28:9,14 36:18

**decision-makers** 28:7

**decision-making** 39:5

**decisions** 8:20 27:18

**definition** 24:11,12

**demoted** 11:14

**Depends** 24:11

**deposed** 5:15

**deposition** 5:3 6:14 42:21

**detail** 34:4 41:21

**details** 9:13 31:16,22 32:24

**device** 8:5,6, 8,14,21,25 12:20 15:24 17:11

**diagnose** 11:8

**difference** 11:2,6,10

**difficulty** 11:12

**director** 7:14, 17

**disagree** 13:7 29:8

**discuss** 27:17

**discussed** 12:25 17:9 21:25 22:1 23:2 26:3,4 31:17 38:4,6 40:13

**discussing** 14:13 15:20 22:21 24:7 39:23

**discussion** 17:18

**discussions** 13:17 14:23 27:4

**disrespect** 22:1 23:13

**disrespected** 34:15

**disrespectful** 23:11

**disruptions** 12:11

**document** 17:13 19:7 39:14 40:5

**documentation** 37:5

**documented** 22:3,16 23:6 24:2

**documents** 31:7

**downsizing** 13:12

**Drive** 7:1,3

**due** 35:25 37:2

**duly** 5:15

**Dunwoody** 6:24 7:1

**E**

**e-mail** 17:21, 24 18:1,2,3, 5,17,25 19:9,12,13, 14 20:20,23 21:8,9,25 22:13 23:9 24:22,24 25:2 30:11 32:23 37:15, 17 38:5 39:16,20 40:6

