# EXHIBIT E –

# DANIELLE FEUILLEBOIS

# DEPOSITION

1          IN THE UNITED STATES DISTRICT COURT
    FOR THE NORTHERN DISTRICT OF GEORGIA
2                 ATLANTA DIVISION

3    JHOSTIN QUINONES,           )      Civil Action No.
                                 )      1:24-CV-01319
4       Plaintiff,               )
                                 )
5    v.                          )
                                 )
6    FLOCK GROUP, INC.,          )
                                 )
7       Defendant.               )
     _____)

8

9

10

11

12

13

14

15

16          The Videoconference Deposition of

17               Danielle Feuillebois

18            (Taken by The Plaintiff)

19                Conducted Remotely

20               November 20, 2024

21

      Reported by: Jacqueline Frazier
22                 Certified Court Reporter
                   Georgia
23                 License No. 5465-2647-6265-0624

24

25

**Page 2**

1  STATE OF GEORGIA

2  COUNTY OF GWINNETT

3  VIDEOCONFERENCE DEPOSITION OF DANIELLE FEUILLEBOIS

4

5          Pursuant to Article 8.B of the RULES AND

6  REGULATIONS OF THE BOARD OF COURT REPORTING OF THE

7  JUDICIAL COUNCIL OF GEORGIA, I make the following

8  disclosure:

9

10         I am a Georgia Certified Court Reporter.  I

11  am here as a representative of Huseby Global

12  Litigation.

13

14         Huseby Global Litigation was contacted by

15  the offices of THE WORKERS' FIRM, to provide court

16  reporting services for this deposition.  Huseby Global

17  Litigation will not be taking this deposition by

18  O.C.G.A. 15-14-37 (a) and (b).

19

20

21

22

23

24

25

**Page 3**

1          A P P E A R A N C E S

2

3  ON BEHALF OF THE PLAINTIFF:

4          PATRICK REID - videoconference
           ATTORNEY AT LAW

5          THE WORKERS' FIRM
           7000 CENTRAL PARKWAY

6          SUITE 1100
           ATLANTA, GEORGIA  30328

7          patrick@theworkersfirm.com

8

9  ON BEHALF OF THE DEFENDANT:

10         ADAM KEATING - videoconference
           ZACHARY MCCORMACK - videoconference

11         ATTORNEYS AT LAW
           DUANE MORRIS, LLP

12         1075 PEACHTREE STREET, NE
           SUITE 1700

13         ATLANTA, GEORGIA  30309
           akeating@duanemorris.com

14         zmccormack@duanemorris.com

15

16

17

18

19          - - -

20     The Videoconference Deposition of Danielle

21  Feuillebois, taken by the Plaintiff, Conducted

22  Remotely, on the 20th day of November 2024, at

23  3:52 p.m., before Jacqueline Frazier, Certified Court

24  Reporter.

25

**Page 4**

1              INDEX TO EXAMINATIONS

2

3  Examination by Mr. Reid.............................5

4

5  Certificate of Reporter............................54

6

7              INDEX TO EXHIBITS

8  Exhibit        Description              Page

9  P-2            FLOCK 26-28               26

10  P-3            FLOCK 29-30               32

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 5**

1          P R O C E E D I N G S

2              - - -

3  (Whereupon, the videoconference deposition of Danielle

4    Feuillebois commenced at 3:52 p.m. on November 20,

5              2024.)

6          (Whereupon, the Zoom recording feature

7      was turned on.)

8          (It was stipulated by all counsel

9      present that the court reporter is

10      authorized to swear the witness remotely.)

11         (Whereupon, the witness was sworn in.)

12              DANIELLE FEUILLEBOIS,

13  having been duly sworn, was deposed and examined as

14  follows:

15              EXAMINATION

16  BY MR. REID:

17      Q    Could you tell me how to pronounce your last

18  name?  I've been butchering it all day.

19      A    That's okay.  It's Feuillebois.

20      Q    Feuillebois.  All right.  I'm going to do my

21  best to remember that.  Okay.  Ms. Feuillebois, there's

22  some housekeeping matters that attorneys always go

23  over.

24          So the first question I'm at is:  Is there

25  any reason you'd be prevented from testifying

**JHOSTIN QUINONES vs FLOCK GROUP, INC.**
**Danielle Feuillebois on 11/20/2024**

Page 6

1    truthfully or accurately today?
2         A    No.
3         Q    And then obviously, you just heard Madam
4    Court Reporter speak.  So she's taking down everything
5    that we're saying, and it's kind of hard for her to do
6    that if we're speaking over each other.  I'm going to
7    do my best not to interrupt you, although, sometimes
8    it's hard over Zoom.
9              Can you agree also to let me finish my
10   questions before you begin answering?
11        A    Yes.
12        Q    And if you do, no worries.  We'll figure it
13   out, always happens.
14             What did you do to prepare for your
15   deposition today?
16        A    I --
17        Q    And I don't -- by the way, I want to put this
18   in before, I don't want to hear anything you may have
19   talked about with attorneys.  So don't tell me about
20   the content of anything you may have said to any of
21   your attorneys.
22        A    I reviewed our files and our employee files.
23        Q    Okay.  Did you meet with attorneys?
24        A    I did.
25        Q    Okay.  How many times did you do that?

Page 7

1         A    Two times.
2         Q    Okay.  How long were those meetings?
3         A    Thirty minutes or so, each.
4         Q    Okay.  And did you make any notes from any of
5    your preparation?
6         A    I did.
7         Q    Okay.  What notes did you make?
8         A    Notes about the -- our employee file and the
9    situation.
10             MR. REID:  Okay.  Adam, I'm going to
11        need a copy of those, so I will follow back
12        on that.
13             MR. KEATING:  I'll follow up on that.
14   BY MR. REID:
15        Q    Where do you currently live?
16        A    I live in Atlanta, Georgia.
17        Q    What is your address?
18        A    1779 Donnalee Avenue Southeast, Atlanta,
19   Georgia 30316.
20        Q    Okay.  How do you spell Donnalee?
21        A    D-O-N-N-A-L-E-E, one word.
22        Q    Got it.
23             Did you have any plans to move from that
24   address in the next two years?
25        A    Yes.

Page 8

1         Q    Okay.  Where are you currently employed?
2         A    Flock Safety.
3         Q    And what is your position there?
4         A    I'm the vice president of the HR.
5         Q    Okay.  Was that your position in November of
6    2023?
7         A    No, prior to that -- at that time, I was a
8    director of HR.
9         Q    Okay.  When did you become the VP?
10        A    January 2023 -- so sorry -- yes, correct.
11        Q    So you would have been the VP --
12        A    Yes.
13        Q    Okay.  You would have -- just -- okay.  Just
14   for the clarity of the record, you would've been VP in
15   November of 2023?
16        A    Yes.
17        Q    Gotcha.
18             And then what do you do in your role?
19        A    I manage a team of HR VPs, compensation
20   managers, and various other HR functions.
21        Q    Okay.  And sometimes maybe the HR business
22   partners will come to you with an issue and you'll
23   discuss it, right?
24        A    Yes.
25        Q    And you have what are called HR meeting

Page 9

1    calls, right?
2         A    Correct.
3         Q    And those are meetings where you will be with
4    HR VPs and you will discuss kind of what's going on,
5    does anyone have any issues, and things like that,
6    right?
7         A    Correct.
8         Q    Okay.  Prior to November of 2023, do you
9    remember in any calls with anyone, Mr. Jhostin
10   Quinones, his name, being brought up?
11        A    Not on an HR VP call, no.
12        Q    Okay.  What do you -- what calls do you
13   remember him being brought up?
14        A    With my one-on-one meetings with Laura
15   McCormick.
16        Q    Okay.  What do you remember her telling you
17   about Mr. Quinones during the --
18             MR. KEATING:  Hold on, Patrick.  I'm
19        sorry.  We're trying to -- we're going to
20        get some noise background here, we're going
21        to -- I don't want you to -- I want you to
22        finish your question.
23             MR. REID:  Sure.  No problem.
24             (Whereupon, a brief discussion took
25        place off the record.)

Page 10

BY MR. REID:

2  Q   I believe the question was, what do you
3  remember -- well, let's go back or step back for a
4  second.

5      When do you remember Ms. McCormick talking to
6  you on calls that you had with her about Mr. Quinones?

7  A   Going back to, I believe, April of 2023.

8  Q   Okay.  And then continuing until when?

9  A   November, (inaudible).

10  Q   Got it.

11     And what was the content of those
12  conversations?

13  A   There have been a number of performance
14  concerns, and so we discussed that.

15  Q   Okay.  And what was the -- what was she
16  asking you specifically, about what you should do?

17  A   Well, we always discuss any performance
18  concerns with the employee -- or that have to do with
19  its employees, and it's generally not so much what she
20  should do, but we collaborate on those things.

21  Q   Okay.  What does she think that she should do
22  with Mr. Quinones?

23  A   In all of those calls?

24  Q   Let's say, April to August, what did -- what
25  was she thinking she should do?

Page 11

1      MR. KEATING:  Objection as to time.

2  A   We were documenting these performance issues,
3  and she was working with his manager directly to make
4  sure those were documented, and she was sharing that
5  information with me.

6  BY MR. REID:

7  Q   And also, trying to find a way for
8  Mr. Quinones to perform, I guess, the necessary
9  requirements in his role, so he did have performance
10  issues, right?

11     MR. KEATING:  Object to the form.  Calls
12  for speculation.

13  A   Correct.  I mean, we would always document
14  it, make sure it's presented to the employee.

15  BY MR. REID:

16  Q   Was terminating Mr. Quinones ever brought up
17  before November of 2023?

18  A   Multiple times.

19  Q   And what were the results of those
20  conversations?

21  A   We wanted to ensure that we had the proper
22  documentation, and we were discussing that with him,
23  providing feedback, as well.

24  Q   Okay.  And so was it -- when you say "him,"
25  who do you mean?

Page 12

1  A   Jhostin.

2  Q   Okay.  Got it.

3      So before November 2023, did y'all feel that
4  he didn't have enough performance documentation to
5  terminate Mr. Quinones?

6  A   No, we certainly did.  We also always tried
7  to provide multiple forms of feedback before a
8  termination.

9  Q   Okay.  And so what was the reason that
10  Mr. Quinones was not terminated before November?

11  A   We wanted to give him the ability to try and
12  improve.

13  Q   Okay.  Do you know about Flock's job posting
14  procedure?

15  A   I do.

16  Q   How does that work?

17  A   Recruiting is responsible -- the recruiting
18  team is responsible for posting any open roles, and
19  that falls through that.

20  Q   Okay.  And so does Flock, to your knowledge,
21  over post roles that -- well, let me preface this.  So
22  some companies will post roles even though they're not
23  actually hiring, and they just want to get in resumes.

24     Does Flock do that?

25  A   Generally, sometimes.  It depends on the

Page 13

1  role.

