# EXHIBIT G –

# LAURA MCCORMICK DEPOSITION

1          IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF GEORGIA
2                 ATLANTA DIVISION

3    JHOSTIN QUINONES,          )      Civil Action No.
                                )      1:24-CV-01319
4      Plaintiff,               )
                                )
5    v.                         )
                                )
6    FLOCK GROUP, INC.,         )
                                )
7      Defendant.               )
     _____)
8

9

10

11

12

13

14

15

16          The Videoconference Deposition of

17                 Laura McCormick

18           (Taken by The Plaintiff)

19              Conducted Remotely

20              November 20, 2024

21

     Reported by: Jacqueline Frazier
22                Certified Court Reporter
                  Georgia
23                License No. 5465-2647-6265-0624

24

25

**Page 2**

1  STATE OF GEORGIA

2  COUNTY OF GWINNETT

3  VIDEOCONFERENCE DEPOSITION OF LAURA MCCORMICK

4

5          Pursuant to Article 8.B of the RULES AND

6  REGULATIONS OF THE BOARD OF COURT REPORTING OF THE

7  JUDICIAL COUNCIL OF GEORGIA, I make the following

8  disclosure:

9

10          I am a Georgia Certified Court Reporter.  I

11  am here as a representative of Huseby Global

12  Litigation.

13

14          Huseby Global Litigation was contacted by

15  the offices of THE WORKERS' FIRM, to provide court

16  reporting services for this deposition.  Huseby Global

17  Litigation will not be taking this deposition by

18  O.C.G.A. 15-14-37 (a) and (b).

19

20

21

22

23

24

25

**Page 3**

1       A P P E A R A N C E S

2

3  ON BEHALF OF THE PLAINTIFF:

4       PATRICK REID - videoconference
        ATTORNEY AT LAW

5       THE WORKERS' FIRM
        7000 CENTRAL PARKWAY

6       SUITE 1100
        ATLANTA, GEORGIA 30328

7       patrick@theworkersfirm.com

8

9  ON BEHALF OF THE DEFENDANT:

10      ADAM KEATING - videoconference
        ZACHARY MCCORMACK - videoconference

11      ATTORNEYS AT LAW
        DUANE MORRIS, LLP

12      1075 PEACHTREE STREET, NE
        SUITE 1700

13      ATLANTA, GEORGIA 30309
        akeating@duanemorris.com

14      zmccormack@duanemorris.com

15

16

17

18

19

20                  - - -

21      The Videoconference Deposition of Laura McCormick,

22  taken by the Plaintiff, Conducted Remotely, on the 20th

23  day of November 2024, at 12:50 p.m., before Jacqueline

24  Frazier, Certified Court Reporter.

25

**Page 4**

1          INDEX TO EXAMINATIONS

2

3  Examination by Mr. Reid...........................5

4

5  Certificate of Reporter..........................77

6

7          INDEX TO EXHIBITS

8  Exhibit      Description              Page

9  P-2          FLOCK 64                  32

10  P-7          FLOCK 17                  57

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 5**

1       P R O C E E D I N G S

2            - - -

3  (Whereupon, the videoconference deposition of Laura

4  McCormick commenced at 12:50 p.m. on November 20,

5        2024.)

6          (Whereupon, the Zoom recording feature

7  was turned on.)

8          MR. REID:  Madam Court Reporter, if you

9  could please swear in the witness.

10          (It was stipulated by all counsel

11  present that the court reporter is authorized

12  to swear the witness remotely.)

13          (Whereupon, the witness was sworn in.)

14          LAURA MCCORMICK,

15  having been duly sworn, was deposed and examined as

16  follows:

17          EXAMINATION

18  BY MR. REID:

19      Q    All right.  Good morning, Ms. McCormick.

20  How are you today?

21      A    I'm good.

22      Q    All right.  I'm going to try to get you on

23  your flight as quickly as possible.  I understand that

24  you have something going on today, so I will endeavor

25  to do my best.

Page 6

1           And before we begin, I -- you know, attorneys
2   always ask these same questions kind of at the
3   beginning.
4           Is there any reason that you would be
5   inhibited from testifying truthfully and accurately
6   today?
7       A   No.
8       Q   Okay.  And, you know, obviously, you've heard
9   the madam court reporter speak a little bit.  So she's
10  taking down kind of everything that we say.  And it's
11  going to be hard for her to, you know, take down things
12  if we talk over each other.  And, you know, sometimes
13  that can be hard.  You know, we kind of had the last,
14  you know, deposition over Zoom, but, you know, let's
15  both agree to do our best today that -- and then I
16  think we should begin.
17          So what did you do to prepare for your
18  deposition today?
19          MR. KEATING:  Object to the form to the
20      extent it calls for any attorney-client
21      privileged information.
22          You can answer.
23      A   I met with my attorneys.
24  BY MR. REID:
25      Q   Okay.  How many times did you do that?

Page 7

1       A   Three.
2       Q   Okay.  And how long were those meetings?
3       A   Thirty minutes.
4       Q   Okay.  And did you review any documents in
5   those meetings?
6       A   The documents that have been provided, yes.
7       Q   Like, e-mails, for example?  Did you review
8   any of the --
9       A   Yes.
10      Q   Okay.  Sorry, I did not -- that -- that's
11  another thing --
12      A   Yeah, yeah, I also --
13      Q   Got it.
14      A   Yeah, I provided the e-mails for production
15  during discovery, so, yeah.  That was (inaudible).
16      Q   Got it.
17          Okay.  And so you -- you ran the search for
18  insurance and pulled them?
19      A   Yeah.  Absolutely.
20      Q   Gotcha.
21          And did you review the -- any of the
22  termination-related paperwork for Mr. Quinones?
23      A   Yes.
24      Q   Okay.  Did you make any notes during any of
25  those meetings?

Page 8

1       A   No.
2       Q   And you also, I believe, were present at the
3   deposition of Omar Lodge, correct?
4       A   Yes.
5       Q   Okay.  And you -- you were not present at the
6   deposition of Mr. Quinones?
7       A   I was here.
8       Q   Oh, you were here.  Okay.  I guess you look
9   differently on screen than you do, I guess, in person.
10          Okay.  Where do you currently live?
11      A   Denver, Colorado.
12      Q   And what is your address?
13      A   1313 North Williams Street.
14      Q   Okay.  What's the ZIP on that?
15      A   80218.
16      Q   Okay.  Any plans to move from that address
17  within the next few years?
18      A   No.
19      Q   Okay.  Where are you currently employed?
20      A   Flock Safety.
21      Q   And that is the defendant in this case,
22  correct?
23      A   Correct.
24      Q   What -- what was your -- what is your
25  position currently in Flock Safety?

Page 9

1       A   Senior human resources business partner.
2       Q   Was that the same title that you had back in
3   November of 2023?
4       A   Yes.
5       Q   Okay.  What do you do in that role?
6       A   I partner with the business leaders on HR
7   matters.
8       Q   Okay.  Do you have -- so in, let's say --
9   let's do the time period of September to November 2023.
10          Do you have regular meetings with Omar Lodge
11  at that time?
12      A   Yes.
13      Q   Okay.  And what was the purpose of those
14  meetings?
15      A   We would meet to discuss the team, how
16  they're doing, work performance of the entire team.
17      Q   Okay.  Gotcha.
18          And would that be -- how often were those
19  meetings?
20      A   I would need to reference my calendar to see
21  how often I was meeting with Omar.  But at a minimum,
22  once a month.  But when he needed more assistance with
23  performance issues on his team, I would meet with him
24  up to weekly.
25      Q   Okay.  Did you do -- did you have regular

1  meetings with Brian Barnard from -- was it September to
2  November 2023?
3      A    Yes.
4      Q    And would that have been the same --
5      A    At --
6      Q    Go -- sorry, go ahead.
7      A    Sorry, I had to think about that because my
8  client groups have changed, so it's not -- but, yes, I
9  believe I was meeting Brian as well, yeah, monthly.
10     Q    Okay.  And then do you recall you're at any
11 meetings that happened during the month of October with
12 Omar Lodge?
13     A    I would have to reference my calendar.
14     Q    Okay.  Do you remember talking with him at
15 that time about the team's performance or anything like
16 that in the month of October 2023?
17     A    I would have to check my calendar because I
18 was meeting with 87 managers a month at that point,
19 so -- yeah.
20     Q    Sure.
21          So you would have notes -- would -- would
22 your calendar contain, like, notes of what the meetings
23 were set to discuss?
24     A    No.
25     Q    Okay.  So it would just -- you know, it would

1  let you know that you have a meeting?
2      A    Oh, they're recurring meetings.
3      Q    But they would say, like, you know, recurring
4  meeting with Omar Lodge or whatever --
5      A    Yes, yes, yes, yes.
6      Q    But it wouldn't say, like --
7      A    Yeah.
8      Q    -- you know, recurring meeting with Omar
9  Lodge, and the notes below, it's saying, discussing X?
10     A    Correct.
11     Q    Okay.  And so you would have no memory, then,
12 of any meetings you may have had with Mr. Lodge in
13 October 2023?
14     A    The details, that's correct.
15     Q    Okay.  Do you remember any general
16 conversations that you had with him in October of 2023?
17 Like, general topics.  So I know obviously -- you know,
18 you said you don't remember specifically what you
19 talked about.
20          But then would you remember any general
21 conversations?
22     A    No, I don't -- I don't remember much of
23 October 2023 in general.
24     Q    Sure.  Fair enough.  I don't either.  And I'm
25 sure probably no one here does as well.

1      Q    So can you explain to me, what is an HRVP
2  call?
3      A    Oh, that is a meeting we have every two weeks
4  with all of the human resource business partners and
5  the VP of human resources.  We meet every two weeks to
6  discuss what's happening in the business.
7      Q    And then the VP would be Danielle, and then
8  I --
9      A    Feuillebois.  Feuillebois.
10     Q    Feuillebois.
11     A    It's --
12     Q    Okay.  Sounds very New Orleansy.
13          So -- okay.
14          And what -- what do y'all discuss in those
15 meetings?
16     A    Anything that needs to be discussed regarding
17 anything that could be happening in HR at the business.
18     Q    Okay.  Do you remember bringing any issues
19 having to do with Omar Lodge's team in October of 2023
20 during one of those meetings?
21     A    I don't recall specifics.
22     Q    Okay.  Do you recall anything about having --
23 saying anything about Omar Lodge's team during those
24 meetings in October 2023?
25     A    I do not recall.

1      Q    Okay.  Fair enough.  I wouldn't remember
2  either.
3          Okay.  Do you know, at the time in
4  November 2023, how many people would be on those HRVP
5  calls approximately?
6      A    Three.
7      Q    Okay.  And it would be -- so including you,
8  three?
9      A    Yeah.
10     Q    Okay.  So it would be you, Danielle, and then
11 who would the other person be?
12     A    Kristina Kreamer.
13     Q    Okay.  And does she have the same title as
14 you?
15     A    Yeah.
16     Q    And she's just responsible for the same
17 things for different people?
18     A    That's right.
19     Q    Okay.  Got it.
20          Do you know who is on the e-mail
21 people@flocksafety.com e-mail address?
22     A    Yes.
23     Q    Okay.  Who would that be?
24     A    Well, it depends on the timeframe that you're
25 referencing.

Page 14

1   Q   Sure.
2       So what about in November of 2023?
3   A   Yeah. Danielle, Kristina, me, Dalton
4   Comiskey, Kayla Ragans.
5   Q   Okay.
6   A   Do you need their titles?
7   Q   I'm going to ask what Dalton and Kayla's
8   title is.
9   A   Okay. Yeah. Dalton's title, I know right
10  now, is manager of total compensation and rewards. And
11  Kayla is the director of people operations.
12  Q   Okay. What is people operations?
13  A   Yeah. It's the operations of HR. So the
14  computer systems, the e-mail, the benefits, the --
15  Q   Gotcha. Okay.
16      So kind of the stuff that usually happens in
17  the background and --
18  A   That's right.
19  Q   Yeah. Okay.
20  A   That's right.
21  Q   Okay. Okay.
22  A   Those are the people that I recall being on
23  the people alias -- e-mail alias.
24  Q   Gotcha.
25      Do you recall a time -- well, do you recall

Page 15

1   the name of Omar Lodge's team?
2   A   It changed several times over the years
3   including this year. So I do recall what the name of
4   it was at that time, I do not without refreshing my
5   memory by looking at our computer system.
6   Q   Could it have been the device support team?
7   A   Yes. I mean, maybe. We -- the -- that was
8   their job title. That may not have been the
9   department.
10  Q   Gotcha.
11      Okay. Do you remember did you have any
12  participation before November of 2023 in any
13  conversations having to do with eliminating a device
14  support engineer from Mr. Lodge's team?
15  A   Yes, yes. Many -- okay.
16  Q   When did -- okay.
17      So when did those first start -- begin?
18  A   I think they began in March of 2023. I have
19  e-mails from May of 2023 that are not -- that were not
20  part of this production, but I have it because they're
21  not relevant to anything happening exactly with
22  Jhostin.
23      But they were planning behind-the-scenes for
24  what that structure of the team should -- should look
25  like going forward, yeah. And then I -- Brian and I

Page 16

1   talked about it almost every single time we met. So it
2   would probably be monthly.
3   Q   Yeah. Okay.
4       MR. REID: Adam, I think we're going to
5   need those e-mails. I think those are
6   probably relevant.
7       MR. KEATING: Let me talk about it to
8   Paul Fletcher.
9       MR. REID: Yeah, sure. That's fine.
10      So what was -- who were you having these
11  conversations with in March -- in May of
12  2023?
13      THE WITNESS: Brian Barnard.
14  BY MR. REID:
15  Q   Okay. Was Omar Lodge a part of any of the
16  calls or discussions you were on at that point?
17  A   I mean, Omar and I discussed it sometimes,
18  but Brian would have been the decision-maker on that,
19  so he was much more formal about it.
20  Q   Got it.
21  A   Yeah.
22  Q   And so what was -- what was Brian saying in
23  terms of wanting to or not wanting to eliminate an
24  engineer from that team?
25  A   He was making business decisions about the

