IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JHOSTIN QUINONES,
     Plaintiff,

v.

FLOCK GROUP, INC.,
     Defendant.

CIVIL ACTION NO.

1:24-cv-1319-TWT-CMS

## **FINAL REPORT AND RECOMMENDATION**

Plaintiff Jhostin Quinones sued Defendant Flock Group, Inc. ("Flock"), his former employer, alleging that Flock violated Title VII of the Civil Rights Act of 1964 ("Title VII") by terminating his employment in retaliation for his complaints about his supervisor's purported sexual harassment. [Doc. 1, Compl.]. Pending before the Court is Flock's Motion for Summary Judgment. [Doc. 37]. The parties have fully briefed the motion. [Doc. 37-1; Doc. 57; Doc. 59]. For the reasons below, I will recommend that the motion for summary judgment be granted.

# I.   BACKGROUND

## A.   Facts[1]

### 1.   The Parties and Quinones' Employment with Flock

Flock is a nationwide company, and its mission is to eliminate crime by collecting evidence, usually via cameras. [Doc. 45-1, Dep. of Omar Lodge "Lodge Dep." at 10–11, 14]. Flock has cameras in locations across the United States. [*Id.* at 14].

In June 2021, Quinones began working for Flock as a QA Deployment Engineer on the device support production team. [Lodge Dep. at 11, Doc. 44-1 at 62–64; Doc. 44-1, Dep. of Jhostin Quinones "Quinones Dep." at 47, 51]. The device support production team was responsible for ensuring that the cameras or devices that Flock supplied in the field were collecting evidence. [Lodge Dep. at 12–13]. The device support production team had responsibility for monitoring cameras across the United States, including checking the cameras to determine whether issues could be fixed remotely. [*Id.* at 12–14].

---

[1] For purposes of this Report and Recommendation, citations to the record are made to the CM/ECF heading at the top of the page cited, except for depositions, where the citations are to the page number of the hard copy deposition transcript.

Omar Lodge was Quinones's supervisor. [Quinones Dep. at 52]. Lodge reported to Brian Barnard. [Lodge Dep. at 31].

Quinones's job title later changed to Device Support Engineer II. [Quinones Dep. at 53; Lodge Dep. at 24]. After his first three months of employment with Flock, Quinones worked remotely. [Quinones Dep. at 54–55]. During Quinones's employment with Flock, his group held group meetings via video calls almost every day. [*Id.* at 36–37]. Quinones usually had individual meetings with Lodge every week via video call. [*Id.* at 37].

According to Flock, Quinones had conduct and performance issues throughout his employment with Flock. [Lodge Dep. at 45–46]. Quinones, however, believes that beginning in March 2022, Lodge fabricated issues with his performance in retaliation for not acquiescing to what Quinones characterizes as sexual harassment by Lodge. [Quinones Dep. at 94–95, 97].

### 2. Lodge's Purported Conduct

### a. Video Calls

Quinones testified that around March 2023, Lodge began "making weird requests" to Quinones. [Quinones Dep. at 38–39]. According to Quinones, Lodge told Quinones that he wanted to see Quinones's face during video calls, while smiling at him "oddly." [*Id.* at 164–65, 168]. Quinones testified that based on

Lodge's tone, he perceived that Lodge enjoyed looking at his face "in a sexual manner." [*Id.* at 164–65].

According to Quinones, Lodge was "particularly obsessed with [Quinones's] personal camera presence," and Quinones "found [Lodge's] obsession bizarre." [Doc. 57-1 at 4–9, Decl. of Jhostin Quinones "Quinones Decl." ¶ 14; Quinones Dep. at 39, 141–42]. Quinones recalled that other employees, including Avia Smith, a female employee, were permitted to have their cameras off or not have their face visible. [Quinones Decl. ¶¶ 14–15]. Although Lodge required Quinones to have his camera on and have his face visible, he never made the same requests to other employees, including Smith. [*Id.*]. Later, Lodge also required Quinones to have his face close to the camera and clearly visible. [*Id.*].

Lodge also later asked Quinones to move to specific positions on camera, often saying that he wanted Quinones to do so "because he 'really wanted to see [Quinones's] face.'" [Quinones Decl. ¶ 16; Quinones Dep. at 44]. According to Quinones, Lodge asked those questions in "odd tones that [Quinones] perceived to be flirtatious and creepy." [Quinones Decl. ¶ 16]. Quinones recalls that as time passed, Lodge became more insistent "about wanting to see [Quinones's] face on camera." [*Id.* ¶ 17; *see also* Quinones Dep. at 45 (stating that Lodge began

micromanaging his movements)]. Quinones testified that he "perceived this as a further escalation of [Lodge's] sexual harassment." [Quinones Decl. ¶ 16].

Lodge's requests occurred approximately every other meeting. [Quinones Dep. at 39–40]. Lodge did not request to see anything other than Quinones's face and body in frame. [*Id.* at 143].

### b.    Questions

Quinones testified that about once a month, Lodge asked him during one-on-one conversations if he was married or seeing anyone, inquired about Quinones's family, or asked what Quinones had done over the weekend. [Quinones Dep. at 46, 93–94, 117–18; Quinones Decl. ¶ 13]. Quinones was uncomfortable with those questions. [Quinones Dep. at 46, 94]. Around June 2022, Quinones asked Lodge to stop asking questions and told Lodge that he did not "feel comfortable about [his] personal life being at work." [*Id.* at 94]. Quinones recalled that Lodge responded, "Well, you need to relate more to the team, and you have to be more open towards the team." [*Id.*]. Quinones "did not feel comfortable" with how Lodge "was phrasing that." [*Id.*]. Quinones testified that when he told Lodge to stop, Lodge "would try to punish [him]," would "back off, and then he [would] try to ask questions again." [*Id.* at 94]. Quinones "believed [Lodge] was asking those

questions to flirt with [Quinones] and to see if [Quinones] was romantically available to him." [Quinones Decl. ¶ 13].

During group meetings, Lodge asked other team members about their families and personal lives. [Quinones Dep. at 116–17]. According to Quinones, however, Lodge "was more personal with [him] than with the other team members." [*Id.* at 116].

### c. Purported Threats or Reprimands

According to Quinones, when he rejected what he perceived as Lodge's sexual demands and advances or refused to answer questions about his romantic life, Lodge began to write him up and threaten his job. [Quinones Decl. ¶¶ 5–7]. Quinones stated that Lodge occasionally told Quinones that many people would like to have Quinones's job and that Quinones was easily replaceable. [Quinones Dep. at 41, 104]. Quinones also testified that Lodge told him, "[Y]ou don't do what I tell you, you won't be long with this company." [*Id.* at 104]. Quinones believed that Lodge was trying to punish him by (1) failing to answer questions, (2) giving him conflicting information or orders, (3) placing him in situations where he could not meet metrics, and (4) writing him up without telling the whole story or fabricating facts. [Quinones Dep. at 94–95, 97, 104–05; Quinones Decl. ¶¶ 6, 8]. Quinones testified that during meetings that occurred about once each month, Lodge

purposefully attempted to make Quinones look bad in front of others to make it seem that Quinones was not performing well. [Quinones Dep. at 94–95, 97, 104–05]. Quinones believes that Lodge did these things to get Quinones to acquiesce to what Quinones characterizes as "sexual demands" and "to surreptitiously inform" Quinones that these actions were tied to Quinones's rejection of Lodge's demands. [Quinones Decl. ¶ 7].

Quinones believes that the writeups and reprimands that he received were connected to his rejection of what he characterizes as Lodge's "sexual demands and advances." [Quinones Decl. ¶ 7]. According to Quinones, he generally received verbal reprimands right after Lodge threatened him. [*Id.*]. Quinones typically received writeups "within two weeks of the threat being made." [*Id.*].

Quinones states that he was reprimanded for using casual speech when talking with Lodge, but other employees and Lodge used the same type of speech without receiving a reprimand. [Quinones Decl. ¶ 9]. Quinones testified that although Lodge wrote him up for working during non-traditional hours, another employee on the team, "Sammer," routinely worked odd hours and was not written up. [*Id.* ¶¶ 10–11].