**e-mails** 6:15 18:24 24:6 30:12,23 31:4,8

**earlier** 14:17 37:15

**earning** 13:22

**educational** 16:20,22

**effective** 8:18

**elements** 26:3

**eliminate** 15:9,11 17:11 22:20, 22,23 23:4, 15 24:16 25:15 26:21, 25 27:8,24 36:19 38:7

**eliminated** 9:5 10:19 14:10 27:12 28:8, 20 36:20 37:2

**eliminating** 12:19 14:12, 14,21,22,24 26:12,20

**elimination** 23:22 28:23

**employed** 7:11

**employee** 32:7 33:10 41:4

**employees** 17:7 36:10

**employment** 9:24 41:13 42:2

**end** 18:24,25 24:18

**ended** 14:7

**enforce** 22:8

**engineer** 11:3 17:11

**engineers** 16:13,19

**entire** 14:22, 24 15:5 19:14

**environment** 19:3 37:21

**established** 22:5

**event** 22:8,11

**events** 38:18

**exact** 24:5

**EXAMINATION** 5:17

**examined** 5:15

**examples** 13:20

**executed** 23:6

**expense** 14:3

**explain** 11:6 39:18 41:20

**explanation** 25:5

**explicitly** 23:6

F

**face** 35:4

**fact** 9:7

**fall** 15:13

**familiar** 9:13 32:10 37:8

**feature** 5:5 42:18

**feel** 35:25

**Feels** 24:24

**felt** 31:12 33:25 34:15

**female** 32:6 33:9

**Feuillebois** 20:7

**figure** 32:1

**find** 41:15

**fine** 33:19 34:22 35:18

**finish** 6:9,10

**fireball** 24:25 25:3

**Flock** 7:12 9:24 12:2 14:3 36:9,11 41:8,18

**flow** 29:17

**forgot** 39:15

**form** 15:2 16:5,14 19:6 22:15 23:16 26:15 27:25 29:20 37:7 40:4 41:16

**forwarded** 18:9

**forwards** 15:21

**found** 42:1

**Friday** 20:3 21:8,16 22:13

**friends** 42:5

**future** 19:4 23:4 37:23

G

**gave** 39:9

**general** 16:4, 24

**generic** 16:2,3

**Georgia** 6:24 7:1

**Give** 17:15 30:11

**giving** 40:17

**God** 12:15

**good** 5:19 15:10

**Gotcha** 14:16

**group** 28:9,14

**guess** 13:11 23:8 27:20

**guessing** 12:10

**guys** 42:5

H

**handle** 36:13

**hanging** 23:12, 13

**happen** 17:6

**happened** 9:14 27:1 29:13, 17 31:5,13 36:1 39:17 40:2,11,18, 21

**harassed** 33:25

**harassment** 36:3

**hard** 6:5,7

**head** 7:23 22:6 34:15

**heard** 12:15 28:14 41:3

**Hey** 16:24 26:4

**hire** 10:8 16:18

**hiring** 16:13

**history** 9:3 22:2 24:3,6 26:1,2

**hold** 29:24

**honest** 6:8

**hope** 19:3 37:21

**housekeeping** 5:22

**HR** 38:12,21

**hung** 26:5 27:10 40:22

I

**idea** 13:12

**ideas** 12:23

**identify** 25:2

**impetus** 23:14 25:10

**improvement** 19:3 37:22

**inaudible** 8:5 9:8 15:16 16:17 18:10 25:21,22 29:4,10 35:14 39:18

**inches** 34:16

**incident** 24:8 30:9 32:22

**include** 25:6

**individuals** 10:8 27:23 39:9

**information** 20:24 21:1 39:25 40:2, 11,17

**inhibited** 5:25

**input** 39:9

**instances** 12:13

**interested** 41:17

**investigation** 38:20

**investigations** 38:22

**involved** 12:14 38:22 39:4

**issue** 11:8

**issues** 19:1 22:3,17 24:1,14 36:24 37:3, 20

J

**J-I-R-A** 11:25

**Jhostin** 6:17 8:22,25 18:13 22:1 29:3,12 31:11 32:21 33:24 34:14, 15 36:21 38:1,17 40:22

**Jira** 11:23,25 12:7

**job** 15:10 16:9 41:15

**jobs** 10:7

**July** 9:4 10:19

**June** 9:4

**justified** 14:2

**justify** 14:1 15:10

K

**KEATING** 9:7 12:8 15:2 16:5,14 18:8 19:6 20:5 22:15 23:16, 20 26:15 27:25 29:20 30:24 31:14, 20 32:8,17 33:11 34:1, 8,17,23 35:5,10,15, 21 37:7 38:25 40:4 41:16 42:16

**keeping** 14:20

**kind** 8:16 13:11 15:7 33:3 42:9

**knowledge** 10:14,17 41:7

L

**Laura** 14:8 18:5,9,14 20:3,7 21:15,18 28:2 29:6,11 30:3 31:10 32:20 33:3,6

**Lauren** 33:23

**lawyers** 5:22 30:25 31:6

**Leading** 18:8

**leaving** 25:4

**left** 9:23 10:2 41:8

**level** 8:17

**levels** 11:10

**lieu** 8:12

**lines** 32:5 33:8

**live** 6:23

**lobby** 5:20

**Lodge** 7:25 9:23 15:1 18:13,20 26:5 27:1,11 28:16,19 32:6 33:9 37:18,25 39:4,22 40:12 41:4,8

**Lodge's** 42:10

**long** 12:24 22:2 24:2,4, 9,11,12,14,

15 25:25

**longer** 9:14,16 10:6 41:17

**lower** 17:4

**M**

**M-I-L-E** 7:6

**mad** 33:20

**made** 17:7,11 22:4,19 28:14 36:18 41:23

**maintain** 19:2 37:20

**make** 24:16 27:18,21 28:24

**makeup** 16:20

**making** 23:14 28:22 38:11

**malfunctions** 12:7

**manage** 8:3 41:12

**managed** 8:8 10:5,6

**manager** 8:10 10:1

**managing** 8:13

**March** 10:11, 24 13:5

**matter** 39:23

**Mccormick** 18:6,9,14 20:3,7 21:16 29:6,12 30:1 31:10 33:6, 24 35:2,24 39:3

**meet** 21:13

**meeting** 20:2, 13 21:15,17, 19,21,22,24 22:4,24 23:2,12 25:4,6,7,10, 13,19,25 29:7,9 36:17 38:6,10 39:21,24 40:3,13,14, 15,18,21,23

**meetings** 19:4 20:11 21:4, 10 26:6 27:11 37:23 39:10

**memory** 32:22

**mentioned** 32:20 34:11 37:6

**mentioning** 34:5

**mild** 7:5

**mile** 7:1,3,4, 5,6,7

**mind** 12:11 38:1,4

**Misstates** 16:6,15

**moment** 22:22

**money** 13:22

**month** 9:16 12:15 21:5

**months** 10:21 13:2 15:19 24:8

**morning** 21:25

**mouth** 40:7

**move** 7:8

**moved** 7:21,24

**multiple** 27:6

**N**

**nods** 7:23

**notice** 25:5

**November** 5:4 7:15 10:10, 23,24 14:10 16:12,21 20:4,8,16,20 21:5,8,16 22:14 25:10 26:5 27:2, 12,14 29:7, 14 31:13 36:1,18 37:17 40:15