2  Q   Got it.

3      Okay.  What about for roles that would be
4  similar to Mr. Quinones?

5  A   Could be -- can you clarify your question,
6  when you post jobs that --

7  Q   Sure.

8      So something -- like, doing this job, I kind
9  of see what different companies do.  And so some
10  companies want to have a pool of resumes that, you
11  know, if they do actually open a job, they can go into
12  that pool and say, okay.  Hey, here's the people that
13  applied to this posting that we made, let's say, on
14  August, right?  And we can use these resumes and start
15  e-mailing people immediately.

16     But when they post in August, there's not
17  actually a role that they're hiring for, and so what
18  they'll do is they'll just collect resumes.

19  A   Correct.

20  Q   Got it.

21     So does that make sense now?

22  A   Yes, it does.

23  Q   Okay.

24  A   So, yes, we would do that depending on what
25  we're hiring for and what's open for pipeline

Page 14

1  candidates.
2      Q    Okay.  Do you remember -- do you know what
3  Mr. Quinones's position was?
4      A    At the time, I believe he was an asset
5  engineer, but we restructured the entire team.
6      Q    Would it ring a bell if I said device support
7  two?
8      A    Yes.
9      Q    Okay.  And do you remember what team he was
10 on?
11     A    I mean, he -- it was the device support team
12 or what we --
13     Q    Yeah.
14     A    -- rebranded, yeah.  I mean, we completely
15 restructured that team.
16     Q    Yeah.
17         But at the time, it was probably called
18 device support two?
19     A    Correct.
20     Q    Okay.  Do you remember -- do you know if
21 after Mr. Quinones's termination, if any job posting
22 was posted for a device engineer on that team?
23     A    I do not.
24     Q    Okay.  Do you know if anyone was hired after
25 Mr. Quinones's termination to that team?

Page 15

1      A    For that team, I don't believe so.  We
2  basically restructured that team, so it no longer
3  existed.
4      Q    Okay.
5      A    We changed it all.
6      Q    And -- okay.  When did you do that?
7      A    Pretty immediately.
8      Q    Immediately in regards to what?
9      A    Meaning, we had been discussing for a number
10 of months prior to that whether or not we wanted to
11 include device engineering as a part of the asset
12 engineering team.  And what we determined was that
13 wasn't really a specific role that we needed, and so we
14 took part of that role and combined it in some of the
15 other engineering roles.
16     Q    Got it.
17         Are you aware of conversations that are in or
18 about March about, you know, Are we going to eliminate
19 some roles from the device support team?  Are we going
20 to get rid of the device support team altogether?  Are
21 we going to keep it where it is?  Are you aware of
22 conversations like that?
23     A    Yes.
24     Q    Okay.  And how are you aware of that?
25     A    Any organizational changes, I would need to

Page 16

1  be consulted on.  And so typically, I mean, we would
2  discuss that prior to making the changes.
3      Q    And who would've communicated that with you
4  about Mr. Quinones's team?
5      A    Brian Barnard, Omar, any number of people.
6      Q    And so in -- do you recall what was going on
7  with those conversations in October of 2023?
8      A    We would typically discuss any sort of
9  organizational changes well in advance of making any
10 decision.
11     Q    Okay.  So do you recall when the decision was
12 made that a device support engineer position was going
13 to be eliminated?
14     A    I don't recall.  It was slightly in October
15 prior to his separation, to Jhostin Quinones's
16 separation.
17     Q    Okay.  And if individuals testified that that
18 decision was made on November 3rd, would you have any
19 reason to disagree with the testimony?
20         MR. KEATING:  Object to form.
21     A    I would agree that we made the decision to
22 separate Mr. Quinones on -- not November 3rd, but
23 after that.  But we had already had discussions about
24 how we were going to change that department in that
25 organization prior.

Page 17

1  BY MR. REID:
2      Q    Okay.  So that -- I guess let me be more
3  specific.  So if someone testified specifically that
4  the decision to -- well, no, let's just scratch that.
5         So you just said that Mr. Quinones's
6  termination was not decided on November 3rd.
7         Who decided that Mr. Quinones was going to be
8  terminated?
9      A    I would say it was myself, his manager, and
10 Laura McCormick.
11     Q    His manager would be Omar Lodge, correct?
12     A    Correct.  I would also say that Brian Barnard
13 also was involved in that decision.
14     Q    Okay.  When do you remember that decision
15 occurring?
16     A    It was certainly after the 3rd.
17     Q    Okay.  We might look at some documents later
18 that might refresh your recollection, so we'll just
19 come back to that.
20     A    Sure.
21     Q    Put a pin in that for a little bit.
22         Does Flock Safety have any policies around
23 what should be put on separation notices for employees?
24     A    When you say separation notice, what are you
25 referring to?

Page 18

1    Q    Well, it seems -- well, let me divide that
2    up.  There's kind of some different documentation.
3         So the first thing, the first question, I
4    guess, I would have:  Was there any training that
5    people at Flock receive on what they're supposed to
6    tell an employee when they are terminating them in that
7    termination meeting?
8    A    Yes.
9    Q    And what is that training?
10   A    For the manager, for the HR person?
11   Q    Well, let's do the manager first, and then we
12   can do the HR person.
13   A    The HR VP would work with the manager to go
14   through what the script looks, essentially giving them
15   talking points, and that is the same for every
16   termination we give.
17   Q    Okay.  And this script would accurately
18   reflect the reasons for the termination, right?
19   A    Yes.
20   Q    Okay.  And then there's also a Georgia
21   Department of Labor separation notice that y'all fill
22   out for employees that are terminated in Georgia,
23   right?
24   A    Correct.
25   Q    Is there any training on what to fill out in

Page 19

1    those?
2    A    Yes.
3    Q    And what is that?
4    A    It is our training is standard only, the HR
5    business partners to complete that, and it is to
6    complete the information that is requested on the form
7    accurately.
8    Q    Would it also -- would the training also
9    include recording the reason completely?
10        MR. KEATING:  Object to the form.
11   Asked and answered.
12   A    Yes.
13   BY MR. REID:
14   Q    Okay.  And then it also seems like there is
15   some sort of, like, internal personnel file type of
16   thing that you guys have electronically.
17        Do you know what I'm talking about?
18   A    All of our electronic -- all of our personnel
19   files are electronic.
20   Q    And so you know what I'm talking about when I
21   say electronic personnel file, right?
22        MR. KEATING:  Object to the form.
23   I don't know what you're referring to.
24   BY MR. REID:
25   Q    Okay.  Well, I can show you an example.  Give

Page 20

1    me one second.
2         Okay.  Can you see that?
3    A    Correct, yes.
4    Q    And does this look to you like a snippet of a
5    personnel file for an employee at Flock?
6    A    Yes.
7    Q    Okay.  And when filling this out, the
8    training would also be to fill out the reason
9    completely and accurately, right?
10   A    Yes.
11   Q    Okay.  And then there's also some sort of --
12   I don't know what to call this -- like, internal
13   separation notice.
14        Do you know what I'm talking about there, it
15   says unemployment solutions in client?
16   A    Yes.
17   Q    What is that?
18   A    We previously used third-party to manage
19   unemployment claims for us, and that was specific to
20   that third-party.
21   Q    Okay.  So you would fill it out for the
22   third-party in case they needed it for anything related
23   for employment, right?
24   A    Correct.
25   Q    For example, you know, if there was a

Page 21

1    contestation of unemployment, they -- you would -- they
2    would have those files to be able to kind of do what
3    they need to do contest that or whatever they need to
4    do, right?
5    A    Correct, yes.
6    Q    Okay.  And is there a training on those, on
7    filling out those forms for HR VPs?
8    A    Yes.
9    Q    Okay.  And the training in those would also
10   include filling out the reasons for termination
11   completely and accurately, right?
12   A    Correct.
13   Q    Okay.  Would it surprise you to learn that
14   the -- well, I'll leave out -- well, let me ask you
15   this first:  The kind of the internal e-personnel file
16   for an employee, when you're filling out the reason for
17   termination, is it like a drop down box and you have to
18   select something?
19   A    It is.
20   Q    And you can only select one thing, right?
21   A    Yes.
22   Q    Okay.  So we'll ignore that.  So the -- and
23   I'm going to call the -- I'm going to turn to these
24   documents, the kind of third-party separation notice,
25   the Georgia Department of Labor separation notice, and

Page 22

1  the script.
2        You know what I'm referring to when I refer
3  to those things?
4    A    Yes, I do.
5    Q    Okay.  Would it surprise you to learn that
6  none of those three documents in Mr. Quinones's case
7  reference him having a bad performance?
8    A    That is accurate because that is ultimately
9  not why we decided to separate him.
10   Q    Well, why did Jhostin and -- compared to
11 other, I guess, device support engineers?
12   A    Well, we did eliminate this role, and we
13 ultimately decided on Jhostin because of his
14 performance.
15   Q    So that would have been why he was terminated
16 specifically, correct?
17       MR. KEATING:  Object to the form.
18       Asked and answered.
19   A    I mean, he was separated because we
20 eliminated his role.
21 BY MR. REID:
22   Q    Okay.  But he was also separated because of
23 his performance, right?
24       MR. KEATING:  Object to the form.
25       Asked and answered.

Page 23

1    A    That was taken into consideration when making
2  the decision as to when we were going to separate on
3  that team first.
4  BY MR. REID:
5    Q    And so it was one of the reasons for the
6  decision, right?
7        MR. KEATING:  Object to the form of the
8        question.  Asked and answered for the third
9        time.
10 BY MR. REID:
11   Q    Well, I apologize, you -- I probably messed
12 it up.
13       Like, when people say it was taken into
14 consideration, that's not exactly answering the
15 question.
16       So what --
17       MR. KEATING:  Yes, it is.
18       MR. REID:  Well, that's your opinion,
19       Adam.
20       So what I'm asking you is, was Mr. --
21       and I think it's reasonable, I can make it
22       simpler.
23       Was Mr. Quinones's performance a factor
24       in deciding to terminate him?
25       THE WITNESS:  Yes.