Page 17

1   future of that team. Yeah.
2   Q   And what did he -- go ahead.
3   A   Like, the size of work, the scope, what we
4   should all (inaudible), whether we should -- you know,
5   there were many, many -- and it's all -- it's all in
6   the -- in the e-mail.
7   Q   Okay.
8   A   Yeah.
9   Q   So in terms of the size of the team, what do
10  you remember him saying about the size of the team in
11  20- -- in early 2023?
12  A   If I can look at my e-mails from that time,
13  it would be helpful. But as far as I can recall
14  without looking at them, he was concerned with the
15  level of the work that was needed and the skills of the
16  team. And, yeah, he wasn't that sure whether
17  they're -- he -- the whole team or reduce the size.
18  Q   Okay.
19  A   Or even eliminate the whole team in its
20  entirety, actually.
21  Q   Okay.
22  A   He was exploring many options.
23  Q   And how did that -- so that specifically,
24  that particular facet, whether people on the team will
25  be eliminated, whether the team would stay the same

1    size, whether the whole team was going to be
2    eliminated, how did those -- how did he progress in his
3    conversations with you as to what his thoughts are --
4    his thoughts were on that particular issue?
5         A    As far as I recall, all of -- I mean, it's a
6    business decision, right?  So he's monitoring each
7    month what's happening, what's changing with the
8    business dynamics, and the need for that team.  So I'm
9    not sure if I'm answering your question correctly,
10   but --
11        Q    Sure.
12        A    Yeah.
13        Q    So he's basically looking at the team's
14   metrics, what are they doing, how much are they
15   handling, how were they handling it.  And then he's
16   looking at -- he's taking that information and looking
17   at, Okay, what do I need to do with the size of this
18   team, if anything?
19        A    I think so.
20        Q    Okay.
21        A    You -- yeah.  You could ask him.
22        Q    Okay.  And do you have any knowledge about
23   whether, beginning in November, that team would have a
24   higher workload?
25             MR. KEATING:  Object to the question as

1         to time.
2    BY MR. REID:
3         Q    In November -- well, let's say -- let me --
4    let me -- let me break that up.
5              So would you have any knowledge as to whether
6    it's unusual occurrence that starting in November and
7    during the winter months that that team would have more
8    to do, that they would have more requests and alerts
9    from cameras?
10        A    I had never heard that before until I
11   listened to Omar explain that --
12        Q    Okay.
13        A    -- in his deposition.
14        Q    Yeah.  So besides Omar's deposition, you
15   would also then have no knowledge of that specifically
16   in November of 2023, right?
17        A    I'm sorry, can you ask that again?
18        Q    Sure.  Of course.  Yeah.  And if you ever,
19   like -- you know, sometimes I get caught up in my
20   thoughts and I maybe don't ask a question, so you can
21   always feel free to ask me to rephrase.
22             So given that you had heard that in November,
23   that that team typically has more alerts on cameras,
24   more work to do starting then going into the winter
25   months, you then also would not have known until today

1    that that team had -- in November of 2023, was -- was
2    picking up and having more alerts, right?
3         A    Okay.  Let me make sure -- maybe I'll
4    rephrase this.
5              Are you asking me to confirm that I didn't
6    know that camera alert volume might spike in November
7    of each year?
8         Q    So I think you've answered that one.  And so
9    I'm just asking you about specific -- that same
10   question specifically for November 2023.
11        A    I had no knowledge.
12        Q    Okay.
13        A    Of the volume.
14        Q    Right.
15        A    But -- yeah.  Sorry.
16        Q    No.  No worries.  So you can -- if I ever
17   interrupt you, just tell me I'm interrupting you and
18   just continue on talking.
19             So do you know exactly when the decision was
20   made to -- well, the decision was made at some point to
21   eliminate a device support engineer 2 from that team,
22   right?
23        A    Yes.
24        Q    And that was in November of 2022 -- 2023,
25   correct?

1         A    Yes.
2         Q    Since that time, have any other positions
3    been eliminated from that team?
4         A    Yes.
5         Q    What positions?
6         A    Device engineer 1.
7         Q    Okay.  And when was that?
8         A    I'd have to go back to my records, but I
9    think it was -- I think it was this summer sometime.
10        Q    This summer?
11        A    I can check -- I think it was June 1st or
12   July 1st, but I -- I would need to check my records.
13   But two positions were eliminated, yes.
14        Q    You're saying two positions were eliminated
15   in July or -- well, let me back up.
16        A    Yes.
17        Q    This year, two positions that were both
18   device support engineer 1s were eliminated?
19        A    Correct.
20        Q    And let me -- I think you're having trouble
21   (inaudible).
22             Okay.  Do you know which individuals those
23   were that were -- their position was eliminated?
24        A    Yeah, Mia Gonzalez and Michelle Sharp.
25        Q    Okay.

Page 22

1    A    But they chose to take new positions at
2  Flock.  So they're still employed at Flock.
3    Q    Got it.
4         And what was the reason for those
5  eliminations?
6    A    Same reasons, business need changed.
7    Q    So when you say "business need changed," what
8  do you mean in this context?
9    A    Yeah, yeah.  We don't need those device
10 support engineers.
11   Q    Okay.  And since November of 2023, do you
12 recall anyone being added to Omar Lodge's team?
13   A    Well, yeah, in -- meaning the remnants of --
14 well, I mean, because he left in December of 2023 to
15 take a new job, so --
16   Q    So let's break that up, then, I guess,
17 (inaudible).
18   A    Okay.
19   Q    So --
20   A    Yeah.  But the -- I'm sorry.
21   Q    What happened with Omar Lodge's team after he
22 left?  Who then managed the team?
23   A    Actually --
24   Q    Okay.  Is that a person that was already
25 employed by Flock?

Page 23

1    A    I think so.
2    Q    Okay.
3    A    And then she left.  And then Zach Paul was
4  managing them, I think.  But I need to look at my
5  records.
6    Q    Sure.
7         And so besides the actual person that was in
8  charge of managing the team, was anyone else added to
9  the team, like device support engineer 2 or 3?
10   A    No, no.
11   Q    Did Flock ever post a position online for a
12 device support engineer 1, 2, or 3 after November 2023?
13   A    I've heard that there was a job posted in
14 December, but that's not part of my responsibilities,
15 so I don't know firsthand knowledge.
16   Q    Who would have told you that?
17   A    I think it came up in -- the first time it
18 came up was something from Jhostin's attorney.
19   Q    All right.  Okay.  And then did you talk with
20 anyone about that afterwards?
21        MR. KEATING:  Object to the form to the
22     extent it calls for attorney-client
23     privilege.
24 BY MR. REID:
25   Q    Not the attorneys.

Page 24

1    A    No, no, I didn't talk with anyone about it.
2  That's not part of my job.
3    Q    Okay.  So you're saying the only way you
4  heard that a job was posted was from -- something
5  having to do with this lawsuit?
6    A    Yeah.
7    Q    Okay.  Whose job responsibility would it be
8  to actually post job postings for a device -- go ahead.
9    A    The recruiting team.
10   Q    Okay.  Is there anyone in particular from the
11 recruiting team that would have been responsible for
12 posting jobs for this position -- for these positions?
13   A    I'm sure there was someone specific.  I don't
14 know who that would have been.
15   Q    Okay.  And then who made the decision to
16 eliminate the two -- the device support engineers that
17 we talked about whose positions were eliminated this
18 year?
19   A    There was a team of people who made that
20 decision.
21   Q    Who was the team?
22   A    Davis Lukens.
23   Q    Okay.
24   A    Zach Paul.  Tom Pethel.
25   Q    Tom, what was his last name?

Page 25

1    A    Pethel.
2    Q    H-E-T-H-E-L?
3    A    P-E-T-H-E-L [sic].
4    Q    Okay.  Was Brian Barnard involved in that
5  decision?
6    A    I'm not a hundred percent sure.  I would need
7  to go check, but I don't think he was because I don't
8  think he was directly responsible for that team
9  anymore.  I believe it -- well, Zach Paul was, I think,
10 in charge of that team when that decision was made,
11 yeah.
12   Q    Okay.  And so Flock is a -- Flock has been
13 described to me as a start-up.
14        Would you describe Flock as a start-up?
15   A    That's funny.  I don't know exactly how you'd
16 find what a start-up is, but, yes, we describe
17 ourselves as a start-up often.
18   Q    Okay.  And kind of -- well, let's limit it to
19 this period.  So from, let's say, like, July 2023 to
20 the current -- like, right now, today, Flock is a
21 growing company -- is Flock growing a -- let me back
22 up.
23        From, let's say, July 1st of 2023 until
24 today, is Flock then a growing company?
25        MR. KEATING:  Object to the form.

Page 26

```
1     A    Yes.
2  BY MR. REID:
3     Q    Sure.
4          Revenues have increased?
5     A    Yes.
6     Q    Has the number of employees that you employ
7  increased?
8     A    Yes.
9     Q    Okay.  And so, you know, typically, you know,
10 if a company is growing and you eliminate a position,
11 you might offer another position that is opening up in
12 another department to that employee whose position has
13 been eliminated, right?
14         MR. KEATING:  Object to the form.
15         Calls for speculation.
16    A    We eliminate positions, and we encourage
17 employees, if they feel qualified and are interested,
18 to apply to any opening positions that they are
19 interested in.  And then they apply and go through the
20 interview process, then might be selected.
21 BY MR. REID:
22    Q    Okay.  Do you know if that's what happened
23 with the two device support engineers whose positions
24 were --
25    A    That is what happened, yeah.
```

Page 27

```
1     Q    With the ones that were eliminated this year?
2     A    Yeah, but they must be in good standing and
3  good performance in order to be considered.  Well, I
4  mean, in order to make it through a process.
5     Q    Okay.  Do you know who made the decision to
6  terminate Jhostin Quinones?
7     A    The decision to terminate anyone is usually
8  made by at least three people who are not the hiring
9  manager.  And so --
10    Q    Okay.
11    A    -- Danielle Feuillebois and Brian Barnard
12 made the decisions.
13    Q    Okay.  Got it.
14         Do you know when they --
15    A    I --
16    Q    Go ahead.
17    A    I supported their decision.
18         I believe it was November 2nd.
19    Q    Do you believe on November 2nd that that
20 decision was made?
21    A    Yeah, that's right.
22    Q    So was that decision made before you met with
23 Brian Barnard and Omar Lodge and possibly Danielle on
24 November 3rd?
25    A    Yes.
```

Page 28

```
1     Q    Okay.  And how -- well, how did you come to
2  that decision then?
3     A    I didn't make the decision.
4     Q    But you know how --
5     A    Brain Barnard -- Brian Barnard wanted the
6  position eliminated.
7     Q    Okay.  And what was Danielle's response to
8  that?
9     A    She supported that.
10    Q    Okay.  And what was -- who's the other
11 person, his name?  I think those are the two people.
12         Like, in what forum and through what medium,
13 I guess is the better way to say it, did you have a
14 meeting where that was discussed?
15    A    Brian Barnard said in the e-mail that you
16 have produced in discovery that he wanted to separate
17 Jhostin, and then we supported that decision.  And we
18 met -- I met with Brian and Omar to start discussing
19 the logistics on the 3rd.
20    Q    And how was Danielle involved at that point?
21    A    Yeah, Danielle was involved all throughout.
22 I mean, she received the e-mail from Omar outlining the
23 call on the 2nd.  And then he -- we met on the 3rd to
24 confirm that we were going to eliminate the position.
25    Q    Okay.  So I'm going to show you a document.
```

Page 29

```
1  Let's get it pulled up.
2          Okay.  Can you see that?
3     A    Yep.
4     Q    So you said you recall that Brian Barnard
5  expressed wanting to eliminate the position in an
6  e-mail, right?  Is that this e-mail?
7     A    Yep, yep, yep, that's the one, yep.
8     Q    You can -- you see that this e-mail was sent
9  on November 3rd, right?
10    A    No.  Brian's was sent on November 2nd.  It
11 says --
12    Q    Yeah, gotcha.  Okay.  So you're talking about
13 the e-mail above.
14         Okay.  So you're saying --
15    A    Yeah.
16    Q    But he's asking for thoughts on whether this
17 is a fireable offense and if Mr. Quinones should be
18 terminated on the 2nd, right?
19         MR. KEATING:  Object to the form.
20    A    That's speculation, but I -- it says, Feels
21 like this should be a fireable offense, and we should
22 use it to end this problem that has been going on for a
23 while.
24 BY MR. REID:
25    Q    Yup.
```

Page 30

1        And he said that to you, right?
2    A    Yes.
3    Q    Okay.  And so what -- when you read this,
4 what did you think that he was -- what did you think he
5 was saying?  Or rather, what was he asking you?
6    A    He was asking me for my thoughts.
7    Q    Sure.
8        So did he ask --
9    A    And I --
10    Q    Okay.  Go ahead.
11    A    Then I replied.  So I met with him later to
12 discuss the expectations about having the cameras on.
13    Q    And that's -- are you talking about you met
14 with him on November 2nd to talk about that?
15    A    Yeah.
16    Q    Okay.  What was -- did you meet before or
17 after this e-mail, the next e-mail that you sent at
18 8:41?
19    A    After.
20    Q    Okay.  And so this -- in this e-mail, you
21 asked -- you don't ask anything in this e-mail on
22 November 2nd at 8:41 -- well, let me scratch that.
23        You don't say anything about your opinion on
24 terminating Mr. Quinones in response in your e-mail on
25 Thursday, November 2nd at 8:41, right?

Page 31

1        MR. KEATING:  Object to the form.
2    A    I'm sorry, Patrick, I'm not sure what you're
3 asking me.
4 BY MR. REID:
5    Q    Sure.
6        So you don't --
7        MR. KEATING:  I'm sorry, Patrick, I know
8    you got a question pending.  I'm just trying
9    to get this noise outside.  I'll just try to
10    get them to move into the other room.
11        MR. REID:  Yeah, no worries.
12        MR. KEATING:  Hold on one second.
13        All right.  Sorry.
14    A    So there were two things that I wanted to
15 cover with Brian in that e-mail on November 2nd in
16 '21.  One was I wanted to understand the norms and the
17 expectations for the entire team on joining team
18 meetings with their cameras on, which he answered.
19        And second, I wanted to know -- Jhostin's
20 performance had been that for more than a year, but I
21 wanted to know what was happening currently with his
22 work performance.
23 BY MR. REID:
24    Q    Okay.
25    A    Yeah.