### 4. Disciplinary Actions and Warnings

#### a. October 13, 2022, Verbal Warning

On October 13, 2022, Lodge gave Quinones a verbal warning. [Doc. 44-1 at 124–25]. The Corrective Action form relating to the verbal warning stated that: (1) Quinones's work output did not meet expectations, (2) Quinones failed to reply to an email requesting a response, and (3) Quinones failed to comply with workflow procedures. [*Id.* at 124]. Quinones was directed to: (1) respond to emails within twenty-four hours and to Slack messages within two hours, (2) consistently improve his work output; (3) respond "to all QA Deployment Engineer Salesforce 'mentions'" within two hours, and (4) be generally available for forty hours or work during normal working hours and to communicate ahead of time when he would not be available. [*Id.*]. The Corrective Action form stated, "The unacceptable behaviors addressed above must cease immediately. Failure to sustain improvement may result in further action, up to and including termination of employment." [*Id.*]. Quinones signed the Corrective Action form, acknowledging that he had received and reviewed it. [*Id.* at 125].

#### b. March 7, 2023, Email Reprimand

On March 7, 2023, Lodge reprimanded Quinones via email. [Doc. 51, Def.'s Statement of Material Facts ("SMF") ¶ 5; Doc. 56-2, Pl.'s Resp. SMF ("RSMF")

¶ 5].  The March 7, 2023, email listed Quinones's alleged shortcomings as (1) engaging in an unacceptable Slack exchange on March 2, 2023, (2) having unwarranted truck rolls that exceeded the acceptable five percent threshold, and (3) not assigning DVC codes to cases moved to Tier 3.  [Doc. 44-1 at 129].  Quinones contends that the email was in retaliation for Quinones's refusal to submit to Lodge's purported sexual harassment.  [RSMF ¶ 5].  He also testified that other employees used casual language and were not reprimanded.  [Quinones Decl. ¶ 9].

### c.    March 20, 2023, Email Exchange

On March 20, 2023, Lodge emailed Quinones (following Quinones's week-long vacation), copying Brian Barnard and blind carbon copying Laura McCormick, a Senior Human Resources Business Partner for Flock.  [SMF ¶ 6; RSMF ¶ 6].  The email directed Quinones to, among other things, "[a]ssign correct DVC codes to all 89 of your unmarked cases moved to T3."  [Doc. 144-1 at 143].  Quinones responded:

> Attached is a picture of a message sent on march 10th saying that there will be a discussion about cleaning up dvc codes that were untagged.  I assumed that these[] cases were off my hands.  It is March 20th, and these cases were not even touched.  If [I] was told to take on this task before going on vacation, I would have done that.
>
> I am not sure if these cases were changed during my vacation.  So I cannot give a promise that 89 cases will be finished today.

[*Id.*].  Lodge replied:

This slack conversation was with regards to irStatus specifically, an issue that does not have a DVC code. You went through T1 DPIs nighttime Blurry plates + bright nighttime plates which would fall into the category of a DVC code that already exists. I sent you an email before you left for holidays expecting you to step [in] and fix this, you did not. Today I am explicitly asking for you to assign the proper DVC codes for the cases you moved to T3 as the rest of the team has been doing.

[*Id.*]. Quinones does not dispute receiving this email, but he denies having performance issues. [RSMF ¶ 6]. Quinones testified at his deposition that he corrected the DVC codes before going on vacation, but the system sometimes restored codes automatically. [Quinones Dep. at 91–92].

### d. August 9, 2023, Email

On August 9, 2023, Lodge sent an email to Quinones discussing Quinones's behavior and work performance. [Doc. 44-1 at 135]. That email listed behaviors by Quinones that Lodge felt did "not align with the expected conduct within our team," including (1) "nonchalantly" responding to Lodge's concerns about being unable to see Quinones during a July 27, 2023, one-on-one meeting; (2) failing to acknowledge Slack requests promptly; (3) engaging casually on Slack; and (4) having low work output on the morning of August 9, 2023. [*Id.*]. According to Quinones, other employees on his team, including Lodge, used casual speech with

each other on Slack, and the other employees were not reprimanded. [Quinones Decl. ¶ 9].

### e. September 19, 2023, Email

On September 19, 2023, Lodge sent an email to Quinones stating, "I see that you are online however I am not seeing any activity from you even though we have plenty to do. Your first modified case was at 9:14 AM and the last case touched was 2:41 PM and it is now 5:30 PM." [Doc. 44-1 at 136]. The email also provided, "Likewise for cases closed your first closed case was at 9:36 AM and your last closed case was at 2:41 PM[.]" [*Id.*]. On September 22, 2023, Lodge emailed Quinones, requesting a response to his September 19 email. [*Id.* at 137]. Quinones responded, "I worked some cases at night to being able to adjust settings. Closing night time quality cases during the night helps see adjustments faster." [*Id.* at 138]. Quinones claims that the team never had a set schedule and that another employee on the team, "Sammer," routinely worked odd hours and was never written up or warned about this behavior. [Quinones Decl. ¶¶ 10–11].

### 5. Discussions About Eliminating Quinones's Position

In March 2023, as part of Flock's ongoing strategy to reduce costs, Barnard, Lodge, McCormick, and Danielle Feuillebois with HR began discussing eliminating a position from the Device Support Team. [SMF ¶ 7; RSMF ¶ 7]. In March 2023,

Lodge sent McCormick an email recommending Quinones's termination based on his purportedly low work output and stating that Quinones's position was no longer needed. [SMF ¶ 8; RSMF ¶ 8]. In April 2023, Lodge sent McCormick another email suggesting moving forward with Quinones's termination. [SMF ¶ 9; RSMF ¶ 9]. Quinones does not dispute that Lodge emailed McCormick recommending his termination, but he disputes that his performance was deficient. [RSMF ¶¶ 8–9].

### 6. The Events of November 2, 2023

#### a. Group Meeting

On November 2, 2023, Lodge held a group morning sync meeting via video call. [Quinones Dep. at 119]. All of the participants had their cameras turned on during that meeting, including Quinones. [*Id.* at 119–20]. According to Quinones, he "was a little bit off center but [his] face was visible," and he was "in frame." [*Id.*; *see also id.* at 162–63 (testifying that he was on the left corner of the screen, but his face was still in frame)].[2] No other employees on the call were out of frame. [*Id.* at 120]. According to Quinones, Lodge could see him. [*Id.*].

---

[2] Lodge recalled that when the meeting began, Quinones was not in frame, and only his shoulder was visible. [Lodge Dep. at 33]. At the summary judgment stage, however, the Court must view the evidence in the light most favorable to Quinones. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970).

During the November 2, 2023, group call, Lodge told Quinones, "I really want to see your face. Can you get closer?" [Quinones Dep. at 121]. Quinones testified that Lodge's tone made him feel uncomfortable, and based on Lodge's previous comments and questions, he felt that Lodge was making sexual requests of him and was trying to look at his body in a "weird" way. [*Id.* at 121, 125–26; Quinones Decl. ¶¶ 3, 12, 18].

Quinones asked Lodge, "[H]ow does my face and body being two inches from the center of the camera or where you tell me to affect the meeting of the team or the productivity of the team?" [Quinones Dep. at 127; *see also id.* at 131 (stating that Quinones asked Lodge, "Can you please explain to me how the productivity of the team is affected by . . . my face [being] not fully on camera?")]. According to Quinones, Lodge responded, "You put your face and body where I tell you." [*Id.*]. Quinones then logged off the call. [*Id.* at 127–28]. According to Quinones, he hung up because (1) he did not feel comfortable with Lodge's answer, (2) he feared that the situation would keep escalating, (3) he felt that he was being sexually harassed, and (4) he was trying to rebuff and oppose what he believed were sexual advances and requests. [*Id.* at 128; Quinones Decl. ¶ 4].

No other participants in the November 2, 2023, meeting complained about Lodge's requests concerning Quinones's camera presence. [SMF ¶ 28; RSMF ¶ 28].

The other participants testified that they did not perceive Lodge's requests as being strange or sexual in nature. [SMF ¶ 29; RSMF ¶ 29].