**O**

**Object** 15:2 16:5,14 19:6 22:15 23:16 26:15 27:25 29:20 30:24 37:7 40:4 41:16

**objection** 9:7 12:8 18:8 29:25 31:14, 20 32:8,17 33:11 34:1, 8,17 35:5, 11,21

**obsession** 33:3

**occasion** 36:8

**occupying** 27:8

**occur** 7:20

**occurred** 20:15 38:10,24

**occurring** 12:23 21:23 33:17

**October** 15:22

**odd** 33:4

**offense** 24:25 25:3

**official** 39:10

**Omar** 7:25 14:8 15:1,4, 7 18:13,20

21:2,3,22 23:11,14 28:2,16,21 33:8,25 34:14 35:3 37:17 40:19

**one-on-one** 23:13 25:7 39:17,21,23 40:3,11,23

**ongoing** 22:16 23:17,20 27:3

**operational** 8:17

**operations** 7:14,21,24

**opinion** 15:16 23:25 34:21 35:17

**options** 14:19

**originally** 13:12,16

**ownership** 11:19

P

**P-O-S-T** 7:6

**p.m.** 5:4 42:22

**paper** 17:15

**paperwork** 36:14 37:9, 10

**parallel** 28:6

**part** 13:13 28:3,4

**participation** 19:4 37:22

**passing** 39:10

**people** 8:19 14:12 16:21, 25 21:4 25:11 27:16, 17,18

**performance** 22:2,3,7,17 23:17,20 24:1,3,13 26:2 27:6 36:24 37:2,6

**person** 6:7 11:14 13:11 38:7

**personal** 36:12

**phone** 28:3, 10,12,13,21 29:2 38:13

**piece** 17:14

**place** 17:19

**plan** 17:5

**plans** 7:8 16:18 17:6

**point** 17:24 20:19,23 23:4 29:11, 15,16 35:13

**poor** 22:7,8, 11

**position** 7:13, 15 12:19 14:10 17:1, 11 22:20,22, 23 23:4,15, 21 25:15,21 26:9,12,20, 21,25 27:8, 11,24 28:20, 23 29:3 36:19 38:7 41:12,18,23

**positions** 9:5 10:18 14:2, 21 15:9,11

**positive** 19:2 37:20

**possibly** 12:19 14:11

**Post** 7:1,3,4, 7

**posted** 10:7

**precisely** 9:18,21 12:24

**preliminary** 5:21

**prepare** 6:13

**presence** 30:25

**present** 5:11 10:19

**pretty** 15:9 19:19

**prior** 16:6,15 25:5 40:13

**priority** 26:22

**problem** 24:18

**problems** 22:2 24:3 26:2

**process** 39:5

**Product** 7:17

**productions** 8:5

**productive** 19:2 37:21

**progenitor** 13:10

**promoted** 11:20

**proposition** 17:2

**put** 26:1 35:4

**putting** 40:6

Q

**quality** 13:20

**question** 6:10 21:7 28:6 32:19 33:5 35:16 39:19 40:8,10 42:9

**questioning** 35:13

**questions** 33:4 34:20 42:14, 16

**quick** 37:16

**Quinones** 8:22, 25 10:5,18 18:13 24:1 25:14,20 27:1,10 28:8,17,25 29:12,19 30:2,3 31:25 32:4 33:7,24 34:14 35:3, 25 36:19,21, 23 37:19 38:11,17 39:5,21 40:12 41:5

**Quinones's** 6:17 14:9 24:13 29:3 37:5 38:21

**quote** 32:11

**quote-unquote** 16:19

**R**

**ranks** 11:21

**rate** 11:11

**read** 18:22,25 19:14,18 20:24 30:14

**reading** 19:9, 12,23

**ready** 19:20

**reason** 5:24 13:6,9,25 23:21 29:8

**reasonable** 25:5

**reasons** 25:24 26:8,14

**recall** 9:6 12:6 17:10, 23 18:1 19:9,11 21:10,15 29:11 33:13 34:3,24 35:24 36:3 38:9

**receive** 17:23 39:25

**received** 18:1 40:2,10 41:3

**recent** 9:12

**recess** 5:13

**recollection** 15:4,25

**record** 17:19

**recording** 5:5 42:18

**reduce** 16:8 22:6 26:22 27:4

**reduced** 17:3

**reducing** 14:15 16:2,4,8 17:8

**reduction** 37:2

**referring** 22:16

**REID** 5:7,18 9:10 12:12 15:3,6 16:10,16 17:20 18:11, 18 19:8 20:6,10 22:18 23:18, 23,24 26:18 28:5 29:23 31:2,18,23 32:12,19,25 33:18 34:6, 10,21 35:1, 8,12,17,23 37:12 39:2 40:9 41:19 42:12

**related** 36:21 37:10

**relationship** 8:13

**relayed** 34:13

**remember** 8:2,4 9:16,21 10:7 14:13,17 15:22 20:1,2 21:1,3,17, 20,23 28:15, 16,19,21 29:9,18 30:6 31:16,22 32:13,16 33:15,16 34:5,24,25 35:7 40:20 41:21,22