Page 24

1  BY MR. REID:
2    Q    Okay.  Was it an important factor?
3    A    It was a factor.
4    Q    Okay.  Would he have been terminated if he
5  did not have this performance record?
6    A    He likely would have because we eliminated
7  that role --
8    Q    Okay.
9    A    -- and the structure of that team.
10   Q    Would he have been terminated in November if
11 not for his performance record?
12   A    It would have been very likely around the
13 same time, yes.
14   Q    Okay.  When were the other positions
15 eliminated?
16   A    I don't recall.
17   Q    Okay.  If I were to tell you that individuals
18 in that team were laid off and moved to other teams
19 within Flock in June or July of 2024, would that --
20 could that be what you're referring to when the team
21 was eliminated?
22       MR. KEATING:  Object to the form of the
23       question.
24   A    It could be.
25 BY MR. REID:

Page 25

1    Q    Okay.  All right.  Okay.  So I'm going to
2  start off -- so we're going to talk about
3  Mr. Quinones's termination a bit more specifically.
4        What -- do you recall there being an event on
5  November 2nd, where Mr. Quinones hung up on a team
6  meeting and then, again, in a one-on-one with Omar
7  Lodge?
8    A    Yes.
9    Q    Okay.  After those events, what meetings did
10 you have with anyone to discuss that situation?
11   A    I discussed it with Laura McCormick more than
12 once.
13   Q    Okay.  So let's break that apart, and then we
14 can go through the other ones.
15       So what conversations do you remember having
16 with Laura McCormick?
17   A    Very likely the same conversations we have
18 regarding any separation of the company, which is
19 usually, you know, what is the situation, do we need to
20 do this, what -- are there considerations from a risk
21 perspective.  It's not something we just decide on a
22 whim.
23   Q    Okay.  And so what did she originally come to
24 you and tell you about the situation?
25   A    I was copied on the e-mails that she was

Page 26

1  sent.
2      Q    Okay.  And you were copied on the e-mails
3  with -- between Mr. Quinones and his manager, right?
4      A    Correct.
5      Q    Do you recall being copied on the e-mails
6  that Mr. Quinones was sending to Ms. McCormick?
7          MR. KEATING:  Time and when?
8  BY MR. REID:
9      Q    In November -- from November 2nd to
10  November 6th of 2023.
11     A    Yes, I mean, I could have been.
12     Q    Yeah, I'll go ahead and show you the
13  e-mails.  Give me one second.  This is Exhibit 2.
14          Can you see it?
15     A    Yes.
16          (Whereupon, Plaintiff's Exhibit No. 2
17      was marked for identification.)
18  BY MR. REID:
19     Q    Okay.  So you see there is kind of some
20  e-mails up here, and we'll go through them in a second.
21          But you see that, at this point, an e-mail
22  chain on November 2nd, 2023 at 8:41 a.m., that
23  Ms. McCormick forwarded these e-mails to you?
24     A    Correct.
25     Q    Okay.  Had you seen these e-mails before

Page 27

1  November 6?  I mean, you can review them, if you want.
2  I'll go scroll up to the top.  You just let me know
3  when I need to scroll.
4          MR. KEATING:  Objection, (inaudible).
5          Which specific e-mail?
6          THE WITNESS:  Yeah.
7          MR. REID:  The e-mails before they were
8      forwarded.
9      A    I don't recall.  I am included on thousands
10  of e-mails.
11  BY MR. REID:
12     Q    Okay.  Fair enough.
13          But she can even talk to you before
14  November 6 about the situation, right?
15     A    Yes.
16     Q    Okay.  And what did she tell you about what
17  was going on?
18     A    She essentially reflected and told me what
19  the e-mail was, what the situation was, that she
20  discussed it with Omar Lodge and what her
21  recommendation was.
22     Q    Okay.  Do you remember when that call would
23  have been?
24     A    I don't.
25     Q    Okay.  Do you remember when it would have

Page 28

1  been in terms of relation to any other event that you
2  remember happening during Mr. Quinones's termination?
3      A    I don't understand.
4      Q    Like, there's event -- you may remember, Oh,
5  no, I got this e-mail on November 5th.  I know we had
6  this meeting on November 3rd, right?
7          Do you recall the first time she came and
8  talked to you being before the meeting that you had --
9  well, let me put it this way since you put it this way.
10          Do you remember her coming and talking to you
11  before that meeting that was had between you and -- I
12  believe, it was you, Ms. McCormick, Mr. Lodge, and
13  Mr. Barnard?
14          MR. KEATING:  Object to the form of the
15      question.
16     A    I don't recall.
17  BY MR. REID:
18     Q    Okay.  Fair enough.  Sure.  That's fair.  And
19  if you don't recall, that's fine.
20          So do you remember that when Ms. McCormick
21  came to you and talked to you is the first time that
22  you even heard from someone about the situation?
23     A    The specific situation on November 2nd?
24     Q    Yes.
25     A    I -- no, I mean, I was copied on an e-mail

Page 29

1  that Jhostin sent saying that he was asking about our
2  WebCam policies.
3      Q    Okay.  And then -- so you saw that, and then
4  at some point, Ms. McCormick and you had a conversation
5  about what was going on.
6          And what did she relay to you at that point?
7      A    Pretty much what was -- you know, what
8  Jhostin said happened in this meeting.  And then after
9  she spoke with Omar Lodge and Brian Barnard, what
10  they -- what Omar said happened, and that's about it.
11     Q    Okay.  Do you remember her telling you that
12  Mr. Quinones reported to her that Omar Lodge's requests
13  were making him uncomfortable?
14     A    I believe yes.  He did tell me that he said
15  that it was making him uncomfortable.
16     Q    Okay.  Did she tell you that he had reported
17  that Mr. Lodge had raised his voice at him when he had
18  asked, like, why he was being asked questions about his
19  camera?
20     A    No, I don't recall.
21     Q    Okay.  Did she tell you that Mr. Quinones
22  word -- had used the word "sexual harassment"?
23     A    No, he -- she did not tell me that he had
24  ever used the word "sexual harassment."
25     Q    Okay.  Did you hear the word "sexual" at all?

Page 30

```
1     A   No.
2     Q   Okay.  Did she relay to you that Mr. Quinones
3  had during her -- his conversation with her relating
4  the events told her that -- give me a second.
5         Did she relay to you that Mr. Quinones had
6  basically told her, What would it look like if
7  Mr. Lodge had done the same thing he had done to me to
8  a woman?
9     A   She didn't -- yes, she did mention that to
10 me.  She did share that with me.
11    Q   Okay.  Did y'all discuss, like, why anyone
12 believed that he had said that?
13        MR. KEATING:  Object to the form of the
14    question.  I think it's too broad, Y'all are.
15        MR. REID:  Your or Ms. McCormick.
16        THE WITNESS:  Did we speculate?
17 BY MR. REID:
18    Q   Sure.  Well, yeah, sure.
19        So when Ms. McCormick told you, you know,
20 Mr. Quinones asked me, you know, What would it look
21 like if Mr. Lodge had done this to a female employee?
22 Did you or Ms. McCormick -- did you ask Ms. McCormick,
23 like, what did he mean by that, or did Ms. McCormick
24 explain what she thought that he had meant by that?
25        MR. KEATING:  Object to the form of the
```

Page 31

```
1     question.  Calls for speculation.  She's not
2     Jhostin Quinones.
3     A   No, I have no idea.
4  BY MR. REID:
5     Q   Okay.  Is it possible that y'all had
6  discussed, you know, why Mr. Quinones may have said
7  that?
8         MR. KEATING:  Object to the form.
9     Anything is possible.
10    A   I mean, I do not know.
11 BY MR. REID:
12    Q   Okay.  Fair enough.
13        Okay.  So you had that meeting.  And do
14 you -- now, that we've talked about it, do you recall
15 whether that meeting may have been before or after the
16 meeting you had with -- well, actually, let's talk
17 about that.  And then I'll ask you that question.
18        So we're going to -- this is going to be
19 marked as Exhibit 3.  Okay.  And so this is a series of
20 e-mails between Laura, Mr. Lodge, Mr. Quinones, and
21 then you can see here, Mr. Barnard gets involved.  And
22 then at the end of this e-mail chain, on Friday,
23 November 3rd, 2023, at 5:47 a.m., Mr. Barnard said
24 that e-mail to both you and Laura and says, I know we
25 have time on the calendar this afternoon.  But I hate
```

Page 32

```
1  leaving e-mails unanswered.
2         Did y'all then have a meeting on
3  November 3rd that afternoon?
4     A   I don't know if I was in that meeting or if
5  it was just Brian and Laura.
6         (Whereupon, Plaintiff's Exhibit No. 3
7     was marked for identification.)
8  BY MR. REID:
9     Q   Okay.  If Brian testified that you were in
10 that meeting, would you have any reason to disagree
11 with him?
12    A   No.
13    Q   Okay.  Do you remember if Mr. Lodge was in
14 that meeting?
15    A   I don't recall.
16    Q   And if Mr. Barnard testified that Mr. Lodge
17 was in that meeting, would you have any reason to
18 disagree with him?
19    A   No.
20    Q   Okay.  And you can see here that -- well, let
21 me just read this, the second paragraph of this e-mail
22 on November 3rd at 5:47, and then let me know when
23 you're done.
24    A   I am done.
25    Q   Okay.  Did you discuss this situation in
```

Page 33

```
1  particular when talking -- during that meeting?
2     A   I believe so, if that's what the meeting was
3  for.
4     Q   Okay.  And do you recall the focus of that
5  meeting being what is in this e-mail here?
6         MR. KEATING:  Objection to the form.
7     She said she doesn't remember being in the
8     meeting.
9     A   I don't recall.  I don't recall.
10 BY MR. REID:
11    Q   But for sure, as you testified earlier, the
12 decision to terminate Mr. Quinones did not happen on
13 November 3rd, right?
14        MR. KEATING:  Object to the form.
15    Misstates prior testimony.
16    A   I don't recall exactly when that decision was
17 made.
18 BY MR. REID:
19    Q   Okay.  Do you remember testifying earlier
20 that it was not on November 3rd and that it was after?
21    A   I could have also been confusing
22 November 2nd and November 3rd.  I don't recall which
23 day.
24    Q   Okay.  But you recall being in a meeting --
25 well, who do you -- again, who do you recall being in
```

Page 34

1 the meeting where the decision to terminate
2 Mr. Quinones was made?
3     A   I don't recall.
4     Q   Okay.  Well, I think you testified earlier
5 that -- well, never mind.
6         Did you have any meetings after November 3rd
7 with both Ms. McCormick and Brian Barnard present?
8     A   I don't recall.
9     Q   Okay.  Did you have any conversations with
10 Omar Lodge specifically, including meetings with other
11 people after November 3rd?
12     A   I don't recall.
13     Q   Okay.  Okay.  I'm going to go back to, I
14 believe, the first exhibit.
15         Okay.  So Mr. Quinones sent a follow-up
16 e-mail on November 6th, and then Laura McCormick
17 details in it kind of more of what his position on what
18 happened on November 2nd is.  And then Laura McCormick
19 says, Forwarding this e-mail from Jhostin.  I will
20 bring it up in our HR meeting call later today to you
21 on November 6, 2023, at 8:41 a.m.
22         Do you remember that HR VP meeting?
23     A   I mean, I am sure if I had that meeting
24 scheduled, it happened.  But I don't recall
25 specifically discussed in that meeting.