Page 32

1    Q    And you're saying that you met about that
2 with only Brian on November 2nd?
3    A    As far as I can recall.
4    Q    Okay.
5    A    Yeah.
6    Q    Now, had you already -- Mr. Quinones is also
7 e-mailing you around the same time, right?
8    A    Yes.
9    Q    Do you remember having talked to him before
10 you sent this e-mail at 8:41 on Thursday,
11 November 2nd?
12    A    I would need to refresh my memory --
13    Q    Sure.
14    A    -- as to which came first.
15    Q    Let's do that.
16    A    But you can follow the timeline.
17    Q    Yeah, let's go ahead and do that.  I think
18 you should be able to see another exhibit now.  I'm
19 going to mark this as Exhibit 2.
20        Do you see that?
21    A    It's probably after, no.  It's probably
22 after.
23        (Whereupon, Plaintiff's Exhibit No. 2
24    was marked for identification.)
25 BY MR. REID:

Page 33

1    Q    Okay.  So we'll see here that -- I think you
2 produced both of these, I think that's why your name is
3 at the top right, right?
4    A    Yep, that's right.  That's right.
5    Q    Okay.  Gotcha.
6        And so this e-mail where Jhostin says, Hello,
7 I was wondering if I can talk to somebody about webcam
8 policies because I have a situation that is making me
9 feel uncomfortable, and that is --
10    A    And that's after my e-mail to Brian, right?
11    Q    Yup.
12        It seems to be about three minutes left --
13 afterwards, correct?  And I can switch between if you
14 want.
15    A    Yes.
16    Q    Okay.  And so that was before this e-mail,
17 but -- or that was after this e-mail, about 8:41, but
18 it was before this next e-mail at -- on November 3rd
19 at 5:47 a.m., right?
20        MR. KEATING:  (Inaudible) November 2nd
21    is before November 3rd?
22    A    Yeah.  Sorry.
23 BY MR. REID:
24    Q    Yeah, November 2nd is before November 3rd,
25 right?

1    A    Uh-huh.

2    Q    Okay.  And so then the next e-mail in this
3  second exhibit -- let's see here -- was sent at 8:45 on
4  November 2nd.

5         So that would have been sent after you sent
6  your e-mail back to Brian, right?  Okay.  Sorry, was
7  that --

8    A    It is as explained here in this e-mail.

9    Q    Sure.

10   A    The timeline of events.  Those are timestamps
11  from the e-mail.

12   Q    So all of those are accurate, correct?

13   A    Correct, they are accurate.

14   Q    And then you and Jhostin met that same day on
15  November 2nd, right?

16   A    Yes.

17   Q    Okay.  What -- take me through that meeting.
18        What happened during that meeting?

19   A    I met with him to find out if there was -- to
20  find out his perspective on what was uncomfortable
21  about that meeting.

22   Q    And what did he tell you?

23   A    He told me that he was asked to put his face
24  in the frame during the meeting.

25   Q    Okay.  Did he tell you that Omar had told him

1  to put his face and body where Omar wanted it?

2    A    I do not recall exactly what he said about
3  what Omar -- the way he phrased it.  I recall the --
4  this e-mail from the 6th.

5    Q    Sure.  We'll talk about that and all of it.
6         But you would have -- if Mr. Quinones
7  testified that he told you about that, would you have
8  any reason to disagree that that -- that he told you
9  that on the call?

10        MR. KEATING:  Object to the form.

11   A    He said he was asked to put his face in the
12  frame on the Zoom call.

13  BY MR. REID:

14   Q    Sure.

15        But what I'm asking you is, if Jhostin
16  Quinones testified that during that -- during the
17  meeting with you that he told you that Omar, on
18  November 2nd, 2023, told him, You put your face and
19  body where I want it, would you have any reason
20  specifically to disagree with -- that that's what he
21  said to you?

22   A    No.

23   Q    Okay.  Do you remember him talking to you?
24  Do you remember whether he said if he was having an
25  upcoming one-on-one with Omar or if that had already

1  happened at this point?

2    A    All I can remember is that he said he had a
3  one-on-one with Omar, but that he hung up.

4    Q    Okay.  So it had already happened at that
5  point, correct?  And by which, I mean, the one-on-one
6  with Omar had already happened at the time that you met
7  with Mr. Quinones on November 2nd?

8    A    As far as I can recall.

9    Q    Okay.  Did he tell you that during either of
10  the meetings that Mr. Lodge have become aggressive?

11   A    He did not use the word "aggressive."

12   Q    What did he say?

13   A    I do not remember.

14   Q    Okay.  Do you remember him telling you that
15  Mr. Lodge had raised his voice during either of those
16  meetings with him?

17   A    I don't recall.

18   Q    Okay.  And you would have no reason to
19  disagree if Mr. Quinones says that he said that -- that
20  he said that, would you?

21        MR. KEATING:  Object to the form.  Asked
22        and answered.

23   A    I'm sorry, do I remember if Jhostin said that
24  Omar raised his voice?  I do not remember.

25  BY MR. REID:

1    Q    The question is a little bit different.
2  So -- and it's -- that's not your fault.  Lawyers have
3  a very odd way of asking questions a lot of the time
4  that doesn't make sense to normal people.  And I
5  totally get it, and it's fair.

6         So what I'm asking you is, if Mr. Quinones
7  says that in that meeting, he told you that Mr. Lodge
8  had gotten loud with him, would you have any reason
9  to -- specific reason to disagree with his assessment
10  or his recollection of events?

11   A    Well, I wasn't in the meeting, so listening
12  to -- if that is what he said in the meeting, which I
13  do not recall, I wouldn't argue with an employee who
14  says that their manager raised a voice to them in a
15  one-on-one meeting that I wasn't at.  I'd just be
16  listening to their recollection.

17   Q    Sure.

18   A    That's -- yeah.

19   Q    The -- the question is a little bit more
20  specific, though.

21        Like, the question I'm asking you is, so if
22  Mr. Quinones, let's say, says, I told Laura McCormick
23  during that meeting that Omar raised his voice to
24  me, would you have any reason to disagree with his
25  assertion that he told you that that's what happened?

1    A    Oh, no.  If that's what happened, I don't
2  disagree with the assertion that he said that his
3  manager raised his voice to him.
4    Q    Yeah.
5    A    And raising a voice to anyone --
6    Q    Gotcha.
7    A    -- is -- yeah, so I don't recall.  But if
8  that's what he said, I -- then that's what he said.
9    Q    Okay.
10        MR. KEATING:  My apologies.  Can we
11    take a quick break?  I just need to use the
12    restroom real quick.
13        MR. REID:  Yeah, that's fine.
14        (Whereupon, a brief recess was taken.)
15  BY MR. REID:
16    Q    Okay.  Ms. McCormick, did you talk --
17    A    Yeah.
18    Q    -- to either of your attorneys during the
19  break?
20    A    Not really.
21    Q    Okay.  What do you mean by "not really"?
22    A    Oh, I said hi to them.
23    Q    Oh, okay.  Yeah, yeah.  All right.
24        Okay.  We were talking about the meeting with
25  Mr. Quinones on the 2nd.

1    A    Yeah.
2    Q    Did he --
3    A    Sorry.
4    Q    Do you recall him outlaying to you that he
5  believed that there was this escalating problem with
6  Mr. Lodge starting in the summer of May 2023 that
7  was --
8    A    No, he never said that.  He only talked about
9  the group call on November 2nd and being asked to put
10  his face in the frame.
11    Q    He didn't talk to you about the one-on-one
12  that he had with Omar?
13    A    He -- I don't recall.
14    Q    Okay.
15    A    But he didn't -- if he did, it was only in
16  that, I had a one-on-one.
17    Q    Okay.  Got it.
18        Did he ever tell -- ask you or posit some
19  sort of, like, maxim to you where he asked you to,
20  Well, think about what this would look like if Omar
21  said --
22    A    Yes.
23    Q    -- what he --
24    A    No, sorry.
25    Q    -- what it looks like if Omar ever said what

1  he said to me to a female employee?
2    A    Yes, he said that.  He said, What if I was a
3  woman?
4    Q    Okay.  And what did you --
5    A    And, of course --
6    Q    Go ahead.
7    A    Of course, we -- if -- whether he's a man or
8  a woman, we would handle the situation and the facts
9  exactly the same.
10    Q    And why do you think he's -- well, why do you
11  think he asked you at that point what would it look
12  like or what -- whatever he said?  Why do you think he
13  asked you that?
14    A    I don't know.
15        MR. KEATING:  Object to form.
16  BY MR. REID:
17    Q    Okay.  Did he ever use the word, like,
18  "sexual" or "sexual" -- well, let me ask --
19    A    No.
20    Q    So okay.
21        He never used the word "sexual"?
22    A    Correct.
23    Q    And he never used the word "sexual
24  harassment"?
25    A    Correct.

1    Q    How did he describe the way that Mr. Lodge's
2  actions were making him feel during the call with you?
3    A    Uncomfortable.
4    Q    Okay.  And that he was uncomfortable, was he
5  uncomfortable because they were -- did he say they were
6  weird requests?
7    A    I mean, I can't speculate to why he was
8  uncomfortable, but I know he's on a group call with
9  everyone's faces on Zoom, and he was asked to put his
10  face on Zoom, and that made him uncomfortable.
11    Q    Okay.  And, like, what was your reaction when
12  Mr. Quinones brought up what would it look like, or
13  whatever he said, if it was a female employee?
14    A    I didn't understand it because there were
15  female employees on the call, and he's not a female.
16    Q    But what was your response?  Like, what did
17  you say back to him?
18    A    I didn't say anything.
19    Q    Okay.
20    A    I was listening.
21    Q    Got you.
22        And so, like, what was -- did he ever tell
23  you, like, I don't want to be -- I don't want to have
24  to be in meetings with Omar right now until we get this
25  figured out?

Page 42

1    A    No.
2    Q    Did he ever ask you to investigate further?
3    A    No.  I told him that I was going to ask about
4 what the team norms were for being on camera.
5    Q    Okay.  And so did he express anything about
6 not wanting to be in contact with Omar for -- you know,
7 in the near future or at any point during that call?
8    A    No.
9    Q    Okay.  Let me think.
10        Did he ever tell you that Omar had been
11 asking him personal questions that he was --
12   A    No.
13   Q    -- uncomfortable answering?
14   A    No, he never said anything like that.
15   Q    Okay.  All right.  I'm going to pull back up
16 Exhibit 2.
17        And then did you have any contact with
18 Mr. Quinones between the meeting that we were just
19 discussing in this e-mail that he sent you on
20 November 6th?
21   A    No.
22   Q    Did you ever send him the camera policies?
23   A    We don't have camera policies.
24   Q    Did you ever tell him you don't have camera
25 policies?

Page 43

1    A    I never responded to this e-mail from
2 November 6th.
3    Q    Sure.  But in the -- sure.  But in the
4 meeting, you guys were talking -- that's one of the
5 things that you guys were talking about.
6        Did you, after the meeting, ever tell him,
7 like, We don't have camera policies?
8    A    No, I don't think we talked about camera
9 policies in the meeting.
10   Q    Okay.  Gotcha.
11        And then obviously, on November 6th, he sent
12 you this e-mail.  And it looks like he is detailing a
13 little bit -- let me see if I can zoom in.
14   A    We talked -- we didn't talk about camera
15 policies.  We talked about the norms for the team
16 meetings on camera.
17   Q    Okay.  And what did he tell you about that?
18   A    I didn't ask him.
19   Q    Sure.
20        But what did he tell you about the norms?
21   A    He didn't say anything.
22   Q    Well, you said you were -- that's what you
23 guys were talking about, right?
24   A    No.  I said I had asked Brian Barnard about
25 the team meetings.  I don't know that I talked about it

Page 44

1 with Jhostin.
2    Q    Okay.  And so he kind of -- he details this
3 in more detail to you on November 6th.  And, like, you
4 can go ahead and read this if you haven't already.
5    A    Okay.
6    Q    Great.
7        And so in this, he details what kind of
8 history of events a little bit more, right?
9        MR. KEATING:  Object to the form.  The
10       document speaks for itself.
11 BY MR. REID:
12   Q    Well, would you say that he detailed it a
13 little bit more than what he told you in the verbal
14 meeting, in the e-mail?
15   A    Yeah.
16   Q    Okay.  And he says that -- he outlines
17 everything, and then at the end, he says, After the
18 meeting, the one-on-one with Omar, he, again, promptly
19 logged off as this harassment and obsession with my
20 face being seen up close to the camera is becoming
21 really uncomfortable and stressful.
22        Did you -- well, when you -- I know you
23 didn't respond to this e-mail, but what -- did you do
24 anything in response to this e-mail, talk to anybody,
25 tell anyone anything, maybe Danielle, anybody else?