### b. Quinones Receives an Email Reprimand and Complains to HR

After the November 2 group call, Quinones received an email reprimand from Lodge relating to Quinones's behavior on that call. [Quinones Dep. at 129; Doc. 44-1 at 139]. After Quinones received Lodge's November 2 email reprimand, he emailed HR, stating, "I was wondering IF I can talk to somebody about webcam policies as I have a situation that is making me feel uncomfortable." [Quinones Dep. at 134; Doc. 44-1 at 140]. Quinones's email did not mention Quinones's belief that Lodge's actions were sexual in nature. [Quinones Dep. at 127]. Laura McCormick in HR replied that same day, stating, "I will send you a calendar invite, to learn more about the situation." [Doc. 44-1 at 140].

### c. One-on-One Meeting

Later that same day, and after Lodge sent the email discussed above to Quinones, Quinones and Lodge had a one-on-one meeting via video call. [Quinones Dep. at 128–29, 137–38]. According to Quinones, Lodge told him, "You will just put your face and body where I tell you." [*Id.* at 138]. Quinones testified that he responded, "How does that affect the productivity of the team?" [*Id.*]. According to Quinones, he also told Lodge that he did not feel comfortable because Lodge was

telling him what to do with his body. [*Id.*]. Quinones testified that Lodge told him that he was not being responsive (or was being disrespectful) and that Lodge was going to talk to McCormick. [*Id.* at 129, 138].

Quinones testified that Lodge raised his voice and his hands on camera, and Quinones perceived this behavior as being aggressive. [Quinones Dep. at 129, 138–39]. According to Quinones, he believed Lodge "was making escalating sexual requests" and was "trying to look at [Quinones's] body in a weird and sexual way." [Quinones Decl. ¶ 3]. Quinones then hung up on Lodge, without any explanation. [Quinones Dep. at 129, 138]. Quinones avers now that he hung up on this call because he wanted to (1) prevent Lodge from "escalating his sexual harassment," (2) leave what he believed was a sexually harassing situation, and (3) "further rebuff and oppose Lodge's sexual advances and requests." [Quinones Decl. ¶ 4].

### d.    Quinones Meets with McCormick

Shortly after Quinones sent his November 2 email to HR, McCormick scheduled a meeting to speak with Quinones. [Quinones Dep. at 134–35; SMF ¶ 24; RSMF ¶ 24]. Quinones testified that during that meeting, which also occurred sometime on November 2,

> I said I didn't feel comfortable the way he was talking about my face and body. I also said that there are women who work in this company also, and if a man would go to a woman and say that, you known, and be that aggressive, that would be a big situation, but if a man says

15

> anything or something like that ... would there be the same
> consequences or the same actions?

[Quinones Dep. at 135]. Quinones also stated that he used the words "sexual in nature" during that conversation. [*Id.* at 136; *see also* Quinones Decl. ¶ 3 ("During my November 2, 2023, meeting with Laura McCormick, I told her that there had been a long pattern of escalating behavior that was sexual in nature on the part of Omar Lodge towards me, and that that day, Lodge's sexual requests had become aggressive. I also specifically reported to her about what had occurred on the calls earlier that day.")]. According to Quinones, he told McCormick that he had "hung up on calls with Lodge earlier that day to prevent him from escalating his sexual harassment of me and to leave a situation where I felt I was being sexually harassed." [Quinones Decl. ¶ 4]. This call with McCormick was the first time that Quinones reported Lodge's conduct to HR. [Quinones Dep. at 40, 43, 98].

### 7. Flock Decides to Eliminate Quinones's Position

On November 3, 2023, McCormick spoke with Lodge—as well as Danielle Feuillebois, a director of HR, and Brian Barnard, Lodge's supervisor—about Quinones's behavior during the November 2 calls. [SMF ¶ 27, as modified per RSMF ¶ 27; Doc. 46-1, Dep. of Brian Barnard "Barnard Dep." at 21–22; Doc. 48-1, Dep. of Danielle Feuillebois "Feuillebois Dep.") at 8; Doc. 57-2, Pl.'s Statement of Additional Facts ("SAF") ¶ 6; Doc. 60, Def.'s Resp. SAF ("RSAF") ¶ 6]. During

that meeting, the participants discussed what they perceived as Quinones's disrespectful and rude behavior, his perceived history of performance problems and documented performance issues, and the strategy to reduce head count and cost on Quinones's team. [SMF ¶ 30, as modified by RSMF ¶ 30; Barnard Dep. at 21–22;].

Feuillebois, Barnard, and McCormick decided to eliminate Quinones's position. [Doc. 50-1, Dep. of Laura McCormick "McCormick Dep." at 27]. Flock claims that it decided to eliminate the position because (1) Quinones was the lowest performer on the team, (2) the team needed to downsize, (3) Quinones had a history of performance issues, (4) Quinones refused to participate in the November 2 calls, and (5) Quinones treated his teammates poorly. [McCormick Dep. at 50–52, 55, 62–63, 71; Feuillebois Dep. at 23–24; Barnard Dep. at 21–22, 24–27; Lodge Dep. at 38–39]. McCormick described Quinones's conduct during the November 2 calls with Lodge as "the final straw" for Quinones's employment, and Barnard agreed that the timing was perfect for terminating Quinones. [SAF ¶ 7 (second)[3]; RSAF ¶ 7 (second)].

---

[3] Plaintiff's SAF contains two paragraphs numbered seven.

### 8.    Quinones's November 6, 2022, Complaint to HR

On November 6, 2022, Quinones asked McCormick for a follow-up meeting.

[Quinones Dep. at 140–41; Doc. 44-1 at 141].  Quinones's email stated in part:

> I was wondering if I can request a follow up meeting about the incidents
> that occurred on November 2nd, 2023 with my direct supervisor Omar
> Lodge in both my 9:15 AM meeting and at my 11:00 AM meeting, and
> the webcam policies Flock Safety has for its employees.
>
> A quick recap of the incidents is as follows:
> -At the 9:15 meeting, I had my camera on and my face was positioned
> on the left corner frame of the screen.  My face was visible and [I] was
> told by my direct supervisor Omar Lodge to move the camera closer.  I
> informed my direct supervisor Omar Lodge that my face can be seen
> and there is no need to be closer to the camera.  He asked me to please
> get closer to the camera and angle it to see my face "clearer" and that
> he "really wanted to see my face."  My face was on the screen clearly
> and I felt really uncomfortable in the way Omar [L]odge was
> determined to get my face closer to the camera.  I then asked "Why is
> this a big deal? [A]nd how does this affect the productivity of the
> team?"  He then asked me again to adjust my camera to get a "clearer"
> view of my face.  I promptly logged off as I felt really uncomfortable
> in this behavior and was promptly given a false reprimand and also gave
> the HR team a blind carbon copy of this false reprimand.
>
> -On my 1:1, I positioned my body and face the same way I did in my
> earlier meeting and asked Omar Lodge again "How does the position
> of my face and body on screen affect the productivity of my job and the
> team?  I believe someone having their head not move 2 inches will not
> be a serious problem."  Omar Lodge then proceeded to say that "I felt
> disrespected because your head was 2 inches from where I wanted it."
> I again promptly logged off as this harassment and obsession with my
> face being seen "up close" to the camera is becoming really
> uncomfortable and stressful.

> I did not attend the 9:15 AM meeting on November 3rd, 2023 as I do not feel safe due to the harassment and bizarre behavior displayed by my direct supervisor Omar Lodge.

[Doc. 44-1 at 141]. According to Flock, it had already decided to terminate Quinones's employment when Quinones sent his November 6 email. [McCormick Dep. at 67–69].

Quinones testified that he felt unsafe because he was concerned that the situation with Lodge would "keep escalating." [Quinones Dep. at 144–45]. Quinones was afraid that Lodge would "go to HR and ask for [his] personal information" or "keep escalating into [his] personal life." [*Id.* at 144].

Lodge never threatened Quinones with physical harm. [Quinones Dep. at 144–45]. Quinones acknowledged that his perception of feeling unsafe was based on his own beliefs. [*Id.* at 145].