**remotely** 5:12

**rephrase** 40:7

**replying** 24:23

**report** 38:21

**reported** 33:24

**reporter** 5:8, 11 6:4

**reports** 38:11

**requests** 10:12

**required** 16:9

**requirements** 17:3

**resign** 41:24

**resigned** 41:11

**resolve** 19:1 37:20

**resources** 17:4

**rest** 19:18

**resulted** 27:7

**reviewed** 6:15

**role** 24:16 37:1

**roles** 14:14 17:8

**rude** 22:1 33:2

S

**safe** 35:25
**Safety** 7:12
**scroll** 17:16 19:17,20,21 20:18 25:1 30:16,17 34:12
**scrolling** 30:20
**selected** 23:22 26:9
**Senior** 7:14
**sense** 16:24 27:21
**separate** 21:4 26:6
**set** 16:9 17:3 27:5
**sexuality** 42:10
**sexually** 33:25
**short** 19:19
**show** 17:13,14 18:10 24:6 30:10
**showed** 37:15
**showing** 39:15
**shut** 15:5
**sic** 7:2
**side** 15:8
**simply** 40:10
**situation** 20:15,25 21:5,11
**situations** 11:13
**six-plus** 13:2
**skill** 16:9 17:2 27:5
**skilled** 17:1
**software** 12:10
**sounds** 40:1
**space** 7:6
**speak** 10:20
**speaks** 19:7 40:5
**specific** 28:22,24 33:5
**specifically** 21:6
**specifics** 30:6
**started** 12:23 13:6,15 14:6
**stated** 34:3
**stipulated** 5:10
**strategy** 13:14 14:15 15:21 16:2,3,8 22:5,9,21 23:7 27:4 28:22
**stretches** 24:4
**Strike** 32:1
**submitted** 12:3
**success** 11:11
**suggested** 39:23
**suggesting** 15:5
**summarize** 15:17
**supervisor** 8:3
**support** 8:5,7, 8,14,21 9:1 11:3 12:3,20 15:24
**surrounding** 15:23
**swear** 5:8,12
**swore** 6:4
**sworn** 5:15
**system** 12:2,3, 7,10

T

**taking** 6:4
**talk** 6:6 31:5 38:17 42:6
**talked** 6:20 25:24 29:16 31:10
**talking** 9:12 13:6 21:3 22:11,12 30:25 32:3 40:14
**talks** 17:6
**team** 8:3,4,7, 8,14,21 9:1, 5,8,14,17, 19,22 10:1, 5,7,8,18,20, 25 11:4,20 12:20 13:12, 18,19 14:2, 15,20,21,22, 24 15:5,10, 21,24 16:13, 19,21 19:2 22:7 23:12 25:7 27:5 37:21
**team's** 10:11
**teams** 8:18
**technical** 11:7
**telling** 29:12, 18 35:24
**terminate** 25:14,20 36:9
**terminated** 10:6 29:1 36:11,24

**terminating** 28:7 36:12 39:5

**termination** 6:18 26:9 37:5,11 38:10

**terms** 10:11

**terrible** 34:20 35:15

**testified** 13:5

**testifying** 5:25

**testimony** 6:21 16:6,15

**thing** 17:9 33:9,23 39:13

**things** 5:21,23 13:23 22:12 27:17,19

**thought** 28:17, 25 36:23 37:1 39:11

**Thursday** 20:20

**ticket** 11:24, 25

**tickets** 12:3

**time** 8:21 9:9 10:2,4,5,6, 11,23,24 11:19 12:8, 24 14:6 15:23 16:1, 12 20:14 22:22 23:5 24:1,9,11, 13,14 29:17

**timeline** 24:5

**times** 11:17 12:6 27:6

**title** 7:15

**today** 6:1,14 31:7

**told** 8:16 9:4 10:10 11:22 14:19 29:15, 19,21 30:1,3 31:19,24 32:3 33:6 34:15 35:2,3 37:25 41:14, 17

**trick** 33:21

**true** 10:14 25:17

**truthfully** 5:25

**turned** 5:6 42:19

**typically** 19:14

**U**

**unaware** 38:23 39:1

**uncomfortable** 31:12

**V**

**vein** 22:12

**version** 38:18

**videoconference** 5:3 42:21

**voice** 28:14

**W**

**wait** 5:20

**wanted** 34:16

**word** 36:3

**words** 7:4 15:18 23:9 40:7

**work** 11:12 13:21,22 17:4 19:1 26:23 27:5 37:19 38:1 42:6

**working** 12:7 36:10

**would've** 18:22

**writes** 37:18 38:5

**writing** 37:18

**written** 20:12

**Y**

**y'all** 16:12

**year** 7:22 9:4 10:11,25

**years** 7:9

**Z**

**Zoom** 5:5 6:7 42:18