Page 35

1     Q   Okay.  Do you remember the decision to
2 terminate Mr. Quinones have been made at the point that
3 meeting occurred?
4     A   I have no idea.
5     Q   Okay.
6     A   It's all a blur.
7     Q   Do you remember if Ms. McCormick -- besides
8 this e-mail and your earlier conversation and you
9 reviewing the e-mails that were sent on November 2nd,
10 provided you with more information as to Mr. Quinones's
11 side of the story?
12     A   Sorry.  Could you ask your question again?
13 Do I --
14     Q   Sure.
15         So there's kind of three things that we've
16 talked about where you learned information about what
17 was going on on November 2nd, and that would be that
18 meeting that occurred on November 3rd possibly, a
19 conversation with Laura McCormick, and reviewing the
20 e-mails, right?
21     A   Correct.
22     Q   Besides the information that was provided to
23 you in all of that, do you remember during the HR VP
24 meeting, talking about anything else related to Jhostin
25 Quinones?

Page 36

1     A   I don't recall.
2     Q   Okay.  Do you recall in that meeting,
3 discussing, Okay.  How are we going to terminate to
4 Jhostin Quinones?
5         MR. KEATING:  Object to form.  Asked
6     and answered.
7     A   I don't recall.
8 BY MR. REID:
9     Q   Okay.  Okay.  Do you recall whether you had
10 any further contact after the HR VP meeting with anyone
11 about Jhostin Quinones's employment with Flock?
12     A   I'm sure I discussed it with Laura McCormick.
13 We talk multiple times a day.
14     Q   Okay.  Do you recall any of the contents of
15 those conversations?
16     A   I don't.
17     Q   Fair enough.
18         Okay.  So let's go -- let's talk about Brian
19 Barnard.
20         What -- besides what's in the e-mails, do
21 recall having any communications with Brian Barnard or
22 meetings with Brian Barnard present about
23 Mr. Quinones's termination?
24         MR. KEATING:  Object to the form.  Vague
25     as to what's in the e-mails.

Page 37

1     A   I don't.  I don't recall.
2 BY MR. REID:
3     Q   Okay.  But you may have had a meeting on
4 November 3rd with him, correct?
5         MR. KEATING:  Object to the form.
6     A   I may have.
7 BY MR. REID:
8     Q   Okay.  And then you talk about -- and you
9 never met with Mr. Quinones and talked to him about
10 anything that had happened on November 2nd or about
11 his termination, right?
12     A   No, I don't think so.  Laura would have taken
13 point on that.
14     Q   Okay.  And do remember talking with Omar
15 Lodge after November 2nd about Mr. Quinones?
16     A   I may have.
17     Q   Okay.  Do you recall what format that may
18 have taken place in?
19     A   Not at all.
20     Q   Okay.  Do you recall any of the subjects that
21 may have been discussed during those meetings?
22     A   I can't speculate on what I may or may not
23 have said in a meeting.  I don't know that I recall.
24     Q   Okay.  Fair enough.
25         Okay.  I've kind of already asked you some of

Page 38

1  this.
2       Flock has an employee handbook, right?
3    A   Yes.
4    Q   Are you aware of what's in that employee
5  handbook?
6    A   Yes.
7    Q   Do you know who writes that employee
8  handbook?
9    A   It's typically written internally with review
10  from attorneys.
11    Q   Okay.  Did you have any part in writing the
12  handbook that was updated after January 2023?
13    A   I did.
14    Q   Okay.  Do you remember in your involvement at
15  all had to do with either Flock's group sexual
16  harassment, harassment, general harassment, or anti-
17  retaliation policies?
18    A   I'm sure I did.
19    Q   Okay.  So I'm going to share with you, you
20  know, what has been represented to me as the handbook.
21  But I will ask you -- and I don't know how much of this
22  you're going to read.
23       But do you recognize this?  This is the Flock
24  Safety employee handbook that was last updated in
25  January of 2023?

Page 39

1    A   I do.
2    Q   Okay.  I'm going to scroll -- give me
3  one second.  All right.  We're going to go to page 8,
4  and there's a heading that says, Sexual Harassment,
5  right?
6    A   Correct.
7    Q   And then it reads, The company prohibits any
8  form of sexual harassment on any other -- or any
9  other -- or -- sorry.  It's been a long day.
10       It reads, The company prohibits any form of
11  sexual harassment or any other harassment on any basis,
12  right?
13       MR. KEATING:  Object to the form.  The
14       document speaks for itself.
15    A   Correct.
16  BY MR. REID:
17    Q   And then it also reads, The company will act
18  and investigate all complaints of sexual harassment,
19  either formal or informal, verbal or written, correct?
20    A   Correct.
21    Q   And this policy is an important part of
22  Flock's -- Flock Group's policies, right?
23       MR. KEATING:  Object to the form of the
24       question.
25    A   Yes.

Page 40

1  BY MR. REID:
2    Q   And the reason for that is you don't want
3  employees to have to be sexually harassed at work,
4  right?
5       MR. KEATING:  Object to the form of the
6       question.
7    A   Of course not.
8  BY MR. REID:
9    Q   And then -- sorry, my computer is freezing.
10  Give me one second.
11       Okay.  Can you see it again?
12    A   Yes.
13    Q   Okay.  And one of the ways that -- let's see
14  here -- and one of the -- part of this section here, I
15  believe -- yes.
16       Part of this section here with the bullet
17  points, on page 9 which is Bates-stamped 74, Flock 74,
18  the policy reads, that -- well, among many things --
19  that, One of the ways that can exist per Flock policy
20  is when such conduct has the purpose or effect of
21  interfering with an individual's work performance or
22  creating an intimidating, hostile, or offensive work
23  environment, right?
24    A   Correct.
25    Q   And that is one of the ways that an employee

Page 41

1  can be sexually harassed, right?
2       MR. KEATING:  Object to the form of the
3       question.
4    A   Yes.
5  BY MR. REID:
6    Q   And then another way that an employee can be
7  sexually harassed under Flock's policies is, Any
8  unwelcome sexually-motivated comments, including
9  comments about a person's dress or body, right?
10    A   Yes.
11    Q   And did Laura McCormick ever tell you that
12  Omar Lodge have made the comment to Mr. Quinones that,
13  You are to put your body where I want it?
14    A   I don't recall.
15    Q   Okay.  She could've told you that, right?
16       MR. KEATING:  Object to the form of the
17       question.  She said she doesn't recall.
18  BY MR. REID:
19    Q   So you don't recall specifically, right?
20       MR. KEATING:  Object to the form of the
21       question.  Asked and answered.
22    A   Yeah, I mean, I had the information that was
23  in the e-mail and what Laura relayed to me.
24  BY MR. REID:
25    Q   Okay.  Got it.

Page 42

1          And then an employee's body includes an
2   employee's face, correct?
3       A   Sure.
4       Q   Okay.  And then we'll go a little bit down,
5   and then there's a subheading that says, Procedures for
6   addressing claims of unlawful harassment or
7   discrimination, right?
8       A   Correct.
9       Q   And it says -- well, I'm going to ask you:
10  Is it Flock's policy that any employee who feels that
11  they have been harassed or been a victim of unlawful
12  discrimination or has witnessed or become aware of
13  harassment or discrimination should immediately bring
14  the subject to the attention of an appropriate
15  supervisor?
16          If the employee's direct supervisor is the
17  offending person or the employee does not feel
18  comfortable discussing the matter with their direct
19  supervisor, the employee should approach any human
20  resources team member.  Is that Flock's policy?
21      A   That is correct.
22      Q   Okay.  And that's important, right?
23          MR. KEATING:  Object to the form of the
24  question.
25      A   Yes.

Page 43

1   BY MR. REID:
2       Q   And the reason that's important is because
3   you want an avenue for an employee to be able to report
4   whatever's going on with them regardless of who is the
5   offending person, right?
6       A   Correct.
7       Q   And that's also important so an employee
8   doesn't have to be scared to be retaliated against by
9   the person harassing or discriminating, is that right?
10      A   Absolutely.
11      Q   Okay.  Are you aware of Ms. McCormick ever
12  interviewing Mr. Lodge about Mr. Quinones's complaints
13  about what happened on November 2nd?
14      A   I am sure she did.  It's a part of our
15  process.
16      Q   Okay.  And if she did not, that would be a
17  deviation from the process, right?
18      A   Correct.  That she did discuss the situation
19  and asked and interviewed Mr. Lodge about this.
20      Q   Okay.  Do you know if she ever went back to
21  Mr. Lodge after Mr. Quinones's November 6 e-mail where
22  he gave more specific details?
23      A   I would assume she did.
24      Q   And if she didn't, that would be a deviation
25  from Flock's policies, right?

Page 44

1          MR. KEATING:  Object to the form of the
2   question.
3       A   Yes.
4   BY MR. REID:
5       Q   Okay.  And Flock also has an anti-retaliation
6   policy, right?
7       A   Correct.
8       Q   And that policy is essentially that there's a
9   zero tolerance policy from retaliating against someone
10  who's broadly complaining of harassment to an HR or
11  supervisor, right?
12      A   Correct.
13      Q   And that's important, right?
14      A   Yes.
15      Q   And the reason it's important is because,
16  again, you want employees to feel comfortable reporting
17  things and not -- because they might not report
18  something if they get retaliated against, right?
19      A   Correct.
20      Q   And if they don't report something, you guys
21  have no idea what's going on, but then you can't do
22  anything about it, right?
23      A   That's correct.
24      Q   Okay.  Let me see.  I have one more question
25  about this.

Page 45

1          Okay.  And specifically, the retaliation
2   policy says that retaliation is against any individual
3   who makes a good faith complaint.
4          What does that mean?  What does the term
5   "good faith" mean?
6       A   That means that they believe that they
7   have -- that they believe that they are reporting
8   something that is valid.
9       Q   Okay.  And did you ever hear from anyone at
10  all that Mr. Quinones had complained that -- from the
11  beginning of December 2023 until November -- until his
12  termination, that there was an escalating situation
13  with Omar Lodge that he believed was escalating sexual
14  harassment?
15      A   No.
16      Q   Okay.  Do you have any idea why Omar Lodge is
17  no longer with the company?
18      A   He resigned.
19      Q   Okay.  Do you know why?
20      A   I don't.
21      Q   Okay.  Fair enough.
22          And I hate to have to ask this question, but
23  I have to ask this because of the type of the case this
24  is:  Do you know what Mr. Lodge is sexuality is?
25      A   I do not, nor is it relevant.

Page 46

1    Q   Well, it would be relevant if someone thinks
2  that their manager is coming onto them sexually, right?
3          MR. KEATING:  Object to the form.  No,
4    it's not.
5    A   It's not.
6  BY MR. REID:
7    Q   Why is that not relevant?
8    A   I -- it's not something that we would ever
9  ask specifically or take into consideration if somebody
10 believes -- regardless of someone's sexuality.
11   Q   Okay.  So let's say you have a situation
12 where a male employee has accused another male employee
13 of sexually harassing them, right?  And they -- the
14 harassed -- the accused employee says to the employee,
15 You are going to do what I want you to do with your
16 body.  And then you have an interview, and the employee
17 says, Well, that wasn't sexual.  I'm not sexually
18 attracted to men.  That was not a sexual comment.
19          Y'all would not take that into account in
20 terms of determining whether --
21          MR. KEATING:  Object to the form of the
22    question.  Calls for speculation.  Purely
23    hypothetically.
24          You can answer to the extent you can or
25    want to.