Page 45

1    A    Yeah, I mean, Danielle.
2    Q    Okay.
3    A    According to Danielle.
4    Q    Got it.
5        Did you ever talk to Mr. Lodge about what
6 Mr. Quinones was reporting to you?
7    A    Yeah.
8    Q    What did you talk to -- what did you tell
9 him?
10       MR. KEATING:  Can you repeat the
11       question, Patrick?
12       MR. REID:  Yeah.
13       What did you tell Omar Lodge about what
14       Jhostin Quinones was reporting to you?
15       THE WITNESS:  Yeah, that he was
16       uncomfortable when he's asked to put his
17       face on the group call.
18 BY MR. REID:
19   Q    And what -- at what point during this
20 timeline of events did you tell Omar that?
21       MR. KEATING:  Object to the form as
22       "timeline."
23       Can you clarify what you mean by
24       "timeline of events"?
25 BY MR. REID:

Page 46

```
1    Q    Like, did you --
2    A    I don't --
3    Q    Go ahead.
4    A    I don't remember, but it was after we had
5  already decided to eliminate the position.
6    Q    Okay.  Is it possible that you told him in
7  the meeting on November 3rd?
8    A    It's possible.
9    Q    Okay.  Is it possible that you waited to tell
10 them until after this e-mail was sent, so after
11 November 6th at 8:00 a.m.?
12   A    No.
13   Q    Okay.  So some -- sometime between
14 November 3rd and November 6th is when you relayed that
15 to Mr. Lodge then, correct?
16   A    Yeah, probably November 3rd.  I don't tend to
17 work on the weekends.
18   Q    That's true.  Yeah.  That makes sense.
19        So did you ever -- so it's the same question
20 for Brian Barnard.
21        Did you ever tell Brian Barnard what
22 Mr. Quinones was reporting to you?
23   A    I don't recall.
24   Q    Okay.  Well, you reached out to him and asked
25 him about camera policies for the team, right?
```

Page 47

```
1    A    Yes, yes.
2    Q    And talking about that, would you have told
3  him that, The reason I'm bringing this up is because
4  Jhostin has brought an issue to my attention?
5    A    Yes.
6    Q    Okay.
7    A    Yes.
8    Q    And would you also relate the reason he's
9  bringing it up is because he's uncomfortable?
10   A    Yes, you're right.  So I told him on
11 November 2nd.
12   Q    Okay.  Brian -- so Brian Barnard, you told
13 him on November 2nd, is that correct?
14   A    Yeah.
15   Q    And that would be during --
16   A    I told him about -- yeah, I told him about
17 the uncomfortable behavior, yeah.
18   Q    Got it.
19        And what was his response to that?
20   THE COURT REPORTER:  Can we make sure
21      to let the other person finish talking?
22   MR. REID:  Yes.
23   THE COURT REPORTER:  Thank you.
24   THE WITNESS:  I'm sorry.
25   MR. KEATING:  Can you repeat that last
```

Page 48

```
1  question?  Sorry, Patrick.
2    MR. REID:  Sure.
3        What was Brian Barnard's response to
4    you telling him that Jhostin Quinones was
5    uncomfortable with what had happened on
6    November 2nd?
7    THE WITNESS:  I mean, he was confused --
8  BY MR. REID:
9    Q    Okay.
10   A    -- about why somebody would be uncomfortable
11 being asked to be on camera when that is the team norm
12 for meetings.
13   Q    And did you tell him, you know, I don't
14 really know?
15   A    I don't --
16   MR. KEATING:  Object to the form.
17   THE WITNESS:  What?
18 BY MR. REID:
19   Q    Did you tell him, you know, I'm not sure why?
20 What did you tell him?
21   MR. KEATING:  Object to the form.
22   A    No.
23   MR. KEATING:  It misstates prior
24      testimony.  Putting words in her mouth.
25        Can you ask the question?
```

Page 49

```
1    MR. REID:  Well, yeah, asking her a
2    question.
3        Is that what you said is the question,
4    but what did you tell him in response?
5    THE WITNESS:  I asked him whether it was
6    common for the team to be on camera during
7    team meetings.
8  BY MR. REID:
9    Q    Okay.  Did you tell him, you know, I'm not
10 sure why Jhostin is uncomfortable?
11   A    I don't weigh in on why people are or are not
12 uncomfortable.
13   Q    Okay.
14   A    But I --
15   Q    Yeah.  No, go ahead.
16   MR. KEATING:  I'm sorry, what time is
17      your flight?  I just want to make sure
18      you're not --
19   THE WITNESS:  Yeah.  I'm sorry, I --
20      I'm not understanding what you're asking.
21 BY MR. REID:
22   Q    So let me just ask this:  At the time when
23 Brian Barnard asked you that question or said, I don't
24 understand why Jhostin's uncomfortable, you didn't know
25 why Jhostin was uncomfortable, right?
```

Page 50

1    A    If a person says they're uncomfortable,
2   that's why they're uncomfortable.
3    Q    Okay. All right. I guess we'll move on from
4   that.
5         So in this e-mail, you then say, Forwarding
6   this message to Jhostin from Danielle. I will bring it
7   up in our HR meeting call later today.
8         Did you then talk during the HR meeting call?
9    A    Yeah.
10    Q    Okay. And then what did you say on that
11   call?
12    A    This is the e-mail from Jhostin. We're
13   planning on eliminating the position.
14    Q    You told Danielle that you were planning on
15   eliminating the --
16    A    No, she already knew that. We'd already made
17   that decision on the 2nd. So we're talking about his
18   e-mail on the 6th and whether it would change anything
19   or not.
20    Q    Okay.
21    A    Change the decision that we already made on
22   the 2nd and that we met to discuss logistics on the 3rd
23   and that we had planned for the 8th.
24    Q    And what was that decision?
25    A    No, it doesn't change anything.

Page 51

1    Q    Okay. Got you.
2         So you filled out all of the separation
3   paperwork for Mr. Quinones, right?
4    A    That is correct.
5    Q    Are you aware that nowhere on the separation
6   paperwork that you wrote that Mr. Quinones was having
7   performance problems?
8         MR. KEATING: Object to the form.
9    Documents speak for themselves.
10    A    We made a position elimination, and the
11   reason he was selected over the other teammates for
12   position elimination is because he was the lowest
13   performer on the team.
14   BY MR. REID:
15    Q    Okay. And what happened on November 2nd was
16   also the impetus for the position elimination, right?
17         MR. KEATING: Object to the form.
18    A    No, the impetus was that for many, many
19   months, we've been discussing that we do not need the
20   team to be this large. And when someone isn't even
21   producing the work that they should be producing, that
22   makes that decision even easier.
23         But the performance issues that he had on
24   that day with refusing to participate on the team call
25   and the manner in which he was treating his teammates

Page 52

1   were -- was the final straw in the performance epic
2   saga.
3   BY MR. REID:
4    Q    Let's break that up.
5         What do you mean by the way he was treating
6   his teammates?
7    A    When a person is participating on a team and
8   they are distracting or not pulling their weight, not
9   doing their work, or having other people clean it up
10   for them, that can create distraction and problems on a
11   team.
12    Q    Sure.
13         And that had been going on for a while,
14   right?
15    A    Yes, correct.
16    Q    And so why November 2nd then? Why was that
17   the day that the decision was made?
18    A    Because there's always a decision-making
19   turning point in any performance issue that any manager
20   decides, and that was -- that day was it. And he was
21   refusing to be in contact with them, and there was
22   just -- Omar had been coaching him for more than a
23   year, and it wasn't getting better.
24    Q    Okay. But November 2nd isn't when he
25   started to refuse contact; that's just when he hung up

Page 53

1   the calls, right?
2         MR. KEATING: Object to the form.
3    Compound.
4         Can you ask that question again?
5         MR. REID: Yeah, sure.
6         November 2nd isn't -- Omar Lodge didn't
7    know that -- well, did -- do you know -- do
8    you have any knowledge that Jhostin Quinones
9    had actively started ignoring Mr. Lodge on
10    November 2nd, or did that start happening
11    after November 2nd?
12         THE WITNESS: I mean, Omar would have to
13    answer those questions. He was constantly --
14    I mean, he's obviously in contact with me.
15   BY MR. REID:
16    Q    Sure.
17         So one of the things that he did in terms of
18   not being in contact was saying that he's uncomfortable
19   and hanging up the call, right? That's one of the
20   things that he did on November 2nd?
21         MR. KEATING: Object to the form.
22    Misstates prior testimony. Assumes facts not
23    in evidence.
24   BY MR. REID:
25    Q    Is that one of the things that he did that

Page 54

1  was disrespectful on November 2nd?
2      A    Omar can state to that. I wasn't on that
3  call.
4      Q    Well, do you know that? People told you
5  that, right?
6          MR. KEATING: Told her what?
7  BY MR. REID:
8      Q    Well, let me ask another question.
9          That was part of the reason why the position
10 was eliminated on November 2nd, right?
11         MR. KEATING: Object to the form.
12 What was why?
13     A    Managers reach a decision, and it can be many
14 factors.
15 BY MR. REID:
16     Q    Sure.
17     A    I had -- I received performance documentation
18 for him for more than a year, so I felt like we had
19 plenty of grounds to be done with this performance
20 issue.
21     Q    But one of the new -- like, one of the new
22 grounds was that he hung up on the call in the team
23 meeting and in the one-on-one with Omar, right?
24     A    Yes.
25     Q    Okay. And that was part of the reason why

Page 55

1  Mr. Quinones was terminated, correct?
2      A    Yes.
3      Q    Okay. I'm going to go through some documents
4  very quickly. I know we have a kind of time thing
5  here. Give me one second.
6          Well, let me ask you this: You don't -- you
7  did not tell Mr. Quinones he had any performance
8  issues, and no one told him during his termination
9  meeting that he had any performance issues, right?
10     A    Well, we told him many, many times that he
11 had performance issues. I think -- I wonder if we're
12 talking about semantics here. When we pick a reason to
13 put on the separation documents, we put one reason
14 typically on the documents. Here, we eliminated his
15 position. And maybe I should've said poor performance.
16 Maybe that would've been clearer to Jhostin.
17     Q    And when you fill out separation paperwork,
18 you're trained to fill it out accurately and
19 completely, right?
20     A    Yeah. This is a script that we're looking at
21 right now.
22     Q    Sure.
23         But let's -- so let's ignore that for just a
24 second. We'll come back to it.
25         But when you're filling out separation

Page 56

1  paperwork, you're trained to fill it out accurately and
2  completely, right?
3      A    Yes.
4      Q    And that's what you did in this case,
5  correct?
6      A    Yes. I noticed a typo on one of the
7  documents, but yeah.
8      Q    Sure.
9      A    Yeah, I agree. I agree. Yes.
10     Q    And so let's just -- let's -- we're going to
11 skip over this exhibit. I'm not going to use it.
12         So let's pull up -- do you know what this is,
13 what page this is from? Do you recognize this?
14     A    Yes, that's from our HRS system.
15     Q    Okay. Do you know who filled this out for
16 Mr. Quinones?
17     A    I did.
18     Q    Okay. So you put termination reason,
19 position eliminated, correct?
20     A    Yup.
21     Q    And you fill that out, you wanted to be as
22 accurate as possible when you're filling it out, right?
23     A    Yes. We knew we were not -- yeah. It won't
24 let you pick more than one.
25     Q    Okay. What are the other options?

Page 57

1      A    I'd have to go through a giant pick list.
2      Q    Well, would one of them be performance?
3      A    Yes.
4      Q    Okay. And then I'm going to take you to
5  Exhibit 7.
6          What do you recognize this to be?
7      A    That's the State of Georgia separation
8  notice.
9          (Whereupon, Plaintiff's Exhibit No. 7
10         was marked for identification.)
11 BY MR. REID:
12     Q    And this is something that the company
13 actually sends to the State of Georgia, right?
14     A    No, it's something required by the State of
15 Georgia to give to each employee in case in the future
16 they would like to file for unemployment.
17     Q    Okay. But it also -- and you signed this,
18 right?
19     A    Yes. I put the wrong date on there.
20     Q    Gotcha.
21         Okay. But -- and it says above where you
22 sign, I certify that the above worker has been
23 separated from work, and the information furnished
24 hereon is true and correct. The report has been handed
25 to or mailed to the worker, right?

Page 58

1    A    Yes.
2    Q    And the reason here listed, reason for
3  separation, says position elimination, right?
4    A    Yes.  His position was eliminated because of
5  his poor performance in the past.
6    Q    Okay.  And actually, I'm going to use the
7  script, but just real quick.
8         Did you write this script?
9    A    Yes.
10   Q    Okay.  And so you would have typed out the
11 words, "We've made some tough decisions to eliminate
12 one of the device support engineer 2 positions on our
13 team," right?  You would've typed that?
14   A    Yes.
15   Q    And you also would've typed that, That
16 means -- well, directly after the other portion I just
17 read, That means that your position is being
18 eliminated, right?
19   A    Yes.
20   Q    Okay.  And then I'm going to have one more
21 document, and then I think we'll be done with that for
22 a little bit.  I already asked about that.  All right.
23 One more (inaudible).
24        And so earlier you said that in the internal
25 system, there's only -- like, you can only fill out

Page 59

1  one thing, right?
2    A    Yeah.  Also, when we do a position
3  elimination, we offer separation pay to the employee.
4  And in instances where we separate for performance, we
5  do not.
6    Q    So you offer separation pay in -- okay.  So
7  then why did you offer Mr. Quinones separation pay?
8    A    Because his position was eliminated, and he
9  didn't have any notice that it was going to be
10 eliminated.
11   Q    But didn't you just say that if an employee
12 is terminated for performance reasons that you do not
13 have offer of severance?
14   A    That's right.  Purely performance reasons,
15 yeah.  If we're going to backfill the position and we
16 eliminate -- or we separate them for performance, we do
17 not give them a pay.  But if we're going to eliminate
18 their position and not backfill their role and they
19 didn't have any notice of that, even if the decision
20 was made based on their past performance, as it was
21 with Jhostin Quinones, we give them some separation pay
22 so that they have a cushion.
23   Q    Okay.  And so you also filled this document
24 out, correct?
25   A    That is correct.

Page 60

1    Q    Okay.  What is the purpose of filling out
2  this particular document?
3    A    Yeah.  This is just something that we keep in
4  our records in case the vendor that helps us with
5  unemployment insurance knows the reason why the person
6  separated.
7    Q    And so you might need to give this to a
8  third-party entity so that they can then go and do what
9  they need to do?
10   A    That's possible.
11   Q    For example, if someone contests not
12 receiving unemployment, right?
13   A    I think that's how it's used.
14   Q    Okay.  And so on this one, there's not only
15 one option; it's -- you know, you got -- you could have
16 actually checked the following categories for the
17 reason for discharge:  Violation of company policy,
18 poor performance, unexcused absenteeism, unexcused
19 tardiness, misconduct, or failure to follow supervisory
20 instructions, right?
21   A    Yes.
22   Q    And you did not, correct?
23   A    That is correct.
24   Q    Then you wrote position elimination, device
25 support engineer 2, right?