### 9. Quinones's Termination

On November 8, 2023, Flock terminated Quinones's employment and told him that he was being terminated because Flock was eliminating his position. [Quinones Dep. at 146–47; McCormick Dep. at 59; Doc. 45-1 at 53; SAF ¶ 10 (first)[4]; RSAF ¶ 10]. McCormick and Lodge met with Quinones virtually to discuss

---

[4] Plaintiff's SAF contains two paragraphs numbered 10.

19

his termination. [Quinones Dep. at 146]. Quinones was informed that Flock was offering a severance package. [*Id.* at 147; Quinones Decl. ¶ 20; McCormick Dep. at 59; Doc. 45-1 at 53]. When McCormick asked Quinones to verify his email and personal information, Quinones asked Lodge to log off the call, and Lodge did so. [Quinones Dep. at 147].

McCormick prepared a Flock termination form stating only that Quinones was terminated for "[p]osition elimination – Device Support Engineer II." [Doc. 44-1 at 142; McCormick Dep. at 56]. McCormick testified that Flock's standard practice was to check only one box on the termination form and that the form allowed the person completing the form to select only one option. [McCormick Dep. at 56–57, 61–62]. McCormick also testified that Flock's general practice is not to offer severance pay when an employee is terminated solely based on performance. [*Id.* at 59]. Flock, however, offers separation pay to employees whose positions are eliminated without notice, "even if the decision was made based on their past performance, as it was with [Quinones]." [*Id.*].

### 10. Events Following Quinones's Termination

After Quinones's termination, Lodge emailed the team informing them that Quinones was no longer with Flock. [Lodge Dep. at 87–88; Doc. 45-1 at 62]. The

email listed the individuals who would be stepping in on a temporary basis to cover Quinones's responsibilities. [Lodge Dep. at 87–88; Doc. 45-1 at 62].

Flock never filled Quinones's position after his termination. [McCormick Dep. at 59; Lodge Dep. at 59]. After Flock terminated Quinones, it posted a Device Support Engineer I position on builtin.com. [Quinones Dep. at 153–54; Doc. 57–1 at 49]. When Quinones was terminated, his title was Device Support Engineer II. [Quinones Dep. at 154; Lodge Dep. at 24]. There is no evidence that the Device Support Engineer I position was ever filled. [Quinones Dep. at 154].

### B.    Procedural Background

On March 26, 2024, Quinones filed this lawsuit. [Compl.]. Quinones's Complaint contains only one count: a claim that Flock violated Title VII by terminating his employment in retaliation for his complaints about Lodge's alleged sexual harassment. [*Id.* ¶¶ 37–41].

On January 16, 2025, Flock filed its motion for summary judgment. [Doc. 37]. The parties have fully briefed the motion [Doc. 37-1; Doc. 57; Doc. 59]. For the reasons below, I will recommend that the motion for summary judgment be granted.

## II.   **LEGAL STANDARD**

Summary judgment is authorized when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Bingham, Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir. 1984). The movant carries this burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The court must view the evidence and all factual inferences in the light most favorable to the nonmoving party. *Adickes*, 398 U.S. at 158–59.

Once the moving party has adequately supported its motion, the nonmoving party must come forward with specific facts that demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party must "go beyond the pleadings" and present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Generally, "[t]he mere existence of a scintilla of evidence" supporting the nonmoving party's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

When considering motions for summary judgment, the Court does not resolve the merits of disputed facts. *See Anderson*, 477 U.S. at 249. Rather, the Court only determines whether there are genuine issues of material fact to be tried. Applicable substantive law identifies those facts that are material and those that are not. *Id.* at 248. Disputed facts that do not resolve or affect the outcome of a suit will not properly preclude the entry of summary judgment. *Id.*

## III.   DISCUSSION

Title VII prohibits retaliation against an employee who engages in protected activity under that statute. 42 U.S.C. § 2000e-3(a). Title VII "recognizes two forms of statutorily protected conduct." *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1350 (11th Cir. 1999). "An employee is protected from discrimination if (1) 'he has opposed any practice made an unlawful employment practice by this subchapter' (the opposition clause) or (2) 'he has made a charge, testified, assisted, or participated in any manner in an investigation proceeding, or hearing under this subchapter' (the participation clause)." *Id.* (quoting 42 U.S.C. § 2000e-3(a)). Quinones bases his retaliation claim on the opposition clause.

### A.   No Direct Evidence of Retaliation

Quinones argues that he has direct evidence of retaliation. [Doc. 57 at 18]. According to Quinones, he opposed Lodge's purported sexual harassment by

disconnecting from the November 2 calls, and Flock's witnesses testified that Quinones's hanging up on the November 2 calls was the final straw that led to his termination. [*Id.*].

As discussed below, Quinones did not engage in protected conduct under Title VII's opposition clause by hanging up during the November 2 calls. And even if hanging up on the calls could be considered protected conduct, Quinones has no direct evidence of discrimination.

"Direct evidence of discrimination is 'evidence that, if believed, proves the existence of a fact without inference or presumption.'" *Dixon v. The Hallmark Cos., Inc.*, 627 F.3d 849, 854 (11th Cir. 2010) (quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004)). "Under Eleventh Circuit law, 'only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination.'" *Id.* (quoting *Wilson*, 376 F.3d at 1086). "Evidence that only suggests discrimination, or that is subject to more than one interpretation does not constitute direct evidence." *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997) (citations omitted). "'If the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence.'" *Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1156 (11th Cir. 2010) (quoting *Wilson*, 376 F.3d at 1086).

The statements that Quinones refers to are not direct evidence. Nothing suggests that any of Flock's witnesses made a statement that Flock was terminating Quinones's employment because he complained of sexual harassment. Instead, Flock's witnesses testified that Quinone's unprofessional conduct—hanging up on the November 2 calls—was the final straw that led to Quinone's termination. This testimony, at best, might suggest a retaliatory motive if Quinones's conduct had been protected conduct, but the Court would have to make an inference to conclude that Flock terminated Quinones in retaliation for complaining about sexual harassment. Thus, the testimony is circumstantial evidence at best. *Fernandez*, 961 F.3d at 1156; *see also Reeves v. Columbus Consol. Gov't*, No. 23-11463, 2024 WL 33903, at *1 (11th Cir. Jan. 3, 2024) ("[A]ny evidence that requires an inferential step is circumstantial."). Quinones's retaliation claim must proceed under the circumstantial evidence framework.

### B. Circumstantial Evidence Framework

Courts use the burden-shifting framework established in *McDonnell Douglas* to analyze retaliation claims based on circumstantial evidence. *Moore v. Cobb Cnty. Sch. Dist.*, No. 1:19-CV-4174-MLB, 2021 WL 3661223, at *11 (N.D. Ga. Aug. 18, 2021). First, the plaintiff must establish a prima facie case of retaliation. *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (en banc). Once

the plaintiff establishes a prima facie case of retaliation, the burden of production shifts to the employer to articulate "a legitimate, non-[retaliatory] reason for the employment action." *Id.* at 1135. If the employer meets its burden, the plaintiff "must demonstrate that '[his] protected activity was a but-for cause of the alleged adverse action by the employer.'" *Id.* (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013) ("*Nassar*")). "In other words, 'a plaintiff must prove that had []he not [engaged in the protected conduct], []he would not have been fired.'" *Id.* (second alteration in original) (quoting *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018)).