Page 47

1    A   I can't even -- that -- I don't even how to
2  answer that question.
3  BY MR. REID:
4    Q   So you -- but you believe, right, that a
5  person's sexuality has nothing to do in a possible
6  investigation of sexual harassment, that that person
7  may --
8          MR. KEATING:  Object to the form.
9    Misstates prior testimony.  You're just
10   borderline harassing.  Please move on.
11          MR. REID:  I'm not going to move on.
12          MR. KEATING:  You are.  You are.
13          MR. REID:  No.  All right.
14          I'm asking again.
15          Is it your opinion, Ms. Feuillebois --
16   again, sorry for butchering your name -- that
17   an employee's sexuality has nothing to do
18   with whether that employee sexually harassed
19   another employee?
20          THE WITNESS:  I think it's -- I don't
21   know how to answer a question about an
22   employee's sexuality because it's -- you
23   know, I honestly don't know.
24  BY MR. REID:
25   Q   Okay.  Well, you're the VP of HR at Flock,

Page 48

1  right?
2    A   I am.
3          MR. KEATING:  Patrick, you're starting
4    to (inaudible).  Please move on with your
5    question.
6          MR. REID:  If you wanted to --
7          MR. KEATING:  You asked the question
8    about whether or not she knew about
9    Mr. Lodge's sexuality, she answered that.
10   And quite frankly, that's an inappropriate
11   question, and you keep on going.  Please
12   either rephrase your question or move on.
13          MR. REID:  Can you explain to me, Adam,
14   why you think whether or not a person is a
15   homosexual in a case where there are --
16          MR. KEATING:  I'm an attorney here.  I'm
17   not --
18          MR. REID:  Okay.  And that's fine.
19   Don't answer it.  That's okay.
20          I think I'm pretty much done with that.
21   Let me see.
22          Well, I'll just ask this question:
23   You're the person that HR business partners
24   looks to you for advice on what to do with
25   certain situations, right?

Page 49

1          THE WITNESS:  Yes.
2          MR. REID:  Okay.  All right.  We can
3    move on with that.  Give me two minutes.  I'm
4    going to see if I have anything else.  And
5    then if I don't, that's it.
6          (Whereupon, a brief recess was taken.)
7  BY MR. REID:
8    Q   I just have a couple more questions.  So let
9  me share this.  Okay.  So we're going back to an
10 exhibit that we looked at earlier, which is Brian
11 Barnard's, Friday, November 3rd, 2023, e-mail at
12 5:47 a.m.
13          And then it says in the e-mail, The
14 problem/offense is not that he didn't have his camera
15 on, but that -- and I think it's missing the word "he."
16 It says, Disrespectfully communicating to Omar in the
17 team and hung up.  And then, again, in his one-on-one
18 with Omar, he was disrespectful and hung up on him.
19          So I think the discussion that we want to
20 focus on is not whether or not having his camera on is
21 a fireable offense, but the disrespect and hanging up
22 on his manager.
23          Was that discussed as a reason for
24 Mr. Quinones's termination?
25          MR. KEATING:  Object to the question as

**Page 50**

1    to time.

2        A    I don't recall what was discussed.  But I --

3    again, this was a pattern of his performance that we

4    take into consideration.

5    BY MR. REID:

6        Q    Sure.

7             So this could have been taken into

8    consideration and have been one of the reasons that

9    Mr. Quinones was selected for elimination, right?

10            MR. KEATING:  Object to the question.

11    Asked and answered.

12        A    This specific e-mail?

13    BY MR. REID:

14        Q    Well, the content of the e-mail that I just

15    read about hanging up on -- being disrespectful and

16    hanging up on Omar in the one-on-one and the team

17    meeting.

18        A    Yes, I'm sure we discussed it.

19        Q    Okay.  Do you remember how Mr. Quinones was

20    disrespectful on those two calls?

21            MR. KEATING:  Object to the form of the

22    question.  She didn't write the e-mail.

23        A    Yeah, I don't know.

24    BY MR. REID:

25        Q    Okay.  Sure.  She didn't write the e-mail.

**Page 51**

1             But you don't recall any particular

2    discussions during the meeting about how Mr. Quinones

3    was perceived to have been disrespectful, right?

4            MR. KEATING:  Object to the form of the

5    question.  She didn't use the word

6    "disrespect," Brian Barnard did.

7            MR. REID:  Yes, she did.  But if she was

8    in a conversation where they did discuss it,

9    she would then have knowledge of that

10    conversation that I'm asking about.

11        A    I don't recall that.  I don't recall.

12            MR. KEATING:  Okay.  That's fine.  That's

13    all I have for you.

14            So Mr. Keating may have some follow-up

15    questions.  If not, then I guess we'll see.

16            MR. KEATING:  I have no questions for

17    you now.

18            THE WITNESS:  Okay.

19            MR. KEATING:  We'll do read and sign.

20            (Whereupon, the Zoom recording feature

21    was turned off.)

22                      - - -

23            (The videoconference deposition

24    concluded at 4:48 p.m.)

25

**Page 52**

1            E R R A T A  S H E E T

2        I have read the within and foregoing pages

3    and no changes are required.

4            This, the _____ day of _____,

5    2024.

6

7        I have read the within and foregoing pages

8    and the following changes are required:

9    Page _____ Line _____:

10    _____

11    Reason:

12    _____

13    Page _____ Line _____:

14    _____

15    Reason:

16    _____

17    Page _____ Line _____:

18    _____

19    Reason:

20    _____

21        This, the _____ day of _____, 2024.

22    Sworn to and subscribed before me,

23    this _____ day of _____, 2024.

24    _____

25    Notary Public, Georgia

**Page 53**

1                    DISCLOSURE

2    STATE OF GEORGIA)

3    COUNTY OF GWINNETT)

4        Pursuant to Article 10.B of the RULES AND

5    REGULATIONS OF THE BOARD OF COURT REPORTING OF THE

6    JUDICIAL COUNCIL OF GEORGIA, I make the following

7    disclosure:

8        I am a Court Reporter and an independent

9    contractor.

10        I was contacted to provide court reporting

11    services for this deposition.  I will not be taking

12    this deposition under any contract that is prohibited

13    by the O.C.G.A. 15-14-37(a) and (b).  I have no

14    contract/agreement to provide court reporting services

15    with any party to the case, any counsel in the case.

16        I am not disqualified for interest, personal or

17    financial, under O.C.G.A. 9-11-28(c).

18        I will charge my usual and customary rates to all

19    parties in the case.

20        This the 20th day of November 2024.

21    *Jacqueline Frazier*

22    Jacqueline Frazier

23    Court Reporter

24    Certificate Number 5465-2647-6265-0624

25

Page 54

```
1                  CERTIFICATE

2    STATE OF GEORGIA)

3    COUNTY OF GWINNETT)

4

5           I, Jacqueline Frazier, Court Reporter,

6    certify that the foregoing transcript is a true,

7    correct, and complete record of the testimony given by

8    the deponent, DANIELLE FEUILLEBOIS, who was first duly

9    sworn by me; that I am not a relative, employee,

10   attorney or counsel of any of the parties; am not a

11   relative or attorney or counsel for any parties; nor

12   financially interested in the action; that the said

13   deponent and counsel in the presence of each other and

14   before me did not waive the reading and signing of the

15   deposition; and the original deposition under seal

16   shall be filed with the Court by the attorney taking

17   the deposition.

18          WITNESS my hand and seal at Suwanee,

19   Gwinnett County, Georgia, this the 20th day of November

20   2024.

21

22   _____

23   Jacqueline Frazier

24   CR No. 5465-2647-6265-0624

25   CCR Seal
```