Page 61

1    A    Correct.
2    Q    Okay.  And when you're filling this out,
3  again, are you trained to fill this out accurately and
4  completely for the third party that might want to use
5  it in the future?
6         MR. KEATING:  Object to the form as to
7  training.
8    A    Yeah, we fill out the form.
9  BY MR. REID:
10   Q    Are you trained on how to fill it out?
11   A    No.
12   Q    Okay.  But when you fill it out, still -- you
13 still want to be as accurate as possible, right?
14   A    Yes.  We never pick multiple reasons.  We
15 pick one reason.
16   Q    Well, if you've never gotten training on
17 that, how would you know that?
18   A    This is -- there are very few instances where
19 we contest from an employee receiving unemployment
20 compensation.  It's just for our records.
21   Q    So that wasn't my question.
22        So my question was:  You said that, We just
23 put one reason, so where are you getting that from?
24   A    That's just the norms and practice.
25   Q    Of who?

Page 62

1    A   Of me, as an HR business partner, how I fill
2  out this form.
3    Q   Got it.  Okay.  All right.  Let's move on
4  from that.
5          MR. KEATING:  She's (inaudible).
6          MR. REID:  I'm already getting through.
7  I should be done in the next 15 minutes.
8          MR. KEATING:  Can we take a five-minute
9  break real quick?
10         MR. REID:  Yeah.
11         MR. KEATING:  Just a quick five-minute
12  break.
13         THE WITNESS:  Sure, yeah.
14         (Whereupon, a brief recess was taken.)
15  BY MR. REID:
16    Q   Okay.  Ms. McCormick, was Mr. Quinones's
17  termination decision made before Mr. Lodge could give
18  any input into the termination decision?
19    A   I -- it seems that Brian Barnard made the
20  decision to eliminate the position.
21    Q   So --
22    A   And that Mr. Quinones was chosen for that
23  position elimination because that team needed to be
24  smaller, and he was chosen because -- he was chosen in
25  part because his performance was the worst of the

Page 63

1  entire team.
2    Q   So is that a yes to the question:  Was
3  Mr. Quinones's termination decision made before
4  Mr. Lodge could give input on what he wanted to do with
5  Mr. Quinones's employment?
6    A   I don't know when the two of them talked.
7    Q   Okay.  But it would have had to -- you didn't
8  talk with Mr. Lodge about what his thoughts were,
9  right?
10    A   No, no.  But --
11    Q   Okay.
12    A   Yeah, no.  But we talked about logistics for
13  the --
14    Q   But you would have been cc'd on the e-mail
15  where Mr. Lodge says that he wants to work through this
16  and believes that he can work through this with
17  Jhostin, right?
18          MR. KEATING:  Object to the form.
19    A   I received that e-mail.
20  BY MR. REID:
21    Q   Okay.  Did you have any meeting after
22  November 3rd with Mr. Quinones besides the termination
23  meeting?
24    A   No.
25    Q   Okay.  So you never met with him to follow up

Page 64

1  with the concerns that he e-mailed you, right?
2    A   No, they were the same as the ones he had
3  mentioned on the 2nd.
4    Q   Well, but he told you in the e-mail that he
5  felt like he was being harassed, right?  That was new?
6    A   Yeah, that was new.  That was new.
7    Q   And you never followed up on, you know, what
8  he meant by that, right?
9    A   Yeah, yeah.  Harassment -- he was offering no
10  new details as to why that might be -- why there might
11  be the legal definition of harassment, which is severe
12  or pervasive.
13    Q   Gotcha.
14          Okay.  Well, do y'all only investigate
15  harassment cases which are severe or pervasive?
16    A   But it's not harassment if it's not severe or
17  pervasive.
18    Q   So to -- are you saying --
19    A   Harassment is a word -- sometimes employees
20  use the word "harassment" to say that my manager told
21  me to do something that I don't want to do, and I
22  consider that harassment.  They use it in a -- like a
23  colloquial term.  It means somebody asked me to do
24  something I do not want to do, and they get it confused
25  sometimes with harassment, as in there was a severe

Page 65

1  incident or a pervasive incident.
2    Q   So the question (inaudible), does Flock only
3  investigate reports of harassment when it believes
4  those reports to be the basis for severe and pervasive
5  harassment?
6    A   No, we would investigate all allegations of
7  harassment, especially to learn the facts.  When there
8  are no new facts and we've determined that there is not
9  harassment happening, then there is nothing to
10  investigate.
11    Q   Okay.  So you didn't feel like it was worth
12  following up with Mr. Quinones after his November 6th
13  e-mail to see if he had anything else to say, is that
14  correct?
15    A   Correct.  We were planning on separating him.
16    Q   Okay.  Even if he was going to be separated,
17  you still didn't think, you know, Even if we're going
18  to fire him, maybe I want to talk to him and figure out
19  what his story is, right?
20    A   There was no new story in his e-mail.
21    Q   Well, I mean, you saw the word "harassment,"
22  but you saw the word "harassment" -- when you saw the
23  word "harassment," did you think, Oh, this is just one
24  of those things where an employee doesn't want to do
25  something, and they're saying it's harassment?

1     MR. KEATING:  Object to the form.
2  Misstates prior testimony.  Speculation.
3     MR. REID:  Not -- I don't see how --
4     MR. KEATING:  Can you rephrase that
5  question?
6     MR. REID:  I'm going to ask it the
7  same way.
8     MR. KEATING:  Yes.
9  BY MR. REID:
10     Q     When you saw Mr. Quinones use the word
11  "harassment" in this November 6th, 2023, e-mail, did
12  you think to yourself, Oh, well, it's not really
13  harassment; this is just one of those -- like you said
14  earlier, those cases where an employee has been asked
15  to do something and they don't want to do it, and they
16  say it's harassment?
17     A     Yes.
18     Q     Okay.  And were there -- are there any other
19  meetings that you're aware of besides the termination
20  meeting, the HR VP meeting, your meeting with Brian
21  Barnard, your meeting with Jhostin Quinones, and then
22  the November 3rd meeting between you and whoever else
23  it was that related to Jhostin Quinones's reports or
24  his termination?
25     A     If I understand what you just outlined, it

1  sounds like to me that all the meetings that we've
2  talked about are the only ones that happened regarding
3  Jhostin's separation.
4     Q     Got it.  Okay.
5     A     If I understand it correctly.
6     Q     Gotcha.
7     Well, let me make sure you understand it
8  correctly.
9     So the meetings that we've talked about
10  are -- let me try and go through them in sequential
11  order.  Your first meeting with Mr. Quinones, your
12  meeting with Brian Barnard, both of which occurred on
13  September -- November 2nd, 2023, your meeting with
14  Brian Barnard, maybe Omar Lodge and Danielle on
15  November 3rd, your HR VP meeting, which I think was on
16  November 6th, and then the termination meeting with
17  Mr. Quinones on November 8th.
18     Are you -- are those all of the meetings that
19  you recall that have to do with Mr. Quinones's reports
20  and his termination?
21     A     There was a meeting with Danielle.
22     Q     Okay.  When did that happen?
23     A     November 3rd.
24     Q     What -- who was in that meeting?
25     A     Danielle, HR business partner, and our legal

1  team.
2     Q     Okay.  So we're not going to talk about that.
3     A     That's our regular legal meeting that we have
4  every two weeks.
5     Q     Okay.  Was anything said about Mr. Quinones's
6  termination from anyone who is not an attorney in that
7  meeting?
8     A     All I recall from that meeting is that we
9  said that we've made a business decision to eliminate
10  Jhostin's position because we needed to eliminate a
11  position on the team, and he was selected because -- in
12  part because of his poor performance.
13     Q     Okay.  And that -- would that have happened
14  after the meeting that you had?  And I can pull up --
15  well, let me pull it up.  This may jog your memory.
16  And then I think we're done with the meetings.
17     Let's see.  Okay.  Pulling that up.
18     Was that -- so you see this e-mail from Brian
19  Barnard where he says, I know we had time on the
20  calendar this afternoon?
21     A     Yep.
22     Q     And so would this meeting that he's talking
23  about here been -- have been before the meeting that
24  you had with the attorneys and Danielle?
25     A     I met with the attorneys before I met with

1  Brian.
2     Q     Okay.  And the -- well, this seems to be with
3  Brian and Laura.
4     Do you remember meeting with Brian and Laura
5  on the 3rd?
6     A     No, on the 2nd.
7     Q     What meeting did you have with Brian and
8  Laura on the 2nd?
9     A     It's the best I can recall.  I met with him
10  for probably less than five minutes just to talk about
11  the team's norms on -- about being on camera.
12     Q     Okay.  Okay.  We talked about that, right?
13     A     Yeah, we talked about it already.
14     Q     So -- and the answer might be no, but it
15  appears to me from the e-mail that Brian Barnard sent
16  to you and Laura saying, I think we had time on the
17  calendar this afternoon.
18     Was there another meeting on Friday,
19  November 3rd, besides the one with the attorneys?
20     A     No.  Oh, I'm sorry.  I may not be following.
21     Q     Sure.
22     A     We had a meeting -- Brian is saying that he
23  knows that he has a meeting with me and Omar to discuss
24  the logistics of Jhostin's separation on -- in that
25  afternoon.

Page 70

1    Q    Okay.

2    A    And we met to discuss that that afternoon.

3    Q    He's talking about what reasons should be --

4 what -- like, what is the reasoning behind

5 Mr. Quinones's termination in preparation for that

6 meeting, right?

7         MR. KEATING:  Object to the form.

8    Assumes facts not in evidence.  Calls for

9    speculation.  I don't know (Inaudible).

10        Can you answer?

11        THE WITNESS:  I -- you're asking --

12 BY MR. REID:

13   Q    So you were in the meeting with them, right?

14   A    Yep.

15   Q    And so you know what happened in the meeting,

16 and you also are reviewing this e-mail, being a person

17 that has knowledge of what happened in the meeting.

18        So what I'm asking you is:  In sending this

19 e-mail, is Brian Barnard talking to you that he would

20 then talk to you about the same things in the meeting,

21 about, like, what are we going to do with Jhostin's

22 termination, what are we going to tell Jhostin for his

23 termination, what are the logistics going to be?  Does

24 that make sense?

25   A    Yeah, yeah.

Page 71

1    Q    And that's what he's doing?

2    A    Yeah, we discussed in the meeting, Do you

3 need to backfill this position?

4         No, we can eliminate this position, and we're

5 going to select Jhostin because he is the lowest

6 performer on -- in the group and because we do not need

7 this position.

8    Q    And what -- did you also talk about what's in

9 this e-mail?

10   A    In our meeting?

11   Q    Yes, sorry, not uh-huh, yes.

12   A    Specifically what?

13   Q    The part where he says, I think the

14 discussion we will want to focus on is not whether or

15 not having his camera on is a fireable offense, but the

16 disrespect hanging up on his manager.

17        Did you discuss that?

18   A    I don't recall.

19   Q    Okay.  Gotcha.  Fair enough.  As we've said,

20 you know, November 2023.

21        All right.  Let's see.

22        So did you forward all the other times that

23 Mr. Quinones had performance issues and Mr. Lodge

24 brought them to your attention?  Did you always forward

25 those to Brian Barnard?  So, like, in April or in March

Page 72

1 or September, Mr. Lodge came to you and said, Hey,

2 Jhostin's having performance problems, right?

3    A    Yeah.

4    Q    Okay.  And so I see here that you e-mailed

5 Brian Barnard with what was brought to you on

6 November 2nd, right?

7         MR. KEATING:  Where is that e-mail?

8         MR. REID:  It's right here.  This one.

9         MR. KEATING:  And it seems to be that

10   she's following up.  I mean, all of her

11   answers, that's different.  It's not

12   forwarding (inaudible); it's following up

13   around the expectation.

14   A    Yeah.  So that's a thread.  That's an e-mail

15 thread.  I didn't forward anything.  I'm just replying

16 to his e-mail.

17 BY MR. REID:

18   Q    But he would -- he -- well, he would have --

19 but he's not copied on the original e-mail, right,

20 about the situation?

21   A    I don't know if he was blind copied or not,

22 but I'm sure that he and Omar were talking about

23 Jhostin's performance over the one year and one month

24 of his documented performance issues.

25   Q    Okay.  Got it.  Okay.  Well, that answers

Page 73

1 that.

2         Did you ever tell Mr. Lodge or Mr. Barnard

3 about the kind of -- I don't know how you want to term

4 it -- but then -- when Mr. Quinones said, Imagine if

5 Mr. Lodge had said this to a female employee, did you

6 ever tell him that he had said that?

7         MR. KEATING:  Object to the form as to

8    who, one or two.

9 BY MR. REID:

10   Q    If it is Brian Barnard or Omar Lodge.

11   A    I do not recall telling them that.

12   Q    Okay.  As in you don't remember, or you don't

13 think you did?

14   A    I don't think I did.

15   Q    Okay.  I think I'm going to skip all of this

16 stuff.

17        MR. KEATING:  Sorry, but we've had a

18   witness in the lobby for about an hour.

19        MR. REID:  Yeah, I'm literally on the

20   last three questions that I have written

21   down.  It'll be done.  Okay.  Yeah.

22        Do you have any idea why Mr. Lodge is no

23   longer with Flock?

24        THE WITNESS:  Yeah.  He chose to take a

25   new opportunity with a different company.

Page 74

BY MR. REID:

1  BY MR. REID:

2      Q      And Flock didn't bring any issues about

3  Mr. Lodge's attention or say, Hey, we're thinking about

4  firing you, or you got all these issues before that,

5  right?

6      A      He had no issues.

7      Q      Okay. And Flock never told him, Hey, you

8  know, there's an issue. We're going to investigate

9  you --

10      A      No.

11      Q      -- or anything like that?

12          MR. REID: Okay. All right. That's all

13  I've got.

14          MR. KEATING: Wait. Give me a minute to

15  see if I have any follow-up.

16          No questions.

17          MR. REID: Okay. We can go ahead and go

18  to the next witness.

19          (Whereupon, the Zoom recording feature

20  was turned off.)

21                    - - -

22          (The videoconference deposition

23  concluded at 2:24 p.m.)

24

25

---

Page 75

1          E R R A T A   S H E E T

2      I have read the within and foregoing pages

3  and no changes are required.

4      This, the _____ day of _____,

5  2024.

6

7      I have read the within and foregoing pages

8  and the following changes are required:

9  Page _____ Line _____:

10  _____

11  Reason:

12  _____

13  Page _____ Line _____:

14  _____

15  Reason:

16  _____

17  Page _____ Line _____:

18  _____

19  Reason:

20  _____

21      This, the _____ day of _____, 2024.

22  Sworn to and subscribed before me,

23  this _____ day of _____, 2024.