### 1.  Prima Facie Case

To establish a prima facie case of retaliation, an employee must show that "(1) the employee engaged in statutorily protected conduct, (2) the employee suffered an adverse employment action, and (3) there is a causal connection between the two." *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1234–1235 (11th Cir. 2010). The employee can satisfy the causal connection element by showing that "the protected activity and the adverse action were not wholly unrelated." *Id.* (internal quotation marks omitted). "A plaintiff can establish a prima facie causal link 'by showing close temporal proximity between the statutorily protected activity and the adverse . . . action.'" *Tolar v. Bradley Arant Bolt Commings, LLP*, 997 F.3d 1280, 1294

(11th Cir. 2021) (alteration in original) (quoting *Thomas v. Cooper Lighting, Inc.*,

506 F.3d 1362, 1364 (11th Cir. 2007)).

Flock does not dispute that Quinones can establish the second element of his prima facie case, and I agree. The evidence shows that Quinones suffered an adverse employment action when Flock terminated his employment. I also find, for purposes of this Report and Recommendation, that if Quinones had engaged in protected conduct, he could satisfy the third element of his prima facie case—causation— because he was terminated within days after his November 2 complaint to HR. *See Thomas*, 506 F.3d at 1364 (noting that a plaintiff may establish the causation element of a prima facie case based on a "close temporal proximity between the statutorily protected activity and the adverse employment action").[5]

---

[5] Flock argues that Quinones engaged in an intervening act of misconduct— hanging up on Lodge during the November 2 one-on-one call—that negates the inference of causation. [Doc. 37-1 at 20 n.4]. It is not clear when Quinones's meeting with McCormick occurred, and the evidence, when viewed in the light most favorable to Quinones, shows that Quinones complained about alleged sexual harassment during that meeting. [Quinones Dep. at 135–36; Quinones Decl. ¶¶ 3– 4]. If Quinone's meeting with McCormick occurred *after* his one-on-one call with Lodge, then Quinones's hanging up on the call with Lodge would not be an intervening act of misconduct. A reasonable jury viewing the evidence in Quinones's favor, therefore, could find that Quinones did not engage in an intervening act of misconduct following his complaint to McCormick during their meeting.

Flock also argues that no causal connection exists between Quinones's conduct and the elimination of Quinones's position because Quinones had a history

I conclude, however, that Quinones cannot satisfy the first element of his prima facie case because he did not engage in protected conduct. Quinones argues that he engaged in protected conduct in two ways. [Doc. 57 at 7, 10–13]. First, Quinones claims that he opposed Lodge's purported sexual harassment when he questioned Lodge's reasoning for asking him to center himself on camera and then hung up on the November 2 calls. [*Id.* at 7, 11–13]. Second, Quinones argues that he engaged in protected activity when he reported Lodge's alleged sexual harassment to HR. [*Id.* at 7, 10–11]. For the reasons below, I conclude that neither of those activities were protected conduct.

### a.  Conduct During the Calls

Quinones argues that he engaged in protected conduct when he opposed Lodge's purported sexual harassment during the November 2 calls. [Doc. 57 at 7, 11–13]. According to Quinones, he opposed Lodge's purported sexual harassment by questioning Lodge's reasons for directing him to center himself on camera and by hanging up on the calls. [*Id.*].

---

of performance problems. [Doc. 37-1 at 19–20]. Given the close temporal proximity between Quinones's complaint to HR and his termination, however, a reasonable jury could conclude that a causal connection existed between Quinones's complaint to HR and the decision to eliminate his position. *Thomas*, 506 F.3d at 1364.

A plaintiff's complaint to a harassing supervisor—or a demand that the harassing supervisor stop the offensive conduct—can qualify as protected activity under Title VII's opposition clause. *E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1067–68 (8th Cir. 2015); *Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1007 (8th Cir. 2000). But "'[a] complaint about an employment practice constitutes protected opposition only if the individual explicitly or implicitly communicates a belief that the practice constitutes employment discrimination.'" *Murphy v. City of Aventura*, 383 F. App'x 915, 918 (11th Cir. 2010) (per curiam) (quoting EEOC Compl. Man. (CCH) §§ 8-II-B(2) (2006)); *see also Wheatfall v. Bd. of Regents of Univ. Sys. of Ga.*, 9 F. Supp. 3d 1342, 1353 (N.D. Ga. 2014) (noting that the employee's complaint "must have put [his employer] on notice that []he was opposing a practice made unlawful by Title VII").

"Mere complaints about work and vague or ambiguous protests do not constitute protected activity within the meaning of Title VII if a reasonable employer would not understand those communications to be opposition to discriminatory conduct." *Tarver v. S. Def. Sys., Inc.*, No. CV-07-BE-1570-E, 2009 WL 10703401, at *13 (N.D. Ala. Feb. 24, 2009). "The words or actions of the employee must reveal a clear and unambiguous attempt to oppose conduct that []he believes violates Title VII." *Id.*

Here, Quinones's conduct during the November 2 calls does not qualify as protected activity because Quinones never communicated a belief that Lodge was engaging in sexually harassing conduct or conduct that violated Title VII. Viewing the evidence in the light most favorable to Quinones, Quinones asked Lodge during the first call how Quinones's face being centered on camera affected the team's productivity, and Quinones then hung up on the call. *See* [Quinones Dep. at 127 ("[H]ow does my face and body being two inches from the center of the camera or where you tell me to affect the meeting of the team or the productivity of the team?"); *id.* at 131 (stating that Quinones asked Lodge, "Can you please explain to me how the productivity of the team is affected by . . . my face [being] not fully on camera?")].

Similarly, during the second call, Quinones asked Lodge, "How does [being centered on camera] affect the productivity of the team?" [Quinones Dep. at 138]. According to Quinones, he also told Lodge during the second call that he did not feel comfortable because Lodge was telling him what to do with his body, and he hung up on the call. [*Id.*]. Nothing suggests that Quinones told Lodge that he believed that Lodge was sexually harassing him.

Quinones's conduct did not constitute protected activity because Quinones did not inform Lodge that he believed that Lodge's conduct was sexually hostile or

sexually harassing. *See Murphy*, 383 F. App'x at 918 (finding that an employee did not complain of sexual harassment by asking her supervisor to stop bullying her and complaining to others that her supervisor "had used 'vulgar, inappropriate language,' and engaged in 'bullying, yelling, [and] screaming'") (alteration in original). Indeed, Quinones testified that he first complained about sexual harassment when during his November 2 meeting with McCormick. [Quinones Dep. at 40, 43, 98, 127]. No reasonable employer would have understood Quinones's communications and conduct during the November 2 calls to be opposition to sexually harassing conduct. At best, Quinones's comments and conduct were "vague and ambiguous protests," and they did not "reveal a clear and unambiguous attempt to oppose conduct" that Quinones believed violated Title VII. Quinones's conduct during the November 2 calls thus is not protected under Title VII's opposition clause.[6]

### b.    Complaint to HR

Quinones also argues that he opposed unlawful activity by reporting Lodge's conduct to HR. [Doc. 57 at 7, 10–11]. Flock responds that Quinones did not engage

---

[6] Even if Quinones's conduct during the November 2 calls could be considered opposition to purported sexual harassment, it would not qualify as protected activity. As discussed below, Quinones's belief that Lodge was sexually harassing him in violation of Title VII was not objectively reasonable, and his complaints about purported sexual harassment were not protected.

in protected conduct because his complaints that Lodge engaged in sexual harassment that violated Title VII were not objectively reasonable.[7] [Doc. 37-1 at 3–6].

A plaintiff asserting a retaliation claim must show that he "'had a good faith, reasonable belief that the employer was engaged in unlawful employment practices.'" *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir. 2016) (quoting *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997)). "This burden includes both a subjective and an objective component." *Id.* "That is, the plaintiff must not only show that []he subjectively (i.e., in good faith) believed the defendant was engaged in unlawful employment practices, but also that [his] 'belief was *objectively* reasonable in light of the facts and record present.'" *Id.* (quoting *Little*, 103 F.3d at 960) (emphasis in original). "The objective reasonableness of [the employee's] belief is measured by reference to controlling substantive law." *Id.* "Even so, the plaintiff is not required to prove that the

_____

[7] Flock disputes whether Quinones complained of sexual harassment during his November 2 meeting with McCormick. A reasonable jury, viewing the evidence in the light most favorable to Quinones, could find that Quinones complained during that meeting that he believed that Lodge was sexually harassing him. [Quinones Dep. at 135–36; Quinones Decl. ¶ 3]. As discussed below, however, Quinones's belief that Lodge was sexually harassing him in violation of Title VII was not objectively reasonable.

discriminatory conduct complained of was actually unlawful." *Id.* Instead, "[t]he conduct opposed need only 'be close enough to support an objectively reasonable belief that it is.'" *Id.* (quoting *Clover*, 176 F.3d at 1351). But "'[w]here binding precedent squarely holds that particular conduct is not an unlawful employment practice by the employer, and no decision of [the Eleventh Circuit] or of the Supreme Court has called that precedent into question or undermined its reasoning, an employee's contrary belie[f] that the practice is unlawful is unreasonable.'" *Dorsey v. Fulton Cnty.*, No. 1:10-cv-679-TWT-ECS, 2012 WL 3871921, at *8 (N.D. Ga. Aug. 1, 2012) (first and second alterations in original) (quoting *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1214 (11th Cir. 2008)), *adopted by* 2012 WL 3871919 (N.D. Ga. Sept. 5, 2012) (Thrash, J.).