### Exhibits

**Danielle-P2**
   4:9  26:13,16

**Danielle-P3**
   4:10  31:19
   32:6

---

**1**

**1779**   7:18

---

**2**

**2**   26:13,16

**20**   5:4

**2023**   8:6,10,
   15  9:8  10:7
   11:17  12:3
   16:7  26:10,
   22  31:23
   34:21  38:12,
   25  45:11
   49:11

**2024**   5:5
   24:19

**2nd**   25:5
   26:9,22
   28:23  33:22
   34:18  35:9,
   17  37:10,15
   43:13

---

**3**

**3**   31:19  32:6

**30316**   7:19

**3:52**   5:4

**3rd**   16:18,22
   17:6,16  28:6
   31:23  32:3,
   22  33:13,20,
   22  34:6,11
   35:18  37:4
   49:11

---

**5**

**5:47**   31:23
   32:22  49:12

**5th**   28:5

---

**6**

**6**   27:1,14
   34:21  43:21

**6th**   26:10
   34:16

---

**7**

**74**   40:17

---

**8**

**8**   39:3

**8:41**   26:22
   34:21

---

**9**

**9**   40:17

---

**A**

**a.m.**   26:22
   31:23  34:21
   49:12

**ability**   12:11

**Absolutely**
   43:10

**account**   46:19

**accurate**   22:8

**accurately**   6:1
   18:17  19:7
   20:9  21:11

**accused**   46:12,
   14

**act**   39:17

**Adam**   7:10
   23:19  48:13

**address**   7:17,
   24

**addressing**
   42:6

**advance**   16:9

**advice**   48:24

**afternoon**
   31:25  32:3

**agree**   6:9
   16:21

**ahead**   26:12

**altogether**
   15:20

**answering**   6:10
   23:14

**anti-**   38:16

**anti-retaliation**
   44:5

**apologize**
   23:11

**applied**   13:13

**approach**   42:19

**April**   10:7,24

**asset**   14:4
   15:11

**assume**   43:23

**Atlanta**   7:16,
   18

**attention**
   42:14

**attorney**   48:16

**attorneys**   5:22
   6:19,21,23
   38:10

**attracted**
   46:18

**August**   10:24
   13:14,16

**authorized**
   5:10

**avenue**   7:18
   43:3

**aware**   15:17,
   21,24  38:4
   42:12  43:11

---

**B**

---

**back**   7:11
  10:3,7  17:19
  34:13  43:20
  49:9

**background**
  9:20

**bad**  22:7

**Barnard**  16:5
  17:12  28:13
  29:9  31:21,
  23  32:16
  34:7  36:19,
  21,22

**Barnard's**
  49:11

**basically**  15:2
  30:6

**basis**  39:11

**Bates-stamped**
  40:17

**begin**  6:10

**beginning**
  45:11

**believed**  30:12
  45:13

**believes**  46:10

**bell**  14:6

**bit**  17:21
  25:3  42:4

**blur**  35:6

**body**  41:9,13
  42:1  46:16

**borderline**
  47:10

**box**  21:17

**break**  25:13

**Brian**  16:5
  17:12  29:9
  32:5,9  34:7
  36:18,21,22
  49:10

**bring**  34:20
  42:13

**broad**  30:14

**broadly**  44:10

**brought**  9:10,
  13  11:16

**bullet**  40:16

**business**  8:21
  19:5  48:23

**butchering**
  5:18  47:16

---

**C**

---

**calendar**  31:25

**call**  9:11
  20:12  21:23
  27:22  34:20

**called**  8:25
  14:17

**calls**  9:1,9,
  12  10:6,23

**body**  11:11  31:1
  46:22

**camera**  29:19
  49:14,20

**candidates**
  14:1

**case**  20:22
  22:6  45:23
  48:15

**chain**  26:22
  31:22

**change**  16:24

**changed**  15:5

**claims**  20:19
  42:6

**clarify**  13:5

**clarity**  8:14

**client**  20:15

**collaborate**
  10:20

**collect**  13:18

**combined**  15:14

**comfortable**
  42:18  44:16

**commenced**  5:4

**comment**  41:12
  46:18

**comments**  41:8,
  9

**communicated**
  16:3

**communicating**
  49:16

**communications**
  36:21

**companies**
  12:22  13:9,
  10

**company**  25:18
  39:7,10,17
  45:17

**compared**  22:10

**compensation**
  8:19

**complained**
  45:10

**complaining**
  44:10

**complaint**  45:3

**complaints**
  39:18  43:12

**complete**  19:5,
  6

**completely**
  14:14  19:9
  20:9  21:11

**computer**  40:9

**concerns**
  10:14,18

**conduct**  40:20

**confusing**
  33:21

**consideration**

23:1,14 46:9

**considerations**
25:20

**consulted** 16:1

**contact** 36:10

**content** 6:20
10:11

**contents** 36:14

**contest** 21:3

**contestation**
21:1

**continuing**
10:8

**conversation**
29:4 30:3
35:8,19

**conversations**
10:12 11:20
15:17,22
16:7 25:15,
17 34:9
36:15

**copied** 25:25
26:2,5 28:25

**copy** 7:11

**correct** 8:10
9:2,7 11:13
13:19 14:19
17:11,12
18:24 20:3,
24 21:5,12
22:16 26:4,
24 35:21

37:4 39:6,
15,19,20
40:24 42:2,
8,21 43:6,18
44:7,12,19,
23

**could've** 41:15

**counsel** 5:8

**couple** 49:8

**court** 5:9 6:4

**creating** 40:22

---

**D**

---

**D-O-N-N-A-L-E-E**
7:21

**Danielle** 5:3,
12

**day** 5:18
33:23 36:13
39:9

**December** 45:11

**decide** 25:21

**decided** 17:6,7
22:9,13

**deciding** 23:24

**decision**
16:10,11,18,
21 17:4,13,
14 23:2,6
33:12,16
34:1 35:1

**department**

16:24 18:21
21:25

**depending**
13:24

**depends** 12:25

**deposed** 5:13

**deposition** 5:3
6:15

**details** 34:17
43:22

**determined**
15:12

**determining**
46:20

**deviation**
43:17,24

**device** 14:6,
11,18,22
15:11,19,20
16:12 22:11

**direct** 42:16,
18

**directly** 11:3

**director** 8:8

**disagree** 16:19
32:10,18

**discriminating**
43:9

**discrimination**
42:7,12,13

**discuss** 8:23
9:4 10:17

16:2,8 25:10
30:11 32:25
43:18

**discussed**
10:14 25:11
27:20 31:6
34:25 36:12
37:21 49:23

**discussing**
11:22 15:9
36:3 42:18

**discussion**
9:24 49:19

**discussions**
16:23

**disrespect**
49:21

**disrespectful**
49:18

**Disrespectfully**
49:16

**divide** 18:1

**document** 11:13
39:14

**documentation**
11:22 12:4
18:2

**documented**
11:4

**documenting**
11:2

**documents**
17:17 21:24

22:6

**Donnalee** 7:18,
20

**dress** 41:9

**drop** 21:17

**duly** 5:13

---

**E**

**e-mail** 26:21
27:5,19
28:5,25
31:22,24
32:21 33:5
34:16,19
35:8 41:23
43:21 49:11,
13

**e-mailing**
13:15

**e-mails** 25:25
26:2,5,13,
20,23,25
27:7,10
31:20 32:1
35:9,20
36:20,25

**e-personnel**
21:15

**earlier** 33:11,
19 34:4 35:8
49:10

**effect** 40:20

**electronic**
19:18,19,21

**electronically**
19:16

**eliminate**
15:18 22:12

**eliminated**
16:13 22:20
24:6,15,21

**employed** 8:1

**employee** 6:22
7:8 10:18
11:14 18:6
20:5 21:16
30:21 38:2,
4,7,24 40:25
41:6 42:10,
17,19 43:3,7
46:12,14,16
47:18,19

**employee's**
42:1,2,16
47:17,22

**employees**
10:19 17:23
18:22 40:3
44:16

**employment**
20:23 36:11

**end** 31:22

**engineer** 14:5,
22 16:12

**engineering**
15:11,12,15

**engineers**
22:11

**ensure** 11:21

**entire** 14:5

**environment**
40:23

**escalating**
45:12,13

**essentially**
18:14 27:18
44:8

**event** 25:4
28:1,4

**events** 25:9
30:4

**EXAMINATION**
5:15

**examined** 5:13

**exhibit** 26:13,
16 31:19
32:6 34:14
49:10

**exist** 40:19

**existed** 15:3

**explain** 30:24
48:13

**extent** 46:24

---

**F**

**face** 42:2

**factor** 23:23
24:2,3

**fair** 27:12
28:18 31:12

36:17 37:24
45:21

**faith** 45:3,5

**falls** 12:19

**feature** 5:6

**feedback** 11:23
12:7

**feel** 12:3
42:17 44:16

**feels** 42:10

**female** 30:21

**Feuillebois**
5:4,12,19,
20,21 47:15

**figure** 6:12

**file** 7:8
19:15,21
20:5 21:15

**files** 6:22
19:19 21:2

**fill** 18:21,25
20:8,21

**filling** 20:7
21:7,10,16

**find** 11:7

**fine** 28:19
48:18

**finish** 6:9
9:22

**fireable** 49:21

**Flock** 8:2
12:20,24

17:22 18:5
20:5 24:19
36:11 38:2,
23 39:22
40:17,19
44:5 47:25

**Flock's** 12:13
38:15 39:22
41:7 42:10,
20 43:25

**focus** 33:4
49:20

**follow** 7:11,13

**follow-up**
34:15

**form** 11:11
16:20 19:6,
10,22 22:17,
24 23:7
24:22 28:14
30:13,25
31:8 33:6,14
36:5,24 37:5
39:8,10,13,
23 40:5
41:2,16,20
42:23 44:1
46:3,21 47:8

**formal** 39:19

**format** 37:17

**forms** 12:7
21:7

**forwarded**
26:23 27:8

**Forwarding**
34:19

**frankly** 48:10

**freezing** 40:9

**Friday** 31:22
49:11

**functions** 8:20

---

**G**

**gave** 43:22

**general** 38:16

**generally**
10:19 12:25

**Georgia** 7:16,
19 18:20,22
21:25

**give** 12:11
18:16 19:25
26:13 30:4
39:2 40:10
49:3

**giving** 18:14

**good** 45:3,5

**Gotcha** 8:17

**group** 38:15

**Group's** 39:22

**guess** 11:8
17:2 18:4
22:11

**guys** 19:16
44:20

---

**H**

**handbook** 38:2,
5,8,12,20,24

**hanging** 49:21

**happen** 33:12

**happened** 29:8,
10 34:18,24
37:10 43:13

**happening** 28:2

**harassed** 40:3
41:1,7 42:11
46:14 47:18

**harassing** 43:9
46:13 47:10

**harassment**
29:22,24
38:16 39:4,
8,11,18
42:6,13
44:10 45:14
47:6

**hard** 6:5,8

**hate** 31:25
45:22

**heading** 39:4

**hear** 6:18
29:25 45:9

**heard** 6:3
28:22

**Hey** 13:12

**hired** 14:24

---

**hiring** 12:23
13:17,25

**Hold** 9:18

**homosexual**
48:15

**honestly** 47:23

**hostile** 40:22

**housekeeping**
5:22

**HR** 8:4,8,19,
20,21,25
9:4,11
18:10,12,13
19:4 21:7
34:20,22
35:23 36:10
44:10 47:25
48:23

**human** 42:19

**hung** 25:5
49:17,18

**hypothetically**
46:23

---

**I**

**idea** 31:3
35:4 44:21
45:16

**identification**
26:17 32:7

**ignore** 21:22

**immediately**
13:15 15:7,8

42:13

important   24:2
  39:21 42:22
  43:2,7
  44:13,15

improve   12:12

inappropriate
  48:10

inaudible   10:9
  27:4 48:4

include   15:11
  19:9 21:10

included   27:9

includes   42:1

including
  34:10 41:8

individual
  45:2

individual's
  40:21

individuals
  16:17 24:17

informal   39:19

information
  11:5 19:6
  35:10,16,22
  41:22

interfering
  40:21

internal   19:15
  20:12 21:15

internally

38:9

interrupt   6:7

interview
  46:16

interviewed
  43:19

interviewing
  43:12

intimidating
  40:22

investigate
  39:18

investigation
  47:6

involved   17:13
  31:21

involvement
  38:14

issue   8:22

issues   9:5
  11:2,10

------

**J**

January   8:10
  38:12,25

Jhostin   9:9
  12:1 16:15
  22:10,13
  29:1,8 31:2
  34:19 35:24
  36:4,11

job   12:13

13:8,11
14:21

jobs   13:6

July   24:19

June   24:19

------

**K**

KEATING   7:13
  9:18 11:1,11
  16:20 19:10,
  22 22:17,24
  23:7,17
  24:22 26:7
  27:4 28:14
  30:13,25
  31:8 33:6,14
  36:5,24 37:5
  39:13,23
  40:5 41:2,
  16,20 42:23
  44:1 46:3,21
  47:8,12
  48:3,7,16
  49:25

kind   6:5 9:4
  13:8 18:2
  21:2,15,24
  26:19 34:17
  35:15 37:25

knew   48:8

knowledge
  12:20

------

**L**

Labor   18:21
  21:25

laid   24:18

Laura   9:14
  17:10 25:11,
  16 31:20,24
  32:5 34:16,
  18 35:19
  36:12 37:12
  41:11,23

learn   21:13
  22:5

learned   35:16

leave   21:14

leaving   32:1

live   7:15,16

Lodge   17:11
  25:7 27:20
  28:12 29:9,
  17 30:7,21
  31:20 32:13,
  16 34:10
  37:15 41:12
  43:12,19,21
  45:13,16,24