24  _____

25  Notary Public, Georgia

---

Page 76

DISCLOSURE

1          DISCLOSURE

2  STATE OF GEORGIA)

3  COUNTY OF GWINNETT)

4      Pursuant to Article 10.B of the RULES AND

5  REGULATIONS OF THE BOARD OF COURT REPORTING OF THE

6  JUDICIAL COUNCIL OF GEORGIA, I make the following

7  disclosure:

8      I am a Court Reporter and an independent

9  contractor.

10      I was contacted to provide court reporting

11  services for this deposition. I will not be taking

12  this deposition under any contract that is prohibited

13  by the O.C.G.A. 15-14-37(a) and (b). I have no

14  contract/agreement to provide court reporting services

15  with any party to the case, any counsel in the case.

16      I am not disqualified for interest, personal or

17  financial, under O.C.G.A. 9-11-28(c).

18      I will charge my usual and customary rates to all

19  parties in the case.

20      This the 20th day of November 2024.

21          *Jacqueline Frazier*

22  Jacqueline Frazier

23  Court Reporter

24  Certificate Number 5465-2647-6265-0624

25

---

Page 77

CERTIFICATE

1          CERTIFICATE

2  STATE OF GEORGIA)

3  COUNTY OF GWINNETT)

4

5      I, Jacqueline Frazier, Court Reporter,

6  certify that the foregoing transcript is a true,

7  correct, and complete record of the testimony given by

8  the deponent, LAURA MCCORMICK, who was first duly sworn

9  by me; that I am not a relative, employee, attorney or

10  counsel of any of the parties; am not a relative or

11  attorney or counsel for any parties; nor financially

12  interested in the action; that the said deponent and

13  counsel in the presence of each other and before me did

14  not waive the reading and signing of the deposition;

15  and the original deposition under seal shall be filed

16  with the Court by the attorney taking the deposition.

17      WITNESS my hand and seal at Suwanee,

18  Gwinnett County, Georgia, this the 20th day of November

19  2024.

20          *Jacqueline Frazier*

21  Jacqueline Frazier

22  CR No. 5465-2647-6265-0624

23  CCR Seal

24

25

---

### Exhibits

**McCormick-P2**
  4:8,9 32:19,
  23 42:16

**McCormick-P7**
  4:10 57:5,9

---

### 1

**1**  21:6 23:12

**12:50**  5:4

**1313**  8:13

**15**  62:7

**1s**  21:18

**1st**  21:11,12
  25:23

---

### 2

**2**  20:21 23:9,
  12 32:19,23
  42:16 58:12
  60:25

**20**  5:4

**20-**  17:11

**2022**  20:24

**2023**  9:3,9
  10:2,16
  11:13,16,23
  12:19,24
  13:4 14:2
  15:12,18,19
  16:12 17:11

19:16 20:1,
10,24 22:11,
14 23:12
25:19,23
35:18 39:6
66:11 67:13
71:20

**2024**  5:5

**21**  31:16

**2:24**  74:23

**2nd**  27:18,19
  28:23 29:10,
  18 30:14,22,
  25 31:15
  32:2,11
  33:20,24
  34:4,15
  35:18 36:7
  38:25 39:9
  47:11,13
  48:6 50:17,
  22 51:15
  52:16,24
  53:6,10,11,
  20 54:1,10
  64:3 67:13
  69:6,8 72:6

---

### 3

**3**  23:9,12

**3rd**  27:24
  28:19,23
  29:9 33:18,
  21,24 46:7,
  14,16 50:22

63:22 66:22
67:15,23
69:5,19

---

### 5

**5:47**  33:19

---

### 6

**6th**  35:4
  42:20 43:2,
  11 44:3
  46:11,14
  50:18 65:12
  66:11 67:16

---

### 7

**7**  57:5,9

---

### 8

**80218**  8:15

**87**  10:18

**8:00**  46:11

**8:41**  30:18,
  22,25 32:10
  33:17

**8:45**  34:3

**8th**  50:23
  67:17

---

### A

**a.m.**  33:19
  46:11

**absenteeism**
  60:18

**Absolutely**
  7:19

**accurate**
  34:12,13
  56:22 61:13

**accurately**  6:5
  55:18 56:1
  61:3

**actions**  41:2

**actively**  53:9

**actual**  23:7

**Adam**  16:4

**added**  22:12
  23:8

**address**  8:12,
  16 13:21

**afternoon**
  68:20 69:17,
  25 70:2

**aggressive**
  36:10,11

**agree**  6:15
  56:9

**ahead**  10:6
  17:2 24:8
  27:16 30:10
  32:17 40:6
  44:4 46:3
  49:15 74:17

**alert**  20:6

alerts  19:8,23
  20:2

alias  14:23

allegations
  65:6

answering  18:9
  42:13

answers  72:11,
  25

anymore  25:9

apologies
  38:10

appears  69:15

apply  26:18,
  19

approximately
  13:5

April  71:25

argue  37:13

assertion
  37:25 38:2

assessment
  37:9

assistance
  9:22

Assumes  53:22
  70:8

attention  47:4
  71:24 74:3

attorney  23:18
  68:6

attorney-client
  6:20 23:22

attorneys  6:1,
  23 23:25
  38:18 68:24,
  25 69:19

authorized
  5:11

aware  51:5
  66:19

———————————

           B

back  9:2
  21:8,15
  25:21 34:6
  41:17 42:15
  55:24

backfill
  59:15,18
  71:3

background
  14:17

Barnard  10:1
  16:13 25:4
  27:11,23
  28:5,15 29:4
  43:24 46:20,
  21 47:12
  49:23 62:19
  66:21 67:12,
  14 68:19
  69:15 70:19
  71:25 72:5
  73:2,10

Barnard's  48:3

based  59:20

basically
  18:13

basis  65:4

began  15:18

begin  6:1,16
  15:17

beginning  6:3
  18:23

behavior  47:17

behind-the-
scenes  15:23

believed  39:5

believes  63:16
  65:3

benefits  14:14

bit  6:9 37:1,
  19 43:13
  44:8,13
  58:22

blind  72:21

body  35:1,19

Brain  28:5

break  19:4
  22:16 38:11,
  19 52:4
  62:9,12

Brian  10:1,9
  15:25 16:13,
  18,22 25:4
  27:11,23

28:5,15,18
  29:4 31:15
  32:2 33:10
  34:6 43:24
  46:20,21
  47:12 48:3
  49:23 62:19
  66:20 67:12,
  14 68:18
  69:1,3,4,7,
  15,22 70:19
  71:25 72:5
  73:10

Brian's  29:10

bring  50:6
  74:2

bringing  12:18
  47:3,9

brought  41:12
  47:4 71:24
  72:5

business  9:1,6
  12:4,6,17
  16:25 18:6,8
  22:6,7 62:1
  67:25 68:9

———————————

           C

calendar  9:20
  10:13,17,22
  68:20 69:17

call  12:2
  28:23 35:9,
  12 39:9
  41:2,8,15

42:7 45:17
50:7,8,11
51:24 53:19
54:3,22

calls 6:20
13:5 16:16
23:22 26:15
53:1 70:8

camera 20:6
42:4,22,23,
24 43:7,8,
14,16 44:20
46:25 48:11
49:6 69:11
71:15

cameras 19:9,
23 30:12
31:18

case 8:21
56:4 57:15
60:4

cases 64:15
66:14

categories
60:16

caught 19:19

cc'd 63:14

certify 57:22

change 50:18,
21,25

changed 10:8
15:2 22:6,7

changing 18:7

charge 23:8
25:10

check 10:17
21:11,12
25:7

checked 60:16

chose 22:1
73:24

chosen 62:22,
24

clarify 45:23

clean 52:9

clearer 55:16

client 10:8

close 44:20

coaching 52:22

colloquial
64:23

Colorado 8:11

Comiskey 14:4

commenced 5:4

common 49:6

company 25:21,
24 26:10
57:12 60:17
73:25

compensation
14:10 61:20

completely
55:19 56:2
61:4

Compound 53:3

computer 14:14
15:5

concerned
17:14

concerns 64:1

concluded
74:23

confirm 20:5
28:24

confused 48:7
64:24

considered
27:3

constantly
53:13

contact 42:6,
17 52:21,25
53:14,18

contest 61:19

contests 60:11

context 22:8

continue 20:18

conversations
11:16,21
15:13 16:11
18:3

copied 72:19,
21

correct 8:3,
22,23 11:10,
14 20:25

21:19 33:13
34:12,13
36:5 40:22,
25 46:15
47:13 51:4
52:15 55:1
56:5,19
57:24 59:24,
25 60:22,23
61:1 65:14,
15

correctly 18:9
67:5,8

counsel 5:10

court 5:8,11
6:9 47:20,23

cover 31:15

create 52:10

current 25:20

cushion 59:22

---

### D

Dalton 14:3,7

Dalton's 14:9

Danielle 12:7
13:10 14:3
27:11,23
28:20,21
44:25 45:1,3
50:6,14
67:14,21,25
68:24

Danielle's
28:7

date   57:19

Davis   24:22

day   34:14
  51:24 52:17,
  20

December   22:14
  23:14

decided   46:5

decides   52:20

decision   18:6
  20:19,20
  24:15,20
  25:5,10
  27:5,7,17,
  20,22 28:2,
  3,17 50:17,
  21,24 51:22
  52:17 54:13
  59:19 62:17,
  18,20 63:3
  68:9

decision-maker
  16:18

decision-making
  52:18

decisions
  16:25 27:12
  58:11

defendant   8:21

definition
  64:11

Denver   8:11

department

15:9 26:12

depends   13:24

deposed   5:15

deposition   5:3
  6:14,18 8:3,
  6 19:13,14
  74:22

describe
  25:14,16
  41:1

detail   44:3

detailed   44:12

detailing
  43:12

details   11:14
  44:2,7 64:10

determined
  65:8

device   15:6,13
  20:21 21:6,
  18 22:9
  23:9,12
  24:8,16
  26:23 58:12
  60:24

differently
  8:9

directly   25:8
  58:16

director   14:11

disagree   35:8,
  20 36:19
  37:9,24 38:2

discharge
  60:17

discovery   7:15
  28:16

discuss   9:15
  10:23 12:6,
  14 30:12
  50:22 69:23
  70:2 71:17

discussed
  12:16 16:17
  28:14 71:2

discussing
  11:9 28:18
  42:19 51:19

discussion
  71:14

discussions
  16:16

disrespect
  71:16

disrespectful
  54:1

distracting
  52:8

distraction
  52:10

document   28:25
  44:10 58:21
  59:23 60:2

documentation
  54:17

documented

72:24

documents   7:4,
  6 51:9 55:3,
  13,14 56:7

duly   5:15

dynamics   18:8

---

**E**

e-mail   13:20,
  21 14:14,23
  17:6 28:15,
  22 29:6,8,13
  30:17,20,21,
  24 31:15
  32:10 33:6,
  10,16,17,18
  34:2,6,8,11
  35:4 42:19
  43:1,12
  44:14,23,24
  46:10 50:5,
  12,18 63:14,
  19 64:4
  65:13,20
  66:11 68:18
  69:15 70:16,
  19 71:9
  72:7,14,16,
  19

e-mailed   64:1
  72:4

e-mailing   32:7

e-mails   7:7,14
  15:19 16:5
  17:12

earlier   58:24
  66:14

early   17:11

easier   51:22

eliminate
  16:23 17:19
  20:21 24:16
  26:10,16
  28:24 29:5
  46:5 58:11
  59:16,17
  62:20 68:9,
  10 71:4

eliminated
  17:25 18:2
  21:3,13,14,
  18,23 24:17
  26:13 27:1
  28:6 54:10
  55:14 56:19
  58:4,18
  59:8,10

eliminating
  15:13 50:13,
  15

elimination
  51:10,12,16
  58:3 59:3
  60:24 62:23

eliminations
  22:5

employ   26:6

employed   8:19
  22:2,25

employee   26:12
  37:13 40:1
  41:13 57:15
  59:3,11
  61:19 65:24
  66:14 73:5

employees
  26:6,17
  41:15 64:19

employment
  63:5

encourage
  26:16

end   29:22
  44:17

endeavor   5:24

engineer   15:14
  16:24 20:21
  21:6,18
  23:9,12
  58:12 60:25

engineers
  22:10 24:16
  26:23

entire   9:16
  31:17 63:1

entirety   17:20

entity   60:8

epic   52:1

escalating
  39:5

events   34:10
  37:10 44:8

  45:20,24

everyone's
  41:9

evidence   53:23
  70:8

EXAMINATION
  5:17

examined   5:15

exhibit   32:18,
  19,23 34:3
  42:16 56:11
  57:5,9

expectation
  72:13

expectations
  30:12 31:17

explain   12:1
  19:11

explained   34:8

exploring
  17:22

express   42:5

expressed   29:5

extent   6:20
  23:22

_____

            F
_____

face   34:23
  35:1,11,18
  39:10 41:10
  44:20 45:17

faces   41:9

facet   17:24

factors   54:14

facts   40:8
  53:22 65:7,8
  70:8

failure   60:19

fair   11:24
  13:1 37:5
  71:19

fault   37:2

feature   5:6
  74:19

feel   19:21
  26:17 33:9
  41:2 65:11

Feels   29:20

felt   54:18
  64:5

female   40:1
  41:13,15
  73:5

Feuillebois
  12:9,10
  27:11

figure   65:18

figured   41:25

file   57:16

fill   55:17,18
  56:1,21
  58:25 61:3,
  8,10,12 62:1

filled   51:2

56:15 59:23

**filling**  55:25
56:22 60:1
61:2

**final**  52:1

**find**  25:16
34:19,20

**fine**  16:9
38:13

**finish**  47:21

**fire**  65:18

**fireable**
29:17,21
71:15

**firing**  74:4

**firsthand**
23:15

**five-minute**
62:8,11

**Fletcher**  16:8

**flight**  5:23
49:17

**Flock**  8:20,25
22:2,25
23:11 25:12,
14,20,21,24
65:2 73:23
74:2,7

**focus**  71:14

**follow**  32:16
60:19 63:25

**follow-up**

74:15

**form**  6:19
23:21 25:25
26:14 29:19
31:1 35:10
36:21 40:15
44:9 45:21
48:16,21
51:8,17
53:2,21
54:11 61:6,8
62:2 63:18
66:1 70:7
73:7