For purposes of this Report and Recommendation, I have presumed that Quinones subjectively believed that Lodge's conduct was sexually harassing. For the reasons below, however, Quinones's belief that Lodge was engaged in conduct that violated Title VII was not objectively reasonable.

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). This provision also "prohibits sex-based discrimination that alters the terms and

conditions of employment." *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1300 (11th Cir. 2007). "The forbidden alteration can be brought about in either of two ways." *Id.* "One is through a tangible employment action, such as a pay decrease, demotion or termination." *Id.* "The other way is through creation of a hostile work environment caused by sexual harassment that is sufficiently severe or pervasive to alter the terms and conditions of work." *Id.*

Here, the parties focus their arguments on the hostile work environment theory, and they use the terms "sexual harassment" and "hostile work environment sexual harassment" interchangeably. [Doc. 37-1 at 15, 18; Doc. 57 at 7–10, Doc. 59 at 9–10]. There is, however, a distinction between those two terms.

"Sexual harassment," in and of itself, does not necessarily violate Title VII. Instead, as the Eleventh Circuit has explained, "[s]exual harassment constitutes sex discrimination [in violation of Title VII] only when the harassment alters the terms and conditions of employment." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999). "[I]n the cases traditionally described as hostile-environment cases, an employer's harassing actions toward an employee do not constitute employment discrimination under Title VII unless the conduct is 'sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an

abusive working environment.'" *Id.* (quoting *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986)) (alteration in original) (internal quotation marks omitted)).

Thus, to prevail on his retaliation claim, Quinones must have had a good faith, objectively reasonable belief that Lodge's purported sexual harassment was unlawful under Title VII—i.e., that it created a hostile work environment. *Clover*, 176 F.3d at 1351. Determining whether Quinones's belief was objectively reasonable requires the Court to measure Lodge's conduct against existing substantive law. *Id.*

"To establish a hostile environment claim premised on sexual harassment, a plaintiff must establish, among other things, that the harassment occurred because of [his] sex, and 'that the harassment was sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment.'" *Clover*, 176 F.3d at 1351 (quoting *Watkins v. Bowden*, 105 F.3d 1344, 1355 (11th Cir. 1997)). To determine whether conduct is sufficiently severe and pervasive, courts consider "'(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.'" *Freytes-Torres v. City of Sanford, Fla.*, 270 F. App'x 885, 889–90 (11th Cir. 2008) (per curiam) (quoting *Mendoza*, 195 F.3d at 1246).

Quinones argues that about once a month, Lodge asked him intrusive questions about his personal life, such as (1) whether he was married or seeing anyone, (2) how his family was doing, or (3) what he did over the weekend. [Quinones Dep. at 46, 93–94, 117–18; Quinones Decl. ¶ 13]. Quinones thought that Lodge was asking the questions to flirt with him and to see whether Quinones was romantically available to Lodge, and Quinones was uncomfortable with the questions. [Quinones Dep. at 46, 94; Quinones Decl. ¶ 13].

Quinones also testified that about two or three times a week, Lodge requested that Quinones position himself in a certain way on camera and that Quinones place his face close to the camera so that it was clearly visible. [Quinones Decl. ¶¶ 14–17; Quinones Dep. at 39–40, 45, 141–42]. According to Quinones, Lodge stated that "he 'really wanted to see [Quinones's] face,'" and he made his requests in odd tones that Quinones perceived as "flirtatious and creepy." [Quinones Decl. ¶ 16; Quinones Dep. at 44]. Lodge did not request to see anything other than Quinones's face and body in frame. [Quinones Dep. at 143].

Quinones testified that during meetings that occurred about once each month, Lodge purposefully attempted to make Quinones look bad in front of others to make it seem that Quinones was not performing well. [Quinones Dep. at 94–95, 97, 104–05]. According to Quinones, Lodge also occasionally told him that he was easily

replaceable, and Lodge also stated that Quinones would not be with the company for long if he did not do what Lodge told him. [Quinones Dep. at 41, 104].

Even considered together, the conduct that Quinones describes falls fall short of satisfying the Eleventh Circuit's standard for unlawful sexual harassment based on a hostile work environment. For purposes of this Report and Recommendation, I have presumed that the conduct occurred frequently. The conduct, however, was not severe. The questions that Lodge asked Quinones were "not overtly sexual in nature," although Quinones may have felt uncomfortable answering the questions. *You v. Beaulah Heights Univ., Inc.*, No. 1:20-cv-1103-MHC-CCB, 2022 WL 22807247, at *10 (N.D. Ga. Feb. 4, 2022), *adopted by* 2022 WL 1446834 (N.D. Ga. Mar. 30, 2022). Even presuming that Lodge was interested in Quinones sexually, the questions were simply "'flirtation [that] is part of ordinary socializing in the workplace and should not be mistaken for discriminatory conditions of employment.'" *Dorsey*, 2012 WL 3871921, at *11 (alteration in original) (internal quotation marks omitted) (quoting *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 584 (11th Cir. 2000)). Courts have held that much more intrusive questions were not enough to establish an actionable sexually hostile work environment. *See id.* (finding that a supervisor's "questions about Plaintiff's willingness to 'mess around' and whether she found him attractive, his attempts to find out her home address, his

requests to have her come alone to his work location without identifying any business purpose, and his statement that he and his wife had an open relationship" did not constitute severe harassment) (footnote omitted); *see also Murdoch v. Medjet Assistance LLC*, 294 F. Supp. 3d 1242, 1263–64 (N.D. Ala. 2018) ("A boss's questions to a subordinate about who she is dating and how many times she has been married may be perceived as rude or uncivilized by some. However, they do not—without more—objectively translate into severe or pervasive conduct or create a hostile work environment."); *Orquiola v. Nat'l City Mortg. Co.*, 510 F. Supp. 2d 1134, 1149–50 (N.D. Ga. 2007) (finding that a plaintiff failed to establish that she was subjected to an actionable sexually hostile work environment where—among other things—her supervisor asked her "personal questions about her marriage and if she had ever had extramarital affairs").

Lodge's directions to Quinones to position himself on camera also were not overtly sexual in nature. Nothing suggests that Lodge directed Quinones to discard clothing or display his private parts, and Quinones himself testified that Lodge did not request to see anything other than Quinones's face and body in frame. [Quinones Dep. at 143].

Moreover, none of the conduct, which consisted of comments, could be considered physically threatening or humiliating. *Dorsey*, 2012 WL 3871921, at

*11. Nothing suggests that Lodge touched or attempted to have physical contact with Quinones. *See id.* (noting that none of the alleged harasser's conduct, "all of which consisted of oral comments—could be considered physically threatening or humiliating").

Nor has Quinones pointed to evidence suggesting that any of Lodge's conduct interfered with Quinones's ability to do his job or altered his job performance. Indeed, Lodge's conduct "would not have interfered with a reasonable employee's performance of [his] job." *See Dorsey*, 2012 WL 3871921, at *11 (finding that a supervisor's questions and comments to the plaintiff would not have interfered with a reasonable employee's job performance).