Lodge's   29:12
  48:9

long   7:2 39:9

longer   15:2
  45:17

looked   49:10

## M

**Madam** 6:3

**made** 13:13
16:12,18,21
33:17 34:2
35:2 41:12

**make** 7:4,7
11:3,14
13:21 23:21

**makes** 45:3

**making** 16:2,9
23:1 29:13,
15

**male** 46:12

**manage** 8:19
20:18

**manager** 11:3
17:9,11
18:10,11,13
26:3 46:2
49:22

**managers** 8:20

**March** 15:18

**marked** 26:17
31:19 32:7

**matter** 42:18

**matters** 5:22

**Mccormick** 9:15
10:5 17:10
25:11,16
26:6,23
28:12,20

29:4 30:15,
19,22,23
34:7,16,18
35:7,19
36:12 41:11
43:11

**Meaning** 15:9

**means** 45:6

**meant** 30:24

**meet** 6:23

**meeting** 8:25
18:7 25:6
28:6,8,11
29:8 31:13,
15,16 32:2,
4,10,14,17
33:1,2,5,8,
24 34:1,20,
22,23,25
35:3,18,24
36:2,10
37:3,23

**meetings** 7:2
9:3,14 25:9
34:6,10
36:22 37:21

**member** 42:20

**men** 46:18

**mention** 30:9

**messed** 23:11

**met** 37:9

**mind** 34:5

**minutes** 7:3

49:3

**missing** 49:15

**Misstates**
33:15 47:9

**months** 15:10

**move** 7:23
47:10,11
48:4,12 49:3

**moved** 24:18

**multiple** 11:18
12:7 36:13

## N

**needed** 15:13
20:22

**noise** 9:20

**notes** 7:4,7,8

**notice** 17:24
18:21 20:13
21:24,25

**notices** 17:23

**November** 5:4
8:5,15 9:8
10:9 11:17
12:3,10
16:18,22
17:6 24:10
25:5 26:9,
10,22 27:1,
14 28:5,6,23
31:23 32:3,
22 33:13,20,
22 34:6,11,

16,18,21
35:9,17,18
37:4,10,15
43:13,21
45:11 49:11

**number** 10:13
15:9 16:5

## O

**Object** 11:11
16:20 19:10,
22 22:17,24
23:7 24:22
28:14 30:13,
25 31:8
33:14 36:5,
24 37:5
39:13,23
40:5 41:2,
16,20 42:23
44:1 46:3,21
47:8 49:25

**Objection** 11:1
27:4 33:6

**occurred** 35:3,
18

**occurring**
17:15

**October** 16:7,
14

**offending**
42:17 43:5

**offense** 49:21

**offensive**

40:22

**Omar** 16:5
17:11 25:6
27:20 29:9,
10,12 34:10
37:14 41:12
45:13,16
49:16,18

**one-on-one**
9:14 25:6
49:17

**open** 12:18
13:11,25

**opinion** 23:18
47:15

**organization**
16:25

**organizational**
15:25 16:9

**originally**
25:23

———————————
            **P**
———————————

**p.m.** 5:4

**paragraph**
32:21

**part** 15:11,14
38:11 39:21
40:14,16
43:14

**partners** 8:22
19:5 48:23

**Patrick** 9:18

48:3

**people** 13:12,
15 16:5 18:5
23:13 34:11

**perform** 11:8

**performance**
10:13,17
11:2,9 12:4
22:7,14,23
23:23 24:5,
11 40:21

**person** 18:10,
12 42:17
43:5,9 47:6
48:14,23

**person's** 41:9
47:5

**personnel**
19:15,18,21
20:5

**perspective**
25:21

**pin** 17:21

**pipeline** 13:25

**place** 9:25
37:18

**Plaintiff's**
26:16 32:6

**plans** 7:23

**point** 26:21
29:4,6 35:2
37:13

**points** 18:15

40:17

**policies** 17:22
29:2 38:17
39:22 41:7
43:25

**policy** 39:21
40:18,19
42:10,20
44:6,8,9
45:2

**pool** 13:10,12

**position** 8:3,5
14:3 16:12
34:17

**positions**
24:14

**possibly** 35:18

**post** 12:21,22
13:6,16

**posted** 14:22

**posting** 12:13,
18 13:13
14:21

**preface** 12:21

**preparation**
7:5

**prepare** 6:14

**present** 5:9
34:7 36:22

**presented**
11:14

**president** 8:4

**pretty** 15:7
29:7 48:20

**prevented** 5:25

**previously**
20:18

**prior** 8:7 9:8
15:10 16:2,
15,25 33:15
47:9

**problem** 9:23

**problem/offense**
49:14

**procedure**
12:14

**Procedures**
42:5

**process** 43:15,
17

**prohibits**
39:7,10

**pronounce** 5:17

**proper** 11:21

**provide** 12:7

**provided**
35:10,22

**providing**
11:23

**Purely** 46:22

**purpose** 40:20

**put** 6:17
17:21,23
28:9 41:13

_____

Q

_____

question  5:24
  9:22 10:2
  13:5 18:3
  23:8,15
  24:23 28:15
  30:14 31:1,
  17 35:12
  39:24 40:6
  41:3,17,21
  42:24 44:2,
  24 45:22
  46:22 47:2,
  21 48:5,7,
  11,12,22
  49:25

questions  6:10
  29:18 49:8

Quinones  9:10,
  17 10:6,22
  11:8,16
  12:5,10 13:4
  16:22 17:7
  25:5 26:3,6
  29:12,21
  30:2,5,20
  31:2,6,20
  33:12 34:2,
  15 35:2,25
  36:4 37:9,15
  41:12 45:10

Quinones's
  14:3,21,25
  16:4,15 17:5
  22:6 23:23

25:3 28:2
  35:10 36:11,
  23 43:12,21
  49:24

_____

R

_____

raised  29:17

read  32:21
  38:22

reads  39:7,
  10,17 40:18

reason  5:25
  12:9 16:19
  19:9 20:8
  21:16 32:10,
  17 40:2 43:2
  44:15 49:23

reasonable
  23:21

reasons  18:18
  21:10 23:5

rebranded
  14:14

recall  16:6,
  11,14 24:16
  25:4 26:5
  27:9 28:7,
  16,19 29:20
  31:14 32:15
  33:4,9,16,
  22,24,25
  34:3,8,12,24
  36:1,2,7,9,
  14,21 37:1,
  17,20,23

41:14,17,19

receive  18:5

recess  49:6

recognize
  38:23

recollection
  17:18

recommendation
  27:21

record  8:14
  9:25 24:5,11

recording  5:6
  19:9

recruiting
  12:17

refer  22:2

reference  22:7

referring
  17:25 19:23
  22:2 24:20

reflect  18:18

reflected
  27:18

refresh  17:18

REID  5:16
  7:10,14 9:23
  10:1 11:6,15
  17:1 19:13,
  24 22:21
  23:4,10,18
  24:1,25
  26:8,18
  27:7,11

28:17 30:15,
  17 31:4,11
  32:8 33:10,
  18 36:8
  37:2,7 39:16
  40:1,8 41:5,
  18,24 43:1
  44:4 46:6
  47:3,11,13,
  24 48:6,13,
  18 49:2,7

related  20:22
  35:24

relating  30:3

relation  28:1

relay  29:6
  30:2,5

relayed  41:23

relevant  45:25
  46:1,7

remember  5:21
  9:9,13,16
  10:3,5 14:2,
  9,20 17:14
  25:15 27:22,
  25 28:2,4,
  10,20 29:11
  32:13 33:7,
  19 34:22
  35:1,7,23
  37:14 38:14

remotely  5:10

rephrase  48:12

report  43:3

44:17,20

reported
29:12,16

reporter 5:9
6:4

reporting
44:16 45:7

represented
38:20

requested 19:6

requests 29:12

requirements
11:9

resigned 45:18

resources
42:20

responsible
12:17,18

restructured
14:5,15 15:2

results 11:19

resumes 12:23
13:10,14,18

retaliated
43:8 44:18

retaliating
44:9

retaliation
38:17 45:1,2

review 27:1
38:9

reviewed 6:22

reviewing
35:9,19

rid 15:20

ring 14:6

risk 25:20

role 8:18
11:9 13:1,17
15:13,14
22:12,20
24:7

roles 12:18,
21,22 13:3
15:15,19

---

S

---

Safety 8:2
17:22 38:24

scared 43:8

scheduled
34:24

scratch 17:4

script 18:14,
17 22:1

scroll 27:2,3
39:2

section 40:14,
16

select 21:18,
20

sending 26:6

sense 13:21

separate 16:22
22:9 23:2

separated
22:19,22

separation
16:15,16
17:23,24
18:21 20:13
21:24,25
25:18

series 31:19

sexual 29:22,
24,25 38:15
39:4,8,11,18
45:13 46:17,
18 47:6

sexuality
45:24 46:10
47:5,17,22
48:9

sexually 40:3
41:1,7 46:2,
13,17 47:18

sexually-
motivated 41:8

share 30:10
38:19 49:9

sharing 11:4

show 19:25
26:12

side 35:11

similar 13:4

simpler 23:22

situation 7:9
25:10,19,24
27:14,19
28:22,23
32:25 43:18
45:12 46:11

situations
48:25

slightly 16:14

snippet 20:4

solutions
20:15

someone's
46:10

sort 16:8
19:15 20:11

Southeast 7:18

speak 6:4

speaking 6:6

speaks 39:14

specific 15:13
17:3 20:19
27:5 28:23
43:22

specifically
10:16 17:3
22:16 25:3
34:10,25
41:19 45:1
46:9

speculate
30:16 37:22

speculation
 11:12 31:1
 46:22

spell  7:20

spoke  29:9

standard  19:4

start  13:14
 25:2

starting  48:3

step  10:3

stipulated  5:8

story  35:11

structure  24:9

subheading
 42:5

subject  42:14

subjects  37:20

supervisor
 42:15,16,19
 44:11

support  14:6,
 11,18 15:19,
 20 16:12
 22:11

supposed  18:5

surprise  21:13
 22:5

swear  5:10

sworn  5:11,13

---

**T**

---

taking  6:4

talk  25:2
 27:13 31:16
 36:13,18
 37:8

talked  6:19
 28:8,21
 31:14 35:16
 37:9

talking  10:5
 18:15 19:17,
 20 20:14
 28:10 33:1
 35:24 37:14

team  8:19
 12:18 14:5,
 9,11,15,22,
 25 15:1,2,
 12,19,20
 16:4 23:3
 24:9,18,20
 25:5 42:20
 49:17

teams  24:18

telling  9:16
 29:11

term  45:4

terminate  12:5
 23:24 33:12
 34:1 35:2
 36:3

terminated

12:10 17:8
 18:22 22:15
 24:4,10

terminating
 11:16 18:6

termination
 12:8 14:21,
 25 17:6
 18:7,16,18
 21:10,17
 25:3 28:2
 36:23 37:11
 45:12 49:24