**formal**  16:19

**forum**  28:12

**forward**  15:25
71:22,24
72:15

**forwarding**
50:5 72:12

**frame**  34:24
35:12 39:10

**free**  19:21

**Friday**  69:18

**funny**  25:15

**furnished**
57:23

**future**  17:1
42:7 57:15
61:5

---
**G**
---

**general**  11:15,
17,20,23

**Georgia**  57:7,
13,15

**giant**  57:1

**give**  55:5
57:15 59:17,
21 60:7
62:17 63:4
74:14

**Gonzalez**  21:24

**good**  5:19,21
27:2,3

**gotcha**  7:20
9:17 14:15,
24 15:10
29:12 33:5
38:6 43:10
57:20 64:13
67:6 71:19

**Great**  44:6

**grounds**  54:19,
22

**group**  39:9
41:8 45:17
71:6

**groups**  10:8

**growing**  25:21,
24 26:10

**guess**  8:8,9
22:16 28:13

50:3

**guys**  43:4,5,
23

---
**H**
---

**H-E-T-H-E-L**
25:2

**handed**  57:24

**handle**  40:8

**handling**  18:15

**hanging**  53:19
71:16

**happen**  67:22

**happened**  10:11
22:21 26:22,
25 34:18
36:1,4,6
37:25 38:1
48:5 51:15
67:2 68:13
70:15,17

**happening**
12:6,17
15:21 18:7
31:21 53:10
65:9

**harassed**  64:5

**harassment**
40:24 44:19
64:9,11,15,
16,19,20,22,
25 65:3,5,7,
9,21,22,23,
25 66:11,13,

16

**hard**  6:11,13

**heard**  6:8
  19:10,22
  23:13 24:4

**helpful**  17:13

**helps**  60:4

**hereon**  57:24

**Hey**  72:1
  74:3,7

**higher**  18:24

**hiring**  27:8

**history**  44:8

**Hold**  31:12

**hour**  73:18

**HR**  9:6 12:17
  14:13 50:7,8
  62:1 66:20
  67:15,25

**HRS**  56:14

**HRVP**  12:1
  13:4

**human**  9:1
  12:4,5

**hundred**  25:6

**hung**  36:3
  52:25 54:22

————————
**I**
————————

**idea**  73:22

**identification**
  32:24 57:10

**ignore**  55:23

**ignoring**  53:9

**Imagine**  73:4

**impetus**  51:16,
  18

**inaudible**  7:15
  17:4 21:21
  22:17 33:20
  58:23 62:5
  65:2 70:9
  72:12

**incident**  65:1

**including**  13:7
  15:3

**increased**
  26:4,7

**individuals**
  21:22

**information**
  6:21 18:16
  57:23

**inhibited**  6:5

**input**  62:18
  63:4

**instances**  59:4
  61:18

**instructions**
  60:20

**insurance**  7:18
  60:5

**interested**
  26:17,19

**internal**  58:24

**interrupt**
  20:17

**interrupting**
  20:17

**interview**
  26:20

**investigate**
  42:2 64:14
  65:3,6,10
  74:8

**involved**  25:4
  28:20,21

**issue**  18:4
  47:4 52:19
  54:20 74:8

**issues**  9:23
  12:18 51:23
  55:8,9,11
  71:23 72:24
  74:2,4,6

————————
**J**
————————

**Jhostin**  15:22
  27:6 28:17
  33:6 34:14
  35:15 36:23
  44:1 45:14
  47:4 48:4
  49:10,25
  50:6,12 53:8
  55:16 59:21

  63:17 66:21,
  23 70:22
  71:5

**Jhostin's**
  23:18 31:19
  49:24 67:3
  68:10 69:24
  70:21 72:2,
  23

**job**  15:8
  22:15 23:13
  24:2,4,7,8

**jobs**  24:12

**jog**  68:15

**joining**  31:17

**July**  21:12,15
  25:19,23

**June**  21:11

————————
**K**
————————

**Kayla**  14:4,11

**Kayla's**  14:7

**KEATING**  6:19
  16:7 18:25
  23:21 25:25
  26:14 29:19
  31:1,7,12
  33:20 35:10
  36:21 38:10
  40:15 44:9
  45:10,21
  47:25 48:16,
  21,23 49:16
  51:8,17

53:2,21
54:6,11 61:6
62:5,8,11
63:18 66:1,
4,8 70:7
72:7,9 73:7,
17 74:14

**kind** 6:2,10,
13 14:16
25:18 44:2,7
55:4 73:3

**knew** 50:16
56:23

**knowledge**
18:22 19:5,
15 20:11
23:15 53:8
70:17

**Kreamer** 13:12

**Kristina** 13:12
14:3

---

### L

**large** 51:20

**Laura** 5:3,14
37:22 69:3,
4,8,16

**lawsuit** 24:5

**Lawyers** 37:2

**leaders** 9:6

**learn** 65:7

**left** 22:14,22
23:3 33:12

**legal** 64:11
67:25 68:3

**level** 17:15

**limit** 25:18

**list** 57:1

**listed** 58:2

**listened** 19:11

**listening**
37:11,16
41:20

**literally**
73:19

**live** 8:10

**lobby** 73:18

**Lodge** 8:3
9:10 10:12
11:4,9,12
16:15 27:23
36:10,15
37:7,23 39:6
45:5,13
46:15 53:6,9
62:17 63:4,
8,15 67:14
71:23 72:1
73:2,5,10,22

**Lodge's** 12:19,
23 15:1,14
22:12,21
41:1 74:3

**logged** 44:19

**logistics**
28:19 50:22

63:12 69:24
70:23

**long** 7:2

**longer** 73:23

**lot** 37:3

**loud** 37:8

**lowest** 51:12
71:5

**Lukens** 24:22

---

### M

**madam** 5:8 6:9

**made** 20:20
24:15,19
25:10 27:5,
8,12,20,22
41:10 50:16,
21 51:10
52:17 58:11
59:20 62:17,
19 63:3 68:9

**mailed** 57:25

**make** 7:24
20:3 27:4
28:3 37:4
47:20 49:17
67:7 70:24

**makes** 46:18
51:22

**making** 16:25
33:8 41:2

**man** 40:7

**managed** 22:22

**manager** 14:10
27:9 37:14
38:3 52:19
64:20 71:16

**managers** 10:18
54:13

**managing** 23:4,
8

**manner** 51:25

**March** 15:18
16:11 71:25

**mark** 32:19

**marked** 32:24
57:10

**matters** 9:7

**maxim** 39:19

**Mccormick** 5:4,
14,19 37:22
38:16 62:16

**meaning** 22:13

**means** 58:16,
17 64:23

**meant** 64:8

**medium** 28:12

**meet** 9:15,23
12:5 30:16

**meeting** 9:21
10:9,18
11:1,4,8
12:3 28:14
34:17,18,21,

24 35:17
37:7,11,12,
15,23 38:24
42:18 43:4,
6,9 44:14,18
46:7 50:7,8
54:23 55:9
63:21,23
66:20,21,22
67:11,12,13,
15,16,21,24
68:3,7,8,14,
22,23 69:4,
7,18,22,23
70:6,13,15,
17,20 71:2,
10

meetings  7:2,
5,25 9:10,
14,19 10:1,
11,22 11:2,
12 12:15,20,
24 31:18
36:10,16
41:24 43:16,
25 48:12
49:7 66:19
67:1,9,18
68:16

memory  11:11
15:5 32:12
68:15

mentioned  64:3

message  50:6

met  6:23 16:1
27:22 28:18,

23 30:11,13
32:1 34:14,
19 36:6
50:22 63:25
68:25 69:9
70:2

metrics  18:14

Mia  21:24

Michelle  21:24

minimum  9:21

minute  74:14

minutes  7:3
33:12 62:7
69:10

misconduct
60:19

misstates
48:23 53:22
66:2

monitoring
18:6

month  9:22
10:11,16,18
18:7 72:23

monthly  10:9
16:2

months  19:7,25
51:19

morning  5:19

mouth  48:24

move  8:16
31:10 50:3
62:3

multiple  61:14

_____

N

needed  9:22
17:15 62:23
68:10

noise  31:9

norm  48:11

normal  37:4

norms  31:16
42:4 43:15,
20 61:24
69:11

North  8:13

notes  7:24
10:21,22
11:9

notice  57:8
59:9,19

noticed  56:6

November  5:4
9:3,9 10:2
13:4 14:2
15:12 18:23
19:3,6,16,22
20:1,6,10,24
22:11 23:12
27:18,19,24
29:9,10
30:14,22,25
31:15 32:2,
11 33:18,20,
21,24 34:4,
15 35:18

36:7 39:9
42:20 43:2,
11 44:3
46:7,11,14,
16 47:11,13
48:6 51:15
52:16,24
53:6,10,11,
20 54:1,10
63:22 65:12
66:11,22
67:13,15,16,
17,23 69:19
71:20 72:6

number  26:6

_____

O

Object  6:19
18:25 23:21
25:25 26:14
29:19 31:1
35:10 36:21
40:15 44:9
45:21 48:16,
21 51:8,17
53:2,21
54:11 61:6
63:18 66:1
70:7 73:7

obsession
44:19

occurred  67:12

occurrence
19:6

October  10:11,

16 11:13,16,
23 12:19,24

odd 37:3

offense 29:17,
21 71:15

offer 26:11
59:3,6,7,13

offering 64:9

Omar 8:3
9:10,21
10:12 11:4,8
12:19,23
15:1 16:15,
17 19:11
22:12,21
27:23 28:18,
22 34:25
35:1,3,17,25
36:3,6,24
37:23 39:12,
20,25 41:24
42:6,10
44:18 45:13,
20 52:22
53:6,12
54:2,23
67:14 69:23
72:22 73:10

Omar's 19:14

one-on-one
35:25 36:3,5
37:15 39:11,
16 44:18
54:23

online 23:11

opening 26:11,
18

operations
14:11,12,13

opinion 30:23

opportunity
73:25

option 60:15

options 17:22
56:25

order 27:3,4
67:11

original 72:19

Orleansy 12:12

outlaying 39:4

outlined 66:25

outlines 44:16

outlining
28:22

_____

P

P-E-T-H-T-E-L
25:3

p.m. 5:4
74:23

paperwork 7:22
51:3,6 55:17
56:1

part 15:20
16:15 23:14
24:2 54:9,25
62:25 68:12

71:13

participate
51:24

participating
52:7

participation
15:12

partner 9:1,6
62:1 67:25

partners 12:4

party 61:4

past 58:5
59:20

Patrick 31:2,7
45:11 48:1

Paul 16:8
23:3 24:24
25:9

pay 59:3,6,7,
17,21

pending 31:8

people 13:4,17
14:11,12,22,
23 17:24
24:19 27:8
28:11 37:4
49:11 52:9
54:4

people@
flocksafety.com
13:21

percent 25:6

performance
9:16,23
10:15 27:3
31:20,22
51:7,23
52:1,19
54:17,19
55:7,9,11,15
57:2 58:5
59:4,12,14,
16,20 60:18
62:25 68:12
71:23 72:2,
23,24

performer
51:13 71:6

period 9:9
25:19

person 8:9
13:11 22:24
23:7 28:11
47:21 50:1
52:7 60:5
70:16

personal 42:11

perspective
34:20

pervasive
64:12,15,17
65:1,4

Pethel 24:24
25:1

phrased 35:3

pick 55:12
56:24 57:1

61:14,15

picking 20:2

Plaintiff's
32:23 57:9

planned 50:23

planning 15:23
50:13,14
65:15

plans 8:16

plenty 54:19

point 10:18
16:16 20:20
28:20 36:1,5
40:11 42:7
45:19 52:19

policies 33:8
42:22,23,25
43:7,9,15
46:25

policy 60:17

poor 55:15
58:5 60:18
68:12

portion 58:16

posit 39:18

position 8:25
21:23 23:11
24:12 26:10,
11,12 28:6,
24 29:5 46:5
50:13 51:10,
12,16 54:9
55:15 56:19

58:3,4,17
59:2,8,15,18
60:24 62:20,
23 68:10,11
71:3,4,7

positions
21:2,5,13,
14,17 22:1
24:12,17
26:16,18,23
58:12

possibly 27:23

post 23:11
24:8

posted 23:13
24:4

posting 24:12

postings 24:8

practice 61:24

preparation
70:5

prepare 6:17

present 5:11
8:2,5

prior 48:23
53:22 66:2

privilege
23:23

privileged
6:21

problem 29:22
39:5

problems 51:7
52:10 72:2

process 26:20
27:4

produced 28:16
33:2

producing
51:21

production
7:14 15:20

progress 18:2

promptly 44:18

provided 7:6,
14

pull 42:15
56:12 68:14,
15

pulled 7:18
29:1

pulling 52:8
68:17

Purely 59:14

purpose 9:13
60:1

put 34:23
35:1,11,18
39:9 41:9
45:16 55:13
56:18 57:19
61:23

Putting 48:24

**Q**

qualified
26:17

question 18:9,
25 19:20
20:10 31:8
37:1,19,21
45:11 46:19
48:1,25
49:2,3,23
53:4 54:8
61:21,22
63:2 65:2
66:5

questions 6:2
37:3 42:11
53:13 73:20
74:16

quick 38:11,
12 58:7
62:9,11

quickly 5:23
55:4

Quinones 7:22
8:6 27:6
29:17 30:24
32:6 35:6,16
36:7,19
37:6,22
38:25 41:12
42:18 45:6,
14 46:22
48:4 51:3,6
53:8 55:1,7
56:16 59:7,