Courts in this Circuit have declined to find that actionable sexually hostile work environments existed in cases involving far more egregious circumstances and actions. *See Guthrie v. Waffle House, Inc.*, 460 F. App'x 803, 804, 807–08 (11th Cir. 2012) (per curiam) (finding that no sexually hostile work environment existed where the plaintiff reported that the harasser (1) grabbed her buttocks two to five times, (2) "'talked dirty' to her, including saying five times that he wanted to 'f---' her and 'lick' her 'all over,'" (3) "once spoke openly about having sex in another waitress's van in the restaurant's parking lot," and (4) asked the plaintiff on a date ten to twenty times); *Webb-Edwards v. Orange Cnty. Sheriff's Office*, 525 F.3d

1013, 1026–27 (11th Cir. 2008) (concluding that no sexually hostile work environment existed based on (1) a supervisor's remarks that the plaintiff looked hot and should wear tighter clothes, (2) weekly remarks that the supervisor wished his wife would wear hot clothes, and (3) a supervisor's remark to the plaintiff's husband that he was eating the plaintiff for lunch); *Gupta*, 212 F.3d at 584–85 (finding that the following conduct over a six or seven-month period was not severe or pervasive enough to be a sexually hostile work environment: (1) flirtatious comments, (2) frequent calls to the plaintiff's home at night asking personal questions, (3) one incident when the plaintiff entered the harasser's office when he was expecting her and he was sitting in his chair with his dress shirt off wearing an undershirt, and he "unbuckled his belt and pulled down his zipper and start[ed] tucking his shirt in," (4) one incident where the harasser placed his hand on the plaintiff's inner thigh, and (5) one incident where the harasser lifted the plaintiff's dress several inches and felt the hem); *Mendoza*, 195 F.3d at 1247–53 (concluding that no hostile work environment existed where (1) a supervisor constantly followed the employee and stared in a "very obvious fashion" for more than eleven months, (2) the supervisor made a sniffing sound while looking at the employee's groin area on two occasions and without looking at the employee's groin area on another occasion, (3) the supervisor once rubbed up against the employee's hip while touching her shoulder

40

and smiling, and (4) the supervisor commented that he was "getting fired up too" when the employee came into his office and exclaimed that she was only there to work, not to be harassed); *Baldelamar v. Jefferson S. Corp.*, No. 4:15-cv-209-HLM-WEJ, 2016 WL 9330869, at *13–14 (N.D. Ga. Oct. 13, 2016) (finding that comments soliciting the plaintiff to have sex, among other comments and uncouth non-verbal communications, coupled with one act of touching the plaintiff's buttocks and one act of hugging her from behind and pulling her close, fell well short of the threshold for establishing a hostile work environment claim), *adopted by* 2016 WL 9331114 (N.D. Ga. Dec. 5, 2016).

Although the conduct opposed need not "actually be [actionable] sexual harassment," the conduct "must be close enough to support an objectively reasonable belief that it is." *Clover*, 176 F.3d at 1351. As discussed above, the conduct that Quinones described falls fall short of meeting the Eleventh Circuit's standard for a hostile work environment based on sexual harassment, and it does not violate Title VII. Quinones's belief that Flock violated Title VII based on Lodge's purported sexual harassment thus was not objectively reasonable, and his report to HR was not protected activity. *Id.*

### c. Summary

For the above reasons, Quinones cannot show that he engaged in protected conduct. Quinones, therefore, cannot satisfy the first element of his prima facie case, and summary judgment should be granted to Flock.

### 2. Legitimate, Non-Retaliatory Reason

If Quinones had established a prima facie case of retaliation, the burden would next shift to Flock to articulate a legitimate, non-retaliatory reason for terminating Quinones. *Gogel*, 967 F.3d at 1135. Flock states that it terminated Quinones's employment because it decided to eliminate his position, and it made that decision based on Quinones's poor performance, the team's need to downsize, Quinones's refusal to participate in the November 2 calls, and the manner in which Quinones treated his teammates. [Doc. 37-1 at 20; McCormick Dep. at 50–52, 55, 62–63, 71; Feuillebois Dep. at 23–24; Barnard Dep. at 21–22, 24–27; Lodge Dep. at 38–39]. Flock has met its burden to articulate a legitimate, non-retaliatory reason for terminating Quinones.

### 3. Pretext

The burden next shifts to Quinones to show pretext. *Gogel*, 967 F.3d at 1135. A plaintiff may show pretext "either directly by persuading the court that a [retaliatory] reason more likely motivated the employer or indirectly by showing that

the employer's proffered [sic] explanation is unworthy of credence." *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (citation and quotation marks omitted). The plaintiff "must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc) (citations omitted). The plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [the defendant's] proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Jackson v. State of Ala. Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)). Further, "[t]he pretext inquiry focuses on the employer's beliefs, not the employee's." *McPhie v. Yeager*, 819 F. App'x 696, 699 (11th Cir. 2020) (per curiam) (emphasis in original). A reason cannot be "pretext for [retaliation] unless it is shown both that the reason was false, and that [retaliation] was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) ("*Hicks*") (emphasis in original) (quotation marks omitted); *see also Brooks*, 446 F.3d at 1163 (same). And the Eleventh Circuit requires the plaintiff to rebut each of the legitimate, [nonretaliatory] reasons that the defendant proffers. *See Chandler v. Sheriff, Walton Cnty.*, No. 22-13698, 2023 WL 7297918, at *5 (11th Cir. Nov. 6,

2023) ("'A plaintiff's failure to rebut even one [nonretaliatory] reason is sufficient to warrant summary judgment.'") (quoting *Ring v. Boca Ciega Yacht Club Inc.*, 4 F.4th 1149, 1163 (11th Cir. 2021)).

Quinones argues that he can show pretext because

- His performance was not poor;

- Flock was willing to work with Quinones despite his alleged performance deficiencies until he made his complaint to HR;

- Flock's reference to Quinones's alleged treatment of his coworkers was based on his November 2 protected activity;

- Flock gave shifting reasons for terminating Quinones's employment;

- Flock did not truly eliminate Quinones's position; and

- Flock terminated him shortly after his November 2 conduct and complaint to HR.[8]

[Doc. 57 at 16–25].  I will address those arguments in turn.

*Performance Deficiencies*

Quinones argues that his performance was not poor, claiming that Lodge manufactured the allegations about his performance.  Quinones, however, has not come forward with any evidence to show that Flock did not legitimately believe that Quinones's performance was deficient.  The record reflects that Quinones received

---

[8] Quinones also argues that he has direct evidence of retaliation.  [Doc. 57 at 18–19].  As discussed above, this case does not involve direct evidence.

several warnings about his performance. Quinones disputes the warnings that he received for engaging in casual speech, for working non-traditional hours, for not responding to a request, and for not correcting DVC codes before he left for vacation. [Quinones Decl. ¶¶ 9–11; Quinones Dep. at 79–81; 9–92]. Quinones, however, did not dispute the October 13, 2022, verbal warning. [Doc. 41 at 124–25; SMF ¶ 6; RSMF ¶ 6]. Quinones's own perceptions of his performance are not enough to show that his performance was good or that Flock did not truly believe that his performance was deficient. *See Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997) ("[T]he inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of his performance," and thus, "where the employer produces performance reviews and other documentary evidence of misconduct and insubordination that demonstrate poor performance, an employee's assertions of his own good performance are insufficient to defeat summary judgment, in the absence of other evidence."). Moreover, it is undisputed that Feuillebois, Barnard, and McCormick made the decision to eliminate Quinones's position, and there is no evidence to suggest that they did not truly believe that Quinones's performance was poor.

Quinones also appears to argue that his performance was not truly poor because Flock gave him severance pay. McCormick testified that Flock's general

practice is not to offer severance pay when an employee is terminated solely based on performance. [McCormick Dep. at 59]. McCormick, however, also testified that Flock offers separation pay to employees whose positions are eliminated without notice, even when Flock bases its decisions to eliminate the positions on past performance. [*Id.*]. Quinones's position was eliminated without notice, and the fact that he received severance pay does not cast doubt on Flock's assessment of his performance. Quinones thus cannot show pretext based on this argument.[9]

*Willingness to Work with Quinones*

Quinones also argues that Flock was willing to work with him despite his performance until he complained about Lodge's behavior. It is undisputed, however, that Flock was considering eliminating Quinones's position and terminating his employment long before Quinones made his complaint to HR. [SMF ¶¶ 7–8; RSMF ¶¶ 7–8]. Flock, however, concluded that Quinones's conduct during the November 2 calls was the final straw. It is undisputed that Quinones hung up on Lodge during those calls. Flock presented evidence that it viewed "[a]bruptly leaving [a] meeting

---

[9] Flock states that it selected Quinones for termination not only because his performance was poor but also because he was the lowest performer on the team. Even if Quinones is correct that his performance was not poor, he has not pointed to evidence suggesting that Flock did not genuinely believe that the other team members were better performers.

without any prior notice or reasonable explanation" as a fireable offense, and Quinones has come forward with no evidence to dispute it. [Barnard Dep. at 25; Doc. 45-1 at 58]. The undisputed evidence shows that after Quinones hung up on Lodge, Flock reasonably decided not to continue its attempts to work with Quinones to improve his performance.