terms  28:1
 46:20

testified
 16:17 17:3
 32:9,16
 33:11 34:4

testifying
 5:25 33:19

testimony
 16:19 33:15
 47:9

thing  18:3
 19:16 21:20
 30:7

things  9:5
 10:20 22:3
 35:15 40:18
 44:17

thinking  10:25

thinks  46:1

third-party

20:18,20,22
 21:24

Thirty  7:3

thought  30:24

thousands  27:9

time  8:7 11:1
 14:4,17 23:9
 24:13 26:7
 28:7,21
 31:25

times  6:25
 7:1 11:18
 36:13

today  6:1,15
 34:20

told  27:18
 30:4,6,19
 41:15

tolerance  44:9

top  27:2

training  18:4,
 9,25 19:4,8
 20:8 21:6,9

truthfully  6:1

turn  21:23

turned  5:7

type  19:15
 45:23

typically
 16:1,8 38:9

---
U
---

**ultimately**
  22:8,13

**unanswered**
  32:1

**uncomfortable**
  29:13,15

**understand**
  28:3

**unemployment**
  20:15,19
  21:1

**unlawful**  42:6,
  11

**unwelcome**  41:8

**updated**  38:12,
  24

---
V
---

**Vague**  36:24

**valid**  45:8

**verbal**  39:19

**vice**  8:4

**victim**  42:11

**videoconference**
  5:3

**voice**  29:17

**VP**  8:9,11,14
  9:11 18:13
  34:22 35:23
  36:10 47:25

**VPS**  8:19 9:4
  21:7

---
W
---

**wanted**  11:21
  12:11 15:10
  48:6

**ways**  40:13,
  19,25

**Webcam**  29:2

**whatever's**
  43:4

**whim**  25:22

**witnessed**
  42:12

**woman**  30:8

**word**  7:21
  29:22,24,25
  49:15

**work**  12:16
  18:13 40:3,
  21,22

**working**  11:3

**worries**  6:12

**would've**  8:14
  16:3

**writes**  38:7

**writing**  38:11

**written**  38:9
  39:19

---
Y
---

**y'all**  12:3
  18:21 30:11,
  14 31:5 32:2
  46:19

**years**  7:24

---
Z
---

**Zoom**  5:6 6:8


flock safety

Laura McCormick <laura.mccormick@flocksafety.com>

---

# UNCOMFORTABLE BEHAIVOR
7 messages

---

**Jhostin Nunez** <jhostin.nunez@flocksafety.com>
To: People team <people@flocksafety.com>

Thu, Nov 2, 2023 at 8:44 AM

Hello,

I was wondering IF I can talk to somebody about webcam policies as I have a situation that is making me feel uncomfortable.

--

### Jhostin Nunez
**Device Support Engineer II**       

flocksafety.com

flock safety



--
You received this message because you are subscribed to the Google Groups "People team" group.
To unsubscribe from this group and stop receiving emails from it, send an email to people+unsubscribe@flocksafety.com.
To view this discussion on the web visit https://groups.google.com/a/flocksafety.com/d/msgid/people/
CAHnpTAMjyDtvuXtcRQ9GGwG4jjeOciKq0P08cm1jrNiQuwzWkQ%40mail.gmail.com.

---

**Laura McCormick** <laura.mccormick@flocksafety.com>
To: Jhostin Nunez <jhostin.nunez@flocksafety.com>
Cc: People team <people@flocksafety.com>

Thu, Nov 2, 2023 at 8:45 AM

Hi Jhostin,
I will send you a calendar invite, to learn more about the situation.
Thank you.

**Laura McCormick (she/her)**
*Senior Human Resources Business Partner*
laura.mccormick@flocksafety.com

[Quoted text hidden]

---

**Jhostin Nunez** <jhostin.nunez@flocksafety.com>                    Thu, Nov 2, 2023 at 8:53 AM
To: Laura McCormick <laura.mccormick@flocksafety.com>

Hello Laura,

Thank you for the invite.Will see you soon.

[Quoted text hidden]

---

**Jhostin Nunez** <jhostin.nunez@flocksafety.com>                    Mon, Nov 6, 2023 at 8:00 AM
To: Laura McCormick <laura.mccormick@flocksafety.com>

Hello Laura,

Hope you are having a good day.I was wondering if I can request a follow up meeting about the incidents that occurred on November 2nd, 2023 with my direct supervisor Omar Lodge in both my 9:15 AM meeting and at my 11:00 AM meeting, and the webcam policies Flock Safety has for its employees.

A quick recap of the incidents is as follows:
-At the 9:15 meeting, I had my camera on and my face was positioned on the left corner frame of the screen.My face was visible and was told by my direct supervisor Omar Lodge to move the camera closer.I informed my direct supervisor Omar Lodge that my face can be seen and there is no need to be closer to the camera.He asked me to please get closer to the camera and angle it to see my face ""clearer" and that he "really wanted to see my face".My face was on the screen clearly and I felt really uncomfortable in the way Omar lodge was to determined to get my face closer to the camera.I then asked "Why is this a big deal? and how does this affect the productivity of the team?" He then asked me again to adjust my camera to get a "clearer" view of my face.I promptly logged off as I felt really uncomfortable in this behavior and was promptly given a false reprimand and also gave the HR team a blind carbon copy of this false reprimand..

-On my 1:1, I positioned my body and face the same way I did in my earlier meeting and asked Omar Lodge again "How does the position of my face and body on screen affect the productivity of my job and the team? I believe someone having their head not move 2 inches will not be a serious problem".Omar Lodge then proceeded to say that "I felt disrespected because your head was 2 inches from where I wanted it ".I again promptly logged off as this harassment and obsession with my face being seen "up close" to the camera is becoming really uncomfortable and stressful.

I did not attend the 9:15 AM meeting on November 3rd, 2023 as I do not feel safe due to the harassment and bizarre behavior displayed by my direct supervisor Omar Lodge.My colleague Avia Smith gave me the information that was shown in that meeting.

Hope to hear back and have this situation settled and resolved as this can be happening in other teams.

Regards,
Jhostin Nunez

[Quoted text hidden]

---

**Laura McCormick** <laura.mccormick@flocksafety.com>                    Mon, Nov 6, 2023 at 8:41 AM
To: Daniele Feuillebois <daniele.feuillebois@flocksafety.com>

Forwarding this message from Jhostin.  I will bring it up in our HRBP call later today.
Thank you.

**Laura McCormick (she/her)**
*Senior Human Resources Business Partner*
laura.mccormick@flocksafety.com
[Quoted text hidden]

---

**Laura McCormick** <laura.mccormick@flocksafety.com>    Tue, Nov 7, 2023 at 11:32 AM
To: Jhostin Nunez <jhostin.nunez@flocksafety.com>

Hi Jhostin,
Sorry for the delay.  I sent a meeting invite for tomorrow.
Thank you.

**Laura** **McCormick (she/her)**
*Senior Human Resources Business Partner*
laura.mccormick@flocksafety.com

[Quoted text hidden]

---

**Jhostin Nunez** <jhostin.nunez@flocksafety.com>    Tue, Nov 7, 2023 at 11:48 AM
To: Laura McCormick <laura.mccormick@flocksafety.com>

Hello,

No worries.Thank you and see you then!

Regards,
Jhostin Nunez
[Quoted text hidden]

CONFIDENTIAL



EXHIBIT
1:24-CV-01319-TWT-CMS
FeuilleboisD-P3
Huseby.com

Laura McCormick <laura.mccormick@flocksafety.com>

---

## Reprimand for Morning Sync Behavior
4 messages

---

**Omar Lodge** <omar.lodge@flocksafety.com>                                    Thu, Nov 2, 2023 at 7:46 AM
To: Jhostin Nunez <jhostin.nunez@flocksafety.com>
Bcc: laura.mccormick@flocksafety.com

Dear Jhostin,

I hope this message finds you well. I am writing to address a concerning incident that occurred during our morning sync today. Your behavior during the meeting was not in line with our team's expectations and standards of professionalism.

When asked why you were not on camera, you responded by saying that it was "not a big deal" and questioned why the meeting was being stopped for this issue. Subsequently, you abruptly stated that you could not continue the meeting and suggested discussing the matter in our 1:1 meeting, after which you disconnected from the call.

I must emphasize that participation in video meetings is an essential part of our remote work culture. It is important to have your camera on during team meetings to foster a sense of engagement, accountability, and transparency. By not being on camera and dismissing the issue, you demonstrated a lack of respect for your colleagues and the importance of effective communication within the team.

Furthermore, abruptly ending the meeting without any prior notice or a reasonable explanation is disruptive to the team's workflow and shows a disregard for the group's time and efforts.

I want to remind you that our team values open and constructive communication. If you have concerns or issues related to our meetings or work processes, it is essential that you address them in a respectful and collaborative manner. Dismissing these concerns and disrupting the meeting is not the appropriate way to handle such matters.

I strongly encourage you to take this reprimand seriously and reflect upon your actions. Moving forward, I expect you to actively participate in our team meetings, maintain a professional demeanor, and address concerns through appropriate channels, such as discussing them with me during our 1:1 meetings.

I believe that we can work together to resolve any issues and maintain a positive and productive team environment. I hope to see an improvement in your behavior and participation in our future meetings.

If you have any questions or need further clarification regarding this matter, please feel free to reach out to me. Let us use this as an opportunity for growth and better collaboration within the team.

Sincerely,

--

## Omar Lodge
**Forward Deployment Engineer**       

---

flocksafety.com

---

# flock safety



**Brian Barnard** <brian.barnard@flocksafety.com>                    Thu, Nov 2, 2023 at 7:48 AM
To: Laura McCormick <laura.mccormick@flocksafety.com>

Feels like this should be a fireable offense and we should use it to end this problem that has been going on for a while. Thoughts?

[Quoted text hidden]

**Laura McCormick** <laura.mccormick@flocksafety.com>                    Thu, Nov 2, 2023 at 8:41 AM
To: Brian Barnard <brian.barnard@flocksafety.com>, Daniele Feuillebois <daniele.feuillebois@flocksafety.com>

Is the expectation that folks on the team join team meetings with their cameras on?
Some teams at Flock do not have that expectation. I will set-up time with both you and Omar to learn more about Jhostin's current work performance.
Thank you.

**Laura McCormick (she/her)**
*Senior Human Resources Business Partner*
laura.mccormick@flocksafety.com

[Quoted text hidden]

**Brian Barnard** <brian.barnard@flocksafety.com>                    Fri, Nov 3, 2023 at 5:47 AM
To: Laura McCormick <laura.mccormick@flocksafety.com>
Cc: Daniele Feuillebois <daniele.feuillebois@flocksafety.com>

I know we have time on the calendar this afternoon, but I hate leaving emails unanswered :)

I think the summary / what we will want to talk about today is: yes the expectation is that cameras are on, but the problem / offense is not that he didn't have his camera on, but that disrespectfully communicated to Omar and the team and hung up. Then again in his 1:1 with Omar, he was disrespectful and hung up on him. So I think the discussion we will want to focus on is not whether or not having his camera on is fireable offense, but the disrespect and hanging up on his manager.

Talk to you at 3:45!

[Quoted text hidden]

CONFIDENTIAL