21 62:22
63:22 65:12
66:10,21
67:11,17
71:23 73:4

**Quinones's**
62:16 63:3,5
66:23 67:19
68:5 70:5

---

### R

**Ragans** 14:4

**raised** 36:15,
24 37:14,23
38:3

**raising** 38:5

**ran** 7:17

**reach** 54:13

**reached** 46:24

**reaction** 41:11

**read** 30:3
44:4 58:17

**real** 38:12
58:7 62:9

**reason** 6:4
22:4 35:8,19
36:18 37:8,
9,24 47:3,8
51:11 54:9,
25 55:12,13
56:18 58:2
60:5,17
61:15,23

**reasoning** 70:4

**reasons** 22:6
59:12,14
61:14 70:3

**recall** 10:10
12:21,22,25
14:22,25
15:3 17:13
18:5 22:12
29:4 32:3
35:2,3 36:8,
17 37:13
38:7 39:4,13
46:23 67:19
68:8 69:9
71:18 73:11

**received** 28:22
54:17 63:19

**receiving**
60:12 61:19

**recess** 38:14
62:14

**recognize**
56:13 57:6

**recollection**
37:10,16

**recording** 5:6
74:19

**records** 21:8,
12 23:5 60:4
61:20

**recruiting**
24:9,11

**recurring**

11:2,3,8

**reduce** 17:17

**reference** 9:20
10:13

**referencing**
13:25

**refresh** 32:12

**refreshing**
15:4

**refuse** 52:25

**refusing** 51:24
52:21

**regular** 9:10,
25 68:3

**REID** 5:8,18
6:24 16:4,9,
14 19:2
23:24 26:2,
21 29:24
31:4,11,23
32:25 33:23
35:13 36:25
38:13,15
40:16 44:11
45:12,18,25
47:22 48:2,
8,18 49:1,8,
21 51:14
52:3 53:5,
15,24 54:7,
15 57:11
61:9 62:6,
10,15 63:20
66:3,6,9
70:12 72:8,

17 73:9,19
74:1,12,17

**relate** 47:8

**related** 66:23

**relayed** 46:14

**relevant** 15:21
16:6

**remember** 10:14
11:15,18,20,
22 12:18
13:1 15:11
17:10 32:9
35:23,24
36:2,13,14,
23,24 46:4
69:4 73:12

**remnants** 22:13

**remotely** 5:12

**repeat** 45:10
47:25

**rephrase** 19:21
20:4 66:4

**replied** 30:11

**replying** 72:15

**report** 57:24

**reporter** 5:8,
11 6:9
47:20,23

**reporting**
45:6,14
46:22

**reports** 65:3,4
66:23 67:19

requests   19:8
   41:6

required   57:14

resource   12:4

resources   9:1
   12:5

respond   44:23

responded   43:1

response   28:7
   30:24 41:16
   44:24 47:19
   48:3 49:4

responsibilities
   23:14

responsibility
   24:7

responsible
   13:16 24:11
   25:8

restroom   38:12

Revenues   26:4

review   7:4,7,
   21

reviewing
   70:16

rewards   14:10

role   9:5
   59:18

room   31:10

---

**S**

---

Safety   8:20,25

saga   52:2

scope   17:3

scratch   30:22

screen   8:9

script   55:20
   58:7,8

search   7:17

select   71:5

selected   26:20
   51:11 68:11

semantics
   55:12

send   42:22

sending   70:18

sends   57:13

Senior   9:1

sense   37:4
   46:18 70:24

separate   28:16
   59:4,16

separated
   57:23 60:6
   65:16

separating
   65:15

separation
   51:2,5
   55:13,17,25

---

57:7 58:3
   59:3,6,7,21
   67:3 69:24

September   9:9
   10:1 67:13
   72:1

sequential
   67:10

set   10:23

severance
   59:13

severe   64:11,
   15,16,25
   65:4

sexual   40:18,
   21,23

Sharp   21:24

should've
   55:15

show   28:25

sic   25:3

sign   57:22

signed   57:17

single   16:1

situation   33:8
   40:8 72:20

size   17:3,9,
   10,17 18:1,
   17

skills   17:15

skip   56:11
   73:15

---

smaller   62:24

sort   39:19

sounds   12:12
   67:1

speak   6:9
   51:9

speaks   44:10

specific   20:9
   24:13 37:9,
   20

specifically
   11:18 17:23
   19:15 20:10
   35:20 71:12

specifics
   12:21

speculate   41:7

speculation
   26:15 29:20
   66:2 70:9

spike   20:6

standing   27:2

start   15:17
   28:18 53:10

start-up
   25:13,14,16,
   17

started   52:25
   53:9

starting   19:6,
   24 39:6

state   54:2

57:7,13,14

stay   17:25

stipulated
  5:10

story   65:19,
  20

straw   52:1

Street   8:13

stressful
  44:21

structure
  15:24

stuff   14:16
  73:16

summer   21:9,10
  39:6

supervisory
  60:19

support   15:6,
  14 20:21
  21:18 22:10
  23:9,12
  24:16 26:23
  58:12 60:25

supported
  27:17 28:9,
  17

swear   5:9,12

switch   33:13

sworn   5:13,15

system   15:5
  56:14 58:25

systems   14:14


                T

taking   6:10
  18:16

talk   6:12
  16:7 23:19
  24:1 30:14
  33:7 35:5
  38:16 39:11
  43:14 44:24
  45:5,8 50:8
  63:8 65:18
  68:2 69:10
  70:20 71:8

talked   11:19
  16:1 24:17
  32:9 39:8
  43:8,14,15,
  25 63:6,12
  67:2,9
  69:12,13

talking   10:14
  20:18 29:12
  30:13 35:23
  38:24 43:4,
  5,23 47:2,21
  50:17 55:12
  68:22 70:3,
  19 72:22

tardiness
  60:19

team   9:15,16,
  23 12:19,23
  15:1,6,14,24

16:24 17:1,
  9,10,16,17,
  19,24,25
  18:1,8,18,23
  19:7,23
  20:1,21 21:3
  22:12,21,22
  23:8,9 24:9,
  11,19,21
  25:8,10
  31:17 42:4
  43:15,25
  46:25 48:11
  49:6,7
  51:13,20,24
  52:7,11
  54:22 58:13
  62:23 63:1
  68:1,11

team's   10:15
  18:13 69:11

teammates
  51:11,25
  52:6

telling   36:14
  48:4 73:11

tend   46:16

term   64:23
  73:3

terminate
  27:6,7

terminated
  29:18 55:1
  59:12

terminating

30:24

termination
  55:8 56:18
  62:17,18
  63:3,22
  66:19,24
  67:16,20
  68:6 70:5,
  22,23

termination-
related   7:22

terms   16:23
  17:9 53:17

testified
  35:7,16

testifying   6:5

testimony
  48:24 53:22
  66:2

thing   7:11
  55:4 59:1

things   6:11
  13:17 31:14
  43:5 53:17,
  20,25 65:24
  70:20

thinking   74:3

third-party
  60:8

Thirty   7:3

thoughts   18:3,
  4 19:20
  29:16 30:6
  63:8

thread   72:14,
  15

Thursday   30:25
  32:10

time   9:9,11
  10:15 13:3
  14:25 15:4
  16:1 17:12
  19:1 21:2
  23:17 32:7
  36:6 37:3
  49:16,22
  55:4 68:19
  69:16

timeframe
  13:24

timeline   32:16
  34:10 45:20,
  22,24

times   6:25
  15:2 55:10
  71:22

timestamps
  34:10

title   9:2
  13:13 14:8,9
  15:8

titles   14:6

today   5:20,24
  6:6,15,18
  19:25 25:20,
  24 50:7

told   23:16
  34:23,25

35:7,8,17,18
  37:7,22,25
  42:3 44:13
  46:6 47:2,
  10,12,16
  50:14 54:4,6
  55:8,10
  64:4,20 74:7

Tom   24:24,25

top   33:3

topics   11:17

total   14:10

totally   37:5

tough   58:11

trained   55:18
  56:1 61:3,10

training   61:7,
  16

treating   51:25
  52:5

trouble   21:20

true   46:18
  57:24

truthfully   6:5

turned   5:7
  74:20

turning   52:19

typed   58:10,
  13,15

typically
  19:23 26:9
  55:14

typo   56:6

---

**U**

uh-huh   34:1
  71:11

uncomfortable
  33:9 34:20
  41:3,4,5,8,
  10 42:13
  44:21 45:16
  47:9,17
  48:5,10
  49:10,12,24,
  25 50:1,2
  53:18

understand
  5:23 31:16
  41:14 49:24
  66:25 67:5,7

understanding
  49:20

unemployment
  57:16 60:5,
  12 61:19

unexcused
  60:18

unusual   19:6

upcoming   35:25

---

**V**

vendor   60:4

verbal   44:13

videoconference

5:3 74:22

Violation
  60:17

voice   36:15,
  24 37:14,23
  38:3,5

volume   20:6,13

VP   12:5,7
  66:20 67:15

---

**W**

Wait   74:14

waited   46:9

wanted   28:5,16
  31:14,16,19,
  21 35:1
  56:21 63:4

wanting   16:23
  29:5 42:6

webcam   33:7

weekends   46:17

weekly   9:24

weeks   12:3,5
  68:4

weigh   49:11

weight   52:8

weird   41:6

Williams   8:13

winter   19:7,24

woman   40:3,8

**wondering**   33:7

**word**   36:11
  40:17,21,23
  64:19,20
  65:21,22,23
  66:10

**words**   48:24
  58:11

**work**   9:16
  17:3,15
  19:24 31:22
  46:17 51:21
  52:9 57:23
  63:15,16

**worker**   57:22,
  25

**workload**   18:24

**worries**   20:16
  31:11

**worst**   62:25

**worth**   65:11

**would've**   55:16
  58:13,15

**write**   58:8

**written**   73:20

**wrong**   57:19

**wrote**   51:6
  60:24

————————————
         **Y**
————————————

**y'all**   12:14
  64:14

**year**   15:3
  20:7 21:17
  24:18 27:1
  31:20 52:23
  54:18 72:23

**years**   8:17
  15:2

**Yup**   29:25
  33:11 56:20

————————————
         **Z**
————————————

**Zach**   23:3
  24:24 25:9

**ZIP**   8:14

**zoom**   5:6 6:14
  35:12 41:9,
  10 43:13
  74:19

**<u>Omar</u>**: Thank you for meeting with us today.  We've made some tough business decisions to eliminate one of the Device Support Engineer II positions on our team.  That means that your position is being eliminated, and that today will be your last day working at Flock.  You will be offered a severance of 8 weeks of pay and Laura is here to tell you more about the severance and benefits that will be offered.

**<u>Laura</u>**:
I will send an email today to your personal email address with all of these details stated in writing. Please verify that your personal email address is: <mark>jhostinn1239@gmail.com</mark>

You will be paid your last regular paycheck for November 1st through November 8th via direct deposit, on or before November 10th.

Regarding the severance, I will send a separation agreement today via DocuSign to your personal email address.  The separation agreement will contain an offer of 8 weeks of pay (totaling $<mark>12,104.00</mark> minus applicable taxes). You will have 7 days to decide to sign the agreement.  If you sign the agreement, we must hold it for 7 days after, during which you can revoke the agreement.  Payment will be made as soon possible after the 7 day period lapses.  Your medical insurance will continue through the month of November, and Flock will also pay for 1 additional month of medical insurance through COBRA, so that you will have medical coverage through December.

IT will send you a box to return your laptop.  <mark>Please verify your physical address: 1310 Beaver Creek Road Alpharetta, GA 30022</mark>

Do you have any questions?

Thank you and we wish you well.

Meeting Link:

https://flocksafety.zoom.us/j/81374788995



EXHIBIT

McCormick-P2

Huseby.com



State of Georgia
Department of Labor



**EXHIBIT**

McCormick-P7

Huseby.com

## SEPARATION NOTICE

1. Employee's Name ___Jhostin Nunez___    2. SSN ___XXX-XX-4015___

   a. State any other name(s) under which employee worked. _____

3. Period of Last Employment: From ___06/21/2021___ To ___11/8/2023___

4. REASON FOR SEPARATION:

   a. LACK OF WORK ☐

   b. If for other than lack of work, state fully and clearly the circumstances of the separation:

     Position elimination

5. Employee received payment for: (Severance Pay, Separation Pay, Wages-In-Lieu of Notice, bonus, profit sharing, etc.)
   (DO NOT include vacation pay or earned wages)

   ___Separation Pay___ in the amount of $ ___12,104.00.00___ for period from ___November 9, 2023___ to ___January 4, 2024___
      (type of payment)

   Date above payment(s) was/will be issued to employee ___on or before 11/22/23___

   IF EMPLOYEE RETIRED, furnish amount of retirement pay and what percentage of contributions were paid by the employer.
   _____ per month _____ of contributions paid by employer

6. Did this employee earn at least $7,300.00 in your employ? YES ☑ NO ☐ If NO, how much? $_____
                          Average Weekly Wage _____

Employer's Name ___Flock Safety, Inc___

Address ___1170 Howell Mill Rd NW UNIT 210,___
          (Street or RFD)

City ___Atlanta___ State ___GA___ | ___30318___
                          | ZIP Code

Employer's Telephone No. ___866-901-1781___
      (Area Code)     (Number)

**Ga. D. O. L. Account Number** ___359208-06___
This is the number assigned to the employer by Georgia Department of Labor.

I CERTIFY that the above worker has been separated from work and the information furnished hereon is true and correct. This report has been handed to or mailed to the worker.

*Laura McCormick*

Signature of Official, Employee of the Employer
or authorized agent for the employer

Sr. HR Business Partner

Title of Person Signing

7/5/2023

Date Completed and Released to Employee

### NOTICE TO EMPLOYER

At the time of separation, you are required by the Employment Security Law, OCGA Section 34-8-190(c), to provide the employee with this document, properly executed, giving the reasons for separation. If you subsequently receive a request for the same information on a DOL-1199FF, you may attach a copy of this form (DOL-800) as a part of your response.

### NOTICE TO EMPLOYEE
**OCGA SECTION 34-8-190(c) OF THE EMPLOYMENT SECURITY LAW REQUIRES THAT YOU TAKE THIS NOTICE TO THE GEORGIA DEPARTMENT OF LABOR FIELD SERVICE OFFICE IF YOU FILE A CLAIM FOR UNEMPLOYMENT INSURANCE BENEFITS.**

CONFIDENTIAL    **SEE REVERSE SIDE FOR ADDITIONAL INFORMATION.**    FLOCK 000017

DOL-800 (R-6/19)