Essentially, Quinones's summary judgment argument amounts to a challenge to Flock's business judgment in deciding that it would no longer work with Quinones after his conduct during the November 2 calls. It is not the Court's role to second-guess or reexamine Flock's business decisions, and this argument does not show pretext. *See Elrod v. Sears, Roebuck & Co.*, 929 F.2d 1466, 1470 (11th Cir. 1991) (noting that federal courts "do not sit as a super personnel department that reexamines an entity's business decisions").

### *Treatment of Coworkers*

Quinones argues that Flock's reference to Quinones's poor treatment of his coworkers relates solely to Quinones's conduct during the November 2 calls. The undisputed evidence shows that Lodge, as well as Barnard and McCormick—who, along with Feuillebois, made the decision to terminate Quinones's employment— believed that by hanging up on a group call, without explanation or notice, Quinones had been disrespectful to his coworkers. [Doc. 48-1 at 33; McCormick Dep. at 52–

53; Barnard Dep. at 22–23; Lodge Dep. at 38–39]. There is no evidence that Lodge, Barnard, and McCormick did not honestly hold that opinion. Again, it is not the Court's role to second-guess Flock's determination that Quinones's conduct during the November 2 group call was disrespectful to his coworkers. Quinones cannot show pretext based on this argument.

### Shifting Reasons

Next, Quinones argues that he can show pretext because Flock gave shifting reasons for his termination. "'[S]hifting and inconsistent explanations can provide a basis for a finding of pretext[, b]ut the explanations must actually be shifting and inconsistent to permit an inference of mendacity.'" *Harvey v. Charlie Castleberry's Appliance Sales, Inc.*, No. 1:20-cv-627-LMM-AJB, 2022 WL 22867030, at *10 (N.D. Ga. Jan. 18, 2022) (second alteration in original) (quoting *Schuster v. Lucent Techs., Inc.*, 327 F.3d 539, 577 (7th Cir. 2003)), *adopted by* 2022 WL 22867385 (N.D. Ga. Feb. 2, 2022). "However, the fact that the employer offers an additional reason[] for the employment decision does not suggest pretext if both of the employer's reasons are consistent." *Id.*

Quinones argues that Flock has given shifting reasons for pretext because Flock's termination form lists only "position elimination" as the reason for his termination. McCormick provided undisputed testimony, however, that (1) it is

Flock's standard practice to list only one reason for termination on the form; and (2) when HR completes the form, the system allows HR to choose only one reason for termination. [McCormick Dep. at 56–57, 61–62]. Given that testimony, Flock's failure to list all of its stated reasons for firing Quinones on his termination form is not evidence of pretext. At summary judgment, it is Quinones's obligation to show material fact disputes, and here he has not carried that burden.

Moreover, the reasons that Flock gave for terminating Quinones's employment are not inconsistent. Flock stated that it eliminated Quinones's position and that it selected Quinones for termination because he was the lowest performer on his team, the team needed to downsize, and Quinones engaged in misconduct and treated his teammates poorly when he refused to participate in the November 2 calls. Quinones has not carried his summary judgment burden to dispute these facts, and they are not inconsistent. Quinones cannot show pretext based on this argument.

*Position Eliminated*

Quinones also appears to argue that Flock did not truly eliminate his position. To support this argument, Quinones points to evidence showing that (1) Lodge sent an email temporarily reassigning Quinones's duties to other employees, and (2) Flock posted a Device Support Engineer I position after it terminated Quinones's employment. [Quinones Dep. at 153–54; Lodge Dep. at 87–88; Doc. 45-1 at 62].

Neither argument casts doubt on whether Flock actually eliminated Quinones's position.

First, Quinones's claim that Lodge's email temporarily reassigning his duties to other employees indicated that Flock did not intend to eliminate his position is speculative at best. Flock presented evidence that it never filled Quinones's position after his termination. [McCormick Dep. at 59; Lodge Dep. at 59]. Quinones has not rebutted this evidence, and he cannot show pretext based on this email.

As for the job posting, Flock posted an opening for a Device Support Engineer I position. [Doc. 57–1 at 49; Quinones Dep. at 153–54]. When Flock terminated Quinones, however, he occupied a different position—Device Support Engineer II. [Quinones Dep. at 154; Lodge Dep. at 24]. Quinones acknowledges that he does not know whether the Device Support Engineer I position that Flock posted was ever filled. [Quinones Dep. at 154]. Flock, on the other hand, presented evidence—that Quinones failed to rebut—showing that it never filled Quinones's position. [McCormick Dep. at 59; Lodge Dep. at 59]. Quinones, therefore, cannot show that Flock did not eliminate his position.

### Need to Downsize

Flock also stated that it decided to eliminate Quinones's position because the team needed to downsize. [McCormick Dep. at 50–52, 62–63, 71; Feuillebois Dep.

at 23–24; Barnard Dep. at 21–22, 25–27].  Quinones presents no evidence suggesting that Flock did not truly believe that downsizing was necessary.  Quinones thus has failed to rebut all of Flock's legitimate, non-retaliatory reasons, and he cannot show pretext.  *See Ring*, 4 F.4th at 1163 ("Even if we assume that Ring established a prima facie case of retaliation, her retaliation claim fails because she made no effort to rebut one of the Club's nondiscriminatory reasons for suspending and expelling her.").

### Temporal Proximity

Quinones's November 8 termination occurred shortly after his November 2 complaint to HR, but this evidence, standing alone, is not enough to show pretext. *See Gogel*, 967 F.3d at 1137 n.15 ("While close temporal proximity between the protected conduct and the adverse employment action can establish pretext when coupled with other evidence, temporal proximity alone is insufficient.").  "Rather, close temporal proximity must be coupled with other evidence to establish pretext and but-for causation." *Powe v. Farmers Ins. Exch.*, 667 F. Supp. 3d 1227, 1248 (N.D. Ga. 2023) (internal quotation marks and citation omitted).  Here, other than the temporal proximity between Quinones's November 2 complaint and his November 8 termination, there is no evidence in the record to suggest that the stated reason for terminating Quinones was an excuse to cover up retaliation.

*Summary*

Quinones's contentions amount to an attack on his employer's business judgment in deciding to eliminate Quinones's position and his attempt to substitute Quinones's own judgment for that of his employer. This is not enough to show pretext. *See Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1352 (11th Cir. 2022) ("A plaintiff cannot rebut a reason by simply quarreling with the wisdom of that reason or substituting her business judgment for that of the employer. The plaintiff instead must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence.") (quotation marks and citations omitted). To show pretext, Quinones had to meet the legitimate, nondiscriminatory reason proffered by Flock "head on and rebut it." *Id.* (quotation marks and citation omitted). Quinones has not done so here, and he has failed to demonstrate pretext. Summary judgment should be granted for Flock.[10]

---

[10] The Eleventh Circuit has noted that "the plaintiff will always survive summary judgment if he [or she] presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* (footnote omitted). Quinones does not argue that the convincing mosaic standard should apply in this case. *See generally*

## IV. CONCLUSION

Accordingly, I **RECOMMEND** that Flock's Motion for Summary Judgment [Doc. 37] be **GRANTED**, and that this action be **DISMISSED**.

Because this is a Final Report and Recommendation, and there is nothing more pending before the undersigned, I **DIRECT** the Clerk to **TERMINATE** the referral of this civil action to me.

**SO REPORTED AND RECOMMENDED**, this 28th day of March, 2025.

CATHERINE M. SALINAS
UNITED STATES MAGISTRATE JUDGE

---

[Doc. 57]. Even if he had made that argument, it would fail because he has not presented circumstantial evidence to support an inference that Flock intended to retaliate